1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)

2  Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940

3  Walnut Creek, CA  94596
Telephone: (925) 300-4455

4  Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

5          jluster@bursor.com

6  **BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)

7  Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue

8  New York, NY  10019
Telephone: (212) 989-9113

9  Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

10          ndeckant@bursor.com

11  *Attorneys for Plaintiff*
*And the Interested Parties*

12

13                  UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16  PATRICK HENDRICKS, individually and on        Case No. 13-CV-00729-YGR
behalf of all others similarly situated,

17                                                **DECLARATION OF NEAL DECKANT**
                          Plaintiff,            **IN SUPPORT OF PLAINTIFF'S**

18                                                **MOTION FOR CLASS**
          v.                                    **CERTIFICATION**

19
STARKIST CO.,                                   Date:  April 21, 2015

20                                                Time:  2:00 p.m.
                          Defendant.            Courtroom 1, 4th Floor

21
                                                Hon. Yvonne Gonzalez Rogers

22

23

24

25          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

26

27

28

DECLARATION OF NEAL DECKANT
CASE NO. 13-CV-00729-YGR

**DECLARATION OF NEAL DECKANT**

I, Neal Deckant, declare as follows:

    1.    I am an attorney at law licensed to practice in the State of New York.  I have been admitted *pro hac vice* in this matter, and I am an attorney with Bursor & Fisher, P.A., counsel of record for Plaintiff.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

    2.    In *Forcellati v. Hyland's*, No. 12-CV-1983 (C.D. Cal. Mar. 8, 2012), Bursor & Fisher, P.A. provided direct notice to over 500,000 individuals by subpoenaing retailers who sold certain homeopathic cold and flu products at issue.

    3.    In *Ebin v. Kangadis Food, Inc.*, No. 13-CV-2311 (S.D.N.Y. Apr. 8, 2013), Bursor & Fisher, P.A. provided individual notice to nearly 200,000 olive oil purchasers after serving subpoenas on the retailers where the product was sold.

    4.    In *In re Scotts EZ Seed Litigation*, No. 12-CV-4727 (S.D.N.Y. June 15, 2012), Bursor & Fisher, P.A. was able to identify more than 55,000 purchasers of a lawn care product by subpoenaing major retailers where the product was sold.

    5.    Attached hereto as Exhibit A are true and correct copies of a label exemplar of StarKist Chunk Light Tuna in Water.

    6.    ████████████████████████████████████████
█████████████████████████████████████████████████████████████

    7.    Attached hereto as Exhibit C are true and correct copies of excerpts from the transcript of the deposition of Plaintiff Patrick Hendricks.

    8.    ████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████



14.     Attached hereto as Exhibit J are true and correct copies of the Final Judgment Pursuant To Stipulation in *The People of the State of California v. Bumble Bee Foods, LLC; Tri-Union Seafoods, LLC d/b/a Chicken of the Sea Int'l.; and StarKist Co.*, No. RIC1211729 (Cal. Sup. Ct. Aug. 2, 2012).

16. 

17.

18.

19.

20.

21.

22.

23.

24.   ███████████████████████████████████████
████████████████████████████████████████████████
██████████████████

25.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████

26.   ███████████████████████████████████████
████████████████████████████████████████████████
██████████████

27.   Attached hereto as Exhibit W is the firm resume of Bursor & Fisher, P.A.

28.   Attached hereto as Exhibit X is a document listing 41 cases in which consumer classes were certified where purchasers were unlikely to have retained receipts.

29.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

30.   Attached hereto as Exhibit Z are true and correct copies of a screenshot of a website that StarKist maintains dedicated to its canned tuna products, available at https://www.starkist.com/products/starkist-can-products.

31.   Attached hereto as Exhibit AA are true and correct copies of a screenshot of StarKist's Facebook page, showing that it has collected over 458,000 "Likes."

32.   Attached hereto as Exhibit BB are true and correct copies of a screenshot of StarKist's website, where it collects individually identifiable information to distribute coupons to interested consumers.

33.   Attached hereto as Exhibit CC are true and correct copies of screenshots showing that StarKist's retailers have "customer loyalty" programs, which may be used to collect personally identifiable information from purchasers of StarKist Tuna for the purposes of direct notice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare under penalty of perjury under the laws of the United States, the State of California, and the State of New York that the foregoing is true and correct.  Executed on January 20, 2015 at New York, New York.

/s/ Neal J. Deckant
Neal J. Deckant

**EXHIBIT A**









**EXHIBIT B**

**REDACTED**

**EXHIBIT C**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

5   PATRICK HENDRICKS, individually

    and on behalf of all others

6   similarly situated,

7

8                         Plaintiff,

9

10      -vs-                          No. C13-0729-YGR

11

    STARKIST CO.,

12

13                        Defendant.

                                      /

14

15              VIDEOTAPED DEPOSITION OF

16                  PATRICK HENDRICKS

17                  PAGES 1 to 135

18              FRIDAY, NOVEMBER 14, 2014

19

20   Reported by:  LOUISE MARIE SOUSOURES, CSR #3575

21                 Certified LiveNote Reporter

22

23   Merrill File No. SF-014730

24

25

Page 21

| | | |
|---|---|---|
| 1 | MR. FISHER:  Again, caution you not to disclose | 10:19:29 |
| 2 | the communications you've had with us. | 10:19:30 |
| 3 | BY MR. HAWK: | 10:19:30 |
| 4 | Q.   And you specifically mentioned StarKist; is that | 10:19:53 |
| 5 | right? | 10:19:56 |
| 6 | A.   Yes. | 10:19:56 |
| 7 | Q.   And did you have a concern about any other | 10:19:57 |
| 8 | brands of tuna aside from StarKist as far as having an | 10:20:02 |
| 9 | inadequate amount of tuna? | 10:20:06 |
| 10 | A.   No.  Excuse me.  No. | 10:20:08 |
| 11 | Q.   When did you first have this concern about an | 10:20:10 |
| 12 | inadequate amount of tuna in StarKist cans? | 10:20:19 |
| 13 | A.   Well, I can't say exactly.  It's not like my | 10:20:34 |
| 14 | anniversary date or my wedding date, but at a point a few | 10:20:37 |
| 15 | years ago, I began noticing that there was an inadequate | 10:20:43 |
| 16 | amount of tuna than I had previously experienced when | 10:20:49 |
| 17 | purchasing five-ounce cans of StarKist Tuna. | 10:20:55 |
| 18 | Q.   Was it more than ten years ago that you noticed | 10:21:01 |
| 19 | this? | 10:21:04 |
| 20 | A.   No. | 10:21:08 |
| 21 | Q.   Was it more than five years ago? | 10:21:11 |
| 22 | A.   I would say it was between five and ten years | 10:21:14 |
| 23 | ago. | 10:21:17 |
| 24 | Q.   And what was it that led you to contact | 10:21:29 |
| 25 | Mr. Fisher or Bursor & Fisher in January of 2013, given | 10:21:36 |

PATRICK HENDRICKS - 11/14/2014

Page 22

| | | |
|---|---|---|
| 1 | that you had noticed this inadequate amount of tuna years | 10:21:47 |
| 2 | before that? | 10:21:51 |
| 3 | MR. FISHER:  Again, caution you not to disclose | 10:21:54 |
| 4 | communications you've had with us. | 10:21:56 |
| 5 | Otherwise, go ahead and answer his question. | 10:21:58 |
| 6 | THE WITNESS:  I'm not sure how I can do both. | 10:22:04 |
| 7 | I'm not sure how I can answer his question without | 10:22:07 |
| 8 | disclosing the contents of the conversation. | 10:22:10 |
| 9 | BY MR. HAWK: | 10:22:10 |
| 10 | Q.   Let me try and restrict the question. | 10:22:13 |
| 11 | I just want, I guess, an explanation, if you | 10:22:14 |
| 12 | have one, of sort of what was in your mind, what was your | 10:22:19 |
| 13 | reasoning process for, you know, in January 2013 deciding | 10:22:25 |
| 14 | to take this issue of inadequate fill of tuna cans to | 10:22:32 |
| 15 | counsel when, you know, you had noticed it years before. | 10:22:38 |
| 16 | A.   Well, I had an ongoing relationship with | 10:22:43 |
| 17 | Mr. Fisher and I understood that he -- his firm handled | 10:22:48 |
| 18 | these sort of consumer complaints. | 10:22:56 |
| 19 | So I mentioned my suspicions to him. | 10:22:58 |
| 20 | Q.   When did you first mention your suspicions to | 10:23:04 |
| 21 | him? | 10:23:08 |
| 22 | A.   I believe it was in January. | 10:23:08 |
| 23 | Q.   Of 2013? | 10:23:10 |
| 24 | A.   Yes. | 10:23:11 |
| 25 | Q.   All right.  So when you say an inadequate amount | 10:23:12 |

PATRICK HENDRICKS - 11/14/2014

Page 23

```
 1   of tuna, what -- can you tell us, explain to us more what    10:23:17
 2   you mean by that?                                            10:23:25
 3       A.   Sure.  Previously, several years ago when I         10:23:25
 4   purchased StarKist Tuna, I always had more than enough       10:23:34
 5   tuna to make more than one sandwich.  I always had           10:23:40
 6   leftovers.                                                   10:23:44
 7            And a few years ago, it came to my attention        10:23:49
 8   that that wasn't the case anymore.  I started noticing       10:23:52
 9   that there was an inadequate amount, there was less than     10:23:58
10   enough tuna to have leftovers with.                          10:24:02
11       Q.   And you think you noticed that between five and     10:24:09
12   ten years ago?                                               10:24:13
13       A.   Yes.                                                10:24:14
14       Q.   And it was specifically with the five-ounce         10:24:18
15   cans --                                                      10:24:22
16       A.   Yes.                                                10:24:23
17       Q.   -- that you noticed that?                           10:24:24
18       A.   Yes.                                                10:24:26
19            MR. FISHER:  Let him finish his question before     10:24:26
20   you answer.                                                  10:24:28
21            THE WITNESS:  Sorry.                                10:24:29
22            MR. FISHER:  It's okay.                             10:24:29
23   BY MR. HAWK:                                                 10:24:29
24       Q.   Did you ever buy any six-ounce cans of StarKist     10:24:32
25   Tuna?                                                        10:24:39
```

PATRICK HENDRICKS - 11/14/2014

Page 24

| | | |
|---|---|---|
| 1 | A.   I may have once or twice. | 10:24:39 |
| 2 | Q.   And did those six-ounce cans, did they have | 10:24:46 |
| 3 | enough tuna to make a sandwich and make some leftovers? | 10:24:50 |
| 4 | A.   Yes. | 10:24:56 |
| 5 | Q.   And do you know if -- when you -- is it your | 10:24:57 |
| 6 | recollection that, at some point, that there was a | 10:25:07 |
| 7 | transition between can sizes for StarKist where StarKist | 10:25:10 |
| 8 | went from a six-ounce can to a five-ounce can?  Do you | 10:25:17 |
| 9 | remember that? | 10:25:22 |
| 10 | A.   No. | 10:25:23 |
| 11 | MR. FISHER:  Objection, vague, assumes facts not | 10:25:24 |
| 12 | in evidence, lacks foundation. | 10:25:25 |
| 13 | BY MR. HAWK: | 10:25:25 |
| 14 | Q.   Now, when you were noticing that there wasn't | 10:25:28 |
| 15 | enough tuna in a five-ounce can for you to make a | 10:25:35 |
| 16 | sandwich and then have some leftovers, did you observe -- | 10:25:39 |
| 17 | was there any other indication to you that there was an | 10:25:44 |
| 18 | inadequate amount of tuna in the can other than just the | 10:25:51 |
| 19 | sandwich test, if you will? | 10:25:54 |
| 20 | MR. FISHER:  Objection, vague as to time. | 10:25:57 |
| 21 | THE WITNESS:  Well, seemed like there was a lot | 10:25:59 |
| 22 | of water in it. | 10:26:03 |
| 23 | BY MR. HAWK: | 10:26:03 |
| 24 | Q.   And when you use the tuna, do you drain the | 10:26:13 |
| 25 | water off of it first? | 10:26:17 |

PATRICK HENDRICKS - 11/14/2014

Page 26

| | | |
|---|---|---|
| 1 | experiences. | 10:27:35 |
| 2 | Q.   Were those previous experiences with the | 10:27:39 |
| 3 | five-ounce can or six-ounce can or both? | 10:27:42 |
| 4 | A.   Five-ounce can. | 10:27:45 |
| 5 | Q.   So how far down would you say that the tuna came | 10:27:50 |
| 6 | in the can after you squeezed it out where you thought it | 10:27:53 |
| 7 | was inadequate? | 10:27:57 |
| 8 | MR. FISHER:  Objection, vague. | 10:27:59 |
| 9 | THE WITNESS:  I'm sorry, I didn't bring a slide | 10:28:00 |
| 10 | ruler with me when I made my lunch. | 10:28:05 |
| 11 | I didn't really make a scientific determination | 10:28:07 |
| 12 | as to the size.  I just eyeballed it. | 10:28:13 |
| 13 | BY MR. HAWK: | 10:28:13 |
| 14 | Q.   Okay.  So when you began the first time you | 10:28:23 |
| 15 | noted what you thought was an inadequate amount of tuna | 10:28:28 |
| 16 | in a StarKist five-ounce can, was that a consistent | 10:28:31 |
| 17 | finding after that time?  Did you -- did you consistently | 10:28:40 |
| 18 | find the same amount of what you believed to be an | 10:28:46 |
| 19 | inadequate amount of tuna in StarKist cans for all the | 10:28:50 |
| 20 | cans you purchased after that? | 10:28:55 |
| 21 | A.   Yes. | 10:28:57 |
| 22 | MR. FISHER:  Objection, vague. | 10:28:58 |
| 23 | BY MR. HAWK: | 10:28:58 |
| 24 | Q.   And to your perception, it was always the same; | 10:29:05 |
| 25 | is that right?  It was always the same inadequate amount | 10:29:11 |

**PATRICK HENDRICKS - 11/14/2014**

Page 27

| | | |
|---|---|---|
| 1 | of tuna in the can? | 10:29:14 |
| 2 | MR. FISHER:  Objection, vague, asked and | 10:29:17 |
| 3 | answered. | 10:29:18 |
| 4 | THE WITNESS:  Yes. | 10:29:18 |
| 5 | BY MR. HAWK: | 10:29:18 |
| 6 | Q.   Did you ever -- did you ever weigh the tuna in a | 10:29:21 |
| 7 | StarKist can? | 10:29:26 |
| 8 | A.   No. | 10:29:28 |
| 9 | Q.   Why not? | 10:29:31 |
| 10 | A.   Why would I? | 10:29:36 |
| 11 | Q.   I guess to determine whether or not you were | 10:29:39 |
| 12 | getting an adequate amount of tuna. | 10:29:42 |
| 13 | A.   But the can says five ounces. | 10:29:45 |
| 14 | Q.   And what did that tell you, the can saying five | 10:29:51 |
| 15 | ounces? | 10:29:55 |
| 16 | A.   That there's an adequate amount of tuna in the | 10:29:56 |
| 17 | can. | 10:29:59 |
| 18 | Q.   Can you explain that to us?  I mean what is | 10:30:03 |
| 19 | it -- let me back up, ask a different question. | 10:30:07 |
| 20 | Did you understand -- a statement of five ounces | 10:30:10 |
| 21 | on the can, did you understand that meant there was five | 10:30:16 |
| 22 | ounces of tuna in the can? | 10:30:20 |
| 23 | MR. FISHER:  Objection, vague, calls for a legal | 10:30:23 |
| 24 | conclusion. | 10:30:28 |
| 25 | THE WITNESS:  No, I understand there's going to | 10:30:28 |

PATRICK HENDRICKS - 11/14/2014

Page 28

| | | |
|---|---|---|
| 1 | be some water and fill in it, of course, but if I can go | 10:30:30 |
| 2 | back to my previous statement, there was always more than | 10:30:36 |
| 3 | enough tuna for one sandwich. | 10:30:42 |
| 4 | BY MR. HAWK: | 10:30:42 |
| 5 | Q.   Just to be clear, I understand your testimony | 10:30:48 |
| 6 | about, you know, what I referred to as the sandwich test, | 10:30:50 |
| 7 | but I mean seriously, that was your -- based on your | 10:30:56 |
| 8 | testimony. | 10:30:58 |
| 9 | What I want to just be clear is did you do any | 10:31:00 |
| 10 | other test on the tuna before contacting counsel -- | 10:31:04 |
| 11 | THE VIDEOGRAPHER:  Excuse me. | 10:31:10 |
| 12 | THE WITNESS:  I'm sorry.  Could you repeat the | 10:31:24 |
| 13 | question? | 10:31:26 |
| 14 | BY MR. HAWK: | 10:31:26 |
| 15 | Q.   Yes.  I was just going to say before you | 10:31:27 |
| 16 | contacted your lawyer, did you do any other assessment or | 10:31:29 |
| 17 | test on the tuna such as weighing it or putting it in a | 10:31:36 |
| 18 | cup and seeing how high it came as far as volume or | 10:31:41 |
| 19 | taking a ruler and seeing how far down in the can it was, | 10:31:45 |
| 20 | any kind of test whatsoever to determine whether or not | 10:31:49 |
| 21 | there was an adequate amount of tuna in the can? | 10:31:53 |
| 22 | A.   No. | 10:31:58 |
| 23 | MR. FISHER:  Objection, vague. | 10:31:58 |
| 24 | BY MR. HAWK: | 10:31:58 |
| 25 | Q.   So after you initially made this observation | 10:32:02 |

Page 31

| | | |
|---|---|---|
| 1 | A.    Possibly. | 10:35:16 |
| 2 | Q.    As many as 30 -- | 10:35:18 |
| 3 | A.    Probably. | 10:35:19 |
| 4 | Q.    As many as 30 times consistently disappointed it | 10:35:20 |
| 5 | was inadequate? | 10:35:26 |
| 6 | MR. FISHER:  Objection, vague. | 10:35:27 |
| 7 | THE WITNESS:  I think that's about reaching the | 10:35:32 |
| 8 | limit there. | 10:35:34 |
| 9 | BY MR. HAWK: | 10:35:34 |
| 10 | Q.    So probably somewhere between 20 and 30 times | 10:35:38 |
| 11 | you bought StarKist Tuna, disappointed consistently that | 10:35:42 |
| 12 | it was what you thought was an inadequate amount, | 10:35:49 |
| 13 | correct? | 10:35:52 |
| 14 | A.    I had the same buying habits, yes. | 10:35:52 |
| 15 | Q.    Tell us about those buying habits real quickly. | 10:35:55 |
| 16 | About how much tuna in 2008, 2009 did you buy in | 10:35:59 |
| 17 | a month, canned tuna? | 10:36:04 |
| 18 | A.    Probably a couple of cans a week, a couple of | 10:36:15 |
| 19 | five-ounce cans a week. | 10:36:24 |
| 20 | Q.    Two five-ounce cans a week would be your best | 10:36:26 |
| 21 | estimate? | 10:36:30 |
| 22 | A.    That's my best estimate. | 10:36:30 |
| 23 | Q.    So over a hundred cans a year? | 10:36:34 |
| 24 | A.    (Witness moves head up and down.) | 10:36:41 |
| 25 | MR. FISHER:  Answer audibly. | 10:36:43 |

PATRICK HENDRICKS - 11/14/2014

Page 36

```
 1      A.   Seems to me that it would be of lesser quality.    10:42:09
 2      Q.   Did you ever confirm that by actually trying it    10:42:18
 3   and reaching a conclusion on whether or not it was of      10:42:24
 4   lesser quality?                                            10:42:27
 5      A.   I may have bought it once or twice.                10:42:29
 6      Q.   Did you find it to be of lesser quality?           10:42:36
 7      A.   More than likely.                                  10:42:38
 8      Q.   You don't recall?                                  10:42:40
 9      A.   I don't recall.                                    10:42:43
10           MR. FISHER:  Now a good time for a break,          10:42:48
11   Robert?                                                    10:42:51
12           MR. HAWK:  Yes, sir, we can take a break.          10:42:51
13           THE VIDEOGRAPHER:  We are now off the record at    10:42:55
14   10:42.                                                     10:42:56
15           (Recess taken.)                                    10:42:58
16           THE VIDEOGRAPHER:  We are now on the record at     10:52:52
17   10:52.                                                     10:52:58
18   BY MR. HAWK:                                               10:52:58
19      Q.   When is the last time, to the best of your         10:53:00
20   recollection, that you bought a five-ounce can of         10:53:03
21   StarKist Tuna?                                             10:53:06
22      A.   I don't know.                                      10:53:16
23      Q.   Did you buy any StarKist Tuna -- have you bought   10:53:18
24   any since this lawsuit, since you filed this lawsuit?      10:53:21
25      A.   No.                                                10:53:25
```

PATRICK HENDRICKS - 11/14/2014

Page 50

| 1 | A.   No. | 11:14:39 |
| 2 | Q.   And you were generally the only one eating that | 11:14:40 |
| 3 | can of tuna when you would open a can of StarKist Tuna? | 11:14:45 |
| 4 | A.   That's correct. | 11:14:49 |
| 5 | Q.   So at one point in time is it correct you'd make | 11:14:58 |
| 6 | your sandwich and you wouldn't use all the tuna in the | 11:15:02 |
| 7 | can? | 11:15:06 |
| 8 | A.   That's correct. | 11:15:07 |
| 9 | Q.   And how much tuna would you have left over? | 11:15:08 |
| 10 | A.   I'd have enough left over for half to | 11:15:12 |
| 11 | three-quarters of a tuna sandwich the next day. | 11:15:16 |
| 12 | Q.   And then you would make a half or a | 11:15:22 |
| 13 | three-quarter sandwich the next day, was that your | 11:15:25 |
| 14 | practice? | 11:15:28 |
| 15 | A.   That's correct. | 11:15:28 |
| 16 | Q.   And then at some point, you noted that you only | 11:15:33 |
| 17 | had enough for one sandwich and were having no leftovers | 11:15:40 |
| 18 | or maybe only leftovers for a quarter of another | 11:15:43 |
| 19 | sandwich.  What was that? | 11:15:48 |
| 20 | A.   Hardly any leftovers. | 11:15:49 |
| 21 | Q.   Hardly any leftovers. | 11:15:52 |
| 22 |      Can you quantify for us the difference in the | 11:16:03 |
| 23 | tuna that was left over? | 11:16:06 |
| 24 | A.   The amount of tuna? | 11:16:08 |
| 25 | Q.   Yeah, right. | 11:16:09 |

Page 51

| | | |
|---|---|---|
| 1 | A.    There would be maybe -- after I had prepared the | 11:16:18 |
| 2 | tuna with the mayonnaise and the onions and the pickles, | 11:16:22 |
| 3 | there would be maybe a teaspoon or two left over. | 11:16:29 |
| 4 | Q.    So let me get this straight. | 11:16:36 |
| 5 | You would take the entire can of tuna, put it in | 11:16:38 |
| 6 | a bowl and then add the onions and pickles and mayonnaise | 11:16:42 |
| 7 | and then you would use that, put it on the sandwich | 11:16:48 |
| 8 | enough to make a sandwich and then you would have some or | 11:16:52 |
| 9 | not have some leftover tuna mixture -- | 11:16:56 |
| 10 | A.    That's correct. | 11:17:00 |
| 11 | Q.    -- that you would save? | 11:17:01 |
| 12 | A.    That's correct. | 11:17:02 |
| 13 | Q.    Did you ever throw that extra tuna out because | 11:17:10 |
| 14 | you didn't have it the next day on a sandwich? | 11:17:13 |
| 15 | A.    Did I ever -- | 11:17:17 |
| 16 | Q.    Did you ever throw it out because you didn't use | 11:17:18 |
| 17 | it? | 11:17:21 |
| 18 | A.    Because I didn't use it? | 11:17:21 |
| 19 | Q.    Correct. | 11:17:23 |
| 20 | A.    Yeah. | 11:17:24 |
| 21 | Q.    How often would you end up just throwing out the | 11:17:25 |
| 22 | extra tuna? | 11:17:30 |
| 23 | A.    I don't know. | 11:17:33 |
| 24 | MR. FISHER:  Objection, vague. | 11:17:33 |
| 25 | BY MR. HAWK: | 11:17:33 |

PATRICK HENDRICKS - 11/14/2014

Page 62

```
 1    in a five-ounce can that you have purchased since        11:34:10
 2    February 2009?                                           11:34:15
 3        A.   No, I can't.                                    11:34:18
 4            One week I might buy two cans of tuna, another   11:34:26
 5    week I might not buy any tuna, one week I might feel like 11:34:30
 6    I'm going to eat a lot of tuna this week I'm going to be  11:34:35
 7    working at home, another week I'm going to be on the road 11:34:39
 8    so I don't buy any tuna.                                 11:34:44
 9        Q.   One week you might have bought Chicken of the   11:34:45
10    Sea Tuna?                                                11:34:49
11        A.   One week I might have bought Chicken of the Sea 11:34:49
12    Tuna, but I very rarely buy Chicken of the Sea Tuna.  It 11:34:53
13    wasn't in my habit.                                      11:34:56
14        Q.   In 2010 when you stopped buying StarKist Tuna in 11:34:58
15    the five-ounce can, did you stop buying canned tuna or   11:35:03
16    did you switch to another brand?                         11:35:06
17        A.   I switched.                                     11:35:07
18        Q.   And what did you switch to?                     11:35:08
19        A.   Trader Joe's.                                   11:35:12
20        Q.   And have you consistently purchased Trader Joe's 11:35:14
21    canned tuna since 2010?                                  11:35:21
22        A.   My wife does that now.                          11:35:24
23        Q.   Do you buy -- have you bought any other brand of 11:35:29
24    canned tuna since you stopped buying StarKist Tuna other 11:35:34
25    than Trader Joe's?                                       11:35:39
```

PATRICK HENDRICKS - 11/14/2014

Page 63

| | | |
|---|---|---|
| 1 | A.   No. | 11:35:39 |
| 2 | Q.   What is it about Trader Joe's tuna that you | 11:35:40 |
| 3 | like? | 11:35:47 |
| 4 | A.   You'd have to ask my wife. | 11:35:47 |
| 5 | Q.   Well, she's not here.  I'm just going to ask | 11:35:50 |
| 6 | you, do you like Trader Joe's tuna? | 11:35:53 |
| 7 | A.   It's okay. | 11:35:56 |
| 8 | Q.   You like it as well or better or less than the | 11:35:57 |
| 9 | StarKist Tuna that you ate? | 11:36:02 |
| 10 | A.   Well, it certainly has more tuna in it than | 11:36:03 |
| 11 | StarKist. | 11:36:07 |
| 12 | Q.   What size of can do you buy? | 11:36:07 |
| 13 | A.   The same size, five-ounce. | 11:36:10 |
| 14 | Q.   And how do you know it has more tuna in the can? | 11:36:14 |
| 15 | A.   It's obvious from looking at it. | 11:36:21 |
| 16 | Q.   So what is it -- describe for us -- | 11:36:23 |
| 17 | A.   It's packed tightly, you can see that it's | 11:36:27 |
| 18 | packed tightly and that there's a fair amount of tuna | 11:36:30 |
| 19 | inside of it. | 11:36:34 |
| 20 | My wife's an avid tuna eater, she eats tuna for | 11:36:35 |
| 21 | good nutrition and good diet. | 11:36:40 |
| 22 | So we keep a lot of tuna stocked in the house, a | 11:36:43 |
| 23 | lot of Trader Joe's tuna. | 11:36:48 |
| 24 | Q.   Do you -- does it have less water or the same | 11:36:53 |
| 25 | amount of water? | 11:36:55 |

Page 78

| | | |
|---|---|---|
| 1 | Q.   Because you would always expect more is your | 12:15:26 |
| 2 | testimony -- | 12:15:30 |
| 3 | A.   I would always -- I would always expect more | 12:15:30 |
| 4 | than one sandwich's worth of tuna. | 12:15:39 |
| 5 | Q.   Well, what was the reason that you stopped | 12:16:11 |
| 6 | purchasing StarKist Tuna? | 12:16:15 |
| 7 | A.   It finally got to the point where it was | 12:16:20 |
| 8 | consistent -- it was obvious that it was consistently | 12:16:29 |
| 9 | less tuna than I had previously experienced. | 12:16:34 |
| 10 | There was consistently less tuna than I had | 12:16:41 |
| 11 | previously experienced. | 12:16:46 |
| 12 | In addition to this, my wife, we began | 12:16:47 |
| 13 | cohabitating, she started buying the groceries, she | 12:16:53 |
| 14 | switched us to Trader Joe's tuna, albacore tuna. | 12:16:57 |
| 15 | It was more nutritional. | 12:17:03 |
| 16 | So on both counts, StarKist lost.  They lost my | 12:17:05 |
| 17 | brand loyalty due to their practices of not putting the | 12:17:12 |
| 18 | old amount of tuna in the can and they lost because my | 12:17:20 |
| 19 | wife found a better tuna. | 12:17:25 |
| 20 | Q.   And once your wife started buying or directing, | 12:17:36 |
| 21 | making the decision that you would buy Trader Joe's tuna, | 12:17:41 |
| 22 | did you ever buy StarKist Tuna like onesie-twosie after | 12:17:45 |
| 23 | that time? | 12:17:51 |
| 24 | A.   No. | 12:17:51 |
| 25 | Q.   It was cold turkey? | 12:17:52 |

PATRICK HENDRICKS - 11/14/2014

Page 91

| | | |
|---|---|---|
| 1 | Q.   Well, you think they were 20 percent | 13:19:36 |
| 2 | underweight? | 13:19:40 |
| 3 | A.   I have no idea. | 13:19:41 |
| 4 | Q.   Could it have been as little as five percent | 13:19:44 |
| 5 | underweight? | 13:19:47 |
| 6 | A.   I have no idea. | 13:19:48 |
| 7 | Q.   Turn over, please, sir in your complaint | 13:20:02 |
| 8 | Exhibit 2 to paragraph 14, it's on page 3. | 13:20:05 |
| 9 | That paragraph reads "The claims of the named | 13:20:10 |
| 10 | plaintiff are typical of the claims of the class in that | 13:20:15 |
| 11 | the named plaintiff purchased StarKist Tuna in reliance | 13:20:19 |
| 12 | on the representations and warranties described above, | 13:20:24 |
| 13 | and suffered a loss as a result of that purchase." | 13:20:28 |
| 14 | What loss did you suffer, sir? | 13:20:33 |
| 15 | A.   I'm sorry, I -- | 13:20:36 |
| 16 | MR. FISHER:  You're on the next page. | 13:20:37 |
| 17 | BY MR. HAWK: | 13:20:37 |
| 18 | Q.   Paragraph 14, page 3. | 13:20:40 |
| 19 | A.   Can you repeat that? | 13:20:44 |
| 20 | Q.   Sure. | 13:20:45 |
| 21 | A.   Thank you. | 13:20:46 |
| 22 | Q.   You might just read paragraph 14 to yourself, | 13:20:48 |
| 23 | but my question to you is:  What loss did you suffer as a | 13:20:52 |
| 24 | result of your purchase of StarKist Tuna? | 13:20:58 |
| 25 | A.   I got cheated. | 13:21:01 |

PATRICK HENDRICKS - 11/14/2014

Page 92

| | | |
|---|---|---|
| 1 | MR. FISHER:  Objection, vague, calls for a legal | 13:21:03 |
| 2 | conclusion. | 13:21:05 |
| 3 | You can answer. | 13:21:05 |
| 4 | THE WITNESS:  I was cheated. | 13:21:06 |
| 5 | BY MR. HAWK: | 13:21:06 |
| 6 | Q.   What were you cheated out of? | 13:21:08 |
| 7 | A.   I was cheated out of a fair amount and adequate | 13:21:09 |
| 8 | amount of tuna. | 13:21:12 |
| 9 | Q.   No way you can quantify that? | 13:21:15 |
| 10 | MR. FISHER:  Objection, vague, calls for a legal | 13:21:18 |
| 11 | conclusion. | 13:21:20 |
| 12 | THE WITNESS:  I've already answered that in the | 13:21:20 |
| 13 | best way that I can. | 13:21:23 |
| 14 | BY MR. HAWK: | 13:21:23 |
| 15 | Q.   Which is the sandwich -- | 13:21:28 |
| 16 | A.   The sandwich measurement. | 13:21:30 |
| 17 | Q.   The sandwich method, all right. | 13:21:31 |
| 18 | Turn over, please, to page 4, paragraph 19, | 13:21:37 |
| 19 | defendant as the designer -- are you over there with me | 13:22:44 |
| 20 | at paragraph 19? | 13:22:47 |
| 21 | A.   I'm with you this time, sir. | 13:22:48 |
| 22 | Q.   "Defendant, as the designer, manufacturer, | 13:22:50 |
| 23 | marketer, distributor and/or seller expressly warranted | 13:22:55 |
| 24 | that StarKist Tuna contained an adequate amount of tuna | 13:22:59 |
| 25 | for a five-ounce can and that StarKist Tuna is legal for | 13:23:04 |

Page 109

| | | |
|---|---|---|
| 1 | A.   No, sir. | 13:52:24 |
| 2 | Q.   I think that's all I have on 6. | 13:52:34 |
| 3 |      When you first spoke to counsel about this | 13:52:50 |
| 4 | lawsuit, about being a plaintiff in this lawsuit, did you | 13:52:54 |
| 5 | have any StarKist Tuna at home at that point in time? | 13:52:58 |
| 6 | A.   I don't think so.  I believe I had stopped | 13:53:06 |
| 7 | buying it. | 13:53:10 |
| 8 | Q.   Do you understand that you have certain duties | 13:53:27 |
| 9 | or responsibilities as the named plaintiff in a putative | 13:53:29 |
| 10 | class action such as this one? | 13:53:36 |
| 11 | A.   Yes, I understand that. | 13:53:37 |
| 12 | Q.   What is your understanding of those | 13:53:39 |
| 13 | responsibilities? | 13:53:42 |
| 14 | A.   My understanding is to represent the people in | 13:53:42 |
| 15 | this country and in this state who have been cheated by | 13:53:46 |
| 16 | StarKist in receiving their fair amount or adequate | 13:53:54 |
| 17 | amount of tuna in their purchases of StarKist Tuna, | 13:53:57 |
| 18 | particularly the five-ounce cans. | 13:54:04 |
| 19 | Q.   When you say "represent," any other -- any | 13:54:08 |
| 20 | specific responsibilities or obligations you understand | 13:54:11 |
| 21 | that you have? | 13:54:14 |
| 22 | A.   That they receive a fair compensation for this | 13:54:17 |
| 23 | and that StarKist stop. | 13:54:27 |
| 24 | Q.   Do you intend to buy StarKist Tuna in the | 13:54:36 |
| 25 | future? | 13:54:39 |

PATRICK HENDRICKS - 11/14/2014

Page 111

| | | |
|---|---|---|
| 1 | Q.   So unless and until there was some determination | 13:56:14 |
| 2 | that you were comfortable with in this lawsuit, you | 13:56:18 |
| 3 | wouldn't buy StarKist Tuna? | 13:56:21 |
| 4 | A.   That's correct. | 13:56:23 |
| 5 | Q.   How much time, sir, to date, have you devoted to | 13:56:44 |
| 6 | this lawsuit? | 13:56:48 |
| 7 | A.   Today? | 13:56:49 |
| 8 | Q.   To date. | 13:56:50 |
| 9 | A.   To date.  A good 30 to 40 hours. | 13:56:51 |
| 10 | Q.   You have a signed agreement with your attorneys? | 13:57:11 |
| 11 | A.   Yes. | 13:57:14 |
| 12 | Q.   Tell me this, did you recover any money as a | 13:57:15 |
| 13 | result of your participation as a named plaintiff in the | 13:57:27 |
| 14 | AT&T lawsuit? | 13:57:33 |
| 15 | MR. FISHER:  I'm going to instruct you not to | 13:57:34 |
| 16 | answer on the grounds that the arbitration you had with | 13:57:36 |
| 17 | AT&T -- in the AT&T case is confidential. | 13:57:40 |
| 18 | THE WITNESS:  I can't answer that. | 13:57:42 |
| 19 | BY MR. HAWK: | 13:57:42 |
| 20 | Q.   Do you have any expectation of receiving any | 13:57:44 |
| 21 | payment in this case? | 13:57:47 |
| 22 | MR. FISHER:  Objection, vague. | 13:57:49 |
| 23 | THE WITNESS:  No. | 13:57:57 |
| 24 | BY MR. HAWK: | 13:57:57 |
| 25 | Q.   Why is that? | 13:58:04 |

Page 129

| | | |
|---|---|---|
| 1 | MR. HAWK: Objection, leading. | 14:48:08 |
| 2 | THE WITNESS: Yes, it was an objection that grew | 14:48:09 |
| 3 | over time. | 14:48:11 |
| 4 | BY MR. FISHER: | 14:48:11 |
| 5 | Q. A suspicion that grew over time? | 14:48:12 |
| 6 | A. A suspicion that grew over time, sorry. | 14:48:15 |
| 7 | MR. HAWK: Same objection. | 14:48:18 |
| 8 | BY MR. FISHER: | 14:48:20 |
| 9 | Q. Was there a point where you became convinced | 14:48:20 |
| 10 | there was not enough tuna in a StarKist can? | 14:48:22 |
| 11 | MR. HAWK: Objection, leading, cumulative, asked | 14:48:27 |
| 12 | and answered. | 14:48:31 |
| 13 | THE WITNESS: Yeah, I got tired of there not | 14:48:31 |
| 14 | being enough tuna in the can as usual and I had just | 14:48:33 |
| 15 | gotten married and my wife likes tuna a lot. | 14:48:36 |
| 16 | So it seemed like the right time to stop buying | 14:48:41 |
| 17 | StarKist. I didn't want to buy StarKist anymore because | 14:48:45 |
| 18 | I felt like there wasn't enough tuna in it, I was being | 14:48:48 |
| 19 | cheated, the wife preferred Trader Joe's tuna, so we just | 14:48:53 |
| 20 | stopped buying StarKist. | 14:48:57 |
| 21 | BY MR. FISHER: | 14:48:59 |
| 22 | Q. When do you think the last time you bought | 14:48:59 |
| 23 | StarKist Tuna was? | 14:49:03 |
| 24 | A. 2010, around 2010, when she moved in. She moved | 14:49:03 |
| 25 | in in 2010. | 14:49:08 |

PATRICK HENDRICKS - 11/14/2014

Page 132

```
 1    questions about the FDA testing of tuna?           14:51:39

 2        A.   Oh, correct, yeah.                         14:51:41

 3        Q.   And do you know anything about how the FDA tests   14:51:42

 4    tuna?                                               14:51:45

 5        A.   I have no idea how the FDA tests tuna or any   14:51:45

 6    other foods.                                        14:51:49

 7        Q.   Do you think they open up the cans and look at   14:51:50

 8    them to do the testing?                             14:51:52

 9        A.   I have no idea.                             14:51:53

10        Q.   Do you think that's how they would do it?  Do   14:51:55

11    you have any reason to think that would be the way they   14:51:58

12    would do it?                                        14:52:01

13        A.   Like he just did?                          14:52:02

14        Q.   Like he just did now.                      14:52:04

15        A.   Like maybe, I don't know.                  14:52:07

16        Q.   What are you hoping to get out of this case?   14:52:09

17        A.   I'm hoping to get out of this fair compensation   14:52:11

18    for my time and energy.                             14:52:15

19             I'm hoping that my -- the people that I'm   14:52:17

20    representing get compensated for their losses of tuna,   14:52:21

21    get fair compensation for their losses and I'm hoping   14:52:28

22    that StarKist stops practicing deceptive practices.   14:52:31

23             MR. FISHER:  I have nothing further.        14:52:37

24             MR. HAWK:  Hold on for just a second.  We can go   14:52:40

25    off the record now.                                 14:52:46
```

**EXHIBIT D**

**REDACTED**

**EXHIBIT E**

**REDACTED**

**EXHIBIT F**

**REDACTED**

**EXHIBIT G**

**REDACTED**

**EXHIBIT H**

**REDACTED**

**EXHIBIT I**

**REDACTED**

**EXHIBIT J**

AUG 0 2 2012

1   PAUL ZELLERBACH
    District Attorney, County of Riverside
2   ELISE J. FARRELL, State Bar No. 100929
    Deputy District Attorney
3   3960 Orange Street
    Riverside, CA 92501
4   Telephone: (951) 955-5400

5   EDWARD S. BERBERIAN, JR.
    District Attorney, County of Marin
6   ANDRES H. PEREZ, State Bar No. 186219
    Deputy District Attorney
7   3501 Civic Center Dr., Rm. 130
    San Rafael, CA 94903
8   Telephone: (415) 499-6450

9   BONNIE DUMANIS
    District Attorney, County of San Diego
10  GINA DARVAS, State Bar No. 163221
    Deputy District Attorney
11  330 W. Broadway
    San Diego, CA 92101
12  Telephone: (619) 531-4070

13

14  Attorneys for Plaintiff

15          SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                    COUNTY OF RIVERSIDE

17  THE PEOPLE OF THE STATE OF CALIFORNIA,   Case#: RIC 1211729

18                    Plaintiff,

19          v.                                FINAL JUDGMENT PURSUANT TO
                                              STIPULATION
20  BUMBLE BEE FOODS, LLC; TRI-UNION
21  SEAFOODS, LLC d/b/a CHICKEN OF THE SEA
    INTERNATIONAL; and STARKIST CO.;
22
            Defendants.
23

24

25      THE PEOPLE OF THE STATE OF CALIFORNIA have filed its Complaint in this matter,

26  appearing through its attorneys PAUL ZELLERBACH, District Attorney for the County of

27  Riverside, by Deputy District Attorney Elise J. Farrell; EDWARD S. BERBERIAN, JR., District

28  Attorney, County of Marin, by Deputy District Attorney Andres H. Perez; and BONNIE

1

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE
AUG 02 2012
S.Hopkins-Bright

1   DUMANIS, District Attorney, County of San Diego, by Deputy District Attorney Gina Darvas.

2   Defendants, BUMBLE BEE FOODS, LLC, appearing through its attorneys Goodwin Proctor, LLP

3   by Forrest A. Hainline III and Zackler & Associates, by Allan I. Zackler; TRI-UNION

4   SEAFOODS, LLC d/b/a CHICKEN OF THE SEA INTERNATIONAL, appearing through its

5   attorneys Patton Wolan Carlise LLP by Roger W. Patton; and STARKIST CO., appearing through

6   its attorneys Procopio, Cory, Hargreaves & Savitch, LLP by Edward C. Walton; in lieu of filing

7   responsive pleadings to the Complaint, Defendants, and each of them, have stipulated with Plaintiff

8   to the entry of this Final Judgment Pursuant to Stipulation ("Judgment") without the court taking

9   evidence, and without this Judgment constituting an admission by any Defendant regarding any

10  issue of law or fact.  All parties agree that they jointly participated in the drafting of the Stipulation

11  for Entry of Final Judgment upon which this Judgment is based, and that Civil Code section 1654

12  shall have no application to any interpretation of said Stipulation.  The parties waive the right to

13  appeal this Judgment both as to form and content.

14          This court having considered the pleadings and the Stipulation for Entry of Final Judgment

15  and good cause appearing therefore;

16          IT IS HEREBY ORDERED, ADJUDGED AND DECREED, THAT:

17                                  **JURISDICTION**

18      1.      This court has jurisdiction of the subject matter hereof and the parties hereto.

19                                  **APPLICABILITY**

20      2.      This Judgment is applicable to each Defendant and its respective officers,

21   directors, representatives, successors, and assignees, and all persons, partnerships, corporations,

22  and other entities acting under, by through, on behalf of, or in concert with Defendants, with

23  actual or constructive knowledge of this Judgment.

24                                  **INJUNCTION**

25      3.      Pursuant to Business and Professions Code sections 17203 and 17535, Defendants,

26   and each of them, are enjoined and restrained from distributing in or from California any

27  canned tuna product regulated by the Standard of Identity set forth in the Code of Federal

28  Regulations, Title 21, Section 161.190 (hereafter "SOI") that is "seasoned or flavored" with

2

vegetable broth, within the meaning of that Section (hereafter "Regulated Products"), and that does not meet the fill of container requirements set forth in subsection (c) of that Section (hereafter "Fill Requirements") until such time as the Fill Requirements are abolished or the Federal Food and Drug Administration grants a Defendant an exemption or variance from the Fill Requirements for Regulated Products by means of a Temporary Marketing Permit or other regulatory action, and then only to the Defendant granted the exemption or variance

4.     Any Party shall have the right to seek modification of paragraph 3 of this Judgment in the event of enactment of a material amendment to the Fill Requirements. Prior to seeking such modification, the seeking Party shall provide written notice to the remaining parties stating that said Party intend(s) to seek modification. The Parties agree to meet and confer about modification within thirty (30) days following notice. If the parties agree on modification, the parties will enter a stipulated modified judgment, with approval of the Court. If the parties are unable to agree on modification, the Party seeking modification may file a motion with the Court seeking a modification of the Judgment

5.     The provisions of this Judgment shall not apply to any Regulated Products that have already been manufactured prior to the entry of this Judgment.

### QUALITY CONTROL

6.     Each Defendant shall test every lot of Regulated Products it manufactures and offers for sale to consumers in California until expiration of the injunction provision of this Judgment to ensure that the Defendant is meeting the Fill Requirements for such Regulated Products. Each Defendant shall record the results of each test and shall make those results available to the District Attorney's Offices of Riverside, Marin, or San Diego, and to the Department of Measurement Standards, within 15 days of a written request to that Defendant.

### COMPLIANCE

7.     Each Defendant shall specifically advise the following persons of the injunctive provisions of this Judgment: (a) current officers and directors; (b) officers or directors who are appointed or elected within one year of the date of entry of this Judgment, and (c) any and all persons responsible for packaging the Defendants' Regulated Products at any time during the

3

1   two years following the date of entry of this Judgment.

2       8.      Each Defendant shall use good faith efforts to make available and fully and clearly

3   explain the injunctive language of this Judgment, including the terms and conditions thereof, to

4   each of its tuna canning contractors, its designers of tuna cans and/or any person or entity who is

5   responsible for the canning of Regulated Products offered by the Defendants and each of them

6   to California consumers.

7                           **MONETARY PROVISIONS**

8       9.      Pursuant to Business and Professions Code sections 12015.5, 17206, and 17536,

9   Defendants shall pay a total of $3,300,000 (Three Million Three Hundred Thousand Dollars) in

10  settlement of this matter, divided up as set forth below.  One payment of $3,000,000 (Three

11  Million) shall be made by cashier or business check to "County of Riverside District Attorney's

12  Office" to be paid upon entry of the Judgment, and sent to Elise J. Farrell, Riverside County

13  District Attorney's Office, Special Prosecutions Section, 3960 Orange Street, Riverside, CA

14  92501. Riverside County District Attorney's Office will disburse the monies as follows:

15      A.      A check in the amount of $ 86,000 (Eighty Six Thousand Dollars) shall be made

16              payable to Cashier, State of California Department of Food and Agriculture

17              Division of Measurement Standards for costs of investigation. Of that amount,

18              $62,000 (Sixty Two Thousand Dollars) is to be used specifically for the Division

19              of Measurement Standards quantity and price verification program.

20      B.      Costs of investigation to the following entities paid by separate and individual

21              checks to the entities in the amounts described, as follows:

22              a.  Los Angeles County, Division of Weights and Measures          $715.00

23              b.  Orange County Agricultural Commissioner                       $2772.00

24              c.  Riverside County, Division of Weights and Measures            $688.00

25              d.  San Bernardino County, Division of Weights and Measures       $538.00

26              e.  San Diego County, Division of Weights and Measures            $787.00

27      C.      A check in the amount of $969,500 (Nine Hundred Sixty Nine Thousand Five

28              Hundred Dollars) shall be made payable to the Marin County District Attorney's

                                    4

Office: $ 849,500 shall be allocated as civil penalties pursuant to California Business and Professions Code section 17206 and 17536; and $ 120,000 shall be allocated as costs of investigation.

D.   The amount of $969,500 (Nine Hundred Sixty Nine Thousand Five Hundred Dollars) shall be retained by the Riverside County District Attorney's Office: $ 849,500 shall be allocated as civil penalties pursuant to California Business and Professions Code section 17206 and 17536; and $ 120,000 shall be allocated as the costs of its investigation.

E.   A check in the amount of $969,500 (Nine Hundred Sixty Nine Thousand Five Hundred Dollars) shall be made payable to the San Diego County District Attorney's Office: $849,500 shall be allocated as civil penalties pursuant to California Business and Professions Code section 17206 and 17536; and $ 120,000 shall be allocated as the costs of its investigation.

10.   Recognizing the infeasibility of identifying consumers who suffered actual loss, the impracticality of providing direct restitution to said consumers, and the disproportionate cost of making restitution to individual consumers, which would far exceed the benefit consumers would gain, the parties agree that Defendants shall pay restitution, pursuant to Business and Professions Code sections 17203 and 17535, under the doctrine of *cy pres* in the sum of $300,000 (Three Hundred Thousand Dollars) of canned tuna at retail price within 120 days of entry of this Judgment. Said restitution shall be in the form of canned tuna distributed to food banks throughout the State of California who are members of the California Association of Food Banks and which have status as charitable organizations pursuant to IRS Code section 501(c)(3). Within 180 days of entry of this Judgment, Defendants shall deliver to the District Attorney's Office of Riverside proof of distribution of the canned tuna including the names of the recipient food banks, the amount of tuna distributed to each food bank, and the retail value of the tuna delivered to each food bank. Defendants shall bear all costs associated with this

////

////

5

1  restitution program.

2  ### FAIR, JUST AND EQUITABLE SETTLEMENT

3      11.    The court having reviewed the Complaint, Stipulation and this Judgment, has
4  taken into consideration the sales of products throughout the state for the purpose of assessing
5  penalties and finds the penalties, injunctive provisions, and costs are fair, reasonable and
6  appropriate. The court further finds the *cy pres* restitution to be paid by Defendants is for the
7  benefit of consumers statewide, and is fair, reasonable and appropriate. The court further finds
8  that this Judgment is a fair, full, equitable and a final resolution and disposition of all those
9  matters stated in the Complaint on file herein.

10  ### NO WAIVER

11      12.    Defendants' Stipulation to this Judgment is not, and will not be construed as, a
12  waiver of any defense, whether factual, legal, equitable or constitutional, that they or any of
13  them had, has or will have to the enforceability of the press Fill Requirements of the SOI.  In
14  any action to enforce this Judgment, including but not limited to any contempt proceedings, any
15  party against whom such enforcement is sought may raise any and all available and potential
16  defenses against the enforceability of the Fill Requirements of the SOI, notwithstanding the
17  existence of the Stipulation for Entry of Final Judgment and this Judgment.  This Judgment is
18  not intended to and does not adjudicate or decide any issues of law or fact for purposes of the
19  doctrines of collateral estoppel and res judicata.

20  ### NO ADMISSION OF LIABILITY

21      13.    This Judgment is not to be construed as an admission of liability by any party.
22  This Judgment was entered into as a result of a stipulation of the parties, without admission of
23  fact or law, and without any admission by any of the Defendants, or any related party, of
24  liability, wrongdoing, illegality or any fact alleged in the Complaint.

25  ### RETENTION OF JURISDICTION

26      14.    Jurisdiction is retained for the purpose of enabling any party to this Judgment to
27  apply to the Court at any time for such orders and directions as may be necessary and
28  appropriate for the construction of or the carrying out of this Judgment, for the modification or

FINAL JUDGMENT PURSUANT TO STIPULATION

1  termination of any of the injunctive provisions of the Judgment, and for the enforcement of
2  compliance herewith and for punishment of violations hereof.

3       15.    Except as otherwise provided herein, each party shall bear its own costs of suit,
4  including attorneys' fees.

5       16.    This is a Final Judgment that fully and finally disposes of all claims asserted, or
6  which could have been asserted, in the Complaint, and shall take effect immediately upon entry
7  hereof.

8  DATED: _Aug 2_____ ,2012

9

10

11  _____
12      JUDGE OF THE SUPERIOR COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          7

**EXHIBIT K**

**REDACTED**

**EXHIBIT L**

**REDACTED**

**EXHIBIT M**

**REDACTED**

**EXHIBIT N**

**REDACTED**

**EXHIBIT O**

**REDACTED**

**EXHIBIT P**

**REDACTED**

**EXHIBIT Q**

**REDACTED**

**EXHIBIT R**

**REDACTED**

**EXHIBIT S**

**REDACTED**

**EXHIBIT T**

**REDACTED**

**EXHIBIT U**

**REDACTED**

**EXHIBIT V**

**REDACTED**

**EXHIBIT W**

# BURSOR & FISHER
P.A.

www.bursor.com

888 SEVENTH AVENUE                              1990 NORTH CALIFORNIA BLVD.
NEW YORK, NY 10019                              WALNUT CREEK, CA 94596

## FIRM RESUME

With offices in New York and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country, primarily in the fields of telecommunications, pharmaceuticals, and dietary supplements.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in five of five civil jury trials since 2008. Our most recent trial victory came in August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel and won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Verizon Wireless, AT&T Wireless, Cingular Wireless, Sprint, T-Mobile, General Electric, Haier America, and Michaels Stores as well as purchasers of Avacor™, Xenadrine™, and Sensa™ products. In 2014, our lawyers certified two nationwide consumer classes of consumers pursuant to contested class certification motions (*see Ebin* and *Forcellati*, *infra*). Since December 2010, Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

  i.    *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

  ii.   *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

  iii.  *In re Haier Freezer Consumer Litigation* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

  iv.   *Loreto v. Coast Cutlery Co.* (D.N.J. Sep. 8, 2011) to represent a certified nationwide class of purchasers of knives or tools made by Coast Cutlery,

  v.    *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

vi.  *Avram v. Samsung Electronics America, Inc., et al.* (D.N.J. Jan. 3, 2012), to represent a proposed nationwide class of purchasers of mislabeled refrigerators from Samsung Electronics America, Inc. and Lowe's Companies, Inc.,

vii.  *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012), to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

viii.  *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012), to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

ix.  *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012), to represent a certified nationwide class of purchasers of Sensa weight loss products,

x.  *Dei Rossi v. Whirlpool Corp. et al.* (E.D. Cal. Apr. 19, 2012), to represent a proposed nationwide class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

xi.  *In re Scotts EZ Seed Litig.* (S.D.N.Y. Sept. 19, 2012), to represent a proposed nationwide class of purchasers of Scotts Turf Builder EZ Seed,

xii.  *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers of Sinus Buster products,

xiii.  *Scott v. JPMorgan Chase & Co., et al.* (S.D.N.Y. May 30, 2013) to represent a proposed nationwide class of Chase customers who were allegedly unilaterally enrolled into Chase's Overdraft Protection service and charged unauthorized fees,

xiv.  *Podobedov v. Living Essentials, LLC,* (C.D. Cal. Nov. 8, 2013) to represent a proposed nationwide class of purchasers of 5-hour Energy products,

xv.  *Ebin v. Kangadis Food Inc.,* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

xvi.  *Forcellati v. Hyland's, Inc.,* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies, and

xvii.  *Melgar v. Zicam LLC, et al.* (E.D. Cal. Oct. 29, 2014) to represent a proposed nationwide class of purchasers of homeopathic cold remedy.

BURSOR&FISHER
P.A.

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in five of five civil jury trials since 2008. Mr. Bursor's most recent victory came in August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which he served as lead trial counsel and won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's perfect record of five wins in five class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer. Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996. He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate with Cravath, Swaine & Moore (1996-2000) and Chadbourne & Parke LLP (2001), where he represented large telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second Circuit, United States Court of Appeals for the Third Circuit, United States Court of Appeals for the Fourth Circuit, United States Court of Appeals for the Sixth Circuit, United States Court of Appeals for the Ninth Circuit, United States Court of Appeals for the Eleventh Circuit, United States District Courts for the Southern and Eastern Districts of New York, United States District Courts for the Northern, Central, Southern and Eastern Districts of California, and the United States District Courts for the Southern and Middle Districts of Florida.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications. These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation. Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class. Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert. This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members, and ensured that the class would recover in excess of $275 million.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*. After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement. The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, provides for a $20 million cash payment to provide

refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and includes an injunction that will reduce late fee charges by $18.6 million over 28 months.

## L. TIMOTHY FISHER

Mr. Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.  Prior to founding Bursor & Fisher, P.A. in 2011, Mr. Fisher was an associate with Bramson, Plutzik, Mahler & Birkhaeuser, LLP in Walnut Creek, California for 13 years.  During his career, he has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors.  Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud.  With his partner Scott A. Bursor, Mr. Fisher has tried four class action jury trials, all of which produced successful results.  In the initial phase of *Thomas v. Global Vision Products*, the jury awarded the plaintiff class more than $36 million plus punitive damages, while the Court awarded a $40 million recovery on separate legal claims. In a subsequent phase of the trial against individual defendants, Mr. Fisher and Mr. Bursor obtained a jury award of $50,024,611 – the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997.  He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California.  Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  Recently, Mr. Fisher contributed jury instructions, a verdict form, and comments to the consumer protection chapter of Justice Elizabeth A. Baron's *California Civil Jury Instruction Companion Handbook* (West 2010).  In 2014, Mr. Fisher was appointed to a four-year term as a member of the Standing Committee on Professional Conduct for the United States District Court for the Northern District of California.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997.  While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States.  In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition.  In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### *Representative Cases*

- *Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class

in the amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

- *In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems.  Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions.  The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

- *In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission).  In separate cases that are a part of the same coordinated litigation as the Handset Locking Cases, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million.  In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

- *Guyette v. Viacom, Inc.* (Alameda County Superior Court) - Mr. Fisher was co-counsel for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.  A settlement was negotiated shortly before trial under which defendants paid the class $13 million in cash.

- *In re Haier Freezer Consumer Litigation* (Northern District of California) - Mr. Fisher filed the case in June 2011 and alleged that Haier had misrepresented the energy consumption of its HNCM070E freezer on the ENERGYGUIDE labels attached to the freezers.  After two years of litigation, District Judge Edward J. Davila approved a nationwide settlement valued at $4 million, which provides for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

### ***Selected Published Decisions***

- *In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010)

- *In re Cellphone Termination Fee Cases*, 180 Cal.App.4th 1110 (2009)

- *Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007)

## JOSEPH I. MARCHESE

Mr. Marchese is a Partner with Bursor & Fisher, P.A.  Mr. Marchese focuses his practice on complex business litigation and consumer class actions.  Prior to joining Bursor & Fisher, Mr. Marchese was an associate with DLA Piper and Shearman & Sterling where he litigated complex

commercial matters on behalf of investment banks, pharmaceutical companies, insurance carriers, food manufacturers, and tobacco companies.

Mr. Marchese is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York, as well as the United States Court of Appeals for the Second Circuit.

Mr. Marchese graduated from Boston University School of Law in 2002 where he was a Member of The Public Interest Law Journal.  In 1998, Mr. Marchese graduated with honors from Bucknell University where he earned a B.S.B.A.

### *Representative Cases*

- *Rossi v. The Procter & Gamble Co.* (District of New Jersey) – Mr. Marchese filed the first nationwide consumer class action lawsuit alleging Crest Sensitivity Treatment & Protection toothpaste ("CSTP") was not effective as advertised, and was essentially identical to an existing brand called Crest Pro-Health toothpaste, with only three differentiating features: (1) claims of rapid relief for tooth sensitivity on the product packaging; (2) a different coloring additive; and (3) a 75% price premium over Crest Pro-Health.  The plaintiff defeated defendant's motion to dismiss before negotiating a settlement with P&G.  District Judge Jose L. Linares granted final approval of the nationwide class settlement which provides class members with a monetary refund of at least $4.00 per tube of CSTP.

- *In Re Michaels Stores Pin Pad Litigation* (Northern District of Illinois) – Mr. Marchese filed the first nationwide consumer class action against Michaels Stores concerning a data breach that resulted in the unauthorized release of customers' financial data.  He actively litigated claims that Michaels failed to secure customer personal financial data appropriately, and failed to provide adequate notice to its customers whose information and funds were stolen as a result of the breach at 86 Michaels stores across the country.  After two years of litigation, District Judge Thomas M. Durkin approved a nationwide settlement that requires Michaels to create a monetary fund from which class members could receive full reimbursement for monetary losses arising from the data breach.  Also, every settlement class member was entitled to credit monitoring services for early detection of identity theft and credit fraud.  As part of the settlement Michaels also verified that it had implemented strict new security measures to protect its customers from similar data breaches in the future.

- *Cox et al. v. Clarus Marketing Group, LLC et al.* (Southern District of California) – Mr. Marchese actively litigated claims for a nationwide class of online shoppers who made purchases on Provide-Commerce websites and who were deceptively enrolled in an online service, Freeshipping.com, for which they were charged unauthorized membership fees.  The plaintiffs alleged that they were secretly enrolled in a "Freeshipping" rewards program using the aggressive Internet marketing practice known as "data pass," where Provide-Commerce engaged in the unauthorized sharing and charging of customers' billing information with a third-party vendor.  After more than two years of litigation, District Judge Marilyn L. Huff approved a nationwide settlement valued at over $2.65 million, which included monetary reimbursement to settlement class members for their unauthorized membership charges.

### *Selected Published Decisions*

- *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518 (N.D. Ill. 2011) (denying motion to dismiss in data breach consumer class action)

- *In re Scotts EZ Seed Litig.*, No. 12 CV 4727, 2013 U.S. Dist. LEXIS 73808 (S.D.N.Y May 22, 2013), 2013 WL 2303727, UCC Rep. Serv. 2d 935 (S.D.N.Y. May 22, 2013) (denying motion to dismiss in false advertising consumer class action against grass seed manufacturer)

- *Rossi v. The Procter & Gamble Co.*, No. 11-cv-7238, 2013 WL 5523098 (D.N.J. Oct. 3, 2013) (denying motion to dismiss in false advertising consumer class action against maker of Crest toothpaste)

- *Ebin v. Kangadis Food Inc.*, --- F.R.D.---, 2014 WL 737960 (S.D.N.Y. Feb. 25, 2014) (certifying nationwide class of purchasers of purported "100% Pure Olive Oil" in false advertising consumer class action against edible oil distributor)

## NEAL J. DECKANT

Neal J. Deckant is an Associate with Bursor & Fisher, P.A. Mr. Deckant focuses his practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Mr. Deckant counseled low-income homeowners facing foreclosure in East Boston.

Mr. Deckant is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Mr. Deckant received his Juris Doctor from Boston University School of Law in 2011, graduating *cum laude* with two Dean's Awards. During law school, Mr. Deckant served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms. In 2007, Mr. Deckant graduated with Honors from Brown University with a B.A. in East Asian Studies and Philosophy.

## YITZCHAK KOPEL

Yitzchak Kopel is an Associate with Bursor & Fisher, P.A. Mr. Kopel focuses his practice on complex business litigation and consumer class actions.

Mr. Kopel is admitted to the State Bars of New York and New Jersey and is a member of the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, and District of New Jersey.

Mr. Kopel received his Juris Doctor from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Mr. Kopel served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Mr. Kopel graduated *cum laude* from Queens College with a B.A. in Accounting.

BURSOR&FISHER
P.A.

### ANNICK M. PERSINGER

Annick M. Persinger is an Associate with Bursor & Fisher, P.A. Ms. Persinger focuses her practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Ms. Persinger worked as a legal research attorney for Judge John E. Munter in Complex Litigation at the San Francisco Superior Court.

Ms. Persinger is admitted to the State Bar of California and the bars of the United States District Courts for the Northern District of California, Central District of California, Southern District of California, and Eastern District of California.

Ms. Persinger received her Juris Doctor from University of California, Hastings College of the Law in 2010, graduating *magna cum laude*. During law school, Ms. Persinger served as a member of Hastings Women's Law Journal, and authored two published articles. In 2008, Ms. Persinger received an award for Best Oral Argument in the first year moot court competition. In 2007, Ms. Persinger graduated *cum laude* from University of California, San Diego with a B.A. in Sociology, and minors in Law & Society and Psychology.

### FREDERICK J. KLORCZYK III

Frederick J. Klorczyk III is an Associate with Bursor & Fisher, P.A. Mr. Klorczyk focuses his practice on complex business litigation and consumer class actions.

Mr. Klorczyk is admitted to the State Bars of New York and New Jersey and is a member of the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, and District of New Jersey.

Mr. Klorczyk received his Juris Doctor from Brooklyn Law School in 2013, graduating *magna cum laude* with two CALI Awards for the highest grade in his classes on criminal law and conflict of laws. During law school, Mr. Klorczyk served as an Associate Managing Editor for the Brooklyn Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut. In 2010, Mr. Klorczyk graduated from the University of Connecticut with a B.S. in Finance.

### YEREMEY O. KRIVOSHEY

Yeremey O. Krivoshey is an Associate with Bursor & Fisher, P.A. Mr. Krivoshey focuses his practice on complex business litigation and consumer class actions.

Mr. Krivoshey is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern and Eastern Districts of California.

Mr. Krivoshey received his Juris Doctor from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar. During law school, Mr. Krivoshey worked as

a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C.  Mr. Krivoshey also interned at the United States Department of Justice and the American Civil Liberties Union.  In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

## JULIA A. LUSTER

Julia A. Luster is an Associate with Bursor & Fisher, P.A.

Ms. Luster is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California.  She is also admitted to the United States Court of Appeals for the Ninth Circuit.

In 2013, Ms. Luster received her Juris Doctor from UC Davis School of Law.  While attending UC Davis, Ms. Luster externed with the Honorable Judge Arthur L. Alarcón of the United States Court of Appeals for the Ninth Circuit.  She was a Senior Articles Editor for the UC Davis Law Review and a top 10 oral advocate in appellate advocacy.  She also participated in the Moot Court interschool competition team.  Ms. Luster worked at both the UC Davis Prison Law Clinic and UC Davis Civil Rights Clinic.  While at the Civil Rights Clinic, she co-authored a Ninth Circuit brief for an appeal she subsequently argued and won.  Prior to law school, Ms. Luster received her B.A. in English from UCLA and her M.A. in English and Comparative Literature from Columbia University.

**EXHIBIT X**

**Cases In Which Classes Were Certified On Consumer Claims Where
Purchasers Were Unlikely To Have Retained Receipts**

**Contested (Non-Settlement Classes)**

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) (certifying a class of
California purchasers of Kashi food products that were mislabeled with the
representation "Nothing Artificial").

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D. Cal. 2010)
(certifying a class of purchasers of Blue Sky beverages).

*Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 (C.D. Cal. 2011) (certifying a class of
California purchasers of Children's Coldcalm homeopathic cold products).

*Ebin v. Kangadis Food Inc.*, No.13-Civ.-02311 (JSR) (S.D.N.Y. Dec. 11, 2013)
(order granting class certification for purchasers of "100% Pure Olive Oil" that
contained industrially processed pomace oil).

*Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233 (D.N.J. 2008) (certifying
class of purchasers of certain Dr. Praeger's frozen food products that
misrepresented the amount of calories and fat per serving).

*Galvan v. KDI Dist. Inc.*, 2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) (certifying a
class of purchasers of pre-paid calling cards).

*Gasperoni v. Metabolife, Intern. Inc.*, 2000 WL 33365948 (E.D. Mich. Sept. 27,
2000) (certifying a class of Michigan purchasers of the diet product Metabolife
365, an ephedrine product).

*Godec v. Bayer Corp.*, 2011 WL 5513202 (N.D. Ohio Nov. 11, 2011) (certifying a
class of Ohio purchasers of Bayer One A Day Men's Health Formula and One A
Day Men's 50+ Advantage multivitamins).

*Gordon v. Microsoft Corp.*, 2003 WL 23105552 (Minn. Dist. Ct. Mar. 14, 2003)
(certifying a class of purchasers of Microsoft Word or Microsoft Excel).

*Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468 (C.D. Cal. 2012) (certifying
California and New York classes of purchasers of L'Oreal's Garnier Fructis Sleek
& Shine Anti-Frizz Serum, which include claims under GBL §§ 349 and 350).

*In re Ferrero Litig.*, 278 F.R.D. 552 (S.D. Cal. 2011) (certifying a class of purchasers of Nutella hazelnut spread).

*In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998) (certifying a class of purchasers of Playmobil brand toy products).

*In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012) (certifying a class of purchasers of POM Wonderful pomegranate juice products).

*In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*, 2007 WL 8056980 (C.D. Cal. Mar. 27, 2007) (certifying class of California purchasers of Unocal gasoline marked as compliant with the regulations promulgated by the California Air Resources Board).

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) (affirming district court's certification of a liability class of Ohio purchasers of Whirlpool Duet front-loading washing machines).

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012) (certifying a class of California purchasers of Bayer One A Day Men's Health Formula and One A Day Men's 50+ Advantage multivitamins).

*Johnson v. General Mills, Inc.*, 275 F.R.D. 282 (C.D. Cal. 2011) (certifying a class of purchasers of Yoplait Yo-Plus yogurt).

*Lee v. Carter-Reed Co.*, L.L.C., 4 A.3d 561 (N.J. 2010) (reversing and remanding lower court's denial of class certification for New Jersey purchasers of the Relacore weight loss supplement).

*McCrary v. The Elations Co., LLC*, Case No. 5:13-cv-00242-JGB-OP, Dkt. No. 95, (C.D. Cal. Jan. 14, 2014) (certifying a class of purchasers of defendant's dietary joint supplements)

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012) (certifying a class of California purchasers of Arizona beverages mislabeled with the representations "All Natural," "Natural," or "100% Natural").

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) (certifying a class of purchasers of defendant's Cellmass, Nitrix, and N.O.-Xplode workout supplements).

*Sun Coast Resources, Inc. v. Cooper*, 967 S.W.2d 525 (Tex. App. Ct. 1998) (affirming an order certifying a class of purchasers of tainted gasoline).

*Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012) (certifying state classes of purchasers of Bosch and Siemens brand 27" front-loading automatic washing machines).

*Thurston v. Bear Naked, Inc.*, 2013 WL 5664985 (S.D. Cal. July 30, 2013) (certifying a class of California purchasers of Bear Naked food products that were mislabeled with the representations "100% Pure & Natural" and "100% Natural").

*Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113 (N.D. Cal. June 7, 2011) (certifying a class of purchasers of Diamond Shelled Walnut products that were mislabeled with certain representations regarding the health benefits of omega-3 fatty acids).

## Non-Contested (Settlement Classes)

*Correa v. Sensa Prods.*, LLC, No. BC476808 (Cal. Sup. Ct. Nov. 9, 2012) (Judgment, Final Order, and Decree Granting Final Approval to Class Action Settlement) (certifying a settlement class of purchasers of Sensa weight loss products).

*Date v. Sony Elecs. Inc.*, 2013 WL 3945981 (E.D. Mich. July 31, 2013) (certifying a settlement class of purchasers of Sony Grand Wega Televisions, models KDS-R50XBR1 and KDS-R60XBR1).

*Fishbein v. All Market Inc. d/b/a/ Vita Coco*, No. 11-CV-05580 (S.D.N.Y. Aug. 22, 2012) (Final Order and Judgment Approving Class Action Settlement) (certifying a settlement class of purchasers of Vita Coco coconut water).

*Gallucci v. Boiron, Inc.*, 2012 WL 5359485 (S.D. Cal. Oct. 31, 2012) (certifying a settlement class of purchasers of defendant's homeopathic cold products).

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, (D. Me. 2003) (certifying a broad settlement class of purchasers of compact disc ("CD") music products).

*In re Haier Freezer Consumer Litig.*, No. 11-CV-02911-EJD (N.D. Cal. Oct. 25, 2013) (Final Judgment and Order Granting Plaintiffs' Motion for Final Approval of Class Action Settlement) (certifying a settlement class of purchasers of the Haier model HNCM070E compact chest freezer).

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) (affirming certification of a settlement class of purchasers of certain brands of wet pet food that were contaminated with melamine and cyanuric acid).

*In re M3 Power Razor System Mktg. & Sales Practice Litig.*, 270 F.R.D. 5 (D. Mass. 2010) (certifying a settlement class of purchasers of the Gillette M3P battery-operated shaving razor).

*In re Nutella Mktg. & Sales Practices Litig.*, No. 11-CV-01086 (D.N.J. Jul. 31, 2012) (Final Approval Order and Judgment) (certifying a settlement class of purchasers of Nutella hazelnut spread).

*In re Sketchers Toning Shoe Prods. Liab. Litig.*, 2012 WL 3312668 (W.D. Ky. Aug. 13, 2012) (certifying a settlement class of purchasers of Sketchers Toning Shoes).

*Johnson v. General Mills, Inc.*, 2013 WL 3213832 (C.D. Cal. June 17, 2013) (certifying a settlement class of purchasers of General Mills Yo-Plus yogurt).

*Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 572 (S.D. Iowa Oct. 28, 2011) (certifying a settlement class of purchasers of defendant's bracelets, necklaces, shoe insoles, linens, bedding, and other products, which were advertised to provide certain health benefits).

*O'Brien v. Brain Research Labs, LLC*, 2012 WL 3242365 (D.N.J. Aug. 9, 2012) (certifying a settlement class of purchasers of the Procera AVH memory-boosting supplement).

*O'Brien v. LG Elecs. USA, Inc.*, No. 10-CV-04499 (D.N.J. Nov. 21, 2011) (Final Approval Order and Judgment) (certifying a settlement class of purchasers of LG

refrigerators, models LFX 25975, LFX 28977, LMX 25985, and LFX21975, and Kenmore refrigerators, models Kenmore 7975, Kenmore 7978, and Kenmore 7973).

*Rinaldi v. Iomega Corp.*, 2001 WL 34890424 (Del. Super. June 29, 2001) (certifying a settlement class of purchasers of Iomega Zip Drives).

*Rossi v. The Proctor & Gamble Co.*, 2013 WL 5523098 (D.N.J. Oct. 3, 2013) (certifying a settlement class of purchasers of Crest Sensitivity Treatment & Protection toothpaste).

**EXHIBIT Y**

**REDACTED**

**EXHIBIT Z**



**StarKist**

Connect with us

Join Now or Login to the StarKist community for great coupon savings and to upload your favorite StarKist recipes!

**Recipe Search**

[                    ] GO

▸ More Options

| About StarKist | Charlie® | Products | Promotions and News | Health and Wellness | Recipes | ⬆ Share My Recipe |

## StarKist® Can Products

The great taste generations of seafood lovers have come to expect!



If you're looking for a great-tasting, easy-to-prepare food that you can feel good about serving to your family, then you can always depend upon StarKist® Canned Tuna. - StarKist Classics - StarKist Selects® - NEW StarKist Autentico - StarKist Meal Kits

### Hickory Smoked Tuna Ball

Created By StarKist

View Recipe ▸

## Our Products
Click below to explore the StarKist products

### StarKist Can Products



**Classics in Water and Oil**

Chunk Light Tuna in Water

Chunk Light Tuna in Oil

Chunk White Albacore Tuna in Water

Solid White Albacore Tuna in Water

Solid White Albacore Tuna in Oil

**StarKist Selects®**

StarKist Selects® Chunk Light Tuna in Water

StarKist Selects® Solid Light Tuna in Water

StarKist Selects® Solid Light Tuna in Olive Oil

StarKist Selects® Yellowfin Marinated Tuna - Roasted Garlic

StarKist Selects® Yellowfin Marinated Tuna - Lemon Dill

StarKist Selects® Solid White Albacore Tuna in Water

StarKist Selects® Low Sodium Chunk Light Tuna in Water

StarKist Selects® Very Low Sodium Chunk White Albacore Tuna in Water

**StarKist Autentico®**

StarKist Autentico® Chunk Light Tuna in Oil with Vegetables

StarKist Autentico® Sweet & Spicy Chunk Light Tuna in Oil with Peppers

StarKist Autentico® Chunk Light Tuna in Oil with Jalapenos

**Meals Kits**

Charlie's Lunch Kit® Chunk Light

Charlie's Lunch Kit® Albacore

Ready-to-Eat Tuna Salad Kit, Original Deli Style

Ready-to-Eat Tuna Salad Kit, Sweet & Spicy

**Other Seafood**

Wild Alaskan Pink Salmon

Chopped Clams

Privacy Policy  |  Terms of Use and Services  |  FAQs  |  Contact Us                                    ©2015 StarKist Co. All Rights Reserved.









## Win Big!

Pin your favorite StarKist® recipe for a chance to win a trip to LA to hang with Hungry Girl, Lisa Lillien.

**Read More ▸**

## Omega 6 vs. Omega 3 - What is the difference?

Did you know that some fat is necessary and there are some types of fat that we actually should eat more of?

**Read More ▸**

## Proud partner of Wounded Warrior Project®

Commemorative camouflage-inspired Outdoors Pouch available at select grocery stores nationwide.

**Read More ▸**

Privacy Policy | Terms of Use and Services | FAQs | Contact Us

©2015 StarKist Co. All Rights Reserved.

*Per serving, most varieties

**Tracking Pixels**









**EXHIBIT AA**



**EXHIBIT BB**



**EXHIBIT CC**











Contests | Ads | Savings | Departments | Pig Points | Gluten Free | Contact Us | Store Locator | Sign In

## Rewards Card Info



### Piggly Wiggly Rewards Card

Using the Rewards Card (formerly Preferred Club Card) entitles you to valuable discounts and savings throughout the store.

Our customers enjoy the "Pig Points" program, which gives them the opportunity to earn huge discounts on store items and fuel! There are lots of ways to earn Pig Points and the more you earn, the more you can save.

For more information on Pig Points and a complete list of participating location, please click below.

You can apply for your Rewards Card here or by signing up at your local Piggly Wiggly.

Don't worry folks! You're Preferred Card still works and has the same benefits as the new Rewards Card!



Weekly Specials | Piggly Wiggly Rewards Card | Gluten Free | Employment | Franchise Opportunities
Receive Weekly Specials | Purchase Gift Cards | My Piggly Wiggly | Go Green | Product Recalls
Store Locator | Gift Card Balance | Coupon Policy | About Us | Privacy Policy
Recipes | Pig Points Balance | Upromise | Contact Us | Download iPhone App
Buy Pig Apparel | Join Pumpus Maximus | Kids Corner | Employees | Download Android App
Mr. Pig's Ideas | Tailgate Tips | | my-eStub | App FAQ










© 2000-2015 Safeway Inc. All rights reserved.



# Shoppers Club

▶ Business Program

## Shoppers Club

**Helping you Make Great Meals Easy, Healthy, and Affordable**

Apply Online! »

FAQs »

Business Program »

Contact Us »

### Questions or Comments

**Telephone:**
Shoppers Club
Customer Service
1-800-848-1555

**Hours:**
Monday-Friday:
8:00am - 6:00pm EST
Saturday & Sunday:
8:00am - 5:00pm EST

**Mailing Address:**
Wegmans Shoppers Club
PO Box 23195
Rochester, NY 14692-3195

Contact Us »

### Shoppers Club Card Agreement
☑ View Now »

## Why Swipe Your Shoppers Club Card Each Time You Shop?

▾ Additional Savings

Save every time you shop with Shoppers Club discounts on products throughout the store. Simply present your card or key tag at checkout and the savings are yours...instantly!

▶ Award Winning Menu Magazine

▶ Special wegmans.com Privileges

▶ Product Recall Notification

▶ W-Dollars (great for college students)

▶ Easy Check Cashing

    



| In Our Stores | Services | News | About Us | Customer Service |
|---|---|---|---|---|
| store locator | pharmacy | fresh stories blog | careers | contact us |
| flyer | gift cards | media room | diversity | FAQs |
| events & classes | shoppers club | press releases | for our suppliers | privacy policy |
| menu cooking school | business program | product recalls | for our employees | usage policy |
| next door by wegmans | upromise | awards | community giving | |
| amore by wegmans | floral | hot topics | sustainability | |
| wine store | catering | mary ellen burris | food safety | |
| | | | our farm | |

## SAVE MART SUPERMARKETS

# NEVER PAY FULL PRICE FOR GAS AGAIN.





**SIGN UP   LOGIN   FAQs**

Pick up a Save Mart Rewards Card at participating Lucky locations and start earning Fuel Rewards ® today.

Carry your Rewards card and scan it every time you check out at the store. For every $50 you spend in qualified purchases at Save Mart, you'll earn 5¢ per gallon redeemable at participating Shell stations. You don't have to spend $50 in one trip - Fuel Rewards accumulate and are tracked across visits.

Track Fuel Rewards earned, check expiration dates and manage your account online. Fuel Rewards ® expire on the last day of the month immediately following the month you earn them. For example, rewards received in May will expire June 30th.

You can earn additional Fuel Rewards® savings at 700+ merchants in the Online Mall and 11,000+ restaurants that are part of the Fuel Rewards Network (FRN). Earn 5¢, 10¢, 50¢ or more per gallon for every $50 spent online. Only available at fuelrewards.com/savemart

## HERE'S HOW IT WORKS...

- Pick up a Save Mart Rewards Card at participating Save Mart locations.
- Carry your Rewards card and scan it every time you check out at the store. For every $50 you spend in qualified purchases at Lucky, you'll earn 5¢ per gallon.
- Redeem Fuel Rewards at participating Shell or other fuel stations.
- Insert your Save Mart Rewards Card at the pump.
- Select your form of payment and fuel grade.
- Watch the price drop - dispense up to a maximum of 20 gallons of fuel per purchase.
- Save Mart and S-Mart Rewards are part of the Fuel Rewards Network ®. See fuelrewards.com for a complete list of Fuel Rewards Network Terms and Conditions.

**COME HOME TO LOWER FUEL PRICES.** SAVE MART SUPERMARKETS 

savemart.com/fuelrewards

BROUGHT TO YOU BY SAVE MART SUPERMARKETS AND LUCKY SUPERMARKETS. Copyright 2011 Save Mart Supermarkets. All Rights Reserved. Read official rules and regulations.

Everyday Free Shipping at $25 or more + easy returns in store & online.   See details ›

Checkout

## Walgreens
AT THE CORNER OF **HAPPY & HEALTHY**

Balance Rewards
Savings & Deals
Weekly Ad & Coupons

Store Locator
Healthcare Clinic

Sign In or Register
Your Account | ▾

Pharmacy

| Prescription Refills | Health Info & Services | Contact Lenses | Shop Products | Photo |

Enter keyword or item #    **Search**

Home > Balance Rewards

English | Español

# Welcome to Balance® Rewards

## Member sign in

**Joined in store?**
Activate your membership online.

or

**Already activated your membership on Walgreens.com?**

Rewards or Phone Number
No spaces or dashes

Username
Forgot your username?

**Activate now**

Forgot your password?

☐ Remember username

**Sign in**

**Not a member?**
Join today! It's free:*1

**Join now**

### Balance Rewards for healthy choices™
Get points for the healthy activities you do every day 2
View your dashboard ›
Register now ›

### Get 500 points
for every prescription and immunization.3
Learn more ›

### Earn points
on featured items each week.
See offers ›

Redeem for rewards on your next purchase.

5,000 points = **$5 REWARD**

**$10** 10,000 pts   **$20** 18,000 pts   **$35** 30,000 pts   **$50** 40,000 pts

Learn more ›

### Clip paperless coupons
Save even more in store with5 coupons that clip straight to your card. No printing required.
Learn more ›

**Saving is just the beginning.**
Watch to learn how easy it is to save, earn points and redeem for rewards.

**Your membership. Your way.**
4 convenient ways to use Balance Rewards:
- Your phone number
- Mobile card - get the app ›
- Physical card4 - how to get a card ›
- Your Walgreens.com account

## Discover all the benefits of Balance Rewards
**Program Details**  |  **Find Points & Savings**

*Limit one point offer per Balance Rewards account. Offer applies to accounts that did not previously include an email. Points will be posted to the member's Balance Rewards account upon confirmation of delivery to a valid email account, generally within 7 to 10 days. Offer valid 12/7/2014–12/13/2014.

1 See **Balance Rewards terms and conditions** for full details.

2 Restrictions apply. Limit 20 points per mile, 1000 points per month. Limit 20 points per daily weigh-in logged. Limit 20 points per blood glucose test, two logs per day. Limit 20 points per blood pressure test, one log per day. Information provided to Walgreens online is covered by the terms of our **Online Privacy and Security Policy** and the **terms and conditions of Balance Rewards**. Personally identifiable information is not covered under HIPAA or the Walgreens Notice of Privacy Practices. For full program terms and conditions, visit **Walgreens.com/healthychoices**.

3 Due to state and federal laws, points cannot be earned on some items. Points will not be awarded to anyone who currently is or was at any time in the 6 months prior to purchasing Pharmacy items covered by Medicare, Medicaid, Tricare or any other government-funded healthcare program. Pharmacy items must be purchased at participating Walgreens Drugstore, Express, Duane Reade, or Walgreens Pharmacy locations ("Participating Stores") to earn points. Excludes Pharmacy items purchased from AR, NJ or NY pharmacies and prescriptions transferred to a Participating Store located in AL, MS, OR or PR. See **Balance Rewards terms and conditions** for full details.

4 When you join online or on the Walgreens mobile app, you will not be mailed a physical card. Want one? Visit your local Walgreens and ask a sales associate to link a physical card to your membership.

5 Coupon pricing does not apply to online orders, or orders placed online for in-store pickup.

