Robert B. Hawk (Bar No. 118054)
J. Christopher Mitchell (Bar No. 215639)
Stacy R. Hovan (Bar No. 271485)
HOGAN LOVELLS US LLP
4085 Campbell Avenue, Suite 100
Menlo Park, CA  94025
Telephone:  (650) 463-4000
Facsimile:   (650) 463-4199
robert.hawk@hoganlovells.com
chris.mitchell@hoganlovells.com
stacy.hovan@hoganlovells.com

John E. Hall (admitted *pro hac vice*)
Gregg D. Michael (admitted *pro hac vice*)
Amy J. Roy (admitted *pro hac vice*)
Louis A. DePaul (admitted *pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
Telephone:  (412) 566-6000
Facsimile:  (412) 566-6099
jhall@eckertseamans.com
gmichael@eckertseamans.com
aroy@eckertseamans.com
ldepaul@eckertseamans.com

Attorneys for Defendant
STARKIST CO.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | Case No.  4:13-cv-00729-HSG<br><br>**DEFENDANT STARKIST CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>Date:        April 16, 2015<br>Time:        2:00 p.m.<br>Courtroom:   15, 18th Floor |

**REDACTED VERSION OF DOCUMENT TO BE SEALED**

Hogan Lovells US LLP
Attorneys At Law
Silicon Valley

1

## STATEMENT OF ISSUES

2

      1.      Has Plaintiff satisfied the requirements of Rule 23(a)—specifically, the

3

ascertainability, typicality, and commonality requirements?

4

      2.      Has Plaintiff satisfied the predominance and superiority requirements of

5

Rule 23(b)(3)?

6

      3.      Is the expert opinion of Colin B. Weir admissible under Fed. R. Evid. 702 and

7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)?

8

      Defendant StarKist Co.'s ("StarKist") opposition to Plaintiff's Motion for Class

9

Certification is based on this opposition brief, as well as on the Declaration of Aaron Maxfield

10

("Maxfield Decl."), the Declaration of Harvey Pearson ("Pearson Decl."), the Declaration of

11

Frank Pogue ("Pogue Decl."), the Declaration of Christina A. Mireles DeWitt, Ph.D. ("DeWitt

12

Decl."), the Declaration of Dominique M. Hanssens, Ph.D. ("Hanssens Decl."), the Declaration of

13

Bruce A. Strombom, Ph.D. ("Strombom Decl."), the Declaration of Amy J. Roy ("Roy Decl."),

14

and the Declaration of Robert B. Hawk ("Hawk Decl.").  Unless otherwise indicated, all "Ex. _"

15

citations in this brief refer to exhibits to the Hawk Declaration.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................................... 1

II.   Factual Background ............................................................................................... 3

III.  Argument ............................................................................................................ 11

    A.    Legal Standards ........................................................................................ 11

    B.    The Proposed Class Is Not Ascertainable .............................................. 12

        1.    Plaintiff's Alleged Class Includes Uninjured Members ............................... 12

        2.    No Reliable Method Exists to Identify Relevant Purchasers ........................ 15

    C.    Plaintiff Lacks Standing ........................................................................... 17

    D.    Plaintiff Is Not Typical (Rule 23(a)(3)) .................................................. 19

    E.    Plaintiff Has Not Demonstrated Commonality (Rule 23(a)(2)) or Predominance (Rule 23(b)(3)) ................................................................ 19

        1.    Individual Testing Would Be Required To Determine Core Issues ............ 20

        2.    Individual Issues of Reliance, Causation, and Materiality Predominate ....... 21

    F.    Individual Issues Predominate Regarding Damages ............................... 26

        1.    Weir's Testimony Is Not the Product of Reliable Principles and Methods ................................................................................................. 26

        2.    Weir's Methodologies Are Inconsistent With Plaintiff's Liability Theory ................................................................................................... 29

        3.    Weir's Full Refund Theory Does Not Measure Economic Injury ............... 31

        4.    Weir's Methods Cannot Calculate Damages for Class Members ................ 32

    G.    A Class Action Here Is Neither Superior Nor Manageable ..................... 33

IV.  Conclusion .......................................................................................................... 35

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

ii

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

# TABLE OF AUTHORITIES

**Page**

CASES

*Algarin v. Maybelline, LLC,*
    300 F.R.D. 444 (S.D. Cal. 2014)..................................................................... 16

*Allegro, Inc. v. Scully,*
    762 S.E.2d 54 (S.C. App. 2014)..................................................................... 34

*Amchem Prods. Inc. v. Windsor,*
    521 U.S. 591 (1997)..................................................................... 19

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,*
    158 Cal. App. 4th 226 (2007)..................................................................... 34

*Arrendondo v. Delano Farms Co.,*
    2011 WL 1486612 (E.D. Cal. Apr. 19, 2011)..................................................................... 27

*Astiana v. Ben & Jerry's Homemade, Inc.,*
    2014 WL 60097 (N.D. Cal. Jan. 7, 2014) .................................................... 12, 14, 26

*Badella v. Deniro Mktg. LLC,*
    2011 WL 5358400 (N.D. Cal. Nov. 4, 2011)..................................................................... 25

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014).................................................... 18, 19, 20

*Bernick v. Jurden,*
    293 S.E.2d 405 (N.C. 1982)..................................................................... 23

*Brazil v. Dole Packaged Foods, LLC,*
    2014 WL 5794873 (N.D. Cal. Nov. 6, 2014)..................................................................... 29, 31

*Brazil v. Dole Packaged Foods, LLC,*
    2014 WL 6893715 (N.D. Cal. Dec. 8, 2014) ..................................................................... 33

*Brewer v. Gen. Nutrition Corp.,*
    2014 WL 5877695 (N.D.Cal. Nov. 12, 2014)..................................................................... 19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)..................................................................... 29

*Bruton v. Gerber Prods. Co.,*
    2014 WL 2860995 (N.D. Cal. June 23, 2014) ..................................................................... 17

*Burton v. Nationstar Mortg., LLC,*
    2014 WL 5035163 (E.D. Cal. Oct. 8, 2014) ..................................................................... 21, 22, 33

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

iii

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

*Bussey v. Macon Cnty. Greyhound Park, Inc.*,
  2014 WL 1302658 (11th Cir. Apr. 2, 2014) ........................................................... 33

*Caldera v. J.M. Smucker Co.*,
  2014 WL 1477400 (C.D. Cal. Apr. 15, 2014) ......................................................... 32

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................................... 11

*Caro v. Procter & Gamble Co.*,
  18 Cal. App. 4th 644 (1993) .................................................................................. 24

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) .................................................................................. 16

*Chin v. Chrysler Corp.*,
  182 F.R.D. 448 (D.N.J. 1998) ................................................................................ 23

*Chow v. Neutrogena Corp.*,
  2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) ........................................................ 25

*Cohen v. DirecTV, Inc.*,
  178 Cal. App. 4th 966 (2009) ................................................................................ 24

*Collins v. Safeway Stores, Inc.*,
  187 Cal. App. 3d 62 (1986) ................................................................................... 14

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) .................................................................................... *passim*

*Cooley v. Big Horn Harvestore Sys. Inc.*,
  813 P.2d 736 (Colo. 1991) .................................................................................... 35

*Darst v. Ill. Farmers Ins. Co.*,
  716 N.E.2d 579 (Ind. App. 1999) ................................................................... 34, 35

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................... 26

*Daughtrey v. Ashe*,
  413 S.E.2d 336 (Va. 1992) .................................................................................... 23

*Delarosa v. Boiron, Inc.*,
  275 F.R.D. 582 (C.D. Cal. 2011) .......................................................................... 20

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................................. 13

*Diacakis v. Comcast Corp.*,
  2013 WL 1878921 (N.D. Cal. May 3, 2013) .................................................... 12, 13

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

iv

*Dioquino v. Sempris,*
    2012 WL 6742528 (C.D. Cal. Apr. 9, 2012) ...................................................... 13, 16

*Diviero v. Uniroyal Goodrich Tire Co.,*
    114 F.3d 851 (9th Cir. 1997)........................................................................... 28

*Ebin v. Kangadis Food Inc.,*
    297 F.R.D. 561 (S.D.N.Y. 2014) ....................................................................... 22

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011).........................................................................12, 6

*Faulk v. Sears Roebuck & Co.,*
    2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) .......................................... 24, 25, 26

*Fieldstone Co. v. Briggs Plumbing Prods., Inc.,*
    54 Cal. App. 4th 357 (1997) ............................................................................. 35

*Fischer v. Mead Johnson Labs.,*
    41 A.D.2d 737 (N.Y. App. Div. 1973) .............................................................. 35

*Flory v. Silvercrest Indus. Inc.,*
    633 P.2d 383 (Ariz. 1981) ................................................................................ 35

*Fortune View Condo. Ass'n v. Fortune Star Dev. Co.,*
    90 P.3d 1062 (Wash. 2004)............................................................................... 35

*Garcia v. Medved Chevrolet, Inc.,*
    240 P.3d 371 (Colo. App. 2009) ................................................................ 22, 23

*Gartin v. S & M NuTec LLC,*
    245 F.R.D. 429 (C.D. Cal. 2007) ..................................................................... 35

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)......................................................................................... 28

*Gen. Tele. Co. of the Sw. v. Falcon,*
    457 U.S. 147 (1982).......................................................................................... 17

*Gianino v. Alacer Corp.,*
    846 F. Supp. 2d 1096 (C.D. Cal. 2012)............................................................. 34

*Giddings & Lewis, Inc. v. Indus. Risk Insurers,*
    348 S.W.3d 729 (Ky. 2011) .............................................................................. 34

*Glovatorium, Inc. v. NCR Corp.,*
    684 F.2d 658 (9th Cir. 1982)............................................................................ 34

*Green v. McNeil Nutritionals, LLC,*
    2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005) ............................................. 22

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

v

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

*Greystone Homes, Inc. v. Midtec, Inc.*,
168 Cal. App. 4th 1154 (2008) .......................................................................................... 35

*Hairston v. S. Beach Beverage Co.*,
2012 WL 1893818 (C.D. Cal. May 18, 2012) ................................................................... 19

*Hanson v. Hackman Corp.*,
192 P.3d 1130 (Kan. App. 2008) ...................................................................................... 34

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) ......................................................................... 29

*Henry Schein, Inc. v. Stromboe*,
2002 WL 31426407 (D. Tex. Oct. 31, 2002) .................................................................... 22

*Hernandez v. Chipotle Mexican Grill, Inc.*,
2013 WL 6332002 (C.D. Cal. Dec. 2, 2013) .................................................................... 14

*Hillcrest Country Club v. N.D. Judds Co.*,
461 N.W.2d 55 (Neb. 1990) .............................................................................................. 23

*Hobson v. Entergy Ark., Inc.*,
432 S.W.3d 117 (Ark. App. 2014) ..................................................................................... 34

*Hodes v. Van's Int'l Foods*,
2009 WL 2424214 (C.D. Cal. July 23, 2009) .............................................................. 16, 23

*Holt v. Globalinx Pet, LLC*,
2014 WL 347016 (C.D. Cal. Jan. 30, 2014) ..................................................................... 22

*Hovespian v. Apple, Inc.*,
2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) .................................................................. 14

*Idress v. Am. Univ. of Caribbean*,
546 F. Supp. 1342 (S.D.N.Y. 1982) .................................................................................. 34

*In re ConAgra Foods, Inc.*,
Case No. 2:11-cv-05379-MMM-AGR (C.D. Cal. Feb. 23, 2015) ......................................... 13

*In re Clorox Consumer Litig.*,
301 F.R.D. 436 (N.D. Cal. 2014) ...................................................................................... 17

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
277 F.R.D. 586 (C.D. Cal. 2011) ...................................................................................... 13

*In re Ferrero Litig.*,
278 F.R.D. 552 (S.D. Cal. 2011) ....................................................................................... 20

*In re Ford Motor Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998) ........................................................................................ 23

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
SILICON VALLEY

*In re Hulu Privacy Litig.*,
  2014 WL 2758598 (N.D. Cal. June 17, 2014) ......................................................... 15

*In re POM Wonderful LLC Mktg. & Sales Litig.*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ......................................................... 16

*In re Rail Freight Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ......................................................... 29, 33

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ......................................................... 23, 24

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2010) ......................................................... 24, 32

*Ingaharro v. Blanchette*,
  440 A.2d 445 (N.H. 1982) ......................................................... 34

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ......................................................... 33

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012) ......................................................... 20

*Johnson v. Gen. Mills, Inc.*,
  276 F.R.D. 519 (C.D. Cal. 2011) ......................................................... 20

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
  285 F.R.D. 573 (E.D. Cal. 2012) ......................................................... 25

*Jones v. ConAgra Foods, Inc.*,
  2014 WL 2702726 (N.D. Cal. June 13, 2014) ......................................................... 16, 32

*Just in Case Bus. Lighthouse, LLC v. Murray*,
  2013 WL 3778184 (Colo. App. July 18, 2013) ......................................................... 34

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  2015 WL 510109 (N.D. Cal. Feb. 3, 2015) ......................................................... 27, 29

*Karim v. Hewlett-Packard Co.*,
  2014 WL 555934 (N.D. Cal. Feb. 10, 2014) ......................................................... 23, 33

*Keller v. Inland Metals All Weather Conditioning, Inc.*,
  76 P.3d 977 (Idaho 2003) ......................................................... 23

*Lanovaz v. Twinings N. Am., Inc.*,
  2013 WL 675929 (N.D. Cal. Feb. 25, 2013) ......................................................... 19, 32

*Larsen v. Trader Joe's Co.*,
  2012 WL 5458396 (N.D. Cal. June 14, 2012) ......................................................... 18

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

vii

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................. 17

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) .............................................................. 32, 33

*Lierboe v. State Farm Mut. Auto Ins. Co.*,
    350 F.3d 1018 (9th Cir. 2003) ................................................................. 17

*Lilly v. Jamba Juice Co.*,
    2014 WL 4652283 (N.D. Cal. Sept. 18, 2014) ........................................ 13

*Lozano v. AT & T Wireless Svcs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) .................................................................... 22

*Lust By & Through Lust v. Merrill Dow Pharms., Inc.*,
    89 F.3d 594 (9th Cir. 1996) ..................................................................... 26

*Lutz Farms v. Asgrow Seed Co.*,
    948 F.2d 638 (10th Cir. 1991) .................................................................. 23

*Major v. Ocean Spray Cranberries, Inc.*,
    2013 WL 2558125 (N.D. Cal. June 10, 2013) .......................................... 19

*Makaeff v. Trump Univ., LLC*,
    2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ............................................. 22

*Marsh v. First Bank of Del.*,
    2014 WL 2085199 (N.D. Cal. May 19, 2014) ........................................... 33

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ......................................... 13, 19, 22, 24

*McCormick v. Medtronic, Inc.*,
    101 A.3d 467 (Md. 2014) .......................................................................... 34

*McElhannon v. Ford*,
    73 P.3d 827 (N.M. 2003) .......................................................................... 34

*McManus v. Fleetwood Enters., Inc.*,
    320 F.3d 545 (5th Cir. 2003) .................................................................... 22

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993) .............................................................................. 23

*Moheb v. Nutramax Labs Inc.*,
    2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ........................................... 23

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ............................................................. 22, 24

*Moore v. Puget Sound Plywood, Inc.*,
    332 N.D.2d 212 (Neb. 1983)................................................................................. 35

*Ogden v. Bumble Bee Foods, LLC*,
    2014 WL 27527 (N.D. Cal. Jan. 2, 2014) ............................................................. 32

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*,
    700 F.3d 829 (6th Cir. 2012)................................................................................. 34

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006)................................................................................. 13

*Pearson v. Philip Morris, Inc.*,
    306 P.3d 665 (Or. App. 2013)............................................................................... 22

*Pence v. Andrus*,
    586 F.2d 733 (9th Cir. 1978)................................................................................. 18

*Rahman v. Mott's LLP*,
    2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ....................................................... 33

*Randolph v. J.M. Smucker Co.*,
    2014 WL 7330430 (S.D. Fla. Dec. 23, 2014) ...................................................... 17

*Red v. Kraft Foods, Inc.*,
    2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) ............................................... 16, 32

*Redfield v. Mead, Johnson & Co.*,
    512 P.2d 776 (Or. 1973)........................................................................................ 35

*Reichhold Chem., Inc. v. Haas*,
    1989 WL 133417 (Ohio App. Nov. 3, 1989) ...................................................... 35

*Richey v. Patrick*,
    904 P.2d 798 (Wyo. 1995) .................................................................................... 34

*Ries v. Ariz. Beverages USA LLC*,
    2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ............................................... 18, 32

*Rikos v. Proctor & Gamble, Co.*,
    2012 WL 641946 (S.D. Ohio Feb. 28, 2012)....................................................... 35

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,
    2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) .............................................. 33, 34

*Rodman v. Safeway, Inc.*,
    2014 WL 988992 (N.D. Cal. Mar. 10, 2014) ...................................................... 14

*Rodriguez v. Instagram, LLC*,
    2013 WL 3732883 (N.D. Cal. July 15, 2013) ..................................................... 33

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

ix

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

*Sanders v. Apple, Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) ....................................................................... 13, 33, 35

*Scaringe v. Holstein*,
  477 N.Y.S.2d 903 (N.Y. App. Div. 1984) .............................................................................. 23

*Schmaltz v. Nissen*,
  431 N.W.2d 657 (S.D. 1988) ................................................................................................. 23

*Schwartz v. Lights of Am.*,
  2012 WL 4497398 (C.D. Cal. Aug. 31, 2012) ....................................................................... 33

*Sethavanish v. ZonePerfect Nutrition Co.*,
  2014 WL 580696 (N.D. Cal. Feb. 13, 2014) .......................................................................... 16

*Shoppe v. Gucci Am., Inc.*,
  14 P.3d 1049 (Haw. 2000) ...................................................................................................... 34

*Smith v. Pac. Bell Tel. Co.*,
  649 F. Supp. 2d 1073 (E.D. Cal. 2009) .................................................................................. 29

*Sol-o-Lite Laminating Corp. v. Allen*,
  353 P.2d 843 (Or. 1960) .......................................................................................................... 23

*Stearns v. Select Comfort Retail Corp.*,
  763 F. Supp. 2d 1128 (N.D. Cal. 2010) ................................................................................. 35

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ......................................................................................... *passim*

*Steiner v. Tektronix, Inc.*,
  1991 WL 57033 (D. Or. Feb. 7, 1991) ................................................................................... 23

*Sun Hotel, Inc. v. SummitBridge Credit Invs. III, LLC*,
  86 Va. Cir. 189 (Va. Cir. Ct. Jan. 23, 2013) ......................................................................... 34

*T.W.M. v. Am. Med. Sys., Inc.*,
  886 F. Supp. 842 (N.D. Fla. 1995) ......................................................................................... 35

*Thursby v. Reynolds Metals Co.*,
  466 So. 2d 245 (Fla. Dist. Ct. App. 1984) ............................................................................. 23

*Tietsworth v. Sears, Roebuck & Co.*,
  2013 WL 1303100 (N.D. Cal. Mar. 28, 2013) ....................................................................... 14

*Trahan v. U.S. Bank Nat'l Ass'n*,
  2015 WL 75139 (N.D. Cal. Jan. 6, 2015) ........................................................................ 21, 24

*Tucker v. Pac. Bell Mobile Servs.*,
  208 Cal. App. 4th 201 (2012) ................................................................................................. 24

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

x

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

*Turcios v. Carma Labs., Inc.*,
296 F.R.D. 638 (C.D. Cal. 2014) ................................................................ 23

*United States v. Diaz*,
2006 WL 3512032 (N.D. Cal. Dec. 6, 2006) ............................................... 27

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009)........................................................................ 21

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ................................................... 11, 19, 20, 26

*Webb v. Carter's, Inc.*,
272 F.R.D. 489 (C.D. Cal. 2011) ................................................................. 24

*Weber v. Sanborn*,
526 F. Supp. 2d 135 (D. Mass. 2007) .......................................................... 34

*Weiner v. Snapple Beverage Corp.*,
2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ............................................... 30

*Werdebaugh v. Blue Diamond Growers*,
2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ......................................... 30, 32, 33

*Williams v. Oberon Media, Inc.*,
2010 WL 8453723 (C.D. Cal. Apr. 19, 2010) ....................................... 13, 14, 20, 21

*Wolin v. Jaguar Land Rover NA, LLC*,
617 F.3d 1168 (9th Cir. 2010)...................................................................... 15

*Woodahl v. Matthews*,
639 P.2d 1165 (Mont. 1982) ........................................................................ 23

*Xavier v. Philip Morris USA, Inc.*,
787 F. Supp. 2d 1075 (N.D. Cal. 2011) .................................................. 12, 15

*Zeisel v. Diamond Foods, Inc.*,
2011 WL 2221113 (N.D. Cal. June 7, 2011) ............................................... 20

*Zinser v. Accufix Res. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001)...................................................................... 34

**STATUTES AND REGULATIONS**

21 C.F.R. § 130.17 ........................................................................................ 7

21 C.F.R. § 161.190 ............................................................................ *passim*

21 U.S.C. § 343(a)(1) .................................................................................... 7

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colo. Rev. Stat. Ann. § 4-2-318 ........................................................ 35

Ind. Code § 26-1-2-607 ...................................................................... 35

Ind. Code § 26-1-2-313 ...................................................................... 23

S.D. Codified Laws § 57A-2-607 ....................................................... 35

**OTHER AUTHORITIES**

79 Fed. Reg. 35362 ................................................................................ 7

Fed. R. Civ. P. Rule 23 ................................................................. *passim*

Fed. R. Evid. 702 ................................................................ 26, 28, 29

U.C.C. § 2-314(2)(a) .......................................................................... 21

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

xii

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

## I.      INTRODUCTION

Plaintiff's motion for class certification rests on a fundamental yet baseless assumption: that this is a case in which every consumer bought exactly the same thing, in which a representation that is misleading with respect to one product would be misleading as to all, and in which any consumer who bought the product was injured.  Thus, Plaintiff repeatedly asserts that StarKist *uniformly* or *systematically* misrepresented that its 5 oz. cans contained sufficient tuna, that *everyone* who purchased the products before 2014 received canned tuna that failed the Food and Drug Administration ("FDA") press weight standard, and that everyone accordingly got "shorted."

This fictional assumption is critical to Plaintiff's effort to certify a class, because two requirements for certification—ascertainability of a class and predominance of common issues— require Plaintiff to come forward *with evidence* that injury to class members can be determined on a class basis without individual inquiry.  But Plaintiff makes no such showing.  StarKist made no representation about press weight, and the claim that there was something uniformly false that it said (or omitted to say) about the quantity of tuna in its cans is wrong.  StarKist tuna was not predominantly underweight, let alone uniformly underweight.  To create the contrary impression through his proffered expert, Colin Weir, Plaintiff's counsel declined Weir's request to be provided with all test results, and instead withheld tests showing that the great majority of cans sold during the putative class period actually met or exceeded alleged press weight requirements.

Given those facts, the proposed class cannot meet ascertainability or commonality/ predominance requirements for at least two fundamental reasons: (1) establishing liability to any class member in this case would require individual trials to determine whether that class member received a can or cans of supposedly "underweight" tuna, and (2) the proposed class would necessarily include (many) members who suffered no injury whatsoever.

Plaintiff Hendricks' claims independently fail on typicality and predominance grounds for another reason: he admits that he continued to purchase StarKist even after concluding that it was short on tuna, because (among other reasons) it was of superior quality.  And though Plaintiff is surely not alone in preferring other characteristics—such as taste and texture—over weight (however measured), his continued purchases under those circumstances confirm that materiality of

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1    and reliance on press weight would need to be adjudicated individually.

2          Plaintiff's difficulties do not end there. He seeks to parlay an alleged violation of a

3    technical manufacturing standard into class-wide consumer deception and injury, but the regulation

4    cannot carry that freight. It measures compliance in 24-can averages, rather than in terms of what

5    any individual consumer received. It provides no minimum press weight for any individual can,

6    contemplating some cans above and some below the average. Nor does it specify the time frame or

7    population of cans for which a 24-can test applies. And, in the nearly six decades since the press

8    weight regulation issued, changes in canning technology have made it impossible to test tuna

9    precisely as the regulation instructs. For these reasons, there is no way to conclusively determine

10   whether any given can or population of cans satisfies or fails the regulation.

11         Further, press weight does not measure the amount of edible tuna, or even the amount of

12   tuna put into the can. Rather, it tests the ability of the tuna to retain moisture over time, under far

13   more pressure than a consumer could ever apply, and after valuable nutrients are removed. In fact,

14   in 2014, FDA suspended application of press weight requirements for StarKist (and two other

15   leading canned tuna producers) by issuing a Temporary Marketing Permit ("TMP"). In so doing,

16   FDA effectively and necessarily concluded that eliminating the press weight requirement for

17   canned tuna would not deceive or injure consumers. To now apply this regulatory manufacturing

18   standard as a basis for consumer injury would produce arbitrary results, untethered to any consumer

19   reality.

20         Plaintiff also fails in his obligation to show that damages alleged can be measured on a

21   class-wide basis. His expert, Weir, assumes all cans were short of tuna, in the same amount across

22   all cans, and that alleged shortfalls of press weight correlate directly to price (thereby giving value

23   to something that consumers cannot observe, press weight, but no value to what they can observe—

24   flavor, texture, nutrient-filled juices). And he relies exclusively on press weight test results that

25   have no statistical significance. Because he does not account for inconvenient data and disregards

26   basic economic and statistical principles, Weir's testimony is not reliable or even admissible.

27         StarKist did not become and does not remain the leading seller of canned tuna by

28   systematically shorting its customers. It carefully fills its cans with a sufficient amount of tuna, and

1    tests to make sure that it has succeeded in doing so.  Even if Plaintiff were correct that the results of

2    these efforts were not flawless, and some cans came up short, he has not and cannot show that his

3    claims can be resolved with common proof across the putative class.[1]

4    **II.    FACTUAL BACKGROUND**

5    *StarKist.*  StarKist, the U.S. market leader in canned tuna, is headquartered in Pittsburgh and

6    has more than 4,000 employees around the globe.  Pogue Decl. ¶2.  StarKist sells tuna products in a

7    variety of flavors and packs, in cans with net weights of 3 oz., 4.5 oz., 5 oz., 5.5 oz., 12 oz., and

8    4 lbs., and in pouches.  *Id.* ¶3.  Approximately ███████ cans of the four StarKist 5 oz. canned

9    tuna products at issue (Chunk Light in Water, Chunk Light in Oil, Solid Albacore in Water, and

10   Solid Albacore in Oil) were sold during the putative class period.  Strombom Decl. Ex. 8.  Multiple

11   other StarKist canned tuna products were sold during the same time period that are not at issue in

12   the lawsuit, including 5 oz. Chunk White Tuna in Water (more than ████████ cans sold) and the

13   4.5 oz. canned tuna line (████████ cans sold).  *Id.* ¶¶50-51.

14   *Tuna Processing.*  Fishing boats typically catch tuna far offshore and freeze their catch

15   before delivering the tuna to canneries.  Maxfield Decl. ¶8.  During the putative class period and

16   continuing today, StarKist's cannery in American Samoa (which cans the great majority of the 5 oz.

17   products at issue[2]) tests each load of fish, evaluating its quality.  *Id.* ¶¶10-12.  Once a load of tuna

18   passes the initial quality check, StarKist thaws the fish, injects it with a marinade, pre-cooks it, and

19   removes the skin and bones.  *Id.* ¶13.  Filling machines on the cannery line then place specified

20   amounts of tuna (by weight) into cans.  *Id.* ¶14.  The measured weight of tuna put into each can is

21   referred to as "fish fill."  *Id.* ¶15.  StarKist then adds packing liquid, such as broth or oil, which

---

[1] In connection with a Motion to Intervene, Plaintiff alludes to his desire for certification of four subclasses, based on counts not alleged in the operative Complaint on behalf of putative class representatives who are not parties.  Mot. at 1, *see also* Dkt. Nos. 96, 96-1.  StarKist has opposed Plaintiff's Motion to Intervene.  Dkt. No. 104.  Putative Intervenor Plaintiffs have not requested (and could not request) certification with respect to the claims or subclasses alleged in the proposed Complaint in Intervention—none of which are currently pending in this action.  Nor could Plaintiff properly do so.  StarKist reserves the right to oppose any motion to certify classes with respect to these new parties or claims should they ever become part of the case.

[2] Pogue Decl. ¶8.  StarKist has a production facility in Ecuador, but its production of challenged products during the putative class period was quite small.  *Id.* ¶9.  Based on market conditions and capacity limitations in its own production facilities, StarKist has also from time to time purchased relatively small proportions of its canned tuna product from third party packers.  *Id.* ¶¶10-11.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1    helps keep the tuna moist and prevent scorching when the tuna is later cooked again in the retort

2    process.  *Id.* ¶20.  StarKist next vacuum seals and prints a production code on each can that

3    identifies the plant, product, date packed, and batch.  *Id.* ¶22.

4        StarKist cooks the sealed cans again—the retort process—making the product commercially

5    sterile and ready to eat out of the can.  *Id.* ¶23.  StarKist next conducts a quality control inspection

6    of finished can samples, evaluating product odor, flavor, texture, and appearance.  *Id.* ¶24.  For

7    product subject to FDA's regulatory press weight requirements (prior to the TMP), StarKist also

8    conducted press weight tests on finished can samples.  Pearson Decl. ¶18.  After labeling, finished

9    product goes into shipping containers and moves to the shipping dock.  Maxfield Decl. ¶¶25-26.

10   Ships with canned tuna typically leave the dock every two weeks, taking an additional two weeks to

11   reach the mainland U.S., where cans are held in a StarKist warehouse for distribution.  *Id.* ¶27.[3]

12       ***The Press Weight Regulation.***  Multiple quantity and weight measures exist for canned

13   tuna, including weight of the tuna (fish fill) when put into the can, net weight of the contents of a

14   can of tuna (including packing liquid), drained weight of the tuna after packing liquid is drained

15   off—and the press weight measure set forth in 21 C.F.R. § 161.190(c).  Maxfield Decl. ¶28.  The

16   U.S. is the only country in the world which—until the TMP (discussed *infra*)—measured weight of

17   canned tuna not just by net weight or drained weight, but also by "press weight."  *Id.* ¶29.  Even

18   though other canned foods are packed in oil or water, no other food in the U.S. is subject to the

19   press weight standard.  *Id.*  Promulgated by the FDA in 1957, the press weight standard remains

20   substantively unchanged since its issuance.

21       The press weight regulation prescribes a test procedure that involves opening both ends of

22   the can of tuna, transferring drained can contents to a machine for pressing, applying high pressure,

23   and then weighing the resulting pressed "cake" of tuna.  21 C.F.R. § 161.190(c).  The process

24   _____

25   [3] Contrary to Plaintiff's arguments about how StarKist somehow showed intent to defraud by
     adopting a "ship first and test later" policy, Mot. at 23, StarKist's production and transport

26   approach reflects standard practice in the food industry to conduct quality assurance testing while
     product is in transport.  Pearson Decl. ¶19.  In all events, StarKist's quality assurance program

27   was designed to *produce tuna that on average complied* with the press weight standard, by
     continuously testing tuna fill and monitoring press weights over time.  StarKist's program was

28   not one of differentially labeling tuna to indicate compliance or noncompliance.  Ex. 2 at 156:19-
     158:4.

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

4

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

requires specialized machinery, including steel cylinders, plungers, and press capabilities for exerting high pressures (384 psi).  *Id.*  But performing the press weight test according to the regulation also requires multiple subjective determinations and manual procedures by the tester.[4]  The average weight of the pressed cake from 24 cans determines whether the standard of fill is met.  *Id.* § 161.190(c)(1).

The regulation was developed (more than 50 years ago) when 1) tuna was packed in three-piece cans rather than two-piece cans used today, 2) half-pound cans (not 5 oz. cans) were a standard size in the industry, 3) marinade that allows tuna to retain healthy fats and nutrients through the cooking process had not yet been developed, and 4) tuna was primarily packed in oil.  DeWitt Decl. ¶¶18-27, 39.  In particular, the industry's change to the two-piece can has made it impossible to test canned tuna according to the regulation's instruction.  *Id.* ¶¶22-24; Maxfield Decl. ¶37.  For this reason alone, it is impossible to determine that any tested population of cans does not satisfy the regulation.  As explained in the accompanying declarations of Maxfield and DeWitt, moreover, these changes in the tuna canning industry made the press weight regulation difficult to construe and comply with, made test results less consistent, and rendered the standard virtually irrelevant in determining the amount of tuna—or the amount of value—a typical consumer receives when buying canned tuna.  DeWitt Decl. ¶¶10-11, 52; Maxfield Decl. ¶¶36-41.

A key element of the press weight regulation is that it determines compliance based on an *average* press weight across *24 cans*.  The regulation *does not* specify a minimum press weight for any *individual* can, nor does the standard prescribe a maximum allowed variance from the specified average.  21 C.F.R. § 161.190(c)(1); *see also* Strombom Decl. ¶13(d).  Also, because of the test procedures themselves and variations in fish and packing liquids, press weight results are subject to significant variation, even among cans that are being filled with the same weight of tuna (i.e., have the same "fish fill").  Maxfield Decl. ¶¶36-41; DeWitt Decl. ¶50; Pearson Decl. ¶15; Strombom Decl. ¶¶13(c), 24-26.  Thus, a given 24-can sample that complies with the applicable press weight

---

[4] Subjective measurements or judgments include "gentle finger pressure," "most of the free liquid," "gently force," "as soon as liquid is observed."  21 C.F.R. § 161.190(c)(2).  These factors introduce inconsistency into results, including when different operators perform the test.  DeWitt Decl. ¶¶41-49.  Because performing the test destroys the product, it is impossible to repeat the test on a single sample to check reliability or consistency of measurement.  *Id.* ¶47.

1   standard will frequently have some cans that exceed the standard while others that fall below the

2   standard, but with the *average* of the cans meeting or exceeding the press weight standard.  Ex. 2 at

3   36:21-37:6; Strombom Decl. ¶¶7(a)(ii), 14.

4          Another important aspect of the regulation is that it provides no guidance concerning

5   selection of the 24-can sample.  It does not specify random selection, nor provide guidance for

6   making a random selection.  The regulation does not define a production batch or lot, or specify that

7   samples are to be taken from one or multiple production batches or lots, and it gives no guidance

8   concerning time period of production—a day, a week, a month, or a year—from which samples are

9   to be taken.  21 C.F.R. § 161.190(c); Strombom Decl. ¶¶10, 12, 13(b).

10         Finally, it is important to understand that multiple factors affect press weight that are <u>not</u>

11  <u>related to the fish fill</u> of tuna in a given can.  DeWitt Decl. ¶¶28-50; Maxfield Decl. ¶¶36-41.

12  Specifically, the amount of liquid retained (under pressure) by tuna flesh varies by the species of

13  tuna; the age, health, and size of the fish; post-catch storage temperature; the length of time and

14  temperatures of cooking before canning; the proportion of solid tuna pieces as opposed to tuna

15  flakes in the can; and density of packing.  *See id.*  Because adding more tuna to a can increases the

16  tuna's density and reduces exposure of the tuna's surface area to packing liquid (which reduces

17  moisture absorption), *putting more tuna into the can (a higher fish fill) can result in a lower press*

18  *weight*.  Pearson Decl. ¶16.  The press weight test measures the water-holding capacity of tuna flesh

19  in the can; but there is no direct, consistent, or necessary correlation between the amount of tuna put

20  in a can (fish fill) and the press weight result for that can.  *Id.*; *see generally* DeWitt Decl.;

21  Strombom Decl. ¶¶24-26.

22         ***The Temporary Marketing Permit.***  In October 2011, StarKist, Bumble Bee, and Chicken

23  of the Sea petitioned the FDA requesting that the canned tuna standard of identity be amended to

24  eliminate reliance on the press weight standard.  *See* Dkt. No. 22, Ex. 2 at 7.  The Petition explained

25  that the regulation was outdated and that the press weight methodology was "complicated, more

26  prone to human error, and unknown to most consumers."  *Id.* at p. 7.  At the same time, StarKist

27  filed with FDA a request for a TMP to permit it to base the standard of fill for canned tuna "on

28  drained weight, rather than pressed cake weight."  *See id.* Ex. 6 at p. 1.  On June 20, 2014, the FDA

1    granted the TMP, allowing StarKist to sell canned tuna (182.5 million *pounds* in various size cans

2    over 15 months beginning in 2014) without regard to the press weight standard, so long as the

3    product meets net weight and drained weight statements on the label.  *See* Dkt. No. 76-1, Ex. C (79

4    Fed. Reg. 35362).

5           A specific requirement for issuance of a TMP is that "the interests of consumers are

6    adequately safeguarded."  21 C.F.R. § 130.17(b).  That regulation further provides: "If the [FDA]

7    concludes that the variation may be advantageous to consumers and will not result in failure of the

8    food to conform to *any provision of the act* except section 403(g) [regarding conformance to the

9    standard of identity], a permit shall be issued to the applicant for interstate shipment of such food."

10   21 C.F.R. § 130.17(e) (emphasis added).  Thus, the FDA could not issue a TMP if it concluded that

11   the TMP would result in violation of the act's prohibition against "labeling [that] is false or

12   misleading in any particular."  *See* 21 U.S.C. § 343(a)(1).  In granting the TMP, therefore, the FDA

13   effectively and necessarily concluded that eliminating the press weight requirement for canned tuna

14   would not be false or misleading to consumers.

15          ***StarKist's Press Weight Compliance Program.***  Neither Section 161.190 nor other FDA

16   regulations or guidance specify how tuna producers should implement, or test for compliance with,

17   the press weight standard.  Accordingly, StarKist developed its own testing and compliance

18   protocol.  Pearson Decl. ¶18, Exs. 1-3; Maxfield Decl. ¶¶3-4, 36.  The first step in StarKist's

19   compliance program involved the original formulation of a given canned tuna product (*e.g.*, 5 oz.

20   chunk light in oil).  In 2007, when StarKist was in the process of developing the 5 oz. product line,

21   StarKist Research & Development, Quality Assurance ("QA"), and Production employees worked

22   together to test product specifications (*e.g.*, broth recipe, can size, fish fill weights) against various

23   product requirements (*e.g.*, appearance, nutritional analysis, and press weight compliance).  Pearson

24   Decl. ¶17.  StarKist designed its 5 oz. products and tested samples against those product parameters

25   to determine if the resulting product met StarKist's internal press weight targets, before finalizing

26   product specifications.  *Id.*  StarKist set specifications, including fish fill, to deliver products that

27   met the press weight standard.  *Id.*

28          Further, StarKist has long had a program to monitor the canning process and to conduct in-

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

factory tests on cans of tuna as they are produced.  To begin, StarKist Samoa factory personnel test the tuna-filling equipment and run test batches to ensure that targeted levels of fish fill are being achieved.  Maxfield Decl. ¶¶16-21.  Fill levels of the cans are monitored throughout the production process.  With respect to press weight compliance specifically (prior to the TMP), StarKist personnel gathered samples of 5 oz. cans for each product in production that day, tested for press weight, and recorded results.  *Id.* ¶24; Pearson Decl. ¶18, Exs. 1-3.  StarKist documented its processes for press weight compliance in QA policies covering sample selection, the press testing process, and recording and reporting of results.  Pearson Decl. ¶18, Exs. 1-3.

Because press weight testing requires continual use of machinery operating at precise tolerances, maintaining the machinery in proper operating condition requires attention.  StarKist QA and engineering personnel thus regularly inspected press weight equipment used to test the challenged products.  *Id.* ¶¶7-10.  Plaintiff points to one such instance during July 2012, when StarKist QA Manager Harvey Pearson discovered, and then took necessary steps to remedy, certain mechanical and operational problems with the press weight testing machine in the Samoa plant.  Following a regular inspection of the machine, Mr. Pearson noted (in a July 3, 2012 email) that a combination of malfunction and incorrect calibration of the machine was causing it not to press 5 oz. products at the correct pressure.  Mot. at 6-7; Deckant Decl. Ex. I; Weir Decl. ¶11.

Plaintiff, however, ignores the remainder of the email thread.  In the very same email chain cited by Plaintiff, Mr. Pearson reports one week later (July 10, 2012) that "the press has been recalibrated to the correct Dillon gauge reading," permitting testing of the 5 oz. products.  Deckant Decl. Ex. I at StarKist0005040.  And there is *no evidence* that the problems noted had existed for a lengthy period of time prior to discovery.  Mr. Pearson's testimony, explaining his regular inspection of press weight equipment, confirms the contrary.  Pearson Decl. ¶¶7-12.  More generally, Mr. Pearson testifies that in his inspections of the Samoa press weight equipment, it was rare that he found significant problems with the operation of the equipment, and that when he did identify issues, actions were taken to address them.  *Id.* ¶8.

***Press Weight Testing Results.***  Plaintiff's motion relies on press weight data from limited samples, selective sources, and narrow time periods.  Plaintiff's damages expert, Weir, relies on a

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

1    hand-picked (by Plaintiff's counsel) selection of press weight results, while ignoring hundreds of

2    thousands of press weight test results that contradict his foundational assumptions.  Strombom Decl.

3    ¶¶7(b)(i)-(ii) and Section V.B.  Specifically, Plaintiff asserts—and Weir assumes—that all cans of

4    5 oz. tuna sold during the putative class period were "uniformly" "underfilled."  Mot. at 1; Weir

5    Decl. ¶¶2, 12; Hawk Decl. Ex. 1 at 220:13-20 ("[T]he presumption is all the cans of tuna have been

6    in noncompliance."); id. at 263:22-264:3.  That assertion is baseless, and the evidence before the

7    Court, including evidence cited but mischaracterized by Plaintiff, shows as much.

8          First, Plaintiff makes much of the NOAA press weight tests performed in connection with

9    the 2012 action against StarKist, Bumble Bee, and Chicken of the Sea brought by various county

10   district attorneys in California.  Weir Decl. at ¶8.  But in an inexplicable omission, Plaintiff (and his

11   expert Weir) neglected to disclose that NOAA testing commissioned by the district attorneys

12   concluded that two of the four challenged product lines (StarKist's top-selling 5 oz. product, Chunk

13   Light in Water, and Chunk Light in Oil) both met the press weight standard.  Maxfield Decl. Ex. 1

14   at StarKist0003657-3658; Strombom Decl. ¶58(a); Hawk Decl. ¶10.

15         Second, Plaintiff's own commissioned NOAA testing consisted of an extremely limited

16   sample for each of the four products—consisting of no more than 28 cans for each product, packed

17   during limited time periods.  Strombom Decl. ¶¶59-61, 72, Ex. 6.  But neither Plaintiff nor his

18   expert offers any explanation for why such a narrow range of test results could support an inference

19   of non-compliance for ▓▓▓▓▓ cans over five years—or for any significant period of StarKist

20   production.  Under basic principles of sampling and statistics, the samples chosen for testing are not

21   representative of any larger population.  Thus, Plaintiff's key, foundational assertion of StarKist's

22   five-year noncompliance is baseless.  See Deckant Decl. Ex. D; Strombom Decl. ¶¶72-73.[5]

23         Third, Plaintiff ignores entirely the great bulk of five years' worth of press weight data that

24   StarKist compiled and recorded as part of its compliance program.[6]  Strombom Decl. ¶58(b).

---

25   [5] The Chunk Light Tuna cans tested by NOAA for Plaintiff, moreover, were all packed in
     Thailand, not StarKist's Samoa facility.  See Deckant Decl. Ex. D at PH000121 ("Country of
26   Origin: Thailand"); Strombom Decl. ¶59(d).  These test results say nothing about cans packed in
     Samoa, where the great majority of the challenged products were canned.  See Pogue Decl. ¶8.
27   [6] Plaintiff mentions that StarKist stipulated to an injunction requiring it to test every lot for press
     weight and record the results of those tests.  Mot. at 7.  But Plaintiff's brief is otherwise silent on
28   the hundreds of thousands of test results in StarKist's records.  Weir analyzed a StarKist data

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

9

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

(Indeed, Plaintiff does much worse than just ignore press data.  His lawyers concealed nearly four years of StarKist test data from Plaintiff's own expert Weir, even though Weir asked counsel for all press weight data.  Ex. 1 at 33:1-6 ("I asked for all the pressed weight data that was available, yes."); *id.* at 39:3-9 ("My analysis was what I understood to be all of the available pressed weight data from StarKist relating to the products at issue in this case."); Hawk Decl. ¶¶2-9.)  The StarKist test data comprise the vast majority of available data: the non-StarKist sources cited by Plaintiff consist of only 293 cans total, or less than 0.1% of the cans tested by StarKist and recorded in its press weight data.  Strombom Decl. ¶32 n.73, ¶33 & tbl.1.  Even using assumptions that Weir makes, including that a 24-can average test determines compliance for a lot (or a day or a shift) of production (Ex. 1 at 75:11-25; 116:18-117:2; 117:11-21), the ignored data indicates press weight compliance ████████████████████████████ during the putative class period (Strombom Decl. ¶43 tbl.2)—i.e., had press weight averages of or above 2.84 (chunk) or 3.23 ounces (solid), which Plaintiff alleges to be (and NOAA uses as) the relevant press weight standards.  Compl. ¶¶2-3.  In terms of *cans of tuna shipped*, the data points to an estimated ████████████████████████████████████████ ██████████████████████████████ that were individually at or above even the higher press weight target asserted by Weir.  Strombom Decl. ¶43 n.87.  Plaintiff's proposed class definition sweeps in purchasers of *over* ██████████████ that StarKist data indicates were at or above Weir's claimed press weight targets.  *Id.*

  **Plaintiff Hendricks.**  Patrick Hendricks, who served as named plaintiff in a prior unsuccessful class lawsuit brought by his counsel here,[7] brought this action supposedly because he supposedly noticed "less tuna" in StarKist cans.  *See* Ex. 4 at 21:11-23; 30:11-17; 78:5-19.  But he is not in a position to say he ever purchased a can that failed to meet any applicable press weight standard.  He never submitted any of the cans he purchased for press weight testing (*id.* at 27:6-8; 28:15-22; 66:22-67:10), and he did not purchase any of the cans his counsel submitted to NOAA for testing.  *Id.* at 67:17-25.

---

selection covering only the period July 2010 to June 2011.  Strombom Decl. ¶58(b).

[7] *See Hendricks v. AT&T Mobility LLC*, Case No. 3:11-cv-00409-CRB, Dkt. No. 61.  Hendricks also used the same damages expert, Mr. Weir, in the prior case.  *See* Ex. 5 at PH 1946-PH 1947.

1    But even after purportedly concluding there was a "lesser" amount of tuna in StarKist cans

2    (*id.* at 99:17-22), Hendricks, nonetheless, proceeded to purchase as many as two hundred more cans

3    of the allegedly "inadequate[ly]" filled StarKist tuna (*id.* at 26:24-27:4; 32:12-18).  When asked

4    why, he responded that he likes tuna, he is a "creature of habit," he liked the taste of StarKist tuna,

5    it "[s]eemed okay," StarKist was on sale, other brands were out of stock, and he had an affinity for

6    Charlie the Tuna.  *Id.* at 32:20-33:10; 33:18-34:3; 74:16-75:2.  Plaintiff only discontinued

7    purchasing StarKist when his wife started buying the groceries; she "switched" them to Trader

8    Joe's brand tuna.  *Id.* at 62:14-63:4; 78:5-19; *see also id.* at 98:21-99:4; 129:22-25.

9    Hendricks cannot say how many cans of 5 oz. StarKist tuna he purchased during the class

10   period; he has no receipts to aid recollection.  *Id.* at 61:18-62:3.  Nor can he recall the prices he paid

11   for StarKist tuna.  *Id.* at 58:6-15; 60:2-61:4.

12   Hendricks testified that he never read anything on a StarKist can that led him to believe

13   there was a particular amount of tuna in a can or that StarKist was "lying or being deceptive."  And

14   contrary to the allegations of his complaint (e.g., Compl. ¶¶19, 24, 41, 46, 74), Hendricks saw no

15   words from StarKist indicating "legal for sale in the United States," Ex. 4 at 93:12-18; and he had

16   no understanding about what weight standard, if any, applied to canned tuna when he purchased

17   StarKist.  *Id.* at 72:9-12.  Rather, Plaintiff's expectations about the amount of tuna in StarKist cans

18   were *exclusively* based on the amount he had previously observed in the can.  *Id.* at 22:10-23:10;

19   73:11-25.

20   **III.    ARGUMENT**

21        **A.    Legal Standards**

22   "The class action is 'an exception to the usual rule that litigation is conducted by and on

23   behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

24   2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Departure from the

25   usual rule requires a putative class representative to "affirmatively demonstrate" that he or she has

26   met all requirements of Rule 23.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  And,

27   Plaintiff must satisfy those requirements through evidentiary proof.  Rule 23 requires a court to

28   "probe behind the pleadings" and to conduct a "rigorous analysis" of the evidence bearing on the

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

11

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1   certification motion. *Id*. at 1432. Because "the merits of the class members' substantive claims are

2   often highly relevant when determining whether to certify a class . . . it is not correct to say a district

3   court *may* consider the merits to the extent they overlap with class certification issues; rather, a

4   district court *must* consider the merits if they overlap with Rule 23(a) requirements." *Ellis v. Costco*

5   *Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Notably—and necessarily in light of the

6   TMP—Plaintiff here does not seek to certify an injunctive relief class under Rule 23(b)(2). Thus,

7   this Plaintiff must show that the proposed class meets each of Rule 23(a)'s requirements and

8   Rule 23(b)(3). *Comcast*, 133 S. Ct. at 1432. Plaintiff fails to do so.

9   **B.     The Proposed Class Is Not Ascertainable**

10   This Court has repeatedly recognized that Rule 23(a) requires plaintiffs not only to satisfy

11   the four requirements of numerosity, typicality, commonality, and adequacy, but also to

12   demonstrate that the proposed class is "presently ascertainable" and definite. *See Astiana v. Ben &*

13   *Jerry's Homemade, Inc.*, 2014 WL 60097, at *1 (N.D. Cal. Jan. 7, 2014); *Diacakis v. Comcast*

14   *Corp.*, 2013 WL 1878921, at *4 (N.D. Cal. May 3, 2013); *Xavier v. Philip Morris USA, Inc.*, 787 F.

15   Supp. 2d 1075, 1088-90 (N.D. Cal. 2011). A class is not ascertainable unless it is administratively

16   feasible to determine whether a particular person is a class member. *Xavier*, 787 F. Supp. 2d at

17   1089. Nor is a class ascertainable where it sweeps in uninjured members. *Stearns v. Ticketmaster*

18   *Corp.*, 655 F.3d 1013, 1018 n.5, 1024 (9th Cir. 2011). Here, the proffered class definition fails on

19   all counts.

20   **1.     Plaintiff's Alleged Class Includes Uninjured Members**

21   Plaintiff seeks to certify a class consisting of *all purchasers* of the four challenged 5 oz. tuna

22   product lines over a five-year period. But any way Plaintiff slices it, his proposed class necessarily

23   includes many people who purchased compliant cans and who were neither misled nor suffered

24   injury. Plaintiff's cited test results (as well as years of StarKist press weight test data) confirm, *at a*

25   *minimum*, that a substantial portion of cans, and StarKist production lots, complied with the alleged

26   press weight requirements. Strombom Decl. Section IV.E & ¶58.[8]

---

[8] Plaintiff and his expert offer inconsistent theories of injury. The Complaint alleges "underfilling" and resulting injury when particular cans fall below the 24 can press weight requirement. Compl. ¶¶2-3. Weir, on the other hand, assumes that cans are underfilled if packed

1   This defect of over inclusion is fatal.  "[N]o class may be certified that contains members

2   lacking Article III standing."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012)

3   (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).  In *Stearns*, 655 F.3d at

4   1024, the Ninth Circuit rejected a proposed class definition where consumers allegedly had been

5   enrolled unwittingly in a fee-based purchasing program.  The Court held that the definition

6   improperly included consumers who had been deceived (who did not realize they had been enrolled

7   in a fee-based purchasing program) and those who had not (who *did* realize they were enrolled but

8   declined to purchase products for reasons of their own).  *Id.*

9   Certification is permissible only if the class definition, by means of objective criteria,

10  screens out consumers who were not deceived or injured by the alleged misconduct.  *Id.*; *see also*

11  *Williams v. Oberon Media, Inc.*, 2010 WL 8453723, at *3-4 (C.D. Cal. Apr. 19, 2010), *aff'd* 468

12  Fed. App'x 768, 770-71 (9th Cir. Feb. 22, 2012) (class not ascertainable because there was no

13  objective way to distinguish between members injured by defendant computer failures and those

14  who did not receive a claimed benefit due to other factors); *Diacakis*, 2013 WL 1878921, at *4

15  (holding "overbroad" the proposed class including members irrespective of whether they were

16  "deceived"); *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009); *Dioquino v.*

17  *Sempris*, 2012 WL 6742528, at *6 (C.D. Cal. Apr. 9, 2012); *In re Countrywide Fin. Corp. Mortg.*

18  *Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 602 n.11 (C.D. Cal. 2011); *accord Oshana v. Coca-*

19  *Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

20  Plaintiff suggests that all he has to do is set out an "objective" class definition—regardless

21  of any reliable nexus to injury.  To be sure, a handful of District Courts have held classes

22  ascertainable despite the possibility that they would include uninjured class members.  *See, e.g.*,

23  *Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at *6 (N.D. Cal. Sep. 18, 2014) (Tigar, J.); *In re*

24  *ConAgra Foods, Inc.*, Case No. 2:11-cv-05379-MMM-AGR, Dkt. No. 545 (C.D. Cal. Feb. 23,

25  *in a particular production lot* that did not meet the 24-can press weight standard.  Ex. 1 at

26  157:11-25 ("[T]he way that the code works is . . . any individual can above or below the threshold
    is meaningless.  This lot fails as a result of the press weight not meeting the minimum
    threshold . . . .").  Weir bases his analysis on a lot-by-lot view of compliance, but admits that that

27  the regulation does not specify from what population (*e.g.*, batches, days, months, or years of
    production) the 24 cans should be drawn to determine average press weight.  *Id.* at 119:24-120:7;

28  139:21-140:25; Strombom Decl. ¶13(b).

1   2015).  StarKist respectfully submits that such decisions conflict with the Ninth Circuit holdings in

2   *Stearns* and *Oberon Media*.  In any event, they do not (in the words of a Court subscribing to them)

3   carve out the sweeping exception that Plaintiff's Motion suggests: "The fact that a Proposed Class

4   'will often include persons who have not been injured by the defendant's conduct . . . does not

5   preclude class certification,' but it is also the case that 'a class should not be certified if it is

6   apparent that it contains a *great many* persons who have suffered no injury at the hands of the

7   defendant."  *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *16 (N.D. Cal. Mar. 10, 2014) (Tigar,

8   J.).  Here, the proposed class plainly contains many consumers purchasing many compliant cans of

9   tuna.  Strombom Decl. Section IV.E.

10          The ascertainability requirement exists for a reason: there is little point in certifying a

11  *damages class* when there is no practical way to identify individuals who have actually been injured

12  or might be entitled to compensation.  This case is unlike *ConAgra* and *Jamba Juice*, because here

13  Plaintiff cannot establish that class members received identical products.  Where putative class

14  members receive *differing* products, and liability and injury determinations vary consumer by

15  consumer, courts routinely decline for ascertainability reasons.  *See Astiana*, 2014 WL 60097, at *1

16  (some "all natural" ice cream products contained cocoa processed with an allegedly synthetic

17  ingredient while others did not, and plaintiff provided no evidence as to which ice cream products

18  contained which ingredient); *Tietsworth v. Sears, Roebuck & Co.*, 2013 WL 1303100, at *3-4 (N.D.

19  Cal. Mar. 28, 2013) (some but not all machines contained defective electronic control boards, and

20  existence of defect could not be established absent testing of individual machines); *Hernandez v.*

21  *Chipotle Mexican Grill, Inc.*, 2013 WL 6332002, at *1 (C.D. Cal. Dec. 2, 2013) (certain locations

22  (but not all) served conventionally raised meats when "naturally raised" meats were unavailable,

23  but customers unlikely to remember purchase date or location or to be able to otherwise verify

24  receiving conventionally raised meat); *Hovespian v. Apple, Inc.*, 2009 WL 5069144, at *4 (N.D.

25  Cal. Dec. 17, 2009) (some iMac display screens had defects while others did not); *Collins v.*

26  *Safeway Stores, Inc.*, 187 Cal. App. 3d 62, 69(1986) ("[D]ue to the commingling of 20 percent

27  contaminated eggs with 80 percent non-contaminated eggs, each carton [purchased by consumers]

28  may have contained one or more contaminated eggs, *or none at all*.").  Here, members allegedly

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

14

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

buying "noncompliant" cans (or cans from relevant non-compliant lots) could never be identified.[9]

For the same reasons, Plaintiff cannot limit his class to consumers who received supposedly low weight cans. It is not possible to test cans purchased by individual consumers: most have long been consumed and enjoyed, even if testing were practical. And for unconsumed cans, press weight testing requires specialized equipment and destroys the product tested. *See* Maxfield Decl. ¶35; DeWitt Decl. ¶47. Nor could injury be established using Plaintiff's expert's theory. As posited by Weir, a particular can could violate the press weight regulation only if packed during a "low press" period or "lot"—i.e., packed on a production day when a relevant 24-can test average fell below the press weight standard. Ex. 1 at 75:11-25; 116:18-117:2; 117:11-21. Even assuming periods of alleged non-compliance could be isolated from periods of compliance (and Plaintiff makes no attempt to do so, assuming instead an uninterrupted five years of noncompliance), there exists no reliable method to identify cans from such noncompliant periods in the hands of identifiable consumers. Strombom Decl. Section IV.F.1. The date of purchase provides no help: StarKist tuna has a shelf life of at least three years, and can sit side-by-side on supermarket shelves with other tuna packed and shipped in different time periods. Pogue Decl. ¶5. And while Plaintiff expert Steven M. Weisbrot points to product expiration dates and an 18-digit manufacturing code printed on the bottom of each can, Weisbrot Decl. ¶¶14, 18, Plaintiff supplies no evidence that consumers would save empty tuna cans or recall manufacturing codes or expiration dates. Ex. 3 at 129:1-15.[10]

### 2.     No Reliable Method Exists to Identify Relevant Purchasers

Plaintiff's proposed class founders at an even more basic level: there is no objective, reliable method to identify who purchased the relevant products, or in what amounts, during the alleged class period. StarKist does not receive or maintain information identifying any significant portion

---

[9] Plaintiff may cite *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010). There, however, there was no dispute that all class members had vehicles with defective alignment systems. Because Plaintiff's claims did not depend on actual *manifestation* of the defect (*i.e.*, increased tire wear), the court did not require proof, at the certification stage, that a majority of class members had actually suffered increased tire wear. As to claims predicated only on increased tire wear, however, the Ninth Circuit concluded that individual issues likely predominated and remanded to the District Court for further consideration. *Id.* at 1174.

[10] Class definitions relying on "subjective memory"—such as Mr. Hendricks' purported recollection about amount of tuna in cans purchased years ago—are insufficient. *See Xavier*, 787 F. Supp. 2d at 1089; *see also In re Hulu Privacy Litig.*, 2014 WL 2758598, at *15-16 (N.D. Cal. June 17, 2014).

of consumers who purchase its tuna.  Pogue Decl. ¶6.  And consistent with Plaintiff Hendricks'

experience, consumers generally do not save grocery receipts for low-cost items such as canned

tuna—certainly not for prior years.  Several courts in the Ninth Circuit have recently denied

certification in similar circumstances.  *See Sethavanish v. ZonePerfect Nutrition Co.*, 2014 WL

580696, at *5-6 (N.D. Cal. Feb. 13, 2014); *In re POM Wonderful LLC Mktg. & Sales Litig.*, 2014

WL 1225184, at *6 (C.D. Cal. Mar. 25, 2014) *Red v. Kraft Foods, Inc.*, 2012 WL 8019257, at *5

(C.D. Cal. Apr. 12, 2012); *Dioquino*, 2012 WL 6742528, at *6; *see also Carrera v. Bayer

Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).[11]

Other courts have held that lack of receipts, in itself, does not render classes

unascertainable.  This case, however, presents ascertainability barriers much greater than simple

inability to document individual purchases.  The different canned tuna products here, some

challenged and some not, bear directly on the ability to determine class membership: purchasers of

the four challenged 5 oz. products would fall within the defined class, but purchasers of the nearly

███████ 4.5 oz. cans (largely similar to the challenged products based on appearance) sold by

StarKist during the alleged class period would not.  Strombom Decl. ¶¶50-52; Pogue Decl. ¶12.

Purchasers of Chunk Light in Water or Solid Albacore in Water would be in, but those who bought

the ████████ cans of StarKist's 5 oz. Chunk White in Water would be out.  *Id.*

Survey evidence in this case confirms that most consumers will not be able to recall their

purchases of StarKist 5 oz. tuna during the class period.  Hanssens Decl. ¶18.  In fact, Plaintiff

himself cannot provide the relevant details (*supra* at p. 11); nor can he recall whether he purchased

any Solid White product during the alleged class period.  Ex. 4 at 58:25-59:7.  He can hardly expect

other class members to do so.  "Common sense tells us that while named plaintiffs might make a

point of remembering in great detail their history with the products about which they have filed suit

. . . regular class members might not."  *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *10

(N.D. Cal. June 13, 2014).  In light of the variety of StarKist products, and the low likelihood that

typical consumers would reliably recall how many of which products they purchased and when—

---

[11] These ascertainability problems are also obstacles to manageability and superiority.  *E.g.*,
*Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 455-56, 461 (S.D. Cal. 2014); *Red*, 2012 WL
8019257, at *6; *Hodes v. Van's Int'l Foods*, 2009 WL 2424214, at *4 (C.D. Cal. July 23, 2009).

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

16                    STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1    the class cannot be certified.  *See, e.g.*, *id.* at *10; *Bruton v. Gerber Prods. Co.*, 2014 WL 2860995,

2    at *7-9 (N.D. Cal. June 23, 2014); *see also* Strombom Decl. Section IV.F.2-3.

3        Plaintiff speculates that StarKist purchasers could be identified from retail customer loyalty

4    programs, but critically, he has not subpoenaed any retailer and has furnished no evidentiary basis

5    to conclude that this method could identify <u>any substantial portion</u> of alleged class members.  Ex. 3

6    at 73:1-12; 82:12-83:16 ("The only way to actually know the answer is to serve subpoenas.");

7    84:13-85:5.  Untested hypotheses fall far short of the "affirmative demonstration" *Comcast*

8    requires.  *See In re Clorox Consumer Litig.*, 301 F.R.D. 436, at 441-42 (N.D. Cal. 2014) (class not

9    ascertainable; no showing that customer programs could identify substantial portion of purchasers);

10   *see also Randolph v. J.M. Smucker Co.*, 2014 WL 7330430, at *8 (S.D. Fla. Dec. 23, 2014).[12]

11       **C.    Plaintiff Lacks Standing**

12       Plaintiff Hendricks fails another threshold certification inquiry: he lacks standing.  "[A]

13   class representative must be a part of the class and possess the same interest and suffer the same

14   injury as the class members."  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  "If the

15   individual plaintiff lacks standing, the court need never reach the class action issue."  *Lierboe v.*

16   *State Farm Mut. Auto Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).  Accordingly, named plaintiffs

17   "must allege and *show* that they personally have been injured, not that injury has been suffered by

18   other, unidentified members of the class to which they belong . . . ."  *Lewis v. Casey*, 518 U.S. 343,

19   357 (1996) (emphasis added).  Here, Plaintiff cannot make the required showing.

20       <u>First</u>, Plaintiff cannot establish that he purchased an "underfilled" can—or any can from a

21   relevant StarKist production lot for which a 24-can press weight test indicates noncompliance.  He

22   never commissioned any press weight test, or performed quantitative testing of any kind, on any

23   can that he bought.  Ex. 4 at 27:6-8; 28:15-22; 66:22-67:10; 67:17-25.  At most, Plaintiff invokes

24   his subjective impression that the amount of tuna per can declined from prior purchases.  *Id.* at

25   21:11-23; 22:25-23:10; 30:11-17; 90:19-25.  But Plaintiff's "tuna sandwich test" does not establish

26

27   ────────────────
     [12] Plaintiff's counsel asserts that he obtained customer names through retail loyalty programs in a
28   handful of prior cases.  Deckant Decl. ¶¶2-4.  But this is no substitute for an evidentiary showing
     of ability to identify purchasers of the challenged products here, which has not been made.

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

17

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

noncompliance with press weight or evidence injury related to Plaintiff's liability theories.[13]

Second, other evidence shows he has no standing to allege the deception that is critical to his claims. His sworn testimony shows he personally was not deceived. *Id.* at 71:6-72:3. Even more compelling, his conduct confirms the point: he continued to purchase StarKist tuna— hundreds of cans—after concluding that they contained supposedly inadequate tuna. *Id.* at 32:12-18; 62:14-63:4; 78:5-19; 98:21-99:4; *supra* at pp. 10-11. Plaintiff's testimony and conduct renders implausible any claim that he was deceived or injured. *See, e.g.*, Strombom Decl. ¶27.

Third, although Weir asserts that class members overpaid for StarKist tuna and were thereby injured, Plaintiff himself can only speculate regarding injury and damage. Hendricks saved no receipts, cannot recall what he paid over time, and has no way of finding out. Ex. 4 at 60:21-61:4; 61:18-62:3. Because he cannot say what he paid for how many cans, by definition he cannot establish how much he supposedly overpaid or any measurable damage. Strombom Decl. ¶¶53-55, 64, 75-77. On that basis, too, Plaintiff lacks standing (and fails typicality), and the proposed classes cannot be certified. *See, e.g.*, *Ries v. Ariz. Beverages USA LLC*, 2013 WL 1287416, at *8-9 (N.D. Cal. Mar. 28, 2013) (decertifying "All Natural" case because plaintiff offered no evidence about a premium paid); *see also Pence v. Andrus*, 586 F.2d 733, 736 (9th Cir. 1978) (named representatives "must allege and show" personal injury).

Fourth, Plaintiff cannot have been injured by products he never bought and labels he never read, and thus cannot represent purchasers of three of the four products at issue here.[14] The Ninth Circuit recently held that a plaintiff who signed one version of tool rental agreement could not bring class claims on behalf of others who signed different agreements. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014).[15] Plaintiff here lumps the four products together as "the

---

[13] Hendricks testified that he concluded that StarKist cans were "substantially underweight" based only on his "measurement of a fist portion," Ex. 4 at 90:19-25, a metric that bears no relation to press weight or packing date of a particular can. *See also* Section III.B.1.

[14] In her March 25, 2014 Order in this case, Judge Gonzalez Rogers held that "If a sufficient similarity between the products exists, any concerns regarding material differences can be addressed at the class certification stage." Dkt. No. 57 at 19.

[15] *See also Larsen v. Trader Joe's Co.*, 2012 WL 5458396, at *5 (N.D. Cal. June 14, 2012) (for non-purchased product, plaintiffs "could not have suffered a particularized injury as required by Article III"); *Lanovaz v. Twinings N. Am., Inc.*, 2013 WL 675929, at *2 (N.D. Cal. Feb. 25,

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

18

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1   same product line" and baldly asserts that "his claims concern the same facts."  Mot. at 12.  But the

2   four products differ in material ways, according to Plaintiff's own allegations: they have different

3   press weight requirements, are tested separately, and vary widely in press weight results and in

4   asserted damages.  Compl. ¶¶2-3, Weir Decl. ¶¶4-10.  Plaintiff cannot represent a class with respect

5   to products he did not purchase.  *See Berger*, 741 F.3d at 1067; *see also, e.g.*, *Major v. Ocean Spray*

6   *Cranberries, Inc.*, 2013 WL 2558125, at *4 (N.D. Cal. June 10, 2013).

7       **D.      Plaintiff Is Not Typical (Rule 23(a)(3))**

8          Plaintiff Hendricks fails Rule 23(a)(3) typicality in large part because of the same facts that

9   deprive him of standing—he personally cannot assert the claims for which he seeks certification,

10  was never deceived, continued to buy StarKist despite his claimed realization that cans were

11  underfilled, and never purchased three of the products at issue.  Established doctrine disallowing

12  class representatives vulnerable to unique defenses preclude Hendricks as a class representative.

13  *See Stearns*, 655 F.3d at 1019-20; *Major*, 2013 WL 2558125, at *4.

14      **E.      Plaintiff Has Not Demonstrated Commonality (Rule 23(a)(2)) or Predominance**
           **(Rule 23(b)(3))**
15
16         Plaintiff's proposed class also fails commonality and predominance requirements.

17  "[C]ommonality requires that the class members' claims 'depend upon a common contention' such

18  that 'determination of its truth or falsity will resolve an issue that is central to the validity of each

19  claim in one stroke.'"  *Mazza*, 666 F.3d at 588 (quoting *Dukes*, 131 S. Ct. at 2551).  "[T]he key

20  inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather,

21  whether class treatment will 'generate common answers apt to drive the resolution of the

22  litigation.'"  *Brewer v. Gen. Nutrition Corp.*, 2014 WL 5877695, at *4 (N.D. Cal. Nov. 12, 2014).

23         Although it overlaps with commonality, the predominance test under Rule 23(b)(3) is "'far

24  more demanding' . . . and asks 'whether proposed classes are sufficiently cohesive to warrant

25  adjudication by representation."  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  A

26  plaintiff must "demonstrate the superiority of maintaining a class action and show 'that the

27  questions of law and fact common to class members predominate over any questions affecting only

28  2013); *Hairston v. S. Beach Beverage Co.*, 2012 WL 1893818, at *5 n.5 (C.D. Cal. May 18,
    2012).

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

19                                STARKIST'S OPP. TO MOT. FOR CLASS CERT.
                                  CASE NO. 4:13-CV-00729-HSG

1    individual members.'"  *Berger*, 741 F.3d at 1067.  Critically, a Rule 23(b)(3) class action cannot be

2    maintained, where "the main issues in a case require the separate adjudication of each class

3    member's individual claim or defense."  *Oberon Media*, 2010 WL 8453723, at *7; *see also Johns v.*

4    *Bayer Corp.*, 280 F.R.D. 551, 555 (S.D. Cal. 2012) ("When the court must determine the merits of

5    an individual claim to determine who is a member of the class, then class treatment is not

6    appropriate.").

7                    **1.      Individual Testing Would Be Required To Determine Core Issues**

8             Here, no common proof exists on the Complaint's central allegation: that the challenged

9    StarKist products were "underfilled and thus substantially underweight."  Compl. ¶2.  As discussed,

10   press weight varied widely during the alleged class period: the majority of cans individually met or

11   exceeded the average press weight standard, and others (although they individually may not have

12   been at or above the average press weight standard) were packed as part of a relevant population for

13   which the tested average exceeded applicable press weight standards.  Strombom Decl.

14   Section IV.E.  Under a lot-by-lot view of compliance, establishing liability for any class member

15   would require an individualized determination whether that member purchased a can from a

16   noncompliant lot.  Plaintiff accordingly has not shown (and could never show) that a class trial of

17   the facts will generate "common answers" or resolve class claims "in one stroke."  *See, e.g.*, *Dukes*,

18   131 S. Ct. at 2551.[16]

19            These issues go to the very heart of Plaintiff's lawsuit.  Each claim rests on the allegation

20   that StarKist misrepresented that the products "contained an adequate amount of tuna for a 5-ounce

21   can" and "were legal for sale in the United States."  Compl. ¶¶19, 24, 41, 46, 74.  Even assuming

22   _____

23   [16] This fact distinguishes this case from those cited by Plaintiff.  *See, e.g.*, *Delarosa v. Boiron,
     Inc.*, 275 F.R.D. 582, 594 (C.D. Cal. 2011) ("A determination by the trier of fact that Coldcalm

24   misrepresented its efficacy to Plaintiff will also resolve the common question of whether
     Coldcalm misrepresented its efficacy to all California consumers of Coldcalm."); *see also Bayer*,

25   280 F.R.D. at 557 ("As Plaintiffs note, these predominant questions are binary—advertisements
     were either misleading or not, and Bayer's prostate health claim is either true or false."); *In re*

26   *Ferrero Litig.*, 278 F.R.D. 552, 556 (S.D. Cal. 2011) (Nutella® spread advertised as healthy
     "when in fact it contains dangerous levels of fat and sugar"); *Johnson v. Gen. Mills, Inc.*, 276

27   F.R.D. 519, 521 (C.D. Cal. 2011) (common issue "whether YoPlus does confer a digestive health
     benefit that ordinary yogurt does not"); *Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113, at *2

28   (N.D. Cal. June 7, 2011) (common issue whether walnuts provided health benefits claimed on
     package labels).

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

20                                    STARKIST'S OPP. TO MOT. FOR CLASS CERT.
                                     CASE NO. 4:13-CV-00729-HSG

StarKist made such representations (they appear nowhere on the challenged product), Plaintiff

cannot establish falsity or deception on a class-wide basis, because even assuming such

representations were made and were inaccurate on *some* challenged tuna cans, they would be

entirely accurate on others.  (The analysis applies equally to omission claims: cans that were

compliant were compliant, and there can be no deception in not disclosing that compliant cans were

noncompliant.)  Plaintiff thus cannot establish, without underlined individualized proof, a core element of each

claim: that StarKist made a misrepresentation to each class member.  For the same reasons, Plaintiff

cannot show that StarKist uniformly breached any express or implied warranty.[17]

Individual determinations of liability—implicating ███████ cans sold over five years and

millions of consumers—would swamp common issues.  *See Oberon Media*, 2010 WL 8453723, at

\*7; *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (no

predominance where claims would require inquiries into how much time each individual Home

Loan Consultant spent in the office and how he or she performed on the job); *Trahan v. U.S. Bank*

*Nat'l Ass'n*, 2015 WL 75139, at \*8 (N.D. Cal. Jan. 6, 2015).

### 2. Individual Issues of Reliance, Causation, and Materiality Predominate

Plaintiff contends that a class can be certified as long as he can demonstrate "uniform

representations made to all members of the Class."  Mot. at 22.  But Plaintiff cannot wish away

other core elements of his claims—reliance, causation, and materiality—that must be proven

consumer by consumer.  Plaintiff's arguments contradict controlling law and the evidentiary record;

he has not provided Rule 23's required "rigorous analysis."  *See Comcast*, 133 S. Ct. at 1432.

First, Plaintiff breezes past varying state law requirements that would apply if the classes

were certified, including as to the critical elements of reliance and causation.  "[T]he law on

predominance requires the district court to consider variations in state law" in a multiple jurisdiction

class motion.  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007); *see also*

*Burton v. Nationstar Mortg., LLC*, 2014 WL 5035163, at \*15 (E.D. Cal. Oct. 8, 2014) (when laws

of "up to all fifty states are implicated, the plaintiff has a burden to conduct an extensive choice of

---

[17] Plaintiff cannot show, on a common basis, that the products are not "adequately contained, packaged, and labeled" or that they do not "conform to the promises or affirmations of fact made on the container or label if any."  Mot. at 21 (citing U.C.C. § 2-314(2)(a)).

law analysis and show that the requirements of Rule 23(b)(3) are not defeated"); *Makaeff v. Trump Univ., LLC*, 2014 WL 688164, at *17 (S.D. Cal. Feb. 21, 2014).[18]

Punting on specific state law issues, Plaintiff urges that his fraud and negligent misrepresentation claims be certified based on one sentence from a single Second Circuit decision, saying that fraud classes can be certified where "the claims are based on uniform misrepresentations made to all members of the class."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002).  As an initial matter, *Moore* is of no help because Plaintiff has not identified a uniform misrepresentation made to *all* class members.  *See supra* at III.E.1; *Moore*, 306 F.3d at 1255 (affirming District Court's denial of class certification; "each plaintiff must prove that he or she personally received a material misrepresentation").  More fundamentally, *Moore* does not analyze individual state law requirements.  It accordingly cannot supply the "extensive choice of law analysis" required in this Circuit.  *See Burton*, 2014 WL 5035163, at *15.  Plaintiff also relies to no avail on *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 570 (S.D.N.Y. 2014), but *Ebin* held that only *one* state's law would apply to the claims at issue, and that there were no material differences in laws of the other *four* states that might arguably apply.

Many jurisdictions furnish no presumption of reliance or causation for common law fraud[19]

---

[18] In seeking to certify California-only classes for his UCL, FAL, and CLRA claims, Plaintiff appears to acknowledge that California law cannot be applied to the claims of non-California class members.  In *Mazza*, 666 F.3d at 591-94, the Ninth Circuit held that California's choice-of-law rules prevent the application of California's consumer protection laws to claims on behalf of consumers who purchased products in other jurisdictions, because "[e]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory." The law is similarly clear with respect to Plaintiff's asserted common law claims.  *See id.*; *Holt v. Globalinx Pet, LLC*, 2014 WL 347016, at *4 (C.D. Cal. Jan. 30, 2014) (common law claims raise the problem of "material differences in state law across the jurisdictions covered by the class"). As to purported nationwide common law claims, Plaintiff essentially concedes they would require the application of the laws of 50 states.  *See* Mot. at 21-22.

[19] *See, e.g.*, *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) (rejecting argument for class-wide inference, citing *Henry Schein, Inc. v. Stromboe*, 2002 WL 31426407 (D. Tex. Oct. 31, 2002)); *Garcia v. Medved Chevrolet, Inc.*, 240 P.3d 371, 380 (Colo. App. 2009), *aff'd*, 263 P.3d 92 (Colo. 2011) ("We reject the notion that there is any Colorado precedent for a theory of presumed reliance."); *Green v. McNeil Nutritionals, LLC*, 2005 WL 3388158, at *7 (Fla. Cir. Ct. Nov. 16, 2005) ("whether a purported class member suffered a loss depends on the individual's reason for purchasing [defendant's product]"); *Pearson v. Philip Morris, Inc.*, 306 P.3d 665, 696 (Or. Ct. App. 2013); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 456 (D.N.J. 1998); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220-21 (E.D. La. 1998) ("vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases").

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

22

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

or negligent misrepresentation.[20]  Nor can Plaintiff establish a presumption of reliance or causation

for his purported nationwide express warranty claim.  Certain states require a showing of reliance to

prevail on an express warranty claim.[21]  Other states presume reliance and shift the burden to

defendant to show otherwise, or impose no reliance requirement.[22]

Absent a presumption, Plaintiff would need to prove reliance consumer by consumer—

precluding certification.  *See Moheb v. Nutramax Labs Inc.*, 2012 WL 6951904, at *7 (C.D. Cal.

Sept. 4, 2012); *Hodes*, 2009 WL 2424214, at *4 ("Courts in the Ninth Circuit and in California

have regularly found that where [individualized purchasing] inquiries predominate over common

questions of law or fact, courts may refuse to certify a class action."); *Turcios v. Carma Labs., Inc.*,

296 F.R.D. 638, 646 (C.D. Cal. 2014).  Plaintiff makes no showing that reliance or causation could

be proven on a common basis under governing state laws.

Second, with respect to his California-only classes, Plaintiff asserts that "the elements" of

his UCL, FAL, and CLRA claims can be established "statewide through common proofs," Mot. at

23 (subheading 3), but never says what those elements or proofs would be.  In fact, each count

requires proof that class members relied on the challenged representations or omissions (i.e., that

the representations caused class member injury).  *Stearns*, 655 F.3d at 1022-23.[23]  But no class-

---

[20] *Mirkin v. Wasserman*, 5 Cal. 4th 1082, at 1089 n.2 (1993); *Steiner v. Tektronix, Inc.*, 1991 WL 57033, at *5 (D. Or. Feb. 7, 1991); *Garcia*, 240 P.3d at 381 (citing cases from Delaware, Georgia, Illinois, New Jersey, and Pennsylvania reaching same conclusion).

[21] New York, Nebraska, Oregon, South Dakota, North Carolina, Florida, and Montana require reliance on a warranty.  *See, e.g.*, *Scaringe v. Holstein*, 477 N.Y.S.2d 903, 904 (N.Y. App. Div. 1984) (reliance upon the seller's affirmations or promises is a necessary element); *Hillcrest Country Club v. N.D. Judds Co.*, 461 N.W.2d 55, 61 (Neb. 1990) (plaintiffs must prove reliance on warranty); *Sol-o-Lite Laminating Corp. v. Allen*, 353 P.2d 843, 847 (Or. 1960); *Schmaltz v. Nissen*, 431 N.W.2d 657, 660 (S.D. 1988); *Bernick v. Jurden*, 293 S.E.2d 405, 413-14 (N.C. 1982); *Thursby v. Reynolds Metals Co.*, 466 So. 2d 245, 250 (Fla. Dist. Ct. App. 1984); *Woodahl v. Matthews*, 639 P.2d 1165, 1168 (Mont. 1982).

[22] *Karim v. Hewlett-Packard Co.*, 2014 WL 555934, at *8 (N.D. Cal. Feb. 10, 2014) (finding material state law differences as to reliance requirements for express warranty claims); *Lutz Farms*, 948 F.2d at 644-45 (applying Colorado law) (express warranty created by statements in seller's brochure even though buyer did not rely on the statements); Ind. Code § 26-1-2-313, cmt.3.  Other states, like Colorado, Virginia, and Idaho, have no reliance requirement.  *Keller v. Inland Metals All Weather Conditioning, Inc.*, 76 P.3d 977, 981 (Idaho 2003); *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 644-45 (10th Cir. 1991); *Daughtrey v. Ashe*, 413 S.E.2d 336, 338-39 (Va. 1992).

[23] Plaintiff may argue that the California Supreme Court decision in *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)) eliminates the reliance requirement as to absent class members.  But subsequent authority holds that *Tobacco II*, which concerns *statutory standing*, does not remove

Hogan Lovells US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1  wide inference of reliance is available unless "material misrepresentations have been made to the

2  entire class." *Id.*, 655 F.3d at 1022; *Mazza*, 666 F.3d at 595 (no class-wide inference "where there

3  is no evidence that the allegedly false representations were uniformly made to all members of the

4  proposed class"); *see also In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 133 (2010); *Tucker*, 208

5  Cal. App. 4th at 228.  Plaintiff can identify no class-wide misrepresentation or omission here.

6       Third, even where a presumption of reliance is otherwise available, courts do not presume

7  reliance—and no class may be certified—where materiality would differ from consumer to

8  consumer.  *See Vioxx*, 180 Cal. App. 4th 116, 133 (2010) (presumption appropriate only upon

9  showing of "'common evidence as to what consumers perceived or what they would find

10  material'"); *Tucker*, 208 Cal. App. at 222; *see also Moore*, 306 F.3d at 1255.  To invoke a

11  presumption of reliance, then, Plaintiff must first present evidence showing that, with respect to the

12  claimed falsehood at issue, *materiality itself* is a common issue among consumers.  *E.g.*, *Webb v.*

13  *Carter's, Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011); *Faulk v. Sears Roebuck & Co.*, 2013 WL

14  1703378, at *9 (N.D. Cal. Apr. 19, 2013); *see also Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th

15  644, 668 (1993).[24]

16       Critically Plaintiff offers no evidence, common to the class or otherwise, that class members

17  relied on press weight, or that press weight was material to proposed class members, as opposed to

18  myriad other factors influencing purchase decisions.  Hanssens Decl. ¶¶17, 47-48; Strombom Decl.

19  Sections IV.B-D.  Plaintiff says only that "it is impossible that class members did not rely on

20  defendant's representation, as it concerned the name of, and nature of the very product which they

21  purchased."  Mot. at 22.  In fact, no reference to "press weight" ever appeared on cans: consumers

22  never saw it, could not have relied on it, and in all events were undoubtedly unaware that it existed

23  as a metric, much less what it purported to measure.  Hanssens Decl. ¶48; Pogue Decl. ¶4.  Nor has

---

the element of reliance from the class certification analysis.  *Tucker v. Pac. Bell Mobile Servs.*,
208 Cal. App. 4th 201, 227 (2012); *Cohen v. DirecTV, Inc.*, 178 Cal. App. 4th 966, 981 (2009)
(on facts presented, "we find *Tobacco II* to be irrelevant because the issue of 'standing' simply is
not the same thing as the issue of 'commonality'").

[24] Even if a presumption of reliance might otherwise arise, StarKist is entitled to offer evidence to
rebut it.  *See Caro*, 18 Cal. App. 4th at 667 n.20.  Common issues cannot predominate.  *See*
*Trahan*, 2015 WL 75139, at *7 ("[I]f the adjudication of a defense for which the defendant has
the burden of proof would necessitate individual inquiries, and those inquiries would predominate
over inquiries into common questions, certification should be denied.").

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

24

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1  Plaintiff shown that press weight (even if consumers knew what it was) correlates to consumer

2  value: Plaintiff's expert Weir made no investigation of the supposed correlation (Ex. 1 at 54:9-

3  55:6), and from a practical perspective, no consumer would wish to eat tuna from which the juices

4  had been pressed out at hundreds of pounds of pressure per square inch.  DeWitt Decl. ¶52.

5           Absent evidence, it would be "at best, speculative" to assume that press weight

6  compliance was a material factor in the decision to purchase the challenged products "for all or

7  many of putative class members."  Hanssens Decl. ¶32.  This is fatal to class certification:

8  "Materiality is an objective standard, but still, Plaintiffs will need to point to some type of

9  common proof, particularly given Defendant's arguments that people join Amateur Match for

10  many different reasons and for many different purposes."  *Badella v. Deniro Mktg. LLC*, 2011

11  WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011); *see also Chow v. Neutrogena Corp.*, 2013 WL

12  5629777, at *2 (C.D. Cal. Jan. 22, 2013); *Johnson v. Harley-Davidson Motor Co. Grp., LLC*,

13  285 F.R.D. 573, 580-81 (E.D. Cal. 2012).

14           The only competent empirical evidence on this record shows that materiality is an

15  individualized issue.  Survey evidence confirms that consumers consider a variety of factors when

16  buying canned tuna, including brand, taste, packing liquid, type of tuna, dolphin-safe certification,

17  expiration date, freshness, and more.  Hanssens Decl. Ex. 6.  In the survey, no consumer, of course,

18  identified press weight as an important factor.  *Id.* ¶48.  And only 2.3% of surveyed consumers

19  identified as important any factor relating to fill of the can or weight or quantity of the tuna.  *Id.*

20  Plaintiff's testimony—that he valued multiple characteristics of canned tuna (Ex. 4 at 35:5-36:1;

21  53:8-56:6), and that he continued to purchase StarKist tuna even after supposedly concluding he

22  was being shorted (*id.* at 32:20-33:10; 33:18-34:3; 74:16-75:2)—likewise belies materiality as a

23  common issue.  *See Faulk*, 2013 WL 1703378, at *9 ("That Faulk continued to purchase Sears tires

24  and the Road Hazard Plus warranty even after he became aware of Sears' allegedly unlawful policy

25  to deny warranty coverage shows, at least as to the Named Plaintiff, materiality may not be

26  susceptible to proof by objective criteria.").

27           And it is no answer for Plaintiff to say that the amount of a product delivered to the

28  consumer is necessarily or logically material.  Press weight is not a measure of tuna put in the can

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

25

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

of tuna as it is used and enjoyed by consumers.  DeWitt Decl. ¶¶28, 52.  Neither Plaintiff nor his expert presents evidence of any consistent, discernible relationship between press weight compliance and value.  Strombom Decl. Sections IV.B.-D., V.D.1.  He offers no testimony from any recognized marketing or seafood expert, and he performs no empirical consumer survey.  Thus, Plaintiff makes no showing to establish materiality (and thus reliance) on a class-wide basis.

### F.   Individual Issues Predominate Regarding Damages

Rule 23(b)(3) certification is improper unless a plaintiff establishes that damages are "capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1433.  A court can certify a Rule 23(b)(3) class under *Comcast* only where the plaintiff comes forward with "'evidentiary proof' showing a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability." *Astiana*, 2014 WL 60097, at *13.  Plaintiff here relies exclusively on Weir's opinion to make this showing, but neither of Weir's two proposed methodologies—"Full Refund" or "Difference in Value"—passes muster.

### 1.   Weir's Testimony Is Not the Product of Reliable Principles and Methods

Rule of Evidence 702 permits opinion testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and if the testimony is based upon sufficient facts or data, is the product of reliable principles and methods, and the expert has reliably applied those principles and methods reliably to the facts of the case.  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Weir's testimony fails these requirements.[25]

Weir's proposed methodologies first of all betray a fundamental misunderstanding of economic injury and statistical analysis.  To calculate damages for his Difference in Value methodology, for example, Weir multiplies an average "underfill" percentage by an average price for every can of StarKist tuna sold during the alleged class period.  Weir Decl. ¶¶28-29.  Weir calculates the underfill percentage, in turn, using four Plaintiff-commissioned NOAA tests of 24 cans each, representing a grand total of three packing days, and then extrapolating those results

---

[25] The proffering party bears the burden of proving that expert testimony meets these requirements, *see Lust By & Through Lust v. Merrill Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996), including at the class certification stage. *See Dukes*, 131 S. Ct. 2541 at 2551; *Ellis*, 657 F.3d at 982.

to hundreds of millions of cans packed and sold over five years.  Strombom Decl. ¶72.[26]

This calculation fails as a matter of common sense and basic statistics: no valid inference can be drawn as to the five-year, ███████ can population on the basis of Weir's limited sample size and time period.  Strombom Decl. ¶¶30-33, 72-73.  Courts have excluded as unreliable expert testimony based on similarly limited or insufficient samples.  *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 2015 WL 510109, at *11 (N.D. Cal. Feb. 3, 2015) (expert could not "explain with any specificity how these disparate results" could be extrapolated over broader population; "small sample size raises serious questions"); *Arrendondo v. Delano Farms Co.*, 2011 WL 1486612, at *14 (E.D. Cal. Apr. 19, 2011) ("He extrapolates statistically based upon a limited pool of information, but offers no foundation as to why such extrapolation would be warranted.  This information is not assistive of the issue of commonality."); *United States v. Diaz*, 2006 WL 3512032, at *16 (N.D. Cal. Dec. 6, 2006).

What is more, Weir ignores, or was not shown, the overwhelming majority of class period press weight test data, all of which bear directly on his analysis.  Hawk Decl. ¶¶1-9; Strombom Decl. ¶¶57-58.  In light of the key test data that Weir never considered, Weir simply cannot have reached an informed, scientifically-based, or reliable opinion that every can at issue over a five-year period was non-compliant.[27]  Strombom Decl. ¶¶30-33, 57-61, 72-73.  Likewise, given substantial variation in press weight results across the alleged class period, no single average "underfill" amount could accurately or reliably measure claimed damages.  *Id.* ¶72.

Weir offers no answer to these fundamental defects.  He insists that "all of the evidence I've

---

[26] *See also* Weir Decl. ¶¶29, 30; Hawk Decl. Ex. 1 at 269:19-23.  He cites additional tests— Chicken of the Sea, NOAA tests commissioned by California counties, and a limited slice of StarKist test data—as purported confirmation of his assumption that all challenged StarKist products failed press weight throughout the alleged class period.  *Id.* at 193:19-25; 272:1-8.

[27] For example, while Weir points to two NOAA tests as purported confirmation for his opinion (Weir Decl. ¶8, tbl. 2), he admitted at deposition that he had never seen other contemporaneous NOAA tests confirming that two of the challenged StarKist product lines were above press weight targets.  Ex. 1 at 161:21-162:17; 170:1-16.  He attempted to dismiss them as unreliable because each utilized more cans (27 and 28) than the 24 prescribed by regulation.  *Id.* at 166:3-167:14; 167:17-168:16; 173:10-14.  At the same time, however, he credits a test of only 2 cans— 22 *below* the number prescribed by regulation—as purported evidence of "uniform" underfilling.  *Id.* at 174:8-19; *see also id.* at 195:6-15 (relying on Chicken of the Sea test of 5 cans).  As is widely understood in statistics, however, a larger sample provides more precise estimates (i.e., small margins of error for a given confidence level) of underlying population parameters (e.g., average press weight).  Strombom Decl. ¶¶33, 59(a).

1   seen indicates that all of the cans across pretty much any time frame would not have met the

2   pressed weight compliance." Ex. 1 at 118:25-119:23.  But this assurance means nothing—he has

3   never seen the vast majority of data.  He makes a half-hearted, circular-reasoned attempt to defend

4   his use of limited tests and sample sizes: "You can use a single number to get a result from my

5   damages methodology and *if the result is a reasonable result*, then yes, I think you can get

6   reasonable results from my damages models for the Class Period using the one result." *Id.* at

7   222:13-24 (emphasis added).  The "*if*" says it all.  Weir seeks to dismiss StarKist testing data as

8   unreliable and incapable of establishing press weight compliance, but again offers no evidence.[28]

9   And even as he purports to criticize StarKist data, he admits that he has no factual basis to conclude

10  the Plaintiff's and Chicken of the Sea tests at the center of his opinion were performed reliably.  *Id.*

11  at 214:12-24; 215:12-216:1; 216:19-24; 271:8-19.

12          Another critical assumption underlying Weir's damages model is that all consumers would

13  have received more tuna—more fish fill—if the press weight numbers had satisfied the standard.

14  *Id.* at 75:11-76:4.  This assumption permits Weir—according to Weir—to conclude that even a

15  consumer who receives a can of tuna with press weight above the relevant press weight standard is

16  damaged if that particular can comes from a lot with an average under the press standard.  *Id.*  But

17  this key assumption is simply wrong as a matter of both logic and statistics.  Strombom Decl. ¶68.[29]

18          In light of these deficiencies, Weir fails to offer proper expert testimony.  *See Gen. Elec. Co.*

19  *v. Joiner*, 522 U.S. 136, 146 (1997) (expert testimony may be excluded where opinion "is

20  connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is

21  simply too great an analytical gap between the data and the opinion proffered"); *accord Diviero v.*

22  *Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (Rule 702 precludes expert

23  [28] Never having seen the majority of StarKist press results, Weir still condemns them as "obtained
    through the use of faulty equipment which was rife with problems."  Weir Decl. ¶11; Ex. 1 at

24  77:15-20.  But Weir admits that he does not know the duration of any problems, and was unable
    to determine it during his deposition.  Ex. 1 at 209:5-211:5.  Weir provides no evidence to support

25  his across-the-board dismissal of StarKist test data.

26  [29] Weir's methodology would produce nonsensical results.  Under his lot-by-lot approach, for
    example, two consumers could purchase cans with identical press weight—one can deriving from

27  a non-compliant lot (measured by a 24-can average) and another from a compliant lot.  According
    to Plaintiff, both consumers would receive identical amounts of tuna.  But under Weir's

28  methodology, one would be injured and the other not.  Weir's model does not produce reliable or
    realistic conclusions regarding harm to individual consumers.  Strombom Decl. ¶¶15-16.

Hogan Lovells US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

28                                          STARKIST'S OPP. TO MOT. FOR CLASS CERT.
                                            CASE NO. 4:13-CV-00729-HSG

1   testimony based on "unsubstantiated speculation and subjective beliefs"); *Henricksen v.*

2   *ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1163 (E.D. Wash. 2009).  StarKist objects to any

3   consideration of Weir's testimony.

4        Moreover, Weir has not demonstrated that he could *ever* accurately calculate damages in

5   light of press weight variations.  He argues that his model would work with any set of data.  Weir

6   Decl. at ¶29; Ex. 1 at 269:18-25.  But the "mere suggestion that more data could improve the model

7   is insufficient, at least without any showing that the data is available."  *Kamakahi*, 2015 WL

8   510109, at *12.  Weir has made no such showing here; in fact, he claims that StarKist testing—the

9   only substantial available source of data—is inherently unreliable.  A damages model that can only

10  generate reliable results using data that does not exist is no model at all.  *See Brazil v. Dole*

11  *Packaged Foods, LLC*, 2014 WL 5794873, at *11 (N.D. Cal. Nov. 6, 2014) ("insufficient data only

12  favors a finding that the Regression Model is incapable of accomplishing its objective"); *see also*

13  *Smith v. Pac. Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009); *Brooke Grp. Ltd. v.*

14  *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

15       Finally, Weir cannot say how he would adapt his analysis if it were proven that some cans

16  met or exceeded applicable fill standards.  Ex. 1 at 184:19-185:3; 192:16-193:1.  At most, he says

17  he would have "used additional steps and conduct[ed] additional research," but offers no specifics.

18  *Id.* at 191:2-22.  The "rigorous" analysis required by Rule 23 cannot be satisfied where a damages

19  expert "has done nothing to confirm that his proposed approaches would be workable in [a given]

20  case."  *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *8 (S.D.N.Y. Aug. 5, 2010); *In re*

21  *Rail Freight Surcharge Antitrust Litig.*, 725 F.3d 244, 254 (D.C. Cir. 2013).  In short, Weir's

22  opinions here do not yield adequate assurances to the Court that his proposed approaches could be

23  reliably undertaken or would provide reliable or relevant results.

24       **2.    Weir's Methodologies Are Inconsistent With Plaintiff's Liability Theory**

25       **No Connection to Consumer Value.**  Weir's models also fail *Comcast* because they lack

26  the requisite connection to Plaintiff's theory of injury.  As noted, Weir calculates Difference in

27  Value damages as the percentage underfill multiplied by average retail price.  Putting aside its other

28  failings, this computation incorrectly (and with no substantiation) assumes a direct, one-to-one

1  correlation between press weight "underfill" and dollar value to the consumer.  In other words,

2  Weir says that lower press weight automatically means less tuna that consumers care about, which

3  translates into a precisely corresponding loss of value to consumers (e.g., five percent less press

4  weight means five percent less tuna, which means the can is worth five percent less in dollars).

5        Critically, however, Weir provides no supporting evidence or analysis to support this

6  foundational conclusion.  In fact, he simply assumes the correlation because Plaintiff counsel

7  instructed him to do so.  Ex. 1 at 101:1-11.  In reality, press weight does not measure the amount of

8  tuna placed in a can (fish fill); a greater amount of tuna might yield lower press weights, and vice

9  versa.  Pearson Decl. ¶16; Strombom Decl. ¶¶24-26.  Indeed, Weir admits that he does not know if

10  factors other than fish fill affect press weight; he has done nothing to find out.  Ex. 1 at 106:19-

11  107:11.

12        Weir concedes that consumers may value factors other than quantity or weight in

13  purchasing canned tuna—as confirmed by record evidence (Hanssens Decl. ¶¶ 47, 48 & Ex. 6;

14  Ex. 4 at 53:8-56:24; 57:18-23)—but he again ignores such evidence in his analysis.  He makes no

15  attempt, for example, to assess whether consumers would place more value on taste or moistness

16  than press weight (as Hendricks evidently did). Ex. 1 at 47:7-50:18.  Press weight, in fact, fails to

17  reflect the value to consumers of liquids in the can (for example, the moistness or juiciness of the

18  tuna, or nutrients contained in those juices).  DeWitt Decl. ¶39, 52. And Weir admits that he does

19  not know whether consumers use, or place value on, the broth contained in cans of tuna.  Ex. 1 at

20  53:8-18.  Weir has simply not attempted to measure the value of moist or nutrient-rich tuna or to

21  factor it into his calculation of consumer value.  Strombom Decl.  ¶¶19-23, 67, 69.

22        Weir's exclusive focus on press weight to the exclusion of these numerous other factors is a

23  basic flaw in his proposed methodologies.  Strombom Decl. Section V.D.1.  In *Brazil v. Dole*, for

24  example, the Court rejected plaintiff expert's proposed model under *Comcast* because it omitted

25  critical variables, and accordingly did "not sufficiently isolate the price impact of Dole's 'All

26  Natural Fruit' labeling statements."  2014 WL 5794873, at *8.  Here, too Weir has failed to isolate

27  the impact (if any) of press weight on consumer value; this shortcoming compels rejection of his

28  model.  *See also Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *11 (N.D. Cal.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

30

STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1    Dec. 15, 2014).

2         At a minimum, to measure the value impact of press weight variations, as opposed to that of

3    the multiple other factors influencing consumer preference, would require additional, detailed

4    analysis. *See, e.g.*, Strombom Decl. ¶¶28-29, 67.  But Weir admits that he has performed no such

5    research or analysis as he has proposed in other cases, and does not know if such an analysis could

6    yield reliable results in this context. Ex. 1 at 59:24-60:21.  Because he neither cites nor provides

7    evidence to conclude that the value received by consumers bears <u>any</u> correlation to press weight—

8    much less the one-to-one correlation that forms the heart of his calculation—he has not shown that

9    damages can be computed on a class-wide basis.

10        **Weir Does Not Measure Deception Damages.**  Weir's theories are unconnected to

11   Plaintiff's theory of injury and damage for another reason.  From the perspective of individual

12   putative class members, Weir's model makes no distinction between people who were deceived by

13   alleged StarKist representations or warranties, and those who (1) never perceived those

14   representations or warranties, (2) were indifferent to press weight, or (3) purchased cans of tuna

15   even after forming a belief that those cans were "underfilled" (like  Hendricks).  Weir confirmed as

16   much, testifying that his model <u>does not change</u> depending on any class member's state of mind or

17   experience: consumers who were not deceived would receive the same damages as those who were.

18   Ex. 1 at 238:6-240:3; 240:14-25.  Yet alleged consumer deception underlies Plaintiff's Complaint.

19   Compl. ¶¶14, 21, 31, 35, 47, 53-56, 60, 63, 66, 69, 74-75.  Because Weir's models lack the requisite

20   link to the injury alleged by Plaintiff, they fail *Comcast*'s requirement.

21              **3.    Weir's Full Refund Theory Does Not Measure Economic Injury**

22        Weir says that "full compensatory damages" could be awarded by returning to each class

23   member the purchase price spent on StarKist products.  Weir Decl. ¶24.  But his model fails to

24   account for the value received by each putative Class member from the use of StarKist products.

25   Strombom Decl. Section V.C.  Here, it is undisputed that Class members received value from the

26   cans of StarKist tuna at issue.  Plaintiff Hendricks admits that he received value from his purchases

27   despite alleged underfilling, Ex. 4 at 99:24-100:11, and survey evidence establishes that consumers

28   overwhelmingly derive satisfaction (and thus value) from their purchases of StarKist tuna.

Hogan Lovells US
LLP
Attorneys At Law
Silicon Valley

31                              STARKIST'S OPP. TO MOT. FOR CLASS CERT.
CASE NO. 4:13-CV-00729-HSG

1    Hanssens Decl. ¶54.  But Weir admits his full refund approach does not account for value received

2    by consumers in their purchases at issue.  Ex. 1 at 230:6-14.

3              Not surprisingly, courts have repeatedly rejected full-refund models premised on an

4    assumption that a specific alleged misrepresentation rendered the products worthless.  *See Ogden v.*

5    *Bumble Bee Foods, LLC*, 2014 WL 27527, at *13 (N.D. Cal. Jan. 2, 2014); *Ries*, 2013 WL

6    1287416, at *7; *Jones*, 2014 WL 2702726, at *19 ("Return of the full retail or wholesale prices is

7    not a proper measure of restitution, as it fails to take into account the value class members received

8    by purchasing the products."); *Caldera v. J.M. Smucker Co.*, 2014 WL 1477400, at *4 (C.D. Cal.

9    Apr. 15, 2014); *see also Werdebaugh* at *8; *Lanovaz*, 2014 WL 1652338, at *6; *Vioxx*, 180 Cal.

10   App. 4th at 135.

11             **4.      Weir's Methods Cannot Calculate Damages for Class Members**

12             Even assuming some class-wide damages amount could reliably be calculated—and Weir

13   has shown *no* method by which it could be—it still would not solve Plaintiff's dilemma.  Weir's

14   model cannot provide at least two necessary inputs—purchase price information or the specific

15   amount any particular consumer was "shorted"—and consumers will not be able to do so either.

16   His model thus cannot produce *damage awards* in the absence of individualized proof.  Class

17   certification has been denied on this basis.  *Red*, 2012 WL 8019257, at *11 ("While the amount of

18   [a] premium might be established on a class-wide basis, Plaintiffs cannot get around the fact that

19   individual class members, to recover, would need to show, at minimum, proof [of facts regarding

20   their purchases].").[30]

21             While individual class member damages *amounts* need not be calculated at certification,

22   *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013), Weir's methodologies fail

23   even to *suggest a method* by which any calculated damages pool could ever become a basis for

24   actual damage awards to class members—whose undocumented purchases vary at least in number,

25   price, size, location, discount or promotion, and time period (to say nothing about subjective

26   purchasing reason).  *Leyva* affirmed an order of class certification where the defendant could (and

27   

28   _____
     [30] Weir admits he has made no effort to calculate individual damages awards and does not know
     if he could do so.  Ex. 1 at 231:14-22; 236:6-13.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

32                              STARKIST'S OPP. TO MOT. FOR CLASS CERT.
                               CASE NO. 4:13-CV-00729-HSG

did) calculate each of the roughly 500 class members' damages down to the dollar based on its own

records.  716 F.3d at 515.  Here, on the other hand, the aggregated class members likely number in

the tens of millions, members and purchase information can never be reliably identified, and no

evidence exists to fill these gaps.  Plaintiff has introduced no evidence showing that damages can

"feasibly and efficiently be calculated once the common liability questions are adjudicated."  *Leyva*,

716 F.3d at 514; *see also Rail Freight*, 725 F.3d at 254; *Bussey v. Macon Cnty. Greyhound Park,*

*Inc.*, 2014 WL 1302658, at *6 (11th Cir. Apr. 2, 2014).[31]

### G.     A Class Action Here Is Neither Superior Nor Manageable

For the reasons discussed above, a class action—involving millions of individual

determinations regarding press weight, reliance, materiality, and damages—is not superior or

manageable.  Plaintiff's proposed nationwide classes are unmanageable for yet an additional reason:

courts in this circuit overwhelmingly decline to certify Rule 23(b)(3) classes where application of

the laws of 50 states would be required.  *See, e.g.*, *Marsh v. First Bank of Del.*, 2014 WL 2085199,

at *7-8 (N.D. Cal. May 19, 2014) (collecting cases); *Brazil*, 2014 WL 2366559, at *12;

*Werdebaugh*, 2014 WL 2191901, at *21; *Burton*, 2014 WL 5035163 at *15; *Karim*, 2014 WL

555934 at *8; *Schwartz v. Lights of Am.*, 2012 WL 4497398, at *9 (C.D. Cal. Aug. 31, 2012);

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 WL 4906433, at *3 (C.D. Cal. Nov.

13, 2008); *see also Rodriguez v. Instagram, LLC*, 2013 WL 3732883, at *3 (N.D. Cal. July 15,

2013)); *Sanders*, 672 F. Supp. 2d at 991.

---

[31] For the same reasons, *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014), is of no assistance to Plaintiff.  There, the Ninth Circuit affirmed a District Court order certifying a liability-only class, and bifurcating damages determinations, in the context of an 800-member class.  *Id.* at 1163.  In contrast, certification of a liability-only class here would not "materially advance the disposition of the litigation as a whole."  *Rahman v. Mott's LLP*, 2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014) (citing Fed. R. Civ. P. Rule 23(c)(4)).  To the contrary, denial of class certification is dictated by a second ruling of the *Jimenez* court: because defendants have a due process right to present individual defenses to liability, representative testimony and statistical evidence cannot be used to establish damage awards.  *See Jimenez*, 765 F.3d at 1165.  The result would be numerous mini-trials on damages.  *See Rahman*, 2014 WL 6815779, at *9 ("[a]llowing myriad individual damages claims to go forward hardly seems like a reasonable or efficient alternative, particularly in a case such as this where the average class member is likely to have suffered less than a hundred dollars in damages"); *see also Brazil v. Dole Packaged Foods, LLC*, 2014 WL 6893715, at *1 (N.D. Cal. Dec. 8, 2014) (*Jimenez* does not alter *Comcast* requirement of showing that damages can "feasibly and efficiently be calculated once liability issues are determined").

1   "Variations in state law can swamp any common issues and interject a multitude of different

2   legal standards governing a particular claim." *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096,

3   1099, 1104 (C.D. Cal. 2012) (referencing problems of varying standards for evidence admissibility

4   and jury instruction and verdict form complications); *see also Zinser v. Accufix Res. Inst., Inc.*, 253

5   F.3d 1180, 1189 (9th Cir. 2001) ("When more than a few state laws differ, [the] court would be

6   faced with [the] impossible task of instructing [the] jury on [the] relevant law.").

7   Because he is seeking certification of a nationwide class, Plaintiff "bears the burden of

8   demonstrating a suitable and realistic plan for trial of the class claims." *Id.* Plaintiff, however, has

9   proposed no trial plan, and fails meaningfully to address material differences in state law. He never

10  explains, for example, how the Court could formulate a single fraud jury instruction, or a

11  manageable set of different instructions, given wide variations in reliance requirements, the

12  substantive standard and burden of proof. *See Rivera*, 2008 WL 4906433, at *2 (collecting cases).[32]

13  The problems are worse for negligent misrepresentation.[33]

14  Nor does Plaintiff's brief mention of warranty claims (Mot. at 21) explain how the Court

15
16  [32] *See also, e.g., Hobson v. Entergy Ark., Inc.*, 432 S.W.3d 117, 123 (Ark. App. 2014) ("the
    defendant knew that the representation was false or that there was insufficient evidence upon
    which to make the representation [and] the defendant intended to induce action or inaction by the
17  plaintiff in reliance upon the representation"); *Just in Case Bus. Lighthouse, LLC v. Murray*, 2013
    WL 3778184, at *11 (Colo. App. July 18, 2013) ("defendant knew the representation was false or
18  was aware that he did not know whether the representation was true or false"); *Shoppe v. Gucci
    Am., Inc.*, 14 P.3d 1049, 1067 (Haw. 2000) (requiring representations made "with knowledge of
19  their falsity (or without knowledge of their truth or falsity) [and] in contemplation of plaintiff's
    reliance upon these false representations"). Additionally, the standard of proof varies. *Compare
20  Glovatorium, Inc. v. NCR Corp.*, 684 F.2d 658 (9th Cir. 1982) (California applies preponderance
    of the evidence standard) *with Idress v. Am. Univ. of Caribbean*, 546 F. Supp. 1342 (S.D.N.Y.
21  1982) (clear and convincing evidence).

    [33] In at least the following states, alleged omissions are insufficient to state a cause of action for
22  negligent misrepresentation: California, *Apollo Capital Fund, LLC v. Roth Capital Partners,
    LLC*, 158 Cal. App. 4th 226, 243 (2007); Kentucky, *Giddings & Lewis, Inc. v. Indus. Risk
23  Insurers*, 348 S.W.3d 729, 746 (Ky. 2011); Maryland, *McCormick v. Medtronic, Inc.*, 101 A.3d
    467, 488 n.14 (Md. 2014); New Hampshire, *Weber v. Sanborn*, 526 F. Supp. 2d 135, 148 (D.
24  Mass. 2007) (citing *Ingaharro v. Blanchette*, 440 A.2d 445 (N.H. 1982)); New Mexico,
    *McElhannon v. Ford*, 73 P.3d 827, 831 (N.M. 2003); New York, *Ohio Police & Fire Pension
25  Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 842 (6th Cir. 2012); Ohio, *id.*; South
    Carolina, *Allegro, Inc. v. Scully*, 762 S.E.2d 54, 68 (S.C. App. 2014); Wyoming, *Richey v.
26  Patrick*, 904 P.2d 798, 802 (Wyo. 1995). Three states do not recognize negligent
    misrepresentation as a separate cause of action. *See Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d
27  579, 584 (Ind. App. 1999); *Hanson v. Hackman Corp.*, 192 P.3d 1130, at *6 (Kan. App. 2008);
    *Sun Hotel, Inc. v. SummitBridge Credit Invs. III, LLC*, 86 Va. Cir. 189, 2013 WL 8019584, at *4
28  (Va. Cir. Ct. Jan. 23, 2013).

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SILICON VALLEY

34                          STARKIST'S OPP. TO MOT. FOR CLASS CERT.
                           CASE NO. 4:13-CV-00729-HSG

could manage a class trial. Elements of express warranty differ in multiple respects, including reliance (discussed above), privity,[34] notice,[35] and other requirements. And while Plaintiff claims an exception to the privity requirement, he provides no authority that an exception exists under any state law other than California. Given these differences, "[c]ourts routinely hold that . . . warranty claims are difficult to maintain on a nationwide basis." *Sanders*, 672 F. Supp. 2d at 991; *see also, e.g.*, *Rikos v. Proctor & Gamble, Co.*, 2012 WL 641946 at *5-7 (S.D. Ohio Feb. 28, 2012). Proceeding with the alleged nationwide class would make a single trial unworkable for the jury, the parties, and the Court. *See Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007).

## IV.    CONCLUSION

Defendant respectfully requests that the Court deny Plaintiff's Motion for Class Certification in its entirety.

Dated: March 3, 2015

HOGAN LOVELLS US LLP
ECKERT SEAMANS CHERIN & MELLOTT, LLC

By:    /s/ Robert B. Hawk
Attorneys for Defendant
STARKIST CO.

---

[34] Arizona and Florida bar recovery in the absence of vertical privity, but some states (like Washington, Ohio, and Colorado) do not require privity, and others (like California) require privity but have exceptions to the rule. *See Flory v. Silvercrest Indus. Inc.*, 633 P.2d 383, 387 (Ariz. 1981); *T.W.M. v. Am. Med. Sys., Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995); *Fortune View Condo. Ass'n v. Fortune Star Dev. Co.*, 90 P.3d 1062, 1065-66 (Wash. 2004); *Reichhold Chem., Inc. v. Haas*, 1989 WL 133417, at *3 (Ohio App. Nov. 3, 1989) (*superseded by statute on other grounds as stated in Greystone Homes, Inc. v. Midtec, Inc.*, 168 Cal. App. 4th 1154 (2008); Colo. Rev. Stat. Ann. § 4-2-318; *Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal. App. 4th 357, 369 n.10 (1997).

[35] Depending on the transaction, a plaintiff in California either needs to notify the manufacturer or the seller. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1142-43 (N.D. Cal. 2010). Certain other states, including Colorado, Indiana, Oregon, and South Dakota, also require pre-suit notice to manufacturer or seller. *Cooley v. Big Horn Harvestore Sys. Inc.*, 813 P.2d 736, 741 (Colo. 1991) (en banc); *Redfield v. Mead, Johnson & Co.*, 512 P.2d 776, 781 (Or. 1973); Ind. Code Ann. § 26-1-2-607; S.D. Codified Laws § 57A-2-607. Other states, like New York and Nebraska, do not require notice. *Fischer v. Mead Johnson Labs.*, 41 A.D.2d 737, 737-38 (N.Y. App. Div. 1973); *Moore v. Puget Sound Plywood, Inc.*, 332 N.D.2d 212, 215-16 (Neb. 1983).