1   **BURSOR & FISHER, P.A.**
    L. Timothy Fisher (State Bar No. 191626)
2   Julia A. Luster (State Bar No. 295031)
    1990 North California Boulevard, Suite 940
3   Walnut Creek, CA  94596
    Telephone: (925) 300-4455
4   Facsimile:  (925) 407-2700
    E-Mail: ltfisher@bursor.com
5          jluster@bursor.com

6   **BURSOR & FISHER, P.A.**
    Scott A. Bursor (State Bar No. 276006)
7   Neal J. Deckant (admitted *pro hac vice*)
    888 Seventh Avenue
8   New York, NY  10019
    Telephone: (212) 989-9113
9   Facsimile:  (212) 989-9163
    E-Mail: scott@bursor.com
10         ndeckant@bursor.com

11  *Attorneys for Plaintiff*
    *And the Interested Parties*

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16  PATRICK HENDRICKS, individually and on       Case No. 13-CV-00729-HSG
    behalf of all others similarly situated,
17                                               **PLAINTIFF'S NOTICE OF MOTION**
                              Plaintiff,          **AND MOTION FOR SANCTIONS**
18
         v.                                       Date: June 4, 2015
19                                                Time: 2:00 p.m.
    STARKIST CO.,                                 Courtroom 15, 18th Floor
20
                              Defendant.          Hon. Haywood S. Gilliam, Jr.
21

22

23

24              REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

25

26

27

28

---

1   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2   **PLEASE TAKE NOTICE THAT** on June 4, 2015 at 2:00 p.m., or as soon thereafter as the

3   matter may be heard by the above-captioned Court, located at 450 Golden Gate Avenue, San

4   Francisco, CA 94102, Courtroom 15, 18th Floor, in the courtroom of the Honorable Haywood S.

5   Gilliam, Jr., Plaintiff will and hereby does move for sanctions concerning Starkist's payments to fact

6   witnesses to influence their testimony.

7   This motion is based on the attached Memorandum Of Points And Authorities, the

8   accompanying Declaration of Scott A. Bursor and exhibits attached thereto, the pleadings and papers

9   on file herein, and any other written and oral arguments that may be presented to the Court.

10   **CIVIL RULE 7-4(a)(3) STATEMENT OF ISSUE TO BE DECIDED**

11   Whether StarKist should be sanctioned for making payments to fact witnesses to influence

12   their testimony.

13   Dated:  March 26, 2015                  Respectfully submitted,

14                                          **BURSOR & FISHER, P.A.**

15                                          By:   _/s/ Scott A. Bursor_
16                                                 Scott A. Bursor

17                                          Scott A. Bursor (State Bar No. 276006)
                                            Neal J. Deckant (admitted *pro hac vice*)
18                                          888 Seventh Avenue
                                            New York, NY  10019
19                                          Telephone: (212) 989-9113
                                            Facsimile:  (212) 989-9163
20                                          E-Mail: scott@bursor.com
                                                    ndeckant@bursor.com
21
                                            **BURSOR & FISHER, P.A.**
22                                          L. Timothy Fisher (State Bar No. 191626)
                                            Julia A. Luster (State Bar No. 295031)
23                                          1990 North California Boulevard, Suite 940
                                            Walnut Creek, CA 94596
24                                          Telephone:  (925) 300-4455
                                            Facsimile:  (925) 407-2700
25                                          E-Mail: ltfisher@bursor.com
                                                    jluster@bursor.com
26
                                            *Attorneys for Plaintiff*
27                                          *And the Interested Parties*

28

---

PLAINTIFF'S MOTION FOR SANCTIONS                                                    i
CASE NO. 13-CV-00729-HSG

1

**TABLE OF CONTENTS**

2

**PAGE(S)**

3  I.   INTRODUCTION ............................................................................................... 1

4  II.  KELLY ROBERTS ............................................................................................ 1

5  III. HARVEY PEARSON.......................................................................................... 9

6  IV.  STARKIST'S AGREEMENTS TO PAY FACT WITNESSES ARE
      IMPROPER..................................................................................................... 16

7
      A.   StarKist's Agreements To Pay Fact Witnesses Violate Public Policy ................... 17
8
      B.   StarKist's Agreements To Pay Fact Witnesses Violate The California
9          Bar's Rules Of Professional Conduct .................................................... 20

10 V.   RELIEF SOUGHT............................................................................................ 21

11     A.   Exclusion Of Tainted Evidence ................................................................ 21

12     B.   Payment Of Attorney's Fees And Costs .................................................. 22

13 VI.  CONCLUSION.................................................................................................. 22

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alexander v. Watson*,
    128 F.2d 627 (4th Cir. 1942) ................................................... 17, 18

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assn.*,
    117 F.3d 1328 (11th Cir. 1998) ................................................... 17, 19, 20, 21

*Goldstein v. Exxon Research & Engineering Co.*,
    1997 WL 580599 (D.N.J. Feb. 28, 1997) ................................................... 18

*Hamilton v. General Motors Corp.*,
    490 F.2d 223 (7th Cir. 1973) ................................................... passim

*In re Marriage of Simon*,
    2007 WL 1874433 (Cal. Ct. App. 2007) ................................................... 21

*Rocheux Int'l of New Jersey v. U.S. Merchants Financial Group*,
    2009 WL 3246837 (D.N.J. Oct. 5, 2009) ................................................... 19, 21, 22

*Wright v. Somers*,
    25 Ill. App. 256 (1906) ................................................... 18, 19

**RULES**

Fed. R. Civ. P. 30(c)(2) ................................................... passim

## I.      INTRODUCTION

StarKist has agreed to pay money, and actually paid money, to several fact witnesses who were deposed in this case.  Plaintiff has taken the depositions of five fact witnesses, four of whom are former StarKist employees (Aaron Maxfield, Harvey Pearson, Kelly Roberts, and Brett Butler). Upon learning that Plaintiff wished to depose their former employees, StarKist's counsel contacted those nonparties and proposed to enter into "consulting" agreements, whereby StarKist would pay them money for their testimony.  Three of the four (Mr. Maxfield, Mr. Pearson, and Ms. Roberts) accepted.[1]

Mr. Maxfield's deposition was the first.  When he testified that he was retained as a consultant to StarKist, plaintiff's counsel thought it an odd coincidence, and assumed perhaps this was a situation where Mr. Maxfield would be a testifying expert for StarKist.  It was not until we learned that StarKist proposed similar agreements to <u>every</u> former employee we sought to depose, that we realized something may be amiss.  So in the later depositions of Mr. Pearson and Ms. Roberts, we attempted to probe more carefully into these purported "consulting" relationships.

## II.     KELLY ROBERTS

Kelly Roberts was a Senior Analyst in StarKist's Corporate Quality Assurance ("QA") department from March 2012 through October 2013.  Ms. Roberts was a whistleblower, at least internally, regarding StarKist's persistent under-filling of cans in violation of federal law.  In internal emails she wrote that the press weight data from StarKist's Samoa plant was "███████████." Ex. 20, Bursor Decl. Ex. A.  She wrote that she had repeatedly advised and reported that "████████ ██████████" Ex. 22, Bursor Decl. Ex. B.  She wrote "████████████████████████ █████████████████████████████████████████." *Id.*  She wrote ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████." Ex. 39, Bursor Decl. Ex. C.

Ms. Roberts left StarKist 18 months ago.  Shortly after the Plaintiff requested her deposition

---

[1] The fourth, Mr. Butler, is the subject of another motion concerning StarKist's assertion of a "joint defense" privilege, which is being filed contemporaneously herewith.

as a fact witness, StarKist's lawyers contacted her, proposed to retain her as a "consultant," and proposed that they would represent her as counsel.  This arrangement was not disclosed in advance of Ms. Roberts' deposition.  It was revealed when Ms. Roberts was asked how she had come to be represented by StarKist's lawyer, Mr. Hawk:

> Q:    How did you – did you hire Mr. Hawk to represent you?
>
> A:    I'm not sure I understand what you're asking.
>
> Q:    So Mr. Hawk is the lawyer sitting next to you, right?
>
> A:    That is correct.
>
> Q:    And you've told me that he's representing you today, right?
>
> A:    That is correct.
>
> Q:    And my question is, did you hire him to do that?
>
> MR. HAWK:  Objection, vague and argumentative.
>
> A:    I'm still not quite sure I understand exactly what you're asking.
>
> Q:    Did you hire that lawyer that's sitting next to you right now?
>
> MR. HAWK:  Objection, vague.  The witness has indicated that she doesn't understand the question, and if you don't understand his question, you can tell him.[2]
>
> A:    I don't – I don't understand the question.
>
> …
>
> Q:    From all the lawyers in the world, how did you choose him?
>
> A:    I was – I engaged in a consulting agreement with StarKist which is how I met Mr. Hawk.
>
> Q:    How long have you been a consultant for StarKist?
>
> A:    In what respect?  Can I –
>
> Q:    In any respect.

_____

[2] Fed. R. Civ. P. 30(c)(2) states:  "An objection must be stated concisely in a nonargumentative and nonsuggestive manner."  Mr. Hawk's objections here, and to the prior question, violated that rule by, among other things, suggesting to the witness that she answer the question by stating she did not understand.  This was a signal to the witness which she promptly obeyed.

A:      After I – I would guess – I'm just thinking.  I'm sorry.  Could
we define what your definition of consulting is?

Roberts Dep. at 11:6-12:22, Bursor Decl. Ex. D.[3]

Shortly after the Plaintiff requested a deposition of Ms. Roberts as a fact witness, on
January 6, 2015, StarKist's counsel, Amy Roy, contacted her and sent her a proposed "consulting"
agreement.  Ms. Roberts signed the agreement on March 10.  Ex. 72, Bursor Decl. Ex. E.  Eight days
later, on March 18, she testified that she could not remember the terms of the 1-page agreement, or
even how much she was being paid.  Roberts Dep. at 15:13-14, Bursor Decl. Ex. D ("I don't know.  I
don't recall the parameters of the agreement.").

Without the benefit of seeing the agreement, Plaintiff's counsel attempted to inquire:

Q:      Are you a consultant for the StarKist Company, or are you a
consultant for StarKist's lawyers?

A:      I would be a consultant for the StarKist Company.

Q:      Consultant about what?

MR. HAWK:  I'm going to – I'm going to instruct the witness not to
answer because it's invasive of – it goes to the substance.  You
know, she's a consultant for purposes of this litigation, and so,
you know, those substantive communications are confidential.

MR. BURSOR:  Well, that's not a proper instruction.  That's an issue
that we're going to take up with the court ….

*Id.* at 14:8-22.

Q:      What is it you think you are going to consult about?

MR. HAWK:  Object to form.  Argumentative.[4]

A:      At this point, because I'm unclear, I would like to exercise my
right not to answer.

…

---

[3] The deposition transcripts cited in this memorandum are submitted in their entirety as exhibits to
the Declaration of Scott A. Bursor, filed herewith.  In some instances, for sake of brevity, counsel's
objections and colloquy are omitted from the quotations in this memorandum.

[4] This is not a proper objection under Rule 30(c)(2).  It is a signal to the witness to avoid answering
the question.

Q:     What is it that you're exercising?

A:     My legal counsel advised me not to answer, and because I'm not sure what you're asking me, I am not comfortable answering that question.

…

Q:     Can you explain in your own words the purpose of this consulting agreement that you claim to have with StarKist's lawyers?

MR. HAWK:  Objection, asked and answered.  That same substitute question.  You can answer if you can do so without disclosing our communications, and if not, you should not answer it.[5]

A:     I'm going to not answer at this time.

*Id.* at 20:24-23:1.

Q:     All right.  How many other consulting agreements do you have?

A:     This was my first formal consulting agreement.

Q:     In your life?

A:     In my life.

*Id.* at 30:20-24.

Later in the deposition, Ms. Roberts was shown Exhibit 19, Bursor Decl. Ex. F, an email she wrote to a colleague at StarKist on July 3, 2012, stating:

After Ms. Roberts was confronted with this email, the deposition continued as follows:

Q:     And before you spent six hours meeting with lawyers and before there was an agreement to pay you for your testimony, you concluded that

---

[5] This was another objection that violated Rule 30(c)(2) by, among other things, signaling the witness that she should not answer the question, then directing her to limit her response.  Again, Ms. Roberts promptly recognized and obeyed Mr. Hawk's signal and refused to answer the question.

1    MR. HAWK:  Object to form, argumentative.

2    A:    I kind of also take offense to the fact that you just said I was
3          being paid for testimony, which would – which is, A,
           inaccurate and, 2, would be an unethical implication to me.

4    …

5    Q:    So before you had an agreement with the StarKist Company to
6          pay you for your testimony in this case, you concluded ▓▓▓▓
7          ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, right?

8    MR. HAWK:  Objection, argumentative, mischaracterizes.[6]

9    A:    I'm sorry, could you read the question exactly as he said again?
           I'm still on the offended piece.

10   (The record was read back by the Reporter.)

11   A:    So there's two questions in there.

12         First of all, I indicated I'm not being paid for testimony, and
13         the second is that I indicated I entered into a consulting
           agreement, and it appears I said here, but did not make any – ▓▓
14         ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15         ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16         ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17   Q:    If you're not being paid for your testimony, what are you being
18         paid for?

19   MR. HAWK:  Objection, asked and answered.  Do you really want to
           go back into this now?[7]

20   Q:    Can you answer my question?

21   A:    Well, I guess I don't understand what paying – maybe because
22         I've never been in a situation like this, what paying for
           testimony means, so I guess I'm not sure what you're saying to

23   _____

24   [6] Here again, Mr. Hawk's objections violated Rule 30(c)(2) and signaled the witness that she should
     disagree with the premise of the question ("argumentative, mischaracterizes").  Under Rule 30,
25   "objection to form" is all that is required.  "Mischaracterizes" is not an objection.  It is a signal to the
     witness to disagree.

26   [7] Mr. Hawk's objection again violated Rule 30(c)(2).  "Asked and answered" is never a proper
27   objection at a deposition.  Here it was a signal to the witness to either refuse to answer or to be
     careful to ensure that her answer remains consistent with her prior testimony.  Ms. Roberts initially
28   picked up on the signal and provided a nonresponsive answer.  Only after the question was read back
     twice did she finally admit that she was being paid for her testimony.

PLAINTIFF'S MOTION FOR SANCTIONS                                                    5
CASE NO. 13-CV-00729-HSG

1                      me.  It just sounds like you're making me out like I'm

2                      unethical, and that's not true.

3            MR. BURSOR:  Can you read my question back, please?

4            (The record was read back by the Reporter [Question: If you're not

                    being paid for your testimony, what are you being paid for?])

5

6            Q:     Can you answer that question?

7            A:     [Prolonged silence.]   My understanding was I was asked to

                    speak to things about this case with you today.

8  Roberts Dep. at 106:23-109:13, Bursor Decl. Ex. D.

9        Under Mr. Hawk's watchful eye, Ms. Roberts then feigned a lack of memory and inability to

10  understand statements in the email she wrote, Exhibit 19, and claimed they were "not her words":

11            Q:     Okay.  Now, when you wrote this poses a huge compliance risk

12                      for us, what was the compliance risk?

13            A:     I will tell you that my recollection of this – you're asking me to

14                      answer a question based on limited knowledge at this point in

                    time, so this is – these are not my words, first of all, so I think

15                      that that's what we need to be totally clear.  …

16            Q:     Do you think the company most likely was not making press

                    weight?

17             A:     At this point in time, what I'm telling you is that I wrote this as

18                      the summation of what was discussed on the call, and ▆▆▆▆▆▆

19                      ▆▆▆▆▆▆▆▆▆▆▆▆

20            …

21            Q:     So was it the consensus of the group that ▆▆▆▆▆▆▆▆

22                      ▆▆▆▆▆▆▆▆▆▆

23            A:     I am telling –

24            MR. HAWK:  Let me object.

25            THE WITNESS:  Go ahead.

26            MR. HAWK:  I'll object to form.  I'll object to form, and it's also

27                      vague. [8]

28  [8] This objection violated Rule 30(c)(2) by suggesting to the witness she disagree or feign a lack of memory, which she promptly did.

1    A:    I am telling you I don't remember. …

2    Q:    Well, you said these are not my words, right?

3    A:    I said I'm not sure.  These are not exactly my words.  I typed
4          this e-mail.  There's no doubt about this.

5    Q:    If these are not your words, whose words are they?

6    A:    That's what I'm telling you.  I'm not sure. …

7          …

8    Q:    Now, when you wrote this poses ████████████████████
9          were those also not your words?

10   A:    I think I've indicated I'm not sure if they were ….

Roberts Dep. at 111:20-116:2, Bursor Decl. Ex. D.

       Later in the deposition, Ms. Roberts feigned a similar inability to remember or understand

statements she wrote in an August 22, 2012 email exchange with StarKist's Director of R&D, Glenn

Mast.  That email began with Mr. Mast ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████." Ex. 22, Bursor Decl. Ex. B.  At her

deposition, Ms. Roberts testified she could not understand her own statement:

18   Q:    It's your comment that ██████████, right?

19   A:    Right, but I don't know what ███ means. …

Roberts Dep. at 181:5-6, Bursor Decl. Ex. D.

       In the same email, Ms. Roberts also wrote that "████████████████████████████████

████████████████████████":

1  Ex. 22, Bursor Decl. Ex. B.    But in her deposition, again under Mr. Hawk's watchful eye, she

2  testified:  "I am not aware or can recall ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓."  Roberts Dep. at 193:15-17, Bursor Decl. Ex. D.

4  　　　　Some of the significant changes to Ms. Roberts' views, as expressed before and after her

5  "consulting" agreement with StarKist's lawyers, are highlighted in the following table:

6

| Ms. Roberts' statements BEFORE the "consulting" agreement | Ms. Roberts' testimony AFTER the "consulting" agreement |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 19. | Q:　　If these are not your words, whose words are they?<br><br>A:　　That's what I'm telling you.  I'm not sure. …<br><br>Dep. at 115:3-5. |
| "I was under the assumption that ▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓." Ex. 20. | Q:　　After you got this e-mail [Ex. 19], you knew ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓, didn't you?<br><br>A:　　That is not correct, and I don't think it's indicated in this e-mail trail.<br><br>Dep. at 87:11-15. |
| "All we can keep doing is advising and reporting that ▓▓▓▓▓▓▓▓▓▓▓▓▓." Ex. 22. | "I am not aware or can recall ▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Dep. at 193:15-17. |

| Ms. Roberts' statements BEFORE the "consulting" agreement | Ms. Roberts' testimony AFTER the "consulting" agreement |
|---|---|
| "[I]f I had the power, I would ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓" Ex. 22. | Q:  Why did you want to ▓▓▓▓▓ ▓▓▓▓▓▓? <br><br> A:  I don't recall wanting to ▓▓▓▓ ▓▓▓▓▓ <br><br> … <br><br> Q:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓? <br><br> A:  I don't know that ▓▓▓▓▓▓▓ ▓▓▓▓. <br><br> Dep. at 155:6-17 (objection omitted). |

During the deposition, Mr. Hawk repeatedly instructed Ms. Roberts not to answer questions concerning their communications, or the substance of the purported "consulting." *See, e.g.*, Roberts Dep. at 34:8-35:2, 44:24-45:13, 49:4-8, 51:5-10, 55:11-56:3, 57:3-7, 72:21-73:8, 126:10-14, 183:7-14, 184:11-12, Bursor Decl. Ex. D.  He repeatedly made suggestive objections and other statements on the record to coach and influence Ms. Roberts' testimony. *See, e.g.*, 21:8-10, 48:17-19, 53:10-12, 58:16-22, 80:13-14.  After initially refusing to produce the "consulting" agreement during the morning of the deposition, Mr. Hawk reluctantly produced it during the afternoon. *See id.* at 255:25-256:8.  But Mr. Hawk's conduct throughout the day continually impeded, frustrated and delayed the deposition.[9]

## III.   HARVEY PEARSON

Harvey Pearson was StarKist's Director of Corporate Quality Assurance ("QA") until he left the company in May 2013.  In June 2012, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ at StarKist's plant in American Samoa and ▓▓▓▓▓▓▓▓▓▓▓▓▓.  On July 3, 2012, Mr. Pearson wrote an email to

---

[9] Mr. Hawk similarly impeded, frustrated and delayed the deposition of Aaron Maxfield with improper objections, coaching, and instructions not to answer. *See, e.g.*, Maxfield Dep. at 24:23-26:20, 24:23-26:20, 28:11-30:3, 36:6-37:6, 40:14-41:1, 44:20-45:5, 64:10-21, 82:16-83:13, 90:23-91:5, 107:15-108:10, 124:8-127:1, 128:1-25, 130:7-24, 138:12-141:16, 158:5-164:6, 191:8-193:19, 211:4-11, 243:5-12, 258:15-259:1, 270:11-272:15, 277:21-278:12, Bursor Decl. Ex. I.

plant manager Brett Butler and others:

███████████████████████████

███████████████████████████

███████████████████████████ .

Ex. 18, Bursor Decl. Ex. G (emphasis in original).  Pearson found that ████████████

█████████████████████.  *Id.* at

StarKist0005042 (stating ███████████████████████████

█████████████).  Pearson found that ████████████████████

██████.  *Id.*  █████████████████████████████

█████████).  Pearson found that the staff at the plant was ███████████

███████.  *Id.* ("██████████████████████

Pearson found ██████████████████████

██████, and ████████████████████████

███████████████████████████

███████████████████████████

███████████████████████).

     Mr. Pearson left StarKist nearly 2 years ago.  Shortly after the Plaintiff requested his

deposition as a fact witness one of StarKist's lawyers, Amy Roy, contacted him and proposed to

retain him as a "consultant," just as Ms. Roy had done with Kelly Roberts.  Again, this "consulting"

arrangement was not disclosed prior to Mr. Pearson's deposition.  It was revealed when Mr. Pearson

was asked about his preparation for the deposition:

> Q:    So you spent a total of about 20 hours with StarKist lawyers to
> prepare for this deposition?
>
> A:    That sounds about right, yeah.
>
> Q:    Were you paid for that time?
>
> A:    I was hired by StarKist as a consultant.
>
> Q:    Consultant to do what?
>
> A:    For this deposition.

Q:      How many hours have you billed to StarKist under this consulting agreement?

A:      Maybe 15 or 16 hours, I think, at this point.

…

Q:      Have you billed for anything else other than meeting with the lawyers to prepare for this deposition?

A:      Mileage, any costs I had.

Q:      When did you make this arrangement to be a consultant for the StarKist Company?

A:      I think it started in late November, early December [2014].

Q:      How did that come about?

A:      Phone call.

Q:      Phone call from who?

A:      From Amy Roy.

Q:      What did she say?

MR. SHEPARD: Objection; he's a former employee, and the communications are privileged.  Don't answer.

MR. BURSOR:   What privilege is that?

MR. SHEPARD:  He's a former employee.  It's the attorney-client privilege.

BY MR. BURSOR:

Q:      Was Ms. Roy your lawyer when she called you?  Was that your understanding?

MR. SHEPARD: Objection; calls for a legal conclusion.

THE WITNESS: No.  It was a phone call from her.[10]

Pearson Dep. at 42:8-44:3, Bursor Decl. Ex. H (some objections omitted).

---

[10] Mr. Shepard's objections and instructions here violated Rule 30(c)(2).  There is no "former employee" privilege.  Mr. Pearson confirmed that Ms. Roy was not her lawyer when she called him.  "Calls for a legal conclusion" is not an objection recognized under the federal rules.  It is a signal to the witness to avoid answering the question.

Q:      Did you communicate with anyone at StarKist about this
consulting arrangement?

MR. SHEPARD: It's vague and ambiguous.

THE WITNESS: No.  I don't think I spoke to anyone else at StarKist.

*Id.* at 46:16-20.

Q:      Did you discuss consulting about anything other than preparing
to give this testimony today?

MR. SHEPARD:  Objection; vague and ambiguous.

THE WITNESS:  No.  It pretty much involved the issue with the
deposition.

*Id.* at 52:16-20.

StarKist's counsel developed a strategy to portray the problems Mr. Pearson had identified

with StarKist's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.  In opposing class certification, they argued:

> [T]here is *no evidence* that the problems had existed for a lengthy
> period prior to discovery.  Mr. Pearson's testimony, explaining his
> regular inspection of the press weight equipment, confirms the
> contrary.  Pearson Decl. ¶¶ 7-12.

Defendant StarKist Co.'s Opposition To Plaintiff's Motion For Class Certification at 8:21-23 (filed

under seal March 3, 2015) (italics in original).  To support that strategy, StarKist's counsel obtained

Mr. Pearson's signature on a declaration, which they submitted with their opposition to class

certification, stating that Mr. Pearson was responsible for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Pearson Decl. ¶ 3 (Doc. No. 111-12), that one of his "regular

duties was to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," *id.* ¶ 7,

and that during the "majority" of Mr. Pearson's visits to the Samoa plant, he "made a point to ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," *id.* ¶ 8.[11]  During his deposition seven days

later, Mr. Pearson repudiated each of those statements.

Paragraph 3 of Mr. Pearson's declaration states:

3.  One of my responsibilities during my tenure at StarKist was

---

[11] Mr. Pearson's sworn declaration does not state that he submitted this testimony as a paid
consultant to StarKist.

Mr. Pearson repudiated that statement during his deposition, stating that this was not his responsibility:

> Q:    My question was whether it was one of your responsibilities during your tenure at StarKist to �altitude. Was it or wasn't it?
>
> A:    No.   I was –
>
> MR. SHEPARD:  Overbroad as to time.[12]
>
> THE WITNESS:  I was involved only with ▇▇▇▇▇▇.

Pearson Dep. at 100:17-24, Bursor Decl. Ex. H.

Paragraphs 7 and 10 of Mr. Pearson's declaration described maintenance of ▇▇▇▇ as being among his "regular duties":

> 7.  From the early 2000s through mid-2012, while I was Manager, Quality Assurance, one of my regular duties was to ▇▇▇▇▇▇▇▇▇▇ at the Samoa plant.  …
>
> 10.  The reason I regularly ▇▇▇▇▇▇▇▇▇▇, so the problems could be remedied, if any existed.  …

Mr. Pearson repudiated those statements during his deposition, repeatedly denying that ▇▇▇▇ was among his "regular duties":

> Q:    But you wouldn't say that it was one of your regular duties to ▇▇▇▇▇▇▇▇▇?
>
> A:    No, not –
>
> MR. SHEPARD:  Objection; mischaracterizes –

---

[12] Mr. Shepard's objection violated Rule 30(c)(2) and was a suggestion to the witness that he avoid giving a straightforward answer to a simple question.  The question incorporated verbatim the exact statement from paragraph 3 of Mr. Pearson's sworn declaration, including the exact same timeframe ("during my tenure at StarKist").  When Mr. Pearson initially contradicted his declaration with a clear "No," Mr. Shepard interjected to try to muddy the record.

THE WITNESS:  Sorry.

MR. SHEPARD:   – testimony.[13]

BY MR. BURSOR:

Q:      Go ahead and answer.

A:      Not every time I went to the plant.  I had other projects that I
        was there to do.

Q:      So it was not one of your regular duties to conduct ▓▓▓▓▓▓
        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓?

MR. SHEPARD:  Objection; asked and answered, overbroad, vague
        and ambiguous.[14]

THE WITNESS:  Yeah, I did not – I was not required to ▓▓▓▓▓▓
        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ It depended on what my
        assigned duties were when I went to the facility.

Pearson Dep. at 141:8-142:2, Bursor Decl. Ex. H.

Paragraph 8 of Mr. Pearson's declaration states he inspected the press machine during the

"majority" of his visits to Samoa:

        8.  During this period, I frequently traveled to Samoa – going there in
        most years on an almost monthly basis, and spending several months a
        year in Samoa in some years.  During the majority of my visits to the
        Samoa Plant, I made a point to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ …

During his deposition, Mr. Pearson repudiated the statement that he ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ on a

"majority" of his visits to the plant:

        Q:      Would you say that you ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ on
                the majority of your visits to the plant?

MR. SHEPARD:  Objection; overbroad as to time.[15]

---

[13] "Mischaracterizes testimony" is not a proper objection under Rule 30(c)(2).  Even if it were, the question posed does not characterize any testimony.  This is another instance where Mr. Pearson initially contradicted his declaration with a clear "No," which prompted Mr. Shepard interject.

[14] Again Mr. Shepard violated Rule 30(c)(2) with suggestive objections.  Here "object to form" was all that was needed to preserve any objection – though even that would be dubious since there is no problem with the form of the question.  This was an interjection by Mr. Shepard to try to stem the damage from Mr. Pearson's contradiction of a key point in his declaration, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was one of his "regular duties."

THE WITNESS:  No, I don't know.  I didn't document exactly on
which trip I looked at them.

BY MR. BURSOR:

Q:      So you wouldn't say you inspected them on a majority of your
trips to the plant, would you?

MR.SHEPARD:  Objection; mischaracterizes his testimony, overbroad
as to time.[16]

THE WITNESS:  I don't know that.

Pearson Dep. at 145:22-146:9, Bursor Decl. Ex. H.

Later in his deposition, Mr. Pearson testified that it was the engineering department at the

Samoa Plant, and not him, that was responsible for the ████████████████████.  And that

████████████████████████████████  Indeed, Mr. Pearson had urged a more ████████████

██████████████████████████  but none was  implemented:

Q:      Have you ever seen any ██████████████████ reports
and records from the StarKist Company?

A:      No.  I never looked for any.  I don't know whether the
engineering department writes all that down or not.

Q:      Well, you told them they should.

A:      Yes.  That was – prior to that, I don't know.  They were –
hopefully, they were doing it after instruct- a – I sent that
e-mail to Brett and they were doing it.

…

Q:      You told them that they should have a documented
████████████████████████████, right?

A;      Yes.

Q:      But you never actually saw documents about that, correct?

MR. SHEPARD:  Vague and ambiguous.

---

[15] This was another suggestive objection from Mr. Shepard to try to signal the witness to avoid
contradicting his declaration.  Here, the witness did not pick up on the signal; he contradicted his
declaration with a clear "No."

[16] "Mischaracterizes testimony" is not a proper objection under Rule 30(c)(2).  Even if it were, the
question posed did not characterize any testimony.  This was a signal to the witness.

THE WITNESS:  I didn't see any documents from the engineering
department.

BY MR. BURSOR:

Q:      Or from anywhere else within StarKist?

A:      Correct.

*Id.* at 220:1-221:2.

StarKist's counsel, Mr. Shepard, recognized that Mr. Pearson's testimony starkly contradicted his declaration.  When Plaintiff's counsel finished his questioning, Mr. Shepard took his paid fact witness out of the room for some more "consulting."  They returned 26 minutes later.  *See id.* at 289:1-5 (videographer's time stamps showing break from 5:40 p.m. to 6:06 p.m.).  Mr. Shepard then led Mr. Pearson through a series of suggestive leading questions based on 16 expense reports for trips to Samoa during 2011 through 2013, and elicited testimony that Mr. Pearson "would have" ▮▮▮▮▮▮▮▮▮ on a number of these trips.  *See id.* at 289:7-311:9.  Only 1 of the 16 expense reports mentions any work related to the ▮▮▮▮▮▮.  But Mr. Shepard suggested through his questioning that Mr. Pearson inspected the press machine on a majority of the trips:

Q:      And you conducted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ on those occasions?

A:      Yes.

Q:      And you did tha ▮▮▮▮▮ times in 2011, ▮▮▮▮▮ times
in 2012, and ▮▮▮▮▮ times in 2013, correct?

MR. BURSOR:  Object to form.

THE WITNESS:  Yes.

*Id.* at 340:4-12.

## IV.   STARKIST'S AGREEMENTS TO PAY FACT WITNESSES ARE IMPROPER

StarKist's agreements to pay three fact witnesses in this case, Ms. Roberts, Mr. Pearson, and Mr. Maxfield, violate public policy.  And the conduct of StarKist's counsel in connection with these agreements violated Rules 5-310 and 5-200 of the California Bar's Rules of Professional Conduct.

A.     **StarKist's Agreements To Pay Fact Witnesses Violate Public Policy**

From our research it appears that the Ninth Circuit has yet to address the question whether payments to fact witnesses violate public policy. The Fourth, Seventh, and Eleventh Circuits, however, have held that payments to fact witnesses are improper. *See Alexander v. Watson*, 128 F.2d 627 (4th Cir. 1942); *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assn.*, 117 F.3d 1328 (11th Cir. 1998).

In *Alexander*, a lawyer and an accountant, both of whom testified as to facts within their personal knowledge in a prior trial, petitioned the court to recover compensation for their services rendered in that trial. They contended that their memories of the facts had been dim, but that they had "left nothing undone" and "looked up … records" so as to testify more completely and effectively as fact witnesses. 128 F.2d at 629. The Fourth Circuit, after stating that any agreement to pay beyond those fees provided by law would be void as "lacking in consideration and also as contrary to public policy," commented:

> [T]he giving of testimony as to facts within one's knowledge is a matter of public duty, and one may not impose any condition upon the performance of that duty which the law does not authorize. Except in the case of expert witnesses, we know of no authority which would justify an allowance to witnesses in excess of ordinary witness fees, however valuable their testimony may have been to the parties calling them to testify.

*Id.* at 630. The implication here is, of course, that even time spent preparing to testify on facts within one's personal knowledge may not be compensated by a litigant.

In *Hamilton*, the Seventh Circuit had to resolve the "fundamental problem of whether public policy permits any compensation to be paid to a non-expert witness." 490 F.2d at 224. Executors of the estate of Harold F. Hamilton had brought an action against the General Motors Corporation ("GMC") in order to recover for services performed by the deceased in connection with complex antitrust litigation brought against GMC by the United States government. The Seventh Circuit found that public policy does not permit such compensation. *Id.* at 229.

Hamilton, a former General Motors executive, was an expert in the diesel locomotive

industry who formed and subsequently sold to GMC his company, Electro-Motive Engineering

Corporation.  Although he was a fact witness in the antitrust litigation, Hamilton independently met

with the GMC trial lawyers on seven different occasions – four times to develop a comprehensive

memorandum of his knowledge and three times to prepare for his deposition testimony.  *Id.* at 225.

Additionally, over a period of four years, there was a continual stream of correspondence between

Hamilton and the trial attorneys.  His involvement in the GMC case was so pervasive that the

complaint alleged that he "came out of his retirement and thereafter for approximately ten years

regularly devoted substantially all of his time and effort in assisting GMC officials and counsel."  *Id.*

Nevertheless, relying on a combination of statutory and case law, the court found that any

agreement to compensate Hamilton, whose involvement was premised upon his own personal

knowledge of the facts at issue, would have been improper.  Quoting from *Wright v. Somers*, 25 Ill.

App. 256 (1906), the Seventh Circuit stated:

> If a witness, who knows a fact material to the issue in the cause … can
> traffic with the suitor, who desires to call him, as to the value of his
> testimony, and then call upon the courts to enforce the contract thus
> made, the tendency to evil consequences is apparent.  Such a ruling
> leans toward the procurement of perjury; toward the raising up of a
> class of witnesses who, for a sufficient consideration, will give
> testimony that shall win or lose the lawsuit, toward the perversion of
> justice; and toward corruption in our courts.
>
> We are not charging that any of these dangerous consequences
> happened in this case.  It does not appear but that appellee when called
> in the damage case testified simply and purely to the truth.  But the
> affirmance of this judgment would so clearly tend to evil consequences
> that we must declare the contract upon which it is founded void as
> against public policy.

490 F.2d at 228.

*Hamilton*  and *Alexander* were discussed and applied in *Goldstein v. Exxon Research &*

*Engineering Co.*, 1997 WL 580599 (D.N.J. Feb. 28, 1997), which involved "a consulting agreement

between a fact witness, Dr. Effron, and Defendant [Exxon]."  *Id.*, at *1.  There, the court found that

"the agreement to compensate Dr. Effron for his time spent preparing to testify is improper."  *Id.*,

at *3.  The court emphasized that the truthfulness of Dr. Effron's testimony was beside the point.

Discussing the foregoing passage from Hamilton, the court explained:

Likewise, in this case, it does not matter whether the "dangerous consequence" of perjury occurred.  When a witness is called because of vast personal knowledge of the subject matter of a lawsuit – as both Hamilton and Effron were – even if the witness has a "connection" with the suit, public policy dictates that such a witness may not be compensated for his services by a party to the litigation.

*Id.*, at *4.

Chief Judge Brown of the District of New Jersey reached a similar decision in *Rocheux Int'l of New Jersey v. U.S. Merchants Financial Group*, 2009 WL 3246837 (D.N.J. Oct. 5, 2009), regarding payments to a witness, Jorge Gutierrez.  The plaintiff initially identified Mr. Gutierrez as an expert witness, but the defendant sought to depose him as a fact witness.

During the deposition, Mr. Gutierrez revealed that he had been paid more than $4,000 by Plaintiff's counsel, but that he understood the fee to compensate him for his consulting services (specifically, his communications with counsel and time reviewing the affidavit) rather than his expected expert testimony, and he admitted that he submitted no expert reports ….

Defendants moved to exclude Mr. Gutierrez as an improperly paid fact witness, arguing that Plaintiff's counsel wrongfully listed Mr. Gutierrez as an expert witness, despite the lay factual basis of his testimony, in order to bypass the legal bar to payment of fact witnesses and obtain testimony damaging to Defendants.

*Id.*, at *1-2 (footnote omitted).  Chief Judge Brown agreed that Gutierrez was a fact witness, and cited *Hamilton* and *Golden Door* to hold the payments improper:

Mr. Gutierrez was a fact witness, and his payment by Plaintiff's counsel clearly runs afoul of the longstanding prohibition against payment of fact witnesses.  Witnesses brought before a court are duty-bound to tell the truth, and the payment of witnesses for their testimony "leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit, toward the perversion of justice; and toward corruption in our courts."  *Hamilton*, 490 F.2d at 228 (quoting *Wright v. Somers*, 125 Ill. App. 256, 256 (1906)).

Mr. McAlindin's decision to pay Mr. Gutierrez for factual testimony has cast a cloud over the legitimacy of that testimony, and the Court must prevent this suspect evidence from contaminating future proceedings.  Federal Rule of Evidence 403 permits this Court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," and other courts have

> recognized that the proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witnesses. *See, e.g.*, *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1526-27 (S.D. Fla. 1994) (excluding "testimony given in this action by any of the fact witnesses who received monetary compensation from [counsel]"); *rev'd in part on other grounds, Golden Door*, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (approving of the district court's exclusion of paid fact witnesses). Because this Court finds such a sanction necessary to protect the integrity of these proceedings, the Court will exclude the testimony of Mr. Gutierrez.

*Id.* at *4.

The facts here are much worse than those confronted in any of these prior cases. StarKist has paid not just one fact witness, but three. Unlike Mr. Hamilton in the GMC case, these witnesses have done no discernable consulting work. And both Ms. Roberts and Mr. Pearson readily acknowledged their "consulting" work involved nothing other than giving testimony. Pearson Dep. at 52:19-20, Bursor Decl. Ex. H ("It pretty much involved the issue with this deposition."); Roberts Dep. at 109:12-13, Bursor Decl. Ex. D ("My understanding was I was asked to speak to things about this case with you today."). And there can be little doubt from the record of their testimony, as set forth in Parts II and III above, that these payments were designed to and did make these witnesses more sympathetic to StarKist and accepting of the influence of StarKist's counsel over the substance of their testimony.

### B.   StarKist's Agreements To Pay Fact Witnesses Violate The California Bar's Rules Of Professional Conduct

At least three of StarKist's outside counsel are complicit in the wrongful payment of fact witnesses in this case. Amy J. Roy of Eckert Seamens Cheron & Mellott, LLC, appears to have initiated each of the "consulting" arrangements. Robert B. Hawk and Michael J. Shepard of Hogan Lovells US LLP participated in lengthy meetings with each of the paid fact witnesses, then coached them throughout their depositions with suggestive objections and instructions not to reveal the substance of their "consulting." Ms. Roy is a Pennsylvania lawyer admitted *pro hac vice* for this case. Mr. Hawk and Mr. Shepard are members of the California bar. Each of them is subject to the California Bar's Rules of Professional Conduct.

Rule 5-310 provides:  "A member shall not … (B) Directly or indirectly pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case."  The rule's purpose is to "prohibit a lawyer from paying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, because it violates the integrity of the justice system and undermines the proper administration of justice.  Quite simply, a witness has the solemn and fundamental duty to tell the truth.  He or she should not be paid a fee for doing so."  *In re Marriage of Simon*, 2007 WL 1874433, at *3 (Cal. Ct. App. 2007), *quoting Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assn.*, 865 F. Supp. 1516, 1526 (S.D. Fla. 1994).

Rule 5-200 provides: "In presenting a matter to a tribunal, a member:  (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth."

The conduct of StarKist's counsel, in making sham consulting agreements to pay three fact witnesses, to induce them to accept representation by and influence from StarKist's counsel, and in coaching their testimony and obstructing their depositions, violated both Rules 5-310 and 5-200.

## V.     RELIEF SOUGHT

### A.     Exclusion Of Tainted Evidence

Plaintiff requests that the Court preclude StarKist from submitting evidence from any fact witness who received monetary consideration from StarKist or its counsel.  *See, e.g.*, *Golden Door Jewelry Creations, Inc.*, 865 F. Supp. at 1518 ("The Court finds that the exclusion of all evidence tainted by the ethical violations is proper and appropriate.  Accordingly, Lloyds shall not be permitted to submit into the evidence in this civil action the testimony given in this case by any fact witness who received monetary compensation from Lloyds."), *aff'd*, 117 F.3d 1328, 1335 n.2 ("[T]he sanction imposed – barring Lloyds from using the testimony of paid witnesses – adequately penalized Lloyds for violating Rule 4-3.4(b) of the Rules of Professional Conduct and did not constitute an abuse of the district court's discretion."); *Rocheux*, 2009 WL 3246837, at *4 ("Mr. McAlindin's decision to pay Mr. Gutierrez for factual testimony has cast a cloud over the legitimacy of that testimony, and the Court must prevent this suspect evidence from contaminating future

proceedings. … Because this Court finds such a sanction necessary to protect the integrity of these proceedings, the Court will exclude the testimony of Mr. Gutierrez."). Similarly, the Court should apply an evidentiary sanction striking the Declarations of Harvey Pearson (Dkt. No. 111-12, filed March 3, 2015) and Aaron Maxfield (Dkt. No. 113, filed March 3, 2015) in their entirety. The Court should also disregard the deposition testimony Mr. Shepard elicited from Mr. Pearson, discussed in Part III, above.

###    B.    Payment Of Attorney's Fees And Costs

The Court should order StarKist and/or its counsel to pay Plaintiff's reasonable attorneys' fees and costs incurred as a result of the misconduct underlying the instant motion. The Court should impose this additional sanction pursuant to its inherent authority to ensure the integrity of the proceedings before it. *See, e.g.*, *Rocheux*, 2009 WL 3246837, at *4-5 ("[T]he Court will grant Defendants reasonable attorneys' fees and costs incurred as a result of the misconduct underlying the instant motion. Defendants will have 30 days from the entry of the accompanying Order to submit descriptive time entries and supporting documentation from its billing records relating to reasonable attorneys' fees and costs arising from this motion and the precipitating misconduct."). Just as in *Rocheux*, the Court should allow a reasonable time for Plaintiff's counsel to submit documentation of the amount of such fees and costs.

## VI.    CONCLUSION

For the foregoing reasons, the Court should preclude StarKist from submitting evidence tainted by the payments to these fact witnesses, and should award Plaintiff his costs and attorneys' fees in bringing this motion. The Court should also exercise its inherent authority to ensure the integrity of proceedings before it, and grant such further relief as justice may require.[17]

---

[17] Plaintiff has also sought relief pursuant to ¶ 12 of the Court's Standing Order, through the preparation of a joint letter seeking an order compelling StarKist to disclose all evidence concerning its payment of fact witnesses, and compelling the continuation of the depositions of Ms. Roberts, Mr. Pearson, and Mr. Maxfield so they can be questioned on these matters. Plaintiff sent a draft of his portion of the joint letter to Starkist's counsel on March 25, 2015, and will submit the joint letter to the Court promptly after receiving StarKist's response.

1   Dated:  March 26, 2015                Respectfully submitted,

2                                         **BURSOR & FISHER, P.A.**

3
                                          By:  /s/ *Scott A. Bursor*
4                                                Scott A. Bursor

5                                         Scott A. Bursor (State Bar No. 276006)
                                          Neal J. Deckant (admitted *pro hac vice*)
6                                         888 Seventh Avenue
                                          New York, NY  10019
7                                         Telephone: (212) 989-9113
                                          Facsimile:  (212) 989-9163
8                                         E-Mail: scott@bursor.com
                                                  ndeckant@bursor.com

9                                         **BURSOR & FISHER, P.A.**
                                          L. Timothy Fisher (State Bar No. 191626)
10                                        Julia A. Luster (State Bar No. 295031)
                                          1990 North California Boulevard, Suite 940
11                                        Walnut Creek, CA 94596
                                          Telephone:  (925) 300-4455
12                                        Facsimile:  (925) 407-2700
                                          E-Mail: ltfisher@bursor.com
13                                                jluster@bursor.com

14
                                          *Attorneys for Plaintiff*
15                                        *And the Interested Parties*

16

17

18

19

20

21

22

23

24

25

26

27

28