1   **BURSOR & FISHER, P.A.**
    L. Timothy Fisher (State Bar No. 191626)
2   Julia A. Luster (State Bar No. 295031)
    1990 North California Boulevard, Suite 940
3   Walnut Creek, CA  94596
    Telephone: (925) 300-4455
4   Facsimile:  (925) 407-2700
    E-Mail: ltfisher@bursor.com
5           jluster@bursor.com

6   **BURSOR & FISHER, P.A.**
    Scott A. Bursor (State Bar No. 276006)
7   Neal J. Deckant (admitted *pro hac vice*)
    888 Seventh Avenue
8   New York, NY  10019
    Telephone: (212) 989-9113
9   Facsimile:  (212) 989-9163
    E-Mail: scott@bursor.com
10          ndeckant@bursor.com

11  *Attorneys for Plaintiff*
    *And the Interested Parties*

12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15

16  PATRICK HENDRICKS, individually and on      Case No. 13-CV-00729-HSG
    behalf of all others similarly situated,
17                                               **PLAINTIFF'S REPLY MEMORANDUM**
                              Plaintiff,          **OF POINTS AND AUTHORITIES IN**
18                                               **SUPPORT OF MOTION FOR CLASS**
            v.                                   **CERTIFICATION**
19
    STARKIST CO.,                                Date: April 16, 2015
20                                               Time: 2:00 p.m.
                              Defendant.          Courtroom 15, 18th Floor
21
22                                               Hon. Haywood S. Gilliam, Jr.

23

24

25          REDACTED VERSION OF DOCUMENTS SOUGHT TO BE FILED UNDER SEAL

26

27

28

---

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
CASE NO. 13-CV-00729-HSG

# TABLE OF CONTENTS

**PAGE(S)**

I.     INTRODUCTION ................................................................................. 1

     A.     The Press Weights Were Light Because StarKist Set The Fish Fill
            Knob On The Filling Machines To Purposely Short The Cans ................................ 3

     B.     StarKist Continued Shorting The Cans Even After It Was Enjoined As
            A Result Of The DA's Lawsuit ............................................................. 5

     C.     The Abraham Lincoln Standard For Class Certification ........................................... 6

II.    STARKIST'S MERITS ARGUMENTS DO NOT AFFECT CLASS
     CERTIFICATION ................................................................................. 7

III.   STARKIST'S STANDING ARGUMENTS ARE WRONG ............................................... 9

IV.   STARKIST'S TYPICALITY ARGUMENTS ARE WRONG ........................................... 13

V.    STARKIST'S COMMONALITY AND PREDOMINANCE ARGUMENTS
     ARE WRONG ................................................................................... 14

VI.   STARKIST'S DAMAGES ARGUMENTS ARE WRONG ............................................... 19

VII.  STARKIST'S NO-RECEIPTS ARGUMENT DOES NOT AFFECT THE
     ASCERTAINABILITY OF THE CLASS ............................................................. 21

VIII. CONCLUSION ................................................................................... 24

1

2

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)............................................................................................ 10

*Allen v. Hylands, Inc.*,
  2012 WL 1656750 (C.D. Cal. May 2, 2012) ..................................................... 17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  -- U.S. --, 133 S. Ct. 1184 (2013) ........................................................................ 7

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ........................................................................ 12

*Baker v. Microsoft Corp.*,
  -- F.3d --, 2015 WL 1219506 (9th Cir. Mar. 18, 2015) ...................................... 8

*Bell v. Farmers Ins. Exch.*,
  115 Cal. App. 4th 715 (2004) ............................................................................ 21

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) .......................................................................... 12

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ............................................................................ 19

*Bohn v. Pharmavite, LLC*,
  2012 WL 8898669 (C.D. Cal. May 16, 2012) ................................................... 15

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  2014 WL 2195858 (S.D. Cal. May 27, 2014).................................................... 11

*Bruno v. Eckhart Corp.*,
  280 F.R.D. 540 (C.D. Cal. 2012) ...................................................................... 17

*Bruton v. Gerber Prods. Co.*,
  2014 WL 2860995 (N.D. Cal. June 23, 2014) ................................................... 23

*Burton v. Nationstar Mortg., LLC*,
  2014 WL 5035163 (E.D. Cal. Oct. 8, 2014) ...................................................... 19

*Carnegie v. Household Intern., Inc.*,
  376 F.3d 656 (7th Cir. 2004) ............................................................................ 24

*Cf. Marsh v. First Bank of Delaware*,
  2014 WL 2085199 (N.D. Cal. May 19, 2014) ................................................... 19

*Chavez v. Blue Sky Natural Bev. Col.*,
  268 F.R.D. 365 (N.D. Cal. 2010)............................................................ 12, 15, 17

*Clothesrigger, Inc. v. GTE Corp.*,
  191 Cal. App. 3d 605 (1987) ............................................................................ 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Comcast Corp. v. Behren*,
　　-- U.S. --, 133 S. Ct. 1426 (2013) ................................................................. 19, 20

*Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc.*,
　　918 N.E.2d 36 (Mass. 2009) ......................................................................... 18

*DG ex rel. Stricklin v. Devaughn*,
　　594 F.3d 1188 (10th Cir. 2010) ...................................................................... 7

*Dziennik v. Sealift, Inc.*,
　　2006 WL 1455464 (W.D.N.Y. May 23, 2006) ................................................ 22

*Ellis v. Costco Wholesale Corp.*,
　　657 F.3d 970 (9th Cir. 2011) .......................................................................... 8

*Forcellati v. Hyland's, Inc.*,
　　2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ....................................... passim

*Gentile v. Olan*,
　　2013 WL 1880771 (S.D.N.Y. May 6, 2013) ................................................... 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　　2013 WL 5429718 (N.D. Cal. June 20, 2013) ................................................. 7

*In re Mattel, Inc.*,
　　588 F. Supp. 2d 1111 (C.D. Cal. 2008) .......................................................... 15

*In re Nexium Antitrust Litig.*,
　　777 F.3d 9 (1st Cir. 2015) ............................................................................... 7

*Jimenez v. Allstate Ins. Co.*,
　　765 F.3d 1161 (9th Cir. 2014) ......................................................................... 7

*Jones v. ConAgra Foods, Inc.*,
　　2014 WL 2702726 (N.D. Cal. June 13, 2014) ................................................ 23

*Karim v. Hewlett-Packard Co.*,
　　2014 WL 555934 (N.D. Cal. Feb. 10, 2014) ................................................... 19

*Kohen v. Pacific Inv. Mgmt. Co.*,
　　571 F.3d 672 (7th Cir. 2009) .......................................................................... 7

*Kramas v. Security Gas & Oil Inc.*,
　　672 F.2d 766 (9th Cir. 1982) ......................................................................... 10

*Leyva v. Medline Industries, Inc.*,
　　716 F.3d 510 (9th Cir. 2013) ......................................................................... 19

*Madness, L.P. v. DiTocco Konstruction, Inc.*,
　　873 So. 2d 427 (Fla. Dist. Ct. 2004) .............................................................. 18

*Major v. Ocean Spray Cranberries, Inc.*,
　　2013 WL 2558125 (N.D. Cal. Jun. 10, 2013) ........................................... 12, 13

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ........................................................................ 14, 15, 17

*McCann v. Foster Wheeler LLC*,
   225 P.3d 516 (Cal. 2010) .................................................................................... 17

*Mims v. Stewart Title Guaranty Co.*,
   590 F.3d 298 (5th Cir. 2009) ............................................................................... 7

*Oppenheimer Fund, Inc. v. Sanders*,
   437 U.S. 340 (1978)........................................................................................... 21

*Pacific Props., LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ............................................................................ 11

*Ries v. Ariz. Bevs.*,
   287 F.R.D. 523 (N.D. Cal. 2012)........................................................................ 12

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,
   2008 WL 4906433 (C.D. Cal. Nov. 13, 2008)...................................................... 19

*Sav-on Drug Stores, Inc. v. Superior Court*,
   34 Cal. 4th 319 (2004) ....................................................................................... 21

*Schwartz v. Lights of Am.*,
   2012 WL 4497398 (C.D. Cal. Aug. 31, 2012)...................................................... 19

*Staton v. Boeing Co.*,
   327 F.3d 935 (9th Cir. 2003) ............................................................................. 12

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ............................................................................ 13

*Stockwell v. City and County of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) .............................................................................. 7

*Story Parchment Co. v. Paterson Parchment Paper Co.*
   282 U.S. 555 (1931).......................................................................................... 11

*Tom Trading, Inc. v. Better Blue, Inc.*,
   26 Fed. Appx. 733 (9th Cir. 2002)...................................................................... 18

*Wash. Mut. Bank v. Superior Court*,
   15 P.3d 1071 (Cal. 2001) .................................................................................... 14

*Wershba v. Apple Computer, Inc.*,
   91 Cal. App. 4th 224 (2001) ............................................................................... 17

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ............................................................................ 16

*Yamada v. Nobel Biocare Holding AG*,
   275 F.R.D. 573 (C.D. Cal. 2011) ................................................................... 16, 17

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ................................................................ 19

*Zinser v. Accufix Research Institute, Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................ 14

**STATUTES**

21 C.F.R. § 130.14(b) ................................................................ 10, 23

21 C.F.R. § 161.190(c) ................................................................ passim

21 C.F.R. § 161.190(c)(1) ................................................................ 1, 6, 9, 11

21 C.F.R. § 160.190(c)(4) ................................................................ 14

# I.    INTRODUCTION

StarKist's opposition to class certification includes a declaration by Bruce A. Strombom, Ph.D., an expert in statistics retained by StarKist to analyze StarKist's own press weight data.  For one of the four products at issue, StarKist Solid White Albacore In Water ("SAW"), Dr. Strombom calculates an average press weight of ▮ oz. across ▮ samples pressed by StarKist during the class period, from 2009 through 2014.  *See* Strombom Decl. Ex. 4, p. 4.  That is ▮ below the federal standard of fill for solid tuna.  This is the average of <u>every</u> press StarKist performed on this product during the 5-year class period.  According to Dr. Strombom, the "Probability of Failing FDA Test" for any 24-can sample, as required by 21 C.F.R. § 161.190(c)(1), is ▮  *Id.*  In other words, if StarKist had tested for compliance with the U.S. Food and Drug Administration's ("FDA") press weight requirement, there was a ▮ probability of failure.

For another product, StarKist Solid While Albacore In Oil ("SLO"), Dr. Strombom calculates an average press weight of ▮ oz. across ▮ samples pressed by StarKist during the class period, from 2009 through 2014.  *See* Strombom Decl. Ex. 5, pp. 5-7.  That is ▮ below the standard of fill for solid tuna.  Again, this is the average of <u>every</u> press StarKist performed on this product during the 5-year class period.  According to Dr. Strombom, the "Probability of Failing FDA Test" for any 24-can sample taken from this population is ▮ that is, ▮.[1]

The reason Dr. Strombom calculated the "Probability of Failing FDA Test" is because StarKist had no actual press weight tests that conformed to the regulation.  StarKist sold more than ▮ ▮ cans of the tuna during the class period.  It did zero tests for compliance with 21 C.F.R. § 161.190(c).  Zero.

> Q:    So you knew that whatever the test was for compliance with this reg involved taking a sample and calculating an average across 24 cans?
>
> A:    Yes.

---

[1] These figures were omitted from the body of Dr. Strombom's 67-page report, buried deep in the exhibits.  These are the same data that StarKist alleges to have been "concealed" from the plaintiff's expert, Mr. Weir.  *See* Opp. Br. at 10:1-2 (asserting Plaintiff's "lawyers concealed nearly four years of StarKist test data from Plaintiff's own expert Weir, even though Weir asked counsel for all press weight data").

Q:      All right.  Did you see a single test by the StarKist Company on any product during the class period that took an average across 24 cans?

A:      I don't recall specifically, no, as I sit here.  I mean, I didn't look specifically for that, but I don't recall seeing it.

Strombom Dep. at 38:17-39:1, Deckant Reply Decl. Ex. A.  According to Dr. Strombom, StarKist tested only smaller samples of ████████ and did so only for internal purposes, not to determine compliance with federal law.

Q:      So as far as you know, during the entire class period, you've never seen any tests for press weight done by StarKist to test compliance with the FDA standard, have you?

A:      I – I don't know that I have or not.  I can't recall one, as I sit here.

*Id.* at 26:6-12; *see also* Weir Reply Decl. ¶ 44 ("The StarKist data does not appear to contain a single test compliant with the CFR requirement that 24 cans be tested.").  Lacking any actual test data for compliance with the FDA standard, all Dr. Strombom could do was to calculate the probability of failure if such a test had been done.  For the entire class period he found that probability exceeded ████████████ and ████████████

There were so many problems with StarKist's press weight tests that StarKist's own personnel knew they were "not accurate."  *See, e.g.*, Exhibit 20, Deckant Reply Decl. Ex. B (Kelly Roberts email stating:  "as we know that data is not accurate").[2]  One source of error involved StarKist's practice of ████████████████████████████████████████████ ████████████████ – a practice that violated the federal standard.  *See* Exhibit 61, Deckant Reply Decl. Ex. C (Harvey Pearson email stating:  "The practice of ████████████████████████ ████████████ … will result in the product involved being held for violation of the standard of identity for fill of container.").[3]  But according to the manager of StarKist's Samoa plant, "█████████████████ ████████████████████████ when calculating the individual press of the can for each lot."  *Id.*  Internally,

---

[2] Kelly Roberts is one of the three fact witnesses to whom StarKist has paid money to influence her deposition testimony.  *See* Plaintiff's Motion For Sanctions (Dkt. No. 142).

[3] Harvey Pearson is another of the fact witnesses to whom StarKist has paid money to influence his deposition testimony.  *See* Plaintiff's Motion For Sanctions (Dkt. No. 142).

1  StarKist's Director of QA, Aaron Maxfield, determined the quantifiable error caused by this practice

2  was "████████    Exhibit 50, at StarKist0010328, Deckant Reply. Decl. Ex. D.[4]  Dr. Strombom

3  was unaware of this.  Strombom Dep. at 70:10-71:2, Deckant Reply Decl. Ex. A.  In his reply

4  declaration, Mr. Weir explains that correcting for just this one source of error, at least ████ of

5  StarKist's individual press weight tests for Chunk Light In Water ("CJW"), and at least ████ of

6  StarKist's individual press weight tests for Chunk Light In Oil ("CJO"), fall below the federal

7  standard of fill.  Weir Reply Decl. ¶ 53.

8        Mr. Weir has now looked at all of the data StarKist provided to Dr. Strombom.  Mr. Weir's

9  analysis shows that when adjusted for all known errors, <u>StarKist's own press weight data show near</u>

10  <u>████ non-compliance with the federal press-weight standard throughout the entire 5-year class</u>

11  <u>period</u>:

12        Based upon my review of the complete production of ████
13        individual StarKist test results, when adjusted for known, quantifiable
        errors, StarKist's own press weight test data shows at least ████
14        non-compliance for all four Products, across the entire class period.

15  *Id.* ¶ 54.

16  **A.    The Press Weights Were Light Because StarKist Set The Fish Fill Knob On The Filling Machines To Purposely Short The Cans**

17        StarKist argues "there is no direct, consistent or necessary correlation between the amount of

18  tuna put in the can (fish fill) and the press weight result for that can."  Opp. Br. at 6:19-20.  But

19  StarKist's internal documents show otherwise.  StarKist has an internal procedure to calculate fish

20  fill based on press weight.  *See* Exhibit 50, Deckant Reply Decl. Ex. D (StarKist QA Procedure

21  Number CQP-09-F-04, "Determination of Fish Fill based on Press Cake").  "The purpose of this

22  procedure is to determine the proper fish fill of a can of tuna and be able to make adjustments in the

23  fills to meet company requirements for pressed cake values."  *Id.* at StarKist0010330.  The

24  procedure specifies a detailed mathematical formula to calculate target fish fill settings based on the

25  press weight values.

26        Q:    When you say "Aaron math," you mean a formula created by

27  _____

28  [4] Aaron Maxfield is another of the fact witnesses to whom StarKist has paid money to influence his
   deposition testimony.  *See* Plaintiff's Motion For Sanctions (Dkt. No. 142).

1      Aaron Maxfield?

2     A:    It was affectionally dubbed Aaron math, yes.  This was the calculation that was used to determine the fill weight needed to

3          meet whatever the desired press weight was.

4     Q:    And you would work backwards from the press weight to get

5          to the fish fill weight?

6     A:    To get the fish fill weight.

7 Roberts Dep. at 132:24-133:7, Deckant Reply Decl. Ex. F.

8     Q:    And the basis for this calculation is that there's a relationship between fish fill and press weight?

9

10    A:    I believe I have indicated that there is some relationship between fish fill and press weight.

11 *Id.* at 138:1-8 (objections omitted).

12       The relationship between fish fill and press weight is, frankly, obvious.  The entire reason for

13 the press weight rule is to ensure adequate fish fill.  And StarKist's internal documents are replete

14 with statements confirming this relationship.  For example, in July 2011, after the district attorneys

15 of three California counties had threatened to sue StarKist for shorting the cans, the manager of

16 StarKist's Samoa plant, Brett Butler "recommend[ed] we manage production to press weight

17 compliance immediately, which means more fish fill."  Exhibit 63, Deckant Reply Decl. Ex. G.  A

18 month later, Butler wrote again:  "The State of California is looking to take the tuna companies to

19 court over this.  So now we are enforcing this regulation and to do this we are going to put more fish

20 in the can."  Deckant Decl. Ex. E.

21       Unfortunately, StarKist did the opposite of what Mr. Butler recommended.  StarKist's fish

22 fill targets were set well below the press weight requirements.  Fish fill is controlled by ██████

23 ████████████████████████████████████████████████████████████ of tuna

24 packed into the can.  Butler Dep. at 76:2-17, Deckant Reply Decl. Ex. E.  StarKist measures fish fill

25 ████████████████████ when setting the ████████ for production runs.  *Id.* at 76:15-17

26 ("[B]asically when you turn the knob, you're going to run cans to verify based on the cans.  We

27 measure to the ████████████." ).  From October 2009 through September 2012, StarKist set

28 the fish fill for Chunk Light In Water ("CJW") at ████ oz., substantially below the standard of fill

(███ oz. for chunk tuna).  In October 2012, StarKist actually reduced the fish fill even further below the standard of fill, to ███ oz.  *See* Strombom Decl. ¶ 25a.

There was only one reason StarKist set the fish fill so light.  Money.  StarKist calculated that a 0.1 oz. reduction to fish fill for Chunk Light In Water would save $1 million per quarter.  *See* Exhibit 67, Deckant Reply Decl. Ex. H, at StarKist008210 ("The implication financially to moving back to ███ from ███ is approximately ███████ versus budget assuming the switch takes place for the last nine months of 2013.").  Mr. Butler confirmed this at his deposition:

> Q:   Does – is it possible that a change in fish fill as small as a ███
>        ███████ could have an impact of ███████ on the budget
>        over nine months?
>
> A:   Yeah.  The numbers get close in that range.
>
> Q:   During your tenure at StarKist you paid close attention to the
>        impact that changes to fish fill would have on the budget,
>        right?
>
> A:   Yes.  …

Butler Dep. at 139:19-140:7, Deckant Reply Decl. Ex. E (objections omitted).

**B.   StarKist Continued Shorting The Cans Even After It Was Enjoined As A Result Of The DA's Lawsuit**

As we pointed out in our opening brief, on August 2, 2012, StarKist settled the DA's lawsuit by stipulating to an injunction requiring improved compliance with the federal standard of fill.  *See* August 2, 2012 Final Judgment Pursuant To Stipulation, Deckant Decl. Ex. J.  Before the ink was dry on Judge Sharon J. Waters's signature on that injunction, StarKist continued violating it.  StarKist continued shipping product without testing for press weight compliance.  And three witnesses, Mr. Mast, Mr. Pearson, and Ms. Roberts, confirmed that StarKist did not even attempt to comply with the injunction:

> Q:   So as you sit here today, you can't identify any changes that
>        the StarKist Company made as a result of that injunction?
>
> A:   No, not that I would know for certain.

Pearson Dep. at 192:5-10, Deckant Reply Decl. Ex. I (objections omitted).

Q:      You are not aware of any change that the company made to anything as a result of the injunction, are you?

A:      Nothing within my R&D function, no.

Mast Dep. at 108:19-24, Deckant Reply Decl. Ex. J (objections omitted).

Q:      So as a result of this settlement, can you identify anything that the company did differently?

A:      I can't speak to what the company might have done as a whole on this, except maybe increased focus, perhaps.

Roberts Dep. at 169:8-15, Deckant Reply Decl. Ex. F (objections omitted).

But there was at least one change. We now know that in October 2012, less than 2 months after Judge Waters signed the injunction prohibiting the company from violating the federal press weight standard, StarKist actually <u>reduced</u> the fish fill on its best-selling product, Chunk Light In Water ("CJW"). Having been caught shorting the cans, StarKist decided to short them even worse. StarKist ███████ on the filler machines down, from ███ oz. to ███ oz. By doing this StarKist reduced its costs by ████████ per quarter.

## C.      The Abraham Lincoln Standard For Class Certification

The evidence that StarKist shorted cans is overwhelming. Nevertheless, StarKist argues that "a substantial portion of cans, and StarKist production lots, complied with the alleged press weight requirements," thus the proposed class "necessarily includes many people who purchased compliant cans." Opp. Br. at 12:21-26. To paraphrase Abraham Lincoln, StarKist's argument is that it only shorted some of the people some of the time, and a class cannot be certified unless StarKist had shorted all of the people all of the time. But that argument is wrong on both the facts and the law.

Factually, the evidence shows that StarKist <u>did</u> short all of the people all of the time. Throughout the entire class period, StarKist shipped product without testing for compliance with the federal standard, and continued this practice even after being enjoined by Judge Waters. And StarKist's after-the-fact testing never complied with 21 C.F.R. § 161.190(c)(1), because none of the tests took an average across 24 cans. *See* Part I, *supra*. Furthermore, after-the-fact analyses by experts for both sides, Dr. Strombom and Mr. Weir, show probable failure rates very close to ████ throughout the entire class period. *See* Strombom Dep. at 20:25-21:11, Deckant Reply Decl. Ex. A;

1   Weir Reply Decl. ¶ 54.

2       StarKist's argument is also wrong on the law, because class certification cannot be defeated

3   merely because there might be some class members who were uninjured.  *See, e.g.*, *Jimenez v.*

4   *Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) (a class action may be maintained "even when

5   some [class members] might have no harms at all"); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 25 (1st

6   Cir. 2015) ("Numerous courts have certified plaintiff classes even though the plaintiffs have not

7   been able to use common evidence to show harm to <u>all</u> class members.") (emphasis added); *Kohen v.*

8   *Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) (Posner, J.) ("What is true is that a class

9   will often include persons who have not been injured by the defendant's conduct … [s]uch a

10  possibility or indeed inevitability does not preclude class certification."); *Mims v. Stewart Title*

11  *Guaranty Co.*, 590 F.3d 298, 308 (5th Cir. 2009) ("Class certification is not precluded simply

12  because a class may include persons who have not been injured by the defendant's conduct."); *DG*

13  *ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("That a class possibly or even

14  likely includes persons unharmed by a defendant's conduct should not preclude certification."); *see*

15  *also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *22 n.26 (N.D. Cal. June

16  20, 2013) ("It is well-settled that class certification is not precluded simply because a class may

17  include persons who have not been injured by the defendant's conduct.") (quotation omitted).

18  **II.   STARKIST'S MERITS ARGUMENTS DO NOT AFFECT CLASS CERTIFICATION**

19      StarKist's opposition to class certification is based primarily on arguments that go to the

20  merits of Plaintiff's claims.  While some evaluation of the merits frequently "cannot be helped" in

21  evaluating a motion for class certification, that likelihood of overlap with the merits is "no license to

22  engage in free-ranging merits inquiries at the certification stage."  *Stockwell v. City and County of*

23  *San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans &*

24  *Trust Funds*, -- U.S. --, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308 (2013)).  Instead, as the

25  Supreme Court clarified in *Amgen*, "[m]erits questions may be considered to the extent – but only to

26  the extent – that they are relevant to determining whether the Rule 23 prerequisites for class

27  certification are satisfied."  *Id.* at 1111-12 (quoting *Amgen Inc.*, 133 S. Ct. at 1195).  "'[W]hether

28  class members could actually prevail on the merits of their claims' is not a proper inquiry in

---

1   determining the preliminary question 'whether common questions exist.'" *Id.* at 1195 (quoting *Ellis*

2   *v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

3          Each of StarKist's merits arguments would apply to the individual claims of any class

4   member just the same.  For example StarKist argues "there is no way to conclusively determine

5   whether any given can or population of cans satisfies or fails the regulation."  Opp. Br. at 2:9-10; *see*

6   *also* Strombom Decl. ¶ 12 ("The FDA press weight standard is an unclear and unworkable standard

7   for determining harm to individual consumers ….").  If that argument is correct, then Plaintiff's

8   individual claims will be defeated on the merits.  And so will the individual claims of any other class

9   member.  This is a common question that will be decided entirely by common evidence.  *See Baker*

10  *v. Microsoft Corp.*, -- F.3d --, 2015 WL 1219506, at *6 (9th Cir. Mar. 18, 2015) ("What Microsoft is

11  really arguing is that plaintiffs cannot prevail on the merits.  However, Microsoft's merits-based

12  contention has no place in the determination of whether an action may proceed on a class-wide

13  basis.") (internal citation omitted).

14         Similarly, StarKist's argument that Mr. Hendricks's claims lack merit because he "never

15  commissioned any press weight test, or performed quantitative testing of any kind, on any can that

16  he bought," Opp. Br. at 17:20-23, is true not only with respect to Mr. Hendricks, but for every class

17  member.  StarKist's argument that "individual testing would be required" to determine compliance

18  for each class member, *id.* at 20:7, is preposterous.  As Dr. Strombom explains, "press weight is a

19  test that requires special equipment to perform and renders the sample unsuitable for consumption."

20  Strombom Decl. ¶ 18.  No class member could perform such an individual test.  Nor would one.

21  Furthermore, as StarKist points out, a press weight test of a single can would be meaningless, since

22  the standard is based on an average across a 24-can sample.  Thus StarKist's argument – that

23  individual testing is both "necessary" and "impossible," presents a classic Catch-22.  StarKist's

24  argument is essentially, "heads I win, tails you lose."  The proper way to address the claims in this

25  case, and indeed the only way, is to focus on evidence that will be entirely common to the class:

26  evidence showing where StarKist ███████████ on the filler machines, and the press weight

27  data showing how much tuna was in the cans.

28

## III.   STARKIST'S STANDING ARGUMENTS ARE WRONG

StarKist makes four arguments that the plaintiff, Patrick Hendricks, lacks standing.  Each of those arguments is wrong on the merits, and irrelevant to class certification.

<u>First</u>, StarKist argues that Hendricks "cannot establish that he purchased an 'underfilled' can" because he "never commissioned any press weight test, or performed quantitative testing of any kind, on any can that he bought."  Opp. Br. at 17:20-23.  But the press weight data analyzed by Dr. Strombom and Mr. Weir is proof that every can sold to class members, including Mr. Hendricks, was underfilled.  *See supra* Part I.

<u>Second</u>, StarKist argues that Hendricks lacks standing because his "sworn testimony shows he personally was not deceived."  Opp. Br. at 18:2-7.  But Hendrick's testified that he <u>was</u> deceived:

> Q:   And you weren't really deceived after the first five or ten purchases of StarKist Tuna that had less than what you expected to be in the can, were you?
>
> A:   Yes, I was deceived.
>
> Q:   How were you deceived?  What were you deceived about?
>
> A:   I was deceived about the amount of tuna.

Hendricks Dep. at 77:16-25, Deckant Reply Decl. Ex. K (objections omitted).  StarKist argues that Hendricks was unable to identify any statement on the label that was "deceptive or misleading."  But that is not surprising, since there is no reference to press weight, or to the federal standard of fill, on the label.

The federal standard of fill requires StarKist's 5 oz. cans to include at least ███ oz. for chunk, and ███ oz. for solid tuna, measured by press weight.  *See* 21 C.F.R. § 161.190(c)(1).[5]

---

[5] Plaintiff's initial complaint alleged that the standard of fill for StarKist's 5-ounce cans was 2.84 oz. for chunk and 3.23 oz. for solid tuna.  Complaint ¶¶ 2-3.  That allegation was based on NOAA press weight results that listed those values as the press weight standards.  But there is no indication that NOAA actually measured the volume of StarKist's cans.  StarKist's Director of Corporate Quality Assurance ("QA"), Harvey Pearson, however, did calculate the precise standard of fill for StarKist's 307 x 105 cans, and determined that it was ███ oz. for chunk and ███ oz. for solid.  Pearson Dep. at 60:5-62:24, Deckant Reply Decl. Ex. I; *see also* Exhibit 48, Deckant Decl. Ex. L (setting forth Mr. Pearson's calculation); Weir Decl. ¶¶ 4-6 (reproducing Mr. Pearson's calculation).  Mr. Pearson's calculation was the only calculation of the standard of fill in use in the StarKist Company from the time the 5 oz. cans were introduced, until at least 2013 when he left the company.  Pearson Dep. at 62:9-18, Deckant Reply Decl. Ex. I.  Plaintiff learned of Mr. Pearson's calculation through discovery.  Plaintiff did not have the benefit of this information when the complaint was filed, which

---

If the cans do not meet that standard of fill, they cannot legally be sold in the U.S. unless they include a disclosure on the label specified by 21 C.F.R. § 161.190(c)(4).  That regulation provides: "If canned tuna falls below the applicable standard of fill of container prescribed in paragraph (c)(1) of this section, the label shall bear the general statement of substandard fill provided in 130.14(b) of this chapter, in the manner and form therein specified."  21 C.F.R. § 130.14(b) requires the can's label to include statement "'Below Standard in Fill' printed in Cheltenham bold condensed caps" on the container "in 12-point type" surrounded by "lines, not less than 6 points in width, forming a rectangle" that are "are so placed as to be easily seen when the name of the food or any pictorial representation thereof is viewed, wherever such name or representation appears so conspicuously as to be easily seen under customary conditions of purchase."  None of the products at issue included this statement on the label.

Mr. Hendricks's failure to identify an affirmative misrepresentation on the label is thus of no moment.  His deception claims are based primarily on the underfilling of the cans, and on the omission of these federally mandated labeling requirements for underfilled cans.  *See, e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) (holding that reliance is presumed when a defendant is under a duty to disclose a material fact but fails to do so); *Kramas v. Security Gas & Oil Inc.*, 672 F.2d 766, 769 (9th Cir. 1982) ("*Affiliated Ute* [] establishes that reliance upon alleged omissions is to be presumed from materiality.").  And while Mr. Hendricks, as a lay witness and typical purchaser, was not able to recite these regulations chapter and verse, he did explain the deception in a straightforward and accurate way – "I was deceived about the amount of tuna."  Hendricks Dep. at 77:16-25, Deckant Reply Decl. Ex. K.

Third, StarKist argues that because Hendricks "saved no receipts … he cannot say what he paid for how many cans, [and] by definition he cannot establish how much he supposedly overpaid or any measurable damage."  Opp. Br. at 18:8-12.  But there is no memory test requirement for class

is why the complaint used the lower figures set forth on the NOAA forms.  StarKist seeks to take advantage of that circumstance by arguing that the lower figures (2.84 oz. for chunk and 3.23 oz. for solid) should be used.  Plaintiff contends that Mr. Pearson's calculation showing the standard of fill to be ██ oz. for chunk and ██ oz. for solid is correct, and is the only calculation of the standard of fill StarKist had ever used prior to the filing of this lawsuit, and is the only calculation of the standard of fill in the evidentiary record.  In any event, insofar as class certification is concerned, the evidence as to which standard of fill is correct is the same for every class member.

certification.  Hendricks provides his "best estimate" that he purchased two cans per week during 2009, then switched to a different brand in 2010.  *See* Hendricks Reply Decl. ¶ 5; *see also* Hendricks Decl. ¶ 4 ("Q:  Two five-ounce cans a week would be your best estimate?  A:  That's my best estimate."); *id.* ¶ 7 (quoting deposition testimony that Hendricks switched to another brand in 2010 because he "got tired of there not being enough tuna in the can").  Hendricks' individual damages can be calculated based on his testimony, together with IRI retail price data for the time period of his purchases.  *See* Weir Reply Decl. ¶¶ 61-62.   Both the Supreme Court and the Ninth Circuit have made clear that damage calculations need not be exact.  "[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."  *Pacific Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1170-71 (9th Cir. 2013) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.* 282 U.S. 555, 563 (1931)). In such circumstances, plaintiffs are "not obligated to prove their losses with precision."  *Id.* at 1170. Rather, "[t]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."  *Story Parchment*, 282 U.S. at 563; *see also Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 2014 WL 2195858, at *6 (S.D. Cal. May 27, 2014) (denying motion for judgment as a matter of law where damages could not be proven with precision, stating "[a] wrongdoer cannot complain that the damages cannot be measured with exactness and precision").

   <u>Fourth</u>, StarKist argues that Hendricks "cannot represent purchasers of three of the four products at issue here," Opp. Br. at 18:18-19, because he purchased StarKist Chunk Light In Water, and did not purchase the three other varieties included in the class definition (Chunk Light In Oil, Solid White Albacore In Water, or Solid White Albacore In Oil).  Judge Rogers explicitly rejected that argument in denying StarKist's motion to dismiss:

> Defendant argues that solid tuna products are governed by pressed weight standards that differ from the standards applicable to the product Plaintiff bought.  *See* 21 C.F.R. § 161.190(c)(1) (specifying different minimum weights for solid, chunk, flakes, and grated tuna). Further the allegations of the Complaint show that the four products fell short of the pressed weight requirements by four different amounts.  Thus Defendant argues that the claims relating to the three products Plaintiff did not purchase differ significantly from the claims against the one he did purchase, and that he lacks standing for claims based on those other three products.

> The Court disagrees that the claims differ significantly here.  There is sufficient similarity between the product purchased and other products accused here.  The Complaint alleges the same misrepresentation as to all four varieties of canned tuna.

3/25/14 Order at 19-20 (Dkt. No. 57); *see also Chavez v. Blue Sky Natural Bev. Col.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (certifying class of beverage purchasers, stating "although plaintiff did not purchase each type of beverage carrying the misleading label, his claims are 'reasonably coextensive with those of absent class members'") (quoting *Staton v. Boeing Co.*, 327 F.3d 935, 957 (9th Cir. 2003)); *Ries v. Ariz. Bevs.*, 287 F.R.D. 523, 538-39 (N.D. Cal. 2012) (certifying class of beverage purchasers "although plaintiff did not purchase each type of beverage carrying the misleading label"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (S.D. Cal. 2013) (certifying class on behalf of purchasers of "all natural" food products, stating "Defendant's argument that Plaintiff … can only represent purchasers of the exact same products, rather than similar products with the same alleged misrepresentations, is likewise unavailing"); *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *10 (C.D. Cal. Apr. 9, 2014) (certifying class of cold-medicine purchasers, stating "it is immaterial that Defendants' [other] products contain different ingredients [than those purchased by plaintiffs] because Plaintiffs are challenging the products' common homeopathic preparation").

StarKist cites two cases on this point, *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), and *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125 (N.D. Cal. Jun. 10, 2013).  *See* Opp. Br. at 18-19.  Both are easily distinguished.  In *Berger*, the court held that the plaintiff could not represent a subclass of which he was not a member.  *Berger*, 741 F.3d at 1067. Here, by contrast, Plaintiff is a member of the Class and California Subclass he seeks to represent.[6] In *Major*, the court found that "the content that purportedly g[ave] rise to Plaintiff[']s claims is unique to the specific and particular product she purchased and ha[d] no applicability to other products within the same line." *Major*, 2013 WL 2558125, at *4.  Here, by contrast, Judge Rogers has already found there is "sufficient similarity" between the products and that Plaintiff alleges "the same misrepresentation as to all four varieties of canned tuna." *See* 3/25/14 Order at 20 (Dkt. No.

---

[6] Similarly, the proposed intervenors joining this motion, Laury Smith, Ben Hall, Brian Andacky, and Joseph Vallillo are members of the Class and, respectively, the California, Massachusetts, New York, and Florida subclasses they seek to represent.

1    57).

2    **IV.    STARKIST'S TYPICALITY ARGUMENTS ARE WRONG**

3         StarKist's arguments that Mr. Hendricks is not a typical class member are based on two

4    cases, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), and *Major*, 2013 WL 2558125.

5    Both are readily distinguishable.

6         In *Stearns*, the court found typicality lacking because the plaintiff's injury was due to his

7    own mistake.  *See Stearns*, 655 F.3d at 1020 (explaining that since the plaintiff "insisted that he was

8    not really deceived into joining the Entertainment Rewards program and, indeed, decided that he

9    would not do so, but must have accidentally clicked on 'Yes,' he [wa]s not at all typical of the

10   proposed class.").  Here, by contrast, Hendricks, like every other class member, purchased cans of

11   tuna that were both underfilled and mislabeled in violation of federal law.  *See supra* Parts I and III.

12   This was the result of wrongdoing by StarKist's practice of underfilling the cans.  It was not the

13   result of any mistake on Mr. Hendricks' part.

14        *Major* is similarly distinguishable.  There, the plaintiff "base[d] her mislabeling causes of

15   action with regard to the Diet Sparkling Pomegranate Blueberry drink product, in part, on the claims

16   made on the specific label of this specific drink product."  *Major*, 2013 WL 2558125, at *4.  The

17   District Court found typicality lacking "[b]ecause this language include[d] specific claims about

18   blueberries, it would only be applicable to drinks containing blueberries."  *Id.*  The plaintiff failed to

19   demonstrate typicality because "the content that purportedly gives rise to Plaintiff's claims is unique

20   to the specific and particular product she purchased and has no applicability to other products within

21   the same line."  *Id.*  Here, by contrast, Plaintiff Hendricks has demonstrated that the challenged

22   conduct – the systematic under-filling of cans of StarKist Tuna – is uniform and pervasive across

23   each of the products included in the class definition.  Opening Br. at 1-8.  Thus all class members

24   were subject to exactly the same conduct as Mr. Hendricks, and the evidence needed to prove his

25   claims is probative of, and indeed identical to, that needed to prove the claims of all class members.

26

27

28

# V.      STARKIST'S COMMONALITY AND PREDOMINANCE ARGUMENTS ARE WRONG

StarKist argues that individual issues predominate because "varying state law requirements … would apply if the classes were certified, including as to the critical elements of reliance and causation." Opp. Br. at 21. But that argument ignores California choice of law rules. *See, e.g.,* *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001) ("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law.").

"Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001)). "Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id.* at 590 (quoting *Wash. Mut. Bank*, 15 P.3d at 1081). Here, Plaintiff has demonstrated "that California has significant contact or significant aggregation of contacts to the claims of each class member," because all of the products at issue were distributed through StarKist's "forward labeling and specialty packaging" facility in Mira Loma, California:

> Q:      So all – is it the case that all of the shipments from Samoa that are destined for the United States – all of the shipments of StarKist tuna that are destined for the United States run through the DSC warehouse complex in Mira Loma?
>
> A:      At least during the time that I was there, all – yes. All of the products came into that warehouse, except for the bright product, which was shipped to a DSC building, which was on that facility.

Pearson Dep. at 19:11-22, Deckant Reply Decl. Ex. I.

Every one of those products was underfilled and bore a label that failed to include the mandatory underfilling disclosure required by 21 C.F.R. § 160.190(c)(4). *See supra* n.5. The labeling and shipment of every one of these products through Mira Loma, California, provides sufficient contacts with the State of California to apply California's law to every class member's

1    claim throughout the United States.  *See, e.g.*, *Mazza*, 666 F.3d at 590 ("California has a

2    constitutionally sufficient aggregation of contacts to the claims of each putative class member in this

3    case because Honda's corporate headquarters [and] the advertising agency that produce[d] the

4    allegedly fraudulent misrepresentations … are located in California."); *Chavez*, 268 F.R.D. at 379

5    (N.D. Cal. 2010) ("Defendants are headquartered in California and their misconduct allegedly

6    originated in California.  With such significant contacts between California and the claims asserted

7    by the class, application of the California consumer protection laws would not be arbitrary or unfair

8    to defendants."); *Bohn v. Pharmavite, LLC*, 2012 WL 8898669, at *3 (C.D. Cal. May 16, 2012)

9    (applying California law to a nationwide class where "Plaintiff alleges that Defendant's headquarters

10   are in California and it manufactures, distributes, markets and sells the products at issue to

11   consumers nationwide from its headquarters in Mission Hills, California") (internal quotations

12   omitted); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (applying California law to

13   a nationwide class where "Plaintiffs complain of misrepresentations made in reports, company

14   statements, and advertising that are reasonably likely to have come from or been approved by Mattel

15   corporate headquarters in California").

16          Because Plaintiff has met his initial burden to show that California has significant contacts or

17   significant aggregation of contacts to the claims of each class member, "the burden is on Defendant[]

18   to defeat the presumption that California law applies and to show a compelling reason justifying

19   displacement of California law under the applicable choice-of-law analysis." *Forcellati*, 2014 WL

20   1410264, at *2.  StarKist "must make this showing under California's three-step governmental

21   interest test." *Id.* (citing *Mazza*, 666 F.3d at 590).  First, StarKist "must show that the relevant laws

22   of the affected jurisdictions are materially different." *Id.* (citing *Mazza*, 666 F.3d at 590).  Next,

23   StarKist "must show that the foreign jurisdictions have an 'interest in the application of [their] own

24   law under the circumstances of the particular case' such that 'a true conflict exists.'" *Id.* (citing

25   *Mazza*, 666 F.3d at 590).  Finally, if StarKist can show that a true conflict exists, it "must engage in

26   a comparative impairment analysis and demonstrate that the foreign states' interest in this matter are

27   stronger than California's such that the foreign states 'would be more impaired if [their] law[s] were

28   not applied.'" *Id.* (citing *Mazza*, 666 F.3d at 590).  "Rather than attempt to make a showing based

1    on the particulars of this case, Defendant[] ha[s] opted to rely on conclusory assertions and citations

2    to cases in which defendants met their burdens in different factual circumstances." *Id.*  StarKist does

3    not even attempt to address all three required steps, and therefore fails to meet its burden under

4    California law.

5         First, while StarKist identifies certain differences in the various states' laws concerning

6    reliance and causation, *see* Opp. Br. at 22-23, it fails to demonstrate how those differences are

7    material to this litigation.  Merely, "identifying differences in state law is but the first step in an

8    analysis under the first prong of the governmental interest test.  The only differences that are

9    relevant to the conflict-of-laws analysis are those that are material *in this litigation*."  *Forcellati*,

10   2014 WL 1410264, at *2.  The addition of a reliance requirement is not a bar to use of common

11   proofs.  "An inference of reliance arises if material misrepresentations were made to persons whose

12   acts thereafter were consistent with reliance upon the representation."  *Yamada v. Nobel Biocare*

13   *Holding AG*, 275 F.R.D. 573, 578 (C.D. Cal. 2011) (quotation omitted).  Here, "it is unlikely that a

14   member of the putative class would have purchased [StarKist Tuna] without having been influenced

15   by Defendant's uniform marketing claims.  Furthermore, it is reasonable to assume that no rational

16   member of the putative class would have purchased … [StarKist Tuna] … had he or she been

17   aware," that the cans were underfilled and thus substantially underweight. *Id.*  "Accordingly, the

18   identical nature of the alleged fraudulent representations supports a presumption of reliance." *Id.*

19   Differences in state laws concerning causation are also a non-issue.  Class members purchased cans

20   of StarKist Tuna that were underfilled when they left the Mira Loma facility for distribution.  Thus,

21   individual issues of causation do not affect whether StarKist Tuna was sold underfilled and

22   mislabeled. *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir.

23   2010) ("[W]e reject Land Rover's suggestion that automobile defect cases can categorically never be

24   certified as a class.  [Plaintiffs] Gable and Wolin assert that the defect exists in the alignment

25   geometry, not in the tires. …  Although individual factors may affect premature tire wear, they do

26   not affect whether the vehicles were sold with an alignment defect.").  Recognizing this, courts in

27   this Circuit have certified nationwide claims under the same causes of action asserted here. *See, e.g.*,

28   *Forcellati*, 2014 WL 1410264, at *1, *13 (certifying nationwide class for breach of express and

1  implied warranty claims); *Yamada*, 275 F.R.D. at 576, 582 (same); *Chavez*, 268 F.R.D. at 376-77,

2  380 (certifying nationwide class for common law fraud claim).

3          <u>Second</u>, StarKist does not address the second prong of the test, which requires it "to examine

4  each jurisdiction's interest in the application of its own law in the circumstances of the particular

5  case to determine whether a true conflict exists."  *McCann v. Foster Wheeler LLC*, 225 P.3d 516,

6  527 (Cal. 2010) (quotation omitted).  StarKist relies on *Mazza* for the proposition that "'[e]ach state

7  has an interest in setting the appropriate level of liability for companies conducting business within

8  its territory.'"  Opp. Br. at 22 n.18 (citing *Mazza*, 666 F.3d at 592).  But that is insufficient.  *Mazza*

9  did not "categorically rule out application of California law to out-of-state class members."  *Allen v.*

10 *Hylands, Inc.*, 2012 WL 1656750, at *2 (C.D. Cal. May 2, 2012); *see also Mazza*, 666 F.3d at 594

11 (stating that its holding was reached "[u]nder the facts and circumstances of [that] case").  More

12 importantly, "[g]iven that California law requires a case-specific analysis to demonstrate a true

13 conflict, [StarKist's] conclusory reliance on *Mazza* does not satisfy their burden under the second

14 prong of the governmental interest analysis test."  *Forcellati*, 2014 WL 1410264, at *3; *see also*

15 *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 547 (C.D. Cal. 2012) ("*Mazza* did not and could not have

16 changed state law requiring the defendant to analyze various states' laws under the circumstances of

17 the particular case and given the particular legal issue in question ….").

18         <u>Third</u>, StarKist also fails to address the third prong of the test, which requires it to "carefully

19 evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application

20 of its own law to determine which state's interest would be more impaired if its policy were

21 subordinated to the policy of the other state."  *McCann*, 225 P.3d at 527 (internal quotations

22 omitted).  Here, StarKist "once again expect[s] a citation to *Mazza* to be sufficient to carry [its]

23 burden."  *Forcellati*, 2014 WL 1410264, at *3; *see also* Opp. Br. at 22, n.18.  StarKist does not

24 evaluate and compare the strength of each state's interest.  But, even if it did, it would conclude that

25 California has the predominant interest.  "[I]n a false advertising case the state from which the

26 misrepresentation was disseminated often has the predominant interest."  *Forcellati*, 2014 WL

27 1410264, at *3; *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 243 (2001) ("[A] California

28 court may properly apply the same California statutes at issue here to non-California members of a

1    nationwide class where the defendant is a California corporation and some or all of the challenged

2    conduct emanates from California."); *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 616

3    (1987) ("California's more favorable laws may properly apply to nonresident plaintiffs when their

4    home states have no identifiable interest in denying such persons full recovery.").

5           Because Plaintiff has met his burden to create a presumption that California law applies to

6    the nationwide class' claims, which StarKist has failed to rebut, the Court may certify the class

7    nationwide and apply California law to the class' claims.

8           In the alternative, if the Court finds that differences in state law preclude nationwide class

9    certification, the Court should limit the class definition to purchasers in California, Massachusetts,

10   New York, and Florida, where Plaintiff and the proposed intervenors reside.  *See supra* n.6.  A

11   survey of potentially applicable state laws reveals no material difference that would affect the merits

12   of the class' common law claims at trial.  For example, elements of common law fraud are

13   effectively identical across California, Massachusetts, New York, and Florida.  *See, e.g.*, *Tom*

14   *Trading, Inc. v. Better Blue, Inc.*, 26 Fed. Appx. 733, 736 (9th Cir. 2002) ("Under California law, the

15   elements of fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure)

16   (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable

17   reliance; and (e) resulting damage.") (internal quotations omitted); *Cumis Ins. Society, Inc. v. BJ's*

18   *Wholesale Club, Inc.*, 918 N.E.2d 36, 47 (Mass. 2009) (same in Massachusetts); *Gentile v. Olan*,

19   2013 WL 1880771, at *3 (S.D.N.Y. May 6, 2013) (same in New York) (internal quotations omitted);

20   *Madness, L.P. v. DiTocco Konstruction, Inc.*, 873 So. 2d 427, 429 (Fla. Dist. Ct. 2004) (same in

21   Florida).  Thus, limiting the class to California, Massachusetts, New York, and Florida purchasers

22   would eliminate any choice of law concerns.[7]

23          In the second alternative, Plaintiff and the Interested Parties propose certifying California,

24   Massachusetts, New York, and Florida subclasses.  This will alleviate any predominance concerns

25   the Court may have.

26          Finally, StarKist rehashes the same meritless argument in the manageability context, stating

27

28   [7] As explained in Plaintiff's moving brief, the claims under California, Massachusetts, New York, and Florida law are all subject to common proof.  *See* Opening Br. at 23-24.

"application of the laws of 50 states would be required." Opp. Br. at 33. That is wrong. As explained above, a proper choice of law analysis reveals that only California law will apply. StarKist's cases on this point are inapposite because in each there was either an insufficient nexus to California to apply California law to the class' claims, or the defendant met its burden under California's choice of law test. *Cf. Marsh v. First Bank of Delaware*, 2014 WL 2085199, at *3 (N.D. Cal. May 19, 2014) (holding California did not apply nationwide where the plaintiff "only provide[d] facts about the actions of the ZaaZoom Defendants and not the defendants that are at issue"); *Burton v. Nationstar Mortg., LLC*, 2014 WL 5035163, at *15 (E.D. Cal. Oct. 8, 2014) (holding California law did not apply where plaintiff "failed to conduct" a choice of law analysis); *Karim v. Hewlett-Packard Co.*, 2014 WL 555934, at *8 (N.D. Cal. Feb. 10, 2014) (holding California law did not apply where defendant met its burden under the test); *Schwartz v. Lights of Am.*, 2012 WL 4497398, at *9 (C.D. Cal. Aug. 31, 2012) (same); *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 WL 4906433, at *3 (C.D. Cal. Nov. 13, 2008) (same). Here, StarKist did not even attempt to meet its burden and cannot "rely on conclusory assertions and citations to cases in which defendants met their burdens in different factual circumstances" to do so. *Forcellati*, 2014 WL 1410264, *2.

## VI.   STARKIST'S DAMAGES ARGUMENTS ARE WRONG

StarKist argues that class certification should be denied because individual issues predominate regarding damages. Opp. Br. at 26. "In this circuit, however, damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *see also id.* at 1089 ("The potential existence of individualized damage assessments … does not detract from the action's suitability for class certification."); *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 513-15 (9th Cir. 2013) (holding the district court abused its discretion by denying class certification on the ground that individual damage issues predominated); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); *Yokoyama*, 594 F.3d at 1089.

StarKist relies heavily on *Comcast Corp. v. Behren*, -- U.S. --, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013), in arguing that Plaintiff's damage calculations lack the required nexus to the plaintiff's

theory of liability.  Similar arguments have gained traction in antitrust cases, such as *Comcast*, and in a handful of cases with complex damages theories.  But this case is exceedingly simple.  The theory of liability is that StarKist cheated customers by underfilling cans in violation of the federal standard of fill.  Mr. Weir simply takes the average underfill as a percentage, and multiplies it by the average retail price per can and the number of cans sold.  *See* Weir Decl. ¶¶ 28-30.  So, for example, StarKist's Chunk Light In Water cans were shown to have an average fill of ███ oz. according to testing by NOAA.  *See id.* ¶ 7.  Mr. Weir calculated that this average was ██████ below the ███ oz. standard of fill, and multiplied ██████ by the average retail price for the cans and the number of cans sold, to produce an aggregate damage figure for the class.  StarKist offers three arguments against this calculation.  But each of those arguments goes to the merits of the claim, not the appropriateness of class certification.

First, StarKist argues that the underfill figures Mr. Weir obtained from NOAA are based on too small a sample, and cannot be extrapolated "to hundreds of millions of cans packed and sold over five years."  Opp. Br. at 26:25-27:1.  However, it is StarKist who is responsible for the lack of better data, as it admittedly never performed tests designed to ensure compliance with the federal regulations.  *See supra* Part I.  Furthermore, the press weight data from StarKist's internal press weight tests shows "at least ██████ non-compliance for all four Products, across the entire class period."  Weir Reply Decl. ¶ 54.

Second, StarKist argues that Weir improperly assumes "that all consumers would have received more tuna – more fish fill – if the press weight numbers had satisfied the standard."  Opp. Br. at 28.  But that is not an assumption.  It is a matter of both logic and physics.  If StarKist had put more fish into the cans, class members would have gotten more fish out of the cans.  The entire purpose of the press weight rule is to ensure adequate fish fill.  And StarKist's own internal procedures use press weight data to determine the amount of the fish fill. *See supra* Part I.A.

Third, StarKist argues that it would be impossible to "*ever* accurately calculate damages in light of press weight variations."  Opp. Br. at 29:4-5 (italics in original).  StarKist correctly observes that the standard of fill "measures compliance across 24-can averages, rather than in terms of what any individual consumer received."  *Id.* at 2:4-5.  But the necessity of calculating damages from a

statistical average figure is routine in class actions. *See, e.g.*, *Bell v. Farmers Ins. Exch.*, 115 Cal. App. 4th 715, 750 (2004) (affirming certification of a class where "statistical sampling" was used to calculate damages notwithstanding "the possibility of awarding [damages] to particular [class members] who are not entitled to them … [because this possibility] is not a unique problem of statistical sampling; it is inherent in many class action decisions"); *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 333 (2004) ("[A]s the Court of Appeal recently recognized [in *Bell*], the use of statistical sampling in an overtime class action 'does not dispense with proof of damages but rather offers a different method of proof.'") (quoting *Bell*, 115 Cal. App. 4th at 750).

Finally, StarKist fails to address the issue of statutory damages. Both New York and Massachusetts laws provide for statutory damages in amounts ranging from $25 to $500 per violation. Here, Mr. Weir simply multiplies the number of violations by the statutory amount to calculate the aggregate damages for the New York and Massachusetts subclasses. *See* Weir Decl. ¶ 31. StarKist provides no substantive response to these calculations.

## VII. STARKIST'S NO-RECEIPTS ARGUMENT DOES NOT AFFECT THE ASCERTAINABILITY OF THE CLASS

StarKist argues there is "no objective, reliable method to identify who purchased the relevant products, or in what amounts, during the class period." Opp. Br. at 15:20-22. That argument is false. As we explained in our opening brief, Plaintiff's counsel, Bursor & Fisher, P.A., has successfully identified hundreds of thousands of purchasers of similar products by obtaining data from retailers.

StarKist also argues that the experience of Plaintiff's counsel in obtaining customer names through retailer loyalty programs in prior cases is "no substitute for an evidentiary showing of ability to identify purchasers of the challenged products here, which has not been made." *Id.* at 17:27-28. But such an evidentiary showing is not possible prior to class certification because the production of class member identifying information ordinarily is governed by Rule 23(d), not the discovery rules. *See, e.g.*, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350 (1978) ("[W]e hold that Rule 23(d), not the discovery rules, is the appropriate source of authority for such an order."); *id.* at 354-55 ("Rule 23(d) also authorizes a district court in appropriate circumstances to require a defendant's

cooperation in identifying the class members to whom notice must be sent.").  Had this information
been sought prior to class certification, StarKist and the retailers certainly would have objected that
it was premature.  *See, e.g.*, *Dziennik v. Sealift, Inc.*, 2006 WL 1455464, at *1 (W.D.N.Y. May 23,
2006) ("Courts have ordinarily refused to allow discovery of class members' identities at the pre-
certification stage out of concern that plaintiffs' attorneys may be seeking such information to
identify potential new clients, rather than to establish the appropriateness of certification.").  Thus,
the 500,000 purchasers of homeopathic cold and flu products in *Forcellati*, and the 200,000
purchasers of Capatriti olive oil in *Ebin*, were identified from retailers' records in response to
subpoenas issued <u>after</u> class certification was granted, pursuant to Rule 23(d).  *See* Deckant Reply
Decl. ¶ 23.  StarKist offers no reason why the same procedure cannot be used here to identify
purchasers of StarKist Tuna.

StarKist's argument that survey evidence shows "most consumers will not be able to recall"
their purchases is weak and wrong.  StarKist's cartoon mascot, Charlie the Tuna, appears on every
label:



This "beloved icon" with his catchphrase "Sorry Charlie!" is one of the most recognizable brand
identifiers in American history.  *See* starkist.com/charlie.  Class members are able to recognize and
recall this unique brand identifier.  *See, e.g.*, Hendricks Dep. at 33:24-25, Deckant Reply Decl. Ex. K
(testifying that his purchases of StarKist over other brands were influenced by Charlie the Tuna:  "I
like Charlie Tuna").  StarKist's survey is biased and wrong.  The survey was an "opt-in"
questionnaire provided to 67,000 potential respondents over the Internet, but only 643 respondents,
less than 1% of the total pool, even completed the first section of the survey.  Hanssens Decl. ¶¶ 40-
41.  The results from such a small, self-selected pool of respondents are inherently unreliable.[8]

---

[8] Dr. Hanssens's testimony should not be considered in ruling on this motion, since StarKist failed to
produce him for a deposition in advance of the deadline for this reply brief.

StarKist cites *Bruton v. Gerber Prods. Co.*, 2014 WL 2860995, at *7-9 (N.D. Cal. June 23, 2014) and *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *10 (N.D. Cal. June 13, 2014) in support of its argument that "the class cannot be certified" due to "the variety of StarKist products" at issue and the purportedly "low likelihood that typical consumers would reliably recall how many [cans of StarKist Tuna] they purchased and when." Opp. Br. at 16:22-17:2. Both of those cases are easily distinguished.

In *Bruton*, the plaintiff "challenge[d] Gerber's use of 'nutrient content claims'" in 69 varieties of baby food. *Bruton*, 2014 WL 2860995, at *2. These claims were embodied in seven differently-worded label statements which had undergone rolling label changes. "Of the 69 products at issue … 66 were labeled both with and without challenged labels during the class period." *Id.*, at *6. But here there are only 4 products at issue, not 69. And there were no pertinent label changes for any product during the class period. Each of the four products was consistently underfilled. And the labels were identical insofar as none of them included the statement "Below Standard in Fill" as required by 21 C.F.R. § 130.14(b). *See supra* Part III.

*Jones* involved claims that "Defendant ConAgra's website and products – including Hunt's tomato products, PAM cooking spray products, and Swiss Miss hot cocoa products – contain deceptive and misleading information" concerning (i) the products' antioxidant properties in regards to Swiss Miss, or (ii) their purported status as being "100% Natural," in regards to Hunt's tomato products and PAM cooking sprays. *Jones*, 2014 WL 2702726, at *1-3. That case involved "literally dozens of varieties with different can sizes, ingredients, and labeling over time," with some labels that "included the challenged language and some that included no such language at all." *Id.*, at *10. For that reason, the court concluded that class members could not recall whether they purchased products with the challenged statements. *Id.* This case does not present those complications, since every can was underweight, and none included the disclosure required by 21 C.F.R. § 130.14(b). *See supra* Part III.

In these circumstances, it would be particularly unjust for theoretical ascertainability concerns to pose an obstacle to class certification. The evidence in this case leaves little doubt that StarKist committed a massive fraud on millions of customers. Without class certification, StarKist

1  will retain the profits of that fraud and be incentivized to repeat its illegal conduct.  This is precisely

2  the type of case that requires class treatment if there is to be any possibility of redress.  As Judge

3  Posner put it:

4           The *realistic* alternative to a class action is not 17 million individual
           suits, but zero individual suits, as only a lunatic or a fanatic sues for
5           $30.  But a class action has to be unwieldy indeed before it can be
           pronounced an inferior alternative – no matter how massive the fraud
6           or other wrongdoing that will go unpunished if class treatment is
7           denied – to no litigation at all.

8  *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in

9  original).  Concerns over class members' ability to remember their exact purchases pale by

10 comparison to concerns that StarKist knowingly violated the law for years – and continued violating

11 it even after being enjoined by Judge Waters.  Class members should not be denied a fair day in

12 court.  And StarKist should not be rewarded for this outrageous behavior.

13 **VIII.   CONCLUSION**

14        For the foregoing reasons, as well as those set forth in our opening brief, the Court should

15 certify the Class and California Subclass, appoint him as a class representative, and appoint Bursor

16 & Fisher, P.A. as class counsel.  The proposed intervenors, Interested Parties Laury Smith, Ben Hall,

17 Brian Andacky, and Joseph Vallillo also join in these requests and further request that the Court

18 certify each of their respective subclasses and appoint them as class representatives.

19

20 Dated:  April 7, 2015                    Respectfully submitted,

21                                          **BURSOR & FISHER, P.A.**

22                                          By:  /s/ *Scott A. Bursor*
23                                               Scott A. Bursor

24                                          Scott A. Bursor (State Bar No. 276006)
                                            Neal J. Deckant (admitted *pro hac vice*)
25                                          888 Seventh Avenue
                                            New York, NY  10019
26                                          Telephone: (212) 989-9113
                                            Facsimile:  (212) 989-9163
27                                          E-Mail: scott@bursor.com
                                                    ndeckant@bursor.com
28

1    **BURSOR & FISHER, P.A.**

2    L. Timothy Fisher (State Bar No. 191626)
     Julia A. Luster (State Bar No. 295031)
3    1990 North California Boulevard, Suite 940
     Walnut Creek, CA 94596
4    Telephone:  (925) 300-4455
     Facsimile:  (925) 407-2700
5    E-Mail: ltfisher@bursor.com
             jluster@bursor.com
6

7    *Attorneys for Plaintiff*
     *And the Interested Parties*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28