UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>      v.<br><br>STARKIST CO.,<br><br>                              Defendant. | Case No. 13-0729-HSG |

Reply Declaration

of

# COLIN B. WEIR

April 7, 2015

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE FILED UNDER SEAL

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.   I am the same Colin B. Weir who has previously testified in this proceeding.  My qualifications are set forth in Exhibit 1 to the Declaration of Colin B. Weir dated January 20, 2015 ("Weir Declaration").

## II. ENGAGEMENT

2.   I have been asked by counsel for Plaintiff to review and respond to elements of the Defendant's opposition to class certification.[1]

## III. DISTRICT ATTORNEY/NOAA TESTS

### The additional tests

3.   At my deposition,[2] I was presented with a series of NOAA tests (Weir Deposition Exhibit 6), some of which I had not seen prior to the deposition.  These documents do not cause me to change my opinion that it is possible to calculate damages on a class-wide basis using common evidence.  As set forth in the Weir Declaration,[3] and confirmed in the Weir Deposition,[4]

---

[1] Defendant's Opposition to Plaintiff's Motion for Class Certification, March 3, 2015, and associated filings.

[2] Deposition of Colin Weir, February 10, 2015 ("Weir Deposition").  I have also been provided with additional NOAA test results from Plaintiff.

[3] Weir Declaration at 14.

[4] Weir Deposition, at 227, 269.



my damages methodology can accept as an input any measure of underfill that the Class may

prove at trial.

**The DA Letter**

4.    One of the District Attorney NOAA tests that was presented to me at my deposition

purportedly showed that the test passed the requirements of the press weight standard set forth in

21 CFR § 161.190.  As I noted in my deposition testimony, that test appears to be non-compliant,

containing 27 cans rather than the requisite 24.[5]  I also noted that this result must not be viewed

in a vacuum, but rather should be viewed in context, especially that context provided by the

additional documents from the District Attorneys.[6]  Prior to my deposition, I was provided with a

letter from the District Attorneys to StarKist.[7]  The DA Letter describes the "Factual

Background" of the situation:

> "The Department of Food and Agriculture, Division of Measurement Standards
> (DMS) began inspecting Starkist brand canned tuna products in 2010.
> Investigation and subsequent testing revealed that these products did not meet
> the required standard for pressed weight of tuna, and thus violated the standard
> of identity set forth in 21 CFR 161.190. Specifically, testing conducted from the
> time period of April 14, 2010 to June 4, 2010, showed that Starkist tuna
> products consistently failed to meet established press weight standards, with
> shortages of up to 22% less than the stated weight in tested batches, and up to
> 29% on individual cans of tuna. More recent testing, conducted from March 2,
> 2011 through March 14, 2011, again demonstrated that Starkist products failed
> to meet standards."

5.    This letter conveys that the test results show, at least in the eyes of the District

Attorneys, that StarKist "consistently failed to meet established press weight standards."  This

---

[5] Weir Deposition, at 161 *et seq.*

[6] Weir Deposition, at 163.

[7] Starkist0003584-3587 ("DA Letter").

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 3 of 23

evidence moved the District Attorneys to state that "For the time period of 2007 through January of 2011, total sales were 94,380,375 cans of product just of the type we specifically tested. Clearly, total sales of product were much higher, and potentially could be included in the number of violations."[8]

6.   It would appear that a small number of test results that purportedly show a "pass" did not cause the District Attorneys to change their finding that StarKist was consistently underfilling its 5 ounces cans of tuna.

## IV.  PROBLEMS WITH THE STARKIST TESTS

**Press issues**

7.   As I have discussed in the Weir Declaration, Defendant StarKist admits that its own test results were obtained through the use of faulty equipment which was rife with problems. Even after it was sent for repairs, the testing machine "never performed well."[9]  Even though testing data was obtained frequently, Defendant "kn[e]w that data [wa]s not accurate either." These inaccuracies appear to have been caused by numerous issues that resulted in *underpressing* test samples, which would *overstate* the press weights in Defendant's favor.[10] These issues include:

- "The target pressures for the ████████████ listed in the press room are ████ and ████████ respectively. The target pressures should be ████████ and ████████[11]



---

[8] DA Letter, at 3.

[9] Bates No. StarKist0009978.

[10] Maxfield Deposition, at 243-244.

[11] *See* Bates Nos. StarKist0005041-5042.



ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 4 of 23

- "It was observed when calibrating the machine for the ███████ pounds of force was targeted on the Dillon gauge resulting in the ████ i pressure gauge reading. The correct Dillon Gauge target for the ██████████ pounds which in turn should provide a reading of █████ i on the pressure gauge. The operators indicated they were told to target the Dillon gauge to ████ pounds. Apparently there was some miscommunication during training at some point."[12]

- "When an attempt to calibrate the press at the correct ████ pounds reading on the Dillon gauge it was found that both the digital pressure readout and the analog dial pressure gauge were reading incorrectly. The digital gauge read ██████ and the analog dial gauge read ██████ rather than the correct reading of ████████ [13]

- "An attempt was made to calibrate for the ████ (███ can size requiring a Dillon Force Gauge reading of ████ pounds. The pump could not provide the necessary ██████ to reach the required ████ reading on the Dillon gauge. Maintenance made a number of adjustments to the hydraulic pump. The highest pressure attainable was ██████ on the questionable digital pressure gauge with a reading of ████ on the Dillon gauge."[14]

- "Maintenance indicated the hydraulic pump will need to be replaced or rebuilt if parts are available."[15]

- "The electronic PLC ramp system was not bringing up the pressure up in the proper increments through the first minute of pressing. Initial pressure is set to high and the system sits at the initial pressure for the first ██████ before starting the ramp to the required pressure taking ████████ to reach the required pressure. This results in a ██████ excess ramp time allowing only ██████ for the hold at pressure stage rather than the required ████████."[16]

8.    Former StarKist Corporate Quality Assurance Manager Aaron Maxfield explained that the repercussions of a faulty test press that did not exert sufficient pressure would be test results that *overstate* the press weights in Defendant's favor:

> Q:  You understand how that machine works, right?

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 5 of 23

A:  (Witness reviews document.)  He is talking about having a problem achieving the proper pressures in the press cups, yes.

Q:  So if you don't press hard enough, you don't squeeze out as much of the water or oil or other medium, right?

A:  It's a little more complicated than that … but the general principle of the process was you applied a certain amount of pressure to get a certain amount of liquid or moisture squeezed out, yes.

Q:  And the more liquid or moisture you squeeze out, the lighter the press weight is going to be, right?

A:  That would be the overall theory or principle of the machine and the press standard, yes.

Q:  And the opposite of that is also true, if you don't press hard enough, you're not squeezing out as much of the liquid, right?

A:  Yes, that's what logic would say.

Q:  And if you're not squeezing out as much of the liquid, then press weight is going to appear to be heavier?

A:  That would be the principle, yes.

Q:  And that's what Harvey found was happening with the press machine in Samoa; isn't that what he writes here?

A:  Yes.[17]

9.    In response to these ongoing problematic test press results, various company quality control  representatives commented:

- "This looks bad.."[18]

- "We have to get this under control and quickly. We can't keep screwing around with this (for lack of a better term)..."[19]

---

[17] Maxfield Deposition, at 243-244.

[18] Bates No. StarKist0014183.

[19] *Id.*



Reply Declaration of Colin B. Weir
April 7, 2015
Page 6 of 23

- "I agree. If I could fix it myself, I would step on the necks of everyone in the way and do it myself. But this is not the case, and I have enough of my own work I can control to complete."[20]

- "Unfortunately QA has no power or authority to change this either. All we can keep doing is advising and reporting that we are out of compliance. The reporting structure for QA in our company is unusual and not a model generally followed across the board. When QA reports to operations and marketing we have little power for change and get lots of blame when things are wrong. It is a little discouraging. If it were me, I would have been cooperative initially as maintenance and production tried to work this out but by this point in time if I had the power, I would put every can of product made on hold until someone fixed the problem or I got fired."[21]

- "We need to get control of our current Samoa press, as well as the timing of the new machines. If this data is accurate, we are SOL if we get audited ... especially since we just settled. I'm sure there will be a follow-up. Any next step suggestions is appreciated."[22]

**Scraping practices**

10.   StarKist's test press problems are not the only reason that the StarKist internal test results cannot reliably demonstrate compliance.  It appears that during most if not all of the class period, StarKist's test results included ████████████████████████████, a violation of the test press rules specified by the CFR.[23]

11.   Specifically, Brett Butler, former StarKist General Manager of the Samoa Plant, emailed a team including Harvey Pearson, former StarKist Director of Quality Assurance, stating:

> "Harvey, went to look at the press myself, and took the picture below of the chunks that we are losing as result of the manual pressure we apply during the

---

[20] *Id.*

[21] *Id.*

[22] *See* Bates No. StarKist0014512.

[23] StarKist0005119-5132.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 7 of 23

> pressing. The girl me tells that they have always ██████████ when calculating the individual press of the can for each lot."[24]

Mr. Butler requests clarification as to whether this is permissible.

> 12.  Harvey Pearson writes back unequivocally:

> " CQA has never authorized ██████████ out from the body of the press machine and placing it bad[sic] into the press cup.

> "Attached is a copy of standard of identity for canned tuna from the CFR, 161.190 which contains the section on tuna pressing for fill of container.[...] It is in violation of the SOI.

> **"The practice of ██████████████████ back into the cup will be stopped. Any further use of this practice will result in the product involved being held for violation of the standard of identity for fill of container."**[25]

> 13.  In his deposition, Mr. Pearson confirmed that neither he, nor anyone else would have authorized the practice of ██████████ of the press and adding them back.  "No, I never authorized that.  I don't think anybody else did either."[26]

> 14.  Mr. Pearson also confirmed that the repercussion of the practice will be *higher* apparent press weights: "I think that's what I said. Originally, you're going to put the fish back in and you're going to get -- get a higher reading.  If you're adding weight to it, it's going to be higher."[27]

---

[24] *Id.*

[25] *Id.* (Emphasis original, bracketed text added for clarification).

[26] Deposition of Harvey Pearson, March 10, 2015, ("Pearson Deposition"), at 272.

[27] *Id.*, at 280.



Reply Declaration of Colin B. Weir
April 7, 2015
Page 8 of 23

**Absence of documented test press calibration and maintenance**

15.  In his deposition, Harvey Pearson indicated that the StarKist Samoa plant should have records of monthly calibration of the test press machine.[28]  Mr. Pearson also indicated that he recommended the institution of a documented preventative maintenance program for the test press.[29]  Internal StarKist documents also refer to supposed written maintenance records.[30] However, Mr. Pearson has never seen any written maintenance or calibration records.[31]

16.  I have been informed by Counsel for Plaintiff that StarKist has been unable to produce any such records.

17.  For some portion of the class period, it is known that StarKist technicians were calibrating the press machine incorrectly, resulting in lower than required pressures being exerted on the press machine.[32]  The lack of press calibration data raises further questions about the accuracy of the StarKist internal press results.

18.  Similarly, as discussed above, were clearly maintenance issues with the press machine, and the lack of maintenance data raises further questions about the accuracy of the StarKist internal press results.

**Absence of press test forms**

19.  StarKist maintains a written quality assurance procedure with instructions on the "Procedure to Determine Compliance to Company Tuna Press Weight Standard."[33]  This

---

[28] Pearson Deposition, at 122-124.

[29] *Id.*, at 139-140.

[30] Bates No. StarKist0006895-6898.

[31] Pearson Deposition, at 220.

[32] *Id.*, at 120-121; StarKist0005041-5042.

[33] Bates No. StarKist10335 *et seq.*


ECONOMICS AND TECHNOLOGY, INC.

document, among other things, requires that the tester "Record this information on the 'Pressed Cake Report' form" and "Report results on the attached form on a daily basis to plant Q.A. Manager, Operations Manager and Plant General Manager. The same form can be used to report results on a weekly basis." The document also includes a copy of a sample form.

20. Although numerous StarKist press test results have been produced in summary form as electronic spreadsheets, I have been informed by Counsel for Plaintiff that StarKist has been unable to produce any of the underlying forms.

21. As I discuss in more detail below, the StarKist data contains numerous anomalies, which Defendant's expert Bruce Strombom agrees must be "erroneous values" which he omitted from his analysis.[34] The lack of the underlying forms makes it difficult to verify the accuracy of the data entry associated with the electronic results.

## V. MINIMUM FILL / WATER CAPACITY STANDARDS

22. As I have discussed in the Weir Declaration, the CFR provides a clear method for determining the benchmark minimum fill required in the standard of identity. This process involves conducting a water capacity test on the relevant can, and using the results of that test to determine the minimum press weight fill.

---

[34] Deposition of Bruce Strombom, April 3, 2015 ("Strombom Deposition"), at 23.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 10 of 23

**Defendant's calculation of the water capacity and minimum fill**

23.   Defendant has determined the water capacity of its five ounce cans to be ███

ounces.[35]  Using the formula provided by the CFR, the calculation of the required tuna fill would

be:

*Solid*: [███████████████

*Chunks*:███   ████████████

24.   Defendant made this same calculation of the minimum required fill rates, and arrived

at the same results of ███ ounces for solid tuna and ███ ounces for chunk.[36]

25.   Defendant's expert has chosen not to express an opinion on, nor does he possess the

"special knowledge" required to determine, the appropriate minimum fill requirement for use in

this litigation,[37] and has not conducted a water capacity test.[38]  Strombom does acknowledge that

StarKist used the higher ███ and ███ minimum fill requirements.[39]

26.   I have now seen further evidence that StarKist believed these were the correct

figures for determining compliance with CFR standards.  A representative of the Dongwon

company (the parent corporation of StarKist), "Nemo" asked former Starkist General Manager of

the Samoa Plant Brett Butler to confirm the minimum fill rates for StarKist's US code

compliance.

> "Chairman aske[sic] to me about US federal regurations[sic] for press weight
> suddenly.

---

[35] Defendant made this determination via testing on February 8, 2008. *See* Bates No. StarKist0010948.  Defendant re-confirmed these figures in a follow-up email from Harvey Pearson to Bess Atienza dated May 29, 2013. *See* Bates Nos. StarKist0010496-10497.

[36] *Id.*

[37] Strombom Deposition, at 45-46.

[38] *Id.*, at 47.

[39] *Id.*, at 46.


ECONOMICS AND TECHNOLOGY, INC.

I wanted cross check with you for my remember.

In my remember it was ███ oz for 5 oz chunk can, is it right?

And what's the issue for our press weight?"[40]

27.  In response to this request, Mr. Butler stated:

"Correct ███ for chunk and ███ for solid.  The issue is that sometimes we meet requirement for CL1/2's and very rarely meet the requirement for solid 1/2's."[41]

**NOAA and Chicken of the Sea minimum fill**

28.  21 CFR § 161.190 is clearly written to accommodate likely variations between the cans of different manufacturers, as evidenced by the standards set forth for the water capacity test, and the formula provided to translate the results of the water capacity tests into a specific minimum fill benchmark.

29.  I have seen that both NOAA and competitor Chicken of the Sea have used slightly different minimum fill benchmarks. [42,43]  Given the nature of the water capacity test and minimum fill calculations, it does not surprise me that the results of these tests/formulas may vary by competitor.  However, I have seen no evidence that either NOAA or Chicken of the Sea has ever conducted a water capacity test on a StarKist (or any other brand) 5 ounce tuna can--a prerequisite to determining the minimum fill required by the standard of identity--or that the minimum fills noted by NOAA and Chicken of the Sea are specific to StarKist.  Indeed, the only evidence I have seen of water capacity tests specific to StarKist 5 ounce cans is that cited above.

---

[40] Bates No. StarKist0001385.

[41] *Id.*

[42] *See* Bates Nos. StarKist0003587, StarKist0003656, and StarKist0003664.

[43] *See* Bates Nos. StarKist0014089-90 (testing conducted by Chicken of the Sea).


ECONOMICS AND
TECHNOLOGY, INC.

30.  Unless further evidence is adduced to the contrary, it would appear that the most accurate minimum fill requirements for purposes of this litigation are those based upon the actual water capacity tests of actual StarKist 5 ounce cans: ███ ounces for chunk light, and ███ ounces for solid.  However, as with the specific measure of underfill, my methodology is flexible, and can accommodate the use of any minimum fill benchmark value.

## VI.  FISH FILL AND PRESS WEIGHTS

31.  In StarKist's Opposition to Class Certification, counsel for Defendant insinuates that increasing fish fill would not be the method that StarKist would use to increase press weights, and that there is no direct relationship between fish fill and press weights--or that increasing fish fill rates might result in *lower* press weights.

32.  This representation does not comport with the evidence I have seen in this case.

**StarKist company policy**

33.  StarKist internal Quality Assurance Procedure Number: CQP-09-F-04 is titled "Determination of Fish Fill based on Press Cake"[44]  This procedure contains detailed instructions on the calculation of press weight, and how to convert that value back to expected fish fill amounts.  Not only is the relationship between fish fill and press weight laid plain, this document states that it is StarKist's unequivocal policy to "Increase fill weight target if converted pressed weight value (from ███ is lower than target press weight value calculated from ███ (or the sample has low pressed weight)."[45]

---

[44] Bates No.  StarKist0010330-10334.

[45] *Id.*


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 13 of 23

**Butler email**

34.   In an email to StarKist/Dongwon executives, Bruce Butler states:

> "The issue is that sometimes we meet requirement for CL1/2's and very rarely
> meet the requirement for solid 1/2's. The State of California is looking to take
> the tuna companies to court over this. So now we are enforcing this regulation
> and *to do this we are going to put more fish in the can*."[46]

**"Aaron Math"**

35.   In an email to Aaron Maxfield, Harvey Pearson describes a procedure to increase

press compliance by increasing fish fill:

> "Following is the calculation procedures used to calculate a new fish fill to
> insure meeting the company ███ press compliance."[47]

36.   The email then provides a detailed formula for converting press weights into

corresponding fish fill requirements.  Not surprisingly, the formula shows that increasing fish fill

results in *increased* press weights.  The email is silent as to other ways in which press weight

might be increased.

**$3-million fish fill budget implication**

37.   In another chain of emails regarding fish fill and its relationship to press compliance,

Harvey Pearson states:

> "The ███ oz. fill in Samoa is resulting in very border line press results and on
> an ongoing basis there are batches that do not meet the ███ individual can
> requirement.

---

[46] Bates No. StarKist0001385 (emphasis supplied).

[47] Bates No. StarKist0009949-9950.



> With the number of variables in fish and differences in processing that can effect press results the plant will start production with a ██ oz. fill."[48]

38.   This email chain continues and demonstrates that even a small change in fish fill has financial consequences for StarKist--thus indicating that small amounts of tuna, in the aggregate, have value:

> " The implication financially to moving back to ████ from ████ is approximately $██ to $██ million versus budget assuming the switch takes place for the last nine months of 2013."[49]

## VII.  ANALYSIS OF THE STARKIST RESULTS

39.   Since the filing of the Weir Declaration and Weir Deposition, I have been provided with additional internal StarKist press weight data.  I have reviewed data for the press results of: ████ tests and nearly ████ cans of Chunk Light in Water; ████ tests and nearly ████ cans of Chunk Light in Oil; ██ tests and more than ████ cans of Solid White in Water; and ██ tests and more than ████ cans of Solid White in Oil.  These data cover the class period from 2009 through June 2014.[50]

40.   A review of this data, in concert with all of the other evidence I have reviewed (as discussed herein and in the Weir Declaration) does not cause me to alter my opinion that my damages methodology can accept as an input any measure of underfill that the Class may prove at trial, and that my methodology can allow for the calculation of classwide damages using common evidence.  This data, in concert with all of the other evidence that I have reviewed does

---

[48] Bates No. StarKist0008209-8216.

[49] *Id.*  It should be noted that the financial amounts referenced in this email are related to StarKist's wholesale costs, and thus understate the value of tuna at the higher, retail prices paid by class members.

[50] Bates Nos. StarKist0008982, StarKist0013543, StarKist0013544, StarKist0013545, StarKist0013546, StarKist0013547, StarKist0013548, StarKist0013549, StarKist0013550, StarKist0013551, StarKist0013552, StarKist0013553, StarKist0013554, StarKist0013555, StarKist0013556, StarKist0013557, StarKist0013558, StarKist0013559, StarKist0013560,  and StarKist001405.



Reply Declaration of Colin B. Weir
April 7, 2015
Page 15 of 23

not cause me to alter my opinion that the StarKist Products were subject to widespread

underfilling.

**Data Anomalies**

41.  The StarKist data contains numerous anomalies that call to question the reliability of

the data set.

42.  While I understand that cans are occasionally overfilled (so-called "flippers"), the

StarKist data contain purported press values as high as ███ ounces or nearly ███ ███ of

tuna.   This is clearly not possible, given the fact that the cans have a maximum capacity of ███

ounces *of water*.  Table 1 below shows the maximum weight contained in the dataset for each of

the four varieties of tuna at issue in this litigation.

| Table 1. | |
|---|---|
| **Type** | **Max Value in the dataset** |
| Chunk Light Water | ███ ounces |
| Chunk Light Oil | ███ ounces |
| Solid Water | ███ ounces |
| Solid Oil | ███ ounces |

43.  The StarKist data contain some ██ purported press values of 5 ounces or more.



Reply Declaration of Colin B. Weir
April 7, 2015
Page 16 of 23

| Table 2. | |
| --- | --- |
| **Type** | **Number of cans with press weights 5 ounces or greater** |
| Chunk Light Water | ■ |
| Chunk Light Oil | ■ |
| Solid Water | ■ |
| Solid Oil | ■ |

**CFR Compliance**

44.  The StarKist data does not appear to contain a single test compliant with the CFR requirement that 24 cans be tested.  Defendant's own expert, Bruce Strombom, has also testified that he has never seen a 24 can sample in the StarKist data.[51]

45.  This is not surprising, *as it was official company policy to test fewer than 24 cans*. StarKist written procedures for testing press weight specify "A ▬▬▬ can sample is used for all can sizes except for the 41b. can size where a ▬▬ can sample is used."[52]

46.  The majority of tests in the StarKist data, some ▬▬0 tests, are ▬▬▬▬▬.

47.  The StarKist data contains nearly ▬▬▬▬▬▬ (less than half of all tests in the StarKist data).

48.  The StarKist data contain ▬▬▬ of what appear to be non-standard quantities of cans, raising further questions about the integrity of the data.

49.  Table 3 below summarizes this information by variety of tuna.

---

[51] Strombom Deposition, at 38-39, 54, 56-57.

[52] Bates No. StarKist0010335.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 17 of 23

| Table 3. | | | | |
|---|---|---|---|---|
| Type | ███ | ███ | ███ | 24-Can, CFR Compliant Tests |
| Chunk Light Water | ███ | ███ | █ | 0 |
| Chunk Light Oil | ███ | ██ | █ | 0 |
| Solid Water | ██ | ██ | █ | 0 |
| Solid Oil | ███ | ███ | █ | 0 |

**Known quantifiable errors**

50.   StarKist itself appears to have determined the magnitude of the quantifiable errors of the problems plaguing its test press.[53]  StarKist has identified: press machine and Dillon force gauge calibration errors, parallax errors from reading the pressure gauge, and scraping as major sources of error in their internal press test procedure.  Specifically, StarKist has quantified the errors resulting from these factors as follows:

| Table 4. | |
|---|---|
| Error | Quantification |
| Calibration Errors | ███ |
| Parallax / Gauge Reading Errors | ███ |
| Scraping Errors | █████ |
| Total | ███ |

**Sensitivity analysis**

51.   In light of the evidence surrounding the problems with StarKist's test press and test procedures, and the quantification of some of these errors I have conducted sensitivity analyses

---

[53] Bates Nos. StarKist 0010327-10329.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 18 of 23

to determine the effect of these errors on the StarKist test press data.  For purposes of my

analysis, I have assumed, *arguendo*, that StarKist's test results were conducted in compliance

with the CFR (despite the fact that not a single 24-can test was conducted).

52.   Taking the data both at face value (including obviously erroneous values, such as the

purported ▮ ounce result discussed above) and eliminating questionable entries (those below 1

ounce and those above 5 ounces) I calculated whether each test would meet the minimum fill

requirements if, on average, the StarKist press weights were overstated by ▮▮▮▮▮ or

▮▮▮▮ as a result of  StarKist's test press maintenance repair and calibration issues, StarKist

staff misconducting the tests by underpressing, and scraping tuna from the press back into the

test.[54]

53.   The results of these tests are shown below in Table 5.

| Table 5. Percent of tests that fail | | | | | | |
|---|---|---|---|---|---|---|
| | **All Observations** | | | **Observations with >1 ounce/ <5 ounces** | | |
| **Type** | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Chunk Light in Water | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Chunk Light in Oil | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Solid White in Water | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Solid White in Oil | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

54.   Based upon my review of the complete production of 37,611 individual StarKist test

results, when adjusted for known, quantifiable errors, StarKist's own press weight test data

shows at least ▮▮▮ non-compliance for all four Products, across the entire class period.

---

[54] There may be other sources of error (such as "measurement error" described by Defendant's expert [Strombom Deposition, at 75-76],  causing these results to be conservative.



**Long run averages**

55.   Defendant's expert Bruce Strombom has testified that the long run average "is a significant finding" that "indicates" whether "the product systematically failed to meet the target press weight over the class period"[55]   I have examined the long run averages of the StarKist press results, with results spanning the period August 2009 through June 2014.  Despite all the deficiencies of the StarKist press data, StarKist's own results show that both Solid White in Water and Solid White in Oil fall well below the CFR minimum required fill.

| Table 6. | | | | | |
|---|---|---|---|---|---|
| **Type** | **Cans Tested** | **Tests Run** | **Long Run Average** | **CFR Minimum Required Fill** | **Underfill (ounces/%)** |
| Solid White in Water | ■■ | ■■ | ■■ | ■■ | ■■ |
| Solid White in Oil | ■■ | ■■ | ■■ | ■■ | ■■ |

56.   Defendant's own expert has come to the same conclusion.[56]

57.   These long run results are extremely close to the results of the Plaintiff's NOAA test results, which are compared in Table 7 below:

| Table 7. | | |
|---|---|---|
| **Type** | **StarKist Long Run Average** | **Plaintiff NOAA Test** |
| Solid White in Water | ■■ | ■■ |
| Solid White in Oil | ■■ | ■■ |

58.   I have conducted similar tests for the Chunk Light products, reflected in Table 8 below.

---

[55]  Strombom Deposition, at 11-12.

[56] Strombom Deposition, at 18-19, 52-53.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 20 of 23

| Table 8. | | | | |
|---|---|---|---|---|
| Type | Cans Tested | Tests Run | Long Run Average | CFR Minimum Required Fill |
| Chunk Light in Water | ██ | ██ | ██ | ██ |
| Chunk Light in Oil | ██ | ██ | ██ | ██ |

59. Despite the press issues, scraping procedure, and other factors which in total may cause ████ in errors, these results only show StarKist's long run average exceeding the CFR Minimum Required Fill by ███-██ or between three hundredths to five hundredths of an ounce. As above, I have conducted a sensitivity analysis with regards to the long run averages for chunk light tuna, the results of which are shown below in Table 9.

| Table 9. | | | | |
|---|---|---|---|---|
| Type | 7.35% | 10.00% | 18.95% | CFR Minimum Required Fill |
| Chunk Light in Water | ██ | ██ | ██ | ██ |
| Chunk Light in Oil | ██ | ██ | ██ | ██ |

60. As with StarKist's individual tests, my review of press results for over ████ cans, when adjusted for known, quantifiable errors, StarKist's own press weight long run averages for all four Products show non-compliance, across the entire class period.

## VIII.  PLAINTIFF HENDRICKS' DAMAGES

61. I have been provided with the Reply Declaration of Patrick Hendricks.[57] This declaration states that Mr. Hendricks purchased approximately two 5 ounce cans of tuna per

---

[57] Reply Declaration of Patrick Hendricks, April 7, 2015.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 21 of 23

week during the period August 2009 through late-February 2010, of which approximately 75%

was StarKist chunk light tuna.[58]

62.   Using this information, California- and temporal-specific IRI pricing data, and

Plaintiff's figure of ███████ underfill,[59] I have estimated Mr. Hendricks Full Compensatory and

Price Premium Damages to be as set forth in Tables 10 and 11, respectively, below.

---

[58] *Id.*

[59] As I have already noted, any measure of underfill may be substituted, and my methodology will still produce a result.



Reply Declaration of Colin B. Weir
April 7, 2015
Page 22 of 23

| Table 10. Patrick Hendricks: Full Compensatory Damages | | | |
|---|---|---|---|
| **Number of Cans x Average Retail Price = Damages** | | | |
| Month | Number of Cans | CA Average Retail Price | Damages |
| 2 WE 8/16/09 | 3 | | |
| 4 WE 9/13/09 | 6 | | |
| 4 WE 10/11/09 | 6 | | |
| 4 WE11/08/09 | 6 | | |
| 4 WE 12/06/09 | 6 | | |
| 4 WE 1/06/10 | 6 | | |
| 4 WE 1/31/10 | 6 | | |
| 2 WE 2/14/10 | 3 | | |
| Total | 42 | | |

| Table 11. Patrick Hendricks: Price Premium Damages | | | | |
|---|---|---|---|---|
| **Number of Cans x Average Retail Price x Underfill = Damages** | | | | |
| Month | Number of Cans | CA Average Retail Price | Underfill | Damages |
| 2 WE 8/16/09 | 3 | | | |
| 4 WE 9/13/09 | 6 | | | |
| 4 WE 10/11/09 | 6 | | | |
| 4 WE11/08/09 | 6 | | | |
| 4 WE 12/06/09 | 6 | | | |
| 4 WE 1/06/10 | 6 | | | |
| 4 WE 1/31/10 | 6 | | | |
| 2 WE 2/14/10 | 3 | | | |
| Total | 42 | | | |

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
April 7, 2015
Page 23 of 23

## IX.  RESERVATION OF RIGHTS

My testimony, these calculations and estimates are based on the data presently available to me.  I understand that additional, different and/or updated data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my calculations and my testimony.

### VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 7th day of April, 2015.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.