1  Robert B. Hawk (Bar No. 118054)
   J. Christopher Mitchell (Bar No. 215639)
2  Stacy R. Hovan (Bar No. 271485)
   HOGAN LOVELLS US LLP
3  4085 Campbell Avenue, Suite 100
   Menlo Park, CA  94025
4  Telephone:  (650) 463-4000
   Facsimile:   (650) 463-4199
5  robert.hawk@hoganlovells.com
   chris.mitchell@hoganlovells.com
6  stacy.hovan@hoganlovells.com

7  Michael J. Shepard (State Bar No. 91281)
   HOGAN LOVELLS US LLP
8  3 Embarcadero Center, Suite 15
   San Francisco, CA  94111
9  Telephone:  (415) 374-2310
   Facsimile:   (415) 374- 2499
10 michael.shepard@hoganlovells.com

11 John E. Hall (admitted pro hac vice)
   Gregg D. Michael (admitted pro hac vice)
12 Amy J. Roy (admitted pro hac vice)
   Louis A. DePaul (admitted pro hac vice)
13 ECKERT SEAMANS CHERIN & MELLOTT, LLC
   U.S. Steel Tower
14 600 Grant Street, 44th Floor
   Pittsburgh, PA  15219
15 Telephone:  (412) 566-6000
   Facsimile:   (412) 566-6099
16 jhall@eckertseamans.com
   gmichael@eckertseamans.com
17 aroy@eckertseamans.com
   ldepaul@eckertseamans.com

18
   Attorneys for Defendant
19 STARKIST CO.

20              UNITED STATES DISTRICT COURT

21             NORTHERN DISTRICT OF CALIFORNIA

22                SAN FRANCISCO DIVISION

23 PATRICK HENDRICKS, individually and    Case No. 3:13-cv-0729-HSG
   on behalf of all others similarly situated,
24                                         **DEFENDANT STARKIST CO.'S OPPOSITION
                    Plaintiff,             TO PLAINTIFF'S MOTION FOR SANCTIONS**
25
            v.                             Date:       April 16, 2015
26                                         Time:       2:00 p.m.
   STARKIST CO.,                           Courtroom:  15, 18th Floor
27
                    Defendant.
28

Hogan Lovells US
LLP
ATTORNEYS AT LAW
MENLO PARK

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

# TABLE OF CONTENTS

Page(s)

I.  Introduction ........................................................................................................ 1

II. Plaintiff's Request for Sanctions Is Completely Without Merit Both Legally and Factually ...................................................................................................... 1

    A.  The California Rules of Professional Conduct Permit Compensation to Witnesses ................................................................................................ 2

    B.  StarKist's Conduct Was Fully in Compliance With the California Rules .............. 3

    C.  Plaintiff's Authorities Are Inapt and Inapplicable ................................................. 4

    D.  Plaintiff's Requested Sanction Is Unjustified ......................................................... 7

III. Plaintiff's Smear Campaign Is Completely Unwarranted .......................................... 8

    A.  Suggestions that StarKist's Witnesses Perjured Themselves Because They Were Paid for Preparation Time Are Completely Baseless. ................................... 8

    B.  StarKist Did Not Enter Into Agreements With Witnesses in Order to Stymie Plaintiff's Discovery. ............................................................................................ 13

    C.  Plaintiff's Counsel Was Not Blindsided in Depositions. ...................................... 13

    D.  StarKist's Objections at Depositions Were Proper. .............................................. 15

        1.  Harvey Pearson ......................................................................................... 16

        2.  Kelly Roberts ............................................................................................ 18

        3.  Aaron Maxfield .......................................................................................... 21

IV. Conclusion ......................................................................................................... 23

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
MENLO PARK

i

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Alexander v. Watson,*
  128 F.2d 627 (4th Cir. 1942)................................................................................................. 5

5

*Aristocrat Techs. v. Int'l Game Tech.,*
  2010 WL 2595151 (N.D. Cal. June 28, 2010) ...................................................................... 2

6

7

*Cal. Native Plant Soc'y v. U.S. E.P.A.,*
  2008 WL 4911162 (N.D. Cal. Nov. 14, 2008)...................................................................... 2

8

9

*Connolly Data Sys., Inc. v. Victor Techs., Inc.,*
  114 F.R.D. 89 (S.D. Cal. 1987)........................................................................................... 21

10

*Consol. Rail Corp. v. CSX Transp., Inc.,*
  2012 WL 511572 (E.D. Mich. Feb. 16, 2012) ................................................................. 5, 6

11

12

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,*
  117 F.3d 1328 (11th Cir. 1998)......................................................................................... 6, 7

13

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,*
  865 F. Supp. 1516 (S.D. Fla. 1994) .................................................................................. 6, 7

14

15

*Goldstein v. Exxon Res. & Eng'g Co.,*
  1997 WL 580599 (D.N.J. Feb. 28, 1997)......................................................................... 5, 7

16

17

*Hamilton v. Gen. Motors Corp.,*
  490 F.2d 223 (7th Cir. 1973).............................................................................................. 5

18

19

*Hynix Semiconductor Inc. v. Rambus Inc.,*
  2008 WL 397350 (N.D. Cal. Feb. 10, 2008)...................................................................... 20

20

*Platypus Wear, Inc. v. Horizonte Fabricacao Dist. Imp. Exp. Ltda.,*
  2010 WL 625356 (S.D. Fla. Feb. 17, 2010) ........................................................................ 6

21

22

*Prasad v. MML Investors Servs., Inc.,*
  2004 WL 1151735 (S.D.N.Y. May 24, 2004)...................................................................... 2

23

24

*Rocheux Int'l of New Jersey v. U.S. Merchants Fin. Group,*
  2009 WL 3246837 (D.N.J. Oct. 5, 2009)..................................................................... 5, 6, 7

25

*United States v. Cresta,*
  825 F.2d 538 (1st Cir. 1987) .............................................................................................. 7

26

27

*United States v. Cuellar,*
  96 F.3d 1179 (9th Cir. 1996).............................................................................................. 7

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
MENLO PARK

ii

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

*United States v. Davis*,
    261 F.3d 1 (1st Cir. 2001) .................................................................................. 6, 7

**RULES AND OTHER AUTHORITIES**

Am. Bar Ass'n Standing Committee on Ethics & Prof. Responsibility Formal Op. 96-402 .......... 3

Cal. Bar Ethics Op. No. 1997-149 ............................................................................... 1, 2

Cal. Rule of Court 8.1115(a) ........................................................................................ 6

Cal. Rule of Professional Conduct 5-310 .................................................................... 2, 3, 5

Fed. R. Civ. P. 30 ...................................................................................................... 16

N. Dist. of Cal. Civil Local Rule 3-4(e) ......................................................................... 6

N. Dist. of Cal. Civil Local Rule 11-4 ............................................................................ 2

Penn. Rule of Professional Conduct 3.4 .......................................................................... 3

Philadelphia Bar Ass'n Prof. Guidance Comm. Op. 2014-2 .............................................. 3

Restmt. (Third) of Law Governing Lawyers § 117 .......................................................... 3

Victoria E. Brieant, *Depositions and Home and Abroad*,
    Prac. Litigator, Sept. 2003 ..................................................................................... 16

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

iii

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

## I.   **INTRODUCTION**

Given the acerbic tone of Plaintiff's Motion for Sanctions and his serious accusations of violations of the Rules of Professional Conduct (not to mention suggestions of suborning perjury by counsel and perjury by witnesses), it is not too much to ask that he state the law and the facts with some modicum of accuracy.  But from the first sentence of his Memorandum to the last, he misstates the governing law, and scrupulously fails to report the facts that leave no doubt that StarKist complied with the governing law.  Although Plaintiff failed to so advise the Court, California law expressly—and quite reasonably—allows witnesses to be compensated for time spent preparing to testify, and that is all StarKist did.  As a result, Plaintiff's Motion and its associated serious accusations are completely baseless and should be summarily rejected, if not also sanctioned.

Not content merely to make false and irresponsible accusations of perjury and of suborning perjury, Plaintiff also fires a scattershot of other complaints, ranging from criticism of StarKist's objections at depositions to a several-page attempt to demonstrate that Mr. Pearson's deposition testimony was inconsistent with his declaration.  Even if they had been accurate, these complaints do not substitute for facts and law that would support the sanctions he seeks, but in any event the complaints turn out to be no more accurate and no less disingenuous than the rest of his Memorandum.

## II.   **PLAINTIFF'S REQUEST FOR SANCTIONS IS COMPLETELY WITHOUT MERIT BOTH LEGALLY AND FACTUALLY**

We begin with the controlling law, carefully avoided in Plaintiff's Memorandum, that eviscerates his Motion: California expressly permits payments to witnesses for time spent preparing to testify.  This is the modern and the majority rule, which recognizes the burdens on testifying witnesses, especially those who are otherwise employed or would lose income absent some compensation for their lost time.  *See* Cal. Bar Ethics Op. No. 1997-149.  Plaintiff makes a show of citing some contrary cases, but they do not reflect California law and in any event would not prohibit compensation to the witnesses in this case.  Those payments fall squarely within the bounds of California law.  This is more than enough to deny Plaintiff's Motion in its entirety.

## A.      The California Rules of Professional Conduct Permit Compensation to Witnesses

Plaintiff's accusation is built on citing a California Rule of Professional Conduct prohibiting payments to a witness "*contingent* upon the *content* of the witness's testimony."  Brief at 21:1-3 (quoting Rule 5-310(B)) (emphasis added).  Plaintiff omits to mention that Rule 5-310(B) explicitly allows compensating a witness for loss of time in attending or testifying: "a member may advance, guarantee, or acquiesce in the payment of . . . Reasonable compensation to a witness for loss of time in attending or testifying."  Cal. Rule Prof. Conduct 5-310(B)(1)-(2).[1]

This rule has repeatedly and consistently been read to permit the payment of compensation to witnesses for time preparing to testify.  In fact, the State Bar of California issued a formal opinion addressing this precise question and explained that "it is not inappropriate to compensate a witness for otherwise uncompensated time necessary for preparation for or testifying at deposition or trial, as long as the compensation is reasonable in conformance with rule 5-310(B), does not violate applicable law, and is not paid to a witness contingent upon the content of the witness' testimony, or the outcome of the case."  Cal. Bar Ethics Op. No. 1997-149.  As Judge Whyte explained in holding that it was permissible to compensate a fact witness who had been retained as a consultant, "California Rule of Professional Conduct 5-310(B) prohibits paying witnesses compensation that is contingent upon the content of their testimony or the outcome of the case *but allows payment for expenses and lost time*."  *Aristocrat Techs. v. Int'l Game Tech.*, 2010 WL 2595151, at *2 (N.D. Cal. June 28, 2010) (emphasis added).

Indeed, that is the widespread rule.  *See Prasad v. MML Investors Servs., Inc.*, 2004 WL 1151735, at *5 (S.D.N.Y. May 24, 2004) ("federal courts . . . are generally in agreement that a witness may properly receive payment related to the witness' expenses and reimbursement for time lost associated with the litigation") (collecting authorities).  National bar associations are in

---

[1]  "In this district, the conduct of counsel . . . is governed by the standards of professional conduct required of members of the State Bar of California."  *Cal. Native Plant Soc'y v. U.S. E.P.A.*, 2008 WL 4911132, at *1 (N.D. Cal. Nov. 14, 2008); *see also* Civ. L.R. 11-4 (requiring that attorneys appearing in this district "comply with the standards of professional conduct required of members of the State Bar of California").

agreement.  The American Bar Association, for example, opines that a witness may ethically be compensated "for time spent in pretrial interviews with the lawyer in preparation for testifying" and "for time spent in reviewing and researching records that are germane to his or her testimony."  Am. Bar. Ass'n Standing Committee on Ethics & Prof. Responsibility Formal Op. 96-402.[2]  The Restatement of the Law Governing Lawyers similarly concludes that "a lawyer may also compensate a witness for the reasonable value of the witness's time or for expenses actually incurred in preparation for and giving testimony."  Restmt. (Third) of the Law Governing Lawyers § 117 (comment).

### B.    StarKist's Conduct Was Fully in Compliance With the California Rules

Despite the number of times he tossed around the accusation, and despite possessing all three agreements, Plaintiff never once claims, let alone demonstrates, that any of StarKist's agreements at issue are contingent on how any witness testifies.  He cannot do so.  None of the witnesses was offered or paid anything based on how he or she testified; the witnesses were instead provided reasonable compensation for preparation time.

Take Harvey Pearson, for example.  Amidst his many suggestions that the testimony of StarKist's witnesses was purchased, Plaintiff scrupulously avoids telling the Court what he himself elicited from Mr. Pearson on this subject:  Mr. Pearson is employed as a consultant for a company called Ardagh, earning $80 per hour; the time he devoted to this case took away from his consulting business; and the $80 per hour he received from StarKist for preparation work meant that "you know, I wouldn't—I'd be unaffected, basically."  Bursor Decl. Ex. H ("Pearson Depo.") at 50:4-23.

Plaintiff did not suggest during Mr. Pearson's deposition that he lied in exchange for money, so Mr. Pearson did not testify on that subject.  The same is true for Mr. Maxfield.  But in

---

[2]  Based in part on the American Bar Association's opinion, the Philadelphia Bar Association has recently opined that Pennsylvania Rule of Professional Conduct 3.4, which is almost identical to California Rule of Professional Conduct 5-310(B), "is not to be read to disfavor transparent, reasonable compensation to a witness for loss of time," which includes "time spent in preparing to testify, in reviewing documents, in addition to time spent attending or testifying at trial or deposition."  Philadelphia Bar Ass'n Prof. Guidance Comm. Op. 2014-2 (June 2014).

response to questioning at her deposition, Ms. Roberts, the former schoolteacher (Bursor Decl.

Ex. D ("Roberts Depo.") at 6:15-16; 263:4-7), flatly denied Plaintiff's accusations:

> Q.     And before you spent six hours meeting with lawyers and before there was
> an agreement to pay you for your testimony, you concluded that the company most
> likely was not making press weight, right?
>
> . . .
>
> A.     I kind of also kind of take offense to the fact that you just said I was being
> paid for testimony, which would—which is, A, inaccurate and, 2, would be an
> unethical implication to me.

Roberts Depo. at 106:23-107:9.

She also testified unequivocally that her answers were not influenced by her consulting

agreement, and that she was not being paid for the substance of her testimony.  Roberts Depo. at

264:15-23; *see also id.* at 158:9-10 (asked if she was "afraid that if you tell the truth, you won't

be paid," witness responds "As I've indicated on several occasions, I am not being paid for my

testimony here today."); 158-12-18 ("First of all, the fact that you are again suggesting that pay

has anything to do with me being here today, I'm personally offended by that.  I find—I really

find that that pokes at my moral standards, and just for the record, I just want to get it out there

again, it has nothing to do with that.").

Like Mr. Pearson's agreement, the other agreements paid the witness a reasonable hourly

rate to compensate them for the time they lost to prepare to testify in this case.  Declaration of

Amy J. Roy in Support of Defendant StarKist Co.'s Opposition to Plaintiff's Motion for

Sanctions ("Roy Decl.") Exs. B-D.  In fact, StarKist has been more conservative than California

law allows.  It could, but does not, pay for the time witnesses spend being deposed.  For

testifying, StarKist's witnesses only receive the statutory witness fee—standard payments which

have yet to be paid by Plaintiff.  *E.g.* Bursor Decl. Ex. I ("Maxfield Depo.") at 108:25-109:13;

Roberts Depo. at 108:6-7; 150:8-9; 264:24-265:3.  As a result, StarKist's agreements are well

within the limits set by California law.

**C.     Plaintiff's Authorities Are Inapt and Inapplicable**

Plaintiff purports to analyze a handful cases, all from other jurisdictions with different

ethical rules and interpretations than California, in support of his argument that "payments to fact

1    witnesses are improper."  Brief at 17:4.  The cases do not so hold.  For example, *Hamilton v.*

2    *General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973), in particular, specifically acknowledged that

3    fact witnesses *could be compensated* for time spent preparing for and giving testimony.  In that

4    case, the court considered whether fees could be recovered on behalf of a witness in the absence

5    of an agreement that he would be paid for assisting counsel in preparing their case.  *Id.* at 226.

6    The court concluded that "the only contract that the law could imply would be for 'reasonable

7    cost of travel and subsistence incurred and the reasonable value of time lost in attendance' (18

8    U.S.C. § 201(j)). . . . Hamilton in fact reported his reimbursable expenses as they were incurred,

9    and he was reimbursed. . . . If he had any additional claims (for lost time, for example), he had an

10   opportunity to make them as the time was expended."  *Id.* at 229.  In other words, the *Hamilton*

11   court "would have allowed the decedent witness to be compensated for lost time, had he made a

12   claim at the time."  *Consol. Rail Corp. v. CSX Transp., Inc.*, 2012 WL 511572, at *9 (E.D. Mich.

13   Feb. 16, 2012) (rejecting *Hamilton* as support for argument that payment to fact witnesses is

14   improper).

15        No more helpful to Plaintiff is *Alexander v. Watson*, 128 F.2d 627 (4th Cir. 1942).

16   *Alexander* addressed whether witnesses could enforce an agreement whereby, if they testified,

17   *they would be paid a portion of fees awarded if plaintiff won the case*.  *Id.* at 629.  The court

18   disapproved such an arrangement.  And compensation contingent on the outcome of the case

19   would be improper under the California Rule of Professional Conduct 5-310 as well.  *Goldstein v.*

20   *Exxon Research & Engineering Co.*, 1997 WL 580599 (D.N.J. Feb. 28, 1997), rests on the rule

21   articulated in *Hamilton* and *Alexander*, which apparently remains the law in New Jersey, and

22   even under that regime, *Goldstein* determines that the correct remedy is disclosure rather than

23   sanctions.

24        Plaintiff gets even less help from two of the more modern cases he cites, both of which are

25   readily distinguishable: *Rocheux International of New Jersey v. U.S. Merchants Financial Group*,

26   2009 WL 3246837 (D.N.J. Oct. 5, 2009), and *Golden Door Jewelry Creations, Inc. v. Lloyds*

27   *Underwriters Non-Marine Association*, 117 F.3d 1328 (11th Cir. 1998).  In *Rocheux*, plaintiff's

28   counsel identified the witness as an expert, although he was in reality a disgruntled former

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

5

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

employee *who contacted plaintiff's counsel to* "*offer[] allegedly damaging testimony regarding [defendant's] business practices in exchange for a fee.*"  2009 WL 3246837, at *1 (emphasis added).  *Rocheux* has no application here; even Plaintiff does not go so far as to allege that Mr. Maxfield, Mr. Pearson, and Ms. Roberts offered themselves as mercenaries.  *See also Consol. Rail Corp.*, 2012 WL 511572 at *9 (distinguishing *Rocheux* in denying motion to preclude testimony from witness who received compensation because "the record in *Rocheux* shows that the plaintiff's attorney paid the witness 'for his testimony' and that exact language is used by the court and is the basis on which the court excluded him"); *Platypus Wear, Inc. v. Horizonte Fabricacao Dist. Imp. Exp. Ltda.*, 2010 WL 625356, at *6 (S.D. Fla. Feb. 17, 2010) (rejecting *Rocheux* as support for "the argument that payments to fact witnesses are improper").

And in *Golden Door*,[3] defendant *paid two fact witnesses in excess of $640,000, on condition that the witnesses' testimony be "helpful" to the defense*.  865 F. Supp. at 1520, 1524.  No such extravagant payments or conditions on witnesses' testimony are at issue here.  That the *Golden Door* court concluded that the payments in that case violated ethical rules does not remotely support a conclusion that reasonable and unconditional hourly compensation to Mr. Maxfield, Mr. Pearson, and Ms. Roberts for their preparation time is improper.  *See also United States v. Davis*, 261 F.3d 1, 39 n.33 (1st Cir. 2001) ("*Golden Door* is easily distinguished from the present case because the payments to two witnesses totaled over $400,000 and $100,000.  Indeed, *Golden Door* itself acknowledges that '[p]ayments made to fact witnesses as actual expenses as permitted by law will not be disturbed or set aside.'") (quoting *Golden Door*, 865 F. Supp. at 1526 n.11).[4]

_____

[3]  Plaintiff cites to the 11th Circuit's opinion affirming district court's determination that payments to fact witnesses in that case were improper.  But that affirmance does not discuss any issues germane to Plaintiff's Motion. It is the district court's decision, *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Association*, 865 F. Supp. 1516 (S.D. Fla. 1994), that addresses those issues in detail, and the district court's decision is therefore the focus in this Opposition.

[4]  Plaintiff also cites an unpublished California state decision, *In re Marriage of Simon*, 2007 WL 1874433 (Cal. Ct. App. June 26, 2007), that is not citable in this Court under this district's Local Rule 3-4(e) or California Rule of Court 8.1115(a) ("an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not

*(footnote continues on next page)*

1    As a result, Plaintiff cites no convincing authority, let alone controlling authority, on

2    which to conclude that StarKist's compensation agreements run afoul of applicable law.  To the

3    contrary, his citation of authority while avoiding mention of the controlling authority that

4    eviscerates his argument is, to say the least, ironic in a Memorandum that accuses StarKist's

5    counsel—without basis—of violating California Rule of Professional Responsibility 5-200.

6    **D.    Plaintiff's Requested Sanction Is Unjustified**

7    Even if Plaintiff could overcome all the foregoing failings in his effort to condemn the

8    conduct of StarKist's counsel, his requested relief—the exclusion of all evidence from any

9    witness who received compensation from StarKist—would still be unjustified.  As discussed

10   above, the conduct in the cases Plaintiff cites in support of that draconian sanction, *Golden Door*

11   (hundreds of thousands of dollars in witness payments) and *Rocheux* (payment in exchange for

12   damaging testimony), Brief at 21:19-22:2, are not remotely comparable to the reasonable

13   compensation for preparation time that Plaintiff attacks in this case.  Instead, as even the

14   *Goldstein* case determined, "given consistent appellate rulings in civil *and* criminal cases [] the

15   appropriate relief is to require full disclosure of the arrangements and permit full examination at

16   trial."  1997 WL 580599 at *9 (collecting cases) (emphasis in original).  *Accord Davis*, 261 F.3d

17   at 38 ("We have been reluctant to exclude testimony based only on the fact that a witness was

18   paid. . . . 'Rather than adopting an exclusionary rule for a particular factual situation, irrespective

19   of the mode of payment, we prefer the rule that would leave the entire matter to the jury to

20   consider in weighing the credibility of the witness-informant.'") (quoting *United States v. Cresta*,

21   825 F.2d 538, 547 (1st Cir. 1987)); *United States v. Cuellar*, 96 F.3d 1179, 1182-83 (9th Cir.

22   1996) (holding no due process violation where informant was paid hundreds of thousands of

23   dollars because payment arrangements were disclosed and witness was subject to cross-

24   examination at trial).

25

26

27   be cited or relied on by a court or a party in any other action").  In any event, the case does not

28   hold that non-contingent compensation to a fact witness is improper.

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

7                    OPPOSITION TO SANCTIONS MOTION
                     CASE NO. 3:13-CV-0729-HSG

All this has already been provided.  StarKist has disclosed the consulting and compensation arrangements and produced the agreements and related documents.  There is no further relief to which Plaintiff can claim to be entitled.

## III.     PLAINTIFF'S SMEAR CAMPAIGN IS COMPLETELY UNWARRANTED

There being no merit to Plaintiff's Motion for Sanctions, the Court could stop reading here and deny the Motion for the reasons set forth above.  But there is more to Plaintiff's Memorandum.  In essence, because the law and the facts eviscerate his Motion, he filled his brief with a smear campaign instead.  It turns out that this campaign is not only irrelevant but also uses the same tool of misleading accusations, as we demonstrate below.

### A.     Suggestions that StarKist's Witnesses Perjured Themselves Because They Were Paid for Preparation Time Are Completely Baseless.

Although Plaintiff never says so directly—because there is no support for it—his brief is written as if to suggest that Mr. Maxfield, Mr. Pearson, and Ms. Roberts all perjured themselves after being coached to do so by StarKist counsel, and that they did so for money.  *See* Brief at 1:5-7 ("StarKist's counsel contacted those nonparties and proposed to enter into 'consulting' agreements, whereby StarKist would pay them money for their testimony."); *id.* at 20:15-18 (claiming that "there can be little doubt from the record of their testimony . . . that these payments were designed to and did make these witnesses more sympathetic to StarKist and accepting of the influence of StarKist's counsel over the substance of their testimony").  In support of so serious a suggestion, Plaintiff offers nothing about Mr. Maxfield and some lines from Mr. Pearson's and Ms. Roberts' deposition testimony, which are either wrenched out of context or do not support Plaintiff's invention at all.

*Harvey Pearson*.  To hear Plaintiff tell the story, Mr. Pearson was coached during a 26-minute break in his deposition to contradict testimony he gave during questioning by Plaintiff's counsel on the subject of whether he regularly conducted inspections of the press weight machinery and its operations on his trips to American Samoa.  Plaintiff then changes gears and charges that apparently a lot of money and 26 minutes of coaching was not sufficient, so StarKist

1   used a leading question to accomplish the task.  *See* Brief at 16:7-15.  This story leaves out

2   several key facts, which show Plaintiff's accusations to be false.

3        When Plaintiff was asking Mr. Pearson about when he inspected the press weight

4   machine, he said that "I'd have to look at whether I traveled to Samoa during that time."  Pearson

5   Depo. at 246:14-15.  During the break following the close of Plaintiff's questioning, StarKist

6   provided Mr. Pearson with sixteen multi-page expense reports showing his travel to Samoa in

7   2011, 2012 and 2013, and he took the time to review them.  *See* Pearson Depo. at 292:2-4;

8   296:10-13.  Doing so took longer than the usual 10-15 minute break,[5] but it refreshed his

9   recollection about the trips.  *See* Pearson Depo. at 292:12-16.

10        Back on the record after that break and answering questions from StarKist's counsel, Mr.

11   Pearson went one-by-one through each of the sixteen expense reports covering his travel to

12   American Samoa during that two and one-half year period.[6]  Reviewing the reports, which

13   contain descriptions of the main purpose of the trips,[7] reminded Mr. Pearson of how he spent his

14   time on each trip, and as he went through them individually he answered that on eleven of the

15   trips he had inspected the machine and on five of the trips he had not.  Pearson Depo. at 291:18-

16   302:20.  *Virtually none of these questions were leading, and virtually none were objected to at*

17   *all.  Id.*  At the end of the examination, after the witness' testimony established through non-

18   leading questions that he had inspected the machine on 11 of the 16 trips, StarKist's counsel

---

19   [5]  For example, the three prior breaks were each 10-15 minutes.  Pearson Depo. at 237:1-8 (12

20   minutes); 267:2-11 (15 minutes); 281:21-282:2 (10 minutes).  During the 26-minute break,
   counsel also needed to obtain copies of all sixteen of the exhibits for counsel and the court

21   reporter.

   [6]  Mr. Pearson left StarKist in the middle of 2013.  *See* Pearson Depo. at 10:18-11:16.

22   [7]  Checking the press weight machine was never the main purpose of the trips, which typically
   lasted for two weeks, Pearson Depo. at 304:8-18, so it almost never appears on the face of the

23   report, *id.* at 316:2-9.  As an example, although Plaintiff himself contends, and emails reflect, that
   Mr. Pearson inspected the press weight machine on his visit to Samoa at the end of June 2012,

24   Brief at 9:23-24 and Bursor Decl. Ex. G), it was not the main purpose of his visit, and his expense
   report does not mention it.  Pearson Depo. at 337:25-339:19 and Ex. 501-D.  Nonetheless, the

25   descriptions in the reports did assist in refreshing Mr. Pearson's recollection that he had inspected
   the machine by reminding him that on a certain trip he was acting quality assurance manager for

26   the plant, *see, e.g.*, Pearson Depo. at 297:2-9, or by reminding him that on another trip they were
   commissioning a new press weight machine.  *Id.* at 301:12-19.  Other reports helped him to recall

27   that he had not inspected the machine by reminding him that he was too busy to do so.  *E.g.*, *id.* at
   293:20-294:8; 294:20-295:8; 296:14-23; 299:19-300:3; 302:8-14.

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
MENLO PARK
                                          9                    OPPOSITION TO SANCTIONS MOTION
                                                               CASE NO. 3:13-CV-0729-HSG

1  asked a summary question with the totals.  This is the question that Plaintiff wrenches from its

2  context and then presents to the Court in order to suggest that StarKist had to lead the witness to

3  the answer it wanted.  Brief at 16:16-21.

4      What is more, Mr. Pearson was paid for preparation time at the same hourly rate that he

5  would otherwise have charged for the regular consulting work he lost out on—nothing more—

6  and when asked if meetings with StarKist changed his analysis, he said they did not.[8]  Far from

7  establishing Plaintiff's accusation that StarKist suborned perjury, this exercise by Plaintiff merely

8  establishes how little basis there is for Plaintiff's accusations and how unreliable his

9  representations to the Court are.

10     *Kelly Roberts*.  Plaintiff goes to great lengths to suggest that Ms. Roberts changed her

11 testimony after signing her agreement because she was afraid that if she did not do so she would

12 not be paid.  *E.g.*, Brief at 8-9; *see also* Roberts Depo. at 158:5-18 ("Q. Are you afraid to tell the

13 truth here today?  MR. HAWK: Objection.  A. I am never afraid to tell the truth.  MR. HAWK:

14 Argumentative.  Q. Are you afraid that if you tell the truth, you won't be paid?  MR. HAWK:

15 Objection, argumentative.  A. First of all, the fact that you are again suggesting that pay has

16 anything to do with me being here today, I'm personally offended by that.  I find—I really find

17 that that pokes at my moral standards, and just for the record, I just want to get it out there again,

18 it has nothing to do with that.").  Given that the anticipated total of her payments was the grand

19 sum of $480 (six hours of preparation (Roberts Depo. at 9:20-21) at $80 per hour), this is a rather

20 unfathomable accusation on its face, and it was flatly denied by Ms. Roberts.  *See also*

21 Section II.B. above.  And the specific portions of testimony quoted and displayed in chart form in

22 Plaintiff's Memorandum reveal not that Ms. Roberts changed her testimony for $480 but rather

23 that Plaintiff presented her statements to this Court out of context.

24     To take the first example in Plaintiff's chart, Plaintiff quotes from a July 3, 2012 email,

25 written just after Harvey Pearson had been to Samoa and identified a problem with the press

26

27 [8]  *See* Pearson Depo 155:7-11 ("Q All right.  Did the meetings with StarKist lawyers affect your analysis of whether the machine was underpressing or overpressing based on what you wrote in this e-mail? A  No.").

28

weight machine.  Bursor Decl. Ex. F.  On July 3, shortly after Mr. Pearson returned, there was a "quality call," a regular internal call at StarKist, for which Ms. Roberts, who was at the time a very new employee, was taking the meeting minute notes.  *See* Roberts Depo. at 112:3-6; 114:3-8; 116:1-5.  Based on her notes, she sent an email to Ana Maria Costa, a senior manager in the quality group, who had not been able to participate on the call.  *Id.* at 105:18-20; 128:6-7.

Plaintiff's chart is designed to give the impression, based on one snippet of testimony, that in exchange for $480, Ms. Roberts disavowed her words in the email to Ms. Costa to the effect of StarKist "likely not making press weight," and then said she had no idea where those words came from.  Brief at 8:8-10.  Nothing of the sort happened.  In fact, Ms. Roberts acknowledged writing those words and acknowledged based on the email that the machine was not working properly.  *Id.* at 105:13-106:12, 115:7-9.  There was no reason to do otherwise: At least as far as the five-ounce cans at issue in this case are concerned, that problem with the press weight machine was promptly corrected.  *Id.* at 92:2-13; Pearson Depo. at 147:15-148:10.

Nonetheless, Plaintiff wrenches this one answer from this context in an effort to suggest that Ms. Roberts was paid to change her testimony and deny writing the words about "likely not making press weight."  *See* Brief at 8:9-12 ("Q: If these are not your words, whose words are they? A:  That's what I'm telling you.  I'm not sure . . .").  This answer reflects Ms. Roberts' statement that her email was reporting what other people had said in the meeting at which she was taking the minutes, and that she did not recall "if this was me saying this was my spin on it, or if this was me saying as a group we decided this."  *See* Roberts Depo. at 114:18-20.  When she was then asked the question quoted by Plaintiff, her answer, according to Plaintiff, was: "That's what I'm telling you, I'm not sure . . . ."  In light of her prior answer expressing uncertainty about whether her minutes recorded her spin or the group consensus, even Plaintiff's ellipses-filled rendition of her answer shows she was honest and accurate.  That this is the case is confirmed by the rest of the answer, the part Plaintiff washed away with his ellipses.  In full, her answer was:

Q.     If these are not your words, whose words are they?

A.     That's what I'm telling you, I'm not sure. I'm not—I mean, there was multiple people on the call.  Like, this could be—I mean, *obviously these are my words in the respect that I crafted this e-mail,* but whether, you know, three of the

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
MENLO PARK

11                     OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

1    five people said this is a big deal or whether it was Harvey that said, as our senior
2    person, this poses a compliance risk for us.  I mean, I put in here Harvey can give
     you the specifics.  So, you know, I just don't recall the situation around this
3    particular, other than the fact that it was hours after Harvey did an audit of the
     press and identified some potential problems that he felt, even in his own initial
4    e-mail, that would indicate we possibly had an issue, I think, is what you alluded
     to here in the underlined piece.

5    Roberts Depo. at 115:3-22 (emphasis added).

6         Read in full and in context, Ms. Roberts acknowledged a (temporary) problem with the

7    press weight machine, and acknowledged saying so in her email.  The testimony about which

8    Plaintiff would make a perjury case is not about whether Ms. Roberts acknowledged writing the

9    words, as Plaintiff goes through gyrations of slicing and dicing to make it appear; rather, it is only

10   about who was the source of the words.  And only by sleight-of-hand does Plaintiff twist Ms.

11   Roberts' understandable inability to recall specifically the source of the words she wrote in the

12   minutes nearly three years before her testimony into a suggestion that she perjured herself by

13   denying that she wrote the words at all.[9]

14        To take another example, Plaintiff accuses Mr. Roberts of perjury by juxtaposing a

15   statement from Ms. Roberts in an email about "advising and reporting that we are out of

16   compliance" with her testimony that she did not recall any lots that she saw "that would have

17   been out of *regulatory* compliance."  Brief at 8:19-21 (emphasis added).  Plaintiff's juxtaposition

18   and accusation slides over the word "regulatory," which is in the answer but not in the email, and

19   omits Ms. Roberts' explanation:  StarKist intentionally set its own internal compliance standards

20   higher than what it understood the regulatory standard to be, so saying that StarKist was out of

21   compliance is not equivalent to saying that it was out of regulatory compliance.  *See, e.g.*, Roberts

22   Depo. 118:25-119:3 ("I cannot give you specific details about every single can size calculation,

23   but StarKist's policies are more rigorous than is required by law."); Maxfield Depo. at 64:10-65:5

24   ("So, again, earlier, you asked the question about making press to the standard, and I said about a

25

26   _____
     [9] Plaintiff also suggests that Ms. Roberts dishonestly testified that she did not recall an email she
27   wrote in 2012.  Brief at 9.  Omitted from Plaintiff's excerpts are the answers making clear that
     Ms. Roberts did not disavow her words, but simply did not recall them three years later.  Roberts
28   Depo. at 158:24-159:5; *see also id.* at 157:25-158:4.

very—there was many different interpretations of what making press to the standard meant because of how poorly the standard is written.  So when we talk about—in this kind of conversation, we're talking about our internal standards that we set for the company.").[10]  As with the sleight-of-hand in which he engaged with Ms. Roberts' testimony about whose words were used, the only way Plaintiff can suggest that her testimony about compliance was somehow perjurious is to avoid advising the Court of her explanation that being out of compliance with the more rigorous internal standard does not equate to being out of compliance with the government regulation.

### B.   StarKist Did Not Enter Into Agreements With Witnesses in Order to Stymie Plaintiff's Discovery.

Insinuating wrongdoing, Plaintiff asserts that StarKist made offers to all four non-party witnesses "[u]pon learning that Plaintiff wished to depose their former employees," that the offers were to "pay them money for their testimony," and that "[t]hree of the four (Mr. Maxfield, Mr. Pearson, and Ms. Roberts) accepted."  Brief at 1:3-7.  Not so.  As demonstrated above, StarKist paid for preparation time, and did not pay for testimony.  In addition, contrary to Plaintiff's assertion that the agreements were forged in response to deposition notices, StarKist retained its former employee Mr. Maxfield as a consultant two years ago, on April 1, 2013.  *See* Roy Decl. Ex. A.  That was 17 months before Plaintiff noticed his deposition.  And contrary to Plaintiff's assertion that StarKist offered compensation to all four witnesses, the fourth witness, Brett Butler, testified that StarKist made no such offer to him.  *See* Butler Depo. at 147:19-22 ("BY MR. BURSOR:  Q.  Did StarKist lawyers offer to compensate you for your time spent testifying or preparing to testify in this case?  A.  They did not offer me that.").

### C.   Plaintiff's Counsel Was Not Blindsided in Depositions.

Plaintiff suggests that his inability to show anything other than payments to witnesses to compensate them for their preparation time is the result of the fact that the agreements were

---

[10]  As an example, one internal standard in effect during Ms. Roberts' tenure with StarKist was that 80% of the individual cans in a lot had to meet or exceed the internal press weight minimum.  *See* Maxfield Depo. at 120:13-121:16.  Compliance with the regulation, however, is based on an average of 24 cans; there is no individual per-can minimum requirement.

1  hidden from him, and that he should be allowed to reopen the witnesses' depositions "so that they

2  can be questioned about these matters."  Brief at 22 n.14.  Once again, this is the product of

3  disingenuous reporting of the facts by Plaintiff, rather than any conduct by StarKist.

4      Although Plaintiff makes it appear that he first found out about the agreements with Mr.

5  Maxfield and Mr. Pearson at their depositions, *see* Brief at 1:9-10; 10:18-19, in fact he knew

6  about the consulting agreements well in advance.  Plaintiff has known since November 24, 2014

7  that StarKist had retained Mr. Maxfield as a consultant.  Plaintiff knew about the relationship

8  because, even though it had no duty to do so, StarKist advised Plaintiff in writing twenty-three

9  days before Mr. Maxfield's deposition that it had retained Mr. Maxfield as a consultant.  *See* Roy

10  Decl. Ex. A.  No request was made before Mr. Maxfield's deposition, or even during the

11  deposition, for a copy of the consulting agreement.  Nonetheless, Mr. Maxfield was asked and did

12  answer questions about his consulting relationship with StarKist.  *E.g.*, Maxfield Depo. at 107:20-

13  109:18.

14      Harvey Pearson was retained as a consultant on December 11, 2014, and Plaintiff was so

15  informed in the declaration Mr. Pearson filed on March 3, 2015, seven days before he was

16  deposed.[11]  Once again, Plaintiff did not ask for the agreement either before or after the

17  deposition, but Mr. Pearson was asked and answered questions about his payment for preparation

18  time, including how and why it came about.  *E.g.* Pearson Depo. at 45:10-15.  The first time

19  Plaintiff asked for the agreements with Mr. Maxfield and Mr. Pearson was in a court filing—his

20  unauthorized Motion to Compel.  Although the Court terminated that Motion, StarKist produced

21  the documents that same week: the consulting agreements, communications concerning the

22  agreements, and related invoices.  If Plaintiff now feels that he did not adequately question the

23  witnesses about their agreements, he has no one to blame but himself.

24      Plaintiff did ask during Ms. Roberts' deposition for a copy of her consulting agreement;

25  although not obligated to produce it on that day, StarKist did so and she was questioned about it.

26

27  [11]  Mr. Pearson's March 3, 2015 declaration, filed in support of StarKist's Opposition to
   Plaintiff's Motion for Class Certification, disclosed that he was "a consulting expert on quality
   assurance issues."  Dkt. No. 111-12 at ¶ 2.

28

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

14                    OPPOSITION TO SANCTIONS MOTION
                     CASE NO. 3:13-CV-0729-HSG

1    *See, e.g.*, Roberts Depo. at 256:13-262:19.  The suggestion that Plaintiff was somehow deprived

2    of the opportunity to learn about these agreements turns out to be a reflection of his failure to ask

3    for them, and, even more importantly, his election not to report to the Court that he did in fact get

4    his questions about the relationships answered.

5         **D.      StarKist's Objections at Depositions Were Proper.**

6         Although his Motion to Strike does not and cannot seek any relief relating to deposition

7    objections, Plaintiff nonetheless devotes nearly half of the pages in his Memorandum to

8    complaints about objections to specific questions in depositions.  Rather than fill many more

9    pages to address each objection, StarKist devotes its attention below to debunking the central

10   notions that its objections were not phrased in accordance with the rules, and that they

11   impermissibly interfered with Plaintiff's ability to obtain discovery.  StarKist also demonstrates

12   that the questions were in fact objectionable for the reasons stated, as discussed with respect to

13   some examples below.  *See* Sections III.D.1-3.

14        Sticking with his misleading approach, Plaintiff launches his attack on StarKist's

15   objections without once mentioning that the first witness deposed in the case was the Plaintiff

16   himself, and that in that deposition Plaintiff's counsel made an objection other than merely

17   "objection to form" on well over a hundred different occasions.  Included among these objections

18   were 13 "asked and answered" objections, 27 "calls for a legal conclusion" objections, and 90

19   "vague" objections—the same objections about which he complains when StarKist later made

20   them.

21        Despite his heightened criticism of the objection that a question "mischaracterizes the

22   evidence"—as many of his questions did in fact do[12]—he also fails to mention that when he was

23   deposed, his counsel repeatedly voiced that same objection.  *See, e.g.*, Hendricks Depo. at 30:1-2;

24   30:15-16; 32:16-17; 41:25-42:1; 73:16-17; 74:20-21; 75:13-14; 76:17-18; 87:13-14; 88:2-3;

25   89:20-21; *see also id.* at 24:11-12; 37:24-25; 72:18-19; 74:12-13; 82:2-4; 118:2-3.

26

27   _____

[12] *E.g.*, Roberts Depo. at 107:18-108:15; 150:3-9; 151:3-21; Pearson Depo. at 77:8-79:1; 150:1-
24; 241:20-242:2; Maxfield Depo. at 128:2-10; 147:1-9; 250:21-251:17.

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
MENLO PARK

15                    OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

In light of his own objections when he was defending a deposition, it is no surprise that Plaintiff cites no authority establishing that counsel is limited to "object to form" or that non-argumentative, non-suggestive objections such as "foundation," or "vague" are improper.  And of course he cites no authority establishing that such objections were proper when he made them but improper the following month when StarKist made them.

To the contrary, the only rule he cites, Federal Rule of Civil Procedure 30, specifically allows objections that are "stated concisely in a nonargumentative and nonsuggestive manner." The rule could have been written to say that counsel's objections can only be "object to form," but it does not say so.  While there is at least one judge in this district whose standing order *does* appear to require that counsel may only say "object to form," *e.g.*, Supplemental Order to Order Setting Initial Case Management Conference in Civil Cases Before Judge William Alsup at ¶ 19, most judges, including this Court, have not chosen that path.  As a result, it was appropriate for counsel for both Plaintiff and defendant to use the concise, non-speaking objections of which Plaintiff complains.  *See, e.g.*, Victoria E. Brieant, *Depositions and Home and Abroad*, Prac. Litigator, Sept. 2003 at 7, 20-21 (listing objections including those made here).

### 1.    Harvey Pearson

Other than Plaintiff's ill-founded omission of Mr. Pearson's use of his expense reports to refresh his recollection, *see* Section III.A. above, Plaintiff's central attack concerning Mr. Pearson's deposition is to make it appear that Plaintiff was improperly foreclosed from asking about the conversation with Ms. Roy, one of StarKist's counsel, in which Ms. Roy retained Mr. Pearson as a consultant (Brief at 11-12, citing Pearson Depo. at 42:8-44:3 and 52:16-20).  He quotes two passages designed to leave that impression.  But in between the two passages quoted by Plaintiff were a number of questions and answers that he elected not to quote.  Those omitted passages show that Plaintiff elicited the conversation with Ms. Roy, and much more.  *See* Pearson Depo. at 49:22-52:16.  Some of those questions and answers (with objections omitted) are quoted below:

Q How did you choose her as your lawyer?

THE WITNESS: She mentioned some options that I could do, you know, since I

was going to be d[e]posed.  And the one I chose was to have an agreement with StarKist that they would pay me for being a consultant.

BY MR. BURSOR:

Q What were the other options Ms. Roy offered you?

A Well, she said I—if I didn't go—or if—what—I had an option to go out and hire my own counsel.

Q That's what she told you?

A That was—yes.

. . .

Q Were there any other options that Ms. Roy offered you?

A Those were the two.

. . .

Q Did you discuss consulting about anything other than preparing to give this testimony today?

THE WITNESS: No.  It pretty much involved the issue with the deposition.

Pearson Depo. at 51:17-52:20 (objections omitted).[13]  Having exhausted his questions about the

conversation, Plaintiff's counsel then moved on to a different subject.  In this Motion he identifies

no information or question not subject to a privilege claim that he was entitled to but did not

obtain.

　　　　All that remains are some complaints about specific objections, which Plaintiff asserts to

be improper signals to Mr. Pearson.  As an example of an improper objection, Plaintiff complains

about "overbroad as to time" when he asked whether it was Mr. Pearson's responsibility to

monitor StarKist's efforts to comply with the FDA press weight standard "during your tenure at

StarKist."  Pearson Depo. at 100:17-24.  In reciting that complaint, Plaintiff fails to note that Mr.

Pearson testified earlier in the deposition that he had worked at StarKist for 39½ years, during

---

[13]  Plaintiff also cites this testimony as evidence that the consulting agreement was a "sham," but the week before the deposition, Mr. Pearson prepared a declaration that was submitted in connection with StarKist's class certification opposition and served on Plaintiff.  *See* Dkt. No. 111-12.  His testimony that a conversation with counsel "pretty much involved the issue with the deposition" does not demonstrate that no consulting work would occur, and it did in fact occur. *See id.*

1   which he worked in a number of different places.  Pearson Depo. at 13:16-18.  That this question

2   may have been overbroad on its face was hardly unreasonable.

3        Plaintiff's accusations that Mr. Pearson was "coached" are also belied by the fact that

4   Plaintiff favorably cites the answers Mr. Pearson gave despite the supposed "coaching."  *E.g.*,

5   Brief at 13-15.  And even more barren is the assertion (Brief at 13:9 and n.12) that counsel

6   interrupted the witness "to muddy the record."  In fact, the transcript is replete with admonitions

7   to Mr. Pearson to slow down to allow counsel to object.  Pearson Depo. at 30:20; 129:9; 235:20;

8   251:18.  Sometimes Mr. Pearson started first, with counsel shortly behind.  In this instance, Mr.

9   Pearson and the witness spoke over each other immediately after the question was asked; the

10   court reporter has to write them in sequence.  In any event, the record is not "muddy" and the

11   witness's answer was unchanged.

12        **2.**     **Kelly Roberts**

13        Reaching back into his worn-out toolkit, Plaintiff's attacks on the objections at the

14   deposition of Ms. Roberts fall into two groups: he skips quickly over the context of questions and

15   answers in order to accuse StarKist of successfully coaching the witness, and he omits the fact

16   that he was inquiring into information protected by the attorney-client or work-product privilege

17   in order to complain about instructions not to answer.  These attacks say more about the accuracy

18   of Plaintiff's reporting than about the quality of the objections.

19        The "coaching" allegations begin with an objection made after a series of questions that

20   the witness testified she did not understand.  *See* Brief at 2.  In response to Plaintiff's question

21   "did you hire Mr. Hawk to represent you?", Ms. Roberts testified (without the benefit of any

22   objections), "I'm not sure I understand what you're asking."  Rather than address the witness's

23   lack of understanding, Plaintiff asked the same question again: "Did you hire that lawyer that's

24   sitting next to you right now?"  StarKist's counsel then stated: "Objection, vague.  The witness

25   has indicated that she doesn't understand the question, and if you don't understand his question,

26   you can tell him."  Roberts Depo. at 11:6-12:5.  Plaintiff contends that this comment "suggest[ed]

27   to the witness that she answer the question by stating she did not understand," and he asserts that

28   "[t]his was a signal to the witness which she promptly obeyed."  Brief at 2 n.2.  To suggest that

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

18

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

this objection coached her into claiming she did not understand is hollow when she had already stated without any supposed "coaching" that she did not understand the very same question.

Similarly, when Plaintiff asked Ms. Roberts a question that included the statement that "you had an agreement with the StarKist Company to pay you for your testimony in this case," StarKist's counsel said: "Objection, argumentative, mischaracterizes."  Roberts Depo. at 107:18-23.  Plaintiff announces that this "signaled the witness that she should disagree with the premise of the question" and "is a signal to the witness to disagree."  Brief at 5 n.6.  But Plaintiff fails to advise the Court that, before this supposed "signal," Ms. Roberts had just testified that she was not being paid for testimony.  Roberts Depo. at 106:23-107:9.  As noted in Section II.B. above, her prior answer was direct and emotional, telling Plaintiff not only that she had not been paid but also that she took offense at his accusation.  That Plaintiff uses an objection made *after* this answer as a poster child for his complaints about coaching is a measure of how weak his accusations are.[14]

In any event, Plaintiff once again fails to advise the Court that he was able to question Ms. Roberts on the work she had performed in connection with the agreement:

> Q. And it says: Dear Mrs. Roberts: You have agreed to provide consulting and testimony as directed concerning the above captioned litigation, and then there's a reference to the lawsuit.
>
> Do you see that?
>
> A. I do.

---

[14]  Reaching even lower, Plaintiff claims that Ms. Roberts "finally admit[ted] that she was being paid for her testimony," when she answered a question about what she was being paid for by stating, "My understanding was I was asked to speak to things about this case with you today."  Brief at 5-6 and n.7.  This testimony is nothing of the sort.  For one thing, Ms. Roberts had just (and repeatedly and firmly) testified that she was not being paid for her testimony.  Roberts Depo. at 107:5-9; 108:6-7; *see also id.* at 150:8-9 ("As I've indicated on several occasions, I am not being paid for my testimony here today."); 158:12-18 ("First of all, the fact that you are again suggesting that pay has anything to do with me being here today, I'm personally offended by that.  I find—I really find that that pokes at my moral standards, and just for the record, I just want to get it out there again, it has nothing to do with that."); 264:15-23 (denying that her answers were influenced by her consulting agreement and denying that she was being paid for the substance of her testimony).  For another thing, the quoted answer—that she "was asked to speak to things about this case with you today"—does not suggest in any way that her testimony or answers were purchased.

1    Q. Testimony as directed by whom?

2    MR. HAWK: I'll object to the form.

3    A. My understanding of this agreement is that I would make myself available to
     answer questions, so—and then to make myself available, if needed, for things like
4    today.  So, I guess, when we say directed, meaning whoever would ask me to
     come.

5    Q. Has anyone directed you other than Mr. Hawk or Ms. Roy?

6    A. Directed me in what sense?

7    Q. Pursuant to this agreement.

8    A. The only people I have had discussion with about this—about anything, my
9    conversations have been with Amy up until yesterday.

10   Q. And did you receive some direction from Mr. Hawk yesterday?

11   A. Direction in terms of—I'm not sure what you're asking.

12   When you say "direction," what do you mean?

13   Q. Direction pursuant to this agreement.

14   A. In terms of this agreement, I did agree to come in and answer questions and
     give facts related to this case.

15   Roberts Depo. at 257:22-259:3.

16        Plaintiff also inquired without restriction about any work Ms. Roberts had done before her

17   preparation session; about when Ms. Roberts had elected to retain Ms. Roy; about whether the

18   two of them had a separate agreement beyond the consulting agreement; about who was paying

19   her legal fees; about the rate Ms. Roberts was being paid for her time; and about whether she

20   considered alternatives to Ms. Roy.  Roberts Depo. at 259:4-262:10.  At this point, Plaintiff's

21   questions on the subject were exhausted and he moved to another topic.  Any remaining questions

22   about Ms. Roberts' communications with the StarKist counsel who represented her would have

23   been protected by privilege,[15] so there is nothing Plaintiff does or could complain about that he

24   was entitled to but not allowed to ask.

25   _____

26   [15]  Cal. Evid. Code § 954; Roberts Depo. at 10:19-23.  In fact, even if the witness had not been
     personally represented, work product protections would have precluded the questioning.  *See*
27   *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 397350, at *3 (N.D. Cal. Feb. 10, 2008); *see*
     *also Connolly Data Sys., Inc. v. Victor Techs., Inc.*, 114 F.R.D. 89, 96 (S.D. Cal. 1987).

28

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

20                    OPPOSITION TO SANCTIONS MOTION
                      CASE NO. 3:13-CV-0729-HSG

### 3.   Aaron Maxfield

In a footnote and without quoting a single supposedly improper objection or instruction, Plaintiff also contends that StarKist's counsel "similarly impeded, frustrated and delayed the deposition of Aaron Maxfield with improper objections, coaching, and instructions not to answer." Brief at 9 n.9.  This footnote adds nothing to the more specific but nonetheless erroneous complains about the other deponents, and perhaps can best be dismissed with StarKist's response when Plaintiff demanded more than the standard seven hours with Mr. Maxfield—a demand that Plaintiff abandoned, resurrecting his complaint only when he found it necessary to throw a lot of smoke in advance of the argument on his class certification motion. As StarKist explained in a December 23, 2014 email to Plaintiff's counsel after Plaintiff informed StarKist that he "intend[ed] to move the court to continue Mr. Maxfield's deposition due to the obstructionist tactics employed by him and his counsel":

> Mr. Bursor wasted substantial amounts of time during the deposition by asking improper, argumentative questions, inaccurately characterizing in his questions the very FDA regulation on which Plaintiff's complaint relies, and by asking numerous questions about documents that had no connection to Mr. Maxfield and for which there was no foundation.  Mr. Bursor's efforts to (1) prevent the witness from reviewing the documents that he was being questioned about under oath, and (2) cut off the witness's answers, simply because Mr. Bursor did not believe the answers were favorable to his case, were obviously improper.  With respect to your accusations that I engaged in "obstructionist conduct," the transcript confirms that I kept my objections brief and limited to the specific grounds that provided the basis for the objection.  I suggest you look at the transcript of Mr. Hendricks' deposition, where Mr. Fisher made objections in the same style that I did.

Dkt. No. 123-2 at 11.

In the end, Plaintiff's complaints about the depositions amount to an expression of frustration that the facts did not turn out to be as he hoped.  This is not the result of perjury, a $480 bribe, or "coaching," but rather a result of the fact that his case lacks merit—and perhaps also the repeated, abusive tone of his counsel's questioning, which did not exactly endear him to the witnesses:

- Roberts Depo. at 55:11 ("Did you rehearse that answer yesterday?"); 55:16 ("Did you rehearse that answer?"); 55:22 ("How many times did you rehearse that answer?"); 55:24-56:1 ("Did your six-hour meeting with StarKist's lawyers yesterday help you to craft that answer that you just gave?"); 57:3-5 ("Is that a distinction you learned about yesterday during your six hour meeting with your lawyers?"); 72:21-23 ("How many times did you rehearse the explanation for the maintenance of the problems with the press machine?");

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

21

OPPOSITION TO SANCTIONS MOTION
CASE NO. 3:13-CV-0729-HSG

94:7-12 ("Q. Do you need help or can you answer my question?  A. I'm reading the bullet points here.  Q. Well, you read them already.  You sat and took your time to read the whole document, didn't you?  Did you do that?"); 94:15-17 ("Do you remember sitting and taking your time to read through the whole document?  Do you remember doing that?"); 106:23-107:11 ("Q. And before you spent six hours meeting with lawyers and before there was an agreement to pay you for your testimony, you concluded that the company most likely was not making press weight, right?  MR. HAWK: Object to form, argumentative.  A. I kind of also kind of take offense to the fact that you just said I was being paid for testimony, which would—which is, A, inaccurate and, 2, would be an unethical implication to me.  Q. Yes.  It is not an implication.  It's an express statement."); 124:15-18 ("When you spent six hours with StarKist's lawyers yesterday, did you practice giving long answers without identifying anyone by name?  Is that a technique you practiced?"); 126:10-12 ("So did you practice the technique of not using names unless Mr. Hawk gave express permission to use names in your answers?"); 158:9-18 ("Q. Are you afraid that if you tell the truth, you won't be paid?  MR. HAWK: Objection, argumentative.  A. First of all, the fact that you are again suggesting that pay has anything to do with me being here today, I'm personally offended by that.  I find—I really find that that pokes at my moral standards, and just for the record, I just want to get it out there again, it has nothing to do with that."); 158:19-21 ("Do you remember taking an oath at the beginning of this deposition to tell the truth?").

- Pearson Depo. at 57:22-24 ("So spending 20 hours with the lawyers did lead you to at least that much understanding of what was going on, right?"); 70:24-71:5 ("During the 20 hours that you spent with these lawyers practicing for this deposition, did you practice the technique of stalling by flipping through the pages of lengthy documents for three, four, five minutes before answering if you've seen them before?  Is that something you practiced with the lawyers?"); 79:3-5 ("How many hours of the 20 hours that you spent with your lawyers did you spend practicing that particular answer?"); 79:13-14 ("How many times did you practice that answer with the lawyers?"); 117:10-14 ("Is it true that you don't know the name of this person or persons because you just completely made up that story about the machine being calibrated within a few days before you arrived?"); 119:17-21 ("During the 20 hours that you spent with the lawyers preparing to give that testimony, did the ident—did the subject of the identity of this mysterious person who changed the sign, did that subject come up?"); 123:7-15 ("Q. That's what you say after spending 20 hours for which you were paid to sit with StarKist lawyers, but was there any record at the time made of when that incorrect pressure listing was posted?  MR. SHEPARD: I move to strike the predicate to the question.  Don't waste our time.  MR. BURSOR: All right.  Well, that motion will be denied."); 187:4-6 ("Really?  20 hours with the lawyers, and you don't know why there is a lawsuit—"); 264:20-21 ("Did it really take you that long to remember seeing it before?").

His interactions with counsel were little better.[16, 17]

---

[16]  *See, e.g.*, Pearson Depo 37:6-7 ("I don't need any more statements from you."); 68:9-17 ("MR. BURSOR:  You're interrupting this deposition.  Don't do that again.  MR. SHEPARD:  Don't lecture me on what to do and not to do.  If you [don't] want to be lectured, don't collect documents that aren't consecutively Bates-numbered, put them in front of the witness to try to trick him, and then show him a 50-page document and expect him to answer immediately whether he's seen it before."); 112:25-113:1 ("MR. BURSOR: You already objected.  There's no reason for to you speak again, all right?").

[17]  Although his Motion can easily be denied on the merits, Plaintiff also failed to satisfy the Court's meet and confer requirement, and inaccurately reports the facts about his failure to do so. For example, he says he satisfied the meet and confer requirement about Mr. Pearson's deposition

*(footnote continues on next page)*

## IV.   **CONCLUSION**

For the foregoing reasons, StarKist respectfully requests that the Court deny Plaintiff's Motion for Sanctions.  There are no grounds to exclude evidence obtained from witnesses who received non-contingent compensation from StarKist, and no grounds to burden StarKist with the costs and fees generated by Plaintiff's counsel's decision to bring his unfounded motion.

Dated: April 10, 2015

HOGAN LOVELLS US LLP
ECKERT SEAMANS CHERIN & MELLOTT, LLC

By:     */s/ Robert B. Hawk*
Robert B. Hawk

Attorneys for Defendant
STARKIST CO.

---

by advising StarKist after an instruction not to answer that "[W]e'll take it up with the court at the appropriate time."  Pearson Depo. at 79:21-22.  This throwaway line was no invitation to meet and confer, and the middle of a deposition is not a time to reflect on positions or to conduct a meet and confer—especially given Plaintiff's repeated admonitions to StarKist lawyers, cited in footnote 17 above, not to speak at all during his depositions.

Even more tellingly, the passage cited by Plaintiff in which he told StarKist that "[W]e'll take it up with the court at the appropriate time," *does not relate to any instruction that Plaintiff complains of in his Memorandum.*  Rather, it the instruction about which he said that "[W]e'll take it up with the court at the appropriate time," related to an instruction, not challenged in this Motion (nor could it be), in which Plaintiff asked Mr. Pearson about the substance of his conversations with counsel.  *See* Pearson Depo. 68:2-22.  The instructions raised in this Motion did not prompt even a "[W]e'll take it up with the court at the appropriate time," let alone an actual meet-and-confer.

This was not Plaintiff's only failure to meet and confer.  In addition to Plaintiff's Motion to Compel that the Court terminated, Plaintiff's counsel never mentioned during either the March 24, 2015 case management conference or any subsequent meet and confer that he was considering a Motion for Sanctions excluding witness testimony.  The first StarKist knew of such a motion was the day StarKist was served with it.