**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
         jluster@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
         ndeckant@bursor.com

*Attorneys for Plaintiff
And the Interested Parties*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>STARKIST CO.,<br><br>                    Defendant. | Case No. 13-CV-00729-HSG<br><br>**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS**<br><br>Date: April 16, 2015<br>Time: 2:00 p.m.<br>Courtroom 15, 18th Floor<br><br>Hon. Haywood S. Gilliam, Jr. |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

PAGE(S)

I. INTRODUCTION ................................................................................................................ 1

II. KELLY ROBERTS .............................................................................................................. 2

    A. The Timing Of Ms. Roberts' "Consulting" Agreement Supports An Inference That She Was Paid For Her Testimony ....................................................... 2

    B. The Lack Of Any Real Consulting Work Supports An Inference That Ms. Roberts Was Paid For Her Testimony ................................................................. 2

    C. The Baseless Assertions Of Privilege By StarKist's Counsel Support An Inference That Ms. Roberts Was Paid For Her Testimony ................................. 3

    D. The Substance Of Ms. Roberts' Testimony Supports An Inference That She Was Paid For Her Testimony ...................................................................... 3

    E. Ms. Roberts' Admission That She Was Paid For Her Testimony Is Direct Evidence That She Was Paid For Her Testimony ........................................ 5

    F. The Express Terms Of StarKist's "Consulting" Agreement With Ms. Roberts Confirm That She Was Paid For Her Testimony ........................................ 6

III. HARVEY PEARSON .......................................................................................................... 6

    A. The Timing Of Mr. Pearson's "Consulting" Agreement Supports An Inference That He Was Paid For His Testimony ......................................................... 6

    B. The Lack Of Any Real Consulting Work Supports An Inference That Mr. Pearson Was Paid For His Testimony ................................................................. 7

    C. The Baseless Assertions Of Privilege By StarKist's Counsel Support An Inference That Mr. Pearson Was Paid For His Testimony ................................. 7

    D. StarKist's Filing Of A False Declaration Bearing Mr. Pearson's Signature Supports An Inference That He Was Paid For His Testimony .................. 7

    E. Mr. Pearson's Admission That He Was Paid For His Testimony Is Direct Evidence That He Was Paid For His Testimony ........................................... 8

    F. The Express Terms Of StarKist's "Consulting" Agreement With Mr. Pearson Confirm That He Was Paid For His Testimony ........................................... 8

IV. STARKIST'S PATTERN OF BEHAVIOR SUPPORTS AN INFERENCE THAT AARON MAXFIELD WAS PAID FOR HIS TESTIMONY .................................. 9

V. STARKIST'S AGREEMENTS TO PAY FACT WITNESSES ARE IMPROPER .......................................................................................................................... 10

    A. StarKist's Agreements To Pay Fact Witnesses Violate Public Policy .................... 10

      B.    StarKist's Agreements To Pay Fact Witnesses Violate The California Bar's Rules Of Professional Conduct .................................................................. 10

VI.    CONCLUSION ........................................................................................................... 12

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Aristocrat Techs. v. Int'l Game Tech.*,
  2010 WL 2595151 (N.D. Cal. June 28, 2010) .................................................................................. 2

*Consol. Rail Corp. v. CSX Transp., Inc.*,
  2012 WL 511572 (E.D. Mich. Feb. 16, 2012) ................................................................................ 11

*Hamilton v. General Motors Corp.*,
  490 F.2d 223 (7th Cir. 1973) .......................................................................................................... 10

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  2008 WL 3973503 (N.D. Cal. Feb. 10, 2008) ............................................................................. 3, 7

*Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao LTDA*,
  2010 WL 625356 (S.D. Fla. Feb. 17, 2010) .................................................................................... 5

*Prasad v. MML Investors Servs. Inc.*,
  2004 WL 1151735 (S.D.N.Y. May 24, 2004) ................................................................................ 11

*Rocheux Int'l of N.J. v. U.S. Merchs. Fin. Group, Inc.*,
  2009 WL 3246837 (D.N.J. Oct. 5, 2009) ......................................................................................... 9

*State of New York v. Solvent Chem. Co.*,
  166 F.R.D. 284 (W.D.N.Y. 1996) ................................................................................................ 2, 6

*United States v. Cresta*,
  825 F.2d 538 (1st Cir. 1987) ............................................................................................................ 3

*United States v. Cuellar*,
  96 F.3d 1179 (9th Cir. 1996) ........................................................................................................... 3

**OTHER AUTHORITIES**

Cal. State Bar Standing Comm. on Professional Responsibility and Conduct, Formal
  Op. 149 (1997) ............................................................................................................................... 11

## I. INTRODUCTION

StarKist admits the fundamental premise of this motion – that StarKist has agreed to pay money, and actually paid money, to several fact witnesses who were deposed in this case. Plaintiff's opening brief asserted two grounds for finding those payments improper. First, Plaintiff asserted that StarKist's payments to fact witnesses violate public policy. Plf.'s Opening Br. Part IV.A. StarKist did not respond to that argument.

Second, Plaintiff asserted that StarKist's payments to these fact witnesses violate Rules 5-310 and 5-200 of the California Rules of Professional Conduct. *Id.* Part IV.B. StarKist responds that Rule 5-310 only prohibits payments that are "contingent upon the content of the witness's testimony or the outcome of the case." Opp. Br. at 2:2-5. StarKist argues there was no violation of Rule 5-310 because "[n]one of the witnesses was offered or paid anything based on how he or she testified; the witnesses were instead provided reasonable compensation for their preparation time." *Id.* at 3:12-14. The evidence contradicts that argument.

The express terms of the written agreements with Ms. Roberts and Mr. Pearson state:

> You have agreed to provide consulting and testimony as directed
> concerning the above captioned-litigation (the "Hendricks Litigation")
> for StarKist Co.

Roy Decl. Exs. C and D. These agreements require "testimony" to be given "as directed" by StarKist's counsel, "for StarKist." This makes quite clear that the agreements contemplate testimony "for StarKist," not against it. The agreements also make quite clear that such testimony will be given "as directed" by StarKist's counsel. *See infra* Parts II.F and III.F and IV. None of the agreements mention "preparation time."

StarKist did more than just pay a fact witness. It paid <u>3</u> fact witnesses, then shielded the involvement of StarKist's counsel in shaping their testimony behind dubious assertions of privilege. That conduct goes way beyond anything envisioned by Rule 5-310. Payments to fact witnesses, coupled with the assertion of privilege to stifle inquiry into what those payments accomplished, are doubly improper. There is ample evidence that this conduct was designed to influence, and did influence, the substance of Ms. Roberts' and Mr. Pearson's testimony.

## II. KELLY ROBERTS

The evidence that Kelly Roberts was paid for her testimony is abundant and overwhelming.

### A. The Timing Of Ms. Roberts' "Consulting" Agreement Supports An Inference That She Was Paid For Her Testimony

StarKist does not dispute that its counsel contacted Ms. Roberts to retain her as a "consultant" only after Plaintiff requested her deposition.  A notice for Ms. Roberts' deposition was initially served on December 18, 2014.  Bursor Reply Decl. Ex. A.  StarKist's counsel sent her a proposed "consulting" agreement on January 6, 2015.  Roy Decl. Ex. D.  On similar facts, in *State of New York v. Solvent Chem. Co.*, 166 F.R.D. 284 (W.D.N.Y. 1996), the court held such timing "creates, in and of itself, an appearance of impropriety":

> [I]t was only after service of the subpoena in July 1995 – when it became clear that OCC and other parties were intending to obtain both documents and testimony from Mr. Beu – that ICC moved to acquire Mr. Beu's services as a "litigation consultant."  The timing of ICC's actions creates, in and of itself, an appearance of impropriety that serves to further undermine the company's claim of work product protection for the consulting agreement and related materials.

*Id.* at 290.

### B. The Lack Of Any Real Consulting Work Supports An Inference That Ms. Roberts Was Paid For Her Testimony

StarKist does not contend that Ms. Roberts did any actual consulting work.  Nor does StarKist assert that Ms. Roberts has valuable expertise.  On the contrary, StarKist has portrayed her as inexperienced – "a very new employee" during the events in question.  Opp. Br. at 11:3.  She is thus in a very different position from the inventor in *Aristocrat Techs. v. Int'l Game Tech.*, 2010 WL 2595151 (N.D. Cal. June 28, 2010), cited at page 2 of StarKist's opposition brief, who had been retained to consult on litigation concerning his patents.  *See id.* at *2 (finding that a consulting agreement with an inventor is "no different than an expert witness who is paid for his time" and does not violate public policy).

Ms. Roberts was not a senior employee with specialized knowledge.  Before her deposition was requested, she had never been hired as a consultant by anyone, for any purpose.  This was the first and only "consulting" agreement she has ever been a party to.  *See* Roberts Dep. at 30:20-24,

Bursor Decl. Ex. D ("This was my first formal consulting agreement. … In my life.").[1]

### C. The Baseless Assertions Of Privilege By StarKist's Counsel Support An Inference That Ms. Roberts Was Paid For Her Testimony

StarKist cites *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 397350, at *3 (N.D. Cal. Feb. 10, 2008) to support its argument that questions about Ms. Roberts' communications with StarKist's counsel are protected by the work product privilege. Opp. Br. at 20 n.15. StarKist also complains that deposition questions concerning whether Ms. Roberts had "rehearsed" particular answers with StarKist's counsel were "abusive." *Id.* at 21:25-28. But those were proper questions. Indeed, in *Hynix Semiconductor*, Judge Whyte specifically held that "asking a witness whether they rehearsed their testimony would be proper and not infringe on protected work product." *Hynix Semiconductor*, 2008 WL 397350, at *3. Numerous instructions by StarKist's counsel not to answer such questions violated Rule 30(c). *See* Roberts Dep. at 55:11, 55:16, 55:22, 55:24-56:1, 72:21-23, 124:15-22, 126:10-14, Bursor Decl. Ex. D. The payments to Ms. Roberts, coupled with those improper instructions, create an inference that Ms. Roberts <u>did</u> rehearse her testimony with StarKist's counsel, and was paid to do so.

### D. The Substance Of Ms. Roberts' Testimony Supports An Inference That She Was Paid For Her Testimony

StarKist describes Ms. Roberts as a "former schoolteacher." Opp. Br. at 4:1. But during her deposition, she had extreme difficulty with the English language. In excerpts quoted at length in our opening brief, she claimed she was unable to understand the question whether she had hired the lawyer representing her, Opening Br. at 2:12-18, she had difficulty understanding the term "consulting," *id.* at 3:1-2, she could not "understand what paying for testimony means," *id.* at 5:20-23, and she was unable to understand the meaning of the word "bad" in her own email, *id.* at 7:19 ("I don't know what bad means."). One possible explanation for Ms. Roberts' difficulty with these basic concepts was her discomfort discussing the arrangement through which she was paid for

---

[1] StarKist's citations to cases involving paid government informants are also inapposite. *See* Opp. Br. at 6-7 (citing *United States v. Cresta*, 825 F.2d 538 (1st Cir. 1987); *United States v. Cuellar*, 96 F.3d 1179 (9th Cir. 1996)). As the Ninth Circuit observed in *Cuellar*, payments to government informants in many instances are authorized by federal statute. *Cuellar*, 96 F.3d at 1180. Ms. Roberts was not a paid government informant, and no statute authorized StarKist's payments to her.

her testimony.  The alternative explanation, that a former schoolteacher really does not know what "bad" means, and really could not understand a question asking whether she had hired the lawyer sitting next to her, is not credible.

On key points at issue in the litigation, the substance of Ms. Roberts' testimony leaves no doubt that her paid rehearsals with StarKist's counsel influenced the content of her testimony. Particularly noteworthy was her assertion that she is "not aware or can recall any lots that I saw during my time at StarKist that would have fallen out of regulatory compliance." Roberts Dep. at 193:15-17, Bursor Decl. Ex. D.  Ms. Roberts had written several internal emails advising and reporting that StarKist was "out of compliance" with the press weight regulation. *See, e.g.*, Ex. 22, Bursor Decl. Ex. B ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").

StarKist attempts to explain Ms. Roberts' sudden turnabout by arguing that StarKist set its own internal compliance standards higher than what it understood the regulatory standard to be, "so saying that StarKist was out of compliance is not equivalent to saying that it was out of regulatory compliance." Opp. Br. at 12:20-21; *see also id.* at 13:6-7 ("[B]eing out of compliance with the more rigorous internal standard does not equate to being out of compliance with the government regulation.").  But that argument is contradicted by Ms. Roberts' contemporaneous emails.  Exhibit 39, for example, is an email Ms. Roberts wrote on November 14, 2012 to StarKist's Corporate R&D Manager, Glenn Mast:



Ex. 39 (emphasis added), Bursor Decl. Ex. C.  Ms. Roberts' contemporaneous correspondence did not state, "You would think this one would be a no-brainer because it is a more rigorous internal

standard." She wrote "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." The theory that Ms. Roberts' concerns related only to a "more rigorous internal standard" and not to the federal regulation is not credible. But that theory was drilled into her during her 6-hour paid rehearsal with StarKist's counsel. She parroted the rehearsed theory during her deposition. Then StarKist's counsel instructed her not to answer questions concerning the paid rehearsal.

That episode, along with several others detailed in our opening brief, certainly raises an inference that Ms. Roberts may have altered her testimony at the behest of StarKist's counsel. *Cf. Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao LTDA*, 2010 WL 625356, at *5 (S.D. Fla. Feb. 17, 2010) ("Horizonte's payments certainly raise fair questions whether these witnesses are biased in Horizonte's favor as a result, or whether the witnesses may have altered their testimony to favor Horizonte."); *id.* at *1 ("At trial … I will have the opportunity to ascertain whether Mr. Baagoe, Mr. Theodosakis, and Mr. Aguiree are improperly biased in Horizonte's favor, or whether they may have altered their testimony to favor Horizonte. If I find that to be the case, I will revisit the issue of sanctions.").

### E. Ms. Roberts' Admission That She Was Paid For Her Testimony Is Direct Evidence That She Was Paid For Her Testimony

All of the foregoing inferences were confirmed by direct evidence when Ms. Roberts admitted during her deposition that she was paid for her testimony. Initially Ms. Roberts protested that she was not being paid for her testimony. Then the question was put to her: "If you're not being paid for your testimony, what are you being paid for?" After some obstruction by StarKist's counsel and some evasion by the witness, the question was read back by the court reporter. Ms. Roberts' response, after a prolonged silence, was: "My understanding was I was asked to speak to things about this case with you today." This question-and-answer sequence is quoted at length across 3 pages of our opening brief, from page 4 line 23 through page 6 line 8.

StarKist's response is buried in a footnote near the end of its opposition brief: "the quoted answer – that she 'was asked to speak to things about this case with you today' – does not suggest in any way that her testimony or answers were purchased." Opp. Br. at 19 n.14. But that is exactly what she said. "Today" was the day of her deposition. The "you" she was asked to speak with was

the examining attorney.  The speaking was her sworn testimony.  Ms. Roberts was unable to explain any rationale for the payments other than as payments for her testimony that day.

### F. The Express Terms Of StarKist's "Consulting" Agreement With Ms. Roberts Confirm That She Was Paid For Her Testimony

The written agreement StarKist's counsel proposed and which Ms. Roberts accepted, states:

> You have agreed to provide consulting and testimony as directed concerning the above captioned-litigation (the "Hendricks Litigation") for StarKist Co.

Ex. 72, Roy Decl. Ex. D.  So the terms of the agreement require Ms. Roberts to provide two things: "consulting and testimony."  But both she and StarKist admit that she did no actual "consulting."  *See supra* Part II.B.  That leaves just "testimony."  The agreement further specifies the testimony will be given "as directed," and "for StarKist Co."  This makes quite clear that the agreement contemplates Ms. Roberts will give testimony "for StarKist," not against it.  It also makes quite clear that such testimony will be given "as directed" by StarKist's counsel.  And as we pointed out in our opening brief, StarKist's counsel did quite a bit of directing during Ms. Roberts' deposition.

StarKist asserts that it "paid for preparation time, and did not pay for testimony."  Opp. Br. at 13:13-14.  But StarKist's agreement with Ms. Roberts makes no mention of "preparation time."  Only "testimony."

## III. HARVEY PEARSON

The evidence that Harvey Pearson was paid for his testimony is abundant and overwhelming.

### A. The Timing Of Mr. Pearson's "Consulting" Agreement Supports An Inference That He Was Paid For His Testimony

StarKist does not dispute that its counsel contacted Mr. Pearson to retain him as a "consultant" only after Plaintiff requested his deposition.  A notice for Mr. Pearson's deposition was initially served on November 25, 2014.  Bursor Reply Decl. Ex. B.  StarKist's counsel sent him a proposed "consulting" agreement on December 11, 2014.  Roy Decl. Ex. C.  As with Ms. Roberts, this timing "creates, in and of itself, an appearance of impropriety."  *Solvent Chem. Co.*, 166 F.R.D. at 290.

### B. The Lack Of Any Real Consulting Work Supports An Inference That Mr. Pearson Was Paid For His Testimony

StarKist does not contend that Mr. Pearson did any actual consulting work, and he admitted during his deposition that he did none. *See* Pearson Dep. at 52:16-20, quoted at page 12 of our opening brief. StarKist's citations to cases involving inventors in patent litigation, and paid government informants, are as inapplicable to Mr. Pearson as they are to Ms. Roberts. *See supra* Part II.B.

### C. The Baseless Assertions Of Privilege By StarKist's Counsel Support An Inference That Mr. Pearson Was Paid For His Testimony

During his deposition, Mr. Pearson was instructed not to answer questions concerning whether he practiced his testimony with StarKist's counsel, just as Ms. Roberts had been instructed. *See, e.g.*, Pearson Dep. at 70:24-71:19, 71:21-72:8, 79:3-11, 79:13-18, Bursor Decl. Ex. H. Again, as Judge Whyte explained in *Hynix Semiconductor*, "asking a witness whether they rehearsed their testimony would be proper and not infringe on protected work product." *Hynix Semiconductor*, 2008 WL 397350, at *3. As with Ms. Roberts, the payments to Mr. Pearson coupled with those improper instructions, create an inference that Mr. Pearson <u>did</u> rehearse his testimony with StarKist's counsel, and was paid to do so.

### D. StarKist's Filing Of A False Declaration Bearing Mr. Pearson's Signature Supports An Inference That He Was Paid For His Testimony

StarKist recognizes that Plaintiff's opening brief included "a several-page attempt to demonstrate that Mr. Pearson's deposition testimony was inconsistent with his declaration." Opp. Br. at 1:14-15. Indeed, our opening brief identified significant contradictions between Mr. Pearson's declaration and his deposition testimony on 3 key points addressed in the class certification briefing. StarKist does not respond to the substance of those arguments, and focuses instead on trying to explain the conduct of counsel during Mr. Pearson's deposition, particularly with respect to the 26-minute break during the deposition. *See id.* at 8:23-10:9.

The contradictions between (a) Mr. Pearson's March 3, 2015 declaration, then (b) his testimony on March 10, 2015 before the 26-minute break, and (c) his testimony after the 26-minute break, raise significant questions concerning the malleability of his testimony at the hands of

1  StarKist's counsel.  This sequence of events raises an inference that he was paid for his testimony.

2        **E.**      **Mr. Pearson's Admission That He Was Paid For His Testimony Is Direct Evidence That He Was Paid For His Testimony**

3  All of the foregoing inferences were confirmed by direct evidence when Mr. Pearson admitted during his deposition that he was paid for his testimony:

> Q: So you spent a total of about 20 hours with StarKist lawyers to prepare for this deposition?
>
> A: That sounds about right, yeah.
>
> Q: Were you paid for that time?
>
> A: I was hired by StarKist as a consultant.
>
> Q: Consultant to do what?
>
> A: For this deposition.

Pearson Dep. at 42:8-14, Bursor Decl. Ex. H.

> Q: Did you discuss consulting about anything other than preparing to give this testimony today?
>
> MR. SHEPARD: Objection; vague and ambiguous.
>
> THE WITNESS: No.  It pretty much involved the issue with the deposition.

*Id.* at 52:16-20.

      **F.**      **The Express Terms Of StarKist's "Consulting" Agreement With Mr. Pearson Confirm That He Was Paid For His Testimony**

The written agreement StarKist's counsel proposed and which Mr. Pearson accepted, states:

> You have agreed to provide consulting and testimony as directed concerning the above captioned-litigation (the "Hendricks Litigation") for StarKist Co.

Roy Decl. Ex. C.  So the terms of the agreement require Mr. Pearson to provide two things: "consulting and testimony."  But both he and StarKist admit that he did no actual "consulting."  *See supra* Part III.B.  That leaves just "testimony."  The agreement further specifies the testimony will be given "as directed," and "for StarKist"  This makes quite clear that the agreement contemplates Mr. Pearson will give testimony "for StarKist," not against it.  It also makes quite clear that such

testimony will be given "as directed" by StarKist's counsel.  And as we pointed out in our opening brief, StarKist's counsel did quite a bit of directing during Mr. Pearson's deposition, including some behind-the-scenes directing during a 26-minute break.

StarKist asserts that it "paid for preparation time, and did not pay for testimony."  Opp. Br. at 13:13-14.  But StarKist's agreement with Mr. Pearson makes no mention of "preparation time."  Only "testimony."

### IV. STARKIST'S PATTERN OF BEHAVIOR SUPPORTS AN INFERENCE THAT AARON MAXFIELD WAS PAID FOR HIS TESTIMONY

Aaron Maxfield's agreement states:  "This is in regard to providing expert consulting and testimony as directed …."  Roy Decl. Ex. B.  But as StarKist's counsel pointed out during his deposition, Mr. Maxfield has not been disclosed as a testifying expert, and StarKist frequently objected to deposition questions on the ground that he was not an expert.  *See* Maxfield Dep. at 110:7-9, Bursor Decl. Ex. I ("He hasn't been disclosed as a testifying witness and – testifying expert witness at this time."); *id.* at 128:18-20 ("I'm going to object as calling for a legal conclusion and expert testimony."); *id.* at 128:24-25 ("The same objections.  You're not here as an expert."); 130:9-10 ("The same objection as calling for expert testimony."); 243:22-23 ("Objection.  It calls for expert opinion testimony ….").

The terms of Mr. Maxfield's agreement appear to require two things:  "expert consulting and testimony."  This phrase is ambiguous as to whether the adjective "expert" modifies only "consulting" or if it modifies both "consulting and testimony."  That ambiguity is, however, clarified by the fact that StarKist has not designated Mr. Maxfield as a testifying expert, and repeatedly objected to him giving any expert testimony.  This is very similar to the facts of *Rocheux Int'l of N.J. v. U.S. Merchs. Fin. Group, Inc.*, 2009 WL 3246837 (D.N.J. Oct. 5, 2009), where a fact witness received payments "to compensate him for his consulting services … rather than his expected expert testimony," and "he admitted that he submitted no expert reports."  *Id.* at *1.  The Court excluded his testimony "as an improperly paid fact witness."  *Id.* at *5.

Since StarKist objected to any expert testimony by Mr. Maxfield, the agreement must be read as an agreement that Mr. Maxfield is to provide expert consulting, but just regular (non-expert)

testimony. The agreement also provides that Mr. Maxfield's testimony will be given "as directed" by StarKist's counsel. This is very similar to the agreements with Ms. Roberts and Mr. Pearson. These circumstances support an inference that StarKist made payments to Mr. Maxfield for the purpose of influencing his testimony, and did succeed in influencing it.

## V.   STARKIST'S AGREEMENTS TO PAY FACT WITNESSES ARE IMPROPER

Plaintiff's opening brief argued that StarKist's agreements to pay these 3 fact witnesses violate public policy and also violate Rules 5-310 and 5-200. StarKist responded only with respect to Rule 5-310.

### A.   StarKist's Agreements To Pay Fact Witnesses Violate Public Policy

Our research has found no controlling decision by the Ninth Circuit addressing whether payments to fact witnesses violate public policy. Nevertheless, the Court should hold that the payments in this case do violate public policy for all the reasons laid out by the Fourth, Seventh, and Eleventh Circuits in *Alexander v. Watson*, 128 F.2d 627 (4th Cir. 1942), *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973), and *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assn.*, 117 F.3d 1328 (11th Cir. 1997), which were discussed at length in our opening brief.

It is significant to note that the conduct here went beyond the mere payment of money, and extended to repeated assertions of privilege to stifle inquiry into what those payments accomplished. Even if the Court were inclined to find that payments to fact witnesses do not violate public policy in some circumstances, it should not permit such payments to be coupled with secret rehearsals of testimony, shielded by privilege. The potential for mischief in this scenario is too great. And it is difficult to conceive of any rationale for tolerating such a sharp practice.

### B.   StarKist's Agreements To Pay Fact Witnesses Violate The California Bar's Rules Of Professional Conduct

StarKist argues there was no violation of Rule 5-310 because "[n]one of the witnesses was offered or paid anything based on how he or she testified; the witnesses were instead provided reasonable compensation for their preparation time." Opp. Br. at 3:12-14. The evidence contradicts that argument. The express terms of the written agreements with Ms. Roberts and Mr. Pearson both

1 require "testimony" to be given "as directed" by StarKist's counsel, "for StarKist." *See supra* Parts II.F and III.F. None of the agreements mentions "preparation time."

Our research has not uncovered any California cases discussing the meaning of the phrase "contingent on the content of the witness's testimony" as it is used in Rule 5-310. But an agreement specifying that the testimony be given "for StarKist" and "as directed" by StarKist's counsel would certainly seem to fit within that description. Furthermore, the circumstances surrounding these agreements confirm that they were "designed as a financial inducement or as a method to secure the cooperation of a hostile witness." *See Consol. Rail Corp. v. CSX Transp., Inc.*, 2012 WL 511572, at *11 (E.D. Mich. Feb. 16, 2012) (quoting *Prasad v. MML Investors Servs. Inc.*, 2004 WL 1151735, at *6 (S.D.N.Y. May 24, 2004)). There can be no doubt, based on the totality of the circumstances described at length in the briefing on this motion, that the purported "consulting" agreements were designed to influence, and did influence, the testimony of Ms. Roberts, Mr. Pearson, and Mr. Maxfield.

StarKist's reliance on a non-binding advisory opinion by a committee of the California State Bar is misplaced. *See* Cal. State Bar Standing Comm. on Professional Responsibility and Conduct, Formal Op. 149 (1997) ("This opinion … is advisory only. It is not binding upon the courts …."). While that opinion suggests that payments to fact witnesses for preparation time may, in some circumstances, be permitted under Rule 5-310, the agreements here say nothing about "preparation time." Furthermore, the advisory opinion notes that "Rule 5-310(B)(2) does not expressly permit paying a witness for 'preparing,' as distinguished from attending or testifying." *Id.* It also punts on the broader question of the legality of such payments:

> Legal limits to witness payments exist which are beyond the scope of this opinion. For example, federal and state laws prohibit bribing witnesses and limit payments to incarcerated witnesses. In addition, certain contracts with witnesses may be illegal under common law principles. (See generally 1 Witkin on Summary of California Law, (9th ed. 1987) Contracts, § 611). Whether a particular payment violates these or other substantive rules is a question of law, upon which the Committee does not opine.

*Id.* (footnote omitted).

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS   11
CASE NO. 13-CV-00729-HSG

1  If this were a disciplinary action before the State Bar, the argument that StarKist's counsel relied on this non-binding opinion might be a defense, or a mitigating factor. But this motion does not seek any discipline against StarKist's counsel. The remedies sought here are the exclusion of the tainted evidence and the payment of attorney's fees and costs. Thus, the bar committee's non-binding advisory opinion has no bearing on this motion.

## VI. CONCLUSION

For the foregoing reasons, the Court should preclude StarKist from submitting evidence tainted by the payments to these fact witnesses, and should award Plaintiff his costs and attorneys' fees in bringing this motion. The Court should also exercise its inherent authority to ensure the integrity of proceedings before it, and grant such further relief as justice may require.[2]

Dated: April 14, 2015                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Scott A. Bursor*
          Scott A. Bursor

Scott A. Bursor (State Bar No. 276006)
Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
             ndeckant@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
            jluster@bursor.com

*Attorneys for Plaintiff
And the Interested Parties*

---

[2] Plaintiff has also sought relief pursuant to ¶ 12 of the Court's Standing Order, through the submission of a joint letter on April 1, 2015 seeking an order compelling the continuation of the depositions of Ms. Roberts, Mr. Pearson, and Mr. Maxfield.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS                    12
CASE NO. 13-CV-00729-HSG