1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Haywood S. Gilliam Jr. Magistrate Judge

4

5   HENDRICKS,                    )
                                  )
6           Plaintiff,            )
                                  )
7   vs.                           )   No. C 13-00729-HG
                                  )
8   STARKIST COMPANY,             )
                                  )
9           Defendant.            )
    _____)
10

11                                San Francisco, California
                                  Thursday, April 16, 2015
12

13   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 2:02 - 2:28 = 26 MINUTES</u>

14

15  <u>APPEARANCES:</u>

16  For Plaintiff:
                                Bursor & Fisher, P.A.
17                              888 Seventh Avenue
                                New York, New York 10019
18                      BY:     SCOTT BURSOR, ESQ.
                                JULIA LUSTER, ESQ.
19
    For Defendant:
20                              Hogan Lovells US LLP
                                4085 Campbell Avenue
21                              Suite 100
                                Menlo Park, California 94025
22                      BY:     ROBERT B. HAWK, ESQ.
                                STACY R. HOVAN, ESQ.
23
                                600 Grant Street, 44th Floor
24                              Pittsburgh, Pennsylvania 15219
                        BY:     AMY JO ROY, ESQ.
25

2

1  Transcribed by:              Echo Reporting, Inc.
2                               Contracted Court Reporter/
                                Transcriber
3                               echoreporting@yahoo.com
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1    <u>Thursday, April 16, 2015</u>                    <u>2:02 p.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4         THE CLERK:  Calling C13-00729, Hendricks versus

5    Star -- I'm sorry -- Starkist Company.

6         Please step forward and state your appearances for the

7    record, please.

8         MR. HAWK:  Good afternoon, your Honor.  Robert

9    Hawk from Hogan Lovells, for Defendant Starkist, and I have

10   with me Stacy Hovan from Hogan Lovells and Amy Roy from

11   Eckert Stevens.

12        THE COURT:  Good afternoon, Mr. Hawk.

13        MR. BURSOR:  Good afternoon, your Honor.  Scott

14   Bursor from Bursor and Fisher, and my colleague, Julia

15   Luster (phonetic), is with me today.  We're here on behalf

16   of Mr. Hendricks, the Plaintiff.

17        THE COURT:  All right.  Good afternoon, Mr.

18   Bursor.

19        So, thanks for coming in.  I got your call to my deputy

20   this morning indicating that there is a -- a settlement in

21   the works, and in light of that, I'm fine holding the

22   motions in abeyance, which is what the parties asked in

23   their stipulation.

24        I thought it made sense for us to get together and just

25   let you know some of the things that I'm thinking based on

4

1 having prepared for the hearing on the class cert motion so

2 that you all can take that into account as you make your way

3 through the process of submitting the preliminary approval

4 papers, and you don't need to answer those questions today,

5 but I thought it made sense for you to know what I'm

6 thinking having prepped for the hearing.

7     And the first question I have, which I will ask you to

8 answer, is what's the proposed timing for the submission of

9 the preliminary approval motion?

10          MR. HAWK:  We had not talked about it

11 specifically, but I think Mr. Bursor was thinking sooner

12 rather than later, which is -- which is fine.  We -- our

13 client is in Korea or a part -- an owner of our client is in

14 Korea, and so it takes a little bit of time to -- and we

15 have to get a settlement agreement, a full settlement

16 agreement put together.  So I would just ask that we not --

17 you know, we give ourselves at least three -- three weeks or

18 so to work through that.

19          THE COURT:  Yeah, I was going to say two weeks,

20 but three weeks is fine.

21          THE COURT:  That time frame makes complete sense

22 to me.  So that's -- that's fine.

23     So here are the -- here are the issues that occurred to

24 me in considering the class certification motion.  Obviously

25 I'll need to conduct an analysis under the law of

5

1   certification even in a settlement class, and the law in the

2   Ninth Circuit says that that's not a pro forma exercise.  I

3   need to actually take a look at that.

4       So here are a couple of things that are questions that

5   I think you all should think about how to address in the

6   context of the preliminary approval process.  So one is the

7   -- the class definition issue, and I preface all this by

8   saying I'm not sure what you all are contemplating in terms

9   of a proposed class, whether it's co-extensive with what

10  would have been sought or something different for

11  settlement, but in looking at the -- the data that was

12  attached to the papers regarding the expert analysis, it

13  struck me that there was a pretty clear line of demarcation

14  between mid 2011 and the time period after that, and the way

15  that I read the data at least, it appeared that in the

16  period from 2009 to the middle of 2011, almost all of the

17  tested product fell below the press weight standard, and

18  then after that it looked like virtually all the product was

19  above the standard.

20      And so one question I had is whether there is some

21  relevant factual distinction between those two periods, and

22  it seemed that the parties were, in essence, averaging over

23  the entire period but it looks to me at least based on my

24  reading of the data that there were two distinct time frames

25  in which the facts may have been very different.

6

1          MR. HAWK:  Your Honor, I guess all I would say
2  about that is that there are two -- there are four products,
3  and two of the products I think your observation is, you
4  know, consistent with some of the testimony, some of the
5  expert testimony for sure.
6      The other two products were more -- you know, there was
7  a variance across the entire five-year period according to
8  some of the testimony.
9          THE COURT:  Right.  And I noticed that.  So that's
10 the CLO and the CLW product.  So I -- you can make it a
11 cliffhanger if you want, but is the proposed settlement just
12 the CLO and CLW?
13         MR. HAWK:  It's all four.  It's all four products
14 are -- are subject to the settlement.
15         THE COURT:  All right.  So at least as to SLO and
16 SLW, it does seem to me that the issue that I just raised is
17 one that you all ought to be prepared to address.  In other
18 words, if -- if it's the case that folks who bought those
19 products after the middle of 2011 would not in any
20 likelihood have bought underfilled product and the folks
21 from 2009 to 2011 very likely did, how -- how exactly do you
22 create a five-year class that includes both of those types
23 of people?
24         MR. BURSOR:  Can I address that, your Honor?
25         THE COURT:  Sure.

7

1       MR. BURSOR:  And obviously your Honor read pretty

2  deep into the papers to pick up on that, and -- and the

3  distinction that your Honor's drawing is based on the

4  Defendant's view of disputed facts.  Our view is that the

5  test data from Starkist was not accurate, it was overstated

6  for a variety of reasons, and so every can was shorted, even

7  after that 2011 cutoff that your Honor's referencing,

8  despite the fact that some of Starkist's internal tasks have

9  numbers that are above the cutoff.

10      So we -- you know, obviously we did some tests that

11  were after 2011 that continued to show shorting, but one of

12  the purposes of the settlement is to resolve the case, and

13  in order to do that, we want to resolve it for the whole

14  class, not just for the, you know, particular time period

15  where the evidence was different or went one way or the

16  other.

17      So I don't think that's a class certification problem,

18  but we're happy to address that in our papers.  I'm also

19  sort of wary of arguing the -- the class cert motion too

20  much right now since we just smoked a peace pipe and settled

21  the case.

22      THE COURT:  I don't have any interest in creating

23  disharmony here today, but -- but I do want to make sure I

24  understand the issue, and it seems to me that it could -- it

25  goes to ascertainability.  It goes to a number of the

8

1  factors that I'll have to consider.

2      And to the point that you -- you raised, Mr. Bursor,

3  about the -- the equipment, which I also noticed, I think

4  what would be helpful to understand is what is the evidence

5  that that systematic issue that you believe to have been the

6  case spanned the entire five and a half year period.  I

7  mean, that really is the --

8          MR. BURSOR:  Sure.

9          THE COURT:  That's -- and if -- if there's some

10  basis for that and some agreement on that, then that, you

11  know, is something that would obviously be relevant.  But I

12  think that this issue is one that I would be interested in

13  having the parties address in the course of the preliminary

14  approval process.

15          MR. BURSOR:  Okay.  I'm confident we'll be able to

16  address that to the Court's satisfaction.

17          THE COURT:  Okay.  So that's one.  Second is this

18  choice of law question, and I -- it seemed that in the

19  opening brief, the Plaintiffs were arguing that, you know,

20  application of all 50 states laws would not be a class cert

21  problem.  In reply, it seemed that there was something, a

22  different argument, which was, well, California law owned

23  what you would apply.

24      And so I guess the question for the parties -- and,

25  again, you don't have to answer it right now, but does that

9

1   matter.  You know, I mean, it's got to be one of those two,

2   and which is it and does the resolution of that question

3   impact the class definition and, therefore, the -- the

4   certification of even a settlement class.

5           MR. BURSOR:  I think your Honor -- your Honor's

6   right that there was a little bit of a -- a shift in the

7   argument from the opening papers to the reply brief, and

8   part of that was some of the evidence that came in after we

9   filed our opening brief that gave us a better argument we

10  thought about applying California law nationwide, which was

11  Mr. Pearson's testimony that all the products shipped from

12  Samoa, which was more than 90 percent of the products sold

13  in the United States, all went through a single facility in

14  Mira Loma, California.

15      And so I think the issue on a settlement class for

16  choice of law is making sure that your Honor has a basis if

17  you're going to apply California law nationwide, an adequate

18  jurisdictional basis to do that, that there's adequate

19  contacts with the state.  And we -- and the alternative

20  argument we made was that there really isn't a material

21  difference between the laws of any of the 50 states that

22  would impact the claims in this case.  But those again --

23  and I'm sure Mr. Hawk has a different view on those -- there

24  are disputed issues of fact, probably mixed law and fact

25  right there.  But, again, one of the things -- you know, one

10

1  of the reasons for settlement is to -- is to not have to go

2  to the mat on every issue, but I understand that your Honor

3  needs to assure yourself in certifying a settlement class,

4  and it is going to be a nationwide settlement class that

5  we're going to propose -- you need to assure yourself that

6  you're applying the correct law and you have the appropriate

7  basis to do that, and we will be able to address that in the

8  preliminary approval motion.

9           THE COURT:  All right.

10          MR. HAWK:  Your Honor, I would just observe that,

11  you know, notwithstanding the peace pipe, it can be hard to

12  stand here and bite my lip on these issues, but that is what

13  I'm doing, and the -- you know, the standards, as you have

14  noted for class certification are not just a wave of the

15  hand for settlement, but they are somewhat different on

16  settlement than they are on -- you know, on a disputed

17  litigation trial class.  But I'm -- I'm confident that in

18  the -- the motion for preliminary approval that Mr. Bursor

19  will -- will address these issues and hopefully to your

20  Honor's satisfaction.

21          THE COURT:  All right.  So, third, is what I think

22  of as an ascertainability issue, and I think there are two

23  -- two variants of that, one of which is an issue

24  potentially for me.  One isn't.  You know, one strand of law

25  suggests that for consumer class actions where folks don't

11

1 have receipts, that in some way could defeat the existence

2 of a class in itself, and I -- that's, I think, the Carerra

3 case from the Third Circuit.  And that doesn't pose an issue

4 for me.  I -- I mean, I don't think that the Carerra

5 reasoning is something that would stand in the way of

6 finding a certifiable class.

7     But what did occur and is -- I'm assuming that the

8 settlement -- the proposed settlement will involve just the

9 four products at issue in the complaint.  And so that's, as

10 I understand it, a relatively small chunk, you know, bad

11 pun, of Starkist product.  And so one question is how will

12 the parties be able to -- to show that people who say they

13 bought those four products really did.  It just seems to me

14 that asking someone to remember years later whether they

15 bought white chunk tuna in oil as opposed to one of the many

16 other Starkist products could pose a challenge, and I saw

17 that the parties -- or at least the Plaintiff made reference

18 to consumer loyalty programs and data that might be -- be

19 able to be pulled that way.  The question I would have for

20 the parties when they present the preliminary approval

21 motion is is that true, you know, can you go back and does

22 it have the sort of granular data that would allow me to

23 have some confidence that folks actually bought one of the

24 four products at issue as opposed to one of the many other

25 tuna products that Starkist makes.

1          MR. BURSOR:  Sure, your Honor.  I -- I think I can

2    address that.  And just as far as the Carerra case goes, I

3    appreciate your Honor's comments on that.  I think the Court

4    might be interested to know that earlier today the Third

5    Circuit issued an opinion that largely abrogated Carerra.

6    It's a case called Bird v. Aaron's, Inc.  So I think the --

7    the tide has kind of turned against Carerra even within the

8    Third circuit itself.

9          In terms of ensuring that the claims process

10   appropriately screens class members that are submitting

11   claims, I think -- I think we submitted some evidence on

12   that from Mr. Weisbrot, who's from the Angion Claims

13   Administration Group, and we submitted some evidence from a

14   declarant, my associate, Neal Deckant, talking about how

15   we've done this in prior cases with grass seed and olive oil

16   products and that we've been able to get loyalty card data

17   to -- to identify very large numbers of class members based

18   on retailer loyalty data.

19         But in this case the four products comprise the vast

20   vast bulk of sales of Starkist Tuna.  And in the papers, I

21   don't want to recite the figure because it was -- it was

22   designated confidential, but the number of five ounce cans

23   of those four varieties that were sold, it was an enormous

24   share, way more than 90 percent, way more than 90 percent of

25   the cans sold by the Starkist company.  So if you bought a

1  can of tuna with Charlie the Tuna on it, there's better than

2  95 percent chance you're in this class.  So I -- I think

3  we're going to be able to -- to handle that to your

4  satisfaction, your Honor.

5          THE COURT:  Okay.  And is that for all weights,

6  though?  In other words, 95 percent of the product, is five

7  ounce tuna in one of these four products?

8          MR. BURSOR:  I don't know the -- I can't say it's

9  more than 95 for all weights, but the five ounce, the sort

10 of hockey puck size can, the five ounce can, that is the by

11 and large predominant size can of tuna sold in the United

12 States, and of the five ounce, the four varieties in this

13 case were somewhere north of 95 percent of the sales.  I

14 can't even think of what the other sizes are.  I guess it's

15 -- they call them halves and pound sizes, although the half

16 pound is five ounces now.  I can't remember what size the

17 pound is.

18     There are a few specialty products that have been

19 referenced in some of the testimony that are sold at, you

20 know, four and a half ounces, but the sales of those

21 compared to the predominant five ounce cans is very very

22 small.  So I -- I know, Mr. Hawk, if it was a -- if it was a

23 disputed contested class cert hearing, he would want to say

24 that maybe I'm wrong about some of these things.  So I just

25 want -- I'm giving you the Plaintiff's view of perhaps a

14

1  disputed ascertainability issue, but I think we're going to

2  be able to satisfy the Court on that point as well, and we

3  will address it in our preliminary approval motion.

4       THE COURT:  All right.  You understand what my --

5  what my focus is there.  And then the other question -- this

6  may be more esoteric at some level.  It occurred to me that

7  the -- the class period being defined as the time frame

8  during which the press weights were allegedly low might or

9  might not overlap exactly with when folks bought Tuna.  You

10 know, in other words that there could be some lag in terms

11 of tuna actually getting on the shelves from Samoa, and then

12 one question is how long the tuna stays on the shelves.  You

13 know, in other words, does -- is there some tail here, and

14 is that -- you know, is that ascertainable.  Is that

15 something that's not -- you know, that, you know, your best

16 effort is that it ends up being a production period and then

17 you just -- you discount purchases post production period.

18 I'm not -- not sure, but it occurred to me that that was

19 another wrinkle.

20      MR. BURSOR:  This is an issue that Mr. Hawk and I

21 have focused on a little bit, and this is the one change to

22 the class definition that was made in the course of

23 settlement negotiations.  Our proposed class definition had

24 defined the class period by the packed date, and then your

25 Honor's quite right that the date of purchase could be long

after the product was packed, and we did that to try to
achieve a measure of precision in terms of, you know, we
know the evidence about when the cans were packed, but I
think for administrative feasibility reasons, we've agreed
with Starkist to change the class definition to on or before
a certain date of purchase, just to make it more -- more
administratively feasible to ascertain or for an individual
to ascertain whether they're in or out.  I think it's --
it's likely that most people are not going to have the code,
you know, the however many character, alpha numeric code on
the can that indicates exactly when it was packed, but they
will have some idea if they purchased it before October of
2014.

     And so we tried to make the class definition more user
friendly that way.  We recognize that that lacks perfection
in terms of lining it up to when the production issues were
going on, but we agreed that that was a more
administratively reasonable way to do it for settlement
purposes.

          THE COURT:  All right.  And then the -- the last
question, this is another one that may be more in the
category of musings than anything else, but, as I understand
it, 90 percent of the cans during the period were from the
Samoa facility, and the question that raises is does that
mean the other 10 percent of folks bought non-Pago Pago

16

1  tuna, does that mean they just weren't injured.  Is there --

2  and, again, you don't have to answer this now, but is that a

3  consideration that needs to be factored into the class

4  framing?

5          MR. BURSOR:  I'm happy to answer that and, again,

6  with the recognition that I'm giving you Plaintiff's version

7  of disputed facts, but there was some small number of the

8  cans were packed in Thailand by third party contractors and

9  some small number of the cans were packed in Guayaquil,

10  Ecuador at a Starkist facility there, cumulatively less than

11  10 percent.

12       Our view of the merits of the case -- and, again, Mr.

13  Hawk would dispute many aspects of this -- is that every one

14  of those cans was shipped without testing for compliance

15  with the federal standard of fill.  Therefore, every one of

16  those cans was required to have a disclosure about being

17  below standard of fill.  Therefore, every one of those --

18  any purchaser of a can, whether it came from Pago Pago,

19  Samoa, whether it came from Guayaquil, Ecuador, whether it

20  was packed in Thailand by a third party manufacturer, the --

21  the merits of the claim are exactly the same.  Not a single

22  one of those cans was tested for compliance with the reg.

23  Not a single one of those cans had the disclaimer required

24  by the Code of Federal Regulation, and Mr. Hawk, I'm sure,

25  is very -- you know, he has a lot to say about the merits of

17

1 that that I don't know that we need to --

2          MR. HAWK:  I am --

3          MR. BURSOR:  Yeah.

4          MR. HAWK:  -- writing away.

5          THE COURT:  Exactly.  You look very restrained.

6          MR. BURSOR:  But for purposes of class

7 certification, your Honor, it is -- I mean, obviously, when

8 the case is contested, we're saying -- the Plaintiff's side

9 is saying everything is the same for every class member, and

10 the -- and the Defendant's side is saying, "No, there's all

11 these differences."  But I think part of the way to get a

12 settlement done is -- is you're settling those issues.

13 You're settling those issues.

14          THE COURT:  No, understood.  And I think you

15 gather where I'm coming from, and obviously the law is clear

16 that settlements are favored and that the role of the Court

17 is limited in reviewing a class settlement.  I'm not

18 inclined to micromanage or tinker.  That said, the cases

19 also make clear that it's a real class analysis.  It's not

20 -- there's no such thing as a stipulated --

21          MR. BURSOR:  Right.

22          THE COURT:  -- class action settlement, and so --

23 so these are some of the issues that occurred to me in

24 reviewing the matter, and I'll look forward to the -- the

25 preliminary approval motion and I thought that it would be

18

helpful to you up front to hear these so that you can take

those into account in your -- the preparation of your --

your filing.

        MR. HAWK:  We appreciate it, your Honor.

        MR. BURSOR:  Very helpful.  Then -- and, your

Honor, I think the other thing that would be helpful is, if

I could suggest, if we could set a date three weeks out from

today for the filing of the motion, and if we could get on

your Honor's calendar for a hearing date with an appropriate

schedule out from there.

    There isn't -- you know, there's not going to be an

opposition to this motion I would expect.  So we probably

are not going to need a full sequence of a briefing

schedule.  We probably just need the three weeks to get the

motion on and then a hearing -- you know, enough time for

your Honor to process the motion and then a hearing date.

        THE COURT:  That sounds fine to me.  What I would

suggest is why don't we look at a date three weeks from

today.

    Madam Clerk?

        THE CLERK:  9/7.

        THE COURT:  Okay.  And then I think after that,

why don't we -- well, we'll take a look at our calendar and

figure out a time.  I would imagine it would be two, three

weeks after that ideally for the -- for the hearing.

19

1          MR. BURSOR:  That would be great, your Honor.

2          MR. HAWK:  Sounds good, your Honor.

3          THE COURT:  All right.  Do you all have any

4    unavailability issues that I should take into account in

5    figuring that out?

6          MR. BURSOR:  I think not.

7          MR. HAWK:  I don't think so, not out in the, you

8    know, May June.

9          THE COURT:  Okay.  I would do it now, but I'd want

10   to take a look at our law and motion calendar and balance

11   it, make sure we don't overload.

12         MR. HAWK:  Thanks for going through all that

13   stuff, your Honor.  It is quite a load of stuff that was on

14   for today.

15         THE COURT:  Well, it was interesting stuff.  So

16   I'll look forward to -- to seeing you in a few weeks, and

17   I'll look forward to getting your -- your motion.

18         MR. BURSOR:  Thank you, your Honor.

19         MR. HAWK:  And then one other thing, your Honor,

20   just to -- just a call -- shout out for Judge Corley, who,

21   you know, served as our settlement judge in this, and I

22   thought that her efforts were very much appreciated, very --

23         MR. BURSOR:  She set us on the path.  She set us

24   on the path to getting it resolved, and we wanted to make

25   sure your Honor knew she had done that.

20

1          THE COURT:  That's great to hear.  I'll let her
2  know.
3          MR. BURSOR:  All right.  Thank you.
4          MR. HAWK:  Thank you, your Honor.
5          THE COURT:  All right.  Thank you.
6      (Proceedings adjourned at 2:28 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber
Saturday, April 18, 2015