**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
        jluster@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
        ndeckant@bursor.com

*Attorneys for Plaintiff*
*And the Interested Parties*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>    v.<br><br>STARKIST CO.,<br><br>                    Defendant. | Case No. 13-CV-00729-HSG<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: May 28, 2015<br>Time: 2:00 p.m.<br>Courtroom 15, 18th Floor<br><br>Hon. Haywood S. Gilliam, Jr. |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 28, 2015 at 2:00 p.m., or as soon thereafter as the matter may be heard by the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Courtroom 15, 18th Floor, in the courtroom of the Honorable Haywood S. Gilliam, Jr., Plaintiff will and hereby does move, pursuant to Fed. R. Civ. P. 23(e), for the Court to: (i) grant preliminary approval of the proposed Settlement Agreement, (ii) provisionally certify the Settlement Class[1] for the purposes of preliminary approval, designate Plaintiff Hendricks as the Class Representative, and appoint Bursor & Fisher, P.A. as counsel for the Settlement Class, (iii) establish procedures for giving notice to members of the Settlement Class, (iv) approve forms of notice to Settlement Class Members, (v) mandate procedures and deadlines for exclusion requests and objections, and (vi) set a date, time, and place for a final approval hearing.

This motion is made on the grounds that preliminary approval of the proposed class action settlement is proper, given that each requirement of Rule 23(e) has been met.

This motion is based on the attached Memorandum of Points and Authorities, the accompanying Declaration of Scott A. Bursor, the pleadings and papers on file herein, and any other written and oral arguments that may be presented to the Court.

### CIVIL RULE 7-4(a)(3) STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should preliminarily approve the proposed class action settlement pursuant to Fed. R. Civ. P. 23(e).

---

[1] All capitalized terms herein that are not otherwise defined have the definitions set forth in the Settlement Agreement, filed concurrently herewith. *See* Bursor Decl. Ex. 1.

Dated: May 14, 2015

Respectfully submitted,

**BURSOR & FISHER, P.A.**


By: _/s/ Scott A. Bursor_
Scott A. Bursor

Scott A. Bursor (State Bar No. 276006)
Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
    ndeckant@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
    jluster@bursor.com

*Attorneys for Plaintiff*
*And the Interested Parties*

# TABLE OF CONTENTS

I.   INTRODUCTION .......................................................................................... 1

II.  PROCEDURAL BACKGROUND.................................................................. 3

     A.   Pleadings And Motions.................................................................... 3

     B.   Discovery ......................................................................................... 4

     C.   Settlement ........................................................................................ 5

III. THE LEGAL STANDARD FOR PRELIMINARY APPROVAL.................... 5

IV.  THE SETTLEMENT AGREEMENT IS FAIR, ADEQUATE, AND
     REASONABLE ............................................................................................. 7

     A.   Strength Of Plaintiff's Case ............................................................ 8

     B.   Risk Of Continuing Litigation ........................................................ 8

     C.   Risk Of Maintaining Class Action Status ...................................... 9

     D.   The Extent Of Discovery And Status Of Proceedings................... 10

     E.   Experience And Views Of Counsel ............................................... 10

V.   THE COURT SHOULD PROVISIONALLY CERTIFY THE SETTLEMENT
     CLASS FOR THE PURPOSES OF PRELIMINARY APPROVAL ................. 11

     A.   Evidence Supporting Plaintiff's Claims Of Systematic Underfilling
          Throughout The Entire 5½ Year Class Period................................ 11

     B.   Evidence Supporting Application Of California Law To The
          Nationwide Class ........................................................................... 15

     C.   Evidence Concerning The Ability To Identify Class Members Without
          Requiring Receipts.......................................................................... 17

     D.   The Lag Time Between Packing Date And Sale Date Does Not Affect
          The Ascertainability Of The Settlement Class............................... 20

VI.  THE PROPOSED NOTICE PROGRAM PROVIDES ADEQUATE NOTICE
     AND SHOULD BE APPROVED ...................................................................... 21

VII. CONCLUSION.............................................................................................. 24

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alaniz v. California Processors, Inc.*,
  73 F.R.D. 269 (N.D. Cal. 1976)............................................................ 6

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ......................................................... 17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  --- U.S. ---, 133 S. Ct. 1184 (2013)..................................................... 15

*Beaver v. Alaniz*,
  439 U.S. 837 (1978) ............................................................................. 6

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979) ....................................................... 7

*Bruno v. Eckhart Corp.*,
  280 F.R.D. 540 (C.D. Cal. 2012) ......................................................... 17

*Byrd v. Aaron's Inc.*,
  --- F.3d ---, 2015 WL 1727613 (3d Cir. Apr. 16, 2015) ...................... 17

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)................................................................. 17

*Chavez v. Blue Sky Nat. Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) ......................................................... 16

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ................................................................ 8

*Curtis-Bauer v. Morgan Stanley & Co., Inc.*,
  2008 WL 4667090 (N.D. Cal. Oct. 22, 2008)........................................ 8

*Dunk v. Ford Motor Company*,
  48 Cal. App. 4th 1794 (1996) ............................................................... 6

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .............................................................. 15

*Forcellati v. Hyland's, Inc.*,
  2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ........................... 16, 18, 20

*Fulford v. Logitech, Inc.*,
  2010 U.S. Dist. LEXIS 29042 (N.D. Cal. Mar. 5, 2010)........................ 9

*Gallucci v. Boiron,, Inc.*,
  2012 WL 5359485 (S.D. Cal. Oct. 31, 2012) ....................................... 18

*Garner v. State Farm. Mut. Auto. Ins. Co.*,
  2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ....................................... 8

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................................... 7, 8, 11

*In re Apple Computer Sec. Litig.*,
    1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) .......................................... 9

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...................................................................................... 10

*In re Netflix Privacy Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013).......................................................... 9

*In re Omnivision Techns., Inc.*,
    559 F. Supp. 2d 1036, (N.D. Cal. 2008) ................................................................... 10

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373, 378 (9th Cir. 1995) ............................................................................ 7, 10

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ............................................................................... 5, 6, 7

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................................................................... 5, 6

*In re Toys "R" Us-Del., Inc. – Fair & Accurate Credit Transactions Act (FACTA) Litig.*,
    295 F.R.D. 438 (C.D. Cal. 2014) ............................................................................... 18

*Kasel v. Remington Arms Co.*,
    24 Cal.App.3d 711 (1972) .......................................................................................... 16

*Mason v. Heel, Inc.*,
    2014 WL 1664271 (S.D. Cal. Mar. 13, 2014) ......................................................... 18

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................................... 15, 16

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ............................................................................... 6, 7, 8

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008) ............................................................................... 16

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968).................................................................................................... 7

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................. 8, 10

*Stockwell v. City and County of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014) ................................................................................... 15

*Vandervort v. Balboa Capital Corp.*,
    8 F. Supp. 3d 1200 (C.D. Cal. 2014) ........................................................................ 17

*Wash. Mut. Bank v. Superior Court*,
    15 P.3d 1071 (Cal. 2001) ............................................................................................... 15

**STATUTES**

28 U.S.C. § 1404 ............................................................................................................... 3

New York GBL § 349 ........................................................................................................ 1

**RULES**

Fed. R. Civ. P. 23(b)(3) ................................................................................................... 15

Fed. R. Civ. P. 23(c)(2)(B) ....................................................................................... 21, 22

Fed. R. Civ. P. 23(e) ...................................................................................................... 11

Fed R. Civ. P.  23(e)(1) .................................................................................................. 21

**TREATISES**

*Manual for Complex Litigation, 3d Edition*, § 30.41 ................................................. 6, 21

NEWBERG ON CLASS ACTIONS § 11.25 (1992) ............................................................... 6

William B. Rubenstein, Newberg on Class Actions § 12:35 (5th ed. 2014) ..................... 23

**REGULATIONS**

21 C.F.R. § 160.190(c)(4) ............................................................................................... 16

# I. INTRODUCTION

Plaintiff Patrick Hendricks ("Plaintiff"), through his counsel Bursor & Fisher, P.A. ("Bursor & Fisher"), respectfully submits this memorandum of law in support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement.

The Settlement Agreement states that StarKist will pay $12 million into a Settlement Fund, including $8 million in cash and $4 million in vouchers for StarKist-branded products, for the settlement of all claims in this action. Settlement Agreement ¶ 2.1, Bursor Decl. Ex. 1. The Settlement Agreement defines the Settlement Class to include:

> "All residents of the United States of America who, from February 19, 2009 through October 31, 2014, purchased any of the StarKist Products (i.e. 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil)."

*Id.* ¶ 1.23.

The Settlement Agreement is silent on the per claim payout for class members. However, Plaintiff and Class Counsel have submitted herewith a motion to approve a proposed Plan of Allocation of the proceeds of the Settlement Fund, which provides for class member claims to be paid at $25 in cash or $50 in product vouchers, at the election of each claimant, subject to pro rata dilution if the total amount of claims exceeds the available funds. This is an excellent result for class members compared to their likely recovery should they prevail at trial. Plaintiff's damages expert, Colin B. Weir, calculated Mr. Hendricks recoverable damages on an individual basis at $10.57 under a price premium theory, or $63.63 on a full refund theory. 4/7/15 Weir Reply Decl. ¶ 62 (Doc. No. 155-8). Similarly, Interested Party Brian Andacky, who has moved to intervene in this action, could expect to recover $50 in statutory damages on his claim under New York GBL § 349. *See* 1/20/15 Weir Decl. ¶ 31 (Doc. No. 95-5) ("New York GBL § 349 provides for statutory damages of $50 per violation."). A recovery of $25 cash, or $50 in product vouchers, is very close to the maximum recovery Mr. Hendricks, Mr. Andacky, or any class member, could expect at trial.

As in any class action, the proposed Settlement is initially subject to preliminary approval and then to final approval by the Court after notice to the class and a hearing. Plaintiff now requests

that this Court enter an order in the form of the accompanying [Proposed] Order Preliminarily

Approving Class Action Settlement, which will:

    (1)    Grant preliminary approval of the proposed Settlement;

    (2)    Provisionally certify the Settlement Class on a nationwide basis for the purposes of preliminary approval, designate Plaintiff Hendricks as the Class Representative, and Bursor & Fisher, P.A. as counsel for the Settlement Class;

    (3)    Establish procedures for giving notice to members of the Settlement Class;

    (4)    Approve forms of notice to Settlement Class Members;

    (5)    Mandate procedures and deadlines for exclusion requests and objections; and

    (6)    Set a date, time and place for a final approval hearing.

The proposed Settlement is fair and reasonable and falls within the range of approval. It is the product of extended arms-length negotiations between experienced attorneys familiar with the legal and factual issues of this case, including two in-person settlement conferences before Magistrate Judge Jacqueline Scott Corley. Additionally, Class Counsel has conducted an extensive investigation into the facts and law relating to this matter through the course of discovery. This investigation has included serving three separate rounds of interrogatories and requests for production, reviewing more than 17,000 pages of documents, and thousands more pages of spreadsheet data concerning StarKist's press weight testing. Class Counsel has also taken the depositions of 5 current or former StarKist employees as well as 3 expert witnesses. Class Counsel has also interviewed and retained experts, conducted numerous interviews with members of the putative class, and done significant legal research and briefing. As a result of these efforts, Class Counsel is fully informed of the merits of this action and the proposed settlement.

The proposed Settlement Class meets every element of Rule 23(a) and (b)(3). The Settlement Class is so numerous that the joinder of all members is impracticable; there are questions of law or fact common to the proposed Settlement Class; the proposed Class Representative's claims are typical of those of the Settlement Class; and the proposed Class Representative will fairly and

adequately protect the interests of the proposed Settlement Class. In addition, common issues of law and fact predominate over any questions affecting only individual class members, and a class action as proposed here is superior to other available methods for the fair and efficient adjudication of the controversy.

## II.     PROCEDURAL BACKGROUND

### A.       Pleadings And Motions

On February 19, 2013, Plaintiff Hendricks filed his Class Action Complaint, which alleged that StarKist cheated customers by shorting 5 oz. cans of tuna, under-filling them in violation of federal law. That allegation was based on press weight tests conducted in early 2013 by the United States Department of Commerce at the request of Class Counsel. Plaintiff asserts claims on behalf of himself and a nationwide class of purchasers of StarKist Tuna, for breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, unjust enrichment, violation of the California Consumer Legal Remedies Act ("CLRA"), violation of the California Unfair Competition Law ("UCL"), violation of the California False Advertising Law ("FAL"), negligent misrepresentation, and fraud.

On April 18, 2013, StarKist filed a motion to dismiss and a motion to transfer this action to the Western District of Pennsylvania under 28 U.S.C. § 1404. On March 25, 2014, the Court (i) denied Defendant's motion to transfer and (ii) granted in part and denied in part Defendant's motion to dismiss. Specifically, the Court dismissed Plaintiff's claims for unjust enrichment and breach of the implied warranty of fitness for a particular purpose. All other claims remain.

On August 27, 2014, Defendant filed a motion for reconsideration of the Court's March 25, 2014 Order granting in part and denying in part Defendant's motion to dismiss. The Court denied that motion on October 13, 2014.

Plaintiff moved for class certification on January 20, 2015. Specifically, Plaintiff moved to certify a nationwide class on his claims for breach of express warranty, breach of implied warranty, negligent misrepresentation, and fraud. Plaintiff also moved to certify a California subclass on his claims for violation of the CLRA, UCL, and FAL. StarKist filed its opposition on March 3, 2015, and Plaintiff filed his reply on April 7, 2015, with a hearing set for April 16, 2015. Subsequently, on

April 10, 2015, Plaintiff filed an administrative motion for leave to file a supplemental reply brief, which was granted.

Separately, on January 20, 2015, Interested Parties Laury Smith, Brian Andacky, Joseph Vallillo, and Ben Hall, represented by Class Counsel, moved to intervene as named plaintiffs. Each of the Interested Parties further moved to certify a subclass for each of their respective states. The motion was fully briefed on February 10, 2015, with a hearing set for April 16, 2015, the same date as the noticed hearing for Plaintiff's Motion for Class Certification.

On March 26, 2015, Plaintiff moved for sanctions against StarKist, in connection with its payments to three fact witnesses (Aaron Maxfield, Harvey Pearson, and Kelly Roberts) to influence their testimony. The motion was fully briefed on April 14, 2015, with a hearing set for April 16, 2015, the same date as the noticed hearing for Plaintiff's Motion for Class Certification.

On the morning of April 16, 2015, the parties executed a binding settlement term sheet, and all pending motions were stayed in anticipation of a motion for preliminary approval of this settlement.

### B. Discovery

Plaintiff served his first round of interrogatories and requests for production of documents on May 14, 2014, a second round of interrogatories and requests for production on January 20, 2015, and a third round of interrogatories and requests for production on February 26, 2015. StarKist served its interrogatories and requests for production on May 23, 2014. In connection with these requests, the parties produced documents on a rolling basis, which was substantially completed as of October 31, 2014. In total, StarKist produced 17,013 pages of documents, and thousands of additional pages of spreadsheet data.

Plaintiff's counsel deposed 5 current or former StarKist employees: Aaron Maxfield on December 17, 2014, Glenn Mast on February 26, 2015, Harvey Pearson on March 10, 2015, Brett Butler on March 12, 2015, and Kelly Roberts on March 18, 2015. Plaintiff's counsel also deposed three of StarKist's experts: Christina DeWitt on April 2, 2015, Bruce Strombom on April 3, 2015, and Dominique Hanssens on April 8, 2015.

StarKist deposed Plaintiff Hendricks on November 14, 2014.  StarKist also deposed two of Plaintiff's experts:  Colin B. Weir on February 10, 2015, and Steven Weisbrot on February 13, 2015.  StarKist also served the U.S. National Oceanic and Atmospheric Administration with a subpoena *duces tecum* and *ad testificandum* on March 18, 2015, and also served Bursor & Fisher, P.A. with a similar subpoena on March 19, 2015.

On April 1, 2015, pursuant to ¶ 12 of the Court's Standing Order, the parties submitted two joint letters concerning a discovery disputes.  One joint letter addressed issues related to StarKist's payments to three fact witnesses (Aaron Maxfield, Harvey Pearson, and Kelly Roberts) to influence their testimony.  The second joint letter concerned issues that arose during the deposition of Brett Butler, a nonparty witness who is a former StarKist employee.  These matters were pending before the Court on April 16, 2015, when the case was stayed due to the settlement.

### C.    Settlement

On September 30, 2014, the parties attended an in-person Settlement Conference before the Judge Corley.  However, the parties were unable to reach an agreement.

On March 20, 2015, near the end of discovery, the parties attended a second in-person Settlement Conference before Judge Corley.  However, they were again unable to reach an agreement.

On April 16, 2015, prior to the hearing on Plaintiff's motions (i) for class certification, (ii) for sanctions, and (iii) for leave to intervene, the parties executed a Class Action Settlement Term Sheet.  That same day, the parties entered into a stipulation staying all motions, pending the filing of a motion for preliminary approval of the settlement.  On April 22, 2015, the parties entered into an additional stipulation staying all other case deadlines.  The parties reached agreement on a formal Stipulation of Settlement on May 13, 2015.

### III.    THE LEGAL STANDARD FOR PRELIMINARY APPROVAL

Approval of class action settlements involves a two-step process.  First, the Court must make a preliminary determination whether the proposed settlement appears to be fair and is "within the range of possible approval."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); *Alaniz v. California*

*Processors, Inc.*, 73 F.R.D. 269, 273 (N.D. Cal. 1976), *cert. denied sub nom. Beaver v. Alaniz*, 439 U.S. 837 (1978). If so, notice can be sent to class members and the Court can schedule a final approval hearing where a more in-depth review of the settlement terms will take place. *See Manual for Complex Litigation, 3d Edition*, § 30.41 at 236-38 (hereafter, the "Manual").

The purpose of preliminary approval is for the Court to determine whether the parties should notify the putative class members of the proposed settlement and proceed with a fairness hearing. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079. Notice of a settlement should be disseminated where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Id.* (*quoting* NEWBERG ON CLASS ACTIONS § 11.25 (1992). Preliminary approval does not require an answer to the ultimate question of whether the proposed settlement is fair and adequate, for that determination occurs only after notice of the settlement has been given to the members of the settlement class. *See Dunk v. Ford Motor Company*, 48 Cal. App. 4th 1794, 1801 (1996).

Nevertheless, a review of the standards applied in determining whether a settlement should be given *final* approval is helpful to the determination of preliminary approval. One such standard is the strong judicial policy of encouraging compromises, particularly in class actions. *See In re Syncor*, 516 F.3d at 1101 (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983)).

> Beginning with the first [pretrial] conference, and from time to time throughout the litigation, the court should encourage the settlement process. The judge should raise the issue of settlement at the first opportunity, inquiring whether any discussions have taken place or might be scheduled. As the case progresses, and the judge and counsel become better informed, the judge should continue to urge the parties to consider and reconsider their positions on settlement in light of current and anticipated developments.

*Manual*, § 23.11 at 166.

While the district court has discretion regarding the approval of a proposed settlement, it should give "proper deference to the private consensual decision of the parties." *Hanlon v. Chrysler*

*Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). In fact, when a settlement is negotiated at arm's-length by experienced counsel, there is a presumption that it is fair and reasonable. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Ultimately, however, the Court's role is to ensure that the settlement is fundamentally fair, reasonable, and adequate. *See In re Syncor* 516 F.3d at 1100.

Beyond the public policy favoring settlements, the principal consideration in evaluating the fairness and adequacy of a proposed settlement is the likelihood of recovery balanced against the benefits of settlement. "[B]asic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). That said, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

In evaluating preliminarily the adequacy of a proposed settlement, particular attention should be paid to the process of settlement negotiations. Here, the negotiations were conducted by experienced class action counsel, with significant involvement by Judge Corley. Thus, counsel's assessment and judgment are entitled to a presumption of reasonableness, and the court is entitled to rely heavily upon their opinion. *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622-23 (N.D. Cal. 1979).

## IV. THE SETTLEMENT AGREEMENT IS FAIR, ADEQUATE, AND REASONABLE

Rule 23(e)(2) provides that "the court may approve [a proposed class action settlement] only after a hearing and on finding that it is fair, reasonable, and adequate." When making this determination, the Ninth Circuit has instructed district courts to balance several factors: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; and (6) the

experience and views of counsel.  *Hanlon*, 150 F.3d at 1026;[2] *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  Here, the balance of these factors readily establishes that the proposed settlement should be preliminarily approved.

### A.    Strength Of Plaintiff's Case

In determining the likelihood of a plaintiff's success on the merits of a class action, "the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice."  *Officers for Justice*, 688 F.2d at 625 (internal quotations omitted).  The court may "presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery."  *Garner v. State Farm. Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010) (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

Here, Plaintiff's counsel engaged in an arms-length negotiations with StarKist's counsel, and were thoroughly familiar with the applicable facts, legal theories, and defenses.  Although Plaintiff and his counsel believe that Plaintiff's claims have merit, they also recognize that they will face risks at class certification, summary judgment, and trial.  StarKist would no doubt present a vigorous defense at trial, and there is no assurance that the class would prevail.  Thus, in the eyes of Plaintiff's counsel, the proposed Settlement provides the Settlement Class with an outstanding opportunity to obtain significant relief at this stage in the litigation.  The Settlement Agreement also abrogates the risks that might prevent them from obtaining relief.

### B.    Risk Of Continuing Litigation

As referenced above, proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class, having summary judgment granted against Plaintiff, or losing at trial.  Such considerations have been found to weigh heavily in favor of settlement.  *See Rodriguez*, 563 F.3d at 966; *Curtis-Bauer v. Morgan Stanley & Co., Inc.*, 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff

---

[2] In *Hanlon*, the Ninth Circuit also instructed district courts to consider "the reaction of the class members to the proposed settlement."  *Hanlon*, 150 F.3d at 1026.  This consideration is more germane to final approval, and will be addressed at the appropriate time.

class."). Even assuming that Plaintiff were to survive summary judgment, he would face the risk of establishing liability at trial in light of conflicting expert testimony between his own expert witnesses and StarKist's expert witnesses. In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which expert version would be accepted by the jury. The experience of Plaintiff's counsel has taught them that these considerations can make the ultimate outcome of a trial highly uncertain.

Moreover, even if Plaintiff were to prevail at trial, the class would face additional risks if StarKist appeals or moves for a new trial. For example, in *In re Apple Computer Sec. Litig.*, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991), the jury rendered a verdict for plaintiffs after an extended trial. Based on the jury's findings, recoverable damages would have exceeded $100 million. However, weeks later, Judge Ware overturned the verdict, entering judgment notwithstanding the verdict for the individual defendants, and ordered a new trial with respect to the corporate defendant. By settling, Plaintiff and the Class avoid these risks, as well as the delays and risks of the appellate process.

### C.     Risk Of Maintaining Class Action Status

In addition to the risks of continuing the litigation, Plaintiff would also face risks in certifying a class and maintaining that class status through trial. Even assuming that the Court were to grant Plaintiff's January 20, 2015 motion for class certification, the class could still be decertified at any time. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement.") (internal citations omitted). From their prior experience, Plaintiff's counsel anticipates that StarKist would likely move for reconsideration, attempt to appeal the Court's decision pursuant to Rule 23(f), and/or move for decertification at a later date. Here, the Settlement Agreement eliminates these risks by ensuring class members a recovery that is "certain and immediate, eliminating the risk that class members would be left without any recovery … at all." *Fulford v. Logitech, Inc.*, 2010 U.S. Dist. LEXIS 29042, at *8 (N.D. Cal. Mar. 5, 2010).

D.     **The Extent Of Discovery And Status Of Proceedings**

Under this factor, courts evaluate whether class counsel had sufficient information to make an informed decision about the merits of the case.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  Here, this matter has fully progressed through fact discovery. Accordingly, as discussed above, Plaintiff's counsel has received, examined, and analyzed information, documents, and materials that enabled them to assess the likelihood of success on the merits.  These efforts include three separate rounds of interrogatories and requests for production, reviewing over 17,000 pages[3] of responsive documents, taking the depositions of 5 current or former StarKist employees as well as 3 expert witnesses, extensive consultations with Plaintiff's own experts, numerous interviews with members of the putative class, and significant legal research and briefing.  The parties also attended two in-person mediations with the Honorable Jacqueline Scott Corley.  The Settlement Agreement is plainly the result of fully-informed negotiations.

E.     **Experience And Views Of Counsel**

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *In re Omnivision Techns., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008). Deference to Plaintiff's counsel's evaluation of the Settlement is appropriate because "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."  *Rodriguez*, 563 F.3d at 967 (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

Here, the Settlement was negotiated by counsel with extensive experience in consumer class action litigation.  *See* Bursor Decl. Ex. 3 (firm resume of Bursor & Fisher, P.A.).  Based on their collective experience, Class Counsel concluded that the Settlement Agreement provides exceptional results for the class while sparing the class from the uncertainties of continued and protracted litigation.

---
[3] In fact, the actual amount of discovery materials produced is significantly higher than 17,000 pages, because many of these "pages" are actually voluminous Microsoft Excel spreadsheets that were produced in native format, some of which are dozens or hundreds of pages long when printed. *See* 4/7/2015 Deckant Reply Decl. ¶ 6 (Doc. No. 155-7).

## V.    THE COURT SHOULD PROVISIONALLY CERTIFY THE SETTLEMENT CLASS FOR THE PURPOSES OF PRELIMINARY APPROVAL

The Ninth Circuit has recognized that certifying a settlement class to resolve consumer lawsuits is a common occurrence. *Hanlon*, 150 F.3d at 1019. When presented with a proposed settlement prior to the class certification stage, a court must determine whether the putative settlement class satisfies the requirements for class certification under Rule 23. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."). In assessing those class certification requirements, a court may properly consider that there will be no trial. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial.").

Here, Plaintiff has already submitted substantial briefing, with accompanying expert declarations, explaining why class certification is appropriate under the factors of Rule 23(a) and (b)(3):

>    (1)    Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification, dated January 20, 2015 [Doc. No. 95-4];
>
>    •    Declaration of Steven Weisbrot [Doc. No. 95-6];
>
>    •    Declaration of Colin B. Weir [Doc. No. 95-5];
>
>    (2)    Plaintiff's Reply Memorandum of Points and Authorities in Support of Motion for Class Certification, dated April 7, 2015 [Doc. No. 155-6];
>
>    •    Reply Declaration of Colin B. Weir [Doc. No. 155-8];
>
>    (3)    Plaintiff's Supplemental Reply Brief in Support of Motion for Class Certification, dated April 14, 2015 [Doc. No. 164].

Accordingly, Plaintiff respectfully refers the Court to his prior briefing and accompanying expert declarations concerning the propriety of class certification here. In addition, we address several of the issues identified by the Court during the April 16, 2015 hearing.

### A.    Evidence Supporting Plaintiff's Claims Of Systematic Underfilling Throughout The Entire 5½ Year Class Period

During the April 16 hearing the Court referenced findings by StarKist's expert, Dr. Bruce A.

Strombom, suggesting that StarKist's data showed that prior to the middle of 2011, "almost all of the tested product fell below the press weight standard, and then after it looked like virtually all the product was above the standard." 4/16/15 Hearing Tr. at 5:16-19. This prompted to Court to inquire "whether there is some relevant factual distinction between those two periods," *id.* at 5:19-20, and also to inquire "what is the evidence that that systematic issue that you believe to have been the case spanned the entire five and a half year period," *id.* at 8:4-7.

The Court's question was premised on StarKist's version of disputed facts – that the persistent under-filling was identified and remedied in mid-2011, as shown by StarKist's internal testing. But there is a mountain of evidence undermining StarKist's version of those facts.

<u>First</u>, two key witnesses have admitted that, throughout the entire class period, StarKist shipped product without testing for compliance with the FDA press weight requirement. StarKist's Corporate Quality Assurance Manager and Rule 30(b)(6) representative, Aaron Maxfield, testified that the company's policy was to ship first and test later. Maxfield Dep. at 156:3-22, 1/20/15 Deckant Decl. Ex. B (Doc. No. 95-9). Dr. Strombom then confirmed that even the after-the-fact testing done by StarKist did not comply with FDA regulations, because StarKist did not test 24-can samples as the regulations require. Instead, StarKist tested only smaller samples of 6 or 12 cans, and did so only for internal purposes, not to determine compliance with federal law.

> Q:    So as far as you know, during the entire class period, you've never seen any tests for press weight done by StarKist to test compliance with the FDA standard, have you?
>
> A:    I – I don't know that I have or not. I can't recall one, as I sit here.

*Id.* at 26:6-12; *see also* 4/7/15 Weir Reply Decl. ¶ 44 (Doc. No. 155-8) ("The StarKist data does not appear to contain a single test compliant with the CFR requirement that 24 cans be tested."). This evidence demonstrates that throughout the entire class period, both before and after mid-2011, StarKist shipped product without testing for press weight compliance, and failed, throughout the entire 5½ year class period, to perform a single test in compliance with the FDA regulation.

<u>Second</u>, StarKist's internal documents show that its testing was done on faulty equipment which was overstating the press weight results. This was evidenced by, for example, a July 3, 2012

email Mr. Pearson wrote to plant manager Brett Butler and others:

> Last week I reviewed the operation of the Tuna Standard press machine. **There are a number of issues that would indicate that the machine is under pressing the canned product.**

Ex. 18, 3/26/15 Bursor Decl. Ex. G (Doc. No. 141-6) (emphasis in original). StarKist contends that these were routine maintenance issues that were quickly identified and repaired. But the evidence shows otherwise. For example, as of November 14, 2012, four months after Mr. Pearson's July 3, 2012 email, StarKist's internal documents confirm that the press machine in Samoa still did not have a functioning pump. *See* Pearson Dep. at 238:5-17, 3/26/15 Bursor Decl. Ex. H (Doc. No. 141-6); *see also* Ex. 26, Bursor Decl. Ex. 4 ("[W]e sent it for repairs, but the machine never performed well."). And throughout the class period, StarKist's plant in Guayaquil did not even have a functioning press machine. Exhibit 20, 4/7/15 Deckant Reply Decl. Ex. B (Doc. No. 155-7) (Kelly Roberts email stating: "Ecuador didn't even have an operational press"). Furthermore, StarKist's only evidence concerning repairs and maintenance to the press machine in Samoa was the Pearson Declaration (Doc. No. 111-12), which was directly contradicted on every key point by Mr. Pearson's deposition testimony, which revealed that he was not responsible for the maintenance of the press machine in Samoa, and he knew nothing about its maintenance. *See* Plaintiff's 3/26/15 Motion For Sanctions at 9-16 (Doc No. 141-5). Despite Mr. Pearson's dubious declaration, the weight of the evidence confirms that problems with StarKist's press machine persisted throughout the Class Period, and certainly well after the mid-2011 time frame the Court inquired about.

Third, there were so many problems with StarKist's press weight tests, both before and after 2011, that StarKist's own personnel knew they were "not accurate." *See, e.g.*, Exhibit 20, 4/7/15 Deckant Reply Decl. Ex. B (Doc. No. 155-7) (Kelly Roberts email stating: "as we know that data is not accurate"). One source of error involved StarKist's practice of scraping chunk material from the press machine and adding it back to the press cup before weighing – a practice that violated the federal standard. *See* Exhibit 61, 4/7/15 Deckant Reply Decl. Ex. C (Doc No. 155-7) (Harvey Pearson email stating: "The practice of adding the material off the press back into the cup … will result in the product involved being held for violation of the standard of identity for fill of container."). This was discovered in April 2013, when the manager of StarKist's Samoa plant

reported: "they have always scraped these chunks when calculating the individual press of the can for each lot." *Id.* StarKist's Director of QA, Aaron Maxfield, determined the quantifiable error caused by this practice was "at least 10%." Exhibit 50, at StarKist0010328, 4/7/15 Deckant Reply Decl. Ex. D (Doc. No. 155-7). Dr. Strombom was unaware of this. Strombom Dep. at 70:10-71:2, 4/7/15 Deckant Reply Decl. Ex. A (Doc. No. 155-7). In his reply declaration, Mr. Weir explains that correcting for just this one source of error, at least 98.03% of StarKist's individual press weight tests for Chunk Light In Water ("CJW"), and at least 98.63% of StarKist's individual press weight tests for Chunk Light In Oil ("CJO"), fall below the federal standard of fill. 4/7/15 Weir Reply Decl. ¶ 53 (Doc. No. 155-8). This is substantial evidence that StarKist's press weight results were overstated, both before and after mid-2011. It is important to note, based on the Court's comments at the April 16 hearing, that Mr. Weir did <u>not</u> simply "average[] over the entire [class] period," nor did he limit his analysis to Chunk Light in Water and Chunk Light in Oil. *See* 4/16/2015 CMC Tr. at 5:11-25. Rather, Mr. Weir's analysis demonstrates that every variety of StarKist Tuna has been non-compliant, throughout the entire Class Period.

       <u>Fourth</u>, post-2011 press weight testing by sources outside of StarKist showed persistent noncompliance. Press weight testing by the U.S. National Oceanic and Atmospheric Administration ("NOAA"), between December 21, 2012 and April 9, 2013, showed that each variety of StarKist Tuna was underfilled between 4.50% to 16.61%. *See* 1/20/2015 Deckant Decl. Ex. D (Doc. No. 95-9) (NOAA data); *see also* 1/20/2015 Weir Decl. ¶ 7 (Doc. No. 95-5) (Plaintiff's expert's analysis of the NOAA data). Similarly, press weight results from tests run by StarKist's competitor, Chicken of the Sea, dated August 22, 2012, show that StarKist's 5 oz. chunk light in water, measured on Chicken of the Sea's press machine, had an average press weight across 40 samples of only 2.70 ounces, 9.3% below the 2.89-ounce minimum standard of fill. *See* 1/20/2015 Deckant Decl. Ex. K (Doc. No. 95-9) (Chicken of the Sea); *see also* 1/20/2015 Weir Decl. ¶ 9 (Doc. No. 95-5) (Plaintiff's expert's analysis of the Chicken of the Sea data).

       All of this evidence shows that StarKist's press-weight compliance problems were not solved in mid-2011, as Dr. Strombom suggests. In any event, for purposes of class certification there is no requirement that the evidence be exactly the same for all timeframes within the Class

Period.  What matters is that common classwide evidence will predominate over any individualized evidence.  *See* Fed. R. Civ. P. 23(b)(3).  Nor does class certification require the court to find in Plaintiff's favor on the merits with respect to this issue.  *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, --- U.S. ---, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308 (2013) ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *Stockwell v. City and County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (stating that while some evaluation of the merits frequently "cannot be helped" in evaluating a motion for class certification, that likelihood of overlap with the merits is "no license to engage in free-ranging merits inquiries at the certification stage"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) ("[W]hether class members could actually prevail on the merits of their claims is not a proper inquiry in determining the preliminary question 'whether common questions exist.'").  It is enough for Plaintiff to demonstrate that his claims can be proven with common evidence, both before and after mid-2011.  Plaintiff has more than amply met that burden with the four categories of evidence described above.

### B.  Evidence Supporting Application Of California Law To The Nationwide Class

During the April 16 hearing the Court requested clarification on whether it could apply California law nationwide, or whether the certification of the Class requires application of the law of all 50 states.  4/16/15 Hearing Tr. at 8:17-9:4.

"Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001).  "Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'"  *Id.* at 590 (quoting *Wash. Mut. Bank*, 15 P.3d at 1081).

Plaintiff met his initial burden to show significant contacts with California by presenting evidence that more than 90% of the products at issue – those shipped from StarKist's Samoa plant –

were distributed through StarKist's "forward labeling and specialty packaging" facility in Mira

Loma, California:

> Q: So all – is it the case that all of the shipments from Samoa that
> are destined for the United States – all of the shipments of
> StarKist tuna that are destined for the United States run through
> the DSC warehouse complex in Mira Loma?
>
> A: At least during the time that I was there, all – yes. All of the
> products came into that warehouse, except for the bright
> product, which was shipped to a DSC building, which was on
> that facility.

Pearson Dep. at 19:11-22, 4/7/2015 Deckant Reply Decl. Ex. I (Doc. No. 155-7). Every one of those

products was under-filled and bore a label that failed to include the mandatory under-filling

disclosure required by 21 C.F.R. § 160.190(c)(4).

With the Plaintiff having met his initial burden to show sufficient contacts with California,

the burden shifts to StarKist "to defeat the presumption that California law applies and to show a

compelling reason justifying displacement of California law under the applicable choice-of-law

analysis." *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *2 (C.D. Cal. Apr. 9, 2014), citing

*Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 731, 101 Cal.Rptr. 314 (1972). "Defendants must

make this showing under California's three-step governmental interest test." *Forcellati*, 2014 WL

1410264, at *2, citing *Mazza*, 666 F.3d at 590. StarKist has not met this burden in any prior

briefing. "Accordingly, because Plaintiffs have made a sufficient initial showing for application of

California law, and Defendants have failed to show otherwise, California law applies to Plaintiffs'

proposed nationwide class." *Forcellati*, 2014 WL 1410264, at *4. *See also Chavez v. Blue Sky Nat.

Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (certifying nationwide class under California

law, stating "[w]ith such significant contacts between California and the claims asserted by the class,

application of the California consumer protection laws would not be arbitrary or unfair to

defendants."); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) (certifying

nationwide class under California law, stating "[b]ecause defendant does not meet its burden under

California's governmental interest test with respect to plaintiffs' CLRA and UCL claims and because

plaintiffs otherwise make the showing required by Rule 23, nation-wide certification of these claims

is warranted."); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014) (granting certification of nationwide class, stating "as California has the required minimum contacts to satisfy due process, and Defendants have not met their burden to prove that foreign law should apply, California substantive law applies to this action"); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 546 (C.D. Cal. 2012) (applying California law to certified nationwide class, stating "Defendants' prior briefing provided "no law from any jurisdiction for the Court to consider" and thus Defendants did not meet their "burden of showing that there is an actual conflict between California and other law.").

### C. Evidence Concerning The Ability To Identify Class Members Without Requiring Receipts

During the April 16 hearing the Court noted the concerns addressed by the Third Circuit in *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), and asked "how will the parties be able to … show that people who say they both those four products really did." 4/16/15 Hearing Tr. at 11:11-13. Notably, on the same day as the April 16 hearing the Third Circuit issued an opinion largely abrogating *Carrera*, while reversing a district court's denial of class certification on ascertainability grounds, in *Byrd v. Aaron's Inc.*, --- F.3d ---, 2015 WL 1727613 (3d Cir. Apr. 16, 2015).

*Byrd* explains that "there is no records requirement" for identifying class members. *Id.* at *4. Judge Rendell's concurring opinion explains that "[i]mposing a proof-of-purchase requirement does nothing to ensure the manageability of a class or the 'efficiencies' of the class action mechanism; rather, it obstructs certification by assuming that hypothetical road blocks will exist at the claims administration stage of proceedings." *Id.* at *13 (Rendell, J. concurring). "In small-claims class actions like *Carrera*, the real choice for courts is between compensating a few of the injured, on the one hand, versus compensating none while allowing corporate malfeasance to go unchecked, on the other." *Id.* at *15.

Here, the parties have agreed that Class members may submit claims without receipts or other documentary proof of purchase, by affirming under penalty of perjury on the claim form that they have purchased one or more of the covered StarKist products within the class period. This is a standard practice for cases where class members are unlikely to have retained proof of purchase. *See, e.g.*, *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1203 (C.D. Cal. 2014) (granting

final approval to class settlement in which "Claimants who submit an affidavit or declaration under penalty of perjury stating that they received a[n improper] fax or faxes will be eligible for a cash payment"); *Mason v. Heel, Inc.*, 2014 WL 1664271, at *5 (S.D. Cal. Mar. 13, 2014) (granting final approval to settlement for class of purchasers of homoepathic products, accepting "a Claim Form under penalty of perjury."); *Gallucci v. Boiron,, Inc.*, 2012 WL 5359485, at * (S.D. Cal. Oct. 31, 2012) (same), *aff'd* – Fed. Appx. –, 2015 WL 758306 (9th Cir. Feb. 24, 2015); *In re Toys "R" Us-Del., Inc. – Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 448 (C.D. Cal. 2014) ("Class members who attest, under penalty of perjury that to the best of their knowledge, they made one or more credit/debit purchases at a Toys store during the class period will receive a $5 voucher."). Claims administrators have a number of techniques for screening such claims to ensure they are made on behalf of legitimate class members and to minimize the potential for fraud. *See generally* 1/20/15 Declaration of Steven Weisbrot (Doc. No. 95-6). *See also Forcellati*, 2014 WL 1410264, at *7 & n.3 (discussing process where "claimants will be required to affirm their statements [on a claim form] under penalty of perjury," and stating "[i]n light of Plaintiff's proposed claims administration procedure, we are confident that confirming individuals' class membership does not pose overwhelming manageability hurdles in this case").

Nor will this case likely pose any difficulty for class members to accurately recall whether they purchased one of the four covered products. The overwhelming majority of canned tuna sales in the U.S. are comprised of 5-ounce cans. StarKist's cartoon mascot, Charlie the Tuna, appears on every label of StarKist Tuna. *See* 1/20/2015 Deckant Decl. Ex. A (Doc. No. 95-9) (label exemplar that conspicuously displays Charlie the Tuna). Class members are able to recognize and recall this unique brand identifier, and specifically associate it with StarKist-brand tuna. *See, e.g.*, Hendricks Dep. at 33:24-25, 4/7/2015 Deckant Reply Decl. Ex. K (Doc. No. 155-7) (testifying that Plaintiff Hendricks's purchases of StarKist over other brands were influenced by Charlie the Tuna: "I like Charlie Tuna"). "Through-the-register" sales data from Information Resources, Inc. ("IRI") show that the four covered products represent approximately 90% of StarKist's sales of 5-ounce cans. *See* 1/20/2015 Weir Decl. Exs. 6 & 7 (Doc. No. 95-5). So even if all one can remember is that she purchased a normal size can with Charlie the Tuna on the label, there is a roughly 90% certainty that

such person is a Class member.

　　　Class members' ability to accurately determine if they bought a covered product will be facilitated by the inclusion of product images on each of the forms of class notice.  *See* Bursor Decl. Ex. 5 through 7 (long form, publication form, and postcard form notices, all including images of covered products).  There is also survey evidence that purchasers are able to recall their purchases with sufficient detail to identify themselves as Class members.  One of StarKist's experts, Dr. Dominique M. Hanssens, conducted a survey of Class members for this case.  During his deposition, Dr. Hanssens confirmed that his survey screened respondents to identify purchasers of StarKist 5 oz. tuna, to ensure that he was surveying the relevant population, *i.e.*, Class members:

> Q:　　And how do you do that?
>
> A:　　Well, we asked in one of the questions whether they had purchased StarKist, which was one brand listed among several brands.  So we looked for the presence of StarKist on the list of brands that the subject identified as having purchased.
>
> Q:　　And if the respondent identified StarKist among the brands purchased, you concluded that they were a purchaser of StarKist tuna?
>
> A:　　Correct.

Hanssens Dep. at 8:9-18, 4/10/2015 Bursor Supp. Decl. Ex. A.

> Q:　　And from those responses, you concluded that they had purchased StarKist?
>
> A:　　Correct.
>
> Q:　　You concluded that they had purchased five-ounce cans of tuna from the StarKist brand, right?
>
> A:　　That – correct.  That's a more precise answer, because you were asking about five ounces.
>
> Q:　　And you concluded that they made those purchases since 2009, right?
>
> A:　　Yes.

*Id.* at 13:7-17.

> Q:　　Do you have a reasonable degree of confidence that people

who responded to this question by indicating that they purchased StarKist had actually purchased StarKist tuna since 2009?

A:    Yes.

*Id.* at 14:14-18.  There is little doubt that screening procedures similar to those used by Dr. Hanssens can be used to identify Class members as part of the claims process for this settlement.

In any event, as Chief Judge King explained in *Forcellati*, "the inability to absolutely confirm class members' identities" should pose no obstacle to class certification in a case such as this:

> Defendants present no persuasive arguments as to why an inability to absolutely confirm class members' identities should act as an independent bar to class certification.  While it is undeniable that there is no surefire method to confirm on a class-wide basis whether class members actually purchased one of Defendants' products, this ascertainability problem is of no material relevance to Defendants, as it does not affect their bottom-line in any cognizable way, and there is no reason it should inure to Defendants' benefit.  *See Six (6) Mexican Workers,* 904 F.2d at 1306-07; *Wiener,* 255 F.R.D. at 672 ("[T]he Ninth Circuit has minimized the weight to be placed on the existence of unknown class members.").

*Forcellati*, 2014 WL 1410264, at *8.

### D.    The Lag Time Between Packing Date And Sale Date Does Not Affect The Ascertainability Of The Settlement Class

During the April 16 hearing the Court noted "there could be some lag in terms of tuna actually getting on the shelves from Samoa," which could affect the ability of class members to be identified.  4/16/15 Hearing Tr. at 14:10-12.  This concern was raised in the context of the Plaintiff's proposed class definition, which included purchasers of cans "packed before June 20, 2014."  *See* Plaintiff's 1/20/15 Motion For Class Certification (Doc. No. 95-4).  In the context of settlement negotiations, however, the parties agreed to redefine the "Settlement Class" as persons who purchased a covered product "from February 19, 2009 through October 31, 2014."  Settlement Agreement ¶ 1.23, Bursor Decl. Ex. 1.  This was done specifically to eliminate any administrative difficulties that might arise from the "lag" between the pack date and sale date.

## VI. THE PROPOSED NOTICE PROGRAM PROVIDES ADEQUATE NOTICE AND SHOULD BE APPROVED

Once preliminary approval of a class action settlement is granted, notice must be directed to class members. For class actions certified under Rule 23(b)(3), including settlement classes like this one, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, Rule 23(e)(1) applies to any class settlement and requires the Court to "direct notice in a reasonable manner to all class members who would be bound by a proposal." Fed. R. Civ. P. 23(e)(1).

When a court is presented with a classwide settlement prior to the certification stage, the class certification notice and notice of settlement may be combined in the same notice. *Manual*, § 21.633 at 321-22 ("For economy, the notice under Rule 23(c)(2) and the Rule 23(e) notice are sometimes combined."). This notice allows the settlement class members to decide whether to opt out, participate in the class, or object to the settlement. *Id.*

The requirements for the content of class notices for (b)(3) classes are specified in Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii). Each of the proposed forms of notice, including the Long Form, Short Form and Postcard Form notices, meet all of these requirements, as detailed in the following table:

| Requirement | Long Form | Short Form | Postcard Form |
|---|---|---|---|
| "The nature of the action." Fed. R. Civ. P. 23(c)(2)(B)(i). | First introductory bullet; Q&A nos. 2 and 5. | Col. 1, ¶ 1. | ¶ 1. |
| "The definition of the class certified." Fed. R. Civ. P. 23(c)(2)(B)(ii). | Second introductory bullet; Q&A no. 4. | Col. 1, ¶ 2. | ¶ 2. |
| "The class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(2)(B)(iii). | First introductory bullet; Q&A nos. 2, 6 and 7. | Col. 1, ¶ 1. | ¶ 1. |
| "That a class member may enter an appearance through an attorney if the member so desires." Fed. R. Civ. P. 23(c)(2)(B)(iv). | Q&A no. 16, 17, 19. | Col. 2, ¶ 2. | ¶ 4. |

| Requirement | Long Form | Short Form | Postcard Form |
|---|---|---|---|
| "That the court will exclude from the class any member who requests exclusion." Fed. R. Civ. P. 23(c)(2)(B)(v). | Table of "Your Legal Rights and Options;" Q&A nos. 11, 12 & 15. | Col. 2, ¶ 1. | ¶ 4. |
| "The time and manner for requesting exclusion." Fed. R. Civ. P. 23(c)(2)(B)(vi). | Fourth introductory bullet; Q&A no. 13. | Col. 2, ¶ 1. | ¶ 4. |
| "The binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(vii). | Table of "Your Legal Rights and Options"; Fourth introductory bullet; Q&A nos. 11, 12 and 24. | Col. 1, ¶ 4. | ¶ 4. |

In addition to meeting the specific legal requirements of Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii), the proposed notices are based on the Federal Judicial Center's model forms for notice of pendency of a class action. FJC prepared these models at the request of the Subcommittee on Class Actions of the U.S. judicial branch's Advisory Committee on the Federal Rules of Civil Procedure. *See* www.fjc.gov. The FJC models are designed to illustrate how attorneys and judges might comply with Fed. R. Civ. P. 23(c)(2)(B)'s requirement that class action notices "must concisely and clearly state in plain, easily understood language" specific information about the nature and terms of a class action and how it might affect potential class members' rights. *See* www.fjc.gov. FJC explained its methodology for preparing these models as follows:

> We began this project by studying empirical research and commentary on the plain language drafting of legal documents. We then tested several notices from recently closed class actions by presenting them to nonlawyers, asking them to point out any unclear terms, and testing their comprehension of various subjects. Through this process, we identified areas where reader comprehension was low. We found, for example, that nonlawyers were often confused at the outset by use of the terms "class" and "class action." Combining information from the pilot test with principles gleaned from psycholinguistic research, we drafted preliminary illustrative class action notices and forms. We then asked a lawyer-linguist to evaluate them for readability and redrafted the notices in light of his suggestions.

*Id.*  FJC then tested the redrafted model notices "before focus groups composed of ordinary citizens from diverse backgrounds" and also through surveys "[u]sing objective comprehension measures." *Id.*

Based on FJC's testing, the Plaintiff and Class Counsel believe that each of the proposed class notices, which are very closely based on FJC models, with the format and content adopted almost verbatim in most instances, are accurate, balanced, and comprehensible.

These notices will be disseminated through a media plan developed by Kurtzman Carson Consultants ("KCC"), a firm with experience administering more than 2,000 settlements, which has been chosen by the parties as the Settlement Administrator.  *See* Settlement Agreement ¶ 1.22, Bursor Decl. Ex. 1; Rosenthal Decl. ¶ 9 ("Since 2000, KCC (along with Rosenthal) has administered more than 2,000 matters.  As part of these settlements, KCC has provided notice and administration services for cases with class members that range in numbers from 22 to over 26 million, and has distributed settlement payments totaling well over two billion dollars in the aggregate.").  KCC's proposed notice plan includes individual notice by first class mail and email to more than 40 thousand class members who are identifiable from StarKist's business records, a printed publication in *People* magazine, creation of a dedicated settlement website, a dedicated Facebook page, and an internet banner ad and social media campaign that will reach "approximately 75.3% of likely class members on average 1.2 times each."  Rosenthal Decl. ¶ 24.  KCC advises that this notice plan "provides the same reach and frequency evidence that courts have approved, is recommended by the FJC, and that has withstood appellate scrutiny, other expert critiques, as well as collateral review." Rosenthal Decl. Ex. 1, p. 5.  KCC estimates that its services in providing notice and claims administration will cost $668,449, and KCC's estimate includes a "not-to-exceed amount" of $675,000.  *See* Settlement Agreement ¶ 4.5.

This proposed method of giving notice was developed by KCC, in collaboration with Class Counsel, with the objective of ensuring that as much of the Settlement Fund as possible will be distributed to Class members in the most simple and expedient manner.  *See, e.g.*, William B. Rubenstein, Newberg on Class Actions § 12:35 (5th ed. 2014) ("[A] court's goal in distributing class action damages is to get as much of the money to the class members in as simple a manner as

possible."); *see also id.* § 12:15 ("The goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible."). Class Counsel advised KCC that, with claim amounts at $25 cash or $50 vouchers, it will take approximately 80,000 Voucher Claims to exhaust the Voucher Settlement Fund and 120,000 Cash Claims to exhaust the Cash Settlement Fund, and asked KCC to design the notice and claims process to accomplish this objective. Bursor Decl. ¶ 2; *see also* Rosenthal Decl. ¶ 3 (stating the notice plan was designed to stimulate sufficient "participation of the Class members in order to exhaust the settlement fund"); *id.* ¶ 21 (explaining that the Facebook page, "as well as activity on other social media sites such as Top Class Actions [was designed] to enhance participation of the Class in order to exhaust the settlement fund").

## VII.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court approve the Settlement Agreement, provisionally certify the Settlement Class for the purposes of preliminary approval, approve the proposed notice plan, and enter the [Proposed] Order Preliminarily Approving Class Action Settlement, submitted herewith.

Dated: May 14, 2015

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _/s/ Scott A. Bursor_
        Scott A. Bursor

Scott A. Bursor (State Bar No. 276006)
Neal J. Deckant (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
        ndeckant@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        jluster@bursor.com

*Attorneys for Plaintiff*
*And the Interested Parties*