UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>STARKIST CO.,<br><br>     Defendant. | Case No. 3:13-cv-0729-HSG<br><br>**DECLARATION OF DANIEL ROSENTHAL RE SETTLEMENT NOTICE PLAN** |

1

I, Daniel Rosenthal, declare as follows:

1.      I am a Special Consultant to Kurtzman Carson Consultants ("KCC"), a class action settlement administrator. KCC is located at 75 Rowland Way, Suite 250, Novato, California. I am over 21 years of age and am not a party to this action. I have personal knowledge of all matters set forth herein unless otherwise indicated, and would testify thereto if called as a witness in this matter.

2.      The purpose of this Declaration is to provide the Court with my and KCC's qualifications and experiences regarding the development of Class Action Notice Plans and to provide information regarding the Notice Plan for distributing notices in this case. Our Notice Plan, which details all aspects of the proposed form, method and dissemination of notice, is attached as **Exhibit 1**.

## <u>OVERVIEW</u>

3.      The Notice Program developed by KCC was designed to reach 75% or more of the Class.[1] The Notice Plan utilizes individual notice to all known Class members in combination with print publication, internet activity and social media designed to allow participation of the Class members in order to exhaust the settlement fund.

4.      The reach of the Notice Program is consistent with other effective court-approved notice programs, and is designed to meet due process requirements. The Federal Judicial Center's (FJC) *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (the FJC Checklist) considers 70-95% reach among class members reasonable.

5.      We have worked with the parties to develop various forms of notice for Court approval. All forms of notice are designed to provide a clear, concise, plain language statement of Class members' legal rights and options. Draft forms of the Notice are included as **Exhibit 2**.

## <u>EXPERIENCE RELEVANT TO THIS CASE</u>

---

[1] The reach or net reach of a notice program is defined as the percentage of a class that was exposed to a notice net of any duplication among people who may have been exposed more than once. The average "frequency" of notice exposure is the average number of times that those reached by a notice would be exposed to a notice.

6.      I have more than 28 years of class action notice and administration experience, and more than 40 years of advertising agency experience. Prior to 1986, I held positions in the consumer products marketing field, including management positions with McCann-Erickson, a leading international advertising agency. In 1986, I founded DANART Communications, the first advertising agency to specialize in planning and placement of legal notices in all types of media. In addition, from 1988 to 2000, I served as Managing Director of a leading class action administration company, where I developed the methodology, computer systems and staff to manage the company's consumer class action administrations. In 2000, I founded Rosenthal & Company LLC ("Rosenthal"), a class action administration company. In 2010, KCC acquired Rosenthal & Company and DANART Communications. In 2013, I became Special Consultant to KCC, an advisory role in which I provide expertise in developing class action notice and administration plans.

7.      Some consumer case examples for which I have been involved in developing the notice plan and notice documents include: *Verdejo, v. Vanguard Piping Systems*, No. BC448383 (Sup. Ct. Cal.), a multi-state products liability settlement providing additional warranty coverage and reimbursement of costs and expenses due to leaks and reduced water flow of affected plumbing fittings; *In re Sony Vaio Computer Notebook Trackpad* Litigation, No. 9-cv-02109 (S.D. Cal.), a multi-state class action involving class members who purchased computers containing an allegedly defective trackpad pointing device; *Zeller v. E. & J. Gallo Winery*, No. BC432711 (Sup. Ct. Cal.), a national settlement involving class members who purchased wines that were allegedly mislabeled as pinot noir; *Credit/Debit Card Tying Cases*, J.C.C.P. No. 4335 (Sup. Ct. Cal.), a California state antitrust settlement involving consumers who made purchases with a Visa or Mastercard credit or debit card; *Williams v. Motricity, Inc*., No. 2009CH19089 (Cir. Ct. Ill.) and *Walker v. Openmarket, Inc*., No.08CH40592 (Cir. Ct. Ill.), national settlements involving cellular consumers who were allegedly billed for mobile content they did not purchase.

8.      KCC is a class action administrator that specializes in providing comprehensive class action services including, but not limited to, pre-settlement consulting, email and postal

3

mailing campaign implementation, website design, claims administration, check and voucher disbursements, tax reporting, settlement fund escrow and reporting, class member data management, legal notification, call center support, claims administration and other related services critical to the effective administration of class action settlements. KCC has developed efficient, secure and cost-effective methods to properly handle the voluminous data and mailings associated with the noticing, claims processing and disbursement requirements of settlements to ensure the orderly and fair treatment of class members and all parties in interest.

9.     KCC's business is national in scope. Since 2000, KCC (along with Rosenthal) has administered more than 2,000 matters. As part of these settlements, KCC has provided notice and administration services for cases with class members that range in numbers from 22 to over 26 million, and has distributed settlement payments totaling well over two billion dollars in the aggregate. KCC has administered class action administrations for such defendants as HP-Compaq, LensCrafters, United Parcel Service, Ford, Mitsubishi, Nissan, Whirlpool, ATI Video Cards and Twentieth Century Fox.

10.     Attached as **Exhibit 3** is a partial list of consumer cases for which KCC has prepared and implemented court-approved Notice Plans.

## NOTICE PLAN SUMMARY

### *Class Target*

11.     The "Class" (or "Class members" or "Settlement Class") consists of residents of the United States who, from February 19, 2009 through October 31, 2014, purchased any of the StarKist Products (*i.e.*, 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil). Excluded from the Class are the Released Persons. Class members who exclude themselves, based on the procedures set forth in Section V of the Settlement Agreement, are no longer Class members and are not bound by the Settlement Agreement and are not eligible to make a claim for any benefit under the terms of the Settlement Agreement.

DECLARATION OF DANIEL ROSENTHAL RE SETTLEMENT NOTICE PLAN
CASE NO. 3:13-CV-0729-HSG

12.     To verify the notice program's effectiveness, GfK MediaMark Research & Intelligence, LLC ("MRI")[2] data was studied among adults who use StarKist brand and solid white or chunk light canned tunas ("StarKist Canned Tuna Consumers").

13.     Knowing the characteristics, interests, and habits of a target group aids in the media selection process. Demographic highlights of StarKist Canned Tuna Consumers include the following: 98.6% speak English most often; 87.8% are 25 years of age or older, 73.4% are 35 years of age or older, and 57.5% are 45 years of age or older; 87.4% have graduated from high school and 56.6% have attended college or beyond; 87.4% live in a household consisting of two or more people, 72.2% live in a household consisting of two to four people, and 54.8% live in a household consisting of three or more people; 81.2% live in a Metropolitan CBSA;[3] 79.9% are white; 72.4% own a home; 68.5% have a household income of $40,000 or more, 59.4% have a household income of $50,000 or more, and 51.2% have a household income of $60,000 or more; 68.5% live in County Size A or B;[4] 67.2% own a home valued at less than $500,000; 62.5% have lived at their current address for five or more years; 55.6% are married; and 54.1% are women.

---

[2] GfK MRI is a nationally accredited research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media. Established in 1979, MRI measures the usage of nearly 6,000 product and service brands across 550 categories, along with readership of hundreds of magazines and newspapers, internet usage, television viewership, national and local radio listening, yellow page usage, and out-of-home exposure. Based on a yearly face-to-face interview of 26,000 consumers in their homes, MRI's Survey of the American Consumer™ is the primary source of audience data for the U.S. consumer magazine industry and the most comprehensive and reliable source of multi-media audience data available.

[3] The Office of management and Budget defines metropolitan and micropolitan statistical areas (metro and micro areas) as geographic entities for use by Federal statistical agencies in collecting, tabulating, and publishing Federal statistics. The term "Core Based Statistical Area" (CBSA) is a collective term for both metro and micro areas. A metro area contains a core urban area of 50,000 or more population, and a micro area contains an urban core of at least 10,000 (but less than 50,000) population. Each metro or micro area consists of one or more counties and includes the counties containing the core urban area, as well as any adjacent counties that have a high degree of social and economic integration (as measured by commuting to work) with the urban core.

[4] Nielsen County Size classifications are based on Census household counts and metropolitan proximity. "A" counties are highly urbanized areas and belong to the 21 largest Metropolitan Statistical Areas. The combined counties contain 40% of the United States households. "B" counties are counties not defined as A counties that have more than 85,000 households. The combined counties contain 30% of United States households. "C" counties are counties not defined as A or B counties that have more than 20,000 households or are in Consolidated Metropolitan Areas or Metropolitan Statistical Areas with more than 20,000 households. The combined counties contain 15% of United States households. "D" counties are all counties not classified as A, B or C counties. They are considered very rural. The combined counties contain 15% of United States households.

14.     On average, StarKist Canned Tuna Consumers are: 48 years of age; have a household income of $76,745; and own a home valued at $225,926.[5]

15.     Also important is the fact that, compared to the general adult population, StarKist Canned Tuna Consumers are: 17.9% more likely to live in County Size D and 6.4% more likely to live in County Size B; 16.8% more likely to live in a Micropolitan CBSA; 16.5% more likely to be 55-64 years of age, 7.4% more likely to be 65 years of age or older, and 5.5% more likely to be 45-54 years of age; 15.8% more likely to own a home valued between $100,000-$199,999, 11.8% more likely to own a home valued less than $100,000, and 5.8% more likely to own a home valued between $200,000-$499,999; 15.4% more likely to live in the South Census Region and 9.2% more likely to live in the Midwest Census Region; 10.3% more likely to have lived at their current address for five or more years; 8.2% more likely to own a home; 7.8% more likely to live in a household consisting of three or four people; 5.6% more likely to be white; and 5.5% more likely to be working women.

***Individual Notice***

16.     It is our understanding that 6,090 Email Notices will be sent and 34,510 Postcard Notices will be mailed to known Class members. Prior to mailing, the names and addresses will be updated using the United States Postal Service (USPS) National Change of Address (NCOA) database,[6] certified via the Coding Accuracy Support System (CASS),[7] and verified through Delivery Point Validation (DPV).[8]

17.     Notices returned as undeliverable will be re-mailed to any new address provided by the Postal Service. Any returned mailing that does not contain a new address will be researched

---

[5] The average age for U.S. adults is 47, the average household income is $75,616, and the average home value is $241,338.

[6] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and last known address.

[7] Coding Accurate Support System is a certification system used by the USPS to ensure the quality of ZIP+4 coding systems.

[8] Records that are ZIP+4 coded are then sent through Delivery Point Validation to verify the address and identify Commercial Mail Receiving Agencies. DPV verifies the accuracy of addresses and reports exactly what is wrong with incorrect addresses.

through a third party look-up service. Because the Class size is unknown, the reach of the individual notice effort cannot be determined or factored in to the overall reach of the Notice Program.

### *Consumer Publication*

18.      A one-third page Summary Notice will be placed in *People* magazine, a leading publication among StarKist Canned Tuna Consumers. *People* reaches 18.6% of StarKist Canned Tuna Consumers. Compared to the general adult population, readers of *People* are 2.7% more likely to be StarKist Canned Tuna Consumers. The placement will be tracked to ensure that it appears exactly as planned, as well as meets our high standards in terms of quality and positioning.

### *Internet Banners*

19.      Internet usage is high among StarKist Canned Tuna Consumers—81.6% of StarKist Canned Tuna Consumers have access to the internet at home using a computer and 80.4% have looked at or used the internet in the past 30 days. As a result, to further extend reach among the Class, we recommend purchasing 170 million *unique* impressions over a one-month period. The impressions will be targeted to adults 18 years of age or older (Adults 18+). The banners will include an embedded link to the case website and will appear on Run of Network (RON). Sample RON sites may include:

DECLARATION OF DANIEL ROSENTHAL RE SETTLEMENT NOTICE PLAN
CASE NO. 3:13-CV-0729-HSG

   

*Daily Newspaper*

20.     A Summary Notice will appear once a week for four consecutive weeks in the weekday edition of the *San Francisco Examiner*.

*Social Media*

21.     Additional activity will include the establishment of a case Facebook page that will enable Class members to learn more about the class action settlement through the popular social media site, as well as activity on other social media sites such as Top Class Actions to enhance participation of the Class in order to exhaust the settlement fund.

*Response Mechanisms*

22.     An informational website will be established to allow Class members the ability to obtain additional information and documents about the settlement. The website address will be prominently displayed in all printed notice materials and on the social media pages, and accessible through a hyperlink embedded in the email and internet banner notices.

23.     A toll-free number will be established to allow Class members to learn more about the settlement in the form of frequently asked questions. It will also allow Class members to request to have more information mailed directly to them. The toll-free number will also be prominently displayed in all printed notice materials and on the social media pages.

*Reach and Frequency Delivered by the Notice Plan*

24.     The Notice Plan will reach approximately 75.3% of likely Class members on average 1.2 times each. Coverage will be further enhanced by the individual notice and social media efforts as well as the daily newspapers.

DECLARATION OF DANIEL ROSENTHAL RE SETTLEMENT NOTICE PLAN
CASE NO. 3:13-CV-0729-HSG

1      *Notice Design*

2          25.     The Notices have been designed with the parties to provide a clear, concise, plain

3   language statement of Class members' legal rights and options. To ease response, the toll-free

4   number and website address are provided in all printed notice documents and on the social media

5   pages, and the case website will be accessible through a hyperlink embedded in the email and

6   internet banner notices.

7                                    **CONCLUSION**

8          26.     The Notice Plan will effectively reach the Class with Notices that provide

9   information that allows Class members to understand their rights and options.

10         27.     In my opinion, the Notice Plan is consistent with other effective settlement notice

11  programs. It is the best notice practicable and meets the "desire to actually inform" due process

12  communications standard of *Mullane*. It provides the same reach and frequency evidence that

13  Courts have approved and that has withstood appellate scrutiny. The Notice Plan is also consistent

14  with the 70-95% reach guideline set forth in the FJC's Checklist.

15         28.     At the conclusion of the Notice Plan, KCC will provide a final report verifying its

16  adequacy and effective implementation.

17         I declare under penalty of perjury under the laws of the United States of America that the

18  foregoing is true and correct.

19  Dated:  May 14, 2015

20

21

22

23

24                                              _____

25                                                  Daniel Rosenthal

                                                                          *© 2015 KCC*

26

27

28                                      9
_____

DECLARATION OF DANIEL ROSENTHAL RE SETTLEMENT NOTICE PLAN
CASE NO. 3:13-CV-0729-HSG

**Exhibit 1**



*Hendricks v. StarKist Co.*
**Settlement Notice Program**

## Case Analysis

The following known factors were considered when designing the Notice Plan:
1. Contact information is available for a portion of the Class; however, the majority of Class members are unknown consumers who must be reached through a consumer media campaign.
2. Class members are located throughout the U.S., including large cities and rural areas.
3. Effective reach and notice content is vital to convey the importance of the information affecting Class members' rights, as well as to withstand challenge and collateral review.

## Objective

To design a Notice Plan that will reach at least 75% of Class members and capture their attention with notice communicated in clear, concise, plain language so that their rights and options may be fully understood. The FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* considers 70-95% reach among class members reasonable.

## Target Audience

Class members consist of residents of the United States who, from February 19, 2009 through October 31, 2014, purchased any of the StarKist Products (*i.e.*, 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil). Excluded from the Class are the Released Persons. Class members who exclude themselves, based on the procedures set forth in Section V of the Settlement Agreement, are no longer Class members and are not bound by the Settlement Agreement and are not eligible to make a claim for any benefit under the terms of the Settlement Agreement.

To verify the notice program's effectiveness, GfK MediaMark Research & Intelligence, LLC (MRI)[1] data was studied among adults who use StarKist brand and solid white or chunk light canned tunas ("StarKist Canned Tuna Consumers").

Knowing the characteristics, interests, and habits of a target group aids in the media selection process.

- Demographic highlights of StarKist Canned Tuna Consumers include the following:
  - 98.6% speak English most often;
  - 87.8% are 25 years of age or older, 73.4% are 35 years of age or older, and 57.5% are 45 years of age or older;
  - 87.4% have graduated from high school and 56.6% have attended college or beyond;
  - 87.4% live in a household consisting of two or more people, 72.2% live in a household consisting of two to four people, and 54.8% live in a household consisting of three or more people;
  - 81.2% live in a Metropolitan CBSA;[2]

---

[1] GfK MRI is a nationally accredited research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media. Established in 1979, MRI measures the usage of nearly 6,000 product and service brands across 550 categories, along with readership of hundreds of magazines and newspapers, internet usage, television viewership, national and local radio listening, yellow page usage, and out-of-home exposure. Based on a yearly face-to-face interview of 26,000 consumers in their homes, MRI's Survey of the American Consumer™ is the primary source of audience data for the U.S. consumer magazine industry and the most comprehensive and reliable source of multi-media audience data available.
[2] The Office of management and Budget defines metropolitan and micropolitan statistical areas (metro and micro areas) as geographic entities for use by Federal statistical agencies in collecting, tabulating, and publishing Federal statistics. The term "Core



- o  79.9% are white;
- o  72.4% own a home;
- o  68.5% have a household income of $40,000 or more, 59.4% have a household income of $50,000 or more, and 51.2% have a household income of $60,000 or more;
- o  68.5% live in County Size A or B;[3]
- o  67.2% own a home valued at less than $500,000;
- o  62.5% have lived at their current address for five or more years;
- o  55.6% are married; and
- o  54.1% are women.

- On average, StarKist Canned Tuna Consumers:[4]
  - o  are 48 years of age;
  - o  have a household income of $76,745; and
  - o  own a home valued at $225,926.

- Compared to the general adult population, StarKist Canned Tuna Consumers are:
  - o  17.9% more likely to live in County Size D and 6.4% more likely to live in County Size B;
  - o  16.8% more likely to live in a Micropolitan CBSA;
  - o  16.5% more likely to be 55-64 years of age, 7.4% more likely to be 65 years of age or older, and 5.5% more likely to be 45-54 years of age;
  - o  15.8% more likely to own a home valued between $100,000-$199,999, 11.8% more likely to own a home valued less than $100,000, and 5.8% more likely to own a home valued between $200,000-$499,999;
  - o  15.4% more likely to live in the South Census Region and 9.2% more likely to live in the Midwest Census Region;
  - o  10.3% more likely to have lived at their current address for five or more years;
  - o  8.2% more likely to own a home;
  - o  7.8% more likely to live in a household consisting of three or four people;
  - o  5.6% more likely to be white; and
  - o  5.5% more likely to be working women.

## Notice Strategies

The Notice Plan utilizes individual notice to all known Class members in combination with print publication, internet activity and social media designed to allow participation of the Class members in order to exhaust the settlement fund. In addition, <u>four</u> notice placements will be placed once a week for four consecutive weeks in the *San Francisco Examiner*.

---

Based Statistical Area" (CBSA) is a collective term for both metro and micro areas. A metro area contains a core urban area of 50,000 or more population, and a micro area contains an urban core of at least 10,000 (but less than 50,000) population. Each metro or micro area consists of one or more counties and includes the counties containing the core urban area, as well as any adjacent counties that have a high degree of social and economic integration (as measured by commuting to work) with the urban core.

[3] Nielsen County Size classifications are based on Census household counts and metropolitan proximity. "A" counties are highly urbanized areas and belong to the 21 largest Metropolitan Statistical Areas. The combined counties contain 40% of the United States households. "B" counties are counties not defined as A counties that have more than 85,000 households. The combined counties contain 30% of United States households. "C" counties are counties not defined as A or B counties that have more than 20,000 households or are in Consolidated Metropolitan Areas or Metropolitan Statistical Areas with more than 20,000 households. The combined counties contain 15% of United States households. "D" counties are all counties not classified as A, B or C counties. They are considered very rural. The combined counties contain 15% of United States households.

[4] The average age for U.S. adults is 47, the average household income is $75,616, and the average home value is $241,338.



## Plan Delivery

The Notice Plan will reach approximately 75.3% of likely Class members on average 1.2 times each. Coverage will be further enhanced by the individual notice and social media efforts as well as the daily newspaper insertions.

## Proposed Notice Tactics

Following is a summary of notice tactics to reach likely Class members:

1. **Individual Notice:** It is our understanding that 6,090 Email Notices will be sent and 34,510 Postcard Notices will be mailed to known Class members. Prior to mailing, the names and addresses will be:
   - Checked against the United States Postal Service (USPS) National Change of Address (NCOA) database;[5]
   - Certified via the Coding Accuracy Support System (CASS);[6] and
   - Verified through Delivery Point Validation (DPV).[7]

   Because the Class size is unknown, the reach of the individual notice effort cannot be determined or factored in to the overall reach of the Notice Program.

2. **Consumer Magazine**: A one-third page Summary Notice will appear in *People* magazine, a leading consumer publication among StarKist Canned Tuna Consumers.



   - Reaches 18.6% of StarKist Canned Tuna Consumers
   - Readers are 2.7% more likely to be StarKist Canned Tuna Consumers, as compared to the general adult population
   - Circulation: 3,537,318
   - Adult Audience: 42,726,000
   - Weekly entertainment magazine featuring celebrity news, biographies and gossip
   - Provides a large number of pass along readers

3. **Internet Banners**: 81.6% of StarKist Canned Tuna Consumers have access to the internet at home using a computer and 80.4% have looked at or used the internet in the past 30 days. As a result, to further extend reach among the Class, we recommend purchasing 170 million *unique* impressions over a one-month period. The impressions will be targeted to adults 18 years of age or older (Adults 18+). The banners will include an embedded link to the case website and will appear on Run of Network (RON). Sample RON sites may include:

---

[5] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and last known address.

[6] Coding Accurate Support System is a certification system used by the USPS to ensure the quality of ZIP+4 coding systems.

[7] Records that are ZIP+4 coded are then sent through Delivery Point Validation to verify the address and identify Commercial Mail Receiving Agencies. DPV verifies the accuracy of addresses, and reports exactly what is wrong with incorrect addresses.



   

  

    

    

4.  **Daily Newspaper**: A Summary Notice will appear once a week for <u>four</u> consecutive weeks in the weekday edition of the *San Francisco Examiner*.

5.  **Social Media:** Additional activity will include the establishment of a case Facebook page that will enable Class members to learn more about the class action settlement through the popular social media site as well as activity on other social media sites such as Top Class Actions to enhance participation of the Class in order to exhaust the settlement fund.


## Notice Design

The Notices have been designed with the parties to provide a clear, concise, plain language statement of Class members' legal rights and options. To ease response, the toll-free number and website address are provided in all printed notice documents and the case website will be accessible through a hyperlink embedded in the email and internet banner notices.


## Response Mechanisms

KCC advocates the utilization of a website and toll-free number to allow the Class verifiable opportunities to solicit information and communicate about the settlement.

1.  **Case Website:** An informational website with an easy to remember domain name will be established, allowing Class members the ability to obtain additional information and documents about the settlement. The website address will be prominently displayed in all printed notice materials and on the social media pages, and accessible through a hyperlink embedded in the email and internet banner notices.



2.  **<u>Toll-Free Number:</u>** A toll-free number allows a simple way for Class members to learn more about the settlement in the form of frequently asked questions and answers and to request to have more information mailed directly to them. The toll-free number will be prominently displayed in all printed notice materials and on the social media pages.

## Conclusion

The Notice Program is consistent with other effective settlement notice programs. It provides the best notice practicable and meets due process requirements. It is also consistent with the "desire to actually inform" due process communications standard of *Mullane*. It provides the same reach and frequency evidence that Courts have approved, is recommended by the FJC, and that has withstood appellate scrutiny, other expert critiques, as well as collateral review.

**Exhibit 2**

United States District Court for the Northern District of California

# If You Purchased StarKist Tuna, You May Benefit From A Proposed Class Action Settlement

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- A Proposed Settlement has been reached in a class action lawsuit. The lawsuit claims that StarKist Co. ("StarKist") under-filled its 5 oz. tuna cans in violation of federal law. StarKist denies these claims. The Court did not rule in favor of Plaintiff or StarKist. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

- You are a class member if you are a resident of the United States of America who purchased (a) one or more 5 oz. can of Chunk Light Tuna in Water, (b) one or more 5 oz. can of Chunk Light Tuna in Oil, (c) one or more 5 oz. can of Solid White Tuna in Water, or (d) one or more 5 oz. can of Solid White Tuna in Oil (collectively, the "StarKist Products") from February 19, 2009 through October 31, 2014.

- If you are eligible, you may submit a claim for either (a) a cash payment of $25, or (b) $50 in product vouchers redeemable for StarKist tuna products (the "Settlement Benefits"). You may choose to claim the cash payment or the product vouchers, whichever you prefer. These claim amounts may be subject to pro rata dilution if the total amount of claims exceeds the available settlement funds.

**Please read this Notice carefully and in its entirety.**
**Your rights may be affected by the Settlement of this Lawsuit,**
**and you have a choice to make now about how to act:**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **WHAT IS THIS?** | A Proposed Settlement has been reached in a class action lawsuit. The lawsuit alleges that StarKist under-filled the tuna in its 5 oz. cans in violation of federal law. |
| **SUBMIT A CLAIM POSTMARKED BY [DATE]** | **This is the only way to receive Settlement Benefits.** By submitting a claim, you will give up any rights to sue StarKist separately about the same legal claims in this lawsuit. |
| **EXCLUDE YOURSELF FROM THE CLASS BY [DATE]** | If you opt out of the settlement, you will not be eligible to receive the Settlement Benefits, but you will keep any rights to sue StarKist separately about the same legal claims in this lawsuit. |

| OBJECT OR COMMENT BY [DATE] | You may write to the Court about why you do, or do not, like the Settlement. You must remain in the class to comment in support of or in opposition to the settlement. |
|---|---|
| APPEAR IN THE LAWSUIT OR ATTEND A HEARING ON [DATE] | You may ask to speak in Court about the fairness of the settlement. You may enter your appearance in Court through an attorney if you so desire. |
| DO NOTHING | If you do nothing, you will receive no Settlement Benefits. You also give up your right to sue StarKist on your own regarding any claims that are part of the settlement. |

- Your options – **and the deadlines to exercise them** – are further explained in this notice.
- The Court in charge of this case still has to decide whether to approve the settlement. The Settlement Benefits will be made available if the Court approves the settlement and after any appeals are resolved.

## BASIC INFORMATION

### 1.  Why did I get this notice?

If you purchased one or more of the StarKist Products between February 19, 2009 and October 31, 2014, you have a right to know about a proposed settlement of a class action lawsuit and your options. If you have received this Notice in the mail or by e-mail, you have been identified from available records as a purchaser of the StarKist Products. You also may have received this Notice because you requested more information after reading the Publication Notice.

The Court ordered that you be given this Notice because you have a right to know about a proposed settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the settlement. If the Court approves it, and after objections and appeals are resolved, an administrator appointed by the Court will oversee the Settlement Benefits that the settlement allows. You will be informed of the progress of the settlement.

This notice explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them. The Court in charge of the case is the United States District Court for the Northern District of California, and the case is known as *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG. The person who sued is called the Plaintiff, and the company he sued, StarKist, is called the Defendant.

## 2.     What is this lawsuit about?

This lawsuit claimed that StarKist shorted the amount of tuna in its 5 oz. cans, under-filling them in violation of state and federal law.

StarKist denies that it did anything wrong, and the Court has not made any ruling on the factual allegations in the lawsuit.

## 3.     What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case, Plaintiff Patrick Hendricks) sue on behalf of other people who have similar claims. The people together are a "Class" or "Class Members." The named plaintiffs who sued – and all the Class Members like them – are called the Plaintiffs. The company they sued (in this case, StarKist) is called the Defendant. One court resolves the issues for everyone in the Class – except for those people who choose to exclude themselves from the Class.

## 4.     Am I part of this Class?

If you fit into the following description, you are a Class Member:

All residents of the United States of America who, from February 19, 2009 through October 31, 2014, purchased any of the StarKist Products (i.e. 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil).

You are a class member if you purchased one or more of these products from February 19, 2009 through October 31, 2014:

5 oz. StarKist Chunk Light Tuna in Water



5 oz. StarKist Chunk Light Tuna in Oil



5 oz. StarKist Solid White Tuna in Water



5 oz. StarKist Solid White Tuna in Oil



## THE CLAIMS IN THE LAWSUIT

### 5.  What does the lawsuit complain about?

StarKist manufactures and sells tuna products throughout the United States, including the StarKist Products in this case (*i.e.* 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil). Plaintiff alleges that StarKist shorted the amount of tuna in its 5 oz. cans, under-filling them in violation of state and federal law. You can read Plaintiffs' Complaint <link> at http://www.tunalawsuit.com.

### 6.  How does StarKist answer?

StarKist denies any wrongdoing and denies the Plaintiff's allegations. You can read StarKist's Answer to the Complaint <link> at http://www.tunalawsuit.com.

### 7.  Has the Court decided who is right?

The Court hasn't decided whether the Defendant or the Plaintiff are correct. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

## YOUR LEGAL RIGHTS AND OPTIONS

You have to decide now whether to submit a claim, do nothing at all, or ask to be excluded from the Proposed Settlement. You may also choose to object to the Proposed Settlement.

## 8.   What does the Proposed Settlement provide if I submit a claim?

The settlement provides that StarKist will pay $8 million in cash and $4 million in vouchers redeemable for StarKist tuna products.  You may submit a claim for either (a) a cash payment of $25, or (b) $50 in product vouchers redeemable for StarKist tuna products.  You may choose to claim the cash payment or the product vouchers, whichever you prefer.  These claim amounts may be subject to pro rata dilution if the total amount of claims exceeds the available settlement funds.

You do not need a receipt or other proof of purchase to submit a claim.  You will, however, be required to submit a claim form confirming under penalty of perjury (i) the specific StarKist product(s) you purchased, and (ii) that the purchase or purchases were made within the Settlement Class Period.

## 9.   How do I submit a claim form?

Class Members who wish to receive Settlement Benefits must submit claims.

To submit a claim, you must complete a Claim Form.  You can get a Claim Form on the Internet at http://www.tunalawsuit.com.  Read the instructions carefully, fill out the form, and submit it online on or before [DATE].  Alternatively, you may also submit you Claim Form by mailing it to the following address:  [ADDRESS].  It must be postmarked no later than [DATE].

If you received this Notice in the mail or by email, a Claim Form is enclosed or attached.

## 10.   What if I didn't get a Claim Form in the mail or by email?

If you didn't receive a Claim Form in the mail or by e-mail, you can obtain the Claim Form in one of three ways:

(1)   **By Phone:**  Call toll-free, 1-800-[                    ]

(2)   **By Mail:**  Write to [____] Claims Administrator, P.O. Box, [_____].  Be sure to include your name and mailing address.

(3)   **Online:**  You can download the Claim Form at http://www.tunalawsuit.com.  You can also submit a Claim Form online through the same website.

## 11.   What happens if I do nothing at all?

By doing nothing, you are staying in the Class but will not receive any Settlement Benefits.

Keep in mind that if you do nothing now, you will not be able to separately sue, or continue to sue, StarKist – as part of any other lawsuit – for the same legal claims that are the subject of this lawsuit.  You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.  You must exclude yourself to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against StarKist about the subject matter of this lawsuit ever again.

## 12.   Why would I ask to be excluded?

If you exclude yourself from the Class – which is sometimes called "opting-out" of the Class –

you won't get any Settlement Benefits from the Proposed Settlement. However, you may then be able to separately sue or continue to sue StarKist for the legal claims that are the subject of this lawsuit. If you exclude yourself, you will not be legally bound by the Court's judgments in this Proposed Settlement.

If you bring your own lawsuit against StarKist after you exclude yourself, you will have to hire and pay your own lawyer for that lawsuit, and you will have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against StarKist, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 13.    How do I exclude myself from the Class?

To exclude yourself from the Class, you must send a written request for exclusion *that is received no later than [Month 00, 0000]*, to:

> _____ Claims Administrator
> c/o [ADDRESS]

Your request for exclusion *must* contain: (1) the name of this lawsuit, "*Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG"; (2) your full name and current address; (3) a clear statement of intention to exclude yourself such as "I wish to be excluded from the Class"; and (4) your signature. You may also get an Exclusion Request form <link> at http://www.tunalawsuit.com.

## 14.    How do I tell the Court I don't like the Proposed Settlement?

If you're a Class Member, you can object to the settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views.

To object, you must send a letter that contains all the following:

- Your name and current address, and your lawyer's name and address if you are objecting through counsel;
- The name of the lawsuit, *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG;
- A statement of your objections and the reasons for each objection you make;
- A list of the documents you are giving the Court to support your objections, if any;
- A list of any legal authorities you want the Court to consider;
- The names and addresses of any witnesses you want to call to testify, and a summary of the witnesses' expected testimony;
- If you (or your lawyer) want to appear and speak at the Fairness Hearing, a statement that you wish to appear and speak; *and*
- Your signature (or your lawyer's signature).

Your objection must be signed, mailed, and *postmarked by* [_____, 2015] to the Court at:

> Clerk of the Court
> United States District Court
> Northern District of California
> 450 Golden Gate Ave.
> San Francisco, CA 94102

Copies of your objection *must also* be signed, mailed, and *postmarked by* [_____, 2015] to

the following addresses:

<table>
<tr><td>Counsel for the Class</td><td>Counsel for StarKist</td></tr>
<tr><td>Scott A. Bursor</td><td>Robert Hawk</td></tr>
<tr><td>Bursor & Fisher, P.A.</td><td>Hogan Lovells LLP</td></tr>
<tr><td>888 Seventh Avenue</td><td>4085 Campbell Avenue, Suite 100</td></tr>
<tr><td>New York, NY 10019</td><td>Menlo Park, CA 94025</td></tr>
</table>

If you object through a lawyer, you will have to pay for the lawyer yourself.

## 15.    What's the difference between objecting and excluding?

Objecting is simply telling the Court you don't like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

## 16.    Can I appear or speak in this lawsuit and Proposed Settlement?

As long as you do not exclude yourself, you can (but do not have to) participate and speak for yourself in this lawsuit and Proposed Settlement. This is called making an appearance. You can also have your own lawyer speak for you, but you will have to pay for the lawyer yourself.

## 17.    How can I appear in this lawsuit?

If you want yourself or your own lawyer (instead of Class Counsel) to participate or speak for you in this lawsuit, you must give the Court a paper that is titled a "Notice of Appearance." The Notice of Appearance must contain the title of the lawsuit, a statement that you wish to appear at the Fairness Hearing, and the signature of you or your lawyer.

Your Notice of Appearance can also state that you or your lawyer would like to speak at the Court's Fairness Hearing on the Proposed Settlement. If you submit an objection (see question 14 above) and would like to speak about the objection at the Court's Fairness Hearing, both your Notice of Appearance and your objection should be included in that information.

Your Notice of Appearance must be signed, mailed, and *postmarked by* [_____, 2015] to the Court at:

Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

Copies of your objection *must also* be signed, mailed, and *postmarked by* [_____, 2015] to the same two addresses appearing on page 6 of this Notice, in question 14.

### THE LAWYERS REPRESENTING YOU

## 18.    Do I have a lawyer in this case?

The law firm of Bursor & Fisher, P.A. ("Class Counsel") represents you and the other Class Members. You will not be charged for these lawyers. More information about Bursor & Fisher, P.A., their practice, and the firm's lawyers are available at www.bursor.com.

## 19.   Should I get my own lawyer?

If you choose to remain in the Class, you do not need to hire your own lawyer because Settlement Class Counsel are working on your behalf. But, if you want your own lawyer, you will be responsible for paying that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

## 20.   How will the lawyers be paid?

From the inception of the litigation January 2013 to the present, Class Counsel has not received any payment for their services in prosecuting the case or obtaining settlement, nor have they been reimbursed for any out-of-pocket expenses they have incurred. When they ask the Court to approve the settlement, Class Counsel will also make a motion to the Court for an award of attorney's fees of up to one-third of the total $12 million value of the Settlement Fund. The Court may award less than that. In addition to those attorney's fees, Class Counsel will also seek reimbursement of their out-of-pocket expenses from the Settlement Fund. No matter what the Court decides with regard to the requested attorneys' fees, costs and expenses, Class members will never have to pay anything toward the fees or expenses of Class Counsel. Class Counsel will seek final approval of the settlement on behalf of all Class Members. You may hire your own lawyer to represent you in this case if you wish, but it will be at your own expense.

### THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement. You may attend and you may ask to speak, but you don't have to attend or speak.

## 21.   When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing at [TIME] on [DATE], at the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, Courtroom 15, 18th Floor. At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court will listen to people who have asked to speak at the hearing. The Court will also consider Class Counsel's proposed Plan Of Allocation of the Settlement Fund and Settlement Class Counsel's request for an award of attorneys' fees and reimbursement of costs. After the hearing, the Court will decide whether to approve the proposed Settlement, whether to approved the proposed Plan of Allocation, and whether to grant Class Counsel's request for attorneys' fees and expenses. We do not know how long these decisions will take

## 22.   Do I have to come to the hearing?

No. Class Counsel is working on your behalf and will answer any questions the Court may have, but, you are welcome to attend the hearing at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to

attend, but it's not necessary.

## 23.   May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must follow the steps listed in number 16 and 17 above.  You cannot speak at the hearing if you excluded yourself.

### FINAL SETTLEMENT APPROVAL

## 24.   What is the effect of final settlement approval?

If the Court grants final approval of the settlement, all members of the Class will release and forever discharge any and all claims or causes of action that have been, might have been, are now, or could have been brought relating to the transactions, actions, conduct and events that are the subject of this action or settlement, arising from or related to the underfilling of tuna in the StarKist Products, whether in law or equity, whether seeking damages or any other relief (including attorneys' fees), of any kind or character, known or unknown, that are now recognized by law or that may be created or recognized in the future by statute, regulation, judicial decision, or in any other manner, based upon any federal or state statutory or common law, including, without limitation, claims sounding in tort, contract, and the consumer protection laws of the United States or of any state or other jurisdiction within the United States, as well as under the unfair or deceptive trade practices, trade regulation, consumer fraud, misrepresentation, and false advertising law of the United States or any state or other jurisdiction within the United States, including, but not limited to, any claims relating to the underfilling of tuna in the StarKist Products (the "Released Claims").  Excluded from the Released Claims are any and all claims for personal injury, wrongful death, and/or emotional distress arising from personal injury.

If the settlement is not approved, the case will proceed as if no settlement had been attempted.  There can be no assurance that if the settlement is not approved and litigation resumes, the Class will recover more than is provided for under the settlement, or will recover anything.

### GETTING MORE INFORMATION

## 25.   Are more details available?

This Notice is only intended to provide a summary of the proposed settlement.  You may obtain the complete text of the settlement agreement at http://www.tunalawsuit.com, by writing to the Settlement Administrator (at the address listed above), or from the court file, which is available for your inspection during regular business hours at the Office of the Clerk of the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, under the Civil Action Number 13-CV-00729-HSG.

Visit the website, at http://www.tunalawsuit.com, where you will find the Plaintiff's Complaint <link>, StarKist's Answer <link>, a Claim Form <link>, and an Exclusion Request Form <link>.

You may also contact Class Counsel by email at [EMAIL ADDRESS], or by writing to [_____] Claims Administrator, c/o [ADDRESS].

**PLEASE DO NOT CALL OR WRITE TO THE COURT FOR INFORMATION OR ADVICE.**

DATED: May __, 2015

**BY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**LEGAL NOTICE**

# If You Purchased StarKist Tuna, You May Benefit From A Proposed Class Action Settlement



A lawsuit is pending in the United States District Court, Northern District of California, (the "Action") that may affect your rights.  The Action claims that StarKist Co. ("StarKist") under-filled the tuna in its 5 oz. cans in violation of federal law.  StarKist denies this claim.  The Court has not ruled in favor of Plaintiff or StarKist.  Instead, the parties agreed to a proposed settlement in order to avoid the expense and risks of continuing the lawsuit.  The lawsuit is called *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG.

**AM I A MEMBER OF THE CLASS?**  The class is defined as all residents of the United States of America who, from February 19, 2009 through October 31, 2014, purchased one or more of the StarKist Products (i.e. 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil).

**WHAT DOES THE SETTLEMENT PROVIDE?**  Subject to Court approval, the parties have agreed to a settlement under which StarKist will pay $8 million in cash and $4 million in vouchers redeemable for StarKist tuna products.  You may submit a claim for either (a) a cash payment of $25, or (b) $50 in product vouchers redeemable for StarKist tuna products (the "Settlement Benefits").  You may choose to claim the cash payment or the product vouchers, whichever you prefer.  These claim amounts may be subject to pro rata dilution if the total amount of claims exceeds the available settlement funds.

**WHAT ARE MY RIGHTS?**  You have a choice of whether to stay in the Class Settlement or not, and you must decide this now. To receive any benefits under the Proposed Settlement, you **must** submit a claim form by [DATE].  You can obtain a claim form by (1) calling the Settlement Administrator at 1-800-555-5555, (2) mailing a written request for a Claim Form including your name and mailing address to [_____] Settlement Administrator, P.O. Box [_____], or (3) online at http://www.tunalawsuit.com.  If you stay in the Class, you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, StarKist as part of any other lawsuit involving the same claims that are in this lawsuit.  This is true even if you do nothing by not submitting a claim.  You can also "opt out" or exclude yourself from the settlement.  If you ask to be excluded from the settlement, you cannot get any money or benefits from this lawsuit if the Court approves the settlement, but you will keep any rights to sue StarKist for these claims and will not be bound by any orders or judgments of the Court.  To ask to be excluded, send a letter to the address on the front of this postcard that indicates you want to be excluded.  The letter must actually be received by the addressee on or before [DATE].  Include your name, current address, signature, and a statement that you want to be excluded from the lawsuit *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG .  You may hire your own lawyer to appear in Court for you if you wish; however, if you do, you will be responsible for paying that lawyer on your behalf.

For more information, visit http://www.tunalawsuit.com.

<u>LEGAL NOTICE</u>

# If You Purchased StarKist Tuna, You May Benefit From A Proposed Class Action Settlement



A lawsuit is pending in the United States District Court, Northern District of California, (the "Action") that may affect your rights. The Action claims that StarKist Co. ("StarKist") under-filled its 5 oz. tuna cans in violation of state and federal law. StarKist denies this claim. The Court has not ruled in favor of Plaintiff or StarKist. Instead, the parties agreed to a proposed settlement to avoid the expense and risks of continuing the lawsuit.

**AM I A MEMBER OF THE CLASS?** The class is defined as all residents of the United States of America who, from February 19, 2009 through October 31, 2014, purchased one or more of the StarKist Products (*i.e.* 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil).

**WHAT DOES THE SETTLEMENT PROVIDE?** Subject to Court approval, StarKist will pay $8 million in cash and $4 million in vouchers redeemable for StarKist tuna products. You may submit a claim for your choice of a $25 cash payment **or** $50 in product vouchers redeemable for StarKist tuna products (the "Settlement Benefits"). These claim amounts may be subject to *pro rata* dilution if the total amount of claims exceeds the available settlement funds.

**WHAT ARE MY RIGHTS ?** You have a choice of whether to stay in the Class or not. If you file a claim or do nothing you are choosing to stay in the Class. This means you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, StarKist as part of any other lawsuit involving the same claims that are in this lawsuit.

1. <u>File a Claim</u>. Class Members who wish to receive Settlement Benefits must submit claims by [DATE]. Claim Forms are available at www.tunalawsuit.com. Read the instructions carefully, fill out the form, and submit it online or print and mail it to: [ADDRESS]. Claim Forms must be submitted or postmarked no later than [DATE].

2. <u>Object to the Settlement</u>. If you believe the settlement is unsatisfactory, you may file a written objection with the Clerk of the Court for the Northern District of California and send copies to: (1) Plaintiff's Counsel-Scott A. Bursor, Bursor & Fisher, P.A., 888 Seventh Avenue, New York, NY 10019; and (2) StarKist's Counsel-Robert Hawk, Hogan Lovells LLP, 4085 Campbell Avenue, Suite 100, Menlo Park, CA 94025.

3. <u>"Opt Out" of the Settlement</u>. If you exclude yourself from the Class–also known as "opting-out"–you won't get any Settlement Benefits and you won't be bound by any orders of the Court. To opt-out send a letter that includes your name, current address, signature, and a statement that you want to be excluded from the lawsuit *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG, no later than [DATE] to _____ Claims Administrator, P.O. [___].

**THE FAIRNESS HEARING.** On [_____], 2015, at [_____], the Court will hold a hearing in the U.S.District Court for the Northern District of California to determine whether: (1) the proposed settlement and plan of allocation of the Settlement Benefits are fair, reasonable, and adequate and should receive final approval; (2) Plaintiff's attorneys' fees of one-third of the total $12 million settlement fund, plus reimbursement of out-of-pocket expenses should be granted. You may hire your own lawyer to appear in Court for you; however, if you do, you will be responsible for paying that lawyer.

**WANT MORE INFORMATION?** For a detailed notice or other documents, visit www. tunalawsuit.com. You may also contact Class Counsel by email at info@bursor.com, or by writing to: _____ Claims Administrator c/o [ADDRESS].

By order of the United States District Court for the Northern District.

<u>LEGAL NOTICE</u>

### If You Purchased StarKist Tuna, You May Benefit From A Proposed Class Action Settlement



A lawsuit is pending in the United States District Court, Northern District of California, (the "Action") that may affect your rights. The Action claims that StarKist Co. ("StarKist") under-filled its 5 oz. tuna cans in violation of state and federal law. StarKist denies this claim. The Court has not ruled in favor of Plaintiff or StarKist. Instead, the parties agreed to a proposed settlement to avoid the expense and risks of continuing the lawsuit.

**AM I A MEMBER OF THE CLASS?** The class is defined as all residents of the United States of America who, from February 19, 2009 through October 31, 2014, purchased one or more of the StarKist Products (*i.e.* 5 oz. Chunk Light in Water, 5 oz. Chunk Light in Oil, 5 oz. Solid White in Water, and 5 oz. Solid White in Oil).

**WHAT DOES THE SETTLEMENT PROVIDE?** Subject to Court approval, StarKist will pay $8 million in cash and $4 million in vouchers redeemable for StarKist tuna products. You may submit a claim for your choice of a $25 cash payment **or** $50 in product vouchers redeemable for StarKist tuna products (the "Settlement Benefits"). These claim amounts may be subject to *pro rata* dilution if the total amount of claims exceeds the available settlement funds.

**WHAT ARE MY RIGHTS ?** You have a choice of whether to stay in the Class or not. If you file a claim or do nothing you are choosing to stay in the Class. This means you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, StarKist as part of any other lawsuit involving the same claims that are in this lawsuit.

1. <u>File a Claim</u>. Class Members who wish to receive Settlement Benefits must submit claims by [DATE]. Claim Forms are available at www. tunalawsuit.com. Read the instructions carefully, fill out the form, and submit it online or print and mail it to: [ADDRESS]. Claim Forms must be submitted or postmarked no later than [DATE].

2. <u>Object to the Settlement</u>. If you believe the settlement is unsatisfactory, you may file a written objection with the Clerk of the Court for the Northern District of California and send copies to: (1) Plaintiff's Counsel-Scott A. Bursor, Bursor & Fisher, P.A., 888 Seventh Avenue, New York, NY 10019; and (2) StarKist's Counsel-Robert Hawk, Hogan Lovells LLP, 4085 Campbell Avenue, Suite 100, Menlo Park, CA 94025.

3. <u>"Opt Out" of the Settlement</u>. If you exclude yourself from the Class–also known as "opting-out"–you won't get any Settlement Benefits and you won't be bound by any orders of the Court. To opt-out send a letter that includes your name, current address, signature, and a statement that you want to be excluded from the lawsuit *Hendricks v. StarKist Co.*, Case No. 13-CV-00729-HSG, no later than [DATE] to _____ Claims Administrator, P.O. [___].

**THE FAIRNESS HEARING.** On [_____], 2015, at [_____], the Court will hold a hearing in the U.S.District Court for the Northern District of California to determine whether: (1) the proposed settlement and plan of allocation of the Settlement Benefits are fair, reasonable, and adequate and should receive final approval; (2) Plaintiff's attorneys' fees of one-third of the total $12 million settlement fund, plus reimbursement of out-of-pocket expenses should be granted. You may hire your own lawyer to appear in Court for you; however, if you do, you will be responsible for paying that lawyer.

**WANT MORE INFORMATION?** For a detailed notice or other documents, visit www. tunalawsuit.com. You may also contact Class Counsel by email at info@bursor.com, or by writing to: ____ Claims Administrator c/o [ADDRESS].

By order of the United States District Court for the Northern District.

**Internet Banners**

Leaderboard – 728 x 90



Medium Rectangle – 300 x 250



Wide Skyscraper – 160 x 600



# Exhibit 3

# Consumer Experience

As a premier class action administrator, KCC partners with legal professionals to ensure successful implementation of consumer class action settlements. KCC's capacity, data-security measures and distribution processes can handle settlements of any size and complexity.

Our experienced consumer services team has administered hundreds of cases, including a high-profile product liability case that involved 28 million class members. Our legal notice experts develop defensible media campaigns and notice methods tailored for each case's specific needs. They ensure notice programs are compliant with Federal and State rules and regulations and offer expert testimony on the effectiveness of legal notice programs.

Through cost-saving innovations—including a patented double-postcard check, online claims filing, and QR (quick response) codes—KCC partners with clients to reduce administration costs.

As the only claims administrator to adhere to the auditing standards outlined in AT Section 101, KCC's proprietary technology and data-handling processes set the industry standard for security, cost efficiency and quality. Our class-leading, data-security protocols involve enterprise risk management and data-theft prevention devised to ensure the utmost in data integrity.

KCC's domestic infrastructure, the largest in the industry, includes a 900-seat call center and production facilities capable of handling hundreds of millions of documents annually. Last year, our disbursement services team distributed $500 billion to payees.

We offer competitive pricing for solutions to reach class members including case-specific websites, live operator support hotlines, IVRs, and distributions via checks, vouchers, coupons and electronic transfers.

KCC offers cost advantages, industry expertise and secure data management for Consumer class action settlements. To learn more, please email classaction@kccllc.com or call 866.381.9100.



# Representative Consumer Case Experience

| CASE NAME | DOCKET NUMBER | COURT |
|---|---|---|
| Bayhylle v. Jiffy Lube Int'l. | CJ-2002-352 | Cherokee Cty. Dist. Ct., Okla. |
| Benware v. Hugo Boss, U.S.A. | 12-CV-01527 | S.D. Cal. |
| Berry v. Jackson Nat'l Life Ins. Co. | D0I01CV-2000-2603 | Santa Fe County Dist. Ct., N.M. |
| Bowers v. Windstream Kentucky East, LLC | 09-CV-440 | W.D. Ky. |
| Cassese v. Washington Mut., Inc. | 05-CV-02724 | E.D.N.Y. |
| Chamberlain v. Ford Motor Co. | 03-CV-02628 | N.D. Cal. |
| Clemans v. New Werner Co. | 12-CV-5186 | W.D. Wash. |
| Diaz v. HSBC Bank USA, N.A. | 13-CV-21104-FAM | S.D. Fla. |
| Edell v. Bank of America | C-20010051 | Pima County Super. Ct., Ariz. |
| Enfield v. Old Line Life Ins. | D-202-CV-200101367 | Albuquerque  County Dist. Ct., N.M. |
| Fraser v. Asus Computer International | 12-CV-00652 | N.D. Cal. |
| Grider v. Compaq Computer Corp. | CJ-03-969L | Cleveland County Dist. Ct., Okla. |
| Nack v. Reed Elsevier | 13-CV-1147 | Circuit Ct, 19th Judicial Dist, IL |
| In re Nissan Radiator/Transmission Cooler Litig. | 10-CV-07493 | S.D.N.Y. |
| The NVIDIA GPU Litig. | 08-CV-04312 | N.D. Cal. |
| Raab v. Waddell and The Indiana Bureau of Motor Vehicles | 49D12-1303-PL-008769 | Marion County Superior Court, State of Ind. |
| Robles v. Lucky Brand Dungarees, Inc. | 10-CV-04846 | N.D. Cal. |
| Shames v. The Hertz Corp. | 07-CV-02174 | S.D. Cal. |
| Steinfeld v. Discover Financial Services | 12-CV-01118 | N.D. Cal. |
| Stroud v. eMachines, Inc. | CJ-03-968-L | Cleveland County Dist. Ct., Okla. |
| Wise v. Energy Plus Holdings LLC | 11-CV-7345 | S.D.N.Y. |
| Wolph v. Acer America Corp. | 09-CV-1314 | N.D. Cal. |
| Zeisel v. Diamond Foods, Inc. | 10-CV-01192 | N.D. Cal. |

