Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

```
PATRICK HENDRICKS,              )
individually and on behalf of   )
all others similarly situated,  )
                                )
                                )
              Plaintiffs,        )
                                )
   VS.                          )      NO. C 13-00729 HSG
                                )
STARKIST CO.,                   )
                                )
              Defendant.        )
_____ )
```

San Francisco, California
Thursday, May 28, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          BURSOR & FISHER PA
          888 Seventh Avenue
          New York, New York 10019
    BY:  **SCOTT A. BURSOR, ATTORNEY AT LAW**

          BURSOR & FISHER PA
          1990 North California Blvd. - Suite 940
          Walnut Creek, California  94596
    BY:  **JULIA A. LUSTER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                HOGAN LOVELLS US LLP
                                4085 Campbell Avenue - Suite 100
                                Menlo Park, CA  94025

4                        BY:  **ROBERT B. HAWK, ATTORNEY AT LAW**
                             **STACY R. HOVAN, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Thursday - May 28, 2015**                               **2:18 p.m.**

2                           **P R O C E E D I N G S**

3                              ---oOo---

4        **THE CLERK:**  We're calling C 13-00729, Hendricks versus

5    StarKist Company.

6        Please step forward and state your appearances for the

7    record, please.

8        **MR. BURSOR:**  Good afternoon, Your Honor.  Scott Bursor

9    for the plaintiffs, Mr. Hendricks; and with me is my colleague

10   Julia Luster.

11       **THE COURT:**  Good afternoon, Mr. Bursor.

12       **MR. BURSOR:**  Good afternoon.

13       **MR. HAWK:**  Good afternoon, Your Honor.  Robert Hawk

14   and Stacy Hovan from Hogan Lovells for defendant StarKist.

15       **THE COURT:**  Good afternoon, Mr. Hawk.

16       All right.  So we're here on the motion for preliminary

17   approval of the settlement agreement, and I've read the papers

18   and appreciate the time and effort that obviously have gone

19   into the proposed settlement.

20       I did have a number of areas that I wanted to address with

21   you, and I think it probably makes sense to just tick through

22   those.

23       So in no particular order, the first is that I saw that

24   there is a proposal for an incentive payment of up to $5,000 to

25   a number of individuals who are not named plaintiffs in the

1  lawsuit.  I gather that those are the folks who had moved to

2  intervene in the case.

3      It wasn't clear to me why those folks deserve any payment

4  beyond what any other absent class member would receive -- not

5  a named class member.

6          MR. BURSOR:  Yeah, I agree with that, Your Honor.

7  Based on the current record, there's nothing to explain to you

8  why those folks should get anything; however, the usual course

9  is that class counsel has the burden to come in and show you

10 why those individuals should be paid an incentive payment of a

11 particular amount at the final approval hearing, and we would

12 brief that in advance and hopefully meet that burden.

13     If you want a preview of that now, I'm happy to give it;

14 but by preliminarily approving the settlement, you would not be

15 approving any incentive award to anyone.  You'd simply be

16 giving notice to the class that the plaintiff and class counsel

17 would be making that application.

18         THE COURT:  Right.  It probably is worth a preview.

19         MR. BURSOR:  Sure.

20         THE COURT:  I don't know that I would -- well, I do

21 know that I'd be very unlikely to give final approval to a

22 settlement involving payments to those folks.  I don't see a

23 basis for treating them differently than other nonnamed class

24 members; and if it's a good deal, then it's a good deal for

25 them in the way that it's a good deal for everyone else in the

1    class.

2         So I would be interested to hear what the basis would be,

3    but I've got a pretty strong negative reaction to the concept.

4         **MR. BURSOR:**  Sure.  The preview, Your Honor, is that

5    these folks added value to the case.  Certainly the proposed

6    intervenors added value to the case because they strengthened

7    our position in negotiations with the defendant.

8         We were at risk that if our class cert motion had not been

9    granted, or if it had been granted on a less than nationwide

10   basis, we may have had to go state by state to some different

11   states.  And having those proposed intervenors in the case I

12   think enhanced our negotiating strength vis-a-vis the

13   defendants and added value to the settlement.

14        And we'd like to have the opportunity to make that

15   argument.  Now, obviously approval of thumbs up or thumbs down

16   on the settlement doesn't hinge on whether those incentive

17   payments are awarded or not, but we'd like to have the

18   opportunity to make the application on behalf of those folks.

19   And however Your Honor rules on it is fine; but in terms of

20   approving the deal as a whole, it's not contingent on that at

21   all.

22        **THE COURT:**  All right.  Well, though, it is the case,

23   right, that I can't interlineate the settlement?  I have to

24   take it or leave it.  And I guess what I'm positing is, for

25   your consideration, whether if there's a possibility that that

1  will be a basis for not approving the settlement that's

2  proposed and, frankly, probably invite objections from class

3  members when they get the notice, what does that mean for how

4  we proceed if we get to the end of the line and my inclination

5  doesn't change?

6       **MR. BURSOR:**  I don't think that matters, Your Honor,

7  because Your Honor will be asked separately to approve the

8  settlement, you'll be asked separately to approve incentive

9  awards, and one of those determinations does not hinge on the

10  other.

11      For example, there's no need to change the agreement.  If

12  Your Honor told us today, "I will not approve any of these

13  incentive awards in any amount," that wouldn't have an impact

14  on our agreement because the agreement is not that the

15  incentive awards will be paid.  The agreement is only that the

16  parties agree that the class representative and the proposed

17  intervenors and others will make an application for those

18  payments.  So whatever ruling you make has no effect on

19  approval or disapproval of the settlement.

20      **THE COURT:**  All right.  So it's your position that I

21  don't need to now find that a settlement that would provide for

22  5,000-dollar incentive payments to these intervenors is fair

23  and reasonable?  I mean, I don't have to at this point put my

24  imprimatur on that?

25      **MR. BURSOR:**  Not at all.

1    **THE COURT:** All right. I don't know that you have a

2  dog in this issue, Mr. Hawk, but any comment?

3    **MR. HAWK:** On this particular one, Your Honor, I don't

4  think so. I mean, if you wanted my particular -- particular

5  input, I can give, but I don't -- I don't feel moved to speak

6  on this, Your Honor.

7    **THE COURT:** Don't feel obligated.

8    All right. So, well, that's question one, and I take your

9  point, Mr. Bursor, and we'll take that into account in

10  evaluating the motion.

11    The second issue -- and this is one that the parties do

12  have some back and forth on -- is the question of settlement

13  allocation, and I really can see the legitimacy of both

14  perspectives here.

15    On the one hand, I take seriously plaintiffs' statement

16  that the more complicated the claim process becomes, the less

17  likely folks are to participate and that there's a value to

18  simplicity.

19    On the other hand, while I know that a lump-sum payment

20  isn't per se problematic, it does seem to me here that

21  individual members of the class could have suffered pretty

22  dramatically different damage as a result of the conduct at

23  issue.

24    You know, if you have at the extreme end of the scale a

25  business that's buying cases of tuna a week, that's well in

1    excess of the $25 or the $50 in vouchers, as opposed to someone

2    who bought one can of tuna during the whole class period.

3         And it may be that it's just a difficult -- and maybe it

4    is a difficult balance to strike, but I wonder whether there

5    is -- whether thought's been given to some sort of intermediate

6    course, for example, where at least there is some at least

7    general request of the claimants in terms of a range of tuna

8    that they bought, for example.

9         I probably wouldn't go as far as the defendant's proposal

10   because I think that does get to be administratively pretty

11   cumbersome, but is there a way to build in at least some sort

12   of proportionality here?

13        And it really is about, from the Court's perspective in

14   assessing fairness, ensuring that the rights of class members

15   who suffered more damage are adequately protected and

16   vindicated by the settlement.  So that's a philosophical point,

17   but I ask whether that's something that has been considered

18   here.

19             **MR. BURSOR:**  It has, Your Honor, and I can tell you a

20   great deal of thought went into this and there was a great deal

21   of back and forth between the parties, and this was one of the

22   significant reasons why we had to ask for some extra time to

23   get the deal done.  So I can tell you that a great deal of

24   thought has gone into this.

25        I think -- and I'll address all the points that Your Honor

1   brought up.   Number one, Your Honor said that you can see the

2   legitimacy of both perspectives:   We want to do the simpler,

3   flat amount; and the defendant, there's some legitimacy to

4   their perspective as well.

5       I think that, as a matter of law, is the end of the

6   analysis under the *Rieckborn* case that we cited because the

7   question for Your Honor on preliminary approval isn't whether

8   our proposal is better than StarKist's proposal, or maybe

9   Your Honor could think of a third proposal that might be

10  better.   The legal standard is:   Is there a rational basis for

11  the proposal that we made?   And if Your Honor can see the

12  legitimacy for why we made it, that passes the sort of low test

13  of rational basis.

14      On Your Honor's concern that there might be a business or

15  somebody who bought some extremely large volume of tuna, that

16  they might be prejudiced by the flat amount as opposed to a

17  scaled amount, those people would suffer no prejudice from

18  choosing our plan over the StarKist plan because the flat

19  amount in our plan is the max under their plan.   So no matter

20  how much tuna you bought, you wouldn't get more under their

21  plan than you would get under our plan; and if --

22          **THE COURT:**   But you're saying I could come up with a

23  third way, which is my own plan.

24          **MR. BURSOR:**   You could come up with a third way, but

25  that's not what Your Honor is supposed to do because you're not

1    supposed to interlineate the agreement the parties made.

2        And really under the *Reickborn* case and the *Vinh Nguyen*

3    case that we cited, it's not can Your Honor think of a better

4    way to do it than we thought of; it's is there a rational basis

5    for what we thought of.

6        Now, I can tell you that the amounts of underfill that

7    were alleged and supported by the evidence, as Your Honor

8    knows, these were not large.  We're talking about in many

9    instances hundredths of an ounce of a can of tuna; that's

10   supposed to be a 5-ounce can of tuna, it's supposed to have

11   2.89 or 2.87, if you accept their theory.  It's less than a

12   10 percent underfill on a can that's sold for a dollar.  So to

13   get to a point where you bought so many cans that $25 is unfair

14   to you, that would have to be a very, very large number of

15   cans.

16       And we don't represent any middlemen in the class.

17   There's no middlemen in the class, only end users, so we don't

18   have people in the class that are going to be buying the kind

19   of volume that would make this allocation so unreasonable.

20       I'll tell you what our principal concern was in coming up

21   with a plan of allocation -- and this is something that we laid

22   out in the papers -- we've done quite a few cases like this and

23   sometimes we've done flat amounts, and sometimes we've done it

24   differently; but at our level of individual claims at the 25

25   and 50, which is the top of their scale, we still need to get

1  200,000 claims from class members to exhaust the settlement

2  fund.

3      And our concern was we want to make sure as much of the

4  money in the settlement as possible goes to the class members

5  that we represent and as little as possible is left over as

6  residue, which we're going to have to come back and talk to

7  Your Honor about at some point how to *cy pres* that or what to

8  do with the residue if there is residue.

9      So our objective -- and, frankly, I think it should be the

10  Court's primary objective as well -- is to make sure that the

11  class members on whose behalf we brought the case get as much

12  of the money as possible.  And based on our experience and

13  based on our discussions with the settlement administrator,

14  this was, you know, by far the best way to make that happen.

15      Now, the other concern we had about the graduated formula

16  based on number of cans is we just think it's unfair to ask

17  people to remember how many cans they purchased over a

18  five-and-a-half-year period and report that under penalty of

19  perjury.  We think asking that question itself is going to

20  suppress claims.

21      And we have evidence in the case from StarKist.  They

22  submitted an expert report by a fellow named Dominique

23  Hanssens, Ph.D., who did a survey of class members, and one of

24  the things he asked was:  Can you remember and report how many

25  cans you purchased in 2013, in 2012, in 2011?  And two thirds

1    of the people could not.

2         So they want to put a question on the claim form that they

3    know two thirds of the class can't answer and require them to

4    sign it under penalty of perjury.  We just think that's not a

5    good way to try to stimulate claims and distribute the fund to

6    the people we're supposed to distribute the fund to.

7         And, you know, lastly, Your Honor -- and we made this

8    point in the papers as well -- we don't think it's any of the

9    defendant's business how the money that's paid to the class

10   gets distributed.  That's our business and with your oversight,

11   with Your Honor's oversight.

12        But, you know, the rational-basis test is not a tough test

13   to pass, and what we're proposing is -- certainly has a

14   rational basis and it's brought for a good reason.  We want to

15   try to get the money out to the people that it's supposed to go

16   to.

17             **THE COURT:**  Mr. Hawk?

18             **MR. HAWK:**  Yes, Your Honor.

19        First of all, Mr. Bursor's point about the test here being

20   that you should apply is there just a rational basis for

21   plaintiffs' proposal, and if there is, that's really all that's

22   necessary, I don't think that's correct.

23        I think the standard that Your Honor should be concerned

24   with is the method of allocation, as it is finally decided, is

25   that going to be -- with that method of allocation, will that

1   make the settlement agreement overall fair and reasonable to

2   the class and in the class interest.

3       And I think that's what the Court should focus on and

4   should base its -- because I think there are implications on

5   how you would allocate the value to settlement class members or

6   implications of that for whether the settlement as a whole

7   would meet the fair-and-reasonable test.

8       Mr. Bursor also suggested that Your Honor is not supposed

9   to interlineate the agreement; you really should just pick the

10  proposed agreement by plaintiff or not, I guess.

11          **THE COURT:**  Well, I get it.  I can't say, "Here's what

12  I would write, and now this is your agreement."  I can say, "I

13  won't approve it unless you do X, Y, and Z," and it's your

14  choice as to whether you do it.  I get it.

15          **MR. HAWK:**  Certainly.  And I think one is, in

16  practical effect, the same as the other, which is an absolutely

17  correct point from our point of view, Your Honor.

18      But the only point was, is that it is, under the wording

19  of the agreement, your determination.  We were not able to come

20  to an agreement on this particular facet.  And so we did come

21  to an agreement, and that agreement was that we would ask the

22  Court -- impose on the Court, if you would, to determine what

23  the method of allocation would be, and we both proposed one.

24      The one that we proposed, actually one can imagine, and we

25  did imagine, a less complicated one; that rather than going by

 1   10 -- cans of tuna by 10, you can obviously do it by 5 or by

 2   25, and that would -- that would cut down the -- those long

 3   charts to where you only have -- what? -- 5 -- whatever it

 4   takes -- 10 -- 10 different levels, or you could cut it down to

 5   five or six different levels.  There's -- I don't think there's

 6   any particular magic here.

 7          THE COURT:  Or three just to be very broad.

 8          MR. HAWK:  Or three.

 9          THE COURT:  No, understood.

10          MR. BURSOR:  Can I make one more point on that,

11   Your Honor?  Oh, I'm sorry.

12          MR. HAWK:  I was almost done with just responding to

13   the points.

14          THE COURT:  Sure.

15          MR. HAWK:  So -- and we're -- you know, defendant for

16   its part would be -- would be fine with a less complicated one.

17       We do believe that there should be some graduation in the

18   allocation of value to the putative class members, and we laid

19   that out in our short brief, the reasons that we thought that

20   that was really the reasonable way to do it; that if the

21   only -- plaintiffs, I think, go almost so far as to suggest

22   that exhaustion of the settlement fund is -- you know, ought to

23   be the be-all and end-all goal here, but that's not what the

24   law suggests and logic really doesn't back that up either.

25       If exhausting the settlement fund were the be-all and

1    end-all, you would -- you know, in this case you might set

2    individual awards at $5,000 subject to pro rata distributions

3    just to make sure that you've got enough claims.

4        I think with the number of claimants out there, none of us

5    standing here today know what the claims rate is going to be.

6    I do know that this is -- and plaintiffs have suggested this --

7    this is a very generous settlement in terms of the top end of

8    what -- you know, what a consumer can get, what a customer can

9    get, in making these claims, so I don't think that's the issue.

10       And then, finally, whether or not it's really -- as far as

11   people's ability to recall the number of cans that they've

12   purchased, you know, that is an issue that we were certainly

13   pressing in class certification.  It's an issue that I think we

14   are not pressing now in a settlement context.

15       I think that the ability of somebody to say how many cans

16   they bought is very different than saying, "Well, I think I can

17   sign up.  I bought, you know, 25 from -- between 1 and 25 cans

18   in 2014, and the same in these other ones."  In other words,

19   we're letting them -- if you were to go to sort of by 25s, you

20   would be giving them a lot of leeway, and I think a lot more

21   folks would be likely comfortable with that.

22       And then, finally, just as far as our interest, StarKist's

23   interest, in this whole issue, I think the real paramount

24   practical interest is that if this settlement is overturned on

25   appeal, StarKist will have spent a lot of money sending out

notice and doing other things to support this settlement that

it's never going to get back.  So it's plainly in StarKist's --

we have a dog in the fight that the allocation plan here that's

ultimately adopted be fair and reasonable.

And also, I mean, StarKist does care.  It's its customers,

its long-time customers, who are being affected by this

settlement so it has an interest in that sense.

**THE COURT:**  Right.  No, understood.  I mean, I think

that Mr. Bursor is probably right, that that's the extent of

your interest, is this protecting-the-record issue, but

that's -- I take your point.

Mr. Bursor?

**MR. BURSOR:**  And, Your Honor, if I could say, I've

never seen a class settlement get reversed because the payouts

to the people filing claims were too high, number one.

But, number two, just procedurally, we're asking

Your Honor to preliminarily approve the plan of allocation, and

that's a separate determination from the approval of the

settlement itself.  And there will be an opportunity at the

final approval hearing.  If there's a class member who thinks

that this allocation prejudices them, they can come in and

object.  They can either object to the settlement, or they can

object to the plan of allocation, and you can hear them.  And

if they persuade you that this allocation is no good at the

final approval hearing, you would be able to approve the

1  settlement but direct the parties to -- you know, you could

2  deny approval of plan of allocation and exercise some judicial

3  management at that point to tell the parties you're not going

4  to approve it this way, so go back to the drawing board.

5       But I think the only person that really could have a dog

6  in the fight and be critical of the plan of allocation is a

7  class member who could come in and say, "This allocation is

8  unfair to me because under a different allocation that would be

9  fair, reasonable, and adequate, I would receive more," and I

10 don't think there's a class member like that.

11      Also, Your Honor, if there's a class member out there who,

12 say, bought a million cans, they can opt out.  If they don't

13 like this plan of allocation, they can opt out and litigate the

14 claim on their own.

15      Now, again, I don't think there's anybody out there that's

16 going to do that, or that could do that, or that would have an

17 economic incentive to do that.  That's why I just think this

18 isn't a real -- this is not a real problem.  The payouts that

19 we're proposing are very good payouts given the nature of the

20 claims in this case.

21           **THE COURT:**  All right.  Although it's interesting,

22 another part of that is because there's an expected low rate of

23 claims.  And I understand that's how it generally works, but

24 it's interesting.  I don't know that I've seen that feature

25 factored into a fairness assessment before; in other words,

1    that the amount is good because so few people will likely file

2    claims.

3         MR. BURSOR:  Well, if -- we're doing everything we can

4    to max the claims that get filed, and the problem we have,

5    Your Honor, is that StarKist's records can only identify -- we

6    have the number in the papers -- I think it's between 40- and

7    50,000 class members.  We know there's a lot more class members

8    than that, but we're not going to be able to send an individual

9    notice to more than those 40- to 50,000 people; and so what we

10   did is we tried to design a notice program that was going to be

11   as effective as possible in these circumstances to try to get

12   us to 200,000 claims.

13        And I'll tell you that if we fall short, if we fall short,

14   our proposed plan of allocation says that we can come back to

15   you, to Your Honor, and say, "Look, we fell a little bit short,

16   so we want to go up from the -- if it's, you know -- if we go

17   to $26, we'll exhaust the fund so please, Your Honor, approve

18   that change."  We have the ability to do that.  If we go over,

19   if we get more than the 200,000, it will be an automatic

20   reduction.

21        Now, I can tell you that if we're way short, we're not

22   going to come back and say, "Go way up on the claims and make

23   it a ridiculous amount."  What we would probably do is say,

24   "Let's spend a little more on notice, or figure out an

25   intelligent way to use this money."  But if we're just a little

1  short, we're going to come back and say, "Can we up it a little

2  bit, Judge?"  And I think you'll probably find that

3  appropriate.

4         **THE COURT:**  Okay.

5         **MR. HAWK:**  Your Honor, two short points.

6         **THE COURT:**  Sure.

7         **MR. HAWK:**  One, I just want to be clear that I don't

8  necessarily have the same view of the ability to change the

9  top-line payout that -- you know, later on as Mr. Bursor is

10  suggesting under our settlement agreement.  That's one thing.

11  I just want to put that out there.

12         **THE COURT:**  All right.

13         **MR. HAWK:**  The second thing, though --

14         **THE COURT:**  I mean, I don't know that I have to

15  resolve it now, but I pretty clearly read that to be what it

16  says; right?

17         **MR. HAWK:**  I'm sorry?

18         **THE COURT:**  I read that to be what it says, that there

19  is -- depending on the number of claimants who submit claims,

20  there can be a further true-up.

21         **MR. HAWK:**  Downward reduction, Your Honor, that is

22  clearly what it says; and it doesn't -- and I don't have it in

23  front of me.  I just wanted to put that out there so that -- I

24  don't have it -- I can dig it out.  I don't think that it

25  says -- I certainly don't recall putting language in that says

1  you can adjust the payment upward if you get too few a claims

2  as opposed to --

3          **THE COURT:**  I thought it did.

4          **MR. BURSOR:**  Your Honor, I can clear that up.  The

5  agreement doesn't speak to this.  It says we're going to submit

6  a plan of allocation for your approval, and the plan of

7  allocation we submitted says that if we're oversubscribed,

8  there's the automatic pro rata reduction; and if we're

9  undersubscribed, we can come back to you.  It's not automatic

10 because it might not be a reasonable thing; right?  So we would

11 have to come back to you -- come back to Your Honor and say,

12 "All right.  Here's how far under we were.  Here's how much up

13 we want to go."

14         **THE COURT:**  Okay.  So I think we're on the same page.

15         **MR. HAWK:**  So, yeah.  It was in his proposed

16 allocation but not in our agreement.

17     The other thing is, is that I, just from a practical point

18 of view, I don't think it's practical for the Court now to

19 treat the plan of allocation as some sort of preliminary plan

20 of allocation because, as a practical matter, notice is going

21 to go out to the class.  That notice is going to say what the

22 allocation is, what people -- it's going to have -- make claims

23 forms available.  The claim forms will say, you know, what they

24 need to -- what information they need to put and how much they

25 can get if they got a certain amount of cans, for example.

1    And so if you got to the -- if you send all that out and
2  then you get to the final approval hearing, and there's
3  somebody who's objecting and saying, "Let's go back to square
4  one," perhaps that could be done.
5    It would be, at least in most people's view I think, a
6  very significant waste of money because, again, out of that
7  settlement fund, you'd have to take money that could otherwise
8  be going to the class, you'd have to take it out to notice the
9  class again, which, as the Court may observe, just the notice
10  to the class I think is estimated -- the claims administration
11  has estimated just south of $700,000 in this case.
12    **THE COURT:**  No, I understand.  I would not grant
13  preliminary approval unless I think that all aspects of the
14  proposed settlement are at least preliminarily reasonable; but
15  Mr. Bursor's right, that if there were a firestorm of
16  opposition from class members at the final approval stage,
17  that's obviously something that would be meaningful to me.
18    But I certainly understand that whatever I approve being
19  sent out should be something that I have determined is fair and
20  reasonable and meets the legal standards that apply.
21    All right.  Last question on attorneys' fees, just a
22  couple questions for Mr. Bursor.  So the presumptive default in
23  the Ninth Circuit is 25 percent.  I saw that you asked for 33.
24  You know, again, I know that this is -- that you're not now
25  applying for the payment of fees in that amount, but what

```
 1   justifies departure from the presumptive figure?

 2         MR. BURSOR:  Yeah, we're going to try to make that

 3   case to you when we make our fee application, but I can tell

 4   you that this litigation was very, very challenging.  I think

 5   we did more than the usual amount of work that the

 6   Ninth Circuit anticipates being done for the 25 percent

 7   benchmark.  This is a case where we advanced a significant

 8   amount of money, from testing the product prior to filing right

 9   through to getting this deal done.

10         And, obviously, there were quite a few depositions in this

11   case I think in three or four different states.  There was a

12   lot of travel involved, a lot of work involved.  There was a

13   tremendous amount of risk involved.

14         And we think that when Your Honor looks at the factors

15   that the Ninth Circuit considers in determining, "Are we going

16   to do the baseline 25 or are we going to go up to 30 or 33 and

17   a third," we're going to try to persuade you to go up to 33 and

18   a third, and that's the agreement we made, that we could try

19   that.

20         We don't have a clear-sailing provision.  StarKist can

21   oppose it.  You may not agree with us, and you may say, "I'm

22   sticking at the 25 benchmark"; but, again, this is -- we just

23   want to have the opportunity to make our case and show you

24   that.

25         And I can tell you we're going to submit our time records.
```

We're going to show you the work that was done.  We're going to

submit our expense records.  We're going to show you the

expenses that we incurred.  We're going to talk about the risks

we took.  We're going to tell you about the cases that we

couldn't take because we were doing so much work on this case,

which is a factor that the Ninth Circuit looks at in evaluating

fee applications.

So, again, you are not approving our fee today, but you're

sending notice to the class that we're going to make an

application.  And we're going to make that application; and if

class members think it's overstated, or it's too high, or if

Mr. Hawk thinks it's too high, they can come in and try to

persuade you of that.

You know, most of these class deals you have what's called

a clear-sailing provision between the parties where the

defendant agrees not to oppose it.  We never even asked for

that.  We didn't get it because we don't care.  You know, I

just don't think their view matters sort of the way I don't

think their view matters on plan of allocation, but that's not

something we negotiated for.

The other thing, Your Honor, is that this settlement is

going to require a considerable amount of work from my firm

even after the deal's done should we be so fortunate as to get

final approval in this Court.  There's likely to be some stray

objectors.  They're likely to take appeals.

1    We're going to have to deal with the claims administrator

2  for years because the distribution may be held up by the

3  appeals.

4    Once we figure out what the residue that's left in the

5  fund, we have the obligation to come back to court and try to

6  explain to Your Honor a good way to use whatever residue there

7  is.

8    So I think this is a case where there was a lot of work,

9  there was a lot of risk, there's a lot of work still to be

10  done, and we're going to make that case to you.

11    **THE COURT:**  All right.  And another issue along those

12  lines that may well be on my mind is the calculation of the

13  percentage based on the total of cash plus vouchers.  And then,

14  again, you don't need to justify it today, but it strikes me

15  that one thing I'll be thinking about is whether there should

16  be some dollar-for-dollar reduction in the vouchers in the

17  calculation of the fee.

18    **MR. BURSOR:**  We're going to address that issue,

19  Your Honor.  We're going to make a case to you that the

20  vouchers are -- you know, a dollar voucher is a dollar.

21    This is the first case where we have ever agreed to accept

22  product instead of just all dollars, and I'll tell you why we

23  did it.

24    You know, we've done a lot of cases involving products

25  like, you know, weight loss pills that, you know, don't really

1    work and, you know, fake medicines, and things of that nature.

2    This just is not a case like that because StarKist Tuna -- I'm

3    sure Mr. Hawk will enjoy hearing me say this -- StarKist Tuna

4    is a good product, and our case wasn't about the tuna not being

5    good tuna.  People like StarKist Tuna.  It's the number one

6    tuna in America.  The case wasn't about the product not being

7    good.  The case was about not enough of the product being in

8    the cans under our view of the facts.

9         So that's why we were persuaded to accept product in this

10   case.  Now, we're trying to create incentive to exhaust the

11   vouchers by giving out 50 instead of 25.  So I suppose someone

12   could come and make the argument for a 50-cent-on-the-dollar

13   valuation; but Mr. Hawk persuaded me, based on a deal that

14   Judge McMahon -- it was Judge McMahon approved in a case that

15   Mr. Hawk did where the product was valued at --

16        **MR. HAWK:**  You're speaking about Judge Hamilton,

17   actually.

18        **MR. BURSOR:**  I'm sorry, Phyllis Hamilton.

19        -- where the valuation of the product was, I believe,

20   dollar for dollar.  I don't want to misstate that because it

21   wasn't my case.  But Mr. Hawk persuaded me that that was

22   appropriate, and I'm going to try to persuade you to that

23   effect as well, Your Honor.

24        **THE COURT:**  All right.  And then the last thing was

25   just in terms of logistics.  In the event the Court approves

1  the settlement, I didn't see in the settlement agreement

2  deadlines, essentially, for the completion of notice and

3  submission of the claim forms, and I assume that's something

4  that the parties would meet and confer and come up with a time

5  frame for that?

6        MR. BURSOR:  We -- I believe we submitted a proposed

7  order with blanks for Your Honor to fill in.  It's usually

8  keyed from the date of the final approval hearing.

9        THE COURT:  But in terms of what are you-all thinking

10  in terms of the deadline?  I understand that the date will

11  change, but what are the time frames that you're thinking

12  about?

13        MR. HAWK:  We have -- we've come up, Your Honor, with

14  a list of suggested dates.  We haven't shared that yet with

15  Mr. Bursor.  We could -- whatever you think is -- whatever you

16  prefer in terms of us sharing it with him and then providing it

17  to you, or however you want to do it.

18        THE COURT:  Yeah, I think that makes sense for you two

19  to meet and confer and then come up with essentially this event

20  plus X days --

21        MR. BURSOR:  Sure.

22        THE COURT:  -- in terms of -- so obviously it will be

23  triggered by the date of the approval order, but I would have

24  your thoughts as to essentially what the time line would look

25  like.

1    So do you think that makes sense?  I don't know how

2  quickly you can do that.

3          **MR. BURSOR:**  We can do that quickly, Your Honor.  I

4  think the key thing is allowing class members sufficient time

5  between the issuance of the notice and the objection slash

6  opt-out date.

7    And then we're going to want to have a deadline to require

8  my firm to file our fee application in advance of the objection

9  opt-out date so if a class member has an objection to our fee,

10  they have access to that application.  And then just enough

11  time after the objection opt-out date for a response from the

12  parties, and then final approval hearing.

13    And if we get an indication from the Court that

14  preliminary approval is going to be entered in the form of one

15  or the other proposed order and you asked us to submit dates, I

16  think we would be able to work out a schedule within a day or

17  two --

18          **THE COURT:**  All right.

19          **MR. BURSOR:**  -- and submit it to Your Honor.  I think

20  the big wildcard is just the Court communicating to us when it

21  thinks it will be available for a final approval hearing.

22          **THE COURT:**  All right.  That's fair.

23          **MR. HAWK:**  Maybe Wednesday, middle of next week, to

24  get something to Your Honor.

25          **THE COURT:**  That sounds fine.

1          MR. HAWK:  All right.

2          THE COURT:  All right.  Anything else we should

3 discuss?

4          MR. BURSOR:  I don't think so, Your Honor.

5          MR. HAWK:  Not that I know of, Your Honor.

6          THE COURT:  All right.  Well, thank you.  I'll take it

7 under submission, and I'll move forward on it as quickly as I

8 can.

9          MR. HAWK:  Thank you very much.

10          MR. BURSOR:  Thank you.

11          THE COURT:  Thank you.

12              (Proceedings adjourned at 2:55 p.m.)

13                      ---oOo---

14

15                  **CERTIFICATE OF REPORTER**

16      I certify that the foregoing is a correct transcript

17 from the record of proceedings in the above-entitled matter.

18

19 DATE:  Friday, May 29, 2015

20

21

22

23 _____

24      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

25