Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122853)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA  94104
Telephone:      (415) 546-6800
Facsimile:      (415) 546-6801
Email:          kkralowec@kraloweclaw.com
                krogers@kraloweclaw.com
                csaunders@kraloweclaw.com

*Attorneys for Objectors Colin Moore
and Kathy Durand Gore*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>STARKIST CO.,<br><br>          Defendant. | Case No. 3:13-CV-0729-HSG<br><br>**DECLARATION OF KIMBERLY A. KRALOWEC IN SUPPORT OF OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND NOTICE OF APPEARANCE**<br><br>Hearing Date:  Dec. 17, 2015<br>Time: 2:00 pm<br>Judge:  Hon. Haywood S. Gilliam, Jr.<br>Courtroom 15, 18th Floor |

DECLARATION OF KIMBERLY A. KRALOWEC, CASE NO. 3-13-CV-0729-HSG

I, Kimberly A. Kralowec, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and before this Court.  I am the principal of The Kralowec Law Group, counsel of record for the plaintiffs in *Davis-Mathews v. Bumble Bee Foods, LLC, Tri-Union Seafoods LLC, and StarKist Company*, Case No. 15-cv-01878-JLS-MDD (S. D. Cal.), *Moore v. Bumble Bee Foods, LLC, Tri-Union Seafoods LLC, and StarKist Company*, Case No. 15-cv-01911-JLS-MDD (S.D. Cal.),  and *Gore v. Bumble Bee Foods, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc.*, Case No. 15-cv-2121-JLS-MDD (S.D. Cal.).  I make this declaration in support of the objections of my clients, Colin Moore and Kathy Durand Gore, as well as the objections of the other class members, to final approval of the class action settlement in the above-referenced  *Hendricks* action.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

**The Packaged Seafood Products Antitrust Litigation**

2.      This objection asserts that the overbroad release in the Stipulation of Settlement in *Hendricks* (Dkt. No. 183-1) may impact a series of antitrust cases filed in the wake of a public announcement, on July 23, 2015, that the U.S. Department of Justice had commenced a civil grand jury investigation into price-fixing of canned tuna and other Packaged Seafood Products,[1] and that civil investigative subpoenas had been issued to Tri-Union Seafoods, Inc., dba Chicken of the Sea, Bumble Bee Foods, LLC, and (on information and belief), Starkist.  *See* Complaint filed Aug. 28, 2015, *Moore v. Bumble Bee Foods, LLC, et al.*, *supra*, ¶19 (hereafter "*Moore* Complaint") (true and correct copy attached hereto as **Exhibit A**); Complaint filed Sept. 22, 2015, *Gore v. Bumble Bee Foods, LLC, et al.*, *supra*, ¶21 (hereafter "Gore Complaint") (true and correct copy attached hereto as **Exhibit B**).   The date on which these facts first surfaced—July 23, 2015—is the same day that this Court granted preliminary approval of the *Hendricks* Stipulation of Settlement.  *See Hendricks* Dkt. No. 194.  It is well after the Stipulation of Settlement was signed by the parties and presented to this Court for Approval.  *See Hendricks* Dkt. No. 183-1.

---

[1]      "Packaged Seafood Products" includes shelf-stable seafood products that are sold in cans, pouches, or ready-to-eat serving packages.  *See* Moore Compl., ¶1.  It includes the "StarKist Products" defined in paragraph 1.30 of the Stipulation of Settlement in *Hendricks*.

3.     On August 3, 2015, the first putative class action was filed on behalf of direct purchasers of Packaged Seafood Products. *See Olean v. Bumble Bee Foods, LLC, et al.*, Case No. 15-cv-01714-JLS-MDD (S.D. Cal.).  On August 24, 28 and September 22, 2015, my office commenced putative class actions on behalf of end-payor consumers of Packaged Seafood Products (see case cites above).   My firm's *Davis-Mathews* case was the first such case to be filed in any District.  Numerous other actions have been filed on behalf of other end-payor consumers, both in the Southern District of California, where Tri-Union and Bumble Bee are headquartered, as well as in the Northern District of California.  Additional actions have also been commenced on behalf of other direct purchaser plaintiffs, as well as numerous actions on behalf of commercial food preparer plaintiffs.  A non-inclusive list of the pending end-payor class actions filed to date is attached hereto as **Exhibit C**.

4.     On August 28, 2015, the plaintiff in *Olean* filed a motion before the Judicial Panel on Multidistrict Litigation for an order centralizing the actions in the Southern District of California.  Numerous interested party responses have been filed, along with competing motions for transfer to other Districts, including this District.  On December 3, 2015, the Panel will hear oral argument in New Orleans, and is expected to rule shortly thereafter. *See In re Packaged Seafood Products Antitrust Litig.*, MDL No. 2670 (Dkt. Nos. 4, 93).

5.     On October 13, 2015, it was publicly reported that Tri-Union and/or its parent company, Thai Union Frozen Products, is a leniency applicant under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (15 U.S.C. §1, note) ("ACPERA").  Allegations to this effect have been added to an amended complaint filed in *Olean* as well as in an amended complaint in my firm's first-filed end-payor case, *Davis-Mathews*, on October 15, 2015.  *See* First Amended Complaint filed Oct. 15, 2015, *Davis-Mathews v. Bumble Bee Foods, LLC, et al.*, *supra* (true and correct copy attached hereto as **Exhibit D**).

**Attempts to Negotiate an Antitrust Conspiracy Carve-Out From the *Hendricks* Release**

6.     I first became aware of the *Hendricks* settlement in late August 2015, when it was brought to my attention by one of my clients.  I immediately downloaded and reviewed available documents from the *Hendricks* docket, including the Stipulation of Settlement, the Class Notice,

and this Court's Order Granting Preliminary Approval.

7.     The *Hendricks* Stipulation of Settlement, if finally approved, would release certain claims of all persons who bought 5-oz. cans of StarKist tuna (four indicated types) from February 18, 2009 through October 31, 2014.  *See Hendricks* Dkt. No. 183-1, ¶1.23 (defining "Settlement Class").   There is a significant, five-year overlap between the *Hendricks* class period and the class periods alleged in the *Packaged Seafood Products Antitrust Litigation*, which is approximately January 1, 2005 through the present.  *See*, *e.g.*, *Moore*  Compl., ¶38.  Accordingly, if the *Hendricks* release is construed to encompass the claims alleged in the *Packaged Seafood Products Antitrust Litigation*, a significant portion of StarKist's liability in those actions for purchases from 2009 to 2014 may be eliminated.

8.     The *Hendricks* Stipulation of Settlement purports to release: "**all claims … relating in any way to** the claims asserted or the factual allegations made in the Action, including without limitation the underfilling of the StarKist Products and/or **the purchase of any of the StarKist Products** [*i.e.*, the specified 5-oz. cans of tuna] at any time on or after February 19, 2009 and prior to November 1, 2014."  *Hendricks* Dkt. 183-1, ¶6.1 (emphasis added). Because the *Hendricks* complaint does not allege concerted action, and contains no antitrust allegations of any kind, a Court might construe this language as not encompassing the claims in the *Packaged Seafood Products Antitrust Litigation*.  Given the broadness of the language on its face, however, we are unwilling to take that risk and therefore file this objection.

9.     Nothing in the *Hendricks* record indicates that the value of the antitrust conspiracy claims alleged in the *Packaged Seafood Products Antitrust Litigation* was considered in negotiating either: (a) the amount of the settlement consideration, or (b) the scope of the release language.  Indeed, the conspiracy allegations did not come to light until July 23, 2015, which is two months *after* the *Hendricks* settlement agreement was signed on or about May 13, 2015.  The *Hendricks* complaint does not allege an antitrust conspiracy, or any concerted action of any kind between StarKist and its competitors; the allegations are confined to StarKist's unilateral action. Although StarKist has refused to produce any of the discovery record in *Hendricks* (see below), it seems clear that the parties could not have, and did not, discuss the value of any antitrust

1   conspiracy claims in negotiating the *Hendricks* settlement, and that the settlement in fact provides

2   no value for a purported release of such claims.

3          10.     In an attempt to resolve this matter informally, I have had extensive "meet and

4   confer" discussions with counsel for StarKist as well as counsel for the plaintiffs in *Hendricks*.  I

5   first contacted plaintiffs' counsel in *Hendricks* to discuss the release issue on August 31, 2015.

6   On September 4, 2015, I received an email from StarKist's counsel in the antitrust cases, Belinda

7   Lee of Latham & Watkins, requesting a time to discuss the release issue.  On September 10, 2015,

8   attorney Kathleen S. Rogers of my office spoke with Ms. Lee concerning the issue.  I have also

9   had several discussions with attorneys from Hausfeld LLP, Interim Lead Counsel for the direct

10  purchasers, about this issue, including discussions on September 15 and 16, 2015.  On September

11  25, 2015, I participated in a conference call with a Hausfeld attorney and Ms. Lee to discuss the

12  issue, and additional telephone discussions took place between us on October 2, 2015, October

13  19, 2015, and November 16, 2015.  I have coordinated my efforts in this regard with plaintiffs'

14  counsel in other end-payor actions, including those who have joined in these objections, as well

15  as plaintiffs' counsel in the first-filed commercial food preparer action, who have similarly joined

16  in these objections.

17         11.     During my conversations with Ms. Lee, we attempted to negotiate a modification

18  of the release language to carve out the antitrust conspiracy claims alleged in the *Packaged*

19  *Seafood* cases, so as to avoid any doubt concerning whether the *Hendricks* release impacted those

20  claims.  We also requested production of the discovery record, and copies of unredacted

21  pleadings, in *Hendricks*, in order to (among other stated reasons) confirm whether the parties to

22  *Hendricks* litigated the question of concerted action or antitrust violations, and whether evidence

23  of the value of the antitrust claims was considered in negotiating the settlement consideration.  At

24  Ms. Lee's request, we evaluated the *Hendricks* protective order and informed her that we would

25  agree to be bound by it if her client would produce the discovery record and pleadings.

26  Nevertheless, Ms. Lee refused to produce any documents that would assist us in evaluating the

27  adequacy of the settlement.

28

12. On October 27, 2015, Ms. Lee sent me a letter in which she proposed a partial modification of the release language. A true and correct copy of that letter is attached hereto as **Exhibit E**. Ms. Lee indicated that her client would agree to modify the release language by removing the language purporting to release claims related to "the purchase of any of the StarKist Products," but that her client wanted to add *new, additional* language to the already lengthy and over broad release paragraph—language that would expressly release any and all federal and state antitrust claims based on under-filling. *See* Ex. E at 2-3. These are conspiracy claims and theories that were never alleged in *Hendricks*, and that could not have been negotiated or paid for in that settlement. Ms. Lee's proposal is thus an expansion, rather than a narrowing, of the overbroad release language.

13. On November 6, 2015, I sent a letter to Ms. Lee suggesting a modification to the release language that would be acceptable to us. As Ms. Lee originally proposed, the language about "the purchase of any of the StarKist products" would be removed, and in addition, the release would be modified to state that the antitrust and consumer claims alleged in the *Packaged Seafood Products Litigation* would not be released. This was a straightforward proposal that would have avoided all doubt that claims not litigated in *Hendricks*, and for which no consideration was provided, were not released. We advised Ms. Lee that if her client would agree to this modification, it would be unnecessary for our clients to object to the settlement. A true and correct copy of my letter dated November 6, 2015 is attached hereto as **Exhibit F**.

14. On November 13, 2015, Ms. Lee sent me a letter in which she rejected our proposed modification to the release language. A true and correct copy of this letter is attached hereto as **Exhibit G**. Ms. Lee's counter-proposal continued to remove the language about "the purchase of any of the StarKist products," but she persisted in proposing new, added language that would expand, not narrow, the scope of the release. This time, the added language would release not only all federal and state antitrust claims based on under-filling, but also all of the related consumer protection claims alleged in the *Packaged Seafood* complaints. *See* Ex. G. at 3. Once again, this was an expansion, not a narrowing, of the *Hendricks* release.

15.     On November 16, 2015, I sent Ms. Lee an email with another counter-proposal.  In an attempt to facilitate an amicable resolution, we used Ms. Lee's proposed framework as the structure for our proposal.  Our proposed modification, this time, made clear that claims based on a *conspiracy*, as opposed to claims based on *unilateral* conduct by StarKist, would not be released.  In addition, in response to a concern stated by Ms. Lee in her last letter, our proposal made clear that claims based on unilateral conduct that "seek redress for not receiving the correct quantity of tuna" in the cans would be included within the scope of the release.   A true and correct copy of my email to Ms. Lee, with our modification language, is attached hereto as **Exhibit H**.

16.     During a telephone conference on November 16, 2015, I asked Ms. Lee why her client was unwilling to exclude conspiracy claims from the scope of the *Hendricks* release, if her client's position was that no conspiracy was ever formed and that her client's conduct was unilateral.  She was unable to answer that question.

17.     On November 19, 2015, in response to my follow-up email, Ms. Lee indicated that our proposal was unacceptable to her client.  A true and correct copy of Ms. Lee's email is attached hereto as **Exhibit I**.  Accordingly, notwithstanding the extensive efforts described above, the release issue remains unresolved as of the date of this declaration, necessitating my clients' objections to the settlement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on November 20, 2015 at San Francisco, California.


                                  */s/ Kimberly A. Kralowec*
                                  Kimberly A. Kralowec

# EXHIBIT A

KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
CHAD A. SAUNDERS (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA 94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email:    kkralowec@kraloweclaw.com
          krogers@kraloweclaw.com
          csaunders@kraloweclaw.com

*Counsel for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLIN MOORE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, and STARKIST COMPANY,<br><br>Defendants. | Case No. **'15CV1911 DMS NLS**<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Colin Moore, by and through his undersigned attorneys, on behalf of himself and all others similarly situated, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy by the three largest producers of packaged seafood products ("PSPs") in the United States, its territories and the District of Columbia—Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and

StarKist Company (collectively, "Defendants")—which began no later than July 24, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.    Plaintiff, on behalf of himself and all indirect purchasers, brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants. Plaintiff, on behalf of himself and all indirect purchasers, also brings this action pursuant to the antitrust laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480 et seq.) and the consumer protection laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480-2 et seq.) to recover damages, restitution, disgorgement, attorneys' fees, costs of suit, and all other available relief.

3.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367.  The state-law claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

4.    This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over any class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant" and "in which the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §1332(d)(2)(A).

5.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

7.     Plaintiff Colin Moore is a current resident of the State of Hawaii. During the Class Period, Plaintiff indirectly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## DEFENDANTS

8.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9655 Granite Ridge Drive, Suite 100, San Diego CA 92123.  Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital LLP ("Lion"), based in the United Kingdom.

9.     Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea

CLASS ACTION COMPLAINT

-3-

International, is a domestic corporation with its principal place of business located at 9330 Scranton Road, San Diego CA 92121. Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS". CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

10. Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

## UNNAMED CO-CONSPIRATORS

11. On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

12. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

13. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

14. Throughout the Class Period, Defendants transported substantial

---

CLASS ACTION COMPLAINT

-4-

amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

15.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

16.     PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.  In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

17.     Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

18.     This oligopolistic structure within the industry is the result of recent

mergers and acquisitions. For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

19.     On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea

brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

20. The article goes on to state:

An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.

It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

****

The source said others in the industry are now anticipating that they too will be subpoenaed….

21. Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

22. The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district

where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

23.    There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

24.    Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



27.     Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



28.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined

significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

29.     TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand.
> (Emphases added).

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon *"[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added). The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

30.     There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna

1 Council. As explained on that organization's website:

> 2 The National Fisheries Institute's Tuna Council represents the largest processors and household names
> 3 for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna
> 4 Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition
> 5 education and product marketing.

6     31.     An example of such joint conduct is provided by the "Tuna the

7 Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by

8 the Defendants and carried out under the auspices of the Tuna Council with the

9 support of Thai processors. In it, the Defendants teamed up for marketing purposes.

10 Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that

11 "[w]e worked together surprisingly well." He said further that the campaign,

12 intended to increase consumption of tuna, was based on the hope that "as the water

13 level rises…all boats rise with the tide," referring to the three Defendant

14 companies. The same philosophy appears to undergird the alleged price-fixing

15 conspiracy.

16     32.     Another opportunity to collude was provided through bilateral

17 copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for

18 CoS at the former's plant located in Santa Fe Springs, California with respect to

19 West Coast sales. CoS does the same for Bumble Bee at the former's plant in

20 Georgia with respect to East Coast sales. Thus, even before the proposed merger,

21 these two companies were cooperating closely. These interlocking relationships

22 provided an excellent opportunity to collude on pricing.

### FRAUDULENT CONCEALMENT AND TOLLING

23     33.     Plaintiff and members of the Classes did not discover and could not

24 discover through the exercise of reasonable diligence the existence of the

25 combination and conspiracy alleged herein until shortly before this litigation

26 commenced.

CLASS ACTION COMPLAINT                -11-

34.     As indirect purchasers of PSPs manufactured by defendants, Plaintiffs and the members of the Classes had no direct contact or interaction with Defendants, and therefore no means from which they could have discovered the combination and conspiracy alleged in this Complaint until shortly before the lawsuit was filed.

35.     It was not until approximately July 23, 2015 that information first became publicly available that Defendants engaged in the combination and conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand jury subpoenas described above were first publicly disclosed, and when TUF announced that it was suspending its preferential public offering because of the pending investigation.  Prior to that date, Plaintiffs and members of the Classes had no reason to suspect that any combination or conspiracy had been formed.

36.     By their very nature, price-fixing conspiracies tend to be inherently self-concealing.  Plaintiff is informed and believes that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy.  Accordingly, a reasonable person under the circumstances would not have been alerted to any irregularity with regard to PSP prices before late July 2015 at the earliest, and Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

37.     As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action on his own behalf and as a class action

pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

39.     Plaintiff also brings this action on his own behalf and as a class action

pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following Class (the "Hawaii Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within Hawaii from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

40.     Plaintiff does not know the exact number of members of the Class

because such information is in the exclusive control of Defendants. Due to the

nature of the trade and commerce involved, however, Plaintiff believes that Class

members number at least in the thousands and are sufficiently numerous and

geographically dispersed throughout the United States, its territories and the

District of Columbia so that joinder of all Class members is impracticable.

41.     There are questions of law and fact which are common to the claims of

Plaintiff and the Class, including, but not limited to:

   a.     Whether Defendants engaged in a combination or conspiracy

with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for

PSPs;

   b.     Whether the purpose and/or effect of the acts and omissions

CLASS ACTION COMPLAINT                    -13-

alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

          c.      The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

          d.      Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

          e.      Whether Defendants violated the antitrust laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480 et seq.);

          f.      Whether Defendants violated the consumer protection laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480-2 et seq.);

          g.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

          h.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

          i.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the Hawaii antitrust laws, or the Hawaii consumer protection laws.

42.     Plaintiff's claims are typical of the claims of the members of the Class.

43.     Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

44.     Plaintiff is represented by counsel competent and experienced in the

CLASS ACTION COMPLAINT
-14-

prosecution of antitrust and class action litigation.

45.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

46.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.   The Class is readily definable and one for which records should exist in the files of Defendants.

c.   Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.   Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

47.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(On Behalf of Plaintiff and the Nationwide Class)**

48.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

49.   Defendants and their co-conspirators engaged in a continuing contract,

combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

50.     Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

51.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

52.     The illegal contract, combination, or conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.     Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.     Competition in the sale of PSPs has been restrained, suppressed or eliminated.

53.     During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

CLASS ACTION COMPLAINT
-16-

54. Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

55. Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of Hawaii Antitrust Laws
### (Hawaii Rev. Stat. §§480 et seq.)
### (On Behalf of Plaintiff and the Hawaii Indirect Purchaser Class)

56. Plaintiff incorporates by reference each paragraph set forth above.

57. The contract, combination, or conspiracy alleged above violates Hawaii Rev. Stat. §480-4(a), which prohibits, *inter alia*, every contract, combination or conspiracy "in restraint of trade or commerce in the State"; and Hawaii Rev. Stat. §480-4(b)(1), which, *inter alia*, makes it unlawful to "fix, control or maintain the price of any commodity." Defendants' PSPs are "commodities" within the meaning of Hawaii Rev. Stat. §480-1, which includes "goods" and "merchandise." Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for PSPs in Hawaii, restrained trade and commerce in Hawaii, and caused the prices of PSPs to be raised, fixed, maintained and stabilized at supracompetitive levels, in violation of Hawaii antitrust laws.

58. During the Class Period, Plaintiff and the other members of the Hawaii Indirect Purchaser Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct. As a result, Plaintiff and the other members of the Hawaii Indirect Purchaser Class have sustained injury and are entitled to all relief available under Hawaii Rev. Stat. §§480 et seq., including but

not limited to damages in an amount to be determined at trial, along with attorneys' fees and costs of suit.

59.     In compliance with Hawaii Rev. Stat. §480-13.3(a)(1), a copy of this Complaint has been served on the Hawaii Attorney General or shall be served within seven days after the Complaint is filed.

## COUNT III

### Violation of Hawaii Consumer Protection Laws
### (Hawaii Rev. Stat. §§480 et seq.)

### (On Behalf of Plaintiff and the Hawaii Indirect Purchaser Class)

60.     Plaintiff incorporates by reference each paragraph set forth above.

61.     The contract, combination or conspiracy alleged above constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," within the meaning of Hawaii Rev. Stat. § 480-2(a).  Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for PSPs in Hawaii, restrained trade or commerce for PSPs in Hawaii, and caused the prices of PSPs to be raised, fixed, maintained and stabilized at supra-competitive levels, all in violation of Hawaii Rev. Stat. § 480-2(a).

62.     As a result of Defendants' violations of Hawaii Rev. Stat. § 480-2(a), Plaintiff and members of the Hawaii Indirect Purchaser Class paid more for PSPs than they would have in the absence of Defendants' violations.  Plaintiff and members of the Hawaii Indirect Purchaser Class are therefore entitled to damages, including treble damages under Hawaii Rev. Stat. § 480-13(b)(1), from Defendants in an amount to be determined at trial, along with attorneys' fees and costs of suit, as well as all other relief allowable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.     That the Court determine that this action may be maintained as a class

---

CLASS ACTION COMPLAINT

action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B. That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the antitrust laws of Hawaii (including Hawaii Rev. Stat. § 480-4);

C. That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is an "unfair method of competition" and/or an "unfair and deceptive act or practice" within the meaning of Hawaii Rev. Stat. § 480-2(a);

D. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E. That the Court award Plaintiff and the Class damages, including treble damages pursuant to Hawaii Rev. Stat. § 480-13(b)(1);

F. That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G. That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

H. That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

CLASS ACTION COMPLAINT

-19-

DATED: August 28, 2015

By:           */s/ Kimberly A. Kralowec*
                    Kimberly A. Kralowec (Cal. Bar No. 163158)
                    Kathleen Styles Rogers (Cal. Bar No. 122852)
                    Chad A. Saunders (Cal. Bar No. 257810)
                    THE KRALOWEC LAW GROUP
                    44 Montgomery Street, Suite 1210
                    San Francisco, CA 94104
                    Telephone:    415-546-6800
                    Facsimile:     415-546-6801
                    Email:    kkralowec@kraloweclaw.com
                              krogers@kraloweclaw.com
                              csaunders@kraloweclaw.com

                    Counsel for Plaintiff Colin Moore and the Putative Class

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED: August 28, 2015

By:           */s/ Kimberly A. Kralowec*
                    Kimberly A. Kralowec (Cal. Bar No. 163158)
                    Kathleen Styles Rogers (Cal. Bar No. 122852)
                    Chad A. Saunders (Cal. Bar No. 257810)
                    THE KRALOWEC LAW GROUP
                    44 Montgomery Street, Suite 1210
                    San Francisco, CA 94104
                    Telephone:    415-546-6800
                    Facsimile:     415-546-6801
                    Email:    kkralowec@kraloweclaw.com
                              krogers@kraloweclaw.com
                              csaunders@kraloweclaw.com

                    Counsel for Plaintiff Colin Moore and the Putative Class

CLASS ACTION COMPLAINT       -20-

# EXHIBIT B

KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
CHAD A. SAUNDERS (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA 94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

*Counsel for Plaintiff and the Class*
*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHY DURAND GORE, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, STARKIST COMPANY, and KING OSCAR, INC., <br> Defendants. | Case No. **'15CV2121 H     DHB** <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Kathy Durand Gore ("Plaintiff"), by and through her undersigned attorneys, on behalf of herself and all others similarly situated, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1. This action arises out of a conspiracy by the largest producers of packaged seafood products ("PSPs") in the United States, its territories and the

District of Columbia—Bumble Bee Foods LLC, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc. (collectively, "Defendants")—which began no later than July 24, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.     Plaintiff, on behalf of herself and all indirect purchasers, brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants. Plaintiff, on behalf of herself and all indirect purchasers, also brings this action pursuant to the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.) and the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-1 et seq.) to recover damages, restitution, disgorgement, attorneys' fees, costs of suit, and all other available relief.

3.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367. The state-law claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

4.     This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over any class action in which "any member of a class of plaintiffs is a

citizen of a State different from any defendant" and "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §1332(d)(2)(A).

5.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

7.     Plaintiff Kathy Durand Gore is a current resident of the State of New Mexico.  During the Class Period, Plaintiff indirectly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## DEFENDANTS

8.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic limited liability company with its principal place of business located at 9655 Granite Ridge Drive, Suite 100, San Diego, CA 92123.  Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital LLP ("Lion"), based in the United Kingdom.

CLASS ACTION COMPLAINT

-3-

9.     Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea International, is a domestic limited liability company with its principal place of business located at 9330 Scranton Road, San Diego, CA 92121.  Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Unless otherwise indicated, Tri-Union Seafoods LLC will be referred to herein as "CoS." CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

10.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212.  StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

11.     Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108.  King Oscar produces and sells packaged seafood products throughout the United States (including this District), its territories and the District of Columbia.

12.     Defendants CoS and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

### UNNAMED CO-CONSPIRATORS

13.     On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

### AGENTS

14.     The acts alleged to have been done by Defendants were authorized,

CLASS ACTION COMPLAINT
-4-

ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**INTERSTATE TRADE AND COMMERCE**

15.    Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

16.    Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

17.    Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

**FACTUAL ALLEGATIONS**

18.    PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.  In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

19.    Defendants are the largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had

18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

20.     This oligopolistic structure within the industry is the result of recent mergers and acquisitions. For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

21.     On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an

article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

22. The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

23. Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

24. The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury

CLASS ACTION COMPLAINT                     -7-

investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

25.     There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

26.     Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



29.     Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



30.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

31.     TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphasis added.) It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphasis added.) In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added.)

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphasis added.) It indicated that future revenue growth would again be dependent upon *"[r]easonable*

*US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphasis added.) The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

32.     There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

33.     An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

34.     Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to

West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

35.     The interlocking relationship between Defendants is also demonstrated by the movement of executives among the companies. For example, in October 2011, John Engle, former VP of marketing for Bumble Bee, replaced Bob Montano as president of King Oscar's United States operations. Similarly, in July 2014, Brett Butler, the former Plant Manager of StarKist's plant in American Samoa, left the company to join Bumble Bee in August 2014, and relocated to Bumble Bee's San Diego headquarters, where Tri-Union is also based.  It was only a few months later, in December 2014, that the proposed acquisition of Bumble Bee by Tri-Union's parent company was announced. Such movement of executives suggests further opportunities for collusion among all three companies.

36.     A further opportunity to collude arose in October 2011, when Defendants Bumble Bee, Tri-Union, and StarKist jointly prepared and submitted, on joint letterhead with the logos of all three companies, a petition to the Food and Drug Administration ("FDA") to amend certain FDA regulations governing the standard of fill and forms of pack for canned tuna.  The following is an excerpt from the first page of the petition, showing the three companies' joint letterhead with their logos:

 

October 17, 2011

**BY HAND**

Division of Dockets Management
Food and Drug Administration
Department of Health & Human Services
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**CITIZENS PETITION**

37.     In the same month, these Defendants also jointly applied to the FDA for a temporary marketing permit to test-market canned tuna that deviates from the standard of fill and forms of pack required by certain FDA regulations, claiming that existing regulations are "obsolete" and that the proposed deviations would "provide[] a canned tuna product that is more appealing to consumers." On information and belief, the joint application and petition could not have been prepared absent numerous communications among Defendants concerning PSPs, the market for PSPs, production volumes of PSPs, and the impact of the proposed changes on production costs and therefore pricing for PSPs.

38.     Yet another opportunity to conspire arose in February 2014, when Defendants Bumble Bee and StarKist entered into a "joint defense, common interest and confidentiality agreement," in which they stated that "it may be useful and in their best interests to exchange certain information" and "to cooperate" with each other concerning certain pending litigation involving canned tuna:

CLASS ACTION COMPLAINT

-13-

JOINT DEFENSE, COMMON INTEREST
AND CONFIDENTIALITY AGREEMENT

This Joint Defense, Common Interest and Confidentiality Agreement (the "Agreement"), made as of this 28 day of February 2014, is entered into by the undersigned counsel acting on behalf of their respective clients, StarKist Co. and Bumble Bee Foods, LLC (collectively the "Parties"), with their full knowledge, consent and authority to execute the Agreement on their behalf.

## FRAUDULENT CONCEALMENT AND TOLLING

39.     Plaintiff and members of the Classes did not discover and could not discover through the exercise of reasonable diligence the existence of the combination and conspiracy alleged herein until shortly before this litigation commenced.

40.     As indirect purchasers of PSPs manufactured by defendants, Plaintiffs and the members of the Classes had no direct contact or interaction with Defendants, and therefore no means from which they could have discovered the combination and conspiracy alleged in this Complaint until shortly before the lawsuit was filed.

41.      It was not until approximately July 23, 2015, that information first became publicly available that Defendants engaged in the combination and conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand jury subpoenas described above were first publicly disclosed, and when TUF announced that it was suspending its preferential public offering because of the pending investigation.  Prior to that date, Plaintiffs and members of the Classes had no reason to suspect that any combination or conspiracy had been formed.

42.     By their very nature, price-fixing conspiracies tend to be inherently self-concealing.  Plaintiff is informed and believes that Defendants agreed among

CLASS ACTION COMPLAINT

-14-

themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy. Accordingly, a reasonable person under the circumstances would not have been alerted to any irregularity with regard to PSP prices before late July 2015 at the earliest, and Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

43. As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## **CLASS ACTION ALLEGATIONS**

44. Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005, and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

45. Plaintiff also brings this action on his own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "New Mexico Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within New Mexico from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005, and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

CLASS ACTION COMPLAINT

46. Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

47. There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

a. Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

b. Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

c. The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d. Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

e. Whether Defendants violated the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.);

f. Whether Defendants violated the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-1 et seq.);

g. Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

CLASS ACTION COMPLAINT

-16-

h. Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

i. Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the New Mexico Antitrust Act, or the New Mexico Unfair Practices Act.

48. Plaintiff's claims are typical of the claims of the members of the Class.

49. Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

50. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

51. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

52. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b. The Class is readily definable and one for which records should exist in the files of Defendants.

c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

d. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

1    numerous individual actions would require.

2         e.    Class treatment will permit the adjudication of relatively small

3    claims by many Class members who otherwise could not afford to litigate an

4    antitrust claim such as is asserted in this complaint on an individual basis.

5         53.    This class action presents no difficulties of management that would

6    preclude its maintenance as a class action.

7                                    **COUNT I**

8          **Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

9              **(On Behalf of Plaintiff and the Nationwide Class)**

10        54.    Plaintiff incorporates by reference the preceding paragraphs as if fully

11   set forth herein.

12        55.    Defendants and their co-conspirators engaged in a continuing contract,

13   combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the

14   prices of PSPs within the United States, its territories, and the District of Columbia

15   in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

16        56.    Defendants and their co-conspirators agreed to, and did in fact, restrain

17   trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and

18   non-competitive levels, the prices of such PSPs.

19        57.    In formulating and effectuating their contract, combination or

20   conspiracy, Defendants and their co-conspirators engaged in anticompetitive

21   activities, the purpose and effect of which were to artificially fix, raise, maintain

22   and/or stabilize the price of PSPs.

23        58.    The illegal contract, combination, or conspiracy alleged herein had the

24   following effects, among others:

25        a.    The prices charged by Defendants to, and paid by, Plaintiff and

26   members of the Class for PSPs were fixed, raised, maintained and/or stabilized at

27   artificially high and non-competitive levels;

28

---

CLASS ACTION COMPLAINT

b.      Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.      Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.      Competition in the sale of PSPs has been restrained, suppressed or eliminated.

59.     During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

60.     Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

61.     Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of New Mexico Antitrust Act
### (New Mexico Stat. Ann. §§ 57-1-1 et seq.)

### (On Behalf of Plaintiff and the New Mexico Indirect Purchaser Class)

62.     Plaintiff incorporates by reference each paragraph set forth above.

63.     The contract, combination, or conspiracy alleged above violates the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.), which states: "[e]very contract, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful." *Id.* § 57-1-1.

1    Defendants' combinations or conspiracies restrained, suppressed and eliminated

2    price competition for PSPs in New Mexico, restrained trade and commerce in New

3    Mexico, and caused the prices of PSPs to be raised, fixed, maintained and stabilized

4    at supracompetitive levels, in violation of the New Mexico Antitrust Act.

5         64.    During the Class Period, Plaintiff and the other members of the New

6    Mexico Indirect Purchaser Class purchased PSPs indirectly from Defendants, or

7    their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract,

8    combination or conspiracy alleged above, paid more for such products than they

9    would have paid in the absence of such conduct.  As a result, Plaintiff and the other

10   members of the New Mexico Indirect Purchaser Class have sustained injury and are

11   entitled to all relief available under the New Mexico Antitrust Act, including but

12   not limited to treble damages in an amount to be determined at trial, along with

13   attorneys' fees and costs of suit.  *See* N.M. Stat. Ann. § 57-1-3(A).

### COUNT III

**Violation of New Mexico Unfair Practices Act
(New Mexico Stat. Ann. §§57-12-1 et seq.)**

**(On Behalf of Plaintiff and the New Mexico Indirect Purchaser Class)**

18        65.    Plaintiff incorporates by reference each paragraph set forth above.

19        66.    The contract, combination or conspiracy alleged above constitutes

20   "unconscionable trade practices in the conduct of any trade or commerce," which is

21   prohibited by the New Mexico Unfair Practices Act (N.M. Stat. Ann. § 57-12-3).

22   Defendants' combinations or conspiracies resulted in a gross disparity between the

23   value received by the members of the New Mexico Indirect Purchaser Class and the

24   price they paid, in violation of the New Mexico Unfair Practices Act.  *See* N.M.-

25   Stat. Ann. § 57-12-2(E) (defining "unconscionable trade practices").

26        67.    As a result of Defendants' violations of the New Mexico Unfair

27   Practices Act (N.M. Stat. Ann. § 57-12-3), Plaintiff and members of the New

28

---

CLASS ACTION COMPLAINT                    -20-

Mexico Indirect Purchaser Class paid more for PSPs than they would have in the absence of Defendants' violations. Plaintiff and members of the New Mexico Indirect Purchaser Class are therefore entitled to damages from Defendants in an amount to be determined at trial, along with attorneys' fees and costs of suit, as well as all other relief allowable by law. N.M. Stat. Ann. § 57-12-10(B), (E). In addition, because Defendants' conduct alleged above was and is willful, Plaintiff is entitled to recover treble damages or $300, whichever is greater, along with attorneys' fees, costs of suit, and all other available relief. *See id*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.);

C.      That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is an "unconscionable trade practice" within the meaning of the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-2(E), 57-12-3);

D.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E.      That the Court award Plaintiff and the Class damages, including treble damages pursuant to the New Mexico Antitrust Law (N.M. Stat. Ann. § 57-1-3(A));

F.      That the Court award Plaintiff and the Class damages, including treble damages or $300 to Plaintiff, whichever is greater, pursuant to the New Mexico

Unfair Practices Act (N.M. Stat. Ann. § 57-12-10(B)), and actual damages to the Class pursuant to the Act (N.M. Stat. Ann. § 57-12-10(E));

G.  That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

H.  That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

I.  That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

DATED:  September 22, 2015

By:      _/s/  Kimberly A. Kralowec_____
         Kimberly A. Kralowec (Cal. Bar No. 163158)
         Kathleen Styles Rogers (Cal. Bar No. 122852)
         Chad A. Saunders (Cal. Bar No. 257810)
         THE KRALOWEC LAW GROUP
         44 Montgomery Street, Suite 1210
         San Francisco, CA 94104
         Telephone:     415-546-6800
         Facsimile:     415-546-6801
         Email:    kkralowec@kraloweclaw.com
                   krogers@kraloweclaw.com
                   csaunders@kraloweclaw.com

By:      _/s/  Robert Taylor-Manning_____
         Robert Taylor-Manning (Wash. Bar No. 21890)
         THE LAW OFFICES OF ROBERT TAYLOR-
         MANNING

CLASS ACTION COMPLAINT

1800 South Jackson St., Suite 123
Seattle, WA 98144
Telephone:     206.310.3333
Facsimile:     206.299.4010
Email:    rtm@taylor-manning.net

*Counsel for Plaintiff Kathy Durand Gore and the Putative Class*

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED:  September 22, 2015

By:      */s/  Kimberly A. Kralowec*
Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:     415-546-6800
Facsimile:     415-546-6801
Email:    kkralowec@kraloweclaw.com
              krogers@kraloweclaw.com
              csaunders@kraloweclaw.com

By:      */s/  Robert Taylor-Manning*
Robert Taylor-Manning (Wash. Bar No. 21890)
THE LAW OFFICES OF ROBERT TAYLOR-MANNING
1800 South Jackson St., Suite 123
Seattle, WA 98144
Telephone:     206.310.3333
Facsimile:     206.299.4010
Email:    rtm@taylor-manning.net

*Counsel for Plaintiff Kathy Durand Gore and the Putative Class*

CLASS ACTION COMPLAINT

-23-

# EXHIBIT C

## Exhibit C

- *Mathews v. Bumble Bee Foods LLC, et al.* (*Mathews*), No. 3:15-cv-1878-JLS-MDD (S.D. Cal.), filed on August 24, 2015;

- *Walnum v. Bumble Bee Foods LLC, et al.* (*Walnum*), Case No. 3:15-cv-01887-JLS-MDD (S.D. Cal.), filed on August 25, 2015;

- *Olive, et al. v. Bumble Bee Foods LLC, et al.* (*Olive*), Case No. 3:15-cv-01909-BEN-WVG (S.D. Cal.), filed on August 28, 2015;

- *Moore v. Bumble Bee Foods LLC, et al.* (*Moore*), Case No. 3:15-cv-01911-JLS-MDD (S.D. Cal.), filed on August 28, 2015;

- *Damske, et al. v. Bumble Bee Foods LLC, et al.* (*Damske*), Case No. 3:15-cv-04025-VC (N.D. Cal.), filed on September 3, 2015;

- *Nelson, et al. v. Bumble Bee Foods LLC, et al.* (*Nelson*), Case No. 3:15-cv-01979-JLS-MDD (S.D. Cal.), filed on September 4, 2015;

- *Christensen, et al. v. Bumble Bee Foods LLC, et al.* (*Christensen*), Case No. 3:15-cv-04093-VC (N.D. Cal.), filed on September 9, 2015;

- *Waterman v. Bumble Bee Foods LLC, et al.* (*Waterman*), Case No. 3:15-cv-04094-VC (N.D. Cal.), filed on September 9, 2015;

- *Moon, et al. v. Bumble Bee Foods LLC, et al.* (*Moon*), Case No. 3:15-cv-02006-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Colberg, et al. v. Bumble Bee Foods LLC, et al.* (*Colberg*), Case No. 3:15-cv-02011-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Musgrave v. Bumble Bee Foods LLC, et al.* (*Musgrave*), Case No. 3:15-cv-02012-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Joseph v. Bumble Bee Foods LLC, et al.* (*Joseph*), Case No. 3:15-cv-02017-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Ton-Vuong v. Bumble Bee Foods LLC, et al.* (*Ton-Vuong*), Case No. 3:15-cv-02044-JLS-MDD (S.D. Cal.), filed on September 14, 2015;

- *Fragoso, et al. v. Bumble Bee Foods LLC, et al.* (*Fragoso*), Case No. 3:15-cv-02072-JLS-MDD (S.D. Cal.), filed on September 17, 2015;

- *Kennedy v. Bumble Bee Foods LLC, et al.* (*Kennedy*), Case No. 3:15-cv-02073-JLS-MDD (S.D. Cal.), filed on September 17, 2015;

- *Burr, et al. v. Bumble Bee Foods LLC, et al.* (*Burr*), Case No. 3:15-cv-02095-JLS-MDD (S.D. Cal.), filed on September 18, 2015;

- *Gore v. Bumble Bee Foods LLC, et al.* (*Gore*), Case No. 3:15-cv-02121-JLS-MDD (S.D. Cal.), filed on September 22, 2015;

- *Mey v. Bumble Bee Foods LLC, et al.* (*Mey*), Case No. 3:15-cv-02125-DMS-KSC (S.D. Cal.), filed on September 23, 2015;

- *Hudson v. Bumble Bee Foods LLC, et al.* (*Hudson*), Case No. 3:15-cv-02129-BEN-RBB (S.D. Cal.), filed on September 23, 2015;

- *Lesher, et al. v. Bumble Bee Foods LLC, et al.* (*Lesher*), Case No. 3:15-cv-02144-JLS-MDD (S.D. Cal.), filed on September 25, 2015;

- *Willoughby v. Bumble Bee Foods LLC, et al.* (*Willoughby*), Case No. 3:15-cv-02160-JLS-MDD (S.D. Cal.), filed on September 28, 2015;

- *Canterbury v. Bumble Bee Foods LLC, et al.* (*Canterbury*), Case No. 3:15-cv-02169-JLS-MDD (S.D. Cal.), filed on September 29, 2015;

- *Alidad, et al. v. Bumble Bee Foods LLC, et al.* (*Alidad*), Case No. 3:15-cv-02173-JLS-MDD (S.D. Cal.), filed on September 29, 2015;

- *Bowman v. Bumble Bee Foods LLC, et al.* (*Bowman*), Case No. 3:15-cv-02185-JLS-MDD (S.D. Cal.), filed on September 30, 2015;

- *Blumstein v. Bumble Bee Foods LLC, et al.* (*Blumstein*), Case No. 3:15-cv-02186-BEN-DHB (S.D. Cal.), filed on September 30, 2015;

- *Dravid v. Bumble Bee Foods LLC, et al.* (*Dravid*), Case No. 3:15-cv-02187-JLS-MDD (S.D. Cal.), filed on September 30, 2015;

- *Cooper, et al. v. Bumble Bee Foods LLC, et al.* (*Cooper*), Case No. 3:15-

2

cv-02216-JLS-MDD (S.D. Cal.), filed on October 5, 2015;

- *Potvin, et al. v. Bumble Bee Foods LLC, et al.* (*Potvin*), Case No. 3:15-cv-02271-JLS-MDD (S.D. Cal.), filed on October 9, 2015;

- *Lybarger v. Bumble Bee Foods LLC, et al.* (*Lybarger*), Case No. 3:15-cv-02278-JLS-MDD (S.D. Cal.), filed on October 12, 2015;

- *Caldwell v. Bumble Bee Foods LLC, et al.* (*Caldwell*), Case No. 3:15-cv-02302-JLS-MDD (S.D. Cal.), filed on October 14, 2015;

- *Powers v. Bumble Bee Foods LLC, et al.* (*Powers*), Case No. 3:15-cv-02434-JLS-MDD (S.D. Cal.), filed on October 28, 2015;

- *Vangemert v. Starkist Company, et al.* (*Vangemert*), Case No. 3:15-cv-05279-JCS (N.D. Cal.), filed on November 18, 2015;

- *Yee v. Starkist Company, et al.* (*Yee*), Case No. 3:15-cv-05282-MEJ (N.D. Cal.), filed on November 18, 2015.

# EXHIBIT D

KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
CHAD A. SAUNDERS (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA 94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

*Counsel for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUISE ANN DAVIS MATHEWS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, STARKIST COMPANY, KING OSCAR, INC., and TRI MARINE INTERNATIONAL, INC.,<br><br>Defendants. | Case No. 3:15-cv-01878-JLS-MDD<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Louise Ann Davis Mathews, by and through her undersigned attorneys, on behalf of herself and all others similarly situated, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1. This action arises out of a conspiracy by the largest producers of packaged seafood products ("PSPs") in the United States, its territories and the

District of Columbia (Bumble Bee Foods LLC, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc.) as well as a common supplier to all three, Tri Marine International, Inc. (collectively, "Defendants"), which began no later than January 1, 2005, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.     Plaintiff, on behalf of herself and all indirect purchasers, brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants. Plaintiff, on behalf of herself and all indirect purchasers, also brings this action pursuant to the California Cartwright Act and the California Unfair Competition Law to recover damages, restitution, disgorgement, and all other available relief.

3.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367.  The state-law claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

4.     This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over any class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant" and "in which the matter in

-2-

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §1332(d)(2)(A).

5. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6. This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## **PLAINTIFF**

7. Plaintiff Louise Ann Davis Mathews is a current resident of the State of California. During the Class Period, Plaintiff indirectly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## **DEFENDANTS**

8. Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9655 Granite Ridge Drive, Suite 100, San Diego CA 92123. Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. Bumble Bee is privately owned by Lion Capital LLP ("Lion"), based in the United Kingdom.

9. Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

International, is a domestic corporation with its principal place of business located at 9330 Scranton Road, San Diego CA 92121.  Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS".

10.  Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212.  StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

11.  Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108.  King Oscar produces and sells packaged seafood products throughout the United States (including this District), its territories and the District of Columbia.

12.  Defendants CoS and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

13.  Defendant Tri Marine International, Inc. ("Tri Marine") is a domestic corporation with its principal place of business located at 10500 N.E. 8th St., Suite 1888, Bellevue, WA 98004.  Tri Marine supplies processed tuna to PSP producers, including StarKist and CoS, for use in the production of PSPs.  Tri Marine also produces PSPs under its own "Ocean Naturals" label and produces PSPs for Costco under the "Kirkland" brand name.  Tri Marine's website describes itself as "a vertically integrated supplier of private label and branded, consumer packaged cans and pouches, and fresh, frozen and Ultra Low Temperature (ULT) seafood products."

-4-

**UNNAMED CO-CONSPIRATORS**

14. On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

**AGENTS**

15. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**INTERSTATE TRADE AND COMMERCE**

16. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

17. Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

18. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

**FACTUAL ALLEGATIONS**

19. PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

1    were estimated to be $2.397 billion in 2012. In one report, Bumble Bee estimated

2    that canned tuna represents 73% of this value. In the same report, Bumble Bee

3    estimated that total United States retail sales of shelf-stable tuna were $1.719 billion

4    in 2011 and were estimated to be $1.750 billion in 2012.

5        20. Defendants are the three largest domestic manufacturers of PSPs. The

6    industry is highly concentrated. According to the aforementioned presentation by

7    Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had

8    18.4% and StarKist had 25.3%. The remaining market share was comprised of

9    smaller companies and private label brands. With respect to shelf-stable tuna,

10   StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In

11   December of 2014, the *Wall Street Journal* reported that the Defendants' respective

12   shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble

13   Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic

14   canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%

15   and CoS at 20%.

16       21. This oligopolistic structure within the industry is the result of recent

17   mergers and acquisitions. For example, in 1997, Van Camp Seafood Company

18   ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of

19   which TUF was a member. Thereafter, TUF bought out the other investors to

20   acquire Van Camp completely, which it renamed Chicken of the Sea International,

21   an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon

22   acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF

23   bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the

24   United States. And in December of 2014, TUF announced the acquisition from

25   Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The

26   combination of CoS and Bumble Bee would have created a virtual duopoly, with

27   the combined entity substantially exceeding the market share of StarKist. TUF had

28

AMENDED CLASS ACTION COMPLAINT        CASE NO. 3:15-CV-01878-JLS-MDD

planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

22. On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

23. The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

-7-

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

24.   Based on these statements, it appears that the DOJ's investigation extends to the entire domestic PSP sector.  On October 13, 2015, it was publicly reported that defendants StarKist and Tri Marine had also received subpoenas in connection with the DOI investigation.  *See* "Chicken of the Sea applies for leniency in DOJ packaged seafood probe," mLex (Oct. 13, 2015).

25.   The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

26.   On October 14, 2015, it was also reported that CoS and/or its parent company, Thai Union, had applied for leniency under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (15 U.S.C. §1, note) ("ACPERA"). The source reported:  "It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered.  Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come

-8-

AMENDED CLASS ACTION COMPLAINT                CASE NO. 3:15-CV-01878-JLS-MDD

forward and admit to cartel violations.  [¶]  It is likely that Chicken of the Sea is seeking so-called 'Type B' leniency, in which the DOJ uncovers wrongdoing first and then uses a company's cooperation to build out its case."

27.    The significance of CoS seeking Type B leniency is explained in one of the DOJ's web pages (http://www.justice.gov/atr/frequently-asked-questionsregarding-antitrust-divisions-leniency-program):

> **5.  Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

28.  Plaintiff, therefore, alleges on information and belief that Tri-Union has confessed its participation in the conspiracy alleged herein and that CoS, StarKist and Tri Marine participated in it.

29.  There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

1    30.  Consumption of PSPs, particularly canned tuna, has declined over the

2    last ten years in the United States. The annual consumption per person was 3.1 lbs.

3    in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post*

4    graphically represented this decline by measuring United States annual *per capita*

5    consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying

less canned seafood, they are paying more for what they do buy:



31.  Given this decline in consumption of the signature PSP, one would

expect rational businesses to reduce the prices for PSPs, but that did not happen.

The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



32.     One method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices. Beginning in August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans. The can size change was largely completed in January of 2009 and is reflected in the steep climb of prices depicted on the foregoing chart. This was portrayed as a response to rising prices, but it could only have been achieved if Bumble Bee, CoS, and StarKist all agreed to it beforehand.

33.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

34.   TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added).

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon *"[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added). The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the

AMENDED CLASS ACTION COMPLAINT                    CASE NO. 3:15-CV-01878-JLS-MDD

individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

35. There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

36. An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

37. Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

38. The interlocking relationship between Defendants is also demonstrated

by the movement of executives among the companies. For example, in October 2011, John Engle, former VP of marketing for Bumble Bee, replaced Bob Montano as president of King Oscar's United States operations. Similarly, in July 2014, Brett Butler, the former Plant Manager of StarKist's plant in American Samoa, left the company to join Bumble Bee in August 2014, and relocated to Bumble Bee's San Diego headquarters, where Tri-Union is also based. It was only a few months later, in December 2014, that the proposed acquisition of Bumble Bee by Tri-Union's parent company was announced. And, in March 2015, former Starkist CEO Don Binotto joined Tri Marine to head up its retail brand. Such movement of executives suggests further opportunities for collusion among all three companies.

39.     A further opportunity to collude arose in October 2011, when Defendants Bumble Bee, Tri-Union, and StarKist jointly prepared and submitted, on joint letterhead with the logos of all three companies, a petition to the Food and Drug Administration ("FDA") to amend certain FDA regulations governing the standard of fill and forms of pack for canned tuna. The following is an excerpt from the first page of the petition, showing the three companies' joint letterhead with their logos:

 

October 17, 2011

**BY HAND**

Division of Dockets Management
Food and Drug Administration
Department of Health & Human Services
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**CITIZENS PETITION**

40.     In the same month, these Defendants also jointly applied to the FDA for a temporary marketing permit to test-market canned tuna that deviates from the standard of fill and forms of pack required by certain FDA regulations, claiming that existing regulations are "obsolete" and that the proposed deviations would "provide[] a canned tuna product that is more appealing to consumers." On information and belief, the joint application and petition could not have been prepared absent numerous communications among Defendants concerning PSPs, the market for PSPs, production volumes of PSPs, and the impact of the proposed changes on production costs and therefore pricing for PSPs.

41.     Yet another opportunity to conspire arose in February 2014, when Defendants Bumble Bee and StarKist entered into a "joint defense, common interest and confidentiality agreement," in which they stated that "it may be useful and in their best interests to exchange certain information" and "to cooperate" with each other concerning certain pending litigation involving canned tuna:

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

1
2

**JOINT DEFENSE, COMMON INTEREST
AND CONFIDENTIALITY AGREEMENT**

3

4

This Joint Defense, Common Interest and Confidentiality Agreement (the

5

"Agreement"), made as of this 28 day of February 2014, is entered into by the undersigned

6

counsel acting on behalf of their respective clients, StarKist Co. and Bumble Bee Foods, LLC

7

(collectively the "Parties"), with their full knowledge, consent and authority to execute the

8

Agreement on their behalf.

9        42.    Tri Marine, which dealt with and/or partnered with Bumble Bee, CoS

10    and StarKist through this period, provided an excellent conduit for the exchange of

11    price information.  On its website, Tri Marine highlighted its "market intelligence,"

12    saying that it "maintains commercial relationships with the major decision makers

13    in the tuna industry.  We use our access to industry leaders to understand the

14    dynamics of the tuna market and the changing needs of boat owners, processors and

15    brands."  According to its own website, Tri Marine "works closely" with "partners"

16    like CoS and StarKist.  Tri Marine's president, Renato Curto, is quoted as saying

17    that "we are all going to have to cooperate with one another more than we ever

18    have.  In fact, I see no other issue as being more immediately important to us here

19    today.  Cooperation is vital to our industry."

20               **FRAUDULENT CONCEALMENT AND TOLLING**

21        43.    Plaintiff and members of the Classes did not discover and could not

22    discover through the exercise of reasonable diligence the existence of the

23    combination and conspiracy alleged herein until shortly before this litigation

24    commenced.

25        44.    As indirect purchasers of PSPs manufactured by defendants, Plaintiffs

26    and the members of the Classes had no direct contact or interaction with

27    Defendants, and therefore no means from which they could have discovered the

28

-16-

AMENDED CLASS ACTION COMPLAINT            CASE NO. 3:15-CV-01878-JLS-MDD

combination and conspiracy alleged in this Complaint until shortly before the lawsuit was filed.

45.     It was not until approximately July 23, 2015, that information first became publicly available that Defendants engaged in the combination and conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand jury subpoenas described above were first publicly disclosed, and when TUF announced that it was suspending its preferential public offering because of the pending investigation.  Prior to that date, Plaintiffs and members of the Classes had no reason to suspect that any combination or conspiracy had been formed.

46.     By their very nature, price-fixing conspiracies tend to be inherently self-concealing.  Plaintiff is informed and believes that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy.  Accordingly, a reasonable person under the circumstances would not have been alerted to any irregularity with regard to PSP prices before late July 2015 at the earliest, and Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

47.     On September 1 and 3, 2015, Plaintiff, through her counsel, wrote to StarKist, Bumble Bee, and CoS, through their counsel, requesting information on whether each was a DOJ amnesty applicant, and asking for detailed information concerning each defendant's knowledge of the conspiracy, and for all records relating to the conspiracy.  On September 21, 2015, Plaintiff, through her counsel, communicated by email with counsel for Bumble Bee, CoS and StarKist, noting their failure to respond to Plaintiff's counsel's prior correspondence.  Through this date, Bumble Bee, CoS and StarKist, have refused to provide any form of substantive response, despite follow-up efforts by Plaintiff's counsel.  Counsel for

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

CoS, in particular, specifically indicated in an email dated September 21, 2015 that his client would "not be providing a substantive response to the letter sent on September 3, 2015.

48. On October 13, 2015, counsel for CoS indicated, in response to further follow-up efforts in the wake of reports that CoS is the "Type B" amnesty applicant with the DOJ, that his client's position "has not changed."

49. As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

51. Plaintiff also brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "California Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within California from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

-18-

52.  Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

53.  There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

b.      Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

c.      The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d.      Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

e.      Whether Defendants violated the California Cartwright Act;

f.      Whether Defendants violated the California Unfair Competition Law;

g.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

h.      Whether, and to what extent, the conduct of Defendants caused

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

           i.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the Cartwright Act, and/or the Unfair Competition Law.

54.  Plaintiff's claims are typical of the claims of the members of the Class.

55.  Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

56.  Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

57.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

58.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

           a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

           b.      The Class is readily definable and one for which records should exist in the files of Defendants.

           c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

           d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

AMENDED CLASS ACTION COMPLAINT        CASE NO. 3:15-CV-01878-JLS-MDD

e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

59.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

<u>COUNT I</u>

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(On Behalf of Plaintiff and the Nationwide Class)**

60.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

61.  Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

62.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

63.  In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

64.  The illegal contract, combination, or conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiff and members of the Class have been deprived of free

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

and open competition in the purchase of PSPs;

c. Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d. Competition in the sale of PSPs has been restrained, suppressed or eliminated.

65. During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

66. Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

67. Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of the California Cartwright Act
### (Cal. Bus. & Prof. Code §§16700 et seq.)
### (On Behalf of Plaintiff and the California Indirect Purchaser Class)

68. Plaintiff incorporates by reference each paragraph set forth above.

69. The contract, combination, or conspiracy alleged above violates the Cartwright Act, Cal. Bus. & Prof. Code sections 16700 *et seq.*, which prohibits, *inter alia*, any "combination of capital, skill or acts by two or more persons" for the purpose of creating or carrying out any restrictions in trade or commerce, or to "fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise,

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

produce or commerce intended for sale, barter, use or consumption in this State."

70.     During the Class Period, Plaintiff and the other members of the California Indirect Purchaser Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.  As a result, Plaintiff and the other members of the California Indirect Purchaser Class have sustained damages in an amount to be determined at trial.

### COUNT III

**Violation of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§17200 et seq.)**

**(On Behalf of Plaintiff and the California Indirect Purchaser Class)**

71.     Plaintiff incorporates by reference each paragraph set forth above.

72.     The contract, combination and conspiracy alleged above constitutes unfair competition as defined in Cal. Business and Professions Code sections 17200 et seq., as follows:

73.     Defendants' conduct constitutes "unlawful" conduct because it violates section 1 of the Sherman Act and because it violates the California Cartwright Act.

74.     Defendants' conduct constitutes "unfair" conduct because (i) the gravity of the harm caused to Plaintiff and members of the California Indirect Purchaser Class outweighs any purported utility of the conduct and/or because the conduct is immoral, unethical, oppressive, and unscrupulous; (ii) the injury to Plaintiff and members of the California Indirect Purchaser Class is substantial, the injury is not outweighed by any countervailing benefits to consumers or competition, and the injury could not reasonably have been avoided by Plaintiff or class members themselves; and/or (iii) the conduct violates the legislatively-declared spirit and purpose of the California antitrust laws and has had an actual or threatened impact on competition.

-23-

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

75.   As a result of Defendants' unfair competition, Plaintiff and members of the California Indirect Purchaser Class have suffered injury and fact and lost money or property in that they paid more for PSPs than they would have in the absence of Defendants' unfair competition.

76.  Plaintiff and members of the California Indirect Purchaser Class are therefore entitled to injunctive relief and restitution from Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the California Cartwright Act;

C.      That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is "unlawful" and/or "unfair" within the meaning of the California Unfair Competition Law;

D.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E.      That the Court award Plaintiff and the Class treble damages;

F.      That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

H.     That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

DATED:  October 15, 2015

By:     _____*/s/  Kimberly A. Kralowec*_____
Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:     415-546-6800
Facsimile:     415-546-6801
Email:     kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

Counsel for Plaintiff Louise Ann Davis Mathews and the Putative Class

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

# DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED:  October 15, 2015

By:       _/s/  Kimberly A. Kralowec_
Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:      415-546-6800
Facsimile:      415-546-6801
Email:    kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

Counsel for Plaintiff Louise Ann Davis Mathews and the Putative Class

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

# EXHIBIT E

**Belinda S. Lee**
Direct Dial: +1.415.395.8851
belinda.lee@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

October 27, 2015

**VIA PDF-EMAIL**

Mr. Christopher L. Lebsock (*clebsock@hausfeld.com*)
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

Ms. Barbara Hart
Lowey Dannenberg Cohen & Hart, P.C. (*bhart@lowey.com*)
One North Broadway, Suite 509
White Plains, NY 10601

Ms. Whitney E. Street (*whitney@blockesq.com*)
Block & Leviton LLP
520 3rd Street, Suite 108
Oakland, CA 94607

Ms. Kimberly A. Kralowec (*kkralowec@kraloweclaw.com*)
The Kralowec Law Group
44 Montgomery Street, Suite 1210
San Francisco, CA 94104

Re:  *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal.)

Dear Counsel:

This letter responds to Chris Lebsock's letter of October 20, 2015.  It is unclear to us whether Mr. Lebsock's letter was sent on behalf of Hausfeld's clients or on behalf of all of your clients.  We address this letter to all plaintiffs' counsel who were cc'ed on his letter as we hope to reach a joint resolution to this issue.

As an initial matter, it is important to correct a misstatement in Mr. Lebsock's October 20th letter.  Contrary to the letter, we have not taken the position that your clients must relinquish their objection to the *Hendricks* settlement as a condition precedent to even negotiating an amendment with StarKist.  As I said at the beginning of our call on October 19th, StarKist remains willing to negotiate a possible amendment to the scope of the release in *Hendricks*.  This is because StarKist would like to avoid any possible delay to the final approval of the *Hendricks* settlement that your threatened objections might cause (and not because it believes antitrust claims should be or were intended to be excluded from the release).  As such,

LATHAM&WATKINS LLP

and as we advised on October 19th, StarKist is willing to amend the *Hendricks* release in exchange for your clients' agreement not to object to the *Hendricks* settlement. We remain willing to negotiate amended language in order to reach these mutual goals.

Over the last few weeks, we repeatedly requested that Mr. Lebsock and Ms. Kralowec provide us with draft language to amend the *Hendricks* release. We also note that you have represented in recent court filings that your co-counsel (representing PITCO Foods) has already drafted revisions to the *Hendricks* release.[1] Yet, to date, no one has provided us with any proposed language.

Nevertheless, in an effort to move this forward, StarKist proposes the following amendment to the language of Section 6.1 of the *Hendricks* Stipulation of Settlement:

> 6.1  <u>Release by Settlement Class Members</u>. Effective as
>
> of the Final Settlement Approval Date, each and all of the
>
> Settlement Class Members (except any such person who has filed a
>
> proper and timely request for exclusion) shall release and forever
>
> discharge, and shall be forever barred from asserting, instituting, or
>
> maintaining against any or all of the Released Persons, any and all
>
> claims, demands, actions, causes of action, lawsuits, arbitrations,
>
> damages, or liabilities whether legal, equitable, or otherwise,
>
> relating in any way to the claims asserted or the factual allegations
>
> made in the Action, including without limitation the alleged under-
>
> filling of the StarKist Products ~~and/or the purchase of any of the~~
>
> ~~StarKist Products~~ at any time on or after February 19, 2009 and
>
> prior to November 1, 2014 (collectively, the "Claims"). For
>
> avoidance of doubt, this paragraph does not release any Claims

---

[1]  *See* Joint Opposition of Olean Wholesale Grocery, PITCO Foods and Beverly Youngblood to Motion to Amend Order Appointing Interim Class Counsel at p. 7, *Trepco Imports and Distribution Ltd. v. Bumble Bee Foods LLC, et al.*, 15-cv-1987-JLS-MDD (S.D. Cal.), ECF No. 24 (filed Oct. 22, 2015).

LATHAM&WATKINS LLP

under federal or state antitrust laws, except to the extent any such Claims under federal or state antitrust laws are based on allegations of under-filling of StarKist Products, which are released pursuant to this paragraph. With respect to the Claims released pursuant to this paragraph, each Settlement Class Member shall be deemed to have waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of California Civil Code section 1542 (and equivalent, comparable, or analogous provisions of the laws of the United States of America or any state or territory thereof, or of the common law or civil law). Section 1542 provides that:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each and every term of this paragraph shall inure to the benefit of each and all of the Released Persons, and each and all of their respective successors and personal representatives, which persons and entities are intended to be beneficiaries of this paragraph.

As we told you during our October 19th call, StarKist rejects your request for copies of the voluminous discovery record in *Hendricks*. Although you have omitted this from your October 20th letter, your original request for access to these documents was based on your speculation that your antitrust claims could somehow be related to under-filling. As I conveyed to you previously, we believe this is an improper and premature attempt to obtain discovery for use in the antitrust cases. Further, and as Mr. Lebsock and Ms. Kralowec acknowledged in our prior telephone calls, if we are able to reach agreement on an amendment, your clients' antitrust

**LATHAM&WATKINS**LLP

claims will be excluded from the *Hendricks* release, which eliminates any possible need to review the discovery record in that case.

  While your October 20th letter now seeks to cloak this request in a claimed need to evaluate the value of the *Hendricks* settlement, your request for this discovery remains improper. The *Hendricks* litigation was aggressively litigated by competent class counsel, and the settlement was the product of a fair, reasonable and arm's length negotiation. Under such circumstances, courts routinely reject discovery requests by class members. *See, e.g., Jaffe v. Morgan Stanley & Co., Inc.*, No. C 06-3903-TEH, 2008 WL 346417 at *9 (N.D. Cal. Feb. 7, 2008).

  Please let us know if our proposed language is acceptable to your clients.

       Very truly yours,

       Belinda S Lee
       of LATHAM & WATKINS LLP

cc:  Via PDF email
   Mr. Robert Hawk  *(robert.hawk@hoganlovells.com)*
   Mr. Scott A. Bursor  *(scott@bursor.com)*
   Mr. L. Timothy Fisher  *(ltfisher@bursor.com)*

# EXHIBIT F



November 6, 2015

VIA ELECTRONIC DELIVERY

Belinda S. Lee
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Email: belinda.lee@lw.com

     Re:    *Hendricks v. Starkist Co*., Case No. 3:13-cv-0729-HSG; and

             *Mathews v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-1878 BAS-RBB; *Moore v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-01911-DMS-NLS; and related actions

Dear Belinda:

     I write to follow up on our telephone conversations in September and October concerning the overbroad release in the Stipulation of Settlement in the *Hendricks* class action.  This will also respond to your letter of October 27, 2015, and the proposal made therein.

     We have reviewed the proposed revisions to the release language set forth in your October 27 letter and do not believe that they provide adequate protection to our clients or the putative classes we seek to represent in the above-referenced matters.  Attached please find our proposed Amendment to the Stipulation of Settlement.  The Amendment would modify the release language by carving out the conspiracy claims alleged in the *Mathews*, *Moore*, and related actions (the *"Seafood Antitrust Cases"*) referenced above.

     The proposed revisions included in your October 27 letter are insufficient in several respects.  For example, the reference to "federal and state antitrust laws" in your proposal is too narrow.  As you know, many indirect purchaser claims asserted in the *Seafood Antitrust Cases* are based on state unfair competition laws and consumer protection statutes.  In addition, the further exception language you propose regarding "under-filling" would appear to expressly release claims that StarKist conspired with other packaged seafood makers to under-fill products.  We have seen no indication that the *Hendricks* case litigated the issue of packaged seafood makers' potential concerted action on or related to under-filling, and whether such conduct occurred should be addressed in the *Seafood Antitrust Cases*.  The fact that StarKist is now seeking to expand its release to expressly cover certain antitrust claims is a significant concern.



Belinda S. Lee
November 6, 2015
Page 2

We have previously requested, and we believe we are entitled to, production of the discovery record in *Hendricks*, including copies of briefs and declarations without the heavy redactions that appear in the public record (collectively, the "*Hendricks* discovery record").  At your request, we reviewed and evaluated the Amended Stipulated Protective Order entered by Judge Gonzalez Rogers in *Hendricks* (Dkt. No. 71).  We advised you that we would agree to be bound by its terms.  As I understand it, your client is now unwilling to allow us access to any part of the *Hendricks* discovery record—even though we have agreed to be bound by the Protective Order that Judge Gonzalez Rogers found sufficient to protect your client's interests.

To resolve this impasse, we will agree not to pursue production of the *Hendricks* discovery record in *Hendricks* itself (although we reserve the right to seek it in the *Seafood Antitrust Cases*) if, in return, your client executes the attached Amendment to Stipulation of Settlement substantially as drafted.  If the Amendment is executed by all parties before November 20, 2015, we will forego filing a formal objection to the *Hendricks* settlement.

The objection that we would interpose in *Hendricks* would raise the significant and meritorious point that the settlement provides no consideration for the antitrust and associated claims alleged in the *Seafood Antitrust Cases*, yet the release purports to extinguish "all claims … relating in any way to … the purchase of any of the StarKist Products [*i.e.*, 5-oz. cans of tuna] at any time on or after February 19, 2009 and prior to November 1, 2014."  *Hendricks* Stip. of Settlement, ¶6.1.  While we reserve the right to argue that the release is not intended to encompass antitrust claims that appear nowhere in the operative *Hendricks* complaint, and that are mentioned nowhere in the Stipulation of Settlement or in the approval motion papers, the release language is grossly, and unnecessarily, overbroad.

The original Stipulation of Settlement was signed on or about May 13, 2015.  This was two months before the first public reports emerged, on July 23, 2015, of the DOJ's investigation of a conspiracy between your client and its competitors, including Bumble Bee and Tri Union.  The Stipulation could not have provided any compensation for injuries resulting from a conspiracy that remained hidden from the public until the latter date.  Hence, the Stipulation should not release claims for such injuries.

Just last Friday, class counsel in *Hendricks* filed a declaration indicating that the $12 million nationwide settlement will result in an estimated net payout of $2.11 to each cash claimant or $4.68 per voucher claimant—a figure that will likely decrease, because it accounts only for claims received through October 26, 2015.  *Hendricks* class counsel states that these



Belinda S. Lee
November 6, 2015
Page 3

amounts are fair, adequate and reasonable because the tuna cans were under-filled by "between 4.5% to 16.7%, resulting in damages of 3.87 cents to 14.3 cents per can."

As class counsel's explanation makes clear, the settlement provides *no consideration* for injuries caused by the conspiracy asserted in the *Seafood Antitrust Cases*.  The settlement's purpose is to compensate class members for the tuna they did not receive in the cans they purchased.  But we know now that the class members were doubly harmed when they purchased those same cans:  first, they received less tuna in the cans than they should have; and, second, as the result of an unlawful conspiracy between competitors, they paid a supra-competitive price for the cans.  According to *Hendricks* class counsel, the settlement provides compensation only for the former injury.

We believe that the Court will sustain our anticipated objections to the *Hendricks* settlement if we are forced to assert them, and that final approval will not be granted unless the conspiracy claims are explicitly carved out of the release.

Please contact me at your earliest convenience concerning whether the language of our proposed Amendment to the Stipulation of Settlement is acceptable to your client.  We are willing to consider revisions, but the scope of the carve-out must remain broad enough to encompass all potential conspiracies between your client and its competitors.  If we are unable to agree on carve-out language, then we will take all necessary actions to protect our clients' interests, which may include moving to intervene in *Hendricks*, filing objections to the *Hendricks* settlement, seeking production of the *Hendricks* discovery record, and/or moving to unseal the documents filed under seal or redacted in *Hendricks*.

I look forward to hearing from you.

Sincerely,

*/s/ Kimberly A. Kralowec*

Kimberly A. Kralowec

<u>Enclosure</u>

cc:     Kathleen Styles Rogers, Esq.
        Christopher T. Micheletti, Esq.
        Marvin A. Miller, Esq.
        Christopher L. Lebsock, Esq.

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

| PATRICK HENDRICKS, individually and on behalf of all others similarly situated, | Case No. 3:13-CV-0729-HSG |
|---|---|
| Plaintiff, | **AMENDMENT TO STIPULATION OF SETTLEMENT** |
| v. | |
| STARKIST CO., | |
| Defendant. | |

The Stipulation of Settlement filed on May 14, 2015 (hereafter "Stipulation") is hereby amended to add the following provisions immediately after paragraph 8.11:

## IX.    ANTITRUST CARVE-OUT

9.1    Notwithstanding and expressly superseding the release language contained in the Stipulation, including paragraph 6.1 of the Stipulation, any and all claims concerning or related in any way to any allegations that any of the Released Persons (defined in paragraph 1.21 of the Stipulation) tacitly or explicitly agreed with Bumble Bee Foods LLC, Tri-Union Seafoods LLC, King Oscar, Inc., Tri Marine International, Inc., and/or their respective past and present parents, subsidiaries, divisions, affiliates, persons and entities directly or indirectly under its or their control in the past or in the present, or any other manufacturer or supplier of Packaged Seafood Products,[1] the purpose or effect of which was to fix, maintain, control, raise, and/or stabilize the prices and/or supply of, or to under-fill or decrease the can size of, any StarKist Products (defined in paragraph 1.30 of the Stipulation), or concealed or misrepresented any facts concerning the price of the StarKist Products, or otherwise restrained trade or impaired competition in any way as to the StarKist Products (the "Carved-Out Claims"), shall be expressly excluded from the limitations, waivers and releases contained in the Stipulation.

9.2    The term "Carved-Out Claims" shall include all claims that have been asserted or will be asserted in any complaints filed in any of the actions listed in Exhibit A hereto, and in any later-filed actions that are deemed related to any of those actions ("Antitrust Actions").

9.3    No Settlement Class Member shall be deemed to have released, waived, relinquished or compromised any Carved-Out Claims, and No Settlement Class Member shall be barred from asserting the Carved-Out Claims against the Released Persons, regardless of whether the Settlement Class Member submits a claim for a cash payment or voucher pursuant to paragraph 2.4 of the Stipulation, and regardless of whether the Settlement Class Member receives a cash payment from the Cash Settlement Fund or receives or redeems a voucher from the Voucher Settlement Fund.  Because the Antitrust Actions seek relief for different wrongful

---

[1]    "Packaged Seafood Products" is defined as shelf-stable seafood products that are sold in cans, pouches, or ready-to-eat serving packages, and includes the StarKist Products (defined in paragraph 1.30 of the Stipulation).

conduct and for different injuries than those asserted in the Action and encompassed by the Stipulation, any awards granted under the Stipulation, whether from the Cash Settlement Fund or the Voucher Settlement Fund, shall not be used to defend against, reduce, or diminish any amount of damages, restitution or other monetary or injunctive or declaratory relief that may be sought or awarded in the Antitrust Actions.

9.4    If any ambiguities or contradictions are found between the language in the Stipulation and in this Amendment, this Amendment shall govern.

[insert signature blocks]

**<u>EXHIBIT A</u>**

[insert list of cases]

# EXHIBIT G

**Belinda S Lee**
Direct Dial: +1.415.395.8851
belinda.lee@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

## LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

November 13, 2015

**VIA PDF-EMAIL**

Ms. Kimberly A. Kralowec
*kkralowec@kraloweclaw.com*
The Kralowec Law Group
44 Montgomery Street, Suite 1210
San Francisco, CA 94104

Re:    *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal.); and

*Mathews v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-1878-BAS-RBB; *Moore v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-01911-DMS-NLS; and related actions

Dear Ms. Kralowec:

This letter responds to your letter dated November 6, 2015.

We understand you to have raised two issues about the amended release language proposed in our October 27, 2015 letter:  (1) that our reference to "federal and state antitrust laws" is too narrow and does not include state unfair competition and consumer protection laws; and (2) releasing all claims related to under-filling would be too broad.

On your first issue, we can agree to modify the language in the amended release to reference "federal antitrust, state antitrust, state unfair competition, and state consumer protection laws."  We trust this resolves your first issue.  For ease of reference, I have included a revised version of Section 6.1 in an Annex to this letter.

However, your second issue (rejecting any clarification that the settlement releases *all* claims based on allegations of under-filling) misses the point of the *Hendricks* settlement.  It cannot be disputed that the *Hendricks* case relates to the alleged under-filling of the StarKist Products.  Through this settlement, StarKist is making a substantial $12 million payment to the *Hendricks* class to resolve all claims (known and unknown) relating to the alleged under-filling of the StarKist Products.  Your own letter asserts that "[t]he settlement's purpose is to compensate class members for the tuna they did not receive in the cans they purchased."

As you know, the *Hendricks* class asserted violations of California's unfair competition law and several California consumer protection laws.  To exclude federal antitrust, state antitrust, state unfair competition, and state consumer protection claims based on alleged under-filling

**LATHAM&WATKINS**LLP

from the scope of the *Hendricks* release, as you suggest, would result in an incomplete release from the claims in the *Hendricks* case. For these reasons, the draft Amendment attached to your November 6th letter is far too broad.

StarKist remains willing to proceed with a release as described above and stated in the attached Annex. We would like to schedule a call with you on November 16, 2015 to discuss this issue. Please advise us as to your availability.

Very truly yours,

Belinda S Lee
of LATHAM & WATKINS LLP

cc:   Via PDF email
      Mr. Christopher L. Lebsock *(clebsock@hausfeld.com)*
      Ms. Barbara Hart  *(bhart@lowey.com)*
      Ms. Whitney E. Street *(whitney@blockesq.com)*
      Mr. Robert Hawk  *(robert.hawk@hoganlovells.com)*
      Mr. Scott A. Bursor  *(scott@bursor.com)*
      Mr. L. Timothy Fisher  *(ltfisher@bursor.com)*

LATHAM&WATKINS LLP

## ANNEX – REVISED AMENDED SECTION 6.1

6.1     <u>Release by Settlement Class Members</u>. Effective as of the Final Settlement Approval Date, each and all of the Settlement Class Members (except any such person who has filed a proper and timely request for exclusion) shall release and forever discharge, and shall be forever barred from asserting, instituting, or maintaining against any or all of the Released Persons, any and all claims, demands, actions, causes of action, lawsuits, arbitrations, damages, or liabilities whether legal, equitable, or otherwise, relating in any way to the claims asserted or the factual allegations made in the Action, including without limitation the alleged under-filling of the StarKist Products ~~and/or the purchase of any of the StarKist Products~~ at any time on or after February 19, 2009 and prior to November 1, 2014 (collectively, the "Claims"). For avoidance of doubt, this paragraph does not release any Claims under federal antitrust, state antitrust, state unfair competition or state consumer protection laws, except to the extent any such Claims under federal antitrust, state antitrust, state unfair competition or state consumer protection laws are based on allegations of under-filling of StarKist Products, which are released pursuant to this paragraph. With respect to the Claims released pursuant to this paragraph, each Settlement Class Member shall be deemed to have waived and relinquished, to the fullest

**LATHAM&WATKINS**LLP

extent permitted by law, the provisions, rights and benefits of

California Civil Code section 1542 (and equivalent, comparable, or

analogous provisions of the laws of the United States of America

or any state or territory thereof, or of the common law or civil

law). Section 1542 provides that:

> A GENERAL RELEASE DOES NOT EXTEND
> TO CLAIMS WHICH THE CREDITOR DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MUST HAVE
> MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR.

Each and every term of this paragraph shall inure to the benefit of each

and all of the Released Persons, and each and all of their respective

successors and personal representatives, which persons and entities are

intended to be beneficiaries of this paragraph.

# EXHIBIT H

## Kimberly A. Kralowec

| | |
|---|---|
| **From:** | Kimberly A. Kralowec |
| **Sent:** | Monday, November 16, 2015 3:37 PM |
| **To:** | 'CIRILLE.DUFF@LW.com' |
| **Cc:** | clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; BELINDA.LEE@lw.com; Christopher T. Micheletti (CMicheletti@zelle.com); Kathleen S. Rogers; Taylor Asen (tasen@cuneolaw.com); Jon Cuneo |
| **Subject:** | RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.) |
| **Attachments:** | 151116 Hendricks release language.docx |

Dear Belinda,

As discussed during today's telephone conference, attached please find revised language for the antitrust carve-out. Our revised language addresses: (a) the concern stated in your letter that the release language be tied to tuna not received in the purchased cans, and (b) our concern that conspiracy claims, for which the settlement provides no consideration of any kind, are not released.

These edits would need to be incorporated into a separate Amendment to Stipulation of Settlement Agreement, signed by all parties, in a format similar to the one circulated with my last letter.

Please review, discuss with your client, and get back to us with any comments on the proposed language. I hope we are able to resolve this matter short of submitting formal objections.

Kim

**Kimberly A. Kralowec** | Principal
kkralowec@kraloweclaw.com



The Kralowec Law Group
Tel: (415) 546-6800
Fax: (415) 546-6801
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
www.kraloweclaw.com

The UCL Practitioner
www.uclpractitioner.com

**From:** CIRILLE.DUFF@LW.com [mailto:CIRILLE.DUFF@LW.com]
**Sent:** Friday, November 13, 2015 3:26 PM
**To:** Kimberly A. Kralowec
**Cc:** clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; BELINDA.LEE@lw.com
**Subject:** Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.)

Dear Ms. Kralowec:

... including without limitation the alleged under-filling of the StarKist Products ~~and/or the purchase of any of the StarKist Products~~ at any time on or after February 19, 2009 and prior to November 1, 2014 (collectively, the "Claims").  For avoidance of doubt, this paragraph does not release any Claims under federal antitrust, state antitrust, state unfair competition, state consumer protection, <u>or state unjust enrichment laws</u>, except to the extent any such Claims under federal antitrust, state antitrust, state unfair competition, state consumer protection, <u>or state unjust enrichment laws seek redress for not receiving the correct quantity of tuna in the Starkist Products based on allegations of StartKist's unilateral (as opposed to concerted or conspiratorial) under-filling of Starkist Products</u>, which are released pursuant to this paragraph.  ....

# EXHIBIT I

## Kimberly A. Kralowec

**From:** BELINDA.LEE@lw.com
**Sent:** Thursday, November 19, 2015 11:03 AM
**To:** Kimberly A. Kralowec; CIRILLE.DUFF@LW.com
**Cc:** clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com;
robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com;
CMicheletti@zelle.com; Kathleen S. Rogers; tasen@cuneolaw.com;
JonC@cuneolaw.com; Ashley.Bauer@lw.com
**Subject:** RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.)

Dear Kim,

Thank you for your proposal, but StarKist cannot agree to your proposed language, which we believe still does not address the concerns explained in my letter from last week.

I am in a deposition today and tomorrow, but I can find some time to step out and speak with you either this afternoon or tomorrow if you think that would be helpful to you or your co-counsel.  I have also cc'ed my partner Ashley Bauer if you need to speak to someone sooner than that.

Thanks,
Belinda.

---

**From:** Kimberly A. Kralowec [mailto:kkralowec@kraloweclaw.com]
**Sent:** Thursday, November 19, 2015 9:57 AM
**To:** Duff, Cirille (SF)
**Cc:** clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; Lee, Belinda (SF); Christopher T. Micheletti (CMicheletti@zelle.com); Kathleen S. Rogers; Taylor Asen (tasen@cuneolaw.com); Jon Cuneo
**Subject:** RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.)

Hi Belinda, please get back to us on whether our proposed language is acceptable to your client.

Thanks,
Kim

**Kimberly A. Kralowec** | Principal
kkralowec@kraloweclaw.com



The Kralowec Law Group
Tel: (415) 546-6800
Fax: (415) 546-6801
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
www.kraloweclaw.com

The UCL Practitioner
www.uclpractitioner.com