1  Kimberly A. Kralowec (Cal. Bar No. 163158)
   Kathleen Styles Rogers (Cal. Bar No. 122853)
2  THE KRALOWEC LAW GROUP
   44 Montgomery St., Suite 1210
3  San Francisco, CA  94104
   Telephone:    (415) 546-6800
4  Facsimile:     (415) 546-6801
   Email:         kkralowec@kraloweclaw.com
5                 krogers@kraloweclaw.com

6  *Attorneys for Objectors Colin Moore*
   *and Kathy Durand Gore*
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11
   PATRICK HENDRICKS, individually and on      Case No. 3:13-CV-0729-HSG
12 behalf of all others similarly situated,
                                               **DECLARATION OF KIMBERLY A.**
13              Plaintiff,                      **KRALOWEC IN SUPPORT OF**
                                               **MOTION BY OBJECTORS COLIN**
14        v.                                    **MOORE AND KATHY DURAND**
                                               **GORE FOR ATTORNEYS' FEES,**
15 STARKIST CO.,                                **EXPENSES AND INCENTIVE**
                                               **AWARDS**
16              Defendant.
                                               Date:  June 16, 2016
17                                             Time: 2:00 pm
                                               Judge:  Hon. Haywood S. Gilliam, Jr.
18                                             Courtroom 15, 18th Floor
19

20

21

22

23

24

25

26

27

28

I, Kimberly A. Kralowec, declare as follows:

1.     I am an attorney licensed to practice law in the State of California and before this Court. I am the principal of The Kralowec Law Group (hereafter "Kralowec Law"), counsel of record for objectors Colin Moore and Kathy Durand Gore in the above-referenced litigation. I am also counsel of record for objectors Colin Moore and Kathy Durand Gore in *Moore v. Bumble Bee Foods, LLC, Tri-Union Seafoods LLC, and StarKist Company*, Case No. 15-cv-01911-JLS-MDD (S.D. Cal.), and *Gore v. Bumble Bee Foods, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc.*, Case No. 15-cv-2121-JLS-MDD (S.D. Cal.). I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

2.     My firm's lodestar for work performed in this matter from August 2015 through February 2016 (the "Initial Objection Period") is approximately $138,360.50, and we have incurred approximately $927.18 in unreimbursed expenses, as set forth in more detail below.

3.     My firm has also expended time, and incurred unreimbursed expenses, in this matter from March 2016 through mid-April 2016 (the "Second Objection Period"). We intend to file a further motion to recover these fees and expenses, if indicated after the Court rules on the pending objections.

4.     My firm and I are highly experienced in handling complex plaintiff-side litigation. I have almost 24 years of complex litigation experience, including extensive experience handling consumer class actions, such as this one, and antitrust class actions, such as the *Packaged Seafood Products* litigation. I have been named by the *Daily Journal* as one of the Top 100 Women Lawyers in California, and I was honored with a *California Lawyer* Attorney of the Year ("CLAY") Award for my work in *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012), the landmark class action precedent in which I served as lead appellate counsel for the plaintiff class. Former Alameda County Complex Litigation Judge Ronald M. Sabraw has described me as "one of the most talented and capable lawyers to appear in [his] courtroom." A true and correct copy of my current firm resume, summarizing the experience of each of the

firm's professionals, is attached as **Exhibit 1**.  More information on my qualifications and experience is set forth in paragraphs 39-49 of this declaration, below.

### Overview of Work Done by Kralowec Law to Benefit the *Hendricks* Class

5.  ***Initial Objection Period***:  I first became aware of the *Hendricks* matter on August 27, 2015, when I was informed about it by one of my clients in the *Packaged Seafood Antitrust Litigation*.  My declaration filed on November 20, 2015 (Dkt. No. 293-1) details the work performed by my firm from August 27, 2015 through November 20, 2015 to benefit the *Hendricks* class.  A true and correct copy of this declaration is attached hereto as **Exhibit 2**.

6.  In summary, we carefully reviewed and evaluated the release language in the *Hendricks* Stipulation of Settlement, immediately began "meet and confer" discussions with plaintiff and defense counsel in *Hendricks*, participated in numerous telephone discussions and prepared detailed correspondence with proposed revised release language, coordinated with counsel for other objectors, and drafted the objections and supporting client and counsel declarations filed on November 20, 2015 (Dkt. Nos. 293, 293-1, 293-4, 293-5, 293-6).  Thereafter, I reviewed the responses to the objections, and prepared for, appeared, and presented argument at the hearing on December 17, 2015.  More detail on the work performed during this period is set forth below.

7.  All of this work culminated in the Court's order denying final approval (Dkt. No. 336), which cited the objections drafted by my firm and relied heavily on arguments I made during the hearing.  In this declaration, I refer to the period from August 2015 through February 2016 as the "Initial Objection Period."

8.  ***Second Objection Period***:  My declaration filed on March 17, 2016 (Dkt. No. 352-1) details the work my firm performed from approximately March 2, 2016, when the parties to *Hendricks* filed their Second Amendment to Stipulation of Settlement, through March 17, 2016, the date of my clients' objection thereto (Dkt. Nos. 352, 352-1).  As stated above, the fees and expenses incurred during this time period (the "Second Objection Period") are not included in the present motion, but may be sought in a future motion.

## Kralowec Law's Lodestar for Work Done During the Initial Objection Period

9.      The total number of hours reasonably expended by my firm during the Initial Objection Period, *i.e.*, from August 2015 through February 2016, is approximately 205.9 hours, and the total lodestar for my firm at current rates is $138,360.50, as follows:

| Name of Professional | Title | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Kimberly A. Kralowec (1992 law school graduate; 23 years of practice experience) | Principal | 55.2 | $745.00 | $41,124.00 |
| Kathleen S. Rogers (1986 law school graduate; 29 years of practice experience) | Of Counsel | 116.8 | $725.00 | $84,680.00 |
| Chad A. Saunders (2008 law school graduate; 7 years of practice experience) | Associate | 14.2 | $475.00 | $6,745.00 |
| Gary M. Gray (25 years of practice experience) | Senior Litigation Paralegal | 19.7 | $295.00 | $5,811.50 |
| **TOTALS:** | | 205.9 | | $138,360.00 |

10.      The figures stated above were prepared from the contemporaneous computerized time records regularly prepared and maintained by my firm in the ordinary course of business. These records reflect all hours worked and tasks performed to represent the interests of the objectors and the *Hendricks* class.  A detailed report of the work performed by my firm from August 27, 2015 through February 29, 2016, including each individual time entry with a description of the work performed, is available for the Court's *in camera* inspection upon request.

11.      Time spent on the objections in this matter has been carefully segregated from time spent on the *PSP Antitrust Litigation*.  The figures above do not include any hours expended on the *PSP Antitrust Litigation*, and are limited to those hours spent specifically on evaluating the *Hendricks* release language, attempting to resolve the problems with the release language,

1  and preparing and presenting my clients' formal objections to the Court.  The figures above also

2  do not include any hours expended in preparing this motion.

3      12.      Together with the hours expended by co-counsel Robert Taylor-Manning (*see* Mr.

4  Taylor-Manning's declaration filed concurrently herewith), the combined lodestar for our firms

5  is $153,525, for a total of 239.6 hours' work over approximately six months.  The two firms'

6  combined figure for unreimbursed expenses is $1,461.97.

7      13.      The reasonableness of the lodestar figure is borne out by the supplemental

8  declaration of *Hendricks* counsel, Mr. Bursor, filed on April 4, 2016 (Dkt. No. 360).  Mr. Bursor

9  states that his firm incurred 466.3 hours, for a lodestar of $238,812, for the five-month period

10  from October 28, 2016 to approximately early April 2016.  *See* Dkt. No. 360, ¶4.  Much of this

11  time involved responding to our objections and engaging in discussions with us concerning our

12  objections (although class counsel presumably also did other work during that period).  Our total

13  hours of 239.6 and lodestar of $153,525 for approximately ***six*** months' work is comparable to

14  what Mr. Bursor's firm incurred during the overlapping five-month period described in his

15  declaration.

16          **Breakdown of Kralowec Law's Lodestar for Work Performed**
          **During the Initial Objection Period**

17

18      14.      The work performed by Kralowec Law for the benefit of the *Hendricks* class

19  during the Initial Objection Period (August 2015 to February 2016) can be broken down by time

20  period as follows:

21      15.      **August 2015 through October 2015:**  During this period, my firm reviewed and

22  evaluated the impact of the *Hendricks* Stipulation of Settlement and the overbroad release

23  language contained in it.  We engaged in multiple "meet and confer" discussions with *Hendricks*

24  counsel and StarKist's counsel, both by telephone and in writing.  We spent significant time

25  drafting alternative versions of the proposed release language and sharing those proposals with

26  StarKist's counsel, in hopes of resolving the objections.  We coordinated these efforts with

27  counsel for the direct purchasers and counsel for the commercial food preparers in the *PSP*

28  litigation, who shared our concerns with the release language (and whose clients' claims StarKist

ultimately agreed to carve out entirely).  We also began preparations to file our formal

objections, due in November.  *See* Kralowec Decl. filed 11/20/15 (Dkt. No. 293-1) ¶¶10-12 &

Ex. E.  My firm worked closely with our clients during this period to identify and obtain proof of

their purchases of the specific types of canned tuna defined as "StarKist Products" in the

Stipulation of Settlement (Dkt. No. 183-1, ¶1.30).  Because the Stipulation of Settlement covers

only 5-oz. cans and does not include "Chunk *White* in Water" (as opposed to "Chunk *Light* in

Water") (*see Hendricks* Class Notice, ¶8), and because it is limited to a specific class period (*id.*;

*see also* Stipulation of Settlement, Dkt. No. 183-1, ¶6.1), this work had to be carefully done to

ensure that each client could establish that he or she was a member of the *Hendricks* settlement

class with standing to object to the settlement.  My firm expended approximately **52.9 hours** of

professional time on these tasks during this period.

      16.    **November 2015:**  During this period, my firm continued its discussions with

StarKist's counsel in an effort to resolve our objections.   Those discussions consisted of both

telephone conferences and written correspondence.  *See* Kralowec Decl. filed 11/20/15 (Dkt. No.

293-1) ¶¶10, 13-17 & Exs. F-I.  When those efforts failed, my firm drafted detailed the formal

objections, which were filed on November 20, 2015.  *See id.* ¶17.  Ms. Rogers of my firm took

the laboring oar in drafting our objection brief.  We also drafted the declarations of the clients and

worked with the clients to obtain appropriate signatures, including attorney Rob Taylor-Manning,

co-counsel for objector Kathy Gore.  As mentioned above, the client declarations were carefully

done, with evidence of qualifying purchases attached.  *See* Dkt. Nos. 293-4, 293-5, 293-6.  We

coordinated our continuing efforts with counsel for the direct purchasers in the *PSP* litigation, as

well as counsel for the commercial food preparers in the *PSP* litigation, who initially joined in our

objections (*see* Dkt. No. 293-3).  We worked with all joining counsel to obtain their approval of

the final brief, and we took responsibility for completing the filing of the objections, along with

all supporting declarations, in a timely manner.  My firm expended approximately **119.4 hours** of

professional time on these tasks during this period.

      17.    **December 2015 through February 2016:**  During this period, my firm's primary

project was preparation to present oral argument for the hearing on December 17, 2016.  We read

and evaluated the other objections to the settlement, and carefully reviewed and considered the formal responses of Mr. Hendricks and StarKist to our objections.  I personally prepared a detailed oral argument outline and presented oral argument to the Court on December 17.  After the Court issued its ruling on February 19, 2016, my firm reviewed and assessed the impact of that order and considered whether any further action was needed to protect the interests of our objecting clients and the class members.   My firm expended approximately **33.6 hours** of professional time on these tasks during this period.

18.     As mentioned above, from March 2016 through the present, we spent additional time evaluating the second amended release language filed in March, preparing further formal objections, also filed in March, and preparing for the further hearing in April.  This time will be sought in a later motion.

### Kralowec Law's Hourly Rates Are Reasonable and In Line With the Market for Complex Class Action Litigation Work

19.     The hourly rate of each of my firm's professionals as stated above is the usual and customary hourly rate charged for their services in similar complex litigation.  Based on my more than 23 years of experience handling similar complex and class action litigation, I believe the rates are reasonable and in line with the rates charged for similar work by professionals with similar levels of experience and expertise and with comparable reputations.  The rates stated above were determined by me, as the principal of Kralowec Law, in the ordinary course of business, and they apply equally to all of the firm's litigation, consultation and appellate matters, both hourly and contingency.  They are the rates we claim in our fee applications in all of our contingency-fee cases, both inside and outside the San Francisco Bay Area.  The rates contain no premium for the contingency nature of our practice.

20.     It is my responsibility as the principal of Kralowec Law to determine the firm's hourly rates each year.  In determining my firm's hourly rates in the ordinary course of business, I consider a variety of factors, including but not limited to: (a) my knowledge of this market, in which I have been practicing since 1996, including my knowledge of the rates established for me and other attorneys and paralegals by the law firms in California for which I have previously

worked; (b) my review of declarations of other attorneys in California plaintiff-side class action firms with whom my firm competes, setting forth their rates; (c) review of publicly-available information regarding prevailing rates, such as reports in legal newspapers; (d) review of the rates charged by other firms with whom my firm has associated in its litigation matters; (e) review of reported decisions and fee rulings reflecting other firms' hourly rates; and (f) the willingness of prospective hourly clients to agree to pay my firm's regular hourly rates.

21.     In setting my firm's hourly rates as of 2013, I carefully examined (among other data) the extensive information on rates that became publicly available in *In re TFT-LCD (Flat Panel) Antitrust Litigation,* M.D.L. No. 1827 (N.D. Cal.), in which I was co-counsel of record for the indirect purchaser plaintiffs.  In that case, in 2012, co-lead counsel for the direct and indirect purchasers filed dozens of declarations of plaintiffs' counsel, including declarations of attorneys in many plaintiff-side class action firms who were co-counsel of record in that case.  A sampling of the rates set forth in those declarations is attached hereto as **Exhibit 3**.  Based on the wealth of information made available in the *TFT-LCD* matter (as well as other data), I established rates for my firm's professionals that are well within the range of those charged by competing plaintiff-side class action law firms for attorneys with comparable levels of experience and expertise in California.  In adjusting the firm's rates for subsequent years, I continued to rely on this information as a baseline.

22.     As mentioned above, in determining my firm's hourly rates in the ordinary course of business, I rely in part on decisional law in which competing attorneys' hourly rates have been reported.  One of the decisions I considered in 2011 in determining my rates at that time was *Valdivia v. Brown,* 848 F.Supp.2d 1141 (E.D. Cal. 2011), in which the Court examined hourly rates in this area for class action contingency-fee litigation, and approved rates of "up to $800" per hour.  I also considered the rates reflected in *L.H. v. Schwarzenegger,* 645 F.Supp.2d 888, 893-94 (E.D. Cal. 2009), where the Court again examined the market for class action attorneys, and recorded the following rates attested to by other law firms, including the well-known firm of Rosen, Bien & Galvan, as of 2008 (eight years ago):

| Years of Experience | General Rates | General Rates | **Rates for Specialists in … Class Action Litigation** |
|---|---|---|---|
| 25+ | 525–750 | 495–785 | 575–900 |
| 20–24 | 510–750 | 500–700 | 575–700 |
| 15–19 | 575–725 | 490–590 | 495–550 |
| 10–14 | 430–540 | 400–500 | 465–500 |
| 5–9 | 355–515 | 325–560 | 340–475 |
| 0–4 | 260–415 | 250–520 | 285–410 |

*Id.* at 893 (emphasis added; footnotes omitted).  These eight-year-old historical market rates are consistent with and fully support my firm's current 2016 rates.

23.     Other cases revealing the rates charged by competing plaintiff-side class action law firms, and confirming the reasonableness of my firm's rates, include *Vedachalam v. Tata Consultancy Servs., Ltd.,* 2013 WL 3941319, *2 (N.D. Cal. Jul. 18, 2013), a class action in which the Court approved plaintiffs' counsel's rates as "reasonable in light of their experience" and "comparable to other attorneys in this field."  I reviewed the declarations filed in March 2013 by the San Francisco and Oakland law firms in *Vedachalam*.  They reflect the following rates:

| Professional | Rate | Year of Admission | Firm |
|---|---|---|---|
| Kelly M. Dermody | $725 | 1993 | Lieff Cabraser Heimann & Bernstein |
| Daniel Feinberg | $725 | 1988 | Lewis, Feinberg, Lee, Renaker & Jackson |
| Rachel Geman | $625 | 2003 | Lieff Cabraser Heimann & Bernstein |
| Steven M. Tindall | $625 | 1996 | Rukin Hyland Doria & Tindall |
| Jahan Sagafi | $550 | 1998 | Lieff Cabraser Heimann & Bernstein |
| Daniel Hutchinson | $525 | 2005 | Lieff Cabraser Heimann & Bernstein |
| Carol Morganstern | $400 | 2006 | Rukin Hyland Doria & Tindall |
| Angela Perone | $375 | 2006 | Rukin Hyland Doria & Tindall |

24.     These historical 2013 market rates are entirely consistent with my firm's 2016 rates of $745 for myself, for a 1992 admittee with 24 years of experience; $725 for Ms. Rogers, a 1986 admittee with 29 years of experience; and $475 for Mr. Saunders, a 2009 admittee with 7 years of experience.

25.     Another case that supports my firm's hourly rates is *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 454 (E.D. Cal. 2013).  There, the Court considered the claimed hourly rates of a law firm based in the greater Los Angeles area and reduced them to levels it considered "prevalent within the Eastern District."  *Id.* at 452.  Those rates, *three years ago*, were $730 for an attorney with 21 years of experience, $560 for an attorney with 8 years of experience, and $400 for an attorney with 5 years of experience.  *Id.*  My firm's current rates are consistent with and fully supported by these three-year-old rates.

26.     Additionally, in setting my 2015 rates, which I did not increase in 2016, I considered many of the numerous declarations filed in support of the motions for awards of attorneys' fees in two other class action cases in which I am co-counsel of record:  *Hohnbaum v. Brinker Restaurant Corp.*, Case No. GIC834348 (San Diego Sup. Ct.) and *O'Bannon v. National Collegiate Athletics Association (NCAA)*, Case No. 4:09-cv-01967-CW (N.D. Cal.).  Fee declarations were publicly filed in these cases in the last three months of 2014.  A sampling of the rates set forth in those declarations is attached hereto as **<u>Exhibit 4</u>**.  Based on in part on the information in these declarations, I established my 2015 and 2016 rates for my firm's professionals that are well within the range of rates charged by competing plaintiff-side class action law firms for attorneys and paralegals with comparable levels of experience and expertise in California.

27.     With respect to paralegal rates, market information supports the rate of $295 for senior litigation paralegal Gary M. Gray, who performed important work for the benefit of the class in this case.  Mr. Gray is a seasoned litigation paralegal with over 25 years of experience, and his rate of $295 is well within the range charged by other law firms for similarly experienced paralegals, as demonstrated by the following data:

a.     In the *TFT-LCD* matter, the Zelle Hofmann firm attested to 2012 paralegal rates of $290 and $275 for its most experienced paralegals who worked on the case; Girard Gibbs LLP attested to a 2012 rate of $290 for its most experienced paralegal; and Hausfeld LLP attested to 2011 rates of $300 and $275 for its most experienced paralegals.

1

2          b.       In *L.H. v. Schwarzenegger*, 645 F.Supp.2d 888 (E.D. Cal. 2009), the

3  Rosen firm attested to a 2010 paralegal rate of $275 for its most experienced paralegal who

   worked on the case.

4          c.       In *Vedachalam v. Tata Consultancy Servs., Ltd.*, 2013 WL 3941319 (N.D.

5  Cal. Jul. 18, 2013), the Lieff Cabraser firm attested to 2013 paralegal rates of $295 for two of its

6  litigation paralegals, and the Rukin Hyland firm attested to a 2013 paralegal rate of $275 for a

7  paralegal with 17 years of litigation experience.  *See also*, *e.g.*, *Barnes v. The Equinox Group,*

8  *Inc.*, 2013 WL 3988804, *4 (N.D. Cal. Aug. 2, 2013) (approving legal assistant rate of $265).

9          d.       In the *O'Bannon* matter, the Hausfeld firm attested to historical rates of

10 $275 to $320 for its litigation paralegals; the Robbins Geller firm attested to a paralegal rate of

11 $295 per hour; and Venable LLP attested to a historical paralegal rate of $275 per hour.

12         28.      In view of Mr. Gray's 25 years of litigation experience, his 2016 rate is fully

13 consistent with these historical market rates for paralegals from the period 2010 to 2014.

14         29.      My firm's rates have been repeatedly approved by other judges in past fee

15 applications, including the following illustrative examples:

16         a.       On August 4, 2015, Stanislaus County Superior Court Judge Barbara A.

17 Kronlund approved a fee application including my firm's current hourly rates of $745 for myself,

18 $725 for Ms. Rogers, $475 for Mr. Saunders, and $295 for Mr. Gray.

19         b.       On December 12, 2014, San Diego County Superior Court Judge

20 Katherine A. Bacal approved a fee application including my firm's historical hourly rates of

21 $725 for myself, $710 for Ms. Rogers, and Mr. Gray's current hourly rate of $295.

22         c.       On April 11, 2014, San Francisco Superior Court Judge John E. Munter,

23 who was at the time one of the two complex litigation judges of the San Francisco Superior

24 Court, approved a fee application including my firm's historical hourly rate of $725 for myself,

25 $695 for Ms. Rogers, and $285 for Mr. Gray.

26         d.       On December 3, 2010, Sacramento County Superior Court Judge

27 Shelleyanne W.L. Chang approved a fee application including my firm's historical hourly rates

28 of $675 for myself, and $265 for Mr. Gray.

e.       On August 6, 2010, San Francisco Superior Court Judge Richard A. Kramer, who was at the time one of the two complex litigation judges of the San Francisco Superior Court, approved a fee application including the historical hourly rates of $675 for myself and $265 for Mr. Gray.

### Information From Class Counsel's Motion
### That Supports Kralowec Law's Rates and Lodestar

30.       *Hendricks* counsel's own fee motion contains information supporting the conclusion that the rates charged by my firm, and our lodestar, are reasonable and appropriate. Mr. Bursor's declaration (Dkt. No. 262-1), at paragraph 79, lists nine example cases in which certain hourly rates were approved.  I was personally involved as co-counsel for the class in three of those nine cases, and the rates approved in those matters included those established by my firm (or my former firm) for my own work:  *In re TFT-LCD*; *Credit/Debit Card Tying Cases*; and *Savaglio v. Wal-Mart*.

31.       Mr. Bursor, a 1996 law school graduate with less than twenty years of practice experience, seeks approval of an hourly rate of $850 for himself.  This shows that the rates of $745 and $725 for myself and Ms. Rogers are more than reasonable.  Ms. Rogers and I graduated many years before Mr. Bursor did (in 1986 and 1992, respectively) and we both have many more years of practice experience—*ten* years more, in Ms. Rogers' case, and four years more in mine. In fact, Mr. Bursor's claim for this rate fully supports an enhancement of our time.

### Kralowec Law Took on Significant Contingency Risk
### In Order to Pursue This Matter

32.       My firm undertook this litigation on a pure contingency basis.  If we had not been working on this matter, we would have expended those hours working on other pending cases in which attorneys' fees have been or are expected to be awarded in the future.

33.       During the Initial Objection Period, my firm had three full-time attorneys and one paralegal; presently, it has two full-time attorneys and one paralegal.  The time and effort expended by my firm in this matter represented a significant commitment of our limited resources, with no guarantee of any compensation.  As noted by Judge Carter in a recent order,

"small firms with fewer than fifteen attorneys … face even greater risks in litigating large class actions with no guarantee of payment.  The Court finds that the considerable risk in this case due to the uncertain legal terrain, coupled with Counsel's contingency fee arrangement, weigh in favor of an increase from the benchmark rate."  *Boyd v. Bank of America Corp.,* 2014 WL 6473804, *10 (C.D. Cal. Nov. 18, 2014).

**Unreimbursed Expenses Incurred by Kralowec Law During the Initial Objection Period**

34.     In addition to performing the work described above, from August 2015 through February 2016, Kralowec Law incurred unreimbursed costs and expenses in connection with our clients' objections, totaling $927.18, as follows:

| **Expense Category** | **Amount** |
| --- | --- |
| Copies | $446.75 |
| Computer Research | $420.99 |
| Transcription | $48.60 |
| Travel Expenses | $10.84 |
| **Total** | **$927.18** |

35.     The costs and expenses set forth above are the firm's usual and customary charges for the expenses it incurred in this litigation, and no surcharge has been added to any cost or expense.  The costs and expenses set forth above are also reflected in the books and records of the firm.  These books and records are prepared from expense vouchers and check records and are an accurate record of the expenses incurred.  All such costs and expenses would have been billed to the clients if this had been a non-contingency matter.

**Incentive Awards Should Be Approved for Objectors Moore and Gore**

36.     As mentioned above, our clients Mr. Moore and Ms. Gore worked closely with us to prepare their declarations in support of the objections, and provided additional information and documents to us in support of those efforts.  The declarations established their standing to assert these objections by documenting their purchases of qualifying cans of tuna (the "StarKist Products" as defined in the Stipulation of Settlement, Dkt. No. 183-1, ¶1.3) during the *Hendricks*

1    class period (as defined in the Stipulation of Settlement, *id.*, ¶6.1).  Absent their contributions,

2    my firm could not have asserted these objections or obtained the Court's favorable order

3    disapproving the overbroad original release, and preserving the rights of the class to assert claims

4    against StarKist in other litigation.

5         37.    The Stipulation of Settlement sets aside up to $5,000 each for named plaintiff Mr.

6    Hendricks, and for eight Interested Parties, for a total of $45,000.  *See* Dkt. No. 183-1, ¶3.2.  Mr.

7    Bursor's fee motion, however, seeks $5,000 for Mr. Hendricks and only $1,000 for each of the

8    eight Interested Parties, for a total of $13,000.  *See* Dkt. No. 262 at 22:11-12, 23:27-28.  Fairness

9    dictates that the same incentive awards be approved for Mr. Moore and Ms. Gore, whose

10   contributions benefited the class by leading to a significantly narrower release, as are sought for

11   the Interested Parties.  What is more, funds are readily available because the Stipulation of

12   Settlement sets aside up to $45,000 for incentive awards, but plaintiff's motion seeks only

13   $13,000.  Awarding an additional $1,000 each to Mr. Moore and Ms. Gore would result in a total

14   of $15,000 in incentive awards to the named plaintiff and 10 class members, well below the

15   $45,000 set-aside.

16   **Calculation of Kralowec Law's Proportionate Lodestar Vis-à-vis *Hendricks* Counsel**

17        38.    The combined lodestars of Kralowec Law and Taylor-Manning, together with the

18   lodestar claimed by Bursor & Fisher (which is $1,583,532 (*see* Dkt. No. 262, at 16:5; Dkt. No.

19   360, ¶4)), is $1,737,057.50.  The sum set aside in the Stipulation of Settlement for attorneys' fees

20   ($4 million; *see* Dkt. No. 183-1, ¶3.1), if awarded, would represent a multiplier of approximately

21   2.3 for the three firms' combined work.  An award to Kralowec Law of $318,228, and to Taylor-

22   Manning of $34,879.50, representing our firms' proportionate lodestar shares, would be

23   reasonable and appropriate, as well as consistent with class counsel's own fee motion.

24   **Experience, Expertise and Reputation of the Professionals of Kralowec Law**

25        39.    I graduated *cum laude* from Pomona College in Claremont, California in 1989,

26   where I majored in English and was the recipient of the F.S. Jennings Prize in Expository

27   Writing.  In 1992, I graduated from the University of California, Davis, School of Law, where I

28   served as Senior Articles Editor of the *U.C. Davis Law Review*.  My law review article,

1
2
3
4

"Estoppel Claims Against ERISA Employee Benefit Plans," 25 *U.C. Davis L. Rev.* 487 (1992), was the winner of the Patrick J. Hopkins Memorial Writing Award for best student law review article of the year.  After law school, I clerked for the Honorable David Mannheimer, Judge of the Court of Appeals of the State of Alaska.

5
6
7
8
9
10
11
12

      40.     I have been licensed to practice law in California since 1992 and have substantial experience prosecuting and defending complex class action cases in state and federal court.  I am a former member of Severson & Werson, P.C., a 100-attorney San Francisco litigation firm, where I defended complex class action cases from 1996 through 2001.  Since 2001, I have handled plaintiff-side consumer, antitrust, and wage and hour class actions, first with The Furth Firm LLP in San Francisco, and later as a partner with Schubert Jonckheer Kolbe & Kralowec LLP (now known as Schubert Jonckheer & Kolbe LLP), also in San Francisco.  My present firm, which I founded in 2010, handles complex class action cases almost exclusively.

13
14
15

      41.     Many of the class action litigation matters that I have handled during the course of my career are detailed in my firm resume, attached as **<u>Exhibit 1</u>**.  The following matters are illustrative of my experience:

16
17
18
19
20
21

      a.     I served as Lead Counsel for the plaintiffs in *Abid v. Grosvenor Bus Lines, Inc., et al.* (California Superior Court, City and County of San Francisco), an antitrust class action alleging that the three major San Francisco sightseeing tour operators agreed to price-fix the commissions they paid to hotel employees and other sales agents and to jointly lower the commissions to anticompetitive levels, in violation of the Cartwright Act and the UCL.  The action settled for $3.1 million and injunctive relief.

22
23
24
25
26
27

      b.     I served as Co-Counsel for the indirect purchaser plaintiffs in *In re Credit/Debit Card Tying Cases* (California Superior Court, City and County of San Francisco), an antitrust and UCL action alleging that credit card issuers (Visa and MasterCard) unlawfully tied their debit card services to their credit card services, resulting in inflated merchant exchange fees for debit card services that were passed on to the plaintiff retail customers.  The action settled for $30 million.

28

c.     I served as Co-Counsel for the indirect purchaser plaintiffs in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, M.D.L. No. 1827 (N.D. Cal.), alleging price-fixing by the major manufacturers of flat-panel liquid crystal displays.  An associate of my firm was a critical member of the document review, deposition preparation, and trial preparation teams, as well as the team who successfully opposed the defendants' FTAIA motion (the Foreign Trade Antitrust Improvements Act of 1982).  In addition, I personally worked on research and briefing necessary to establish the collateral and/or judicial estoppel effect of the guilty pleas entered by numerous defendants in that litigation.  The action settled for over $1 billion.

d.     I served as Co-Counsel for the plaintiffs in *In re Apple iPhone/iPod Warranty Litigation*, Case No. 10-CV-01610 (N.D. Cal.), a breach of warranty and UCL action alleging that Apple improperly denied warranty coverage in reliance on hair-trigger "liquid contact indicators" that did not reliably indicate whether a customer's iPhone or iPod was damaged by water.  I was extremely active on a day-to-day basis in all aspects of this litigation from filing to conclusion. One of my firm's contributions was to maintain and host the computerized document repository on our server, allowing remote access to other attorneys on our team to the extensive document productions made by Apple.  The action settled for $53 million.

e.     I serve as Co-Lead Counsel for the plaintiffs in *Streit v. Farmers Group, Inc. et al.* (Los Angeles County Superior Court), a UCL class action alleging that defendant insurance company failed to adequately disclose its charges for mid-term policy cancellation. Initially retained to serve as lead appellate counsel, I obtained a full reversal of an order sustaining the defendant's demurrer without leave to amend, and I now serve as Co-Lead Counsel in the trial court proceeding.  In July 2015, the Court granted our motion for class certification of a class of almost 400,000 Farmers insurance policyholders.  In November 2015, the Court granted our motion for summary adjudication of issues, holding that Farmers is liable to the class.  The amount of damages, restitution and interest that Farmers owes the class, which we estimate at approximately $30 million, will be fixed by the Court at a future hearing.

f.      I served as lead appellate counsel in *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012).  My work included developing the appellate theories, drafting the successful petition for review, drafting all of the appellate briefs on the merits, and presenting the oral argument before the California Supreme Court.  As a result of my work, the Supreme Court reinstated the matter as a certified class action, and provided important clarifications of California class action law that have had wide-ranging impact in class action litigation both in state and federal court.   The *Brinker* case alleged violations of California's meal period and rest break laws, and the certified class consisted of over 60,000 California employees of Brinker Restaurant Corporation, which operates Chili's, the Macaroni Grill, and other statewide restaurant chains.  The clarifications provided by the Supreme Court in its *Brinker* opinion have led to reversal of numerous orders denying class certification in other wage and hour cases, as well as many more California employees receiving their meal periods.  The case settled for $56.5 million.

g.      I serve as Co-Lead Counsel for the plaintiffs in *Bluford v. Safeway Stores, Inc.* (Stanislaus County Superior Court), a class action alleging violations of California's meal period, rest break, and wage statement laws.  I actively provided behind-the-scenes consultation work on the appellate briefing that led to reversal of the trial court's order denying class certification, *Bluford v. Safeway Stores, Inc.*, 216 Cal.App.4th 864 (2013), and served as Co-Lead Counsel at the trial court level thereafter.  The case settled for $30 million last year.  In approving the settlement, Judge Barbara A. Kronlund "commend[ed]" all counsel for our "fortitude" and for conducting ourselves "civilly" and "professionally" in representing the class.

h.      I served as Co-Counsel for the plaintiffs in *Ackerman v. Zynga Inc.* (San Francisco Superior Court), a UCL class action that settled for relief valued at more than $10 million, and in which former San Francisco Superior Court Complex Litigation Judge John E. Munter praised our work as "absolutely outstanding."

42.     Of the five cases listed by *Top Class Action* as involving "the biggest class action settlement payments awarded to consumers in 2014," my firm was actively involved in the top two cases:  *In re TFT-LCD Antitrust Litigation* (settlements totaling $1.1 billion) and *In re Apple iPhone/iPod Warranty Litigation* (settlement totaling $53 million).

43.     In 2013, I received a California Lawyer Attorney of the Year ("CLAY") Award from California Lawyer in recognition of my work on the *Brinker* class action.  In 2012 and 2013, I was named by the *Daily Journal* as one of the Top 100 Labor & Employment Lawyers in California, and in 2012, as one of the Top 100 Women Lawyers in California.  I have been selected for inclusion in *Northern California Super Lawyers* every year from 2011 through 2016.  In 2010, I was honored by the Women's Caucus of Consumer Attorneys of California as their Consumer Advocate of the Year.

44.     In addition to being an active litigator, since 2003, I have been the author of *The UCL Practitioner* (http://www.uclpractitioner.com), a weblog on California's Unfair Competition Law and California class action practice.  On a typical business day, my blog receives over 250 page views, and in addition, my posts are emailed to a subscriber base exceeding 300 members.  My regular readers include lawyers, judges and judicial research attorneys.  I am regularly quoted in the press as an expert on the UCL and class action litigation.

45.     I publish and lecture widely on California class action practice, antitrust law, and the UCL.  In addition to regularly publishing new material at *The UCL Practitioner*, recent print articles include  "Supreme Court probing 'pay-for-delay,'" *Daily Journal* (March 17, 2015), "*Dukes* and Common Proof in California Class Actions," *Competition* (Summer 2012), and "Evidentiary Extrapolations in California Class Actions: Guidance from *Brinker*," *California Litigation* (July 2012).

46.     Recent speaking engagements include "25th Anniversary Retrospective and Prospective Views on California Antitrust and Unfair Competition Law" (State Bar of California Antitrust, UCL and Privacy Section, October 2015); "Class Certification Issues and Trial Techniques for UCL and CLRA Class Actions" (State Bar of California Antitrust and Unfair Competition Law Section, October 2013); "Aggregate Proof or 'Trial by Formula'" (The Impact Fund, 11th Annual Class Action Conference, February 2013), and "The U.S. Supreme Court Redirects Class Action Defense" (American Bar Association, Section of Antitrust Law, 60th Annual Spring Meeting, March 2012).

47.     I served as a member of the Executive Committee of the Antitrust and Unfair Competition Law Section of the State Bar of California from 2008 to 2013, most recently as the First Vice Chair of the Section.  I served as a member of the Board of Governors of Consumer Attorneys of California ("CAOC") from 2007 to 2012.  I am an active member of the amicus curiae committees of both "CAOC" and the California Employment Lawyers Association ("CELA").  I have authored *amicus curiae* briefs on behalf of CAOC and/or CELA in a number of significant cases, including *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, in which California Supreme Court provided further clarification of California class action law on the heels of *Brinker*, and *In re Cipro Cases I & II*, 61 Cal.4th 116 (2015), in which the Supreme Court addressed the legality of "pay-for-delay" agreements under California antitrust law.

48.     In 2007, former Alameda County Superior Court Judge Ronald M. Sabraw, who presided over one of the two Complex Litigation Departments of that Court for seven years, wrote as follows:  "During my seven years in complex litigation I had the good fortune of seeing some of the best and brightest lawyers who practice in the areas of consumer class actions, labor and employment class actions, mass tort claims and a variety of complex business disputes.  I can say without equivocation that Ms. Kralowec was one of the most talented and capable lawyers to appear in my courtroom."

49.     The background and experience of the other current and former professionals of Kralowec Law who performed important work on this matter (attorneys Kathleen S. Rogers and Chad A. Saunders, and paralegal Gary M. Gray) are set forth in the firm resume attached hereto as Exhibit 1.

### "Meet and Confer" Efforts with *Hendricks* Counsel re This Motion

50.     In our objection brief filed on March 29, 2016, we informed *Hendricks* counsel that we intended to move for attorneys' fees.  *See* Dkt. No. 352, at pp. 2-3, 16.  They formally addressed that anticipated motion in the response filed on April 5, 2016 (Dkt. No. 359, at pp. 3-5).  The response did not indicate any willingness to agree to consent to payment of any of our fees or expenses.  Nevertheless, on April 20, 2016, I emailed Mr. Bursor and invited him to "meet and confer" in a further effort to informally resolve our fee claim.  As of the date of this

1    filing, the issue has not been resolved.

2         I declare under penalty of perjury under the laws of the United States of America that the

3    foregoing is true and correct and that this declaration was executed on April 20, 2016 at San

4    Francisco, California.

5

6              _____*/s/ Kimberly A. Kralowec*_____
               Kimberly A. Kralowec

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



# THE KRALOWEC LAW GROUP
44 MONTGOMERY STREET, SUITE 1210
SAN FRANCISCO, CA 94104
TEL: (415) 546-6800

**The Kralowec Law Group** was founded in 2010 by attorney Kimberly A. Kralowec. The firm's practice focuses on plaintiffs' class action litigation (antitrust, consumer, wage & hour, and civil rights) in state and federal courts.   A list of representative matters handled by attorneys of the firm appears below.

## THE FIRM'S PROFESSIONALS

**Kimberly A. Kralowec, Principal.**   During her 24-year career as a litigator, Ms. Kralowec has handled class action matters involving employment (wage and hour and misclassification), consumer finance (mortgage and auto), retail products (mislabeling and nondisclosure), antitrust (price-fixing and monopolization), and civil rights (Unruh Act).   She has also handled numerous class actions alleging violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*) and Consumers Legal Remedies Act (Cal. Civ. Code §§1750 *et seq.*).

Ms. Kralowec served as lead appellate counsel for the employees in *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012), in which the California Supreme Court provided important clarifications of California class action law.   Ms. Kralowec was named by the *Daily Journal* as one of the Top 100 Labor & Employment Lawyers in California and one of the Top 100 Women Lawyers in California, and received a 2013 *California Lawyer* Attorney of the Year ("CLAY") Award in recognition of her work on *Brinker*.   She has been selected for inclusion in *Northern California Super Lawyers* each year from 2011 to 2015.

Ms. Kralowec is the author of *The UCL Practitioner* (http://www.uclpractitioner.com), the first and only weblog on California's Unfair Competition Law and California class actions.   Created in 2003, *The UCL Practitioner* is visited an average of 250 times per business day and is used as a research and reference tool by judges, research attorneys, and practicing lawyers. In 2008, Ms. Kralowec was recognized by American Lawyer as one of 20 "Strong Female Voices in the Legal Blogosphere."   She is regularly quoted in the press as an expert on the UCL, CLRA, and class action practice.   *See* http://www.uclpractitioner.com/press.html.

Ms. Kralowec publishes and lectures widely.   Recent speaking engagements include "25th Anniversary Retrospective and Prospective Views on California Antitrust and Unfair Competition Law" (State Bar of California Antitrust and Unfair Competition Law

Section, October 2015) (with the Hon. Susan Illston, moderator); "Aggregate Proof or 'Trial by Formula'" (The Impact Fund, February 2013); 8th Annual Advanced Wage & Hour Seminar (California Employment Lawyers Association, May 2012); "The U.S. Supreme Court Redirects Class Action Defense" (American Bar Association, March 2012); "State Consumer Protection Laws: Enforcement and Litigation Trends in California" (American Bar Association, Section of Antitrust Law , May 11, 2011); "The Potential Impact of *Dukes* on Class Certification in Antitrust and UCL Cases in the Ninth Circuit" (State Bar of California Antitrust and Unfair Competition Law Section, July 22, 2010); and "Antitrust Institute 2010: Developments & Hot Topics" (Practising Law Institute, May 21, 2010).

Recent print articles include "Supreme Court probing 'pay-for-delay,'" *Daily Journal* (March 17, 2015); "*Dukes* and Common Proof in California Class Actions," *Competition* (Summer 2012); "Evidentiary Extrapolations in California Class Actions: Guidance from *Brinker*," *California Litigation* (July 2012); and "UCL Class Actions After *In re Tobacco II*," *CAOC Forum* (September/October 2009).

In 1992, Ms. Kralowec graduated from the University of California, Davis, School of Law, where she served as Senior Articles Editor of the *U.C. Davis Law Review*. Her law review article, "Estoppel Claims Against ERISA Employee Benefit Plans," 25 *U.C. Davis L. Rev.* 487 (1992), earned the Patrick J. Hopkins Memorial Writing Award for best student article of the year. In 1989, she graduated from Pomona College in Claremont, California with a B.A. in English (*cum laude*). While at Pomona College, she received the F.S. Jennings Prize in Expository Writing and was a three-time Pomona College Scholar. In 1992-1993, she served as a judicial clerk for Judge David Mannheimer of the Alaska Court of Appeals.

Ms. Kralowec is a former partner of Severson & Werson, P.C., a 100-attorney San Francisco litigation firm, where she regularly defended class action and UCL matters (2000-2001; Associate, 1996-2000). From 2001 through the present, Ms. Kralowec's practice has focused almost exclusively on plaintiff-side class action litigation, first as Of Counsel to The Furth Firm LLP in San Francisco, and later as a partner with Schubert Jonckheer Kolbe & Kralowec LLP, before founding her own firm in March 2010.

Ms. Kralowec served as a member of the Executive Committee of the Antitrust and Unfair Competition Law Section of the State Bar of California from 2008 through 2013, and currently serves as an advisor to the Section. She is an active member of the amicus curiae committee of Consumer Attorneys of California, on whose Board of Governors she served from 2007-2012. She drafted the amicus curiae brief of CAOC in *In re Cipro Cases I & II*, 61 Cal.4th 116 (2015), in which the California Supreme Court addressed the legality of "pay-for-delay" agreements under California antitrust law.

Ms. Kralowec is admitted to practice in California, the United States Courts of Appeals for the Ninth, Fifth, and Eleventh Circuits, the federal district courts in California, and the United States Supreme Court.

**Kathleen Styles Rogers, Of Counsel.** Ms. Rogers' diverse legal career includes over 20 years' experience practicing antitrust and other complex business litigation, as well as 6 years' experience as Senior Counsel for MCI Telecommunications Corp. Her litigation

experience includes class action matters involving antitrust, employment and unfair competition law (California's Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*).

Ms. Rogers received her B.A. from the University of California, Santa Barbara, and her J.D. from the University of Santa Clara, School of Law, where she served as the first Articles Editor of Santa Clara's *Computer & High-Technology Law Journal*.  During law school, Ms. Rogers served as a judicial extern for Justice Edward A Panelli during his tenure on the California Court of Appeal, First Appellate District.

Ms. Rogers formerly was Of Counsel to San Francisco complex litigation firms including The Furth Firm LLP and Hausfeld LLP and was Partner in a general litigation firm with former Congressman Paul N. "Pete" McCloskey, Jr.

Ms. Rogers is admitted to practice in California, the United States Court of Appeals for the Ninth Circuit and federal district courts in California.

**Arthur C. Kralowec, Of Counsel.**  Mr. Kralowec received his B.A. degree in History from the University of Southern California in 1963.  He was awarded his J.D. degree in 1971 from the University of California, Davis, School of Law.  Mr. Kralowec has handled litigation and transactional matters for more than 35 years, including regular jury trials throughout his career.  He is admitted to practice in all state and federal courts in California.

**Gary M. Gray, Senior Paralegal and Administrator.**  Mr. Gray was educated at the University of California, Santa Cruz, and has over 20 years' experience as a litigation paralegal, first with The Furth Firm LLP and its predecessors and more recently with the Chicago firm of Miller Law LLC.  He has had intensive involvement, from pre-filing research through trial and post-trial settlement administration, in numerous antitrust and price-fixing cases, including *Kendall-Jackson v. Gallo* (trade dress), *Alakayak v. All Alaskan* (Bristol Bay Salmon Price-Fixing Litigation), *High Pressure Laminates Antitrust Litigation*, *Microcrystalline Cellulose Antitrust Litigation*, *Abid v. Grosvenor Bus Lines, Inc.*, Nurse Wages Cases (*Reed v. Advocate Healthcare, Inc.*), and *Apple iPhone/iPod Warranty Litigation*.

## FORMER PROFESSIONALS OF THE FIRM

**Chad A. Saunders, Associate.**  Mr. Saunders was an associate of the firm from December 2014 until March 2016. He has extensive experience with complex litigation matters, including taking a lead role in numerous class actions in California and Federal courts.  Mr. Saunders received his J.D. from New College of California School of Law in 2008, and a B.A. in Philosophy from UMBC in 2001. In law school, he worked as a law clerk for the non-profit law firms Legal Services for Children and Disability Rights California. He is the President of the Board of P.E.E.R.S., an Oakland-based mental health advocacy organization, and a member of the Finance Committee of the Bay Area Chapter of the National Lawyers Guild. Mr. Saunders is admitted to practice in California, the Ninth Circuit Court of Appeals, and all California federal district courts.

### REPRESENTATIVE MATTERS

#### Antitrust Class Actions

**In re TFT-LCD (Flat Panel) Antitrust Litigation** (U.S. District Court, Northern District of California) (Judicial Panel on Multidistrict Litigation No. 1827). Co-counsel for nationwide and California classes of indirect purchasers of flat-panel displays (liquid crystal displays or "LCDs") including computer monitors, laptops, and televisions. Plaintiffs allege that defendants, who are among the major manufactures of LCDs worldwide (including Samsung, Hitachi and LG Philips), engaged in a wide-ranging conspiracy to eliminate competition and to fix and inflate the prices of the displays, resulting in significant increased costs to consumers. Action settled for nearly $1 billion.

**3M Transparent Tape Cases** (California Superior Court, City and County of San Francisco, Judicial Council Coordination Proceeding). Co-Lead counsel for plaintiffs in a class action brought on behalf of California indirect purchasers of 3M's transparent tape. Plaintiffs alleged that 3M unlawfully maintained a monopoly in the market for invisible and transparent home and office tape through various arrangements, contracts, agreements, trusts and combinations in restraint of trade designed primarily to restrict the availability of lower priced transparent tape products to consumers and to maintain high retail prices for its Scotch Brand retail products. Action settled for relief valued at approximately $42 million.

**In re Credit/Debit Card Tying Cases** (California Superior Court, City and County of San Francisco, Judicial Council Coordination Proceeding). Co-counsel for plaintiffs in putative class action under California Unfair Competition Law alleging that credit card issuers (Visa and MasterCard) unlawfully tied their debit card services to their credit card services, resulting in inflated merchant exchange fees for debit card services that were passed on to the plaintiff retail customers. Action settled for $31 million.

**Abid v. Grosvenor Bus Lines, Inc., et al.** (California Superior Court, City and County of San Francisco). Lead counsel for plaintiffs in antitrust class action brought on behalf of hotel employees and other sales agents who were paid by commission for selling sightseeing bus tours of San Francisco and other nearby tourist destinations. The suit alleged that the three major San Francisco sightseeing tour operators agreed to price-fix the commissions they pay to the sales agents and to jointly lower the commissions to anticompetitive levels in violation of California's Cartwright Act and unfair competition law. Action settled for $3.1 million and injunctive relief.

**Mathews v. Bumble Bee Foods LLC, et al.**, **Gore v. Bumble Bee Foods LLC, et al.**, and **Moore v. Bumble Bee Foods LLC, et al.** (U.S. District Court, Southern District of California). Co-counsel for nationwide and California class of indirect purchasers of canned tuna and other packaged seafood products. Plaintiff alleges that defendants, who are the top three U.S. producers of these products, entered into a price-fixing conspiracy. Action pending.

**In re Dynamic Random Access Memory (DRAM) Antitrust Litigation** (U.S. District Court, Northern District of California). Co-counsel for a putative nationwide class of indirect purchasers of DRAM. Plaintiffs allege that the defendants, who are among the

world's largest manufacturers of DRAM, conspired to illegally fix the price of DRAM sold in the United States. The firm represents a client who assembled and sold specially-configured, high-performance computers in California during the class period.  Action settled for $310 million in aggregate settlements (approval pending).

**In re Optical Disk Drives Antitrust Litigation** (U.S. District Court, Northern District of California).  Co-counsel for nationwide class of direct purchasers of optical disk drives, including those installed in laptop computers and CD players.  Plaintiffs allege that defendants, who are among the major manufacturers of optical disk drives worldwide, engaged in price-fixing and a conspiracy to eliminate competition.   Settlements of $37.75 million approved to date.  Action pending.

**In re Skelaxin (Metaxalone) Antitrust Litigation** (U.S. District Court, Eastern District of Tennesee).  Co-counsel for class of independent pharmacies who purchased branded Skelaxin, a muscle-relaxant drug, for resale.  Plaintiffs allege that King Pharmaceuticals conspired with its competitors to delay market entry of a generic version of the drug. Action settled for $2.1 million.

**Brigiotta's Farmland Produce and Garden Center, Inc. v. United Potato Growers of Idaho, Inc. et al.** (U.S. District Court, District of Idaho).  Co-counsel for nationwide class of direct purchasers of fresh and process potatoes.  Plaintiffs allege that defendants engaged in a conspiracy to drive up prices of potatoes nationwide by diminishing output through agreements to reduce acreage and other anticompetitive means.  Action settled for $19.5 million.

**In re Musical Instruments Antitrust Litigation** (U.S. District Court, Southern District of California).  Co-counsel for nationwide class of direct purchasers of guitars and other musical instruments from Guitar Center.  Plaintiffs allege a scheme involving Guitar Center, the National Association of Music Merchants, and various retailers and manufactures to eliminate competition in the market for musical instrument products. Action concluded.

**Nurse Wages Cases: Reed, et al. v. Advocate Healthcare, Inc. et al.** (U.S. District Court, Northern District of Illinois).  Co-counsel for plaintiff RNs in price-fixing class action alleging that the named defendant healthcare providers have conspired to fix and depress wages being paid to the nurse plaintiffs, and that they accomplished the conspiracy through unlawful exchanges of wage information through trade associations and otherwise.  Action settled.

**In re Static Random Access Memory (SRAM) Antitrust Litigation** (U.S. District Court, Northern District of California).  Co-counsel for nationwide class of indirect purchasers.  Plaintiffs alleged that the defendants, who are among the world's largest manufacturers of SRAM, conspired to illegally fix the price of SRAM sold in the United States.  Action settled for $41.3 million.

**In re Microcrystalline Cellulose Antitrust Litigation** (U.S. District Court, Eastern District of Pennsylvania).  Lead counsel for Food Purchasers class.  Plaintiffs alleged a conspiracy to fix prices among the manufacturers of microcrystalline cellulose, a common additive in foods and pharmaceuticals.  Action settled for $50 million.

**Natural Gas Anti-Trust Cases I, II, III &IV** (California Superior Court, County of San Diego).  Co-counsel for direct and indirect purchasers.  Plaintiffs alleged a conspiracy to fix prices and supplies of natural gas during the 2001 energy crisis.  Action settled for $160 million.

**In re Western States Wholesale Natural Gas Antitrust Litigation** (U.S. District Court, District of Nevada).  Co-lead counsel for direct purchasers.  Plaintiffs alleged a conspiracy to fix prices and supplies of natural gas during the 2001 energy crisis.  Action settled for $25.95 million.

**In re Korean Air Lines Co., Ltd. Antitrust Litigation** (U.S. District Court, Central District of California).  Co-lead counsel for nationwide class of indirect purchasers of air travel services.  Action settled for $65 million.

<u>**Consumer Class Actions**</u>

**In re Apple iPhone/iPod Warranty Litigation** (U.S. District Court, Northern District of California).  Co-counsel in consumer class action on behalf of owners of iPhone and iPod touch devices alleging that Apple fails to honor its warranty obligations and uses faulty Liquid Submersion Indicators as a basis for improper denial of warranty coverage.  Action settled for $53 million.

**Minton v. Herbalife International, Inc. et al.** (California Superior Court, County of Los Angeles). Co-counsel in class action alleging unlawful and fraudulent "endless chain" scheme.  Ms. Kralowec assisted in the class certification, settlement, and settlement approval phases of the case.  Action settled for $1.75 million.

**Streit v. Farmers Group, Inc. et al.** (California Superior Court, County of Los Angeles).  Co-lead Counsel counsel in UCL class action alleging that defendant insurance company failed to adequately disclose its charges for mid-term policy cancellation.  On appeal, obtained reversal of order sustaining demurrer without leave to amend.  Action now pending in trial court.  Class certification and summary judgment on liability granted; damages hearing pending.

**Robinson v. OnStar, LLC** (U.S. District Court, Southern District of California).  Co-counsel in class action alleging that OnStar charged customers' debit and credit cards for continuous OnStar service without the written and/or express authorization required by state and federal law, including the Electronic Funds Transfer Act, the Automatic Renewal Law, and the Unfair Competition Law.  Action pending.

**Ackerman v. Zynga Inc.** (California Superior Court, City and County of San Francisco).  Co-counsel in consumer UCL class action on behalf of purchasers of "Words With Friends" and other games.  Plaintiff alleges that Zynga misrepresented in the Apple App Store that the paid versions of the games would be "ad-free" when they were not.  As a result of lawsuit, the user interface of the games was changed to provide users with the "ad-free" gaming experience they paid for.  Action concluded.

**Levitte v. Google, Inc.** (United States District Court, Northern District of California).  Co-counsel in UCL class action alleging misrepresentations to AdWords customers

regarding the types and quality of the websites on which advertisers' ads would be placed.  Action pending.

**Watts v. Allstate Indemnity Co. et al.** (United States District Court, Eastern District of California).  Co-counsel in UCL, breach of contract and fraud class action against insurance company alleging improper payment of policy benefits.  Action concluded.

**Kent v. Avis Rent A Car System LLC** (California Court of Appeal, Fourth Appellate District, Division Three).  Appellate consultant in UCL and CLRA class action alleging improper administrative fee charges.  Retained to assist with oral argument preparation.  Action concluded.

**Clawson v. Automobile Club of Southern California** (California Superior Court, County of Orange).  Consultant in UCL action alleging violation of California statute governing commission rates for auto insurance sales agents.  Retained to assist with opposing demurrer; demurrer overruled.  Action concluded.

**Compassion Over Killing v. Cal-Cruz Hatcheries** (California Superior Court, County of Santa Cruz).  Co-counsel in UCL action for violation of California animal cruelty laws.  Retained as UCL expert to assist with standing arguments.  Action concluded.

**Cobb v. BSH Home Appliance Corp.**  (United States District Court, Central District of California).  Consultant in UCL, CLRA and breach of warranty action against product manufacturer.  Retained as UCL expert to assist with opposing motions to dismiss; motions denied.  Action concluded.

**Quacchia v. DaimlerChrysler Corporation** (California Superior Court, County of Alameda).  Co-counsel in UCL and CLRA class action alleging failure to disclose known safety defect in seat belt design.  Action concluded.

## Securities Class Actions

**In re AOL Time Warner Securities Litigation** (U.S. District Court, Southern District of New York).  Co-counsel in securities class action alleging falsification of advertising revenues in public filings, improperly inflating stock price.  Ms. Kralowec participated in high-level document review and analysis.  Action settled for $2.5 billion.

**Herron v. Lark Creek Investment Management Co. et al.** (California Superior Court, City and County of San Francisco).  Co-Lead counsel for plaintiffs in derivative and class action litigation on behalf of investors in Madoff feeder fund.  Action settled for $3.66 million.

**Herron v. CARE Market et al.** (California Superior Court, City and County of San Francisco).  Co-Lead counsel for plaintiffs in derivative action seeking clawback of mistakenly-paid false profits for benefit of Madoff feeder fund.  Action pending.

**Wage & Hour and Employment Class Actions**

**Brinker Restaurant Corporation v. Superior Court (Hohnbaum)** (California Superior Court, County of San Diego).  Lead appellate counsel in class action alleging violations of California's meal period and rest break laws.  Certified class consists of over 60,000 California employees of Brinker Restaurant Corporation, which operates Chili's, the Macaroni Grill, and other statewide restaurant chains.  Action settled for $56.5 million.

**Savaglio v. Wal-Mart Stores, Inc.** (California Superior Court, County of Alameda).  The Furth Firm LLP acted as lead counsel in this class action alleging failure to pay meal periods and rest breaks.  Ms. Kralowec assisted with the briefing.  Action resulted in jury verdict of $172 million and settled while on appeal.

**Bluford v. Safeway Stores, Inc.** and **Cicairos v. Summit Logistics, Inc.** (California Superior Court, County of San Joaquin).  Co-lead counsel in class actions alleging violations of California's meal period and rest break laws.  Actions settled for $30 million.

**Thomas v. California State Automobile Association** (California Superior Court, County of Alameda).  Co-counsel in wage and hour class action alleging misclassification of insurance adjusters as "exempt" employees in violation of the Labor Code.  Action settled for $8 million.

**Salvas v. Wal-Mart Stores, Inc.** (Supreme Judicial Court of Massachusetts).  The Furth Firm LLP acted as lead counsel in this class action alleging failure to pay meal periods and rest breaks.  Ms. Kralowec assisted with the appellate briefing.  Action settled for $40 million.

**Frlekin v. Apple Inc.** (U.S. District Court, Northern District of California).  Co-counsel in certified class action seeking compensation for California retail workers' unpaid time spent engaging in employer-required security searches.  Action pending.

**In re AMR Wage & Hour Cases** (California Superior Court, County of Alameda).  Co-lead counsel in wage and hour class action on behalf of putative class of California ambulance drivers, paramedics and dispatchers improperly denied their meal periods and rest breaks.  Action pending.

**Civil Rights Class Actions**

**Adler v. California Family Health LLC dba California Family Fitness** (California Superior Court, County of Sacramento).  Lead counsel in civil rights class action alleging that chain of gyms provided unequal facilities to its members on the basis of gender, in violation of the Unruh Civil Rights Act and other laws.  As a result of lawsuit, single-sex workout areas of gyms were opened up to all members.  Action settled.

**Candelore v. Tinder, Inc.** (California Superior Court, County of Los Angeles).  Co-lead counsel in civil rights class action alleging price discrimination based on age, in violation of the Unruh Civil Rights Act and other laws.  Action pending.

# EXHIBIT 2

1 Kimberly A. Kralowec (Cal. Bar No. 163158)
  Kathleen Styles Rogers (Cal. Bar No. 122853)
2 Chad A. Saunders (Cal. Bar No. 257810)
  THE KRALOWEC LAW GROUP
3 44 Montgomery St., Suite 1210
  San Francisco, CA  94104
4 Telephone:    (415) 546-6800
  Facsimile:    (415) 546-6801
5 Email:        kkralowec@kraloweclaw.com
                krogers@kraloweclaw.com
6               csaunders@kraloweclaw.com

7 *Attorneys for Objectors Colin Moore*
  *and Kathy Durand Gore*
8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11             SAN FRANCISCO DIVISION

12
   PATRICK HENDRICKS, individually and on         Case No. 3:13-CV-0729-HSG
13 behalf of all others similarly situated,

14               Plaintiff,                        **DECLARATION OF KIMBERLY A.**
                                                   **KRALOWEC IN SUPPORT OF**
15         v.                                      **OBJECTION TO FINAL APPROVAL**
                                                   **OF CLASS ACTION SETTLEMENT**
16 STARKIST CO.,                                   **AND NOTICE OF APPEARANCE**

17               Defendant.                        Hearing Date:  Dec. 17, 2015
18                                                 Time: 2:00 pm
                                                   Judge:  Hon. Haywood S. Gilliam, Jr.
19                                                 Courtroom 15, 18th Floor

20

21

22

23

24

25

26

27

28

DECLARATION OF KIMBERLY A. KRALOWEC, CASE NO. 3-13-CV-0729-HSG

I, Kimberly A. Kralowec, declare as follows:

1.     I am an attorney licensed to practice law in the State of California and before this Court. I am the principal of The Kralowec Law Group, counsel of record for the plaintiffs in *Davis-Mathews v. Bumble Bee Foods, LLC, Tri-Union Seafoods LLC, and StarKist Company*, Case No. 15-cv-01878-JLS-MDD (S. D. Cal.), *Moore v. Bumble Bee Foods, LLC, Tri-Union Seafoods LLC, and StarKist Company*, Case No. 15-cv-01911-JLS-MDD (S.D. Cal.), and *Gore v. Bumble Bee Foods, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc.*, Case No. 15-cv-2121-JLS-MDD (S.D.Cal.). I make this declaration in support of the objections of my clients, Colin Moore and Kathy Durand Gore, as well as the objections of the other class members, to final approval of the class action settlement in the above-referenced *Hendricks* action. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

## The Packaged Seafood Products Antitrust Litigation

2.     This objection asserts that the overbroad release in the Stipulation of Settlement in *Hendricks* (Dkt. No. 183-1) may impact a series of antitrust cases filed in the wake of a public announcement, on July 23, 2015, that the U.S. Department of Justice had commenced a civil grand jury investigation into price-fixing of canned tuna and other Packaged Seafood Products,[1] and that civil investigative subpoenas had been issued to Tri-Union Seafoods, Inc., dba Chicken of the Sea, Bumble Bee Foods, LLC, and (on information and belief), Starkist. *See* Complaint filed Aug. 28, 2015, *Moore v. Bumble Bee Foods, LLC, et al.*, *supra*, ¶19 (hereafter "*Moore* Complaint") (true and correct copy attached hereto as **Exhibit A**); Complaint filed Sept. 22, 2015, *Gore v. Bumble Bee Foods, LLC, et al.*, *supra*, ¶21 (hereafter "Gore Complaint") (true and correct copy attached hereto as **Exhibit B**). The date on which these facts first surfaced—July 23, 2015—is the same day that this Court granted preliminary approval of the *Hendricks* Stipulation of Settlement. *See Hendricks* Dkt. No. 194. It is well after the Stipulation of Settlement was signed by the parties and presented to this Court for Approval. *See Hendricks* Dkt. No. 183-1.

---

[1]     "Packaged Seafood Products" includes shelf-stable seafood products that are sold in cans, pouches, or ready-to-eat serving packages. *See* Moore Compl., ¶1. It includes the "StarKist Products" defined in paragraph 1.30 of the Stipulation of Settlement in *Hendricks*.

3. On August 3, 2015, the first putative class action was filed on behalf of direct purchasers of Packaged Seafood Products. *See Olean v. Bumble Bee Foods, LLC, et al.*, Case No. 15-cv-01714-JLS-MDD (S.D. Cal.). On August 24, 28 and September 22, 2015, my office commenced putative class actions on behalf of end-payor consumers of Packaged Seafood Products (see case cites above). My firm's *Davis-Mathews* case was the first such case to be filed in any District. Numerous other actions have been filed on behalf of other end-payor consumers, both in the Southern District of California, where Tri-Union and Bumble Bee are headquartered, as well as in the Northern District of California. Additional actions have also been commenced on behalf of other direct purchaser plaintiffs, as well as numerous actions on behalf of commercial food preparer plaintiffs. A non-inclusive list of the pending end-payor class actions filed to date is attached hereto as **<u>Exhibit C</u>**.

4. On August 28, 2015, the plaintiff in *Olean* filed a motion before the Judicial Panel on Multidistrict Litigation for an order centralizing the actions in the Southern District of California. Numerous interested party responses have been filed, along with competing motions for transfer to other Districts, including this District. On December 3, 2015, the Panel will hear oral argument in New Orleans, and is expected to rule shortly thereafter. *See In re Packaged Seafood Products Antitrust Litig.*, MDL No. 2670 (Dkt. Nos. 4, 93).

5. On October 13, 2015, it was publicly reported that Tri-Union and/or its parent company, Thai Union Frozen Products, is a leniency applicant under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (15 U.S.C. §1, note) ("ACPERA"). Allegations to this effect have been added to an amended complaint filed in *Olean* as well as in an amended complaint in my firm's first-filed end-payor case, *Davis-Mathews*, on October 15, 2015. *See* First Amended Complaint filed Oct. 15, 2015, *Davis-Mathews v. Bumble Bee Foods, LLC, et al.*, *supra* (true and correct copy attached hereto as **<u>Exhibit D</u>**).

**Attempts to Negotiate an Antitrust Conspiracy Carve-Out From the *Hendricks* Release**

6. I first became aware of the *Hendricks* settlement in late August 2015, when it was brought to my attention by one of my clients. I immediately downloaded and reviewed available documents from the *Hendricks* docket, including the Stipulation of Settlement, the Class Notice,

1   and this Court's Order Granting Preliminary Approval.

2   7.   The *Hendricks* Stipulation of Settlement, if finally approved, would release certain

3   claims of all persons who bought 5-oz. cans of StarKist tuna (four indicated types) from February

4   18, 2009 through October 31, 2014. *See Hendricks* Dkt. No. 183-1, ¶1.23 (defining "Settlement

5   Class"). There is a significant, five-year overlap between the *Hendricks* class period and the

6   class periods alleged in the *Packaged Seafood Products Antitrust Litigation*, which is

7   approximately January 1, 2005 through the present. *See*, *e.g.*, *Moore* Compl., ¶38. Accordingly,

8   if the *Hendricks* release is construed to encompass the claims alleged in the *Packaged Seafood

9   Products Antitrust Litigation*, a significant portion of StarKist's liability in those actions for

10   purchases from 2009 to 2014 may be eliminated.

11   8.   The *Hendricks* Stipulation of Settlement purports to release: "**all claims …**

12   **relating in any way to** the claims asserted or the factual allegations made in the Action,

13   including without limitation the underfilling of the StarKist Products and/or **the purchase of any**

14   **of the StarKist Products** [*i.e.*, the specified 5-oz. cans of tuna] at any time on or after February

15   19, 2009 and prior to November 1, 2014." *Hendricks* Dkt. 183-1, ¶6.1 (emphasis added).

16   Because the *Hendricks* complaint does not allege concerted action, and contains no antitrust

17   allegations of any kind, a Court might construe this language as not encompassing the claims in

18   the *Packaged Seafood Products Antitrust Litigation*. Given the broadness of the language on its

19   face, however, we are unwilling to take that risk and therefore file this objection.

20   9.   Nothing in the *Hendricks* record indicates that the value of the antitrust conspiracy

21   claims alleged in the *Packaged Seafood Products Antitrust Litigation* was considered in

22   negotiating either: (a) the amount of the settlement consideration, or (b) the scope of the release

23   language. Indeed, the conspiracy allegations did not come to light until July 23, 2015, which is

24   two months *after* the *Hendricks* settlement agreement was signed on or about May 13, 2015. The

25   *Hendricks* complaint does not allege an antitrust conspiracy, or any concerted action of any kind

26   between StarKist and its competitors; the allegations are confined to StarKist's unilateral action.

27   Although StarKist has refused to produce any of the discovery record in *Hendricks* (see below), it

28   seems clear that the parties could not have, and did not, discuss the value of any antitrust

-3-
DECLARATION OF KIMBERLY A. KRALOWEC, CASE NO. 3:13-CV-0729-HSG

1    conspiracy claims in negotiating the *Hendricks* settlement, and that the settlement in fact provides

2    no value for a purported release of such claims.

3        10.    In an attempt to resolve this matter informally, I have had extensive "meet and

4    confer" discussions with counsel for StarKist as well as counsel for the plaintiffs in *Hendricks*. I

5    first contacted plaintiffs' counsel in *Hendricks* to discuss the release issue on August 31, 2015.

6    On September 4, 2015, I received an email from StarKist's counsel in the antitrust cases, Belinda

7    Lee of Latham & Watkins, requesting a time to discuss the release issue. On September 10, 2015,

8    attorney Kathleen S. Rogers of my office spoke with Ms. Lee concerning the issue. I have also

9    had several discussions with attorneys from Hausfeld LLP, Interim Lead Counsel for the direct

10   purchasers, about this issue, including discussions on September 15 and 16, 2015. On September

11   25, 2015, I participated in a conference call with a Hausfeld attorney and Ms. Lee to discuss the

12   issue, and additional telephone discussions took place between us on October 2, 2015, October

13   19, 2015, and November 16, 2015. I have coordinated my efforts in this regard with plaintiffs'

14   counsel in other end-payor actions, including those who have joined in these objections, as well

15   as plaintiffs' counsel in the first-filed commercial food preparer action, who have similarly joined

16   in these objections.

17       11.    During my conversations with Ms. Lee, we attempted to negotiate a modification

18   of the release language to carve out the antitrust conspiracy claims alleged in the *Packaged*

19   *Seafood* cases, so as to avoid any doubt concerning whether the *Hendricks* release impacted those

20   claims. We also requested production of the discovery record, and copies of unredacted

21   pleadings, in *Hendricks*, in order to (among other stated reasons) confirm whether the parties to

22   *Hendricks* litigated the question of concerted action or antitrust violations, and whether evidence

23   of the value of the antitrust claims was considered in negotiating the settlement consideration. At

24   Ms. Lee's request, we evaluated the *Hendricks* protective order and informed her that we would

25   agree to be bound by it if her client would produce the discovery record and pleadings.

26   Nevertheless, Ms. Lee refused to produce any documents that would assist us in evaluating the

27   adequacy of the settlement.

28

-4-
DECLARATION OF KIMBERLY A. KRALOWEC, CASE NO. 3:13-CV-0729-HSG

12.     On October 27, 2015, Ms. Lee sent me a letter in which she proposed a partial modification of the release language.  A true and correct copy of that letter is attached hereto as **Exhibit E**.  Ms. Lee indicated that her client would agree to modify the release language by removing the language purporting to release claims related to "the purchase of any of the StarKist Products," but that her client wanted to add *new, additional* language to the already lengthy and over broad release paragraph—language that would expressly release any and all federal and state antitrust claims based on under-filling.  *See* Ex. E at 2-3.  These are conspiracy claims and theories that were never alleged in *Hendricks*, and that could not have been  negotiated or paid for in that settlement.   Ms. Lee's proposal is thus an expansion, rather than a narrowing, of the overbroad release language.

13.     On November 6, 2015, I sent a letter to Ms. Lee suggesting a modification to the release language that would be acceptable to us.  As Ms. Lee originally proposed, the language about "the purchase of any of the StarKist products" would be removed, and in addition, the release would be modified to state  that the antitrust and consumer claims alleged in the *Packaged Seafood Products Litigation* would not be released.  This was a straightforward proposal that would have avoided all doubt that claims not litigated in *Hendricks*, and for which no consideration was provided, were not released.  We advised Ms. Lee that if her client would agree to this modification, it would be unnecessary for our clients to object to the settlement.  A true and correct copy of my letter dated November 6, 2015 is attached hereto as **Exhibit F**.

14.     On November 13, 2015, Ms. Lee sent me a letter in which she rejected our proposed modification to the release language.  A true and correct copy of this letter is attached hereto as **Exhibit G**.  Ms. Lee's counter-proposal continued to remove the language about "the purchase of any of the StarKist products," but she persisted in proposing new, added language that would expand, not narrow, the scope of the release.  This time, the added language would release not only all federal and state antitrust claims based on under-filling, but also all of the related consumer protection claims alleged in the *Packaged Seafood* complaints.  *See* Ex. G. at 3.  Once again, this was an expansion, not a narrowing, of the *Hendricks* release.

15.     On November 16, 2015, I sent Ms. Lee an email with another counter-proposal.  In an attempt to facilitate an amicable resolution, we used Ms. Lee's proposed framework as the structure for our proposal.  Our proposed modification, this time, made clear that claims based on a *conspiracy*, as opposed to claims based on *unilateral* conduct by StarKist, would not be released.  In addition, in response to a concern stated by Ms. Lee in her last letter, our proposal made clear that claims based on unilateral conduct that "seek redress for not receiving the correct quantity of tuna" in the cans would be included within the scope of the release.   A true and correct copy of my email to Ms. Lee, with our modification language, is attached hereto as **Exhibit H**.

16.     During a telephone conference on November 16, 2015, I asked Ms. Lee why her client was unwilling to exclude conspiracy claims from the scope of the *Hendricks* release, if her client's position was that no conspiracy was ever formed and that her client's conduct was unilateral.  She was unable to answer that question.

17.     On November 19, 2015, in response to my follow-up email, Ms. Lee indicated that our proposal was unacceptable to her client.  A true and correct copy of Ms. Lee's email is attached hereto as **Exhibit I**.  Accordingly, notwithstanding the extensive efforts described above, the release issue remains unresolved as of the date of this declaration, necessitating my clients' objections to the settlement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on November 20, 2015 at San Francisco, California.


      */s/ Kimberly A. Kralowec*
      Kimberly A. Kralowec

Case 3:13-cv-00729-HSG   Document 293-1   Filed 11/20/15   Page 38 of 106

# EXHIBIT A

KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
CHAD A. SAUNDERS (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA 94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

*Counsel for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

COLIN MOORE, on behalf of himself and all others similarly situated,

Plaintiff,

v.

BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, and STARKIST COMPANY,

Defendants.

Case No. **'15CV1911 DMS NLS**

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Colin Moore, by and through his undersigned attorneys, on behalf of himself and all others similarly situated, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1. This action arises out of a conspiracy by the three largest producers of packaged seafood products ("PSPs") in the United States, its territories and the District of Columbia—Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and

StarKist Company (collectively, "Defendants")—which began no later than July 24, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.      Plaintiff, on behalf of himself and all indirect purchasers, brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants. Plaintiff, on behalf of himself and all indirect purchasers, also brings this action pursuant to the antitrust laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480 et seq.) and the consumer protection laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480-2 et seq.) to recover damages, restitution, disgorgement, attorneys' fees, costs of suit, and all other available relief.

3.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367.  The state-law claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

4.      This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over any class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant" and "in which the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §1332(d)(2)(A).

5.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

7.     Plaintiff Colin Moore is a current resident of the State of Hawaii. During the Class Period, Plaintiff indirectly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## DEFENDANTS

8.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9655 Granite Ridge Drive, Suite 100, San Diego CA 92123.  Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital LLP ("Lion"), based in the United Kingdom.

9.     Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea

CLASS ACTION COMPLAINT

-3-

International, is a domestic corporation with its principal place of business located at 9330 Scranton Road, San Diego CA 92121.  Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS". CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

10.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

## UNNAMED CO-CONSPIRATORS

11.     On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

12.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

13.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

14.     Throughout the Class Period, Defendants transported substantial

amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

15. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

16. PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012. In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

17. Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

18. This oligopolistic structure within the industry is the result of recent

CLASS ACTION COMPLAINT

-5-

mergers and acquisitions. For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

19. On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea

brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

20. The article goes on to state:

An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.

It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

****

The source said others in the industry are now anticipating that they too will be subpoenaed....

21. Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

22. The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district

where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

23.    There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

24.    Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



CLASS ACTION COMPLAINT

-8-

27.     Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



28.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined

CLASS ACTION COMPLAINT

significantly due to excess supply, with frozen skipjack prices hitting a 6-year low."
Despite these drastically declining raw material costs, Defendants did not decrease
prices and try to obtain more market share.

29.     TUF's Annual Reports discuss this situation. In its 2013 Annual
Report, TUF stated that "our branded tuna business showed resilient growth from
2012 thanks to the price adjustments in Europe and *more rational market
competition in the US*." (Emphases added). It said in the same report that its future
profit margins would depend upon *"[r]easonable US canned tuna competition
without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF
explicitly noted that this goal had been achieved. It stated:

> Thanks to reduced price competition (*absence of cut
> throat pricing*) and generally lower fish cost, *our own
> tuna brands marked a great year of increased
> profitability*. Despite minimal sales growth in the US,
> competitive inventory cost and reasonable market
> conditions helped lift the margin of our US brand.
> (Emphases added).

The same report went on to note that "*sensible market competition*, supported by
lower raw material costs, made it possible for our own tuna brands to expand their
margins through the year despite limited volume growth." (Emphases added). It
indicated that future revenue growth would again be dependent upon *"[r]easonable
US canned tuna market competition that focuses more on consumption creation
than market share alone*." (Emphases added). The "reasonable market conditions",
"more rational market competition", "sensible market competition", avoidance of
battles for market share and "absence of cut throat pricing" that the reports note
could only have come about through collusion. It would have been against the
individual self-interest of each Defendant to eschew increasing market share during
this period by lowering prices.

30.     There were numerous business opportunities for Defendants to meet
and engage in such collusion. One such opportunity is provided by the Tuna

CLASS ACTION COMPLAINT                  -10-

Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

31.  An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

32.  Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

## FRAUDULENT CONCEALMENT AND TOLLING

33.  Plaintiff and members of the Classes did not discover and could not discover through the exercise of reasonable diligence the existence of the combination and conspiracy alleged herein until shortly before this litigation commenced.

34.     As indirect purchasers of PSPs manufactured by defendants, Plaintiffs and the members of the Classes had no direct contact or interaction with Defendants, and therefore no means from which they could have discovered the combination and conspiracy alleged in this Complaint until shortly before the lawsuit was filed.

35.     It was not until approximately July 23, 2015 that information first became publicly available that Defendants engaged in the combination and conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand jury subpoenas described above were first publicly disclosed, and when TUF announced that it was suspending its preferential public offering because of the pending investigation.  Prior to that date, Plaintiffs and members of the Classes had no reason to suspect that any combination or conspiracy had been formed.

36.     By their very nature, price-fixing conspiracies tend to be inherently self-concealing.  Plaintiff is informed and believes that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy.  Accordingly, a reasonable person under the circumstances would not have been alerted to any irregularity with regard to PSP prices before late July 2015 at the earliest, and Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

37.     As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action on his own behalf and as a class action

pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

39.     Plaintiff also brings this action on his own behalf and as a class action

pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following Class (the "Hawaii Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within Hawaii from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

40.     Plaintiff does not know the exact number of members of the Class

because such information is in the exclusive control of Defendants.  Due to the

nature of the trade and commerce involved, however, Plaintiff believes that Class

members number at least in the thousands and are sufficiently numerous and

geographically dispersed throughout the United States, its territories and the

District of Columbia so that joinder of all Class members is impracticable.

41.     There are questions of law and fact which are common to the claims of

Plaintiff and the Class, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy

with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for

PSPs;

b.      Whether the purpose and/or effect of the acts and omissions

alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

c.    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d.    Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

e.    Whether Defendants violated the antitrust laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480 et seq.);

f.    Whether Defendants violated the consumer protection laws of the State of Hawaii (Hawaii Rev. Stat. §§ 480-2 et seq.);

g.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

h.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

i.    Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the Hawaii antitrust laws, or the Hawaii consumer protection laws.

42.    Plaintiff's claims are typical of the claims of the members of the Class.

43.    Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

44.    Plaintiff is represented by counsel competent and experienced in the

CLASS ACTION COMPLAINT
-14-

prosecution of antitrust and class action litigation.

45.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b.     The Class is readily definable and one for which records should exist in the files of Defendants.

    c.     Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

    e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

47.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

**<u>COUNT I</u>**

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(On Behalf of Plaintiff and the Nationwide Class)**

48.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

49.     Defendants and their co-conspirators engaged in a continuing contract,

combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

50. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

51. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

52. The illegal contract, combination, or conspiracy alleged herein had the following effects, among others:

a. The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b. Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c. Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d. Competition in the sale of PSPs has been restrained, suppressed or eliminated.

53. During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

54.     Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

55.     Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of Hawaii Antitrust Laws
### (Hawaii Rev. Stat. §§480 et seq.)
### (On Behalf of Plaintiff and the Hawaii Indirect Purchaser Class)

56.     Plaintiff incorporates by reference each paragraph set forth above.

57.     The contract, combination, or conspiracy alleged above violates Hawaii Rev. Stat. §480-4(a), which prohibits, *inter alia*, every contract, combination or conspiracy "in restraint of trade or commerce in the State"; and Hawaii Rev. Stat. §480-4(b)(1), which, *inter alia*, makes it unlawful to "fix, control or maintain the price of any commodity." Defendants' PSPs are "commodities" within the meaning of Hawaii Rev. Stat. §480-1, which includes "goods" and "merchandise." Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for PSPs in Hawaii, restrained trade and commerce in Hawaii, and caused the prices of PSPs to be raised, fixed, maintained and stabilized at supracompetitive levels, in violation of Hawaii antitrust laws.

58.     During the Class Period, Plaintiff and the other members of the Hawaii Indirect Purchaser Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct. As a result, Plaintiff and the other members of the Hawaii Indirect Purchaser Class have sustained injury and are entitled to all relief available under Hawaii Rev. Stat. §§480 et seq., including but

CLASS ACTION COMPLAINT                    -17-

not limited to damages in an amount to be determined at trial, along with attorneys' fees and costs of suit.

59.     In compliance with Hawaii Rev. Stat. §480-13.3(a)(1), a copy of this Complaint has been served on the Hawaii Attorney General or shall be served within seven days after the Complaint is filed.

## COUNT III

### Violation of Hawaii Consumer Protection Laws
### (Hawaii Rev. Stat. §§480 et seq.)

### (On Behalf of Plaintiff and the Hawaii Indirect Purchaser Class)

60.     Plaintiff incorporates by reference each paragraph set forth above.

61.     The contract, combination or conspiracy alleged above constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," within the meaning of Hawaii Rev. Stat. § 480-2(a).  Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for PSPs in Hawaii, restrained trade or commerce for PSPs in Hawaii, and caused the prices of PSPs to be raised, fixed, maintained and stabilized at supra-competitive levels, all in violation of Hawaii Rev. Stat. § 480-2(a).

62.     As a result of Defendants' violations of Hawaii Rev. Stat. § 480-2(a), Plaintiff and members of the Hawaii Indirect Purchaser Class paid more for PSPs than they would have in the absence of Defendants' violations.  Plaintiff and members of the Hawaii Indirect Purchaser Class are therefore entitled to damages, including treble damages under Hawaii Rev. Stat. § 480-13(b)(1), from Defendants in an amount to be determined at trial, along with attorneys' fees and costs of suit, as well as all other relief allowable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.     That the Court determine that this action may be maintained as a class

CLASS ACTION COMPLAINT

action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the antitrust laws of Hawaii (including Hawaii Rev. Stat. § 480-4);

C.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is an "unfair method of competition" and/or an "unfair and deceptive act or practice" within the meaning of Hawaii Rev. Stat. § 480-2(a);

D.     That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E.     That the Court award Plaintiff and the Class damages, including treble damages pursuant to Hawaii Rev. Stat. § 480-13(b)(1);

F.     That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.     That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

H.     That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

CLASS ACTION COMPLAINT

-19-

DATED:  August 28, 2015

By:          */s/  Kimberly A. Kralowec*

Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:    415-546-6800
Facsimile:     415-546-6801
Email:    kkralowec@kraloweclaw.com
          krogers@kraloweclaw.com
          csaunders@kraloweclaw.com

Counsel for Plaintiff Colin Moore and the Putative Class

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED:  August 28, 2015

By:          */s/  Kimberly A. Kralowec*

Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:    415-546-6800
Facsimile:     415-546-6801
Email:    kkralowec@kraloweclaw.com
          krogers@kraloweclaw.com
          csaunders@kraloweclaw.com

Counsel for Plaintiff Colin Moore and the Putative Class

CLASS ACTION COMPLAINT      -20-

# EXHIBIT B

KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
CHAD A. SAUNDERS (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery St., Suite 1210
San Francisco, CA 94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

*Counsel for Plaintiff and the Class*
*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHY DURAND GORE, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, STARKIST COMPANY, and KING OSCAR, INC., <br> Defendants. | Case No. **'15CV2121 H    DHB** <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Kathy Durand Gore ("Plaintiff"), by and through her undersigned attorneys, on behalf of herself and all others similarly situated, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1.     This action arises out of a conspiracy by the largest producers of packaged seafood products ("PSPs") in the United States, its territories and the

District of Columbia—Bumble Bee Foods LLC, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc. (collectively, "Defendants")—which began no later than July 24, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.      Plaintiff, on behalf of herself and all indirect purchasers, brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants. Plaintiff, on behalf of herself and all indirect purchasers, also brings this action pursuant to the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.) and the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-1 et seq.) to recover damages, restitution, disgorgement, attorneys' fees, costs of suit, and all other available relief.

3.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367. The state-law claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

4.      This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over any class action in which "any member of a class of plaintiffs is a

1   citizen of a State different from any defendant" and "in which the matter in
2   controversy exceeds the sum or value of $5,000,000, exclusive of interest and
3   costs." 28 U.S.C. §1332(d)(2)(A).

4       5.    Venue is proper in this District pursuant to Section 12 of the Clayton
5   Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants
6   reside, transact business, are found within, and/or have agents within this District,
7   and a substantial part of the events giving rise to Plaintiff's claims occurred and a
8   substantial portion of the affected interstate trade and commerce described below
9   has been carried out in this District.

10      6.    This Court has personal jurisdiction over Defendants because, *inter*
11  *alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and
12  delivered PSPs in this District; (c) has substantial aggregate contacts with this
13  District; and (d) engaged in an illegal price-fixing conspiracy and agreement to
14  limit capacity that was directed at, and had the intended effect of causing injury to,
15  persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

17      7.    Plaintiff Kathy Durand Gore is a current resident of the State of New
18  Mexico. During the Class Period, Plaintiff indirectly purchased PSPs from one of
19  more of the Defendants and has suffered pecuniary injury as a result of the antitrust
20  violations alleged herein.

## DEFENDANTS

22      8.    Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic
23  limited liability company with its principal place of business located at 9655
24  Granite Ridge Drive, Suite 100, San Diego, CA 92123. Bumble Bee produces and
25  sells PSPs throughout the United States (including this District), its territories and
26  the District of Columbia. Bumble Bee is privately owned by Lion Capital LLP
27  ("Lion"), based in the United Kingdom.

28

CLASS ACTION COMPLAINT                    -3-

9.     Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea International, is a domestic limited liability company with its principal place of business located at 9330 Scranton Road, San Diego, CA 92121.  Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Unless otherwise indicated, Tri-Union Seafoods LLC will be referred to herein as "CoS." CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

10.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

11.     Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108.  King Oscar produces and sells packaged seafood products throughout the United States (including this District), its territories and the District of Columbia.

12.     Defendants CoS and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

**UNNAMED CO-CONSPIRATORS**

13.     On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

**AGENTS**

14.     The acts alleged to have been done by Defendants were authorized,

ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**INTERSTATE TRADE AND COMMERCE**

15.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

16.     Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

17.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

**FACTUAL ALLEGATIONS**

18.     PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.  In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

19.     Defendants are the largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had

18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

20.     This oligopolistic structure within the industry is the result of recent mergers and acquisitions. For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

21.     On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an

article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

22.     The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

23.     Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

24.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury

investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*.

25.     There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

26.     Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



29.    Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



CLASS ACTION COMPLAINT

-9-

30.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

31.     TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphasis added.) It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphasis added.) In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added.)

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphasis added.) It indicated that future revenue growth would again be dependent upon *"[r]easonable*

CLASS ACTION COMPLAINT                    -10-

*US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphasis added.) The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

32. There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

33. An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

34. Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to

West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

35.     The interlocking relationship between Defendants is also demonstrated by the movement of executives among the companies. For example, in October 2011, John Engle, former VP of marketing for Bumble Bee, replaced Bob Montano as president of King Oscar's United States operations. Similarly, in July 2014, Brett Butler, the former Plant Manager of StarKist's plant in American Samoa, left the company to join Bumble Bee in August 2014, and relocated to Bumble Bee's San Diego headquarters, where Tri-Union is also based.  It was only a few months later, in December 2014, that the proposed acquisition of Bumble Bee by Tri-Union's parent company was announced. Such movement of executives suggests further opportunities for collusion among all three companies.

36.     A further opportunity to collude arose in October 2011, when Defendants Bumble Bee, Tri-Union, and StarKist jointly prepared and submitted, on joint letterhead with the logos of all three companies, a petition to the Food and Drug Administration ("FDA") to amend certain FDA regulations governing the standard of fill and forms of pack for canned tuna.  The following is an excerpt from the first page of the petition, showing the three companies' joint letterhead with their logos:

 

October 17, 2011

<u>BY HAND</u>

Division of Dockets Management
Food and Drug Administration
Department of Health & Human Services
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**CITIZENS PETITION**

37.     In the same month, these Defendants also jointly applied to the FDA for a temporary marketing permit to test-market canned tuna that deviates from the standard of fill and forms of pack required by certain FDA regulations, claiming that existing regulations are "obsolete" and that the proposed deviations would "provide[] a canned tuna product that is more appealing to consumers." On information and belief, the joint application and petition could not have been prepared absent numerous communications among Defendants concerning PSPs, the market for PSPs, production volumes of PSPs, and the impact of the proposed changes on production costs and therefore pricing for PSPs.

38.     Yet another opportunity to conspire arose in February 2014, when Defendants Bumble Bee and StarKist entered into a "joint defense, common interest and confidentiality agreement," in which they stated that "it may be useful and in their best interests to exchange certain information" and "to cooperate" with each other concerning certain pending litigation involving canned tuna:

CLASS ACTION COMPLAINT

-13-

JOINT DEFENSE, COMMON INTEREST
AND CONFIDENTIALITY AGREEMENT

This Joint Defense, Common Interest and Confidentiality Agreement (the "Agreement"), made as of this 28 day of February 2014, is entered into by the undersigned counsel acting on behalf of their respective clients, StarKist Co. and Bumble Bee Foods, LLC (collectively the "Parties"), with their full knowledge, consent and authority to execute the Agreement on their behalf.

## FRAUDULENT CONCEALMENT AND TOLLING

39.     Plaintiff and members of the Classes did not discover and could not discover through the exercise of reasonable diligence the existence of the combination and conspiracy alleged herein until shortly before this litigation commenced.

40.     As indirect purchasers of PSPs manufactured by defendants, Plaintiffs and the members of the Classes had no direct contact or interaction with Defendants, and therefore no means from which they could have discovered the combination and conspiracy alleged in this Complaint until shortly before the lawsuit was filed.

41.      It was not until approximately July 23, 2015, that information first became publicly available that Defendants engaged in the combination and conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand jury subpoenas described above were first publicly disclosed, and when TUF announced that it was suspending its preferential public offering because of the pending investigation.  Prior to that date, Plaintiffs and members of the Classes had no reason to suspect that any combination or conspiracy had been formed.

42.     By their very nature, price-fixing conspiracies tend to be inherently self-concealing.  Plaintiff is informed and believes that Defendants agreed among

CLASS ACTION COMPLAINT

-14-

themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy. Accordingly, a reasonable person under the circumstances would not have been alerted to any irregularity with regard to PSP prices before late July 2015 at the earliest, and Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

43. As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005, and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

45. Plaintiff also brings this action on his own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "New Mexico Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within New Mexico from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005, and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

46.     Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

47.     There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

    a.     Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

    b.     Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

    c.     The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

    d.     Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

    e.     Whether Defendants violated the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.);

    f.     Whether Defendants violated the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-1 et seq.);

    g.     Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

CLASS ACTION COMPLAINT

-16-

h.     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

i.     Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the New Mexico Antitrust Act, or the New Mexico Unfair Practices Act.

48.     Plaintiff's claims are typical of the claims of the members of the Class.

49.     Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

50.     Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

51.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

52.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.     The Class is readily definable and one for which records should exist in the files of Defendants.

c.     Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would require.

        e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

53.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

### (On Behalf of Plaintiff and the Nationwide Class)

54.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

55.    Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

56.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

57.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

58.    The illegal contract, combination, or conspiracy alleged herein had the following effects, among others:

        a.     The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.    Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.    Competition in the sale of PSPs has been restrained, suppressed or eliminated.

59.    During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

60.    Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

61.    Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of New Mexico Antitrust Act
### (New Mexico Stat. Ann. §§ 57-1-1 et seq.)

### (On Behalf of Plaintiff and the New Mexico Indirect Purchaser Class)

62.    Plaintiff incorporates by reference each paragraph set forth above.

63.    The contract, combination, or conspiracy alleged above violates the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.), which states: "[e]very contract, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful." *Id.* § 57-1-1.

CLASS ACTION COMPLAINT
-19-

Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for PSPs in New Mexico, restrained trade and commerce in New Mexico, and caused the prices of PSPs to be raised, fixed, maintained and stabilized at supracompetitive levels, in violation of the New Mexico Antitrust Act.

64.     During the Class Period, Plaintiff and the other members of the New Mexico Indirect Purchaser Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.  As a result, Plaintiff and the other members of the New Mexico Indirect Purchaser Class have sustained injury and are entitled to all relief available under the New Mexico Antitrust Act, including but not limited to treble damages in an amount to be determined at trial, along with attorneys' fees and costs of suit.  *See* N.M. Stat. Ann. § 57-1-3(A).

## COUNT III

### Violation of New Mexico Unfair Practices Act
### (New Mexico Stat. Ann. §§57-12-1 et seq.)

### (On Behalf of Plaintiff and the New Mexico Indirect Purchaser Class)

65.     Plaintiff incorporates by reference each paragraph set forth above.

66.     The contract, combination or conspiracy alleged above constitutes "unconscionable trade practices in the conduct of any trade or commerce," which is prohibited by the New Mexico Unfair Practices Act (N.M. Stat. Ann. § 57-12-3). Defendants' combinations or conspiracies resulted in a gross disparity between the value received by the members of the New Mexico Indirect Purchaser Class and the price they paid, in violation of the New Mexico Unfair Practices Act.  *See* N.M. Stat. Ann. § 57-12-2(E) (defining "unconscionable trade practices").

67.     As a result of Defendants' violations of the New Mexico Unfair Practices Act (N.M. Stat. Ann. § 57-12-3), Plaintiff and members of the New

Mexico Indirect Purchaser Class paid more for PSPs than they would have in the absence of Defendants' violations. Plaintiff and members of the New Mexico Indirect Purchaser Class are therefore entitled to damages from Defendants in an amount to be determined at trial, along with attorneys' fees and costs of suit, as well as all other relief allowable by law. N.M. Stat. Ann. § 57-12-10(B), (E). In addition, because Defendants' conduct alleged above was and is willful, Plaintiff is entitled to recover treble damages or $300, whichever is greater, along with attorneys' fees, costs of suit, and all other available relief. *See id.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1 et seq.);

C.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is an "unconscionable trade practice" within the meaning of the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-2(E), 57-12-3);

D.     That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E.     That the Court award Plaintiff and the Class damages, including treble damages pursuant to the New Mexico Antitrust Law (N.M. Stat. Ann. § 57-1-3(A));

F.     That the Court award Plaintiff and the Class damages, including treble damages or $300 to Plaintiff, whichever is greater, pursuant to the New Mexico

---

CLASS ACTION COMPLAINT

-21-

Unfair Practices Act (N.M. Stat. Ann. § 57-12-10(B)), and actual damages to the Class pursuant to the Act (N.M. Stat. Ann. § 57-12-10(E));

G. That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

H. That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

I. That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

DATED: September 22, 2015

By: _/s/ Kimberly A. Kralowec_
Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone: 415-546-6800
Facsimile: 415-546-6801
Email: kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

By: _/s/ Robert Taylor-Manning_
Robert Taylor-Manning (Wash. Bar No. 21890)
THE LAW OFFICES OF ROBERT TAYLOR-MANNING

CLASS ACTION COMPLAINT

-22-

1800 South Jackson St., Suite 123
Seattle, WA 98144
Telephone:      206.310.3333
Facsimile:      206.299.4010
Email:    rtm@taylor-manning.net

*Counsel for Plaintiff Kathy Durand Gore and the Putative Class*

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED:  September 22, 2015

By:       */s/  Kimberly A. Kralowec*
Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122852)
Chad A. Saunders (Cal. Bar No. 257810)
THE KRALOWEC LAW GROUP
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone:      415-546-6800
Facsimile:      415-546-6801
Email:    kkralowec@kraloweclaw.com
            krogers@kraloweclaw.com
            csaunders@kraloweclaw.com

By:       */s/  Robert Taylor-Manning*
Robert Taylor-Manning (Wash. Bar No. 21890)
THE LAW OFFICES OF ROBERT TAYLOR-MANNING
1800 South Jackson St., Suite 123
Seattle, WA 98144
Telephone:      206.310.3333
Facsimile:      206.299.4010
Email:    rtm@taylor-manning.net

*Counsel for Plaintiff Kathy Durand Gore and the Putative Class*

CLASS ACTION COMPLAINT
-23-

# EXHIBIT C

## Exhibit C

- *Mathews v. Bumble Bee Foods LLC, et al.* (*Mathews*), No. 3:15-cv-1878-JLS-MDD (S.D. Cal.), filed on August 24, 2015;

- *Walnum v. Bumble Bee Foods LLC, et al.* (*Walnum*), Case No. 3:15-cv-01887-JLS-MDD (S.D. Cal.), filed on August 25, 2015;

- *Olive, et al. v. Bumble Bee Foods LLC, et al.* (*Olive*), Case No. 3:15-cv-01909-BEN-WVG (S.D. Cal.), filed on August 28, 2015;

- *Moore v. Bumble Bee Foods LLC, et al.* (*Moore*), Case No. 3:15-cv-01911-JLS-MDD (S.D. Cal.), filed on August 28, 2015;

- *Damske, et al. v. Bumble Bee Foods LLC, et al.* (*Damske*), Case No. 3:15-cv-04025-VC (N.D. Cal.), filed on September 3, 2015;

- *Nelson, et al. v. Bumble Bee Foods LLC, et al.* (*Nelson*), Case No. 3:15-cv-01979-JLS-MDD (S.D. Cal.), filed on September 4, 2015;

- *Christensen, et al. v. Bumble Bee Foods LLC, et al.* (*Christensen*), Case No. 3:15-cv-04093-VC (N.D. Cal.), filed on September 9, 2015;

- *Waterman v. Bumble Bee Foods LLC, et al.* (*Waterman*), Case No. 3:15-cv-04094-VC (N.D. Cal.), filed on September 9, 2015;

- *Moon, et al. v. Bumble Bee Foods LLC, et al.* (*Moon*), Case No. 3:15-cv-02006-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Colberg, et al. v. Bumble Bee Foods LLC, et al.* (*Colberg*), Case No. 3:15-cv-02011-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Musgrave v. Bumble Bee Foods LLC, et al.* (*Musgrave*), Case No. 3:15-cv-02012-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Joseph v. Bumble Bee Foods LLC, et al.* (*Joseph*), Case No. 3:15-cv-02017-JLS-MDD (S.D. Cal.), filed on September 10, 2015;

- *Ton-Vuong v. Bumble Bee Foods LLC, et al.* (*Ton-Vuong*), Case No. 3:15-cv-02044-JLS-MDD (S.D. Cal.), filed on September 14, 2015;

- *Fragoso, et al. v. Bumble Bee Foods LLC, et al.* (*Fragoso*), Case No. 3:15-cv-02072-JLS-MDD (S.D. Cal.), filed on September 17, 2015;

- *Kennedy v. Bumble Bee Foods LLC, et al.* (*Kennedy*), Case No. 3:15-cv-02073-JLS-MDD (S.D. Cal.), filed on September 17, 2015;

- *Burr, et al. v. Bumble Bee Foods LLC, et al.* (*Burr*), Case No. 3:15-cv-02095-JLS-MDD (S.D. Cal.), filed on September 18, 2015;

- *Gore v. Bumble Bee Foods LLC, et al.* (*Gore*), Case No. 3:15-cv-02121-JLS-MDD (S.D. Cal.), filed on September 22, 2015;

- *Mey v. Bumble Bee Foods LLC, et al.* (*Mey*), Case No. 3:15-cv-02125-DMS-KSC (S.D. Cal.), filed on September 23, 2015;

- *Hudson v. Bumble Bee Foods LLC, et al.* (*Hudson*), Case No. 3:15-cv-02129-BEN-RBB (S.D. Cal.), filed on September 23, 2015;

- *Lesher, et al. v. Bumble Bee Foods LLC, et al.* (*Lesher*), Case No. 3:15-cv-02144-JLS-MDD (S.D. Cal.), filed on September 25, 2015;

- *Willoughby v. Bumble Bee Foods LLC, et al.* (*Willoughby*), Case No. 3:15-cv-02160-JLS-MDD (S.D. Cal.), filed on September 28, 2015;

- *Canterbury v. Bumble Bee Foods LLC, et al.* (*Canterbury*), Case No. 3:15-cv-02169-JLS-MDD (S.D. Cal.), filed on September 29, 2015;

- *Alidad, et al. v. Bumble Bee Foods LLC, et al.* (*Alidad*), Case No. 3:15-cv-02173-JLS-MDD (S.D. Cal.), filed on September 29, 2015;

- *Bowman v. Bumble Bee Foods LLC, et al.* (*Bowman*), Case No. 3:15-cv-02185-JLS-MDD (S.D. Cal.), filed on September 30, 2015;

- *Blumstein v. Bumble Bee Foods LLC, et al.* (*Blumstein*), Case No. 3:15-cv-02186-BEN-DHB (S.D. Cal.), filed on September 30, 2015;

- *Dravid v. Bumble Bee Foods LLC, et al.* (*Dravid*), Case No. 3:15-cv-02187-JLS-MDD (S.D. Cal.), filed on September 30, 2015;

- *Cooper, et al. v. Bumble Bee Foods LLC, et al.* (*Cooper*), Case No. 3:15-

2

cv-02216-JLS-MDD (S.D. Cal.), filed on October 5, 2015;

- *Potvin, et al. v. Bumble Bee Foods LLC, et al.* (*Potvin*), Case No. 3:15-cv-02271-JLS-MDD (S.D. Cal.), filed on October 9, 2015;

- *Lybarger v. Bumble Bee Foods LLC, et al.* (*Lybarger*), Case No. 3:15-cv-02278-JLS-MDD (S.D. Cal.), filed on October 12, 2015;

- *Caldwell v. Bumble Bee Foods LLC, et al.* (*Caldwell*), Case No. 3:15-cv-02302-JLS-MDD (S.D. Cal.), filed on October 14, 2015;

- *Powers v. Bumble Bee Foods LLC, et al.* (*Powers*), Case No. 3:15-cv-02434-JLS-MDD (S.D. Cal.), filed on October 28, 2015;

- *Vangemert v. Starkist Company, et al.* (*Vangemert*), Case No. 3:15-cv-05279-JCS (N.D. Cal.), filed on November 18, 2015;

- *Yee v. Starkist Company, et al.* (*Yee*), Case No. 3:15-cv-05282-MEJ (N.D. Cal.), filed on November 18, 2015.

3

# EXHIBIT D

1   KIMBERLY A. KRALOWEC (Cal. Bar No. 163158)
    KATHLEEN STYLES ROGERS (Cal. Bar No. 122853)
2   CHAD A. SAUNDERS (Cal. Bar No. 257810)
    THE KRALOWEC LAW GROUP
3   44 Montgomery St., Suite 1210
    San Francisco, CA 94104
4   Telephone:   (415) 546-6800
    Facsimile:   (415) 546-6801
5   Email:      kkralowec@kraloweclaw.com
                krogers@kraloweclaw.com
6               csaunders@kraloweclaw.com

7   *Counsel for Plaintiff and the Class*

8

9                   UNITED STATES DISTRICT COURT

10                 SOUTHERN DISTRICT OF CALIFORNIA

11

12  LOUISE ANN DAVIS MATHEWS, on          Case No. 3:15-cv-01878-JLS-MDD
13  behalf of herself and all others similarly
    situated,
14                                        **AMENDED CLASS ACTION**
                 Plaintiff,               **COMPLAINT**
15
        v.                                JURY TRIAL DEMANDED
16
    BUMBLE BEE FOODS LLC,
17  TRI-UNION SEAFOODS LLC,
    STARKIST COMPANY, KING OSCAR,
18  INC., and TRI MARINE
    INTERNATIONAL, INC.,
19
                 Defendants.
20

21

22          Plaintiff Louise Ann Davis Mathews, by and through her undersigned

23  attorneys, on behalf of herself and all others similarly situated, complains and

24  alleges as follows. All allegations herein other than those relating directly to

25  Plaintiff are based on information and belief.

26                      **NATURE OF THE ACTION**

27          1.      This action arises out of a conspiracy by the largest producers of

28  packaged seafood products ("PSPs") in the United States, its territories and the

-1-

1  District of Columbia (Bumble Bee Foods LLC, Tri-Union Seafoods LLC, StarKist

2  Company, and King Oscar, Inc.) as well as a common supplier to all three, Tri

3  Marine International, Inc. (collectively, "Defendants"), which began no later than

4  January 1, 2005, and continues to the present (the "Class Period"), to fix, raise,

5  maintain, and/or stabilize prices for PSPs within the United States, its territories and

6  the District of Columbia in violation of Section 1 of the Sherman Antitrust Act (15

7  U.S.C. § 1). As used herein, the term "PSPs" refers to shelf-stable seafood products

8  (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving

9  packages.

10  ## JURISDICTION AND VENUE

11     2.    Plaintiff, on behalf of herself and all indirect purchasers, brings this

12  action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 16 of the

13  Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants.

14  Plaintiff, on behalf of herself and all indirect purchasers, also brings this action

15  pursuant to the California Cartwright Act and the California Unfair Competition

16  Law to recover damages, restitution, disgorgement, and all other available relief.

17     3.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

18  1337 over Plaintiff's claims under Section 1 of the Sherman Act and Sections 4 and

19  16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental

20  jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367.  The state-law

21  claims are so related to Plaintiff's claims under Section 1 of the Sherman Act and

22  Sections 4 and 16 of the Clayton Act that they form part of the same case or

23  controversy.

24     4.    This Court also has subject matter jurisdiction over the state law claims

25  pursuant to the Class Action Fairness Act of 2005, which confers federal

26  jurisdiction over any class action in which "any member of a class of plaintiffs is a

27  citizen of a State different from any defendant" and "in which the matter in

28

-2-

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §1332(d)(2)(A).

5.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## **PLAINTIFF**

7.     Plaintiff Louise Ann Davis Mathews is a current resident of the State of California.  During the Class Period, Plaintiff indirectly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## **DEFENDANTS**

8.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9655 Granite Ridge Drive, Suite 100, San Diego CA 92123.  Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital LLP ("Lion"), based in the United Kingdom.

9.     Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea

International, is a domestic corporation with its principal place of business located at 9330 Scranton Road, San Diego CA 92121. Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS".

10. Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. StarKist is privately owned by Dongwon Industries ("Dongwon"), based in South Korea.

11. Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108. King Oscar produces and sells packaged seafood products throughout the United States (including this District), its territories and the District of Columbia.

12. Defendants CoS and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

13. Defendant Tri Marine International, Inc. ("Tri Marine") is a domestic corporation with its principal place of business located at 10500 N.E. 8th St., Suite 1888, Bellevue, WA 98004. Tri Marine supplies processed tuna to PSP producers, including StarKist and CoS, for use in the production of PSPs. Tri Marine also produces PSPs under its own "Ocean Naturals" label and produces PSPs for Costco under the "Kirkland" brand name. Tri Marine's website describes itself as "a vertically integrated supplier of private label and branded, consumer packaged cans and pouches, and fresh, frozen and Ultra Low Temperature (ULT) seafood products."

---

-4-

AMENDED CLASS ACTION COMPLAINT       CASE NO. 3:15-CV-01878-JLS-MDD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNNAMED CO-CONSPIRATORS

14.   On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

15.   The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

16.   Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

17.   Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

18.   Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

19.   PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who then resell PSPs to consumers. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

1    were estimated to be $2.397 billion in 2012. In one report, Bumble Bee estimated
2    that canned tuna represents 73% of this value. In the same report, Bumble Bee
3    estimated that total United States retail sales of shelf-stable tuna were $1.719 billion
4    in 2011 and were estimated to be $1.750 billion in 2012.

5        20. Defendants are the three largest domestic manufacturers of PSPs. The
6    industry is highly concentrated. According to the aforementioned presentation by
7    Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had
8    18.4% and StarKist had 25.3%. The remaining market share was comprised of
9    smaller companies and private label brands. With respect to shelf-stable tuna,
10   StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In
11   December of 2014, the *Wall Street Journal* reported that the Defendants' respective
12   shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble
13   Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic
14   canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%
15   and CoS at 20%.

16       21. This oligopolistic structure within the industry is the result of recent
17   mergers and acquisitions. For example, in 1997, Van Camp Seafood Company
18   ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of
19   which TUF was a member. Thereafter, TUF bought out the other investors to
20   acquire Van Camp completely, which it renamed Chicken of the Sea International,
21   an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon
22   acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF
23   bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the
24   United States. And in December of 2014, TUF announced the acquisition from
25   Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The
26   combination of CoS and Bumble Bee would have created a virtual duopoly, with
27   the combined entity substantially exceeding the market share of StarKist. TUF had
28

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

22. On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

23. The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

24.   Based on these statements, it appears that the DOJ's investigation extends to the entire domestic PSP sector.  On October 13, 2015, it was publicly reported that defendants StarKist and Tri Marine had also received subpoenas in connection with the DOI investigation.  *See* "Chicken of the Sea applies for leniency in DOJ packaged seafood probe," mLex (Oct. 13, 2015).

25.   The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

26.   On October 14, 2015, it was also reported that CoS and/or its parent company, Thai Union, had applied for leniency under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (15 U.S.C. §1, note) ("ACPERA"). The source reported:  "It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered.  Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come

forward and admit to cartel violations. [¶] It is likely that Chicken of the Sea is seeking so-called 'Type B' leniency, in which the DOJ uncovers wrongdoing first and then uses a company's cooperation to build out its case."

27. The significance of CoS seeking Type B leniency is explained in one of the DOJ's web pages (http://www.justice.gov/atr/frequently-asked-questionsregarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

28. Plaintiff, therefore, alleges on information and belief that Tri-Union has confessed its participation in the conspiracy alleged herein and that CoS, StarKist and Tri Marine participated in it.

29. There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

30.  Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



31.  Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen.

The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



32.    One method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices. Beginning in August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans. The can size change was largely completed in January of 2009 and is reflected in the steep climb of prices depicted on the foregoing chart. This was portrayed as a response to rising prices, but it could only have been achieved if Bumble Bee, CoS, and StarKist all agreed to it beforehand.

33.    Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the

AMENDED CLASS ACTION COMPLAINT                CASE NO. 3:15-CV-01878-JLS-MDD

beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

34. TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added).

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon *"[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added). The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the

AMENDED CLASS ACTION COMPLAINT      CASE NO. 3:15-CV-01878-JLS-MDD

individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

35.   There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

36.   An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

37.   Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

38.   The interlocking relationship between Defendants is also demonstrated

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

by the movement of executives among the companies. For example, in October 2011, John Engle, former VP of marketing for Bumble Bee, replaced Bob Montano as president of King Oscar's United States operations. Similarly, in July 2014, Brett Butler, the former Plant Manager of StarKist's plant in American Samoa, left the company to join Bumble Bee in August 2014, and relocated to Bumble Bee's San Diego headquarters, where Tri-Union is also based. It was only a few months later, in December 2014, that the proposed acquisition of Bumble Bee by Tri-Union's parent company was announced. And, in March 2015, former Starkist CEO Don Binotto joined Tri Marine to head up its retail brand. Such movement of executives suggests further opportunities for collusion among all three companies.

39. A further opportunity to collude arose in October 2011, when Defendants Bumble Bee, Tri-Union, and StarKist jointly prepared and submitted, on joint letterhead with the logos of all three companies, a petition to the Food and Drug Administration ("FDA") to amend certain FDA regulations governing the standard of fill and forms of pack for canned tuna. The following is an excerpt from the first page of the petition, showing the three companies' joint letterhead with their logos:

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

 

October 17, 2011

**BY HAND**

Division of Dockets Management
Food and Drug Administration
Department of Health & Human Services
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**CITIZENS PETITION**

40. In the same month, these Defendants also jointly applied to the FDA for a temporary marketing permit to test-market canned tuna that deviates from the standard of fill and forms of pack required by certain FDA regulations, claiming that existing regulations are "obsolete" and that the proposed deviations would "provide[] a canned tuna product that is more appealing to consumers." On information and belief, the joint application and petition could not have been prepared absent numerous communications among Defendants concerning PSPs, the market for PSPs, production volumes of PSPs, and the impact of the proposed changes on production costs and therefore pricing for PSPs.

41. Yet another opportunity to conspire arose in February 2014, when Defendants Bumble Bee and StarKist entered into a "joint defense, common interest and confidentiality agreement," in which they stated that "it may be useful and in their best interests to exchange certain information" and "to cooperate" with each other concerning certain pending litigation involving canned tuna:

-15-

**JOINT DEFENSE, COMMON INTEREST
AND CONFIDENTIALITY AGREEMENT**

This Joint Defense, Common Interest and Confidentiality Agreement (the "Agreement"), made as of this 28 day of February 2014, is entered into by the undersigned counsel acting on behalf of their respective clients, StarKist Co. and Bumble Bee Foods, LLC (collectively the "Parties"), with their full knowledge, consent and authority to execute the Agreement on their behalf.

42.　Tri Marine, which dealt with and/or partnered with Bumble Bee, CoS and StarKist through this period, provided an excellent conduit for the exchange of price information. On its website, Tri Marine highlighted its "market intelligence," saying that it "maintains commercial relationships with the major decision makers in the tuna industry. We use our access to industry leaders to understand the dynamics of the tuna market and the changing needs of boat owners, processors and brands." According to its own website, Tri Marine "works closely" with "partners" like CoS and StarKist. Tri Marine's president, Renato Curto, is quoted as saying that "we are all going to have to cooperate with one another more than we ever have. In fact, I see no other issue as being more immediately important to us here today. Cooperation is vital to our industry."

## FRAUDULENT CONCEALMENT AND TOLLING

43.　Plaintiff and members of the Classes did not discover and could not discover through the exercise of reasonable diligence the existence of the combination and conspiracy alleged herein until shortly before this litigation commenced.

44.　As indirect purchasers of PSPs manufactured by defendants, Plaintiffs and the members of the Classes had no direct contact or interaction with Defendants, and therefore no means from which they could have discovered the

-16-

AMENDED CLASS ACTION COMPLAINT　　　　CASE NO. 3:15-CV-01878-JLS-MDD

1    combination and conspiracy alleged in this Complaint until shortly before the

2    lawsuit was filed.

3        45.    It was not until approximately July 23, 2015, that information first

4    became publicly available that Defendants engaged in the combination and

5    conspiracy alleged herein.  That is when the DOJ's ongoing investigation and grand

6    jury subpoenas described above were first publicly disclosed, and when TUF

7    announced that it was suspending its preferential public offering because of the

8    pending investigation.  Prior to that date, Plaintiffs and members of the Classes had

9    no reason to suspect that any combination or conspiracy had been formed.

10       46.    By their very nature, price-fixing conspiracies tend to be inherently

11   self-concealing.  Plaintiff is informed and believes that Defendants agreed among

12   themselves to conceal their unlawful conspiracy, including by agreeing not to

13   discuss the conspiracy publicly and by other means of avoiding detection and

14   maintaining secrecy.  Accordingly, a reasonable person under the circumstances

15   would not have been alerted to any irregularity with regard to PSP prices before late

16   July 2015 at the earliest, and Plaintiff and members of the Classes could not have

17   discovered the alleged contract, conspiracy, or combination at an earlier date by the

18   exercise of reasonable diligence.

19       47.    On September 1 and 3, 2015, Plaintiff, through her counsel, wrote to

20   StarKist, Bumble Bee, and CoS, through their counsel, requesting information on

21   whether each was a DOJ amnesty applicant, and asking for detailed information

22   concerning each defendant's knowledge of the conspiracy, and for all records

23   relating to the conspiracy.  On September 21, 2015, Plaintiff, through her counsel,

24   communicated by email with counsel for Bumble Bee, CoS and StarKist, noting

25   their failure to respond to Plaintiff's counsel's prior correspondence.  Through this

26   date, Bumble Bee, CoS and StarKist, have refused to provide any form of

27   substantive response, despite follow-up efforts by Plaintiff's counsel.  Counsel for

28

-17-

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

CoS, in particular, specifically indicated in an email dated September 21, 2015 that his client would "not be providing a substantive response to the letter sent on September 3, 2015.

48.     On October 13, 2015, counsel for CoS indicated, in response to further follow-up efforts in the wake of reports that CoS is the "Type B" amnesty applicant with the DOJ, that his client's position "has not changed."

49.   As a result of the Discovery Rule and Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

50.   Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

51.   Plaintiff also brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "California Indirect Purchaser Class"):

> All persons and entities that indirectly purchased packaged seafood products within California from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2005 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

-18-

52.  Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

53.  There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

a.  Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

b.  Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

c.  The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d.  Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

e.  Whether Defendants violated the California Cartwright Act;

f.  Whether Defendants violated the California Unfair Competition Law;

g.  Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

h.  Whether, and to what extent, the conduct of Defendants caused

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

        i.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act, the Cartwright Act, and/or the Unfair Competition Law.

54.  Plaintiff's claims are typical of the claims of the members of the Class.

55.  Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

56.  Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

57.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

58.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

        a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

        b.      The Class is readily definable and one for which records should exist in the files of Defendants.

        c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

        d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

AMENDED CLASS ACTION COMPLAINT        CASE NO. 3:15-CV-01878-JLS-MDD

e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

59.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## <u>COUNT I</u>

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(On Behalf of Plaintiff and the Nationwide Class)**

60.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

61.  Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

62.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

63.  In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

64.  The illegal contract, combination, or conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiff and members of the Class have been deprived of free

-21-

AMENDED CLASS ACTION COMPLAINT         CASE NO. 3:15-CV-01878-JLS-MDD

and open competition in the purchase of PSPs;

        c.    Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

        d.    Competition in the sale of PSPs has been restrained, suppressed or eliminated.

65. During the Class Period, Plaintiff and the other members of the Nationwide Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.

66. Defendants' conduct, combination or conspiracy alleged herein is a *per se* violation of section 1 of the Sherman Act, and is ongoing and will continue unless enjoined by the Court.

67. Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Plaintiff and the other members of the Nationwide Class are entitled to equitable and injunctive relief.

## COUNT II

### Violation of the California Cartwright Act
### (Cal. Bus. & Prof. Code §§16700 et seq.)
### (On Behalf of Plaintiff and the California Indirect Purchaser Class)

68. Plaintiff incorporates by reference each paragraph set forth above.

69. The contract, combination, or conspiracy alleged above violates the Cartwright Act, Cal. Bus. & Prof. Code sections 16700 *et seq.*, which prohibits, *inter alia*, any "combination of capital, skill or acts by two or more persons" for the purpose of creating or carrying out any restrictions in trade or commerce, or to "fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise,

-22-

produce or commerce intended for sale, barter, use or consumption in this State."

70.     During the Class Period, Plaintiff and the other members of the California Indirect Purchaser Class purchased PSPs indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of Defendants' contract, combination or conspiracy alleged above, paid more for such products than they would have paid in the absence of such conduct.  As a result, Plaintiff and the other members of the California Indirect Purchaser Class have sustained damages in an amount to be determined at trial.

## COUNT III

### Violation of the California Unfair Competition Law
### (Cal. Bus. & Prof. Code §§17200 et seq.)

### (On Behalf of Plaintiff and the California Indirect Purchaser Class)

71.     Plaintiff incorporates by reference each paragraph set forth above.

72.     The contract, combination and conspiracy alleged above constitutes unfair competition as defined in Cal. Business and Professions Code sections 17200 et seq., as follows:

73.     Defendants' conduct constitutes "unlawful" conduct because it violates section 1 of the Sherman Act and because it violates the California Cartwright Act.

74.     Defendants' conduct constitutes "unfair" conduct because (i) the gravity of the harm caused to Plaintiff and members of the California Indirect Purchaser Class outweighs any purported utility of the conduct and/or because the conduct is immoral, unethical, oppressive, and unscrupulous; (ii) the injury to Plaintiff and members of the California Indirect Purchaser Class is substantial, the injury is not outweighed by any countervailing benefits to consumers or competition, and the injury could not reasonably have been avoided by Plaintiff or class members themselves; and/or (iii) the conduct violates the legislatively-declared spirit and purpose of the California antitrust laws and has had an actual or threatened impact on competition.

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

75. As a result of Defendants' unfair competition, Plaintiff and members of the California Indirect Purchaser Class have suffered injury and fact and lost money or property in that they paid more for PSPs than they would have in the absence of Defendants' unfair competition.

76. Plaintiff and members of the California Indirect Purchaser Class are therefore entitled to injunctive relief and restitution from Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the California Cartwright Act;

C.     That the Court adjudge and decree that the contract, combination or conspiracy alleged herein is "unlawful" and/or "unfair" within the meaning of the California Unfair Competition Law;

D.     That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

E.     That the Court award Plaintiff and the Class treble damages;

F.     That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.     That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on

AMENDED CLASS ACTION COMPLAINT            CASE NO. 3:15-CV-01878-JLS-MDD

behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

H.    That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

DATED:  October 15, 2015

By:       _/s/  Kimberly A. Kralowec_____
          Kimberly A. Kralowec (Cal. Bar No. 163158)
          Kathleen Styles Rogers (Cal. Bar No. 122852)
          Chad A. Saunders (Cal. Bar No. 257810)
          THE KRALOWEC LAW GROUP
          44 Montgomery Street, Suite 1210
          San Francisco, CA 94104
          Telephone:     415-546-6800
          Facsimile:     415-546-6801
          Email:     kkralowec@kraloweclaw.com
                     krogers@kraloweclaw.com
                     csaunders@kraloweclaw.com

          Counsel for Plaintiff Louise Ann Davis Mathews and the Putative Class

AMENDED CLASS ACTION COMPLAINT          CASE NO. 3:15-CV-01878-JLS-MDD

# DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury of all claims so triable.

DATED:  October 15, 2015

By:         */s/  Kimberly A. Kralowec*
             Kimberly A. Kralowec (Cal. Bar No. 163158)
             Kathleen Styles Rogers (Cal. Bar No. 122852)
             Chad A. Saunders (Cal. Bar No. 257810)
             THE KRALOWEC LAW GROUP
             44 Montgomery Street, Suite 1210
             San Francisco, CA 94104
             Telephone:     415-546-6800
             Facsimile:     415-546-6801
             Email:    kkralowec@kraloweclaw.com
                      krogers@kraloweclaw.com
                      csaunders@kraloweclaw.com

             Counsel for Plaintiff Louise Ann Davis Mathews and the Putative Class

AMENDED CLASS ACTION COMPLAINT        CASE NO. 3:15-CV-01878-JLS-MDD

# EXHIBIT E

Case 3:13-cv-00729-HSG   Document 298-1   Filed 04/20/16   Page 115 of 106

**Belinda S. Lee**
Direct Dial: +1.415.395.8851
belinda.lee@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

October 27, 2015

## VIA PDF-EMAIL

Mr. Christopher L. Lebsock (*clebsock@hausfeld.com*)
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

Ms. Barbara Hart
Lowey Dannenberg Cohen & Hart, P.C. (*bhart@lowey.com*)
One North Broadway, Suite 509
White Plains, NY 10601

Ms. Whitney E. Street (*whitney@blockesq.com*)
Block & Leviton LLP
520 3rd Street, Suite 108
Oakland, CA 94607

Ms. Kimberly A. Kralowec (*kkralowec@kraloweclaw.com*)
The Kralowec Law Group
44 Montgomery Street, Suite 1210
San Francisco, CA 94104

    Re:  *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal.)

Dear Counsel:

  This letter responds to Chris Lebsock's letter of October 20, 2015. It is unclear to us whether Mr. Lebsock's letter was sent on behalf of Hausfeld's clients or on behalf of all of your clients. We address this letter to all plaintiffs' counsel who were cc'ed on his letter as we hope to reach a joint resolution to this issue.

  As an initial matter, it is important to correct a misstatement in Mr. Lebsock's October 20th letter. Contrary to the letter, we have not taken the position that your clients must relinquish their objection to the *Hendricks* settlement as a condition precedent to even negotiating an amendment with StarKist. As I said at the beginning of our call on October 19th, StarKist remains willing to negotiate a possible amendment to the scope of the release in *Hendricks*. This is because StarKist would like to avoid any possible delay to the final approval of the *Hendricks* settlement that your threatened objections might cause (and not because it believes antitrust claims should be or were intended to be excluded from the release). As such,

**LATHAM&WATKINS**LLP

and as we advised on October 19th, StarKist is willing to amend the *Hendricks* release in exchange for your clients' agreement not to object to the *Hendricks* settlement. We remain willing to negotiate amended language in order to reach these mutual goals.

Over the last few weeks, we repeatedly requested that Mr. Lebsock and Ms. Kralowec provide us with draft language to amend the *Hendricks* release. We also note that you have represented in recent court filings that your co-counsel (representing PITCO Foods) has already drafted revisions to the *Hendricks* release.[1] Yet, to date, no one has provided us with any proposed language.

Nevertheless, in an effort to move this forward, StarKist proposes the following amendment to the language of Section 6.1 of the *Hendricks* Stipulation of Settlement:

> 6.1 <u>Release by Settlement Class Members</u>. Effective as
>
> of the Final Settlement Approval Date, each and all of the
>
> Settlement Class Members (except any such person who has filed a
>
> proper and timely request for exclusion) shall release and forever
>
> discharge, and shall be forever barred from asserting, instituting, or
>
> maintaining against any or all of the Released Persons, any and all
>
> claims, demands, actions, causes of action, lawsuits, arbitrations,
>
> damages, or liabilities whether legal, equitable, or otherwise,
>
> relating in any way to the claims asserted or the factual allegations
>
> made in the Action, including without limitation the alleged under-
>
> filling of the StarKist Products ~~and/or the purchase of any of the~~
>
> ~~StarKist Products~~ at any time on or after February 19, 2009 and
>
> prior to November 1, 2014 (collectively, the "Claims"). For
>
> avoidance of doubt, this paragraph does not release any Claims

---

[1] *See* Joint Opposition of Olean Wholesale Grocery, PITCO Foods and Beverly Youngblood to Motion to Amend Order Appointing Interim Class Counsel at p. 7, *Trepco Imports and Distribution Ltd. v. Bumble Bee Foods LLC, et al.*, 15-cv-1987-JLS-MDD (S.D. Cal.), ECF No. 24 (filed Oct. 22, 2015).

**LATHAM&WATKINS**LLP

under federal or state antitrust laws, except to the extent any such

Claims under federal or state antitrust laws are based on allegations

of under-filling of StarKist Products, which are released pursuant

to this paragraph. With respect to the Claims released pursuant to

this paragraph, each Settlement Class Member shall be deemed to

have waived and relinquished, to the fullest extent permitted by

law, the provisions, rights and benefits of California Civil Code

section 1542 (and equivalent, comparable, or analogous provisions

of the laws of the United States of America or any state or territory

thereof, or of the common law or civil law). Section 1542 provides

that:

> A GENERAL RELEASE DOES NOT EXTEND
> TO CLAIMS WHICH THE CREDITOR DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MUST HAVE
> MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR.

Each and every term of this paragraph shall inure to the benefit of each

and all of the Released Persons, and each and all of their respective

successors and personal representatives, which persons and entities are

intended to be beneficiaries of this paragraph.

As we told you during our October 19th call, StarKist rejects your request for copies of the voluminous discovery record in *Hendricks*. Although you have omitted this from your October 20th letter, your original request for access to these documents was based on your speculation that your antitrust claims could somehow be related to under-filling. As I conveyed to you previously, we believe this is an improper and premature attempt to obtain discovery for use in the antitrust cases. Further, and as Mr. Lebsock and Ms. Kralowec acknowledged in our prior telephone calls, if we are able to reach agreement on an amendment, your clients' antitrust

**LATHAM & WATKINS** LLP

claims will be excluded from the *Hendricks* release, which eliminates any possible need to review the discovery record in that case.

While your October 20th letter now seeks to cloak this request in a claimed need to evaluate the value of the *Hendricks* settlement, your request for this discovery remains improper. The *Hendricks* litigation was aggressively litigated by competent class counsel, and the settlement was the product of a fair, reasonable and arm's length negotiation. Under such circumstances, courts routinely reject discovery requests by class members. *See, e.g., Jaffe v. Morgan Stanley & Co., Inc.*, No. C 06-3903-TEH, 2008 WL 346417 at *9 (N.D. Cal. Feb. 7, 2008).

Please let us know if our proposed language is acceptable to your clients.

Very truly yours,

Belinda S Lee
of LATHAM & WATKINS LLP

cc:    Via PDF email
       Mr. Robert Hawk  *(robert.hawk@hoganlovells.com)*
       Mr. Scott A. Bursor  *(scott@bursor.com)*
       Mr. L. Timothy Fisher  *(ltfisher@bursor.com)*

# EXHIBIT F



November 6, 2015

<u>VIA ELECTRONIC DELIVERY</u>

Belinda S. Lee
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Email: belinda.lee@lw.com

Re:     *Hendricks v. Starkist Co*., Case No. 3:13-cv-0729-HSG; and

        *Mathews v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-1878
        BAS-RBB; *Moore v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-
        01911-DMS-NLS; and related actions

Dear Belinda:

        I write to follow up on our telephone conversations in September and October concerning
the overbroad release in the Stipulation of Settlement in the *Hendricks* class action.  This will
also respond to your letter of October 27, 2015, and the proposal made therein.

        We have reviewed the proposed revisions to the release language set forth in your
October 27 letter and do not believe that they provide adequate protection to our clients or the
putative classes we seek to represent in the above-referenced matters.  Attached please find our
proposed Amendment to the Stipulation of Settlement.  The Amendment would modify the
release language by carving out the conspiracy claims alleged in the *Mathews*, *Moore*, and
related actions (the *"Seafood Antitrust Cases"*) referenced above.

        The proposed revisions included in your October 27 letter are insufficient in several
respects.  For example, the reference to "federal and state antitrust laws" in your proposal is too
narrow.  As you know, many indirect purchaser claims asserted in the *Seafood Antitrust Cases*
are based on state unfair competition laws and consumer protection statutes.  In addition, the
further exception language you propose regarding "under-filling" would appear to expressly
release claims that StarKist conspired with other packaged seafood makers to under-fill products.
We have seen no indication that the *Hendricks* case litigated the issue of packaged seafood
makers' potential concerted action on or related to under-filling, and whether such conduct
occurred should be addressed in the *Seafood Antitrust Cases*.  The fact that StarKist is now
seeking to expand its release to expressly cover certain antitrust claims is a significant concern.



Belinda S. Lee
November 6, 2015
Page 2

We have previously requested, and we believe we are entitled to, production of the discovery record in *Hendricks*, including copies of briefs and declarations without the heavy redactions that appear in the public record (collectively, the "*Hendricks* discovery record"). At your request, we reviewed and evaluated the Amended Stipulated Protective Order entered by Judge Gonzalez Rogers in *Hendricks* (Dkt. No. 71). We advised you that we would agree to be bound by its terms. As I understand it, your client is now unwilling to allow us access to any part of the *Hendricks* discovery record—even though we have agreed to be bound by the Protective Order that Judge Gonzalez Rogers found sufficient to protect your client's interests.

To resolve this impasse, we will agree not to pursue production of the *Hendricks* discovery record in *Hendricks* itself (although we reserve the right to seek it in the *Seafood Antitrust Cases*) if, in return, your client executes the attached Amendment to Stipulation of Settlement substantially as drafted. If the Amendment is executed by all parties before November 20, 2015, we will forego filing a formal objection to the *Hendricks* settlement.

The objection that we would interpose in *Hendricks* would raise the significant and meritorious point that the settlement provides no consideration for the antitrust and associated claims alleged in the *Seafood Antitrust Cases*, yet the release purports to extinguish "all claims … relating in any way to … the purchase of any of the StarKist Products [*i.e.*, 5-oz. cans of tuna] at any time on or after February 19, 2009 and prior to November 1, 2014." *Hendricks* Stip. of Settlement, ¶6.1. While we reserve the right to argue that the release is not intended to encompass antitrust claims that appear nowhere in the operative *Hendricks* complaint, and that are mentioned nowhere in the Stipulation of Settlement or in the approval motion papers, the release language is grossly, and unnecessarily, overbroad.

The original Stipulation of Settlement was signed on or about May 13, 2015. This was two months before the first public reports emerged, on July 23, 2015, of the DOJ's investigation of a conspiracy between your client and its competitors, including Bumble Bee and Tri Union. The Stipulation could not have provided any compensation for injuries resulting from a conspiracy that remained hidden from the public until the latter date. Hence, the Stipulation should not release claims for such injuries.

Just last Friday, class counsel in *Hendricks* filed a declaration indicating that the $12 million nationwide settlement will result in an estimated net payout of $2.11 to each cash claimant or $4.68 per voucher claimant—a figure that will likely decrease, because it accounts only for claims received through October 26, 2015. *Hendricks* class counsel states that these



Belinda S. Lee
November 6, 2015
Page 3

amounts are fair, adequate and reasonable because the tuna cans were under-filled by "between 4.5% to 16.7%, resulting in damages of 3.87 cents to 14.3 cents per can."

As class counsel's explanation makes clear, the settlement provides *no consideration* for injuries caused by the conspiracy asserted in the *Seafood Antitrust Cases*. The settlement's purpose is to compensate class members for the tuna they did not receive in the cans they purchased. But we know now that the class members were doubly harmed when they purchased those same cans: first, they received less tuna in the cans than they should have; and, second, as the result of an unlawful conspiracy between competitors, they paid a supra-competitive price for the cans. According to *Hendricks* class counsel, the settlement provides compensation only for the former injury.

We believe that the Court will sustain our anticipated objections to the *Hendricks* settlement if we are forced to assert them, and that final approval will not be granted unless the conspiracy claims are explicitly carved out of the release.

Please contact me at your earliest convenience concerning whether the language of our proposed Amendment to the Stipulation of Settlement is acceptable to your client. We are willing to consider revisions, but the scope of the carve-out must remain broad enough to encompass all potential conspiracies between your client and its competitors. If we are unable to agree on carve-out language, then we will take all necessary actions to protect our clients' interests, which may include moving to intervene in *Hendricks*, filing objections to the *Hendricks* settlement, seeking production of the *Hendricks* discovery record, and/or moving to unseal the documents filed under seal or redacted in *Hendricks*.

I look forward to hearing from you.

Sincerely,

*/s/ Kimberly A. Kralowec*

Kimberly A. Kralowec

Enclosure

cc:    Kathleen Styles Rogers, Esq.
       Christopher T. Micheletti, Esq.
       Marvin A. Miller, Esq.
       Christopher L. Lebsock, Esq.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | Case No. 3:13-CV-0729-HSG<br><br>**AMENDMENT TO STIPULATION OF SETTLEMENT** |

The Stipulation of Settlement filed on May 14, 2015 (hereafter "Stipulation") is hereby amended to add the following provisions immediately after paragraph 8.11:

## IX.     ANTITRUST CARVE-OUT

9.1     Notwithstanding and expressly superseding the release language contained in the Stipulation, including paragraph 6.1 of the Stipulation, any and all claims concerning or related in any way to any allegations that any of the Released Persons (defined in paragraph 1.21 of the Stipulation) tacitly or explicitly agreed with Bumble Bee Foods LLC, Tri-Union Seafoods LLC, King Oscar, Inc., Tri Marine International, Inc., and/or their respective past and present parents, subsidiaries, divisions, affiliates, persons and entities directly or indirectly under its or their control in the past or in the present, or any other manufacturer or supplier of Packaged Seafood Products,[1] the purpose or effect of which was to fix, maintain, control, raise, and/or stabilize the prices and/or supply of, or to under-fill or decrease the can size of, any StarKist Products (defined in paragraph 1.30 of the Stipulation), or concealed or misrepresented any facts concerning the price of the StarKist Products, or otherwise restrained trade or impaired competition in any way as to the StarKist Products (the "Carved-Out Claims"), shall be expressly excluded from the limitations, waivers and releases contained in the Stipulation.

9.2     The term "Carved-Out Claims" shall include all claims that have been asserted or will be asserted in any complaints filed in any of the actions listed in Exhibit A hereto, and in any later-filed actions that are deemed related to any of those actions ("Antitrust Actions").

9.3     No Settlement Class Member shall be deemed to have released, waived, relinquished or compromised any Carved-Out Claims, and No Settlement Class Member shall be barred from asserting the Carved-Out Claims against the Released Persons, regardless of whether the Settlement Class Member submits a claim for a cash payment or voucher pursuant to paragraph 2.4 of the Stipulation, and regardless of whether the Settlement Class Member receives a cash payment from the Cash Settlement Fund or receives or redeems a voucher from the Voucher Settlement Fund.  Because the Antitrust Actions seek relief for different wrongful

---

[1]     "Packaged Seafood Products" is defined as shelf-stable seafood products that are sold in cans, pouches, or ready-to-eat serving packages, and includes the StarKist Products (defined in paragraph 1.30 of the Stipulation).

conduct and for different injuries than those asserted in the Action and encompassed by the Stipulation, any awards granted under the Stipulation, whether from the Cash Settlement Fund or the Voucher Settlement Fund, shall not be used to defend against, reduce, or diminish any amount of damages, restitution or other monetary or injunctive or declaratory relief that may be sought or awarded in the Antitrust Actions.

9.4     If any ambiguities or contradictions are found between the language in the Stipulation and in this Amendment, this Amendment shall govern.

[insert signature blocks]

1

**<u>EXHIBIT A</u>**

2

[insert list of cases]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

**Belinda S Lee**
Direct Dial: +1.415.395.8851
belinda.lee@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

November 13, 2015

**VIA PDF-EMAIL**

Ms. Kimberly A. Kralowec
*kkralowec@kraloweclaw.com*
The Kralowec Law Group
44 Montgomery Street, Suite 1210
San Francisco, CA 94104

Re:     *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal.); and

   *Mathews v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-1878-BAS-RBB; *Moore v. Bumble Bee Foods LLC, et al.*, S.D. Cal. Case No. 3:15-cv-01911-DMS-NLS; and related actions

Dear Ms. Kralowec:

   This letter responds to your letter dated November 6, 2015.

   We understand you to have raised two issues about the amended release language proposed in our October 27, 2015 letter:  (1) that our reference to "federal and state antitrust laws" is too narrow and does not include state unfair competition and consumer protection laws; and (2) releasing all claims related to under-filling would be too broad.

   On your first issue, we can agree to modify the language in the amended release to reference "federal antitrust, state antitrust, state unfair competition, and state consumer protection laws."  We trust this resolves your first issue.  For ease of reference, I have included a revised version of Section 6.1 in an Annex to this letter.

   However, your second issue (rejecting any clarification that the settlement releases *all* claims based on allegations of under-filling) misses the point of the *Hendricks* settlement.  It cannot be disputed that the *Hendricks* case relates to the alleged under-filling of the StarKist Products.  Through this settlement, StarKist is making a substantial $12 million payment to the *Hendricks* class to resolve all claims (known and unknown) relating to the alleged under-filling of the StarKist Products.  Your own letter asserts that "[t]he settlement's purpose is to compensate class members for the tuna they did not receive in the cans they purchased."

   As you know, the *Hendricks* class asserted violations of California's unfair competition law and several California consumer protection laws.  To exclude federal antitrust, state antitrust, state unfair competition, and state consumer protection claims based on alleged under-filling

Case 4:13-cv-00729-HSG   Document 363-1   Filed 04/20/16   Page 129 of 142
Case 3:13-cv-00729-HSG   Document 293-1   Filed 11/20/15   Page 99 of 106
November 13, 2015
Page 2

**LATHAM & WATKINS** LLP

from the scope of the *Hendricks* release, as you suggest, would result in an incomplete release from the claims in the *Hendricks* case.  For these reasons, the draft Amendment attached to your November 6th letter is far too broad.

StarKist remains willing to proceed with a release as described above and stated in the attached Annex.  We would like to schedule a call with you on November 16, 2015 to discuss this issue.  Please advise us as to your availability.

Very truly yours,

Belinda S Lee
of LATHAM & WATKINS LLP

cc:     Via PDF email
        Mr. Christopher L. Lebsock *(clebsock@hausfeld.com)*
        Ms. Barbara Hart  *(bhart@lowey.com)*
        Ms. Whitney E. Street *(whitney@blockesq.com)*
        Mr. Robert Hawk  *(robert.hawk@hoganlovells.com)*
        Mr. Scott A. Bursor  *(scott@bursor.com)*
        Mr. L. Timothy Fisher  *(ltfisher@bursor.com)*

LATHAM&WATKINS LLP

## ANNEX – REVISED AMENDED SECTION 6.1

6.1   <u>Release by Settlement Class Members</u>. Effective as of the Final Settlement Approval Date, each and all of the Settlement Class Members (except any such person who has filed a proper and timely request for exclusion) shall release and forever discharge, and shall be forever barred from asserting, instituting, or maintaining against any or all of the Released Persons, any and all claims, demands, actions, causes of action, lawsuits, arbitrations, damages, or liabilities whether legal, equitable, or otherwise, relating in any way to the claims asserted or the factual allegations made in the Action, including without limitation the alleged under-filling of the StarKist Products ~~and/or the purchase of any of the StarKist Products~~ at any time on or after February 19, 2009 and prior to November 1, 2014 (collectively, the "Claims"). For avoidance of doubt, this paragraph does not release any Claims under federal antitrust, state antitrust, state unfair competition or state consumer protection laws, except to the extent any such Claims under federal antitrust, state antitrust, state unfair competition or state consumer protection laws are based on allegations of under-filling of StarKist Products, which are released pursuant to this paragraph. With respect to the Claims released pursuant to this paragraph, each Settlement Class Member shall be deemed to have waived and relinquished, to the fullest

Christopher S. Casborn
November 13, 2015
Page 4

**LATHAM&WATKINS**LLP

extent permitted by law, the provisions, rights and benefits of

California Civil Code section 1542 (and equivalent, comparable, or

analogous provisions of the laws of the United States of America

or any state or territory thereof, or of the common law or civil

law). Section 1542 provides that:

> A GENERAL RELEASE DOES NOT EXTEND
> TO CLAIMS WHICH THE CREDITOR DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MUST HAVE
> MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR.

Each and every term of this paragraph shall inure to the benefit of each

and all of the Released Persons, and each and all of their respective

successors and personal representatives, which persons and entities are

intended to be beneficiaries of this paragraph.

# EXHIBIT H

**Kimberly A. Kralowec**

| | |
|---|---|
| **From:** | Kimberly A. Kralowec |
| **Sent:** | Monday, November 16, 2015 3:37 PM |
| **To:** | 'CIRILLE.DUFF@LW.com' |
| **Cc:** | clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; BELINDA.LEE@lw.com; Christopher T. Micheletti (CMicheletti@zelle.com); Kathleen S. Rogers; Taylor Asen (tasen@cuneolaw.com); Jon Cuneo |
| **Subject:** | RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.) |
| **Attachments:** | 151116 Hendricks release language.docx |

Dear Belinda,

As discussed during today's telephone conference, attached please find revised language for the antitrust carve-out.  Our revised language addresses: (a) the concern stated in your letter that the release language be tied to tuna not received in the purchased cans, and (b) our concern that conspiracy claims, for which the settlement provides no consideration of any kind, are not released.

These edits would need to be incorporated into a separate Amendment to Stipulation of Settlement Agreement, signed by all parties, in a format similar to the one circulated with my last letter.

Please review, discuss with your client, and get back to us with any comments on the proposed language.  I hope we are able to resolve this matter short of submitting formal objections.

Kim

**Kimberly A. Kralowec** | Principal
kkralowec@kraloweclaw.com



The Kralowec Law Group
Tel: (415) 546-6800
Fax: (415) 546-6801
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
www.kraloweclaw.com

The UCL Practitioner
www.uclpractitioner.com

---

**From:** CIRILLE.DUFF@LW.com [mailto:CIRILLE.DUFF@LW.com]
**Sent:** Friday, November 13, 2015 3:26 PM
**To:** Kimberly A. Kralowec
**Cc:** clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; BELINDA.LEE@lw.com
**Subject:** Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.)

Dear Ms. Kralowec:

... including without limitation the alleged under-filling of the StarKist Products ~~and/or the purchase of any of the StarKist Products~~ at any time on or after February 19, 2009 and prior to November 1, 2014 (collectively, the "Claims").  For avoidance of doubt, this paragraph does not release any Claims under federal antitrust, state antitrust, state unfair competition, state consumer protection, <u>or state unjust enrichment laws</u>, except to the extent any such Claims under federal antitrust, state antitrust, state unfair competition, state consumer protection, <u>or state unjust enrichment laws seek redress for not receiving the correct quantity of tuna in the Starkist Products based on allegations of StartKist's unilateral (as opposed to concerted or conspiratorial) under-filling of Starkist Products</u>, which are released pursuant to this paragraph.  ....

# EXHIBIT I

## Kimberly A. Kralowec

| | |
|---|---|
| **From:** | BELINDA.LEE@lw.com |
| **Sent:** | Thursday, November 19, 2015 11:03 AM |
| **To:** | Kimberly A. Kralowec; CIRILLE.DUFF@LW.com |
| **Cc:** | clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; CMicheletti@zelle.com; Kathleen S. Rogers; tasen@cuneolaw.com; JonC@cuneolaw.com; Ashley.Bauer@lw.com |
| **Subject:** | RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.) |

Dear Kim,

Thank you for your proposal, but StarKist cannot agree to your proposed language, which we believe still does not address the concerns explained in my letter from last week.

I am in a deposition today and tomorrow, but I can find some time to step out and speak with you either this afternoon or tomorrow if you think that would be helpful to you or your co-counsel. I have also cc'ed my partner Ashley Bauer if you need to speak to someone sooner than that.

Thanks,
Belinda.

---

**From:** Kimberly A. Kralowec [mailto:kkralowec@kraloweclaw.com]
**Sent:** Thursday, November 19, 2015 9:57 AM
**To:** Duff, Cirille (SF)
**Cc:** clebsock@hausfeld.com; bhart@lowey.com; whitney@blockesq.com; robert.hawk@hoganlovells.com; scott@bursor.com; ltfisher@bursor.com; Lee, Belinda (SF); Christopher T. Micheletti (CMicheletti@zelle.com); Kathleen S. Rogers; Taylor Asen (tasen@cuneolaw.com); Jon Cuneo
**Subject:** RE: Hendricks v. StarKist Co., Case No. 3:13-cv-0729-HSG (N.D. Cal.)

Hi Belinda, please get back to us on whether our proposed language is acceptable to your client.

Thanks,
Kim

**Kimberly A. Kralowec** | Principal
kkralowec@kraloweclaw.com



The Kralowec Law Group
Tel: (415) 546-6800
Fax: (415) 546-6801
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
www.kraloweclaw.com

The UCL Practitioner
www.uclpractitioner.com

1

# EXHIBIT 3

| Professional | Rate | Rank | Year of Admission | Firm |
|---|---|---|---|---|
| Christopher Micheletti | $800* | P | 1988 | Zelle Hofmann Voelbel & Mason LLP |
| Kelly M. Dermody | $725 | P | 1993 | Lieff Cabraser Heimann & Bernstein |
| Daniel Feinberg | $725 | P | 1988 | Lewis, Feinberg, Lee, Renaker & Jackson |
| Daniel Warshaw | $685# | P | 1996 | Pearson, Simon, Warshaw & Penny LLP |
| Judith Zahid | $660* | P | 2001 | Zelle Hofmann Voelbel & Mason LLP |
| Aaron Sheanin | $660# | OC | 2001 | Pearson, Simon, Warshaw & Penny LLP |
| Jonathan Watkins | $660# | OC | 1998 | Pearson, Simon, Warshaw & Penny LLP |
| Jill M. Manning | $660* | OC | 1995 | Steyer Lowenthal Boodrookas Alvarez & SmithLLP |
| Michael S. Christian | $650* | OC | 2001 | Zelle Hofmann Voelbel & Mason LLP |
| Christopher Lebsock | $650# | P | 1996 | Hausfeld LLP |
| Susan Kupfer | $650* | P | 1989 | Glancy Binkow & Goldberg LLP |
| Jonathan K. Levine | $645# | P | 2002 | Girard Gibbs LLP |
| Rachel Geman | $625 | P | 2003 | Lieff Cabraser Heimann & Bernstein |
| Steven M. Tindall | $625 | P | 1996 | Rukin Hyland Doria & Tindall |
| Robert Gralewski | $600* | OC | 1998 | Kirby McInerney LLP |
| Lori Andrus | $575* | P | 1999 | Andrus Anderson LLP |
| Esther Klisura | $570# | A | 2002 | Pearson, Simon, Warshaw & Penny LLP |
| Todd Seaver | $565# | P | 2010 | Berman DeValerio |
| Jahan Sagafi | $550 | P | 1998 | Lieff Cabraser Heimann & Bernstein |
| Qianwei Fu | $540* | SA | 2006 | Zelle Hofmann Voelbel & Mason LLP |
| Daniel Hutchinson | $525 | P | 2005 | Lieff Cabraser Heimann & Bernstein |

| Professional | Rate | Rank | Year of Admission | Firm |
|---|---|---|---|---|
| Bobby Pouya | $475# | A | 2006 | Pearson, Simon, Warshaw & Penny LLP |
| Arthur N. Bailey Jr. | $460# | P | 2007 | Hausfeld LLP |
| Heather T. Rankie | $455* | A | 2009 | Zelle Hofmann Voelbel & Mason LLP |
| Veronica Besmer | $450* | A | 2006 | Trump, Alioto, Trump & Prescott LLP |
| David Denison | $425* | A | 2008 | Trump, Alioto, Trump & Prescott LLP |
| Christine Connolly-Sharp | $410# | A | 2006 | Girard Gibbs LLP |
| Daniel Swerdlin | $400* | A | 2006 | Chavez & Gertler LLP |
| Carol Morganstern | $400 | A | 2006 | Rukin Hyland Doria & Tindall |
| Claire Y. Choo | $390# | A | 2007 | Girard Gibbs LLP |
| Janice S. Yi | $380# | A | 2008 | Girard Gibbs LLP |
| Ryan V. Jacobs | $380* | A | 2008 | Steyer Lowenthal Boodrookas Alvarez & SmithLLP |
| Thomas Boardman | $375# | A | 2011 | Pearson, Simon, Warshaw & Penny LLP |
| Angela Perone | $375 | A | 2006 | Rukin Hyland Doria & Tindall |
| Monica Baresh | $375* | PL | | Zelle Hofmann Voelbel & Mason LLP |
| Daniel Balsam | $360* | A | 2008 | Andrus Anderson LLP |
| Dana Wolheim | $350* | A | 2009 | Glancy Binkow & Goldberg LLP |
| Diane Bone | $300# | PL | | Hausfeld LLP |
| Elizabeth A. Schneider | $290* | PL | | Girard Gibbs LLP |
| Ivy Zabala | $290* | PL | | Zelle Hofmann Voelbel & Mason LLP |
| Fiona McDonald | $275# | PL | | Hausfeld LLP |
| Robert Newman | $275* | PL | | Zelle Hofmann Voelbel & Mason LLP |

*Rate as of June 30, 2012

#Rate as of August 31, 2011

# EXHIBIT 4

*O'Bannon v. National Collegiate Athletics Association (NCAA)*, Case No. 4:09-cv-01967-CW (N.D. Cal.)

Billing Rate Table

| Professional | Rate (Year) | Rank | Year of Admission | Firm |
|---|---|---|---|---|
| Michael Lehmann | $935 (2014) | P | 1977 | Hausfeld LLP |
| Daniel Mason | $900 (2014) | P | 1972 | Zelle Hofmann Voelbel & Mason LLP |
| Bruce Simon | $895 (2014) | P | 1982 | Pearson, Simon & Warshaw LLP |
| Allan Steyer | $860 (2014) | P | 1981 | Steyer Lowenthal Boodrookas Alvarez & Smith LLP |
| Clifford Pearson | $835 (2014) | P | 1984 | Pearson, Simon & Warshaw LLP |
| Bonny Sweeney | $800 (2014) | P | 1988 | Robbins Geller Rudman & Dowd LLP |
| D. Scott Macrae | $790 (2014) | OC | 1982 | Steyer Lowenthal Boodrookas Alvarez & Smith LLP |
| Joseph Saveri | $750 (2011) | P | 1987 | Lieff Cabraser Heimann & Bernstein LLP |
| Brian Schwalb | $740 (2014) | P | 1992 | Venable LLP |
| Eric Fastiff | $700 (2014) | P | 1996 | Lieff Cabraser Heimann & Bernstein LLP |
| Athena Hou | $675 (2014) | P | 2001 | Zelle Hofmann Voelbel & Mason LLP |
| Christopher Lebsock | $670 (2014) | P | 1996 | Hausfeld LLP |
| Robert Retana | $660 (2014) | A | 1992 | Pearson, Simon & Warshaw LLP |
| Seth Rosenthal | $655 (2014) | P | 1993 | Venable LLP |
| Jessica Grant | $650 (2014) | A | 1996 | Pearson, Simon & Warshaw LLP |
| Eric Buetzow | $555 (2014) | A | 2007 | Zelle Hofmann Voelbel & Mason LLP |
| Shawn Stuckey | $535 (2014) | A | 2008 | Zelle Hofmann Voelbel & Mason LLP |
| Heather Rankie | $505 (2014) | A | 2009 | Zelle Hofmann Voelbel & Mason LLP |
| Bobby Pouya | $475 (2014) | A | 2007 | Pearson, Simon & Warshaw LLP |
| Jordan Elias | $475 (2011) | A | 2003 | Lieff Cabraser Heimann & Bernstein LLP |
| Carmen Medici | $460 (2014) | A | 2007 | Robbins Geller Rudman & Dowd LLP |
| Marilani Huling | $320 (2014) | PL | | Hausfeld LLP |
| Karen Cook | $295 (2014) | PL | | Robbins Geller Rudman & Dowd LLP |
| Robert Newman | $275 (2014) | PL | | Zelle Hofmann Voelbel & Mason LLP |
| Alan Ruiz | $265 (2012) | PL | | Lieff Cabraser Heimann & Bernstein LLP |